James H.M. Sprayregen, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Adam C. Paul (*pro hac vice* admission pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Foreign Representative

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 15 |
| | ) |
| EDCON HOLDINGS LIMITED, *et al.*, | ) Case No. 16-13475 |
| Debtors in a Foreign Proceeding[1] | ) |
| | ) |
| Debtors. | ) |
| | ) (Joint Administration Requested) |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN**
**PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Mr. Charles Mzwandile Vikisi, in his capacity as the foreign representative

(the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"),

whose reorganization proceedings under South African law currently are pending (the "South

Africa Proceedings"), submits this verified petition (together with the form petitions filed

concurrently herewith, the "Petition") for recognition of the South Africa Proceedings with

---

[1]    The Debtors in these chapter 15 cases are:  Edcon Holdings Limited, Edcon Acquisition Proprietary Limited, Edcon Limited, and Edgars Consolidated Stores Limited.  The location of the Debtors' corporate headquarters and the service address for all of the Debtors is:  Edgardale, 1 Press Avenue, Crown Mines, Johannesburg 2092, South Africa.

respect to each of the Debtors as "foreign main proceedings," and for additional relief, pursuant to sections 105(a), 1507, 1510, 1515, 1517, 1520, and 1521 of title 11 of the United States Code (the "Bankruptcy Code").

In support of the Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Gary Oertel in Support of the Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Oertel Declaration"), and (b) the *Declaration of Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Vikisi Declaration"), each of which is incorporated herein by reference.[2]

### Preliminary Statement

1.      Edcon Holdings Limited and its subsidiaries and affiliates (collectively, "Edcon") are southern Africa's largest non-food retailers.  Edcon has operated for more than 85 years and has expanded to 1,500 stores, including more than 200 stores in eight countries outside of South Africa.  Edcon Holdings Limited and three of its subsidiaries—Edcon Acquisition Proprietary Limited, Edcon Limited, and Edgars Consolidated Stores Limited—are the four Debtors in these chapter 15 cases.

---

[2]   In further support of the Petition, the notices (the "Compromise Notices") requesting a meeting of certain holders of the Debtors' notes and term loans (collectively, the "Compromise Creditors") to consider the Compromises (as defined below), along with the accompanying explanatory statement (the "Explanatory Statement"), each prepared in accordance with section 155 of the Companies Act No. 71 of 2008 (the "Companies Act"), are attached hereto as **Exhibit 1** (collectively, the "Compromise Documents").   The Compromise Documents provide additional details regarding the Debtors and the South Africa Proceedings.

2.      Like many retailers, Edcon has experienced reduced demand for their products as a result of downward pressures on household incomes and consumer confidence.  Meanwhile, the creditworthiness of Edcon's customers has likewise suffered, negatively affecting all segments of its businesses.  These macroeconomic forces are magnified in South Africa—where Edcon generated 88% of its retail sales in fiscal year 2016—by significant social, political, and economic unrest.  Such challenges, combined with the Debtors' significant leverage and corresponding debt service obligations, ultimately resulted in decreased net cash flow, short-term liquidity issues, and the need to consider refinancing and restructuring alternatives.

3.      Since February 2016, the Debtors have engaged their bank lenders, bondholders, and other creditors in comprehensive restructuring negotiations in respect of approximately $2.1 billion[3] in funded debt obligations.  On October 13, 2016, those negotiations culminated with the Debtors' entry into a lock-up agreement with creditors accounting for approximately 80% of the Debtors' funded indebtedness.  The restructuring transactions contemplated under the lock-up agreements provide for, among other things, significantly deleveraging the company through the issuance of new equity and new notes while also raising incremental liquidity pursuant to a rights offering backstopped by certain support parties (collectively, the "Restructuring Transactions").

4.      To implement the Restructuring Transactions, the Debtors commenced the South Africa Proceedings pursuant to section 155 of the Companies Act, which is South Africa's

---

[3]   For purposes of the Petition, except where stated otherwise, all amounts referenced herein are listed in U.S. dollars.  The South African rand has been converted to U.S. dollars using the November 30, 2016 currency exchange rate of 14.081 South African rand per U.S. dollar.

corporate rehabilitation law.[4]    Certain key dates in respect of the South Africa Proceedings include:

| Event | Date |
|---|---|
| Compromise Launch | December 13, 2016 |
| Record Date[5] | December 20 / 29, 2016 |
| Compromise Meetings | December 29, 2016 |
| Sanction Hearing | January 12, 2017 |
| Compromise Effective Date | January 13, 2017 |
| Restructuring Effective Date | January 31, 2017 |

5.    The Debtors commenced these chapter 15 cases to facilitate the fair and efficient administration of the South Africa Proceedings.  Recognition of the South Africa Proceedings will, among other things, ensure that the Restructuring Transactions, as implemented through the South Africa Proceedings, and other legal consequences of the Compromises are respected in the United States.  In addition, entry of an order recognizing the South Africa Proceedings is a condition precedent to consummation of the Restructuring Transactions.  For the reasons set forth herein, the Foreign Representative submits that recognition of the South Africa Proceedings is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

## **Relief Requested**

6.    The Foreign Representative respectfully requests entry of an order (a) granting the Petition and recognizing the South Africa Proceedings as "foreign main proceedings" pursuant to section 1517 of the Bankruptcy Code, (b) recognizing the Foreign Representative as a "foreign

---

[4]    Section 155 of the Companies Act is extensively modeled on section 311 of the previous Companies Act No. 71 of 1973, which in turn was modeled on the English schemes of arrangement.

[5]    Record date for Notes held through Depository Trust Company is December 20, 2016; record date for all other creditors subject to the Compromises is December 29, 2016.

representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code, (c) granting all relief afforded a foreign main proceeding automatically upon recognition pursuant to section 1520 of the Bankruptcy Code, (d) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the South African Proceedings and Restructuring Transactions, any order entered in respect of this Petition, these chapter 15 cases, any further order for additional relief in these chapter 15 cases, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code, and (e) granting such other relief as the Court deems just and proper.[6]  A proposed form of order is attached hereto as **Exhibit A**.

**Jurisdiction and Venue**

7.       The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.   The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with the Petition to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.       These chapter 15 cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of petitions for recognition of the South Africa Proceedings under section 1515 of the Bankruptcy Code.

9.       Venue is proper pursuant to 28 U.S.C. § 1410(1) and (3).  Each of the Debtors has either issued or guaranteed certain bonds that are governed by New York law.  Additionally, the

---

[6]    The Debtors reserve the right to request further relief pursuant to section 1521 of the Bankruptcy Code prior to or at the hearing on the Petition.

Debtors have deposited a retainer with Kirkland & Ellis LLP at Citibank in New York, New York. Each of the Debtors also has funds deposited in a bank account at JP Morgan Chase in New York, New York.

10.    The statutory bases for the relief requested herein are sections 1504, 1510, 1515, 1517, 1520, and 1521 of the Bankruptcy Code.

## **Background**

### I.    **The Debtors' Businesses.**

11.    Operating since 1929, Edcon is southern Africa's leading clothing, footwear, and textiles retailing group. In fiscal year 2016, Edcon reported more than $2.1 billion of revenue. Edcon has expanded its footprint to 1,542 stores as of March 26, 2016, including 213 stores in eight countries outside of South Africa.[7] The total average retail trading space of Edcon's stores was approximately 1.6 million sqm for fiscal year 2016, whereas its key listed peers' space ranged from approximately 372,000 to 683,000 sqm over the same period. As of March 26, 2016, Edcon had more than 44,000 employees, approximately half of which were employed full time.

12.    Historically, Edcon operated under four primary divisions—i.e., Edgars, discount division (Jet and Jet Mart), specialty division (CNA, Boardmans, and Legit), and Edgars Zimbabwe—comprising nine key store chains as well as mono-branded stores throughout southern Africa.

- The Edgars division, which consists of department stores targeted at middle-to-upper-income customers, includes store chains Edgars, Edgars Active, Edgars Shoe Gallery, Boardmans, and Red Square as well as mono-branded stores such as Topshop, Tom Tailor, MAC, Lipsy, Bobbi Brown, Dune, TM Lewin, Salsa, Jigsaw, Calvin Klein, Kiehls, Victoria Secrets Beauty and Accessories, Vince Camuto, River Island, Doc

---

[7]    Those countries are Namibia, Botswana, Lesotho, Swaziland, Mozambique, Ghana, Zimbabwe, and Zambia.

Martens, Jo Malone, and Gosh.  Many of these brands are still relatively new to South Africa and are available on an exclusive basis in the Edgars and mono-branded stores.  The Edgars division accounted for 51.3% of total retail sales in fiscal year 2016.  As of March 26, 2016, Edcon had 559 stores in the Edgars division (including mono-branded stores) and an average retail space of 846,000 sqm.

- The discount division, which consists of discount stores selling value merchandise targeted at lower- to middle-income customers, includes store chains Jet, Legit, and JetMart, and accounted for 38.8% of total retail sales in fiscal year 2016.  As of March 26, 2016, Edcon had 732 stores in the discount division and an average retail space of 642,000 sqm.

- Through the specialty division, Edcon is also a leading retailer of books and magazines in South Africa.  The CNA division accounted for 6.9% of total retail sales in fiscal year 2016.  As of March 26, 2016, Edcon had 198 stores in the CNA division and an average retail space of 79,000 sqm.

- Edcon's business in Zimbabwe, which comprises Edgars and Jet stores, is independently managed and reported as Edgars Zimbabwe, accounting for 3.0% of total retail sales in fiscal year 2016.  As of March 26, 2016, Edcon had 53 stores in the Edgars Zimbabwe division and an average retail space of 40,000 sqm.

As of March 26, 2016, Edcon completed the implementation of a new reporting structure for its operational business divisions, which, commencing with the first quarter 2017, are primarily organized as:  (a) Edgars, which comprises Edgars; (b) discount division, which comprises Jet and Jet Mart; and (c) specialty division, which comprises CNA, Red Square, Boardmans, Edgars Active, Edgars Shoe Gallery, Cellular, and mono-branded stores.

*[Remainder of page intentionally left blank]*

13.     Edcon's popular retail store chains allow it to serve a wide cross-section of South African society.  Retail sales, by category, in fiscal year 2016 follow.



14.     Edcon also offers credit and financial services to their customers via strategic partnerships with Absa (affiliated with Barclays Bank PLC) and Hollard Insurance, respectively. With more than 3.4 million customer credit accounts, Edcon's private label store card program makes it one of the largest providers of credit in southern Africa by number of customers.  Absa underwrites and funds the store card book.   Similarly, Edcon has the largest retail loyalty program in southern Africa—the Thank U rewards program—with over 12 million members.  As part of its financial services platform, Edcon also offers a wide range of insurance products, including home, legal, funeral, hospital cash back, cell phone, and account protection insurance, to its credit customers.  Such policies are underwritten by Hollard Insurance.

## II.   The Debtors' Capital Structure.[8]

15.     The Debtors' capital structure consists of certain revolving loans, term loans, and notes.   Debtors Edcon Limited and Edgars Consolidated Stores Limited are the borrowers in respect of the revolving loans.   Debtors Edcon Limited and Edcon Holdings Limited are borrowers in respect of the term loans.   Finally, Edcon Limited has issued nearly all of the outstanding notes.   Other Debtors have guaranteed the obligations in respect of such funded debt. As of the date hereof (the "Petition Date"), the Debtors' total amount of outstanding funded indebtedness is approximately $2.1 billion.

### A.   The Revolving Loans.

16.     Debtors Edcon Limited and Edgars Consolidated Stores Limited are borrowers under a fully-drawn approximately $250 million super senior credit revolving facility agreement, dated May 25, 2007, with ABSA Bank Limited, as agent, and the lenders party thereto, secured by liens on substantially all of the Debtors' assets, the proceeds of which have been used for working capital purposes (the "RCF Facility Agreement").   The obligations arising under the RCF Facility Agreement are not subject to the Compromises.

### B.   The Term Loans.

17.     The Debtors are obligors under three term loan facilities.   First, Debtors Edcon Limited, Edcon Holdings Limited, and certain of their subsidiaries are party to that certain term loan facility agreement, dated March 28, 2013, as amended and restated, with ABSA Bank Limited, as agent, and the lenders party thereto, having a balance of approximately $238 million as of November 30, 2016 (the "Senior Secured Term Loan Facility").   Second, Debtors Edcon Limited, Edcon Holdings Limited, and certain of their subsidiaries are party to that certain super senior term loan facility agreement, dated November 27, 2015, as amended and restated, with

---

[8]    The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

ABSA Bank Limited, as agent, and the lenders party thereto, having a balance of approximately $42 million as of November 30, 2016 (the "Super Senior Term Loan Facility").  Third, Debtor Edcon Limited and certain of its subsidiaries are party to that super senior liquidity facility agreement, dated July 29, 2015, as amended and restated, with TMF Management (UK) Limited, as agent, and the lenders party thereto, having a balance of approximately $243 million as of November 30, 2016 (the "Super Senior Secured Liquidity Term Loan Facility" and, together with the Senior Secured Term Loan Facility and the Super Senior Term Loan Facility the "Term Loan Facilities").  Each of the Term Loan Facilities is secured by liens on substantially all of the Debtors' assets.  Debtors Edcon Acquisition (Proprietary) Limited and Edgars Consolidated Stores Limited have guaranteed the obligations arising under the Term Loan Facilities.  The obligations arising under the Senior Secured Term Loan Facility are subject to the senior secured compromise (the "Senior Secured Compromise"), and the obligations arising under the Super Senior Term Loan Facility are subject to the super senior compromise (the "Super Senior Compromise").  The obligations under the Super Senior Secured Liquidity Term Loan Facility are not subject to the Compromises.

### C.    The Notes.

18.    Debtor Edcon Limited has three separate issuances of notes:  (a) the 8.00% fixed rate third-ranking super senior notes due June 30, 2019 (the "2019 Super Senior Notes"), issued in three separate series in Euros pursuant to an indenture dated as of July 29, 2015, between Edcon Limited, as issuer, and The Bank of New York Mellon ("BNYM") as trustee, having a balance of approximately €132 million as of November 30, 2016;[9] (b) the 9.750% / 12.750% senior secured PIK-toggle notes due June 30, 2019 (the "2019 Senior Secured Notes") issued in

---

[9]    The Super Senior Term Loan Facility with the 2019 Super Senior Notes constitute the super senior secured class (the "Super Senior Class") in respect of the Super Senior Compromise.

Euros pursuant to an indenture dated as of November 27, 2015, between Edcon Limited, as issuer, and BNYM, as trustee, having a balance of approximately $44 million as of November 30, 2016; (c) the 9.5% fixed rate notes due March 1, 2018 (the "2018 Notes" and, together with the 2019 Super Senior Notes and the 2019 Senior Secured Notes, the "Notes") issued in three separate series in a combination of U.S. dollars and Euros pursuant to an indenture dated as of March 1, 2011, between, Edcon Limited, as issuer, and BNYM, as trustee, having a balance of approximately €702 million and $284 million as of November 30, 2016.[10]

19.    On November 28, 2016, GLAS Trust Corporation Limited succeeded BNYM as indenture trustee for the Notes.  The Notes are held in global form though Euroclear Bank SA/NV and Clearstream Banking, *société anonyme*, other than the U.S. dollar-denominated 2018 Notes sold pursuant to Rule 144A under the U.S. Securities Act of 1933, as amended, which are held in global form through the Depository Trust Company.

20.    Each series of Notes constitutes a senior obligation of the Debtor Edcon Limited, ranking *pari passu* amongst each other and senior to any obligation of the Debtor Edcon Limited that is expressly subordinated to the Notes.  Each series of the Notes is guaranteed on a senior basis by the Debtors Edcon Holdings Limited, Edcon Acquisition Proprietary Limited, and Edgars Consolidated Stores Limited.  The obligations of Debtor Edcon Limited under the Notes are secured by the same collateral that also secures the obligations of Debtor Edcon Limited under the RCF Facility Agreement and the Term Loan Facilities.  However, pursuant to the terms of that certain intercreditor deed dated May 25, 2007 (the "Intercreditor Agreement"), in the event of an enforcement of the security interests over the collateral, the proceeds from such enforcement will be applied first to repay the 2019 Super Senior Notes (which will be repaid at

---

[10]    The Senior Secured Term Loan Facility together with the 2018 Notes and 2019 Senior Secured Notes constitute the senior secured class (the "Senior Secured Class") in respect of the Senior Secured Compromise.

the same time and pro rata with obligations under the Super Senior Term Loan Facility), and
second to repay 2019 Senior Secured Notes and the 2018 Notes (which will be repaid at the same
time and pro rata with obligations under the Second Secured Term Loan Facility).

21.    A simplified illustration of the Debtors' corporate and capital structure follows.



*Debt figures based on unaudited company accounts as of 30 November 2016.*

## III.    Events Leading to the South Africa Proceedings.

22.    As noted above, macroeconomic factors such as interest rates, consumer
indebtedness, and employment levels affect demand for the Debtors' goods.    South African
households are still considered to be financially fragile, exacerbated by the recent slowdown in
unsecured lending.    Moreover, South Africans at the lower end of the socioeconomic spectrum
have continued to feel the impact of the global economic downturn more severely, due to low

employment growth coupled with power outages and significant increases in electricity, food, and property taxes in South Africa. Additionally, the expansion of social grants has recently slowed, impacting lower-end consumer spending. Consumer indebtedness, persistently high unemployment, strike action, limited power infrastructure, a leveling off of social grants and lower consumer confidence have had a material adverse effect on the Debtors' retail sales.

23. The Debtors' economic performance is also impacted by other factors, such as the prevailing economic climate, the availability of consumer credit, and consumer perception of economic conditions. In June 2014, Standard and Poor's downgraded South Africa's sovereign rating to BBB- from BBB, having previously downgraded it in January 2013, from BBB+. Over the past few years, economic growth performance and prospects have deteriorated in South Africa, affecting public finances and causing the national government debt to rise. A substantial portion of the Debtors' revenues are generated from their South African stores, and the general slowdown in South African gross domestic product and the uncertain economic outlook has adversely affected consumer spending habits, which reduces the Debtors' retail sales and adversely impacts their operational results. Moreover, many items sold by the Debtors, particularly higher-margin fashion and homeware products, represent discretionary purchases, causing the Debtors to experience a decline in retail sales that is proportionally greater than the level of general economic decline. As a consequence, continued unfavorable economic conditions in South Africa continue to depress the Debtors' revenues.

24. Finally, a substantial portion of the Debtors' indebtedness is denominated in Euros and in U.S. dollars. In recent years, the value of the South African Rand as measured against the Euro and the U.S. dollar has fluctuated considerably. Although the Debtors currently have hedging arrangements in place with respect to the indebtedness, currency fluctuations affect

the Debtors' ability to service the foreign currency denominated indebtedness. Over the past two years, the value of the South African Rand has declined in relation to the U.S. dollar and appreciated marginally against the Euro. Weakness of the South African Rand has adversely affected the Debtors' profitability as the Debtors purchase significant quantities of merchandise denominated in foreign currency.

## IV.   Restructuring Efforts Prior to Commencement of the South Africa Proceedings

25.   Prior to commencing the South Africa Proceedings, the Debtors entered into comprehensive restructuring negotiations with their various creditors groups. Over the course of several months, these negotiations culminated with the Debtors' entry into a lock-up agreement (the "LUA") with holders of approximately 80% of the Debtors' long-term debt. The Restructuring Transactions eliminate a significant amount of the Debtors' current long-term debt while ensuring they have sufficient liquidity to operate their businesses.

## V.   The South Africa Proceedings.

26.   To implement the Restructuring Transactions, the Debtors commenced the South Africa Proceedings pursuant to the Companies Act.

### A.   Proceedings under the Companies Act.

27.   Chapter 6 of the Companies Act addresses business rescue and compromises with creditors. Section 155 specifically provides for the compromise process. This section applies to a company, irrespective of whether or not it is financially distressed, and allows for the company to propose an adjustment of debt with respect to some or all of the company's creditors. *See* Companies Act § 155(1).[11]

28.   To commence the compromise process, a board of directors of a company must propose an arrangement (i.e., a compromise) of its financial obligations to all of its creditors, or

---

[11]   A true and correct copy of § 155 of the Companies Act is attached as **Exhibit A** to the Oertel Declaration.

to all of the members of any class of its creditors, by delivering a copy of the compromise proposal and notice of the meeting to consider such proposal to every member of the relevant class of creditors and to the Companies and Intellectual Property Commission (the "Commission").   The Commission is a state institution which has jurisdiction over certain limited affairs of South African companies, similar to the United Kingdom Companies House. The compromise proposal is adopted by the creditors, or the members of a relevant class of creditors, if it is supported by a majority in number, representing more than 75% in value, of the creditors or class, as the case may be, present and voting in person or by proxy, at a meeting called for that purpose.   There is no prescribed minimum quorum requirement in connection with meetings to approve a compromise under section 155 of the Companies Act.   A company proposing a compromise typically (as is the case here) allows at least two weeks advance notice for such meetings.   A company's board of directors and management team remains in control of the company while the compromise process is underway.   There is no automatic stay of proceedings or like protection from creditors during the compromise process.

29.     If the relevant creditors duly adopt the compromise proposal, the company thereafter may apply to the High Court of South Africa for an order sanctioning the compromise. The court may then sanction a compromise if the court considers it "just and equitable" to do so. *See* Companies Act § 155(7)(b).   To reach this decision, the court will consider the number of creditors who voted in favor of the compromise and any issues of fairness which are relevant to the compromise proposal.   If the court sanctions a compromise, a copy of its order must be filed with the Commission within five business days.   *See id.* at § 155(8)(c).   From this filing date, a compromise is final and binding on all of the creditors or members of the relevant class of

creditors.  *See id.* at § 155(9).  The date that a compromise takes effect, however, is determined in accordance with the terms of the compromise proposal itself.

### B.   Commencement of the South Africa Proceedings.

30.    On December 13, 2016, the Debtors appointed a chairman whose function is to conduct the meeting with the Compromise Creditors that are subject to those certain proposals to compromise the Debtors' financial obligations (the "Compromises") and to ascertain the identity of creditors and the extent of their claims.  Also on December 13, 2016, the Debtors commenced the South Africa Proceedings by delivering the Compromise Notices (together with the Compromises) to the Compromise Creditors in accordance with section 155 of the Companies Act.  The Debtors have scheduled the relevant meetings for the Compromises for December 29, 2016, and expect that the relevant sanction hearings for the Compromises will be held on or about January 12, 2017.

31.    Each of the Debtors' boards of directors (collectively, the "Board of Directors") appointed Mr. Vikisi as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code for purposes of the South Africa Proceedings.  The Board of Directors also authorized Mr. Vikisi to file the Petition for recognition of the South Africa Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  Copies of the applicable resolutions are attached hereto as **Exhibit 2**.  Accordingly, the Foreign Representative qualifies as a "foreign representative" within the meaning of sections 101(24) and 1517(a)(2) of the Bankruptcy Code.

C.      **The Compromises.**[12]

32.      As noted above, the Compromises facilitate a significant deleveraging of the Debtors' capital structure.  The Senior Secured Class has agreed to exchange approximately $1.4 billion of claims for $665.0 million of PIK B notes issued by a new holding company ("New Holdco 2") and equity in New Holdco 2 as consideration under the Senior Secured Compromise.  Related, the Super Senior Class has agreed to exchange approximately $400.0 million of claims for €172.0 million of PIK A notes issued by New Holdco 2 as consideration under the Super Senior Compromise.  Given the level of support for each Compromise already obtained pursuant to the Lock-Up Agreements, the Foreign Representative submits that the Debtors will achieve the necessary approvals to present the Compromises to the High Court of South Africa for sanction on or about January 12, 2017.

## Basis for Relief

33.      Chapter 15 of the Bankruptcy Code is designed to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation of financially distressed businesses.  The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

34.      Consistent with these principles, the Foreign Representative commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the South Africa Proceedings.  The Foreign Representative believes that these chapter 15 cases will complement the Debtors' primary proceedings in South Africa to ensure the effective and economic administration of the Debtors' restructuring efforts.  Further, the Foreign Representative submits that recognition of the South Africa Proceedings will not undermine the

---

[12]   The summaries provided herein are qualified in their entirety by the provisions of the relevant Compromise Documents.  To the extent anything in the Petition is inconsistent with such documents, the terms of such documents shall control.

rights that United States creditors typically would enjoy in a chapter 11 proceeding, as creditors will have the right to prosecute their claims and vote on the Compromises in the South Africa Proceedings.

**I.      The Debtors Are Eligible to Be Chapter 15 Debtors.**

35.      Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."  Courts in this district have applied section 109(a) of the Bankruptcy Code to chapter 15 eligibility.  *See, e.g.*, *Drawbridge Special Opp. Fund LP v. Barnett (In re Barnett)*, 737 F.3d 238, 247 (2d Cir. 2013).  Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors under other chapters of the Bankruptcy Code unanimously hold that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States.  *See GMAM Inv. Funds Trust I v. Globo Comunicacoes e Partipacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.)*, 317 B.R. 253, 249 (S.D.N.Y. 2004) (stating that courts have repeatedly found that there is "'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings") (citing *In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003)); *see also In re Global Ocean Carriers Ltd.*, 251 B.R. 31 (Bankr. D. Del. 2000) (holding that approximately $10,000 in a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 15 purposes).  Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

36.      Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code because they have property in the United States in the form of a retainer held by Kirkland & Ellis LLP in its client trust account at Citibank in New York, New York, and funds deposited in separate bank accounts at JP Morgan Chase also located in New York, New

York.  *See Octaviar Admin. PTY Ltd.*, 511 B.R. 361, 372-74 (Bankr. S.D.N.Y. 2014) (holding

that $10,000 in a client trust account was sufficient to satisfy the requirements of 109(a) of the

Bankruptcy Code); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 413 (Bankr. S.D.N.Y.

2014) ("The [escrow retainer] account satisfied the express requirements for eligibility under §

109(a) to permit the JPLs to file the chapter 15 contemplated by the RSA as necessary to

restructure the Debtor.")  Additionally, the Debtors have issued or guaranteed certain notes—

i.e., the 2019 Super Senior Notes, the 2019 Senior Secured Notes, and the 2018 Notes—that are

governed by New York law.  In a recent chapter 15 case in this district, the bankruptcy court

observed that contract rights under a bond indenture could satisfy the jurisdictional requirements

under the Bankruptcy Code.  *See In re Berau Capital Red. PTE Ltd.*, 540 B.R. 80, 82 (Bankr.

S.D.N.Y. 2015).  For these reasons, the Debtors satisfy the requirements under section 109(a) of

the Bankruptcy Code.

## II.   The South Africa Proceedings Should Be Recognized as Foreign Main Proceedings.

### A.   The South Africa Proceedings Are Foreign Proceedings.

37.   Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets
> and affairs of the debtor are subject to control or supervision by a
> foreign court, for the purpose of reorganization or liquidation.

38.   Courts have held that a "foreign proceeding" is one:

> a.   in which "acts and formalities [are] set down in law so that courts,
> merchants and creditors can know them in advance, and apply them
> evenly in practice;"

> b.   that has either a judicial or an administrative character;

> c.   that is collective in nature, in the sense that the proceeding considers the
> rights and obligations of all creditors;

19

d.      that is located in a foreign country;

e.      that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.      in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.      which proceeding is for the purpose of reorganization or liquidation.

See In re Ashapura Minechem Ltd., 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing In re Betcorp Ltd., 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); see also In re Overnight and Control Comm'n of Avánzit, S.A., 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).  As set forth in the Oertel Declaration, the South Africa Proceedings satisfy such requirements and, therefore, qualify as "foreign proceedings" for purposes of section 101(23) of the Bankruptcy Code.

39.      *First*, the South Africa Proceedings are proceedings commenced pursuant to section 155 of the Companies Act, a South African law that governs corporate reorganizations and provides for an arrangement or a compromise of a company's financial obligations.  *See* Companies Act § 155(2).   For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets."  *Betcorp*, 400 B.R. at 278.  Because the South Africa Proceedings operate under such statutory framework, they satisfy the first factor of section 101(23) of the Bankruptcy Code.

40.      *Second*, the South Africa Proceedings are judicial in character.  A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers."  *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010).  Here, the Debtors will petition the High Court of South Africa for an order sanctioning the Compromises following the meeting of creditors.   After notice and hearing, the High Court of South Africa may then

sanction the Compromises having considered the statutory requirements under section 155 of the Company Act, including the number of creditors who voted in favor of such Compromises and any related objections thereto.

41.    *Third*, the South Africa Proceedings are collective in nature in that all affected creditors are allowed to participate.  In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor."  *See* 400 B.R. at 281. Here, the Debtors have commenced the South Africa Proceedings after consultation with various parties in interest, including several of their secured creditors and execution of the LUA, which enjoys the support of approximately 80% of the Debtors' funded indebtedness, the vast majority of which is subject to the South Africa Proceedings.  In addition, affected creditors are entitled to intervene while the High Court of South Africa considers the Compromises.  Importantly, the South Africa Proceedings will not in any way prejudice (or even impact) many of the Debtors' creditors, much less prohibit their participation in the restructuring efforts, as the Debtors intend to continue to operate their businesses including paying and honoring all outstanding obligations to their customers, vendors and employees in the ordinary course of business, including, without limitation, paying any trade claims as and when such claims come due.

42.    *Fourth*, the South Africa Proceedings, including the High Court of South Africa, are located in a foreign country, namely Johannesburg, South Africa.

43.    *Fifth*, as described above, section 155 of the Companies Act, which governs the South Africa Proceedings, relates to the adjustment of debt.  Here, the Restructuring

Transactions to be implemented under the Compromises and pursuant to section 155 of the Companies Act will restructure more than approximately $2.1 billion of funded indebtedness.

44.     **Sixth**, the South Africa Proceedings subject the Debtors' assets and affairs to the supervision of the High Court of South Africa.  Indeed, section 155 of the Companies Act obligates the Debtors to forecast the effects of a compromise proposal, including the treatment of contracts, employees, and the property of the company that is proposed to be available to pay creditors' claims.  Similarly, the High Court of South Africa may consider any objection asserted by a party in interest in respect of the Compromises.

45.     **Finally**, the objective of the South Africa Proceedings is restructuring.  The Foreign Representative intends to submit to the High Court of South Africa, pursuant to section 155 of the Companies Act, the Compromises which will provide for a substantial deleveraging of the Debtors' balance sheets.  Therefore, the Foreign Representative submits that the Debtors have commenced the South Africa Proceedings for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.  *Cf. In re Avánzit*, 385 B.R. at 53 3-34 (recognizing a "financial restructuring" as a "reorganization" for purposes of the sections 101(23) and 1517 analysis, especially where debts will be repaid through the plan at issue).

46.     Since the South Africa Proceedings satisfy all of the criteria required by section 101(23) of the Bankruptcy Code, they are foreign proceedings entitled to recognition under chapter 15 of the Bankruptcy Code.  U.S. courts have recognized collective proceedings similar to the South Africa Proceedings as "foreign proceedings" on numerous occasions.  *See, e.g.*, *In re Towergate Finance plc*, No. 15-10509 (Bankr. S.D.N.Y. Mar. 27, 2015) (recognizing a U.K. scheme of arrangement as a foreign proceeding); *In re New World Resources N.V.*, No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014) (same); *In re hibu Inc.*, No. 14-70323 (Bankr.

S.D.N.Y. Feb. 27, 2014) (same); *In re Magyar Telecom B.V.*, No. 13-13508 (Bankr. S.D.N.Y.

Dec. 11, 2013) (same); *In re Hellas Telecom. (Luxembourg) V*, No. 10-13651 (Bankr. D. Del.

Dec. 13, 2010) (same).

**B.    The South Africa Proceedings Are Foreign Main Proceedings.**

47.    Section 1517(b)(1) of the Bankruptcy Code provides that a "foreign main

proceeding" is a "foreign proceeding" pending in the country where a debtor has its center of its

main interests ("COMI").  The Bankruptcy Code does not define COMI.  However, courts that

have considered this issue have equated it with a debtor's principal place of business.  *See*

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 374 B.R. 122, 127

(Bankr. S.D.N.Y. 2007).  Courts have identified certain factors that are relevant in determining a

debtor's COMI, including:  (a) the location of the debtor's headquarters; (b) the location of those

persons or entities that actually manage the debtor (which, in certain instances, could be the

headquarters of a holding company); (c) the location of the debtor's primary assets; and (d) the

location of the majority of the debtor's creditors or of a majority of the creditors who would be

affected by the case.  *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006).

Further, section 1516(c) of the Bankruptcy Code sets forth a presumption that, "in the absence of

evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the

debtor's main interests."

48.    Here, under all the relevant criteria, South Africa is the Debtors' COMI.  As set

forth in the Oertel Declaration:

> a.    the Debtors are all companies organized and existing under the laws of
> South Africa;
>
> b.    the Debtors' head office is located at Edgardale, 1 Press Avenue, Crown
> Mines, Johannesburg 2025, South Africa;

c.      the Debtors are primarily controlled by, and decision-making is made from, their principal place of business in South Africa;

d.      the majority of the Debtors' employees reside in South Africa;

e.      the majority of the Debtors' assets are located in South Africa;

f.      the majority of the Debtors' trade creditors are located in South Africa; and

g.      all of the Debtors' administrative functions, including accounting, financial reporting, budgeting, and cash management are conducted in South Africa.

49.     Based on these facts, the Debtors' COMI is South Africa and, as such, the South Africa Proceedings should be recognized as foreign main proceedings.

**III.    The Foreign Representative Is a "Foreign Representative."**

50.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding.  Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

51.     On September 14, 2016, the Board of Directors authorized the appointment of the Foreign Representative for purposes of these chapter 15 cases.  On December 7, 2016, the Board of Directors authorized the Foreign Representative to commence the South Africa Proceedings and these chapter 15 cases.  Bankruptcy courts have held that a governing body of an entity may authorize a person to act as that entity's foreign representative in a chapter 15 proceeding.  *See In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 412 (N.D. Tex. 2012), *aff'd sub nom.*, *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1047 (5th Cir. 2012), *cert. dismissed*, 133 S. Ct. 1862 (2013) (recognizing that the board of directors of a corporation could authorize a person to act as the corporation's

foreign representative in a chapter 15 proceeding); *In re OAS S.A.*, 533 B.R. 83, 98 (Bankr.

S.D.N.Y. 2015) (holding same); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-

14182 (MG), 2010 WL 10063842 (Bankr. S.D.N.Y. Nov. 8, 2010) (same).   Copies of the

resolutions appointing the Foreign Representative are attached hereto as **Exhibit 2**.   Moreover,

the Foreign Representative is a "person" under section 101(41) of the Bankruptcy Code.   The

Foreign Representative thus submits that he has met the requirements of section 101(24) of the

Bankruptcy Code and is the Debtors' "foreign representative" as defined therein.

## IV.    The Petition Satisfies the Requirements under Section 1515(b) of the Bankruptcy Code.

52.    Pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition

must be accompanied by one of the following:

> a.    a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
>
> b.    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
>
> c.    in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

53.    In satisfaction of section 1515(b) of the Bankruptcy Code, attached hereto as

**Exhibit 1**, and **Exhibit 2**, and incorporated herein by reference, are true and correct copies of the

following documents evidencing the South Africa Proceedings and the appointment of the

Foreign Representative:    (a) the Compromise Documents and (b) the Board Resolutions.[13]

Therefore, the Petition meets the requirements of section 1515 of the Bankruptcy Code in

satisfaction of the third requirement under section 1517(a) of the Bankruptcy Code.   Because the

---

[13]    The Debtors reserve the right to supplement these materials in advance of or at the final hearing on the Petition.

Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the South

Africa Proceedings in these chapter 15 cases.

**V.      Any Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring Transactions and Should Be Granted.**

54.      Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to

grant "any appropriate relief" at the request of the recognized foreign representative "where

necessary necessary to effectuate the purpose of [chapter 15] and to protect the assets of the

debtor or the interests of the creditors."  Such relief may include:

> a.   staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) of the Bankruptcy Code;

> b.   staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) of the Bankruptcy Code;

> c.   suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) of the Bankruptcy Code; and

> d.   granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code.

The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the

creditors and other interested entities, including the debtor, are sufficiently protected."

11 U.S.C. § 1522(a).  Additionally, section 105(a) of the Bankruptcy Code provides that the

"court may issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of this title."

55.      The Debtors request the Court exercise its discretion under sections 105 and 1521

to grant the relief requested insofar as such relief exceeds that which is available by recognizing

the South Africa Proceedings as a foreign main proceeding, the Foreign Representative as a

"foreign representative" as specified in the Bankruptcy Code, and the effects of such recognition under section 1520 of the Bankruptcy Code.   Any relief requested that does not flow automatically pursuant to section 1520(a) but which the Court may grant in its discretion, is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is a necessary to effect the South African Proceedings and Restructuring Transactions.   If granted, such relief would promote all of the legislatively enumerated objectives of section 1501(a) of the Bankruptcy Code.

56.     Fair and efficient administration of the South African Proceedings that protects all parties in interest requires that all Compromise Creditors be bound by the terms of the South Africa Proceedings and Restructuring Transactions as sanctioned by the High Court of South Africa.  *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail.").   If the Compromises as contemplated by the South Africa Proceedings and Restructuring Transactions thereunder are not fully respected in the United States, there is a risk that dissident Compromise Creditors could bring proceedings in the United States against the Debtors or other parties protected by the Compromises based upon certain bonds that are governed by New York law.  If such Compromise Creditors can effectively evade the terms of the Compromises and the Restructuring Transactions by commencing actions in the United States, the Debtors and others involved in the Compromises would be required to defend any such proceedings and deplete the resources of the restructured business and prejudice its reorganized value.    The relief requested by the Debtors is thus required to prevent individual creditors acting to frustrate the purposes of the Compromises, the foremost of which is the fair

and efficient administration of the South Africa Proceedings and Restructuring Transactions to maximize value for all creditors.

### Conclusion

57.     The Foreign Representative respectfully submits that the Petition satisfies the requirements for the recognition of Mr. Charles Mzwandile Vikisi as the Debtors' "foreign representative" and the South Africa Proceedings as the Debtors' "foreign main proceedings," and further requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein.

### Satisfaction of Local Rule 9013-1(a)

58.     The Petition includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to the Petition.  Accordingly, the Debtors submit that the Petition satisfies Local Rule 9013-1(a).

### Notice

59.     The Foreign Representative has provided notice of the Petition to:  (a) the Office of the United States Trustee; (b) the Securities and Exchange Commission; (c) the United States Attorney for the Southern District of New York; (d) the Internal Revenue Service; (e) the Compromise Creditors; (f) the agent under the Debtors' term loan facilities; (g) the agent under the Debtors' revolving credit facility; (h) the trustee under the indentures to the notes; (i) counsel to certain senior secured term loan lenders and the super senior term loan lenders; (j) counsel to certain revolving credit facility lenders; (k)  all persons or bodies authorized to administer the South Africa Proceedings; (l) the South African Companies and Intellectual Property Commission; (m) Meyer Joffe as chairman of the meeting of Compromise Creditors; and (n) such other parties in interest that have requested notice pursuant to Bankruptcy Rule 2002.  In

light of the relief requested, the Foreign Representative submits that no further notice is necessary.

## **No Prior Request**

60.    No prior request for the relief sought in this Petition has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

| | |
|---|---|
| New York, New York<br>Dated:  December 14, 2016 | */s/ Adam C. Paul* |

James H.M. Sprayregen, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Adam C. Paul (*pro hac vice* admission pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Foreign Representative

## EXHIBIT A

**Proposed Recognition Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| EDCON HOLDINGS LIMITED, *et al.*, | ) Case No. 16-13475 |
| Debtors in a Foreign Proceeding[1] | ) |
| | ) |
| Debtors. | ) |
| | ) (Joint Administration Requested) |

**ORDER GRANTING PETITION FOR (I) RECOGNITION AS FOREIGN MAIN**
**PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Upon consideration of the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (together with the form petitions filed concurrently therewith, the "Petition"),[2] filed by the Foreign Representative as the "foreign representative" of the above-captioned debtors (collectively, the "Debtors"); and upon the hearing on the Petition and this Court's review and consideration of the Petition, the Oertel Declaration, and the Vikisi Declaration; IT IS HEREBY FOUND AND DETERMINED THAT:[3]

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

---

[1]    The Debtors in these chapter 15 cases are:  Edcon Holdings Limited, Edcon Acquisition Proprietary Limited, Edcon Limited, and Edgars Consolidated Stores Limited.  The location of the Debtors' corporate headquarters and the service address for all of the Debtors is:  Edgardale, 1 Press Avenue, Crown Mines, Johannesburg 2092, South Africa.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

[3]    The findings and conclusions set forth herein and in the record of the hearing on the Petition constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

2.    Venue is proper before this Court pursuant to 28 U.S.C. § 1410.  This Court may
enter a final order consistent with Article III of the United States Constitution

3.    Good, sufficient, appropriate and timely notice of the filing of the Petition and the
hearing on the Petition has been given by the Foreign Representative, pursuant to
Bankruptcy Rules 1011(b) and 2002(q), to:  (a) the Office of the United States Trustee; (b) the
Securities and Exchange Commission; (c) the United States Attorney for the Southern District of
New York; (d) the Internal Revenue Service; (e) the Compromise Creditors; (f) the agent under
the Debtors' term loan facilities; (g) the agent under the Debtors' revolving credit facility; (h) the
trustee under the indentures to the notes; (i) counsel to certain senior secured term loan lenders
and the super senior term loan lenders; (j) counsel to certain revolving credit facility lenders; (k)
all persons or bodies authorized to administer the South Africa Proceedings; (l) the South
African Companies and Intellectual Property Commission; (m) Meyer Joffe as chairman of the
meeting of Compromise Creditors; and (n) such other parties in interest that have requested
notice pursuant to Bankruptcy Rule 2002.

4.    No objections or other responses were filed that have not been overruled,
withdrawn, or otherwise resolved.

5.    These chapter 15 cases were properly commenced pursuant to sections 1504,
1509, and 1515 of the Bankruptcy Code.

6.    The Foreign Representative is a "person" pursuant to section 101(41) of the
Bankruptcy Code and is the duly appointed "foreign representative" of the Debtors as such term
is defined in section 101(24) of the Bankruptcy Code.  The Foreign Representative has satisfied
the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

2

7.      The South Africa Proceedings are entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

8.      The South Africa Proceedings are pending in South Africa, where the Debtors' "center of main interests," as referred to in section 1517(b)(1) of the Bankruptcy Code, is located.  Accordingly, the South Africa Proceedings are entitled to recognition as foreign main proceedings.

9.      The Foreign Representative is entitled to all the relief provided pursuant to sections 1520 and 1521(a)(4) and (5) of the Bankruptcy Code without limitation, because those protections are necessary to effectuate the purposes of chapter 15 of the Bankruptcy Code and to protect the assets of the Debtors and the interests of the Debtors' creditors.

10.      The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtors and their interests of its creditors and other parties in interest.

BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Petition is granted.

2.      The South Africa Proceedings are recognized as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code, and all the effects of recognition as set forth in section 1520 of the Bankruptcy Code shall apply.

3.      Upon entry of this Order, pursuant to section 1520 of the Bankruptcy Code, the South Africa Proceedings shall be given their full force and effect and, among other things:

    a.      the protections of sections 361 and 362 of the Bankruptcy Code apply to the Debtors;

3

b.      all persons and entities are enjoined from seizing, attaching, and enforcing or executing liens or judgments against the Debtors' property in the United States or from transferring, encumbering or otherwise disposing of or interfering with the Debtors' assets or agreements in the United States without the express consent of the Foreign Representative; and

c.      all persons and entities are enjoined from commencing or continuing, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against the Debtors or their assets or proceeds thereof, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative or other judgment, assessment, order, lien or arbitration award against the Debtors or their assets or proceeds thereof.

4.      The Foreign Representative and the Debtors shall be entitled to the full protections and rights enumerated under section 1521(a)(4) and (5) of the Bankruptcy Code, and accordingly, the Foreign Representative:

a.      is entrusted with the administration or realization of all or part of the Debtors' assets located in the United States; and

b.      has the right and power to examine witnesses, take evidence or deliver information concerning the Debtors' assets, affairs, rights, obligations, or liabilities.

5.      The Foreign Representative is hereby established as the representative of the Debtors with full authority to administer the Debtors' assets and affairs in the United States, including, without limitation, making payments on account of the Debtors' prepetition and postpetition obligations.

6.      As of the Compromise Effective Date, the order sanctioning the Compromises, the Compromises, and all other related orders and documents are recognized, granted comity, and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on the Compromise Creditors and related parties whether or not they actually agreed to be bound by the Compromises or participated in the South Africa Proceedings.

4

7.      No action taken by the Foreign Representative in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the South African Proceedings and Restructuring Transactions, any order entered in respect of this Petition, the chapter 15 case, any further order for additional relief in the chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code.

8.      The banks and financial institutions with which the Debtors maintain bank accounts or on which checks are drawn or electronic payment requests made in payment of prepetition or postpetition obligations are authorized and directed to continue to service and administer the Debtors' bank accounts without interruption and in the ordinary course and to receive, process, honor and pay any and all such checks, drafts, wires and automatic clearing house transfers issued, whether before or after the Petition Date and drawn on the Debtors' bank accounts by respective holders and makers thereof and at the direction of the Foreign Representative or the Debtors, as the case may be.

9.      The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

10.     The Foreign Representative, the Debtors, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

11.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5

12.     This Court shall retain jurisdiction with respect to the enforcement, amendment or

modification of this Order, any requests for additional relief or any adversary proceeding brought

in and through these chapter 15 cases, and any request by an entity for relief from the provisions

of this Order, for cause shown, that is properly commenced and within the jurisdiction of this

Court.

13.     This Order applies to all parties in interest in these chapter 15 cases and all of

their agents, employees, and representatives, and all those who act in concert with them who

receive notice of this Order.

New York, New York
Dated: _____, 2017                                    _____
                                                                              United States Bankruptcy Judge

## EXHIBIT 1

**Compromise Documents**

**EDCON LIMITED**

Incorporated in South Africa

(Registration number: 2007/003525/06)

_____

**NOTICE BY THE BOARD OF DIRECTORS OF THE COMPANY TO THE SENIOR SECURED
CREDITORS OF THE SENIOR SECURED COMPANY MEETING**

_____

1.    Where appropriate and applicable, the terms defined in the Proposal Document to which this
      notice is attached and forms part of, will bear the same meanings in this notice and, in
      particular, in the resolution set out below.

2.    Notice is hereby given to all Senior Secured Creditors of the Company and to the
      Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior
      Secured Creditors, under the chairmanship of the Chairman, will be held at the offices of
      Edward Nathan Sonnenbergs, 150 West Street, Sandton, Gauteng  at 12h00 (Johannesburg
      time) on 29 December  2016 for the purpose of considering, and if deemed fit, approving the
      Senior Secured Company Resolution more fully set out below with or without modification.

3.    The meeting will commence with an explanatory address by the Chairman.

4.    All Senior Secured Creditors (including their proxies) are required to provide reasonably
      satisfactory identification before being entitled to attend or participate in the Senior Secured
      Company Meeting.  Forms of identification include valid identity documents, driver's licenses
      and passports.

5.    A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior
      Secured Creditor, will not be permitted access to the Senior Secured Company Meeting, save
      with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SENIOR SECURED COMPANY COMPROMISE IN TERMS
OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Senior Secured Company Compromise by the Company as set out in the
Company Proposal at page 763 be and is hereby approved by the Senior Secured Creditors in terms
of section 155(6) of the Companies Act on the basis that the Senior Secured Company Compromise
will take effect on and as from the Compromise Effective Date.*"

The Senior Secured Company Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Company Meeting.

6.    Proxy Form:

6.1.    Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured Company Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

6.3.    Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.4.    The Proxy Form is attached to this Proposal Document at page 678.

6.5.    You may use one Proxy Form for all Compromise Meetings.

6.6.    It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured Company Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7.    Account Holder Letter:

7.1.    Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes, it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder.  If a Secured Noteholder also holds Super

Senior 2019 Notes, it will still only submit **one** Account Holder Letter per Account Holder in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3.     You may use one Account Holder Letter for all Compromise Meetings.

7.4.     Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.     The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.     In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured Company Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.     It is important that you read the Account Holder Letter carefully for information about the Senior Secured Company Compromise and that you complete and return it in accordance with the instructions contained in it.

8.     Copies of the following documents will be available for inspection at the offices of  Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Senior Secured Company Meeting –

8.1.     the Lock-Up Agreement;

8.2.     the Amendment Agreement;

8.3.     the Accession Letter;

8.4.     the Existing Intercreditor Agreement;

8.5.     the Senior Secured 2018 Notes Indenture;

8.6.     the Senior Secured 2019 Notes Indenture; and

8.7.     the Senior Secured Term Loan Agreement.

By order of the board of directors of the Company

**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDCON LIMITED**

12 December 2016

## EDGARS CONSOLIDATED STORES LIMITED

Incorporated in South Africa

(Registration Number 1946/022751/06)

---

## NOTICE BY THE BOARD OF DIRECTORS OF ECSL TO THE SENIOR SECURED CREDITORS OF THE SENIOR SECURED ECSL MEETING

---

1.   Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice and, in particular, in the resolution set out below.

2.   Notice is hereby given to all Senior Secured Creditors of ECSL and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior Secured Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 13h00 (Johannesburg time) on 29 December 2016, or as soon as the Senior Secured Company Meeting has closed, for the purpose of considering, and if deemed fit, approving the Senior Secured ECSL Resolution more fully set out below with or without modification.

3.   The meeting will commence with an explanatory address by the Chairman.

4.   All Senior Secured Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Senior Secured ECSL Meeting. Forms of identification include valid identity documents, driver's licenses and passports.

5.   A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior Secured Creditor, will not be permitted access to the Senior Secured ECSL Meeting, save with the consent of the Chairman.

## RESOLUTION – APPROVAL OF THE SENIOR SECURED ECSL COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT

"*Resolved that the Senior Secured ECSL Compromise by the Company as set out in the ECSL Proposal at page 916 be and is hereby approved by the Senior Secured Creditors in terms of section*

*155(6) of the Companies Act on the basis that the Senior Secured ECSL Compromise will take effect on and as from the Compromise Effective Date.*"

The Senior Secured ECSL Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured ECSL Meeting.

6.      Proxy Form:

        6.1.    Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured ECSL Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

        6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

        6.3.    Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

        6.4.    The Proxy Form is attached to this Proposal Document at page 678.

        6.5.    You may use one Proxy Form for all Compromise Meetings.

        6.6.    It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured ECSL Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7.      Account Holder Letter:

        7.1.    Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes,  it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder.  If a Secured Noteholder also holds Super Senior 2019 Notes, it will still only submit **one** Account Holder Letter in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.    In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured ECSL Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Senior Secured ECSL Compromise and that you complete and return it in accordance with the instructions contained in it.

8.    Copies of the following documents will be available for inspection at the offices of  Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to and including the Business Day immediately preceding the date of the Senior Secured ECSL Meeting –

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Senior Secured 2018 Notes Indenture;

8.6.    the Senior Secured 2019 Notes Indenture; and

8.7.    the Senior Secured Term Loan Agreement.


By order of the board of directors of ECSL

**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of
**EDGARS CONSOLIDATED STORES LIMITED**
12 December 2016

**EDCON ACQUISITION PROPRIETARY LIMITED**

Incorporated in South Africa

(Registration Number 2007/000518/07)

_____

**NOTICE BY THE BOARD OF DIRECTORS OF BIDCO TO THE SENIOR SECURED CREDITORS OF THE SENIOR SECURED BIDCO MEETING**

_____

1.      Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice and, in particular, in the resolution set out below.

2.      Notice is hereby given to all Senior Secured Creditors of Bidco and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior Secured Creditors, under the chairmanship of the Chairman, will be held at the offices Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 13h15 (Johannesburg time) on 29 December 2016, or as soon as the Senior Secured ECSL Meeting has closed, for the purpose of considering, and if deemed fit, approving the Senior Secured Bidco Resolution more fully set out below with or without modification.

3.      The meeting will commence with an explanatory address by the Chairman.

4.      All Senior Secured Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Senior Secured Bidco Meeting. Forms of identification include valid identity documents, driver's licenses and passports.

5.      A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior Secured Creditor, will not be permitted access to the Senior Secured Bidco Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SENIOR SECURED BIDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Senior Secured Bidco Compromise by the Company as set out in the Bidco Proposal at page 1020 be and is hereby approved by the Senior Secured Creditors in terms of section*

*155(6) of the Companies Act on the basis that the Senior Secured Bidco Compromise will take effect on and as from the Compromise Effective Date.*"

The Senior Secured Bidco Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Bidco Meeting.

6.      Proxy Form:

6.1.    Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured Bidco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

6.3.    Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.4.    The Proxy Form is attached to this Proposal Document at page 678.

6.5.    You may use one Proxy Form for all Compromise Meetings.

6.6.    It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured Bidco Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7.      Account Holder Letter:

7.1.    Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes, it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder. If a Secured Noteholder also holds Super Senior 2019 Notes, it will still only submit **one** Account Holder Letter in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.    In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured Bidco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Senior Secured Bidco Compromise and that you complete and return it in accordance with the instructions contained in it.

8.    Copies of the following documents will be available for inspection at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to and including the Business Day immediately preceding the date of the Senior Secured Bidco Meeting –

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Senior Secured 2018 Notes Indenture;

8.6.    the Senior Secured 2019 Notes Indenture; and

8.7.    the Senior Secured Term Loan Agreement.

By order of the board of directors of Bidco

RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER

on behalf of the board of directors of
EDCON ACQUISITION PROPRIETARY LIMITED
12 December 2016

**EDCON HOLDINGS LIMITED**

Incorporated in South Africa

(Registration Number 2006/036903/06)

―――――――――――――――――――――――――――――――――――――――――――――――

## NOTICE BY THE BOARD OF DIRECTORS OF HOLDCO TO THE SENIOR SECURED CREDITORS OF THE SENIOR SECURED HOLDCO MEETING

―――――――――――――――――――――――――――――――――――――――――――――――

1.    Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice and, in particular, in the resolution set out below.

2.    Notice is hereby given to all Senior Secured Creditors of Holdco and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior Secured Creditors, under the chairmanship of the Chairman, will be held at the office of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 13h30 (Johannesburg time) on 29 December 2016, or as soon as the Senior Secured Bidco Meeting has closed, for the purpose of considering, and if deemed fit, approving the Senior Secured Holdco Resolution more fully set out below with or without modification.

3.    The meeting will commence with an explanatory address by the Chairman.

4.    All Senior Secured Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Senior Secured Holdco Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.    A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior Secured Creditor, will not be permitted access to the Senior Secured Holdco Meeting, save with the consent of the Chairman.

## RESOLUTION – APPROVAL OF THE SENIOR SECURED HOLDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT

"*Resolved that the Senior Secured Holdco Compromise by the Company as set out in the Holdco Proposal at page 1125 be and is hereby approved by the Senior Secured Creditors in terms of section*

*155(6) of the Companies Act on the basis that the Senior Secured Holdco Compromise will take effect on and as from the Compromise Effective Date.*"

The Senior Secured Holdco Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Holdco Meeting.

6.      Proxy Form:

   6.1.    Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured Holdco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

   6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

   6.3.    Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

   6.4.    The Proxy Form is attached to this Proposal Document at page 678.

   6.5.    You may use one Proxy Form for all Compromise Meetings.

   6.6.    It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured Holdco Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7.      Account Holder Letter:

   7.1.    Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes, it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder. If a Secured Noteholder also holds Super Senior 2019 Notes, it will still only submit **one** Account Holder Letter in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.    In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured Holdco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Senior Secured Holdco Compromise and that you complete and return it in accordance with the instructions contained in it.

8.    Copies of the following documents will be available for inspection at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to and including the Business Day immediately preceding the date of the Senior Secured Holdco Meeting –

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Senior Secured 2018 Notes Indenture;

8.6.    the Senior Secured 2019 Notes Indenture; and

8.7.    the Senior Secured Term Loan Agreement.

By order of the board of directors of Holdco

**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of
**EDCON HOLDINGS LIMITED**
12 December 2016

**EDCON LIMITED**

Incorporated in South Africa

(Registration number: 2007/003525/06)

_____

**NOTICE BY THE BOARD OF DIRECTORS OF THE COMPANY TO THE SUPER SENIOR THIRD RANKING CREDITORS OF THE SUPER SENIOR COMPANY MEETING**

_____

1.      Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice of meeting and, in particular, in the resolution set out below.

2.      Notice is hereby given to all Super Senior Third Ranking Creditors of the Company and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Super Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton, South Africa at 14h00 (Johannesburg time) on 29 December 2016, or as soon as the Senior Secured Holdco Meeting convened for the same date and place is concluded or adjourned, for the purpose of considering, and if deemed fit, the Super Senior Company Resolution more fully set out below with or without modification.

3.      The meeting will commence with an explanatory address by the Chairman.

4.      All Super Senior Third Ranking Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Super Senior Company Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.      A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior Company Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR COMPANY COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"_Resolved that the Super Senior Company Compromise by the Company as set out in the Company Proposal at page 763 be and is hereby approved by the Super Senior Third Ranking Creditors in_

*terms of section 155(6) of the Companies Act on the basis that the Super Senior Company Compromise will take effect on and as from the Compromise Effective Date.*"

The Super Senior Company Compromise will have been adopted by the Super Senior Third Ranking Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date  held by Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super Senior Company Meeting.

6.    Proxy Form:

6.1.    Each Super Senior Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Super Senior Company Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit one Proxy Form as regards all its Compromise Claims.

6.3.    You may use one Proxy Form for all Compromise Meetings.

6.4.    Super Senior Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.5.    The Proxy Form is attached to this Proposal Document at page 678.

6.6.    It is important that you read the Proxy Form carefully for information about the Super Senior Company Compromise and that you complete and return it in accordance with the instructions contained in it.

7.    Account Holder Letter:

7.1.    Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for Compromise Notes that it holds.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.    In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior Company Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies this Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Super Senior Company Compromise and that you complete and return it in accordance with the instructions contained in it.

8.    Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior Company Meeting–

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Super Senior 2019 Notes Indenture; and

8.6.    the Super Senior Term Loan Agreement.

By order of the board of directors of the Company

RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER

on behalf of the board of directors of

**EDCON LIMITED**

12 December 2016

**EDGARS CONSOLIDATED STORES LIMITED**

Incorporated in South Africa

(Registration Number 1946/022751/06)

---

## NOTICE BY THE BOARD OF DIRECTORS OF ECSL TO THE SUPER SENIOR THIRD RANKING CREDITORS OF THE SUPER SENIOR ECSL MEETING

---

1.    Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice of meeting and, in particular, in the resolution set out below.

2.    Notice is hereby given to all Super Senior Third Ranking Creditors of ECSL and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Super Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnebergs at 150 West Street, Sandton, South Africa at 15h00 (Johannesburg time) on 29 December 2016, or as soon as the Super Senior Company Meeting convened for the same date and place is concluded or adjourned, for the purpose of considering, and if deemed fit, the Super Senior ECSL Resolution more fully set out below with or without modification.

3.    The meeting will commence with an explanatory address by the Chairman.

4.    All Super Senior Third Ranking Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Super Senior ECSL Meeting. Forms of identification include valid identity documents, driver's licenses and passports.

5.    A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior ECSL Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR ECSL COMPROMISE IN TERMS OF
SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Super Senior ECSL Compromise as set out in the ECSL Proposal at page 916 of
the Proposal Document be and is hereby approved by the Super Senior Third Ranking Creditors in
terms of section 155(6) of the Companies Act on the basis that the Super Senior ECSL Compromise
will take effect on and as from the Compromise Effective Date.*"

The Super Senior ECSL Compromise will have been adopted by the Super Senior Third Ranking
Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors
representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise
Claims outstanding at the Record Date held by Super Senior Third Ranking Creditors who are present
and voting in person or by proxy at the Super Senior ECSL Meeting.

6.    Proxy Form:

      6.1.    Each Super Senior Term Loan Lender must ensure that if it does not intend to attend
              (or have its Designated Recipient attend) the Super Senior ECSL Meeting, a Proxy
              Form is completed, executed and delivered to the Information Agent before the
              Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient)
              to vote.

      6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super
              Senior Term Loan Lender, it must submit one Proxy Form as regards all its
              Compromise Claims.

      6.3.    You may use one Proxy Form for all Compromise Meetings.

      6.4.    Super Senior Term Loan Lenders requiring any assistance in completing a Proxy
              Form should contact the Information Agent using the contact details in the Proxy
              Form.

      6.5.    The Proxy Form is attached to this Proposal Document at page 678.

      6.6.    It is important that you read the Proxy Form carefully for information about the Super
              Senior ECSL Compromise and that you complete and return it in accordance with the
              instructions contained in it.

7.    Account Holder Letter:

      7.1.    Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is
              completed, executed and delivered to and received by the Information Agent before

the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for all Compromise Notes that it holds.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.    In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior ECSL Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Super Senior ECSL Compromise and that you complete and return it in accordance with the instructions contained in it.

8.    Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior ECSL Meeting–

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Super Senior 2019 Notes Indenture; and

8.6.    the Super Senior Term Loan Agreement.

By order of the board of directors of ECSL

**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of
**EDGARS CONSOLIDATED STORES LIMITED**

12 December 2016

**EDCON ACQUISITION PROPRIETARY LIMITED**

Incorporated in South Africa

(Registration Number 2007/000518/07)

_____

**NOTICE BY THE BOARD OF DIRECTORS OF BIDCO TO THE SUPER SENIOR THIRD RANKING CREDITORS OF THE SUPER SENIOR BIDCO MEETING**

_____

1.  Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice of meeting and, in particular, in the resolution set out below.

2.  Notice is hereby given to all Super Senior Third Ranking Creditors of Bidco and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Super Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held the offices of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 15h15 (Johannesburg time) on 29 December 2016, or as soon as the Super Senior ECSL Meeting convened for the same date and place is concluded or adjourned, for the purpose of considering, and if deemed fit, the Super Senior Bidco Resolution more fully set out below with or without modification.

3.  The meeting will commence with an explanatory address by the Chairman.

4.  All Super Senior Third Ranking Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Super Senior Bidco Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.  A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior Bidco Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR BIDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Super Senior Bidco Compromise as set out in the Bidco Proposal at page 1020 of the Proposal Document be and is hereby approved by the Super Senior Third Ranking Creditors in terms of section 155(6) of the Companies Act on the basis that the Super Senior Bidco Compromise will take effect on and as from the Compromise Effective Date.*"

The Super Senior Bidco Compromise will have been adopted by the Super Senior Third Ranking Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date held by Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super Senior Bidco Meeting.

6.    Proxy Form:

6.1.    Each Super Senior Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Super Senior Bidco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit one Proxy Form as regards all its Compromise Claims.

6.3.    You may use one Proxy Form for all Compromise Meetings.

6.4.    Super Senior Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.5.    The Proxy Form is attached to this Proposal Document at page 678.

6.6.    It is important that you read the Proxy Form carefully for information about the Super Senior Bidco Compromise and that you complete and return it in accordance with the instructions contained in it.

7.    Account Holder Letter:

7.1.    Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before

the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.     If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for all Compromise Notes that it holds.

7.3.     You may use one Account Holder Letter for all Compromise Meetings.

7.4.     Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.     The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.     In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior Bidco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.     It is important that you read the Account Holder Letter carefully for information about the Super Senior Bidco Compromise and that you complete and return it in accordance with the instructions contained in it.

8.     Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior Bidco Meeting–

8.1.     the Lock-Up Agreement;

8.2.     the Amendment Agreement;

8.3.     the Accession Letter;

8.4.     the Existing Intercreditor Agreement;

8.5.     the Super Senior 2019 Notes Indenture; and

8.6.     the Super Senior Term Loan Agreement.

By order of the board of directors of Bidco

**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of
**EDCON ACQUISITION PROPRIETARY LIMITED**

12 December 2016

**EDCON HOLDINGS LIMITED**

Incorporated in South Africa

(Registration Number 2006/036903/06)

_____

**NOTICE BY THE BOARD OF DIRECTORS OF HOLDCO TO THE SUPER SENIOR THIRD
RANKING CREDITORS OF THE SUPER SENIOR HOLDCO MEETING**

_____

1.      Where appropriate and applicable, the terms defined in the Proposal Document to which this
        notice is attached and forms part of, will bear the same meanings in this notice of meeting
        and, in particular, in the resolution set out below.

2.      Notice is hereby given to all Super Senior Third Ranking Creditors of Holdco and to the
        Commission in terms of section 155(2) of the Companies Act that a meeting of the Super
        Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held at the
        offices of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 15h30
        (Johannesburg time) on 29 December 2016, or as soon as the Super Senior Bidco Meeting
        convened for the same date and place is concluded or adjourned, for the purpose of
        considering, and if deemed fit, the Super Senior Holdco Resolution more fully set out below with
        or without modification.

3.      The meeting will commence with an explanatory address by the Chairman.

4.      All Super Senior Third Ranking Creditors (including their proxies) are required to provide
        reasonably satisfactory identification before being entitled to attend or participate in the Super
        Senior Holdco Meeting.   Forms of identification include valid identity documents, driver's
        licenses and passports.

5.      A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for
        any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior
        Holdco Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR HOLDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Super Senior Holdco Compromise as set out in the Holdco Proposal at page 1125 of the Proposal Document be and is hereby approved by the Super Senior Third Ranking Creditors in terms of section 155(6) of the Companies Act on the basis that the Super Senior Holdco Compromise will take effect on and as from the Compromise Effective Date.*"

The Super Senior Holdco Compromise will have been adopted by the Super Senior Third Ranking Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date held by Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super Senior Holdco Meeting.

6.     Proxy Form:

        6.1.     Each Super Senior Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Super Senior Holdco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

        6.2.     If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit one Proxy Form as regards all its Compromise Claims.

        6.3.     You may use one Proxy Form for all Compromise Meetings.

        6.4.     Super Senior Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

        6.5.     The Proxy Form is attached to this Proposal Document at page 678.

        6.6.     It is important that you read the Proxy Form carefully for information about the Super Senior Holdco Compromise and that you complete and return it in accordance with the instructions contained in it.

7.     Account Holder Letter:

        7.1.     Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before

the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.   If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for all Compromise Notes that it holds.

7.3.   You may use one Account Holder Letter for all Compromise.

7.4.   Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.   The Account Holder Letter is attached to this Proposal Document at page 718.

7.6.   In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior Holdco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.   It is important that you read the Account Holder Letter carefully for information about the Super Senior Holdco Compromise and that you complete and return it in accordance with the instructions contained in it.

8.   Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior Holdco Meeting–

8.1.   the Lock-Up Agreement;

8.2.   the Amendment Agreement;

8.3.   the Accession Letter;

8.4.   the Existing Intercreditor Agreement;

8.5.   the Super Senior 2019 Notes Indenture; and

8.6.   the Super Senior Term Loan Agreement.

By order of the board of directors of Holdco

**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of
**EDCON HOLDINGS LIMITED**

12 December 2016

**THIS PROPOSAL IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**

The definitions and interpretations commencing on page 7 of this Proposal Document apply throughout, including this cover page (unless the context indicates a contrary intention).

**Documents included in the Proposal Document:**

1.      The Explanatory Statement (from page 34);

2.      Proxy Form (from page 678); and

3.      Account Holder Letter (from page 718);

4.      The proposals in respect of the Company and Guarantor Compromises (from page 762).

**Action required:**

5.      This entire Proposal Document is important and should be read with particular attention to the section entitled "*Explanatory Statement*", which commences on page 41.

6.      This Proposal Document, if approved, will compromise certain of your rights under the relevant Compromise Claims and Guarantees.  This Proposal Document contains a Notice of a meeting of each class of Compromise Creditors contemplated in section 155(2) of the Companies Act in respect of the Compromise Companies as well as details of the relevant Compromises as required by section 155(3) of the Companies Act.

7.      If you are in any doubt as to what action to take, you should consult your broker, depositary, including any Clearing System, banker, accountant, attorney or other professional advisor immediately.

8.      If you have disposed of any of your Compromise Claims, please forward this Proposal Document to the acquirer of such Compromise Claims or to the broker, common depositary, banker or other agent through whom the disposal was effected.

**The Compromise Companies, New Holdco 2, New Holdco 1, the Parent and any subsidiary or associate company of the aforementioned companies do not accept responsibility, and will not be held liable, for any action of, or omission by, any Clearing System, banker, agent or broker including, without limitation, any failure on the part of the Clearing System, banker, agent or broker of any beneficial owner of Compromise Notes or a Compromise Lender to notify such beneficial owner of the transactions set out in this Proposal Document.**

**EDCON LIMITED**
Incorporated in South Africa
(Registration Number: 2007/003525/06)
("**Company**")
**EDGARS CONSOLIDATED STORES LIMITED**
Incorporated in South Africa
(Registration Number 1946/022751/06)
("**ECSL**")
**EDCON ACQUISITION PROPRIETARY LIMITED**
Incorporated in South Africa
(Registration Number 2007/000518/07)
("**Bidco**")
**EDCON HOLDINGS LIMITED**
Incorporated in South Africa
(Registration Number 2006/036903/06)
("**Holdco**" and together with ECSL and Bidco **"the Guarantors**")

---

**PROPOSAL BY THE BOARDS OF DIRECTORS OF EACH OF THE COMPANY AND GUARANTORS PURSUANT TO THE PROVISIONS OF SECTION 155 OF THE COMPANIES ACT RELATING TO AN ARRANGEMENT OR A COMPROMISE OF CERTAIN OF THE COMPANY'S AND GUARANTORS' FINANCIAL OBLIGATIONS**

---

Between each of
**THE COMPANY**
and
**THE GUARANTORS**
and

1.      **the "Senior Secured Class", constituting –**

1.1.      (i) the direct creditors (being the registered holders and the Senior Secured 2018 Notes Trustee, solely as beneficiaries of the covenants to repay principal and interest on the  Senior Secured 2018 Notes (as defined below) pursuant to the Senior Secured 2018 Notes Indenture); and (ii) the contingent creditors (as the beneficial holders of and/or the persons with the ultimate economic interest in the Senior Secured 2018 Notes (as defined below)), each in respect of the following notes–

1.1.1.      €300,000,000 9.5% Senior Secured Notes due 2018 (ISIN: XS0888937272 / XS0888936118; Common Code: 088893727 / 088893611);

1.1.2.      €317,000,000 9.5% Senior Secured Notes due 2018 (ISIN: XS0596918648 / XS0596918135; Common Code: 059691864 / 059691813),

collectively referred to as the "**Senior Secured 2018 EUR Notes**";

and

    1.1.3.    $250,000,000 9.5% Senior Secured Notes due 2018 (ISIN: US27929TAB35 / XS0596919026; Common Code: 059691902; CUSIP: 27929TAB3) referred to as the "**Senior Secured 2018 USD Notes**", and together with the Senior Secured 2018 EUR Notes,

collectively referred to hereinafter as the "**Senior Secured 2018 Notes**";

1.2.    (i) the direct creditors (being the registered holders and the Senior Secured 2019 Notes Trustee, solely as beneficiaries of the covenants to repay principal and interest on the Senior Secured 2019 Notes (as defined below) pursuant to the Senior Secured 2019 Notes Indenture); and (ii) the contingent creditors (as the beneficial holders of and/or the persons with the ultimate economic interest in the Senior Secured 2019 Notes (as defined below)), each in respect of the €36,195,706 Senior Secured 9.75%/12.75% PIK Toggle Notes due 2019 (ISIN: XS1314899433/XS1314900462; Common Code: 1313489943/131490046) (referred to as the "**Senior Secured 2019 Notes**"); and

1.3.    the lenders ("**Senior Secured Term Loan Lenders**") under the term loan facility agreement dated 28 March 2013 and as amended and restated from time to time, made between, among others, Holdco, the Company and the Senior Secured Term Loan Lenders ("**Senior Secured Term Loan Agreement**"); and

2.    **the "Super Senior Class", constituting –**

2.1.    (i) the direct creditors (being the registered holders and the Super Senior 2019 Notes Trustee, solely as beneficiaries of the covenants to repay principal and interest on the Super Senior 2019 Notes (as defined below)pursuant to the Super Senior 2019 Notes Indenture); and (ii) the contingent creditors (as the beneficial holders of and/or the persons with the ultimate economic interest in the Super Senior 2019 Notes (as defined below)), each in respect of the following notes:

    2.1.1.    €24,130,471 New Super Senior 8% PIK Notes due 2019 (Series B) (ISIN: XS1314902757 / XS1314902914; Common Code: 131490275 / 131490291);

    2.1.2.    €70,643,115 New Super Senior 8% PIK Notes due 2019 (Series A) (ISIN: XS1314901783 / XS1314901940; Common Code: 131490178 / 131490194); and

    2.1.3.    €21,663,779 New Super Senior 8% PIK Notes due 2019 (Series 1) (ISIN: XS1262391656 / XS1262394247; Common Code: 12623916 / 12623942),

collectively referred to as the "**Super Senior 2019 Notes**"; and

2.2.    the lenders ("**Super Senior Term Loan Lenders**") under the super senior term loan agreement dated 27 November 2015 made between, among others, Holdco, the Company and the Super Senior Term Loan Lenders ("**Super Senior Term Loan Agreement**").



**Attorneys to the Compromise Companies**

Edward Nathan Sonnenbergs Incorporated
150 West Street, Sandown
Sandton
Johannesburg

**INDEX TO THE PROPOSAL DOCUMENT**

| ITEM | DESCRIPTION | PAGES |
|---|---|---|
| 1. | Definitions | 7 |
| 2. | Interpretation | 38 |
| 3. | Explanatory Statement | 41 |
| | Part A (*Company Information, Background to and Reasons for the Financial Restructuring*) | 54 |
| | Part B (*Explanation of a Compromise in terms of section 155 of the Companies Act and Actions Required by Compromise Creditors* | 170 |
| | Part C (*Risk Factors*) | 196 |
| | Part D (*Eligible and Ineligible Creditors*) | 233 |
| | Part E1 (*Transfer Restrictions*) | 240 |
| | Part E2 (*SA Tax Implications to the holders of New Notes*) | 291 |
| | Part F (*Instructions and Guidelines for Compromise Creditors*) | 250 |
| | Part G (*Management's discussion and analysis of financial condition and results of operation*) | 266 |
| | Part H (*Annual Financial Statements*) | 365 |
| 4. | Notice by the board of directors of the Company to the Senior Secured Creditors of the Senior Secured Company Meeting | 645 |
| 5. | Notice by the board of directors of ECSL to the Senior Secured Creditors of the Senior Secured ECSL Meeting | 648 |
| 6. | Notice by the board of directors of Bidco to the Senior Secured Creditors of the Senior Secured Bidco Meeting | 651 |
| 7. | Notice by the board of directors of Holdco to the Senior Secured Creditors of the Senior Secured Holdco Meeting | 654 |
| 8. | Notice by the board of directors of the Company to the Super Senior Third Ranking Creditors of the Super Senior Company Meeting | 657 |
| 9. | Notice by the board of directors of ECSL to the Super Senior Third Ranking Creditors of the Super Senior ECSL Meeting | 660 |
| 10. | Notice by the board of directors of Bidco to the Super Senior Third Ranking Creditors of the Super Senior Bidco Meeting | 663 |
| 11. | Notice by the board of directors of Holdco to the Super Senior Third Ranking Creditors of the Super Senior Holdco Meeting | 666 |
| 12. | Proxy Form for use by Compromise Lenders only | 670 |
| 13. | Account Holder Letter for use by Compromise Noteholders | 705 |

|  |  | only |  |
| --- | --- | --- | --- |
| 14. | Company Proposal | | 746 |
| 15. | ECSL Proposal | | 916 |
| 16. | Bidco Proposal | | 1019 |
| 17. | Holdco Proposal | | 1123 |
| 18. | Restructuring Agreement in agreed form | | 1231 |

## DEFINITIONS AND INTERPRETATION

In this Proposal Document, unless the context indicates a contrary intention, a word or an expression which denotes any gender includes the other genders, a natural person includes a juristic person and *vice versa*, the singular includes the plural and *vice versa* and the following words and expressions bear the meanings assigned to them below . Any capitalised term used in this Proposal Document not defined in this definitions section shall bear its respective meaning in the Restructuring Agreement unless the context otherwise requires.—

| | |
|---|---|
| "**Account Holder**" | persons who are recorded directly in the records of a Clearing System as holding an interest in any Compromise Notes in an account with that Clearing System, either for its own account or on behalf of its client; |
| "**Account Holder Letter**" | the document enclosed within this Proposal and headed '*Account Holder Letter*'; |
| "**Administrative Parties**" | means each Representative (in their capacity as such), the SPV Guarantor and the Security Administrator ; |
| "**Affiliate**" | in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company; |
| "**Amendment Agreement**" | the amendment agreement which, *inter alia*, extends the Long Stop Date of the Lock-Up Agreement |
| "**Announcement**" | any announcement or notification by the Compromise Companies (or any of their agents**)** to the Senior Secured 2018 Noteholders, the Senior Secured 2019 Noteholders and the Super Senior 2019 Noteholders, including by way of – |
| | 1.    the Companies Announcement Service of The Irish Stock Exchange; |
| | 2.    the Registrar and the U.S. Registrar; |
| | 3.    the Clearing Systems; |

|  |  |
|---|---|
|  | 4. the Company website; or |
|  | 5. any other means of effecting notice to the Senior Secured 2018 Noteholders, the Senior Secured 2019 Noteholders and the Super Senior 2019 Noteholders pursuant to the procedures of the Court; and/or |
|  | any announcement or notification by the Compromise Companies (or any of their agents) to the Senior Secured Term Loan Lenders and the Super Senior Term Loan Lenders, including by way of – |
|  | 1. the agents under the Super Senior Term Loan Agreement and the Senior Secured Term Loan Agreement, respectively; |
|  | 2. the Company website; or |
|  | 3. any other means of effecting notice to the Senior Secured Term Loan Lenders and the Super Senior Term Loan Lenders pursuant to the procedures of the Court. |
|  | and "Announce" and "**Announced**" shall have corresponding meanings; |
| "**BEE Trust**" | the trustees for the time being of the Edcon Staff Employment Trust with Masters Reference Number IT4675/05 established to provide a framework for promotion by the Existing Group of black empowerment in the economy of South Africa and certain other countries in sub-Saharan Africa through ownership of equity in the Existing Group; |
| "**Bidco Compromises**" | the Senior Secured Bidco Compromise and the Super Senior Bidco Compromise; |
| "**Bidco Conditions**" | the conditions precedent to the Bidco Compromises, found at page 1034 of the Proposal Document; |

| "Bidco Meetings" | both the Senior Secured Bidco Meeting and the Super Senior Bidco Meeting; |
|---|---|
| "Bidco Proposal" | the proposals made by Bidco to the Senior Secured Class and Super Senior Class as set out at page 1019 of the Proposal Document; |
| "Binding Private Ruling" | means an advance tax ruling submitted to the South African Revenue Service (SARS) on 25 November 2016 and as supplemented on 6 December 2016 to be issued by SARS confirming that the respective repayments of loans by way of a set-off of the face value of such loans against the face value of the respective share subscription considerations  will not trigger the debt reduction rules as contemplated under section 19 or paragraph 12A of the Eighth Schedule to the Income Tax Act 58 of 1962 ; |
| "Business Day" | any day (that is not a Saturday or Sunday) on which commercial banks are open for general business in London and Johannesburg; |
| "Calculation Date" | has the meaning given to that term in Clause 5.1 (*Designation of Calculation Date, Funding Date, Pre-Completion Date and Completion Date*) of the Restructuring Agreement; |
| "Chairman" | Meyer Joffe or such other independent chairman as the board of directors of each of the Compromise Companies may collectively appoint and who shall chair the Compromise Meetings; |
| "Chapter 15 Proceedings" | a case commenced in United States Bankruptcy Court of the Southern District of New York by the filing of a petition for recognition in respect of the South African proceedings related to the Compromises by the Foreign Representative under chapter 15 of  the United States Bankruptcy Code; |

| | |
|---|---|
| "**Clearing Systems**" | collectively Euroclear, Clearstream and DTC (and a reference to "**Clearing System**" hereafter shall be a reference to all applicable clearing houses or systems); |
| "**Clearstream**" | Clearstream Banking (*société anonyme*); |
| "**Commission**" | the Companies and Intellectual Property Commission constituted in terms of section 185 of the Companies Act; |
| "**Committed Creditors**" | the RA Creditors that have, pursuant to the Lock-Up Agreement committed to subscribe to the New Money Notes in the amount up to their New Money Notes Commitments as set out in schedule 7 of the Restructuring Agreement; |
| "**Companies Act**" | the South African Companies Act, No. 71 of 2008, as amended from time to time; |
| "**Company Compromises**" | the Senior Secured Company Compromise and the Super Senior Company Compromise; |
| "**Company Conditions**" | the conditions precedent to the Company Compromise, found at page 765 of the Proposal Document; |
| "**Company Proposal**" | the proposals made by the Company to the Senior Secured Class and Super Senior Class as set out at page 746 of the Proposal Document; |
| "**Completion Date**" | has the meaning given to such term in clause 5.1.4 (*Designation of Calculation Date, Funding Date, Pre-Completion Date and Completion Date*) of the Restructuring Agreement; |
| "**Compromise Agent**" | Lucid Issuer Services Limited or any other agent appointed pursuant to the Compromises for the purpose of executing the relevant Implementation Documents on behalf of the Compromise Creditors in the circumstances, manner and at the times specified in the Restructuring Agreement; |

| | |
|---|---|
| **"Compromise Claims"** | any claim in respect of any Liability of the Company and Guarantors to any person arising out of an interest in the Senior Secured Notes, Senior Secured Term Loan, Super Senior Notes and/or Super Senior Term Loan in relation to the relevant Company Compromises and Guarantor Compromises; |
| **"Compromise Companies"** | each of the Company and the Guarantors; |
| **"Compromise Consideration"** | 1.  in relation to the Senior Secured Company Compromise, the consideration to be received by the Senior Secured Creditors if the Senior Secured Company Compromise is implemented in accordance with its terms, being the New Holdco 2 Ordinary A Shares and the New Holdco 2 PIK B Notes; or<br><br>2.  in relation to the Super Senior Company Compromise, the consideration to be received by the Super Senior Third Ranking Creditors if the Super Senior Company Compromise is implemented in accordance with its terms, being the New Holdco 2 PIK A Notes; |
| **"Compromise Creditors"** | the Super Senior Term Loan Lenders, Super Senior Noteholders and the Senior Secured Creditors; |
| **"Compromise Creditor Outstandings"** | in respect of a Compromise Creditor, from time to time, its Compromise Principal Outstandings plus the aggregate amount of accrued but unpaid interest or interest that has accrued and has not been capitalised on the Senior Secured Debt and Super Senior Third Ranking Debt owed to it; |
| **"Compromise Creditor Total Outstandings"** | from time to time, the aggregate amount of the Compromise Creditor Outstandings of all Compromise Creditors; |

| | |
|---|---|
| "**Compromise Effective Date** " | the date on which a copy of each order of any relevant Court sanctioning each Compromise has been filed by each and every Compromise Company with the Commission; |
| "**Compromise Lender**" | each Senior Secured Term Loan Lender or Super Senior Term Loan Lender; |
| "**Compromise Meetings**" | each of the Senior Secured Company Meeting, the Senior Secured ECSL Meeting, the Senior Secured Bidco Meeting, the Senior Secured Holdco Meeting, the Super Senior Company Meeting, the Super Senior ECSL Meeting, the Senior Secured Bidco Meeting and the Super Senior Holdco Meeting; |
| "**Compromise Noteholders**" | each Senior Secured Noteholder and Super Senior 2019 Noteholder; |
| "**Compromise Notes**" | the Senior Secured 2018 Notes, the Senior Secured 2019 Notes and the Super Senior 2019 Notes; |
| "**Compromise Resolutions**" | collectively, the Senior Secured Company Resolution, the Super Senior Company Resolution, the Senior Secured Bidco Resolution, the Super Senior Bidco Resolution, the Senior Secured ECSL Resolution, the Super Senior ECSL Resolution, the Senior Secured Holdco Resolution and the Super Senior Holdco Resolution; |
| "**Compromises**" | the Senior Secured Bidco Compromise, the Senior Secured Company Compromise, the Senior Secured ECSL Compromise, the Senior Secured Holdco Compromise, the Super Senior Bidco Compromise, the Super Senior Company Compromise, the Super Senior ECSL Compromise and the Super Senior Holdco Compromise; |
| "**Court**" | any South African court with competent jurisdiction to approve and sanction the Compromises pursuant to section 155(7) of the Companies Act; |

| | |
|---|---|
| "CP Notice" | has the meaning given to such term in clause 5.1 (*Designation of Calculation Date, Funding Date, Pre-Completion Date and Completion Date*) of the Restructuring Agreement; |
| "Custody Account" | an account held by an Account Holder with a Clearing System; |
| "Custody Instructions " | instructions given by any relevant Account Holder to Euroclear or Clearstream instructing Euroclear or Clearstream, as the case may be, to block those Compromise Notes in accordance with the instructions contained in the Proposal Document and the Restructuring Agreement; |
| "CVR" | the unsecured obligations of New Holdco 2, as contemplated in the New Holdco 2 MOI and constituted by the CVR Instrument, which have the rights set out in the CVR Instrument and the New Holdco 2 MOI and (to the extent set out in the New Holdco 2 MOI) rank *pari passu* with the New Holdco 2 Ordinary B Shares in issue from time to time; |
| "CVR Instrument" | the instrument pursuant to which the CVRs are constituted in the form scheduled to the Restructuring Agreement at schedule 9 (*Agreed Implementation Documents*); |
| "Designated Recipient" | any person appointed under a valid Account Holder Letter or Proxy Form delivered to and received by the Information Agent on behalf of a Compromise Creditor to receive the Compromise Consideration (to which that Compromise Creditor is entitled pursuant to the terms of the relevant Compromise), and/or New Money Notes, New Holdco 2 Ordinary B Shares or CVRs provided that in all cases, such person is an Eligible Person; |

| "**Distribution Agreement**" | the agreement governing the distribution of Compromise Consideration held by the Holding Period Trustee on behalf of Ineligible Creditors and Non-Respondent Creditors to be entered into between the Company, New Holdco 2, the Information Agent, the Compromise Creditors and the Holding Period Trustee in the form scheduled at schedule 9 (*Agreed Implementation Documents*) of the Restructuring Agreement; |
|---|---|
| "**DOP Super Senior Hedging Agreements**" | has the meaning given to such term in the Existing Intercreditor Agreement; |
| "**DOP Super Senior Hedging Counterparties**" | has the meaning given to such term in the Existing Intercreditor Agreement; |
| "**DTC**" | the Depository Trust Company; |
| "**DTC Record Date**" | the date falling 5 Business Days before the Record Date; |
| "**ECSL Compromises**" | the Senior Secured ECSL Compromise and the Super Senior ECSL Compromise; |
| "**ECSL Conditions**" | the conditions precedent to the ECSL Compromises, found at page 931 of the Proposal Document; |
| "**ECSL Meetings**" | both the Senior Secured ECSL Meeting and the Super Senior ECSL Meeting; |
| "**ECSL Proposal**" | the proposals made by ECSL to the Senior Secured Class and Super Senior Class as set out at page 916 of the Proposal Document; |

| | |
|---|---|
| "Eligible Creditor" | means:(a) a Compromise Noteholder on whose behalf a valid Account Holder Letter has been delivered , and received by, the Information Agent before the end of the Holding Period which includes a confirmation that such Compromise Noteholder (or if such Compromise Noteholder has appointed a Designated Recipient, its Designated Recipient) is an Eligible Person; and/or (b) a Compromise Lender on whose behalf a valid Proxy Form has been delivered to, and received by, the Information Agent before the end of the Holding Period which includes a confirmation that such Compromise Lender (or if such Compromise Lender has appointed a Designated Recipient, its Designated Recipient) is an Eligible Person; |
| "Eligible Lender" | a Compromise Lender who is an Eligible Creditor; |
| "Eligible Noteholder" | a Compromise Noteholder who is an Eligible Creditor; |
| "Eligible Person" | a person in relation to whom the offer to, issue to or subscription by such person in respect of any Compromise Consideration and/or New Money Notes and/or New Holdco 2 Ordinary B Shares or CVRs (as the case may be): (a)     would not be unlawful or prohibited under the laws of any applicable jurisdiction; and (b)     would not, or would not be likely to, result in the Company, New Holdco 2 and New Holdco 1 being required to comply with any filing, registration, disclosure or other onerous requirement in any jurisdiction where that person is a citizen or subject to the laws of or in which that person is domiciled or resident; |
| "Escrow Agent" | Lucid Issuer Services Limited or any other agent appointed by the Company for the purpose of receiving subscription monies for the New Money Notes; |

| | |
|---|---|
| "**Escrow Deed**" | the deed between (i) New Holdco 1, (ii) the Funding Parties (as defined therein) and (iii) the Escrow Agent for the purpose of receiving subscription monies for the New Holdco 1 PIK A-1 Notes and in the form scheduled hereto at Schedule 9 (*Agreed Implementation Documents*); |
| "**Exchange Control Regulations**" | the Exchange Control Regulations 1961, as amended from time to time, issued in terms of section 9 of the South African Currency and Exchanges Act, No. 9 of 1933, as amended from time to time; |
| "**Euro**" or "**EUR**" or "**€**" | the Euro, being the lawful currency of the European Economic and Monetary Union; |
| "**Euroclear**" | Euroclear Bank SA/NV; |
| "**Execution Document**" | means each of the agreements and deeds in the form scheduled at schedule 9 (*Agreed Implementation Documents*) of the Restructuring Agreement and each of the documents, deeds, instruments of transfer, agreements, notices, resolutions, consents and undertakings listed in schedule 8 (*Implementation Document Index*) of the Restructuring Agreement; |
| "**Existing Group**" | Holdco and each of its subsidiaries; |
| "**Existing Intercreditor Agreement**" | the intercreditor agreement made between, among others, Holdco, the Obligors (as defined therein), ABSA Bank Limited (as security administrator and second secured agent) and SPV Guarantor, as originally dated 25 May 2007, and as amended, restated, varied or supplemented from time to time; |
| "**Explanatory Statement**" | the document enclosed within this Proposal Document and headed '*Explanatory Statement*' at page 41 of the Proposal Document; |
| "**Facility A3 Lenders**" | Means |

| | |
|---|---|
| | (a)    BCF Global S.à.r.l |
| | (b)    Big River Group Fund SPC Limited; |
| | (c)    Brigade Opportunistic Credit Fund - ICIP, Ltd; |
| | (d)    Brigade Opportunistic Credit Fund 16 LLC; |
| | (e)    Delta Master Trust; |
| | (f)    DSTR Global S.à.r.l; |
| | (g)    Fedex Corporation Employees' Pension Trust; |
| | (h)    Future Directions Credit Opportunities Fund; |
| | (i)    LCS Global S.à.r.l; |
| | (j)    Los Angeles County Employees Retirement Association; |
| | (k)    President And Fellows Of Harvard College; |
| | (l)    SC Credit Opportunities Mandate LLC; and |
| | (m)    Templeton Emerging Markets Income Fund, Inc; |
| "**Final Allocation and Entitlement Table**" | has the meaning given to such term in the Restructuring Agreement; |
| "**Finance Documents**" | has the meaning given to such term in the Existing Intercreditor Agreement; |
| "**Financial Advisors**" | has the meaning given to such term in the Restructuring Agreement; |
| "**Financial Restructuring**" | the corporate and financial restructuring of the Existing Group, implemented in accordance with this Proposal Document and the Restructuring Agreement; |
| "**Foreign Creditor**" | a Compromise Creditor who or which is a non-resident of South Africa as contemplated in the Exchange Control Regulations; |
| "**GLAS**" | GLAS Trust Corporation Limited a limited liability company incorporated in England and Wales with registered number |

| | 07927175 and whose registered address is 45 Ludgate Hill, London, EC4M 7JU; |
|---|---|
| "**Guarantee**" | any direct guarantee and/or the direct guarantee and indemnity (or counter-indemnity) given by the Guarantors pursuant to the Senior Secured 2018 Notes Indenture, Senior Secured 2019 Notes Indenture, Super Senior Notes Indenture, the Senior Term Loan Agreement and Super Senior Term Loan Agreement ; |
| "**Guarantor**" | collectively Holdco, ECSL and Bidco and "Guarantor" shall mean any of them as the context may require; |
| "**Guarantor Compromises**" | each of the ECSL Compromises, the Bidco Compromises and the Holdco Compromises; |
| "**Guarantor Meetings**" | each of the Senior Secured Guarantor Meetings and the Super Senior Guarantor Meetings; |
| "**Guarantor Resolutions**" | each of the Senior Secured Bidco Resolution, the Super Senior Bidco Resolution, the Senior Secured ECSL Resolution, the Super Senior ECSL Resolution, the Senior Secured Holdco Resolution and the Super Senior Holdco Resolution; |
| "**HBA Shares**" | all of the shares held by Holdco in Hollard Business Associates (Proprietary) Limited, a limited liability company incorporated under the laws of South Africa and registered with registration number 1998/25618/07; |
| "**Holdco Compromises**" | the Senior Secured Holdco Compromise and the Super Senior Holdco Compromise; |
| "**Holdco Conditions**" | the conditions precedent to the Holdco Compromises, found at page 1141 of the Proposal Document; |
| "**Holdco Meetings**" | both the Senior Secured Holdco Meeting and the Super Senior Holdco Meeting; |

| "Holdco Proposal" | the proposals made by Holdco to the Senior Secured Class and Super Senior Class as set out at page 1123 of the Proposal Document; |
|---|---|
| "Holding Company" | in relation to any person, any other person in respect of which it is a Subsidiary; |
| "Holding Period" | has the meaning given to that term in Clause 7.2 (*Holding Period Trust*) of the Restructuring Agreement; |
| "Holding Period Trustee" | being Lucid Issuer Services Limited or any other trustee appointed by the Company and New Holdco 2 to hold on a bare trust for the Holding Period, the relevant Compromise Consideration in respect of Ineligible Creditors and Non-Respondent Creditors; |
| "Implementation Documents" | the Restructuring Agreement, all Execution Documents, and such other documents, deeds, instruments of transfer, agreements, notices, resolutions, consents and undertakings listed in schedule 8 of the Restructuring Agreement (*Implementation Documents Index*) and any other documents as shall be agreed between the Company and the Majority Locked-Up Creditors prior to the Compromise Meetings; |
| "Ineligible Creditor" | a Compromise Creditor who: (a) has failed to confirm in an Account Holder Letter of Proxy Form (as applicable) that they are an Eligible Creditor before the Voting Instruction Deadline; or (b) has confirmed in an Account Holder Letter or Proxy Form (as applicable) that they are not an Eligible Creditor before the Voting Instruction Deadline but who has not appointed a Designated Recipient (such Designated Recipient being an Eligible Person); |
| "Ineligible Lender" | a Compromise Lender who is an Ineligible Creditor; |

| "**Ineligible Noteholder**" | a Compromise Noteholder who is an Ineligible Creditor; |
|---|---|
| "**Information Agent**" | Lucid Issuer Services Limited or any other agent appointed by the Company for the purpose of discharging administrative matters under the Restructuring Agreement and Compromises; |
| "**Initial Allocation and Entitlement Table**" | has the meaning given to that term in Clause 6.15 (Allocation) of the Restructuring Agreement; |
| "**Initial Effective Date**" | the date on which the Restructuring Agreement has been executed by each of the Initial Parties; |
| "**Initial Parties**" | each Party listed in paragraphs (1) to (9) of the Parties Clause in the Restructuring Agreement; |
| "**Interest**" | any cash pay or PIK interest that has accrued and has not been capitalised in accordance with the Finance Documents since the Record Date; |
| "**Legal Advisors**" | has the meaning given thereto in the Restructuring Agreement; |
| "**Liability**" | means any and all liabilities owed by the Company under the Senior Term Loans, Super Senior Term Loans and Super Senior 2019 Notes and being in respect of: <br><br> (a) any principal amounts as at Record Date; and <br> (b) any accrued but unpaid interest thereon as at the Completion Date; <br><br> and any and all liabilities owed by the Company under the Senior Secured Notes and being in respect of: <br><br> (a) any principal amounts as at Record Date or the DTC Record Date (as applicable); and <br> (b) any accrued but unpaid interest thereon as at the Completion Date, <br><br> and "**Liabilities**" shall have the corresponding meaning; |

| | |
|---|---|
| "**Lock-Up Agreement**" or "**LUA**" | the lock-up agreement relating to the Financial Restructuring dated 3 October 2016 entered into between, *inter alios*, the Compromise Companies and certain of their creditors; |
| "**Long-Stop Date**" | 28 February 2017 or such other date as may be determined in accordance with clause 23 (*Amendments*) of the Restructuring Agreement; |
| "**Luxco**" | Edcon (BC) S.à r.l. *a société à responsabilité limitée* incorporated under the laws of the Grand Duchy of Luxembourg and registered with the Registre de Commerce et des Societes with registration number 173107; |
| "**Luxco Parties**" | each of:<br><br>(a) Holdco;<br>(b) Holdco's directors, officers, employees, partners, advisors and agents;<br>(c) Luxco;<br>(d) Luxco's directors, officers, employees, advisors, trustees and managers; and<br>(e) Luxco's current and past direct and indirect members, beneficiaries, their respective general and limited partners and their advisors and/or sub-advisors (including, without limitation, Bain Capital Private Equity LP and its affiliates; |
| "**Majority Locked-Up Creditors**" | as defined in the Restructuring Agreement; |
| "**Management Incentive Trust**" | means any trust established for the purposes of a management incentive plan in relation to the New Holdco Group in accordance with the Restructuring Agreement; |

| "**Management Trust**" | means, taken together: |
|---|---|
| | (a) the trustees for the time being of the Elephant Acquisition Primary Founder Investor Trust with Masters Reference Number IT5665/07; |
| | (b) the trustees for the time being of the Elephant Acquisition Primary Founder Investor Trust 2 with Masters Reference Number IT5659/07; |
| | (c) the trustees for the time being of the Elephant Acquisition Secondary Founder Investor Trust with Masters Reference Number IT5656/07; |
| | (d) the trustees for the time being of the Elephant Acquisition Secondary Founder Investor Trust 2 with Masters Reference Number IT5658/07; |
| | (e) the trustees for the time being of the Elephant Acquisition Secondary Founder Investor Trust 3 with Masters Reference Number IT5657/07; |
| | (f) the trustees for the time being of the Elephant Acquisition Tertiary Investor Trust with Masters Reference Number IT1200/2013; |
| | (g) the trustees for the time being of the Elephant Acquisition Tertiary Investor Trust 2 with Masters Reference Number IT1202/2013; |
| | (h) the trustees for the time being of the Elephant Acquisition Tertiary Investor Trust 3 with Masters Reference Number IT1201/2013; |
| | (i) the trustees for the time being of the Elephant Acquisition Primary Independent Investor Trust with Masters Reference Number IT10676/07; and |
| | (j) the trustees for the time being of the Elephant Acquisition Secondary Investor Trust with Masters Reference Number IT10678/07; |
| | each established for the purpose of incentivising management |

| "New Holdco 1" | K2016470260 (South Africa) Limited a public company incorporated under the laws of South Africa with registration number 2016/470260/06; |
|---|---|
| "New Holdco 1 PIK A-1 Notes" | the secured PIK notes denominated in USD and due 2022 which are to be issued by New Holdco 1 under the New Holdco 1 PIK A-1 Notes Indenture; |
| "New Holdco 1 PIK A-1 Notes Indenture" | the indenture pursuant to which the New Holdco 1 PIK A-1 Notes are issued in the form attached to the Restructuring Agreement as schedule 9 (*Agreed Implementation Documents*); |
| "New Holdco 1 PIK A-2 Notes" | the secured PIK notes denominated in USD and due 2022 which are to be issued by New Holdco 1 under the New Holdco 1 PIK A-2 Notes Indenture; |
| "New Holdco 1 PIK A-2 Notes Indenture" | the indenture pursuant to which any New Holdco 1 PIK A-2 Notes are issued in the form attached to the Restructuring Agreement as schedule 9 (*Agreed Implementation Documents*); |
| "New Holdco 2" | K2016470219 (South Africa) Limited a public company incorporated under the laws of South Africa with registration number 2016/470219/06; |
| "New Holdco 2 MOI" | the memorandum of incorporation of New Holdco 2, as attached to the Restructuring Agreement  (it being recorded that a notice of amendment has been submitted to, but not accepted by, the Commission at the date of this Proposal Document); |
| "New Holdco 2 Ordinary A Shares" | A ordinary shares in the issued share capital of New Holdco 2; |
| "New Holdco 2 Ordinary B Shares" | B ordinary shares in the issued share capital of New Holdco 2; |

| | |
|---|---|
| "**New Holdco 2 Ordinary C Shares**" | C ordinary shares in the issued share capital of New Holdco 2; |
| "**New Holdco 2 Ordinary  D Shares**" | D ordinary shares in the issued share capital of New Holdco 2; |
| "**New Holdco 2 Ordinary E Shares**" | E ordinary shares in the issued share capital of the New Holdco 2; |
| "**New Holdco 2 PIK A Notes**" | any secured PIK A notes , denominated in EUR and due 2022 which are to be issued by New Holdco 2, under the New Holdco 2 PIK A Notes Indenture; |
| "**New Holdco 2 PIK A Notes Indenture**" | the indenture pursuant to which any New Holdco 2 PIK A Notes are issued in the form attached to the Restructuring Agreement as schedule 9 (*Agreed Implementation Documents*); |
| "**New Holdco 2 PIK B Notes**" | any or all New Holdco 2 PIK B USD Notes and New Holdco 2 PIK B ZAR Notes; |
| "**New Holdco 2 PIK B Notes Indentures**" | the indenture pursuant to which any New Holdco 2 PIK B Notes are issued, in the form attached to the Restructuring Agreement as schedule 9 (*Agreed Implementation Documents*); |
| "**New Holdco 2 PIK B USD Notes**" | the secured PIK B notes  denominated in USD and due 2022 and to be issued by New Holdco 2under the New Holdco 2 PIK B Notes Indenture; |
| "**New Holdco 2 PIK B ZAR Notes**" | any secured PIK B notes denominated in ZAR and due 2022 and to be issued by New Holdco 2, having the rights, privileges and entitlements as set out in the New Holdco 2 PIK B Notes Indenture; |
| "**New Holdco Group**" | each of Parent, New Holdco 1 and New Holdco 2; |
| "**New Holdco PIK Note Indentures**" | collectively, the New Holdco 1 PIK A 1 Notes Indenture, the New Holdco 1 PIK A 2 Notes Indenture, the New Holdco 2 PIK A Notes Indenture and the New Holdco 2 PIK B Notes Indenture; |

| "New Money Notes" | the New Holdco 1 PIK A-1 Notes; |
|---|---|
| "New Money Notes Commitment" | the commitments of each of the Committed Creditors in respect of the New Money Notes in the amount set opposite its name in Part A (*New Holdco 1 PIK A-1 Notes Commitments*) of schedule 4 (*Completion Funding Commitments*)of the Restructuring Agreement; |
| "New Money Notes Offer" | the offer by New Holdco 1 to each of the Senior Secured Creditors and the Super  Senior Third Ranking Creditors who are Eligible Creditors, to subscribe for the New Money Notes as set out in Part 4 of the Proxy Form and Account Holder Letter, and in accordance with provisions of the Restructuring Agreement; |
| "New Notes" | any of the New Holdco 1 PIK A-1 Notes, New Holdco 1 PIK A-2 Notes, New Holdco 2 PIK A Notes or the New Holdco 2 PIK B Notes; |
| "Non-Respondent Creditor" | any Compromise Creditor whose valid Proxy Form or Account Holder Letter has not been delivered to, and received by, the Information Agent in respect of such Compromise Creditor before the Voting Instruction Deadline; |
| "Notices" | collectively, the Notice of the Senior Secured Bidco Meeting, the Notice of the Senior Secured ECSL Meeting, the Notice of the Senior Secured Holdco Meeting, the Notice of the Senior Secured Meeting, the Notice of the Super Senior Bidco Meeting, the Notice of the Super Senior ECSL Meeting, the Notice of the Super Senior Holdco Meeting and the Notice of the Super Senior Meeting; |
| "Notice of the Senior Secured Bidco Meeting" | the document enclosed within this Proposal Document and headed "*Notice by the board of directors of Bidco to the Senior Secured Creditors of the Senior Secured Bidco Meeting*"; |

| | |
|---|---|
| "**Notice of the Senior Secured Company Meeting** | the document enclosed within this Proposal Document and headed "*Notice by the board of directors of the Company to the Senior Secured Creditors of the Senior Secured Company Meeting*"; |
| "**Notice of the Senior Secured ECSL Meeting**" | the document enclosed within this Proposal Document and headed "*Notice by the board of directors of ECSL to the Senior Secured Creditors of the Senior Secured ECSL Meeting*"; |
| "**Notice of the Senior Secured Holdco Meeting**" | the document enclosed within this Proposal Document and headed "*Notice by the board of directors of Holdco to the Senior Secured Creditors of the Senior Secured Holdco Meeting*"; |
| "**Notice of the Super Senior Bidco Meeting**" | the document enclosed within this Proposal Document and headed "*Notice by the board of directors of Bidco to the Super Senior Third Ranking Creditors of the Super Senior Bidco Meeting*"; |
| "**Notice of the Super Senior Company Meeting**" | the document enclosed within this Proposal Document and headed "*Notice by the board of directors of the Company to the Super Senior Third Ranking Creditors of the Super Senior Company Meeting*"; |
| "**Notice of the Super Senior ECSL Meeting**" | the document enclosed within this Proposal Document and headed " *Notice by the board of directors of ECSL to the Super Senior Third Ranking Creditors of the Super Senior ECSL Meeting*"; |
| "**Notice of Super Senior Holdco Meeting**" | the document enclosed within this Proposal Document and headed "*Notice by the board of directors of Holdco to the Super Senior Third Ranking Creditors of the Super Senior Holdco Meeting*"; |

| | |
|---|---|
| "**Parent**" | K2016470295 (South Africa) Proprietary Limited a private company incorporated under the laws of South Africa with registration number 2016/470295/07; |
| "**Participating Creditor**" | those Facility A3 Lenders, Compromise Creditors and Committed Creditors who commit or elect to subscribe for their Pro Rata Participation Share of the New Money Notes; |
| "**Person**" | any individual, partnership, corporation, business trust, limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof; |
| "**Pre-Completion Date**" | has the meaning given to such term in the Restructuring Agreement; |
| "**Proposal Document**" | this bound document, dated 12 December 2016, addressed to the Compromise Creditors and which includes, among other things, the Explanatory Statement, the Notices, the Account Holder Letter and the Proxy Form in relation to the Compromise Meetings and the Compromises; |
| "**Pro Rata Participation Share**" | means, in respect of any Compromise Creditor, the proportion that its Compromise Creditor Outstandings bear to the Compromise Creditor Total Outstandings, in each case as at the Calculation Date and as evidenced by the Final Allocation and Entitlement Table in accordance with clause 6 (*Allocation*s) of the Restructuring Agreement; |
| "**Proxy Form**" | the document enclosed within this Proposal Document at page 670 and headed '*Proxy Form*'; |
| "**RA Accession Deadline**" | has the meaning given to it in the Restructuring Agreement; |
| "**RA Accession Letter**" | has the meaning given to it in the Restructuring Agreement; |

| "RA Creditors" | each of the - |
| | 1. RCF Creditors; |
| | 2. Super Senior Secured Liquidity Facility Creditors; |
| | 3. Super Senior Second Ranking Creditors; |
| | 4. Super Senior Second Ranking Participants; and |
| | 5. Compromise Creditors; |
| "RA Effective Date" | the date on which, following the Initial Effective Date and the Compromise Effective Date, each of the Compromise Creditors (either directly or by the Compromise Agent in accordance with the terms of the Compromises), the RCF Lenders, the Super Senior Secured Liquidity Lenders, the Super Senior Second Ranking Creditors and the Super Senior Second Ranking Participants have acceded to the Restructuring Agreement; |
| "RCF Creditors" | as defined in the Restructuring Agreement read with the Existing Intercreditor Agreement; |
| "Record Date" | in respect of each Compromise, the date of the Compromise Meetings, being 29 December 2016 or the date to which any of the Compromise Meetings are adjourned (as applicable); |
| "Registrar" | The Bank of New York Mellon (Luxembourg) S.A.; |
| "Representative" | means each "Representative" (as defined in the Existing Intercreditor Agreement) other than the Senior Holdco Representative (as defined in the Existing Intercreditor Agreement); |
| "Restructuring Agreement" | the restructuring agreement attached hereto in agreed form; |

| | |
|---|---|
| **"Restructuring Term Sheet"** | the term sheet and schedules thereto set out in schedule 9 (*Restructuring Term Sheet*) of the Lock-Up Agreement or as otherwise amended thereto in accordance with the terms of the Lock-Up Agreement; |
| **"SARB"** | the South African Reserve Bank; |
| **"Security Administrator"** | means Absa Bank Limited (acting through its Corporate and Investment Banking Division) in its capacity as security administrator under, and as defined in, the Existing Intercreditor Agreement; |
| **"Senior Holdco Notes"** | means the "Senior Holdco Notes" as defined in the Existing Intercreditor Agreement; |
| **"Senior Secured 2018 Noteholder"** | a person who is the beneficial owner of and the owner of the ultimate economic interest in any of the Senior Secured 2018 Notes as at the Record Date or DTC Record Date (as applicable), whose interests in the Senior Secured 2018 Notes are held through records maintained in book entry form by a Clearing System; |
| **"Senior Secured 2018 Notes Indenture"** | the trust indenture concluded amongst, *inter alios*, the SPV Guarantor, the Company and the Senior Secured 2018 Trustee for the time being pursuant to which any Senior Secured 2018 notes are issued; |
| **"Senior Secured 2018 Notes Trustee"** | GLAS; |
| **"Senior Secured 2019 Noteholder"** | a person who is the beneficial owner of and the owner of the ultimate economic interest in any of the Senior Secured 2019 Notes as at the Record Date, whose interests in the Senior Secured 2019 Notes are held through records maintained in book entry form by a Clearing System; |

| | |
|---|---|
| **"Senior Secured 2019 Notes Indenture"** | the trust indenture concluded amongst, *inter alios*, the SPV Guarantor, the Company and the Senior Secured 2019 Trustee for the time being pursuant to which any Senior Secured 2019 notes are issued; |
| **"Senior Secured 2019 Notes Trustee"** | GLAS; |
| **"Senior Secured Bidco Compromise"** | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of Bidco between Bidco and the Senior Secured Creditors, which will become effective on and as from the Compromise Effective Date; |
| **"Senior Secured Bidco Meeting"** | the meeting of the Senior Secured Creditors to be convened in connection with the Senior Secured Bidco Compromise, which will be held on the Record Date, to consider and, if deemed fit, pass the Senior Secured Bidco Resolution; |
| **"Senior Secured Bidco Resolution"** | the resolution for the approval of the Senior Secured Bidco Compromise in terms of section 155(6) of the Companies Act to be proposed at the Senior Secured Bidco Meeting, the full terms of which are set out in the Notice of the Senior Secured Bidco Meeting; |
| **"Senior Secured Company Compromise"** | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of the Company between the Company and the Senior Secured Creditors, which will become effective on and as from the Compromise Effective Date; |
| **"Senior Secured Company Meeting"** | the meeting of the Senior Secured Creditors to be convened in connection with the Senior Secured Compromise, which will be held on the Record Date, to consider and, if deemed fit, pass the Senior Secured Resolution; |

| | |
|---|---|
| "**Senior Secured Company Resolution**" | the resolution for the approval of the Senior Secured Company Compromise in terms of section 155(6) of the Companies Act to be proposed at the Senior Secured Company Meeting, the full terms of which are set out in the Notice of the Senior Secured Company Meeting; |
| "**Senior Secured Creditors**" | collectively, the Senior Secured 2018 Noteholders, the Senior Secured 2019 Noteholders and the Senior Secured Term Loan Lenders; |
| "**Senior Secured ECSL Compromise**" | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of ECSL between ECSL and the Senior Secured Creditors, which will become effective on and as from the Compromise Effective Date; |
| "**Senior Secured ECSL Meeting**" | the meeting of the Senior Secured Creditors to be convened in connection with the Senior Secured ECSL Compromise, which will be held on the Record Date to consider and, if deemed fit, pass the Senior Secured ECSL Resolution; |
| "**Senior Secured ECSL Resolution**" | the resolution for the approval of the Senior Secured ECSL Compromise in terms of section 155(6) of the Companies Act to be proposed at the Senior Secured ECSL Meeting, the full terms of which are set out in the Notice of the Senior Secured ECSL Meeting; |
| "**Senior Secured Guarantor Meetings**" | each of the Senior Secured Bidco Meeting, the Senior Secured ECSL Meeting and the Senior Secured Holdco Meeting; |
| "**Senior Secured Holdco Compromise**" | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of Holdco between Holdco and the Senior Secured Creditors, will become effective on and as from the Compromise Effective Date; |

| "**Senior Secured Holdco Meeting**" | the meeting of the Senior Secured Creditors to be convened in connection with the Senior Secured Holdco Compromise, which will be held on the Record Date to consider and, if deemed fit, pass the Senior Secured Holdco Resolution; |
| --- | --- |
| "**Senior Secured Holdco Resolution**" | the resolution for the approval of the Senior Secured Holdco Compromise in terms of section 155(6) of the Companies Act to be proposed at the Senior Secured Holdco Meeting, the full terms of which are set out in the Notice of the Senior Secured Holdco Meeting; |
| "**Senior Secured Noteholder**" | Senior Secured 2018 Noteholders and Senior Secured 2019 Noteholders; |
| "**Signing Date**" | has the meaning given thereto in clause 2.5 of the Restructuring Agreement; |
| "**South Africa**" | the Republic of South Africa; |
| "**SPV Guarantor**" | Elephant OnTheCards Proprietary Limited, a private limited liability company incorporated in South Africa with registration number: 2006/034526/07; |

| "**Subsidiary**" | with respect to any person:<br><br>a) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% (fifty percent) of the total voting power of shares of share capital entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such person or one or more of the subsidiaries of that person or a combination thereof; or<br><br>b) any partnership, joint venture, limited liability company or similar entity of which:<br><br>    i) more than 50% (fifty percent) of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such person or one or more of the subsidiaries of that person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise; and<br><br>    ii) such person or any subsidiary of such person is a controlling general partner or otherwise controls such entity; |
| "**Super Senior 2019 Noteholder**" | a person who is the beneficial owner of and the owner of the ultimate economic interest in any of the Super Senior 2019 Notes as at the Record Date, whose interests in the Super Senior 2019 Notes are held through records maintained in book entry form by a Clearing System; |

| | |
|---|---|
| **"Super Senior 2019 Notes Indenture"** | the trust indenture concluded amongst, *inter alios*, the SPV Guarantor, the Company and the Super Senior 2019 Notes trustee for the time being pursuant to which any Super Senior 2019 Notes are issued; |
| **"Super Senior 2019 Notes Trustee"** | GLAS; |
| **"Super Senior Bidco Compromise"** | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of Bidco between Bidco and the Super Senior Third Ranking Creditors, will become effective on and as from the Compromise Effective Date; |
| **"Super Senior Bidco Meeting"** | the meeting of the Super Senior Third Ranking Creditors to be convened in connection with the Super Senior Bidco Compromise, which will be held  on the Record Date, to consider and, if deemed fit, pass the Super Senior Bidco Resolutions; |
| **"Super Senior Bidco Resolution"** | the resolution for the approval of the Super Senior Bidco Compromise in terms of section 155(6) of the Companies Act to be proposed at the Super Senior Bidco Meeting, the full terms of which are set out in the Notice of the Super Senior Bidco Meeting; |
| **"Super Senior Company Compromise"** | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of the Company between the Company and the Super Senior Third Ranking Creditors, which will become effective on and as from the Compromise Effective Date, |
| **"Super Senior Company Meeting"** | the meeting of the Super Senior Third Ranking Creditors to be convened in connection with the Super Senior Compromise, which will be held on the Record Date to consider and, if deemed fit, pass the Super Senior Company Resolution; |

| | |
|---|---|
| "**Super Senior Company Resolution**" | the resolution for the approval of the Super Senior Company Compromise in terms of section 155(6) of the Companies Act to be proposed at the Super Senior Company Meeting, the full terms of which are set out in the Notice of the Super Senior Company Meeting; |
| "**Super Senior ECSL Compromise**" | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of ECSL between ECSL and the Super Senior Third Ranking Creditors, will become effective on and as from the Compromise Effective Date; |
| "**Super Senior ECSL Meeting**" | the meeting of the Super Senior Third Ranking Creditors to be convened in connection with the Super Senior ECSL Compromise, which will be held on the Record Date, to consider and, if deemed fit, pass the Super Senior ECSL Resolution; |
| "**Super Senior ECSL Resolution**" | the resolution for the approval of the Super Senior Compromise in terms of section 155(6) of the Companies Act to be proposed at the Super Senior ECSL Meeting, the full terms of which are set out in the Notice of the Super Senior  ECSL Meeting; |
| "**Super Senior First Ranking Creditors** | means the RCF Creditors and the Super Senior Secured Liquidity Facility Creditors; |
| "**Super Senior Guarantor Meetings**" | each of the Super Senior Bidco Meeting, the Super Senior ECSL Meeting and the Super Senior Holdco Meeting; |
| "**Super Senior Holdco Compromise**" | the compromise in terms of section 155(2) of the Companies Act, proposed by the board of directors of Holdco between Holdco and the Super Senior Third Ranking Creditors, which will become effective on and as from the Compromise Effective Date; |

| "**Super Senior Holdco Meeting**" | the meeting of the Super Senior Third Ranking Creditors to be convened in connection with the Super Senior Holdco Compromise, which will be held on the Record Date, to consider and, if deemed fit, pass the Super Senior Holdco Resolution; |
|---|---|
| "**Super Senior Holdco Resolution**" | the resolution for the approval of the Super Senior Compromise in terms of section 155(6) of the Companies Act to be proposed at the Super Senior Holdco Meeting, the full terms of which are set out in the Notice of the Super Senior Holdco Meeting; |
| "**Super Senior Second Ranking Creditors**" | each of the DOP Super Senior Hedging Counterparties; |
| "**Super Senior Second Ranking Debt**" | any Liabilities owed by a Guarantor to any DOP Super Senior Hedging Counterparty under or in connection with the DOP Super Senior Hedging Agreements as designated as such in accordance with clause 7.7 (Super Senior hedging Debt Designation Provisions) in the Existing Intercreditor Agreement; |
| "**Super Senior Second Ranking Participants**" | Goldman Sachs Lending Partners LLC (on behalf of the European Special Situations Group at Goldman Sachs Lending Partners LLC), Goldman Sachs Lending Partners LLC (on behalf means Goldman Sachs Lending Partners LLC (on behalf of the Private Distressed Group at Goldman Sachs Lending Partners LLC) and Investec Assurance Limited; |
| "**Super Senior Secured Liquidity Facility Amended and Restated Agreement**" | the term loan and revolving credit facility agreement dated 29 July 2015 and as amended and restated and made between, among others, Holdco and its Subsidiaries named therein and the Super Senior Secured Liquidity Facility Creditors named therein; |

| | |
|---|---|
| **"Super Senior Secured Liquidity Facility Creditors"** | the finance parties party to the Super Senior Secured Liquidity Facility Agreement; |
| **"Super Senior Third Ranking Creditors"** | collectively, the Super Senior 2019 Noteholders and Super Senior Term Loan Lenders; |
| **"Super Senior Third Ranking Debt"** | collectively, the debt owed to the Super Senior Term Lenders and the Super Senior Noteholders; |
| **"Trustees"** | the Super Senior 2019 Notes Trustee, the Senior Secured 2018 Notes Trustee and the Senior Secured 2019 Notes Trustee; |
| **"U.S. Dollar"** or **"USD"** or **"$"** | the United States Dollar, being the lawful currency of the United States of America; |
| **"U.S. Registrar"** | The Bank of New York Mellon; |
| **"Voting Instruction Deadline"** | 16h00 (Johannesburg time) 2 (two) Business Days prior to the Record Date; |

**INTERPRETATION**

1. Any reference to an enactment is to that enactment as at the date of the Proposal Document and as amended or re-enacted from time to time and includes any subordinate legislation made from time to time under such enactment.

2. Expressions defined in this Proposal Document shall bear the same meanings in schedules or annexures to this Proposal Document which do not themselves contain their own conflicting definitions.

3. If any term in this Proposal Document is defined within the context of any particular paragraph in this Proposal Document, the term so defined, unless it is clear from the paragraph in question that the term so defined has limited application to the relevant paragraph, shall bear the meaning ascribed to it for all purposes in terms of this Proposal Document, notwithstanding that that term has not been defined in the Definitions or Interpretation section of this Proposal Document.

4. The words "**include**", "**including**" and "**in particular**" in this Proposal Document shall be construed as being by way of example or emphasis only and shall not be construed, nor shall they take effect, as limiting the generality of any preceding word/s.

5. Any reference in this Proposal Document to any other agreement or document shall be construed as a reference to such other agreement or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented.

6. The words "**other**" and "**otherwise**" in this Proposal Document shall not be construed *eiusdem generis* with any preceding words where a wider construction is possible.

7. Reference to a document being in the "agreed form" is a reference to a document in the form and terms approved of, by or on behalf of each party which is party to that document.

8. To the extent that any provisions of the Proposal Document are ambiguous, they are to be interpreted in a manner which is consistent with the purpose of section 155 of the Companies Act.  Every effort has been made to achieve an interpretation consistent with competing elements of this Proposal Document, however, should any inconsistencies or conflict of interpretation arise between any provision of the Proposal Document under the heading of Part B of this Proposal Document and any other provision or explanation in the Proposal Document then the provision under Part B below shall prevail.

9. The general interpretation provisions of section 5 of the Companies Act shall apply *mutatis mutandis* to the Proposal Document.

**EDCON LIMITED**
Incorporated in South Africa
(Registration Number: 2007/003525/06)
**EDGARS CONSOLIDATED STORES LIMITED**
Incorporated in South Africa
(Registration Number 1946/022751/06)
**EDCON ACQUISITION PROPRIETARY LIMITED**
Incorporated in South Africa
(Registration Number 2007/000518/07)
**EDCON HOLDINGS LIMITED**
Incorporated in South Africa
(Registration Number 2006/036903/06)

---

**EXPLANATORY STATEMENT**

---

**EXPLANATORY STATEMENT RELATING TO (1) AN ARRANGEMENT OR A COMPROMISE OF CERTAIN OF THE COMPANY'S FINANCIAL OBLIGATIONS PURSUANT TO THE PROVISIONS OF SECTION 155 OF THE COMPANIES ACT, NO. 71 OF 2008, AS AMENDED,**

between

**each of the Compromise Companies**

and each of the

**Senior Secured Creditors**

and the

**Super Senior Third Ranking Creditors**

**AND**

**(2) AN OFFER BY NEW HOLDCO 1 TO THE SENIOR SECURED CREDITORS AND SUPER SENIOR THIRD RANKING CREDITORS OF NEW MONEY NOTES IN ACCORDANCE WITH THE TERMS OF THE NEW MONEY NOTES OFFER**

_____
_____

Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in the sections entitled "*Definitions" and "Interpretation*" in the Proposal Document to which this Explanatory Statement is attached.

**This Explanatory Statement contains information reasonably required to facilitate Compromise Creditors in deciding whether or not to accept or reject the relevant Compromise, as required in terms of section 155(3) of the Companies Act.**

Further copies of this Explanatory Statement can be obtained by contacting the Information Agent (marked for the attention of Paul Kamminga) via www.lucid-is.com/edcon, email to edcon@lucid-is.com or telephone on +44 20 7704 0880.

**In the event of any conflict between the terms set out in this Explanatory Statement and the terms of the Restructuring Agreement, the terms of the Restructuring Agreement shall take preference to the extent of such conflict.**

**Important KYC Note for Compromise Lenders only**:

- As funding for any New Money Notes will require Compromise Lenders to wire funds directly to the US Dollar account of the Escrow Agent, certain "Know Your Customer " requirements are required – namely:

| **Evidence required** |
| --- |

The Escrow Agent will require evidence of the party's:

1.  registered company/firm number;

2.  registered full company/firm name (including "limited", "plc", "LLP", "LLC", etc.);

3.  names of directors, partners or principals;

4.  registered company/firm address; and

5.  the names of individuals who control or own 25% or more of its shares or voting rights.

- Any Compromise Lender, or its Designated Recipient, who elects to participate in the New Money Notes Offer must comply with such "Know Your Customer" requirements and provide satisfactory evidence to the Information Agent by email or facsimile when submitting its Proxy Form. Proxy Forms received from Compromise Lenders without such "Know Your Customer" documents will be rejected and such Compromise Lender will not be entitled to participate under the New Money Notes Offer.

**IMPORTANT NOTICE**

**Electronic Form**

If the Proposal Document been sent to you in an electronic form, you are reminded that documents transmitted via this medium may be altered or changed during the process of transmission and consequently none of New Holdco 2, New Holdco 1, the Parent, the Company, the Existing Group, the Information Agent, the Registrar, U.S. Registrar, the Trustees or any person who controls, or is a director, officer, employee, agent or any Affiliate of any such person accepts any liability or responsibility whatsoever in respect of any difference between the Proposal Document distributed to you in electronic format and the hard copy version available to you on request from the Information Agent or the Company.

You are reminded that the Proposal Document, including this Explanatory Statement have been delivered to you on the basis that you are a person into whose possession it may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorised to, deliver the Proposal Document, this Explanatory Statement or any part thereof to any other person unless expressly permitted in this Explanatory Statement. If you are not the named addressee to which the Proposal Document has been delivered, please notify the sender immediately and destroy the Proposal Document.

**Restrictions**

The Proposal Document is governed by the laws of South Africa and is subject to any applicable laws and regulations, including but not limited to, the Companies Act. The Compromise Companies do not represent that the Proposal Document may be lawfully distributed in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assume any responsibility for facilitating such distribution, or to any creditor of the Existing Group.

The Compromises, which are the subject of the Proposal Document, may be affected by the laws of the relevant jurisdiction of a Compromise Creditor. Each Compromise Creditor should inform itself about and observe any applicable legal requirements of any such jurisdiction. It is the responsibility of each Compromise Creditor to satisfy itself as to its own full observance of the laws and regulatory requirements of the relevant jurisdiction in connection with the relevant Compromise, including the obtaining of any governmental, exchange control or other consents or the making of any filings which may be required, the compliance with other necessary formalities, the payment of any transfer or other taxes or other requisite payments due to such jurisdiction.

The release, publication or distribution of the Proposal Document, including this Explanatory Statement in certain jurisdictions may be restricted by law and therefore persons in any such jurisdictions into which the Proposal Document is released, published or distributed should inform themselves about and observe such restrictions. Any failure to comply with the applicable restrictions may constitute a violation of the securities laws of any such jurisdiction. The Proposal Document and this Explanatory Statement do not constitute the solicitation of an offer to acquire securities or a solicitation of any vote or approval in any jurisdiction in which such offer or solicitation would be unlawful.

Any offer of securities pursuant to the Proposal Document, read with all supporting documents (including this Explanatory Statement), is only being made to Compromise Creditors who are Eligible Creditors. Compromise Creditors may appoint a Designated

Recipient who constitutes an Eligible Person to receive the relevant Compromise Consideration that such Compromise Creditor would be entitled to receive under the Proxy Form or Account Holder Letter, as applicable.

Any Compromise Creditor who is in doubt as to their position, including, without limitation, their tax status, should consult an appropriate independent professional advisor in the relevant jurisdiction.

**Information and confidentiality; disclaimer**

This Explanatory Statement has been prepared solely for the purpose of providing additional information to Compromise Creditors in relation to the Compromises. The Explanatory Statement informs the Compromise Creditors of the Compromises and the effects thereof.

Nothing in the Proposal Document, Explanatory Statement or any other document issued with or appended to it should be relied on for any purpose other than to assist the Compromise Creditors in making a decision as to how to vote in respect of any of the relevant Compromises and to receive Compromise Consideration. Compromise Creditors may not reproduce or distribute the Proposal Document (including this Explanatory Statement), in whole or in part, and may not disclose any of the contents of the Proposal Document or this Explanatory Statement to anyone other than the Compromise Creditor's Affiliates and advisers or any other person to whom disclosure is required to be made in terms of any applicable laws, or use any information therein and herein for any purpose other than considering and/or making a decision in respect of the relevant Compromise and Compromise Consideration, except as required by applicable law or regulation. In particular and without limitation, nothing in the Proposal Document should be relied on in connection with the purchase or acquisition of any New Money Notes or any other financial instruments or assets of the Company or any other member of the Existing Group. This Explanatory Statement or any part of it is for informational purposes only and does not constitute, and should not be construed as, part of any offer or invitation to sell, any solicitation of any offer to purchase or subscribe for, any debt or equity securities of the Existing Group and it is not intended to provide the basis of any investment decision nor does it, nor is it intended to, form the basis of any contract for acquisition of or investment in the Existing Group, financial promotion, or any offer or invitation in relation to any acquisition of or investment in the Existing Group in any jurisdiction.

You should not assume that the information contained in this Explanatory Statement is accurate as at any date other than the date of the Proposal Document. Nothing in this Explanatory Statement is intended to be, and no statement herein shall be construed to constitute, investment, legal, tax or other advice and you are strongly advised to consult your own financial, legal, investment and tax advisors in connection with the matters set forth herein.

Nothing contained in the Proposal Document constitutes a warranty, undertaking or guarantee of any kind, express or implied, and nothing contained in the Proposal Document shall constitute any admission of any fact or liability on the part of the Compromise Companies, or any other member of the Existing Group with respect to any asset to which it or they may be entitled or any claim against it or them. Without prejudice to the generality of the foregoing, nothing in the Proposal Document or this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by the Compromise Companies or any other member of the Existing Group, that a liability is owed to any person in respect of any claim or that any person is or may be a Compromise

Creditor. The failure to distribute the Proposal Document to any Compromise Creditor shall not constitute an admission by the Compromise Companies that such person is not a Compromise Creditor. No person has been authorised by the Compromise Companies to give any information or make any representations concerning the Compromises (including concerning the Company or any other member of the Existing Group or the Compromise Consideration or the New Money Notes or any debt or equity securities of the Existing Group) which is inconsistent with the Proposal Document and, if made, such representations may not be relied upon as having been so authorised.

The information contained in the Proposal Document has been prepared based upon information available to the Compromise Companies as at the date of the Proposal Document. The delivery of the Proposal Document does not imply that, unless expressly stated otherwise, the information herein is correct as at any time subsequent to the date hereof. Nothing in this Explanatory Statement will create an obligation on behalf of the Compromise Companies or the Existing Group (i) to provide information similar to the information contained in this Explanatory Statement in the future or (ii) to update or revise any of the information, forward-looking statements or the conclusions contained herein or to reflect new events or circumstances or to correct any inaccuracies which may become apparent subsequent to the date hereof. Certain financial, business and other information contained in this Explanatory Statement, including certain industry and market data, has been derived from publicly available third-party resources in Europe and elsewhere. Although the Compromise Companies accept responsibility for the accurate summarization of such information and data, the Compromise Companies have not independently verified the accuracy of such information and data (unless expressly stated to the contrary herein) and they do not accept further responsibility in respect of such information and data.

To the best of the Compromise Companies' knowledge, information and belief, the information relating to the Compromise Companies contained in the Proposal Document is in accordance with the facts and does not omit anything likely to affect the import of such information.

Unless expressly provided otherwise, none of the information contained on the Existing Group's website is incorporated by reference into or otherwise deemed to be linked to the Proposal Document.

In making a decision in respect of the relevant Compromise, each affected Compromise Creditor must rely on its own examination, analysis and enquiry and the terms of the relevant Compromise including the merits and risks involved, and by accepting delivery of the Proposal Document you acknowledge that you will conduct your own examination, analysis and enquiry of the relevant Compromise, including with regards to its merits and the risks involved. None of the Compromise Creditors, their advisers or the Compromise Companies' advisers, have authorised the content of the Proposal Document, any part of it or this Explanatory Statement or any part of it, nor do they accept any responsibility for the accuracy, completeness or reasonableness of the statements contained therein and herein. Additionally, none of the Compromise Creditors, their advisers or the Compromise Companies' advisers, have verified that the information contained in the Proposal Document is in accordance with facts and does not omit anything likely to affect the import of such information and each of those persons expressly disclaims responsibility for such information. Each Compromise Creditor, by its participation in the relevant Compromise and receipt of any Compromise Consideration and/or New Money Notes acknowledges that –

(i)     it has not relied on Lucid Issuer Services Limited as Information Agent or any person affiliated with the Information Agent in connection with any investigation of the accuracy of any information contained in the Proposal Document or their investment decision (including any decision in connection with the relevant Compromise);

(ii)    it has not relied on any trustee of the Company's debt securities (including The Bank of New York Mellon and GLAS Trust Corporation Limited, as former and current Trustee of the Company's debt securities respectively) or any person affiliated with any such trustee in connection with any investigation of the accuracy of any information contained in the Proposal Document or their investment decision (including any decision in connection with the relevant Compromise); and

(iii)   it has relied on the information contained in the Proposal Document and any other information obtained by it through any due diligence undertaken by it on the Compromise Companies.

The Proposal Document has not been reviewed, verified or approved by any rating agency or any regulatory authority (including the U.S. Securities & Exchange Commission). Without prejudice to the representations and warranties given by the Compromise Companies or any other member of the Existing Group or any directors or officers of any member of the Existing Group elsewhere, to the fullest extent permitted by law, neither the Compromise Companies nor any other member of the Existing Group nor any directors or officers of any of the Compromise Companies or any other member of the Existing Group will have any delictual, contractual or any other liability to any person in connection with the use of the Proposal Document other than for the purposes for which this Explanatory Statement was intended (namely to provide Compromise Creditors with all information reasonably required to facilitate Compromise Creditors in deciding whether or not to accept or reject the Compromises) and the Compromise Companies and all other members of the Existing Group do not accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of the Proposal Document or its contents or preparation or otherwise in connection with it (including under any federal, national, state or supra-national securities laws), even if the Compromise Companies or other member of the Existing Group (as applicable) have been advised of the possibility of such damages.

In the future, application will be made to list part or all of the Compromise Consideration (save for the New Holdco 2 Ordinary A Shares) and the New Money Notes on the Euro MTF Market of the Luxembourg Stock Exchange, the Global Exchange Market of the Irish Stock Exchange or another "recognised stock exchange" as defined in the UK Income Tax Act 2007 prior to the first interest payment date of each of the New Holdco 2 PIK Notes using the Proposal Document as listing particulars. In the course of any review by the competent authority, the Existing Group may be requested to make changes to the financial and other information included in the Explanatory Statement in producing the listing particulars for such listing. Comments by the competent authority may require significant modification or reformulation of information contained in the Proposal Document or may require the inclusion of additional information. The Existing Group may also be required to update the information in the Proposal Document to reflect changes in its business, financial condition or results of operations and prospects. To the extent that such changes arise prior to the Compromise Effective Date, the Existing Group will inform you of such changes else the

Existing Group will be under no obligation to inform you of such changes. There can be no assurance that the relevant securities will be listed on the Euro MTF Market of the Luxembourg Stock Exchange, the Global Exchange Market of the Irish Stock Exchange or another "recognised stock exchange" as defined in the UK Income Tax Act 2007 prior to the first interest payment date of each of the New Holdco 2 PIK Notes, and settlement of the Compromise Consideration and the New Money Notes is not conditioned on obtaining this listing.

**Summary Only**

The summary of the principal provisions and effect of the Compromises contained in this Explanatory Statement is qualified in its entirety by reference to the relevant Compromise itself, the full text of which is set out in the Proposal Document. Each Compromise Creditor is advised to read and consider carefully the text of the Proposal Document. This Explanatory Statement has been prepared solely to assist Compromise Creditors in respect of voting on the relevant Compromise.

**IN THE EVENT OF A CONFLICT BETWEEN THE INFORMATION AND TERMS DESCRIBED IN THIS EXPLANATORY STATEMENT AND THE PROPOSAL DOCUMENT, THE TERMS OF THE PROPOSAL DOCUMENT SHALL PREVAIL.**

**Forward-looking statements**

The Proposal Document includes forward-looking statements, which are based on the Compromise Companies' current expectations and projections about future events. All statements other than statements of historical facts included in the Proposal Document, including statements regarding the Existing Group's future financial position, risks and uncertainties related to its business, strategy, capital expenditures, projected costs and its plans and objectives for future operations, including its plans for future costs savings and synergies may be deemed to be forward-looking statements. Words such as "believe," "expect," "anticipate," "may," "assume," "plan," "intend," "will," "should," "estimate," "risk" and similar expressions or the negatives of these expressions are intended to identify forward-looking statements. In the course of preparing such forward-looking statements, the Compromise Companies have taken into account historical financial performance and made certain assumptions that management of the Existing Group has deemed to be reasonable. Unless expressly stated to the contrary, none of the information contained in the forward-looking statements has been independently verified and no representation or warranty, express or implied, is made by the Compromise Companies as to the results expressed in any forward-looking statement. Any forward-looking statements contained in the Proposal Document are made only as of the date thereof.  By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future and Compromise Creditors should keep in mind that any forward-looking statement made in the Proposal Document or elsewhere is applicable only at the date on which such forward-looking statement is made, based on information available to them and subject to the limitations and exclusions set out herein.

Examples of forward-looking statements include statements regarding a future financial position or future profits, cash flows, corporate strategy, anticipated levels of growth, estimates of capital expenditures, acquisition strategy, expansion prospects or future capital expenditure levels and other economic factors, such as, *inter alia*, interest rates.

The Compromise Companies caution you that forward-looking statements are not guarantees of future performance and that actual results of operations, financial condition and liquidity and the developments of the industry in which the Existing Group operates may differ materially, and in an unknown degree, from those made in, or suggested by, the forward-looking statements contained in the Proposal Document and Explanatory Statement. New factors that could cause the business of the Existing Group not to develop as expected may emerge from time to time and it is not possible to predict all of them. The Compromise Companies have no duty to, and they do not intend to, update or revise the forward-looking statements contained in the Proposal Document after the date hereof, except as may be required in law or by applicable regulation (including pursuant to any listing of the Compromise Consideration (save for the New Holdco 2 Ordinary A Shares) and New Money Notes). Consequentially, you should not place undue reliance upon these forward-looking statements.

Some of the risks and uncertainties that may cause the Existing Group's actual results to differ materially from those expressed or implied by, or described in, the forward-looking statements in this Proposal Document are described in Part C (*Risk Factors*) below, and which the Compromise Companies urge you to read and consider in conjunction with the Proposal Document. No Compromise Company is under any obligation to keep current any forward-looking statements contained in the Proposal Document and this Explanatory Statement, and any opinions expressed in it are subject to change without notice.  If any such change arises prior to the Compromise Effective Date, the Compromise Companies will notify the Compromise Creditors accordingly. Furthermore, the Existing Group disclaims any obligation to update their views of any of the risks and uncertainties presented in the Proposal Document unless any such update arises prior to the Compromise Effective Date, in which case the Compromise Companies shall notify the Compromise Creditors accordingly.

Recipients of the Proposal Document are reminded that past financial performance is not a reliable indicator of any potential future performance, and prospective and current investors are solely responsible for making their own independent appraisal of and investigations into the financial and other information presented in the Proposal Document. No member of the Existing Group assumes any obligation to review or confirm analyst expectations or estimates.

**Risk factors**

Please see section Part C (*Risk Factors*) below for a fuller explanation of the risks involved in the Compromises.

**Legal, tax and financial advice**

This Explanatory Statement has been prepared only for the purposes of facilitating Compromise Creditors in deciding whether or not to accept or reject the relevant Compromise, as required in terms of section 155(3) of the Companies Act and was prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it and may only be used, or relied upon, for the purpose set out herein. Nothing in this Explanatory Statement is intended to be, and no statement herein shall be construed to constitute, investment, financial, legal, tax or other advice and you are strongly advised to consult your own investment, financial, legal and tax advisors in connection with the matters set forth

herein. By accepting delivery of the Proposal Document, you acknowledge that you have not relied on the information in the Proposal Document and this Explanatory Statement for any of these purposes, and confirm that you will conduct your own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to your own objectives, financial situations and needs.

**Other jurisdictions**

The implications of the Compromises and the receipt of the relevant Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, for Foreign Creditors may be affected by the laws of the relevant jurisdictions. Such Foreign Creditors should inform themselves about and observe any applicable legal requirements. Any person outside South Africa who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the relevant Compromise and the receipt of the relevant Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

This Explanatory Statement has been prepared on the basis that all offers of the Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, will be made pursuant to an exemption under the Prospectus Directive (as defined below), from the requirement to produce a prospectus in connection with the Compromise Consideration issued pursuant to the Compromise or the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, issued pursuant to the New Money Notes Offer. In relation to each Member State of the European Economic Area ("**EEA**") which has implemented the Prospectus Directive (each a "**Relevant Member State**"), with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, no offer to the public of Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in that Relevant Member State may be made other than:

(i)      to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(ii)      to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the relevant dealer or dealers nominated by the Company, New Holdco 1 or New Holdco 2 for any such offer; or

(iii)      in any other circumstances falling within Article 3(2) of the Prospectus Directive,

*provided that* no such offer of Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, shall require a prospectus to be published pursuant to Article 3 of the Prospectus Directive or a supplement to a prospectus to be published pursuant to Article 16 of the Propectus Directive. Accordingly, any Person making or intending to make any offer within the EEA of the Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, should only do so in circumstances in which no obligation arises to produce a prospectus for such offers. None of the Company, New Holdco 2, New Holdco 1, the Existing Group or any of its or their Affiliates has authorized, nor does it authorize, the making of any offer of

Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, through any financial intermediary.

For the purposes of this provision, the expression an "offer to the public" in relation to any Compromise Consideration pursuant to the Senior Secured Company Compromise, Super Senior Company Compromise or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of such offer and the Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to be offered so as to enable an investor to decide to purchase or subscribe for the Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, as such expression may be varied in the Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State. The expression "**Prospectus Directive**" means Directive 2003/71/EC (as amended, including by Directive 2010/73/EU), and includes any relevant implementing measure in the Relevant Member State.

Each subscriber for or purchaser of the Compromise Consideration in the Compromise or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in the New Money Notes Offer, located within a Relevant Member State will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive. The Company, New Holdco 2, New Holdco 1, the Existing Group and its or their Affiliates and others will rely upon the truth and accuracy of the foregoing representation, acknowledgement and agreement. Notwithstanding the above, a person who is not a qualified investor and who has notified any of New Holdco 2, New Holdco 1 or the Company of such fact in writing may, with the consent of New Holdco 2, New Holdco 1 or the Company, be permitted to subscribe for or purchase the Compromise Consideration in the Compromise or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in the New Money Notes Offer.

**South Africa**

All offers of Compromise Consideration and/or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, will be made pursuant to an exemption under section 96(1) of the South African Companies Act such that no prospectus will be required as no "offer to the public" (as defined in the Companies Act) will be made by the Company, New Holdco 2 or New Holdco 1.  Accordingly, only Compromise Creditors who are Eligible Creditors and the Holding Period Trustee in respect of Ineligible Creditors and Non-Respondent Creditors may receive Compromise Consideration and/or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, (unless such Compromise Creditor has appointed a Designated Recipient who is an Eligible Person).


**COMPROMISE CREDITORS SHOULD CONSULT THEIR OWN PROFESSIONAL ADVISERS WITH RESPECT TO THE MATTERS DESCRIBED IN THIS DOCUMENT, INCLUDING THE LEGAL, FINANCIAL AND TAX CONSEQUENCES OF THE RELEVANT COMPROMISE IN THEIR PARTICULAR CIRCUMSTANCES.**

**IMPORTANT SECURITIES LAW NOTICE**

**NONE OF THE SECURITIES REFERRED TO IN THE PROPOSAL DOCUMENT SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

If the –

3.      Senior Secured Company Compromise is implemented in accordance with its terms, the relevant Compromise Consideration, being the New Holdco 2 Ordinary A Shares and the New Holdco 2 PIK B Notes, will be issued by New Holdco 2 in accordance with the terms of the Senior Secured Company Compromise and the Restructuring Agreement;

4.      Super Senior Company Compromise is implemented in accordance with its terms, the relevant Compromise Consideration, being the New Holdco 2 PIK A Notes, will be issued by New Holdco 2 in accordance with the terms of the Super Senior Company Compromise and the Restructuring Agreement; and

5.      the New Money Notes Offer is implemented in accordance with its terms, the New Money Notes will be issued by New Holdco 1 and the New Holdco 2 Ordinary B Shares or CVRs, as the case may be, will be issued by New Holdco 2, to Participating Creditors in accordance with the terms of the New Money Notes Offer and the Restructuring Agreement.

**Information for Foreign Creditors**

Neither the Proposal Document nor any part hereof constitutes an offer to distribute, issue or sell, or a solicitation of an offer to subscribe for, or purchase, the Compromise Consideration and/or New Money Notes or any other securities in any jurisdiction in which such distribution, issue, sale or solicitation is not permitted and neither the Proposal Document nor any part hereof may be used for or in connection with an offer to, or the solicitation by, any person in any jurisdiction or in any circumstances in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation. Accordingly, neither the Compromise Consideration, New Money Notes nor any other securities may be offered or sold, directly or indirectly, and neither the Proposal Document nor any part hereof nor any prospectus, offering circular, form of application, advertisement, other offering materials nor other information may be issued, distributed or published in any country or jurisdiction except in circumstances that will result in compliance with all applicable laws, orders, rules and regulations.

The Compromise Consideration and New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, will not be distributed pursuant to the relevant Compromise and New Money Notes Offer to or to the order, or for the account or benefit, of any person where such distribution would be prohibited by any applicable law or regulation, or so prohibited except after compliance with conditions or requirements that are unduly onerous. To the extent that such a prohibition applies, such person will be deemed to be an Ineligible Creditor and the Compromise Consideration that would otherwise have been distributed to any relevant person pursuant to the relevant Compromise will be delivered to the Holding Period Trustee to be held in trust by the Holding Period Trustee for the Holding Period. If, after receipt by an instruction from such Compromise Creditor to sell such Compromise Consideration or after the expiry of the Holding Period, such Compromise Consideration to which such Compromise Creditor would have been entitled to in accordance with the terms

of the relevant Compromise (including any accrued and paid dividends and interest or other payments received by the Holding Period Trustee in respect of such Compromise Consideration, in each case net of any applicable taxes (including, without limitation, any withholding taxes but excluding any stamp duty and/or stamp duty reserve tax (if applicable) which the Company will covenant to pay on behalf of that Creditor)) shall be sold by the Holding Period Trustee and the net cash proceeds of such sale (after deduction of all applicable expenses and currency conversion costs) paid to that Compromise Creditor in full satisfaction of its rights in respect of such securities under the relevant Compromise in accordance with the Restructuring Agreement and the Distribution Agreement.

**Notice to Compromise Creditors in the United States**

This document is not an offer of securities for sale in the United States. Neither the Compromise Consideration to be issued pursuant to the Compromises nor the New Money Notes to be issued pursuant to the New Money Notes Offer will be, and are not required to be, registered under the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**"), and will be issued in reliance upon one or more exemptions from the registration requirements of the U.S. Securities Act, including that provided by Section 4(a)(2) thereof, which is available for an offer and sale of securities not involving any public offering in the United States.

Accordingly, the Compromise Consideration to be issued under the relevant Compromise and the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, issued pursuant to the New Money Notes Offer will be issued to (i) persons located in the United States (each, a "**U.S. holder**") only if such persons have demonstrated that they are (A) a "qualified institutional buyer" ("**QIB**") (as such term is defined in Rule 144A under the U.S. Securities Act transacting in a private transaction in reliance upon an exemption from the registration requirements of the U.S. Securities Act); or (B) an institutional "accredited investor" (as such term is defined in Rule 501(a)(1), (2), (3) or (7) under the U.S. Securities Act (each, an "**IAI**")); or (ii) persons located outside of the United States if such persons are not a "U.S. person" (as that term is defined in Rule 902 under the U.S. Securities Act) (a "**U.S. person**"), and in each case have agreed to certain transfer restrictions applicable to the Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be. Each person that wishes to receive Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, will be required to make certain representations contained in the Account Holder Letter. See Part E (*Transfer Restrictions*) for further information.

Any person that is located in the United States that is neither a QIB nor an IAI will be deemed to be an Ineligible Creditor. To the extent that a Person located in the United States fails to deliver a valid Account Holder Letter or Proxy Form (as applicable), such Person will be deemed to be a Non-Respondent Creditor.

The Compromise Consideration and the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, have not been and will not be listed on a U.S. securities exchange or quoted on any inter-dealer quotation system in the United States. The Company does not intend to take any action to facilitate a market in the Compromise Consideration or the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in the United States. Consequently, it is unlikely that an active trading market in such securities will develop in the United States. The information disclosed in the Proposal Document is not the same as that which would have been disclosed if the Proposal Document had been prepared for the purpose of complying with the registration

requirements of the U.S. Securities Act or in accordance with the laws and regulations of any state or other jurisdiction of the United States.

Neither the Compromise Consideration nor the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, have been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**"), any state securities commission in the United States or any other regulatory authority in the United States, nor have any of the foregoing authorities passed comment upon, or endorsed the merit of, the Compromise and the New Money Notes Offer or the accuracy or the adequacy of the Proposal Document. Any representation to the contrary is a criminal offence in the United States.

U.S. persons should consult their own legal and tax advisers with respect to the legal and tax consequences of the Compromise and the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in their particular circumstances.

If, following the Compromises and the New Money Notes Offer, the Compromise Consideration or the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, are offered, resold, pledged or otherwise transferred, such New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, may only be offered, resold, pledged or otherwise transferred (a) outside the United States to non-U.S. persons in a transaction complying with Regulation S under the U.S. Securities Act ("**Regulation S**"), (b) in the United States pursuant to one or more exemptions from the U.S. Securities Act, including pursuant to Rule 144A thereunder and (c) in compliance with the registration requirements of the U.S. Securities Act and in each case in accordance with any applicable securities laws of any state of the United States. See Part E (*Transfer Restrictions*).

Compromise Noteholders in the United States should note that the relevant Compromise will relate to the securities of a South African public limited company that is a "foreign private issuer" as defined under Rule 3b-4 of the U.S. Securities Exchange Act of 1934, as amended ("**Exchange Act**"), and will be governed by South African law. Neither the proxy solicitation nor the tender offer rules under the Exchange Act will apply to the relevant Compromise. Moreover, the relevant Compromise will be subject to the disclosure requirements and practices applicable in South Africa to compromises, which differ from the requirements of the U.S. proxy solicitation rules and tender offer rules.

The financial statements of, and historical financial information relating to, the Company included in this Explanatory Statement have been prepared in accordance with International Financial Reporting Standards (IFRS), as issued by the International Accounting Standards Board (IASB) and the Companies Act, which differ from United States generally accepted accounting principles in certain material respects, and thus may not be comparable to financial statements and historical financial information of U.S. companies.

Enforcement by investors of civil liabilities under the U.S. securities laws may be affected adversely by the fact that the Company is organized under the laws of a jurisdiction other than the United States, that all of its officers and directors are residents of countries other than the United States, and that all or a substantial portion of the assets of the Company and such other persons may be located outside the United States. As a result, it may be difficult or impossible for Compromise Noteholders in the United States to effect service of process within the United States upon the Company and its officers and directors, or to realize against them upon judgments of courts of the United States predicated upon civil liabilities under the securities laws of the United States. In addition, Compromise

Noteholders in the United States should not assume that the courts of South Africa: (a) would enforce judgments of U.S. courts obtained in actions against such persons predicated upon civil liabilities under the securities laws of the United States; or (b) would enforce, in original actions, liabilities against such persons predicated upon civil liabilities under the securities laws of the United States.

PART A

**COMPANY INFORMATION, BACKGROUND TO AND REASONS FOR THE FINANCIAL RESTRUCTURING**

*This section contains a brief overview of certain business and financial information concerning the Existing Group and the Financial Restructuring. The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by reference to, the more detailed information presented elsewhere in this Proposal Document, read with the Restructuring Agreement. Furthermore, the disclaimers set forth on the cover pages of this Explanatory Statement shall apply.*

1.    **Information on the Company**

This Explanatory Statement includes certain summary financial, business and other information concerning the Existing Group. This information should be read in conjunction with, and is qualified in its entirety, by reference to the Existing Group's consolidated annual financial statements for FY 2014 and FY 2015 (attached hereto in Part H), and the related notes thereto, which are included elsewhere in this Explanatory Statement.

2.    **Presentation of Financial Information, Financial Reporting**

2.1.    *Presentation of financial information*

2.1.1.    In this Explanatory Statement, the Existing Group discusses (i) its financial statements and results of operations on a consolidated basis for fiscal years 2014 and 2015 and (ii) certain unaudited preliminary financial data derived from the consolidated management accounts of the Existing Group for fiscal year 2016 and for the 26-week periods ended 24 September 2016 and 26 September 2015. The consolidated annual financial statements for fiscal year 2014 and 2015 have been audited by Deloitte & Touche, South Africa. The unaudited preliminary financial information for fiscal year 2016 and the 26-week periods ended 24 September 2016 and 26 September 2015 is derived from the unaudited consolidated management accounts of Holdco and has not been audited or reviewed by Deloitte & Touche, South Africa. Furthermore, Deloitte & Touche South Africa has not compiled or performed any procedures with respect to any of the financial data included in this Explanatory Statement, and does not express an opinion or any other form of assurance with respect thereto. The Compromise Companies cannot assure you that, upon completing the preparation of the financial statements for fiscal years 2016 or 2017, as applicable, and the review by the independent auditors of the Existing Group of the results for fiscal years 2016 and 2017 (as applicable), the Existing Group will not report materially different results than those indicated herein.

2.1.2.    The Existing Group had classified the store card portfolio in Lesotho, Namibia, Botswana and Swaziland as held-for-sale in FY 2015 and FY 2014. During FY 2016, the Existing Group ceased to classify the trade receivables store card portfolio in Lesotho, Namibia, Botswana and Swaziland as held-for-sale as no buyer

could be found at an acceptable price. The Existing Group has concluded that the carrying amount is no longer deemed to be recovered through a highly probable sale transaction. As a result of this change in classification, the Existing Group re-presented the financial results for FY2014 and FY2015. The results of operations previously presented in discontinued operations in the consolidated statement of comprehensive income has been re-presented and included in income from continuing operations for all periods presented.

2.1.3.   When used in this Explanatory Statement in relation to any year, "fiscal year" or "FY" means the fiscal year ended on the Saturdays of that year closest to March 31 of that year. When used in this Explanatory Statement, "H1/2016" or "six months 2016" means the 26-week period ended 26 September 2015, and "H1/2017" or "six months 2017" means the 26-week period ended 24 September 2016.

2.2.   ***Implementation of new reporting structure***

During FY 2016, the Existing Group completed the implementation of a new reporting structure for its operational business divisions. Starting with the financial results for the first quarter 2017, the Edgars division comprises Edgars; the Discount division comprises Jet and JetMart; and the Specialty division comprises CNA, Red Square, Boardmans, Edgars Active, Edgars Shoe Gallery, Cellular managements costs, Legit (which the Compromise Companies have now agreed to sell) and the Existing Group's mono-branded stores. To present the financial results on a comparative basis, the Existing Group has restated its divisional results for the 26-week periods ended 26 September 2015. As a result of the implementation of this new reporting structure, the divisional results for fiscal years 2014, 2015 and 2016 are not presented on the same basis, and are not directly comparable to, the financial results for the 26-week period ended 26 September 2015 and 24 September 2016, respectively.

3.   **Description of the Company and its business**

3.1.   ***Overview***

3.1.1.   We are the largest non-food retailer in southern Africa as of 26 March 2016. We have been in operation for more than 85 years and have expanded our footprint to include 1,542 stores as of 26 March 2016, including 213 stores located in eight countries outside of South Africa. The total average retail trading space of our stores was approximately 1,607,000 sqm for the fiscal year 2016, whereas that of our key listed peers ranged from approximately 372,000 sqm to 683,000 sqm, for their last reported fiscal year. Historically, we have operated under four principal operating divisions comprising nine key store chains, as well as mono-branded stores throughout southern Africa.

3.1.2.   Our Edgars division, which consists of department stores targeted at middle- to upper-income customers, includes store chains Edgars, Edgars Active, Edgars Shoe Gallery, Boardmans and Red

Square, as well as our mono-branded stores such as Topshop, Tom Tailor, Mac, Lipsy, Bobbi Brown, Dune, TM Lewin, Salsa, Jigsaw, Calvin Klein, Khiels, Victoria Secrets Beauty and Accessories, Vince Camuto, River Island, Doc Martens, Jo Malone and Gosh, which brands are also available through our Edgars stores. The Edgars division accounted for 51.3% of total retail sales in fiscal year 2016. As of 26 March 2016, we had 559 stores in our Edgars division (including mono-branded stores), and an average retail space of 846,000 sqm.

3.1.3.    Our Discount division, which consists of discount stores selling value merchandise targeted at lower- to middle-income customers, includes store chains Jet, Legit (which the Compromise Companies have now agreed to sell) and Jet Mart, and accounted for 38.8% of total retail sales in fiscal year 2016. As of 26 March 2016, we had 732 stores in our Discount division, and an average retail space of 642,000 sqm.

3.1.4.    Through our CNA division, we are also a leading retailer of books and magazines in South Africa, which accounted for 6.9% of total retail sales in fiscal year 2016. As of 26 March 2016, we had 198 stores in our CNA division, and an average retail space of 79,000 sqm.

3.1.5.    Our business in Zimbabwe is independently managed and reported, as Edgars Zimbabwe. It accounted for 3.0% of total retail sales reported in fiscal year 2016. As of 26 March 2016, Edgars Zimbabwe comprised 53 stores and an average retail space of 40,000 sqm.

3.1.6.    We have secured exclusive rights to a number of international brands in South Africa, including Topshop, Tom Tailor, Mac, Lipsy, Bobbi Brown, Dune, TM Lewin, Salsa, Jigsaw, Calvin Klein, Khiels, Victoria Secrets Beauty and Accessories, Vince Camuto, River Island, Doc Martens, Jo Malone and Gosh, each of which are included in our Edgars Division. Most of these brands are still relatively new to South Africa and are available on an exclusive basis in our Edgars stores as well as being rolled out in mono-branded stores. We also hold a controlling stake in companies holding the exclusive rights to Accessorize, La Senza and Inglot.

3.1.7.    We opened our first mono-branded store, in November 2012, and have since then increased the number of mono-branded stores to 85, as at 26 March 2016, through selective acquisitions of companies with the exclusive rights to popular European and American brands, and through organic growth. In certain Sub-Saharan African countries, we also hold exclusive selling rights for a number of our international brands, or a right of first refusal.

3.1.8.    We also sell mobile phones, related accessories and airtime across all of our divisions, which accounted for 11.0% of our total retail sales in fiscal year 2016.

3.1.9.     During the 13-week period ended 26 March 2016, we completed the implementation of a new reporting structure for our operational business divisions. Starting with the financial results for the 26-week period ended 25 June 2016, our Edgars division comprises Edgars; our Discount division comprises Jet and JetMart; and our Specialty division comprises CNA, Red Square, Boardmans, Edgars Active, Edgars Shoe Gallery, Cellular management costs, Legit (which the Compromise Companies have now agreed to sell) and our mono-branded stores. To present our financial results on a comparative basis, we have restated our divisional results for the 26-week period ended 26 September 2015. However, we have not yet restated our historical results for fiscal year 2014, fiscal year 2015 and fiscal year 2016. As a result of the implementation of our new reporting structure, our divisional results for fiscal years 2014, 2015 and 2016 are not presented on the same basis, and are not directly comparable to, our financial results for the 26-week periods ended 26 September 2015 and 24 September 2016, respectively. Unless otherwise indicated in this "Business" section, we present our business divisions and their respective results of operations on a basis consistent with the presentation in our financial statements for fiscal year 2014 and fiscal year 2015 as well as our unaudited trading update for fiscal year 2016.

3.1.10.    We believe that our diverse retail store chains and product offerings allow us to serve a wide cross-section of society in the countries in which we operate.

3.1.11.    We also offer credit and insurance products to our customers through strategic partnerships with Absa Bank, a member of Barclays Bank PLC, and Hollard Insurance. Our partnership with Absa has been in place since 2012, when we sold our South African private label store card portfolio to Absa. In 2014, we also sold a large portion of our Namibian private label store card portfolio to Absa. We still hold our own net foreign book and our own second-look book, which are worth R321 million and R164 million, respectively, as at 26 March 2016. Through Edgars Zimbabwe, we still consolidate the Edgars Zimbabwe book of R481 million, as of 26 March 2016. While Absa is responsible for the credit underwriting and funding of the South African and Namibian book, we retain all customer facing functions, including new account processing, customer service, marketing and collections. Our partnership with Hollard Insurance, through which Hollard acts as underwriter, allows us to offer our customers a wide range of insurance products, including home, legal, funeral, hospital cash back, cellphone, and account protection. Edgars Zimbabwe funds and administers its own trade receivables book and insurance programs.

3.1.12.    We also own a controlling stake in Celrose Proprietary Limited which controls Eddels Proprietary Limited, which are manufacturing businesses. Celrose manufactures apparel whilst Eddels manufactures footwear.

3.1.13.    Our Thank U rewards program, which we introduced in 2012, allows customers to earn Thank U points for their purchases in most of our stores, which they can redeem for future purchases. As at 26 March 2016, the Thank U rewards program had over 12 million members and 69.3% of our total retail sales earned Thank U points. In fiscal year 2017, we are planning on re-launching our Thank U loyalty program with the offering of new benefits tailored to deliver chain value offers to our customers.

3.1.14.    Our primary operations are in South Africa, where we generated 88% of our retail sales in fiscal year 2016. The rest of our operations are in neighbouring Namibia, Botswana, Lesotho, Swaziland, Mozambique, Ghana, Zimbabwe and Zambia, where we operate 213 retail outlets. Edgars Zimbabwe is managed independently and disclosed as a separate division. We experienced a marginal decrease of 0.1% in retail sales outside South Africa in fiscal year 2016, as compared to the prior fiscal year. In fiscal year 2016, we generated revenues of R29,352 million, including retail sales of R27,147 million. We continually explore opportunities to expand our retail operations both inside and outside South Africa.

3.2.    ***Competitive Strengths***

Retail is a confidence business. We believe that speculation about the sustainability of our capital structure has resulted in some erosion of confidence. Notwithstanding this, we continue to believe that we can benefit from a number of key strengths, including the following:

3.2.1.    ***Significant Economies of Scale and an Unrivalled Footprint***

3.2.1.1.    We are the largest non-food retailer in southern Africa, as measured by a number of key operating metrics. As of 26 March 2016, our retail store network includes 1,542 stores, with a total average trading space of approximately 1,607,000 sqm, the highest among our listed peers. For fiscal year 2016, our revenue totalled R29,352 million, and 38.8% of our sales are from the 3.4 million private label store credit cards in issue. Our Thank U rewards program, used by over 12 million customers, is the largest in South Africa, and we believe this speaks to the depth of our customer loyalty. We have also used data from the Thank U rewards program to build a sophisticated customer database, which allows us to track customers' shopping behaviours and preferences, as well as tailor our product offering to all of our various customer groups.

3.2.1.2.    Our size has provided us with significant economies of scale, allowing us to secure high-quality supply at competitive prices, alongside other benefits in real estate, IT development, infrastructure and advertising. For example, the strength of our brands enabled us to secure prime real estate locations, as our store chains, Edgars and Jet, usually serve as anchor tenants in malls and shopping centres.

3.2.2.    ***Diversity of Formats, Customers and Categories Served***

3.2.2.1.    Prior to the first quarter of fiscal year 2017, our retail business was organized under four primary divisions and operated through nine key store chains, which have a diversified portfolio of private label and branded products, including clothing, footwear, cosmetics, homewares, mobile phones and books. In our Edgars stores, we sell our own well-known private label brands, such as Kelso, JX and New Wave, alongside high-end South African apparel brands, such as Jo Borkett, Marion and Lindie, as well as a number of well-known, affordable and international apparel brands, such as Nike, Adidas, Guess, Playtex, Puma, Levis, Mango, Forever New, Tom Tailor, Lipsy, TM Lewin, Topshop, Topman and River Island, and cosmetic brands, such as Chanel, Bobbi Brown, Mac and Estee Lauder. We have exclusive distribution rights in South Africa for certain of these brands, some of which we also retail through our mono-branded stores. In our Jet, Jet Mart and Legit stores, we sell our own private labels, such as Massumi, Enzo and Pace. In line with our newly-announced strategic initiatives, we implemented a new division and repartition structure through which we re-organized our business into three primary divisions, Edgars, Discount, and Specialty.  See paragraph 3.1 (*Overview*).

3.2.2.2.    We believe that the diversity of our products, and the mix of proprietary, local and international brands, increases our appeal to customers across the majority of the South African socioeconomic spectrum, including the rapidly expanding middle class. We believe this reduces our exposure to adverse developments in any one product line or market segment. In addition, while we provide new and attractive assortments to our customers, large proportions of the items we sell are basic fashion items that entail lower fashion risk.

3.2.2.3.    We continuously analyse both our store formats and the various products we offer to our customers. Based

on our analysis, and in response to market demand, we have down-sized some of our stores, such as CNA, while expanding and refurbishing many others, such as Edgars and Jet.

3.2.3.   ***Iconic, Market-Leading Brands Supported by Appealing Product Proposition***

3.2.3.1.   We believe that Edgars and Jet are iconic retail brands and meaningful in size as measured by sales and total retail space in their respective customer segments. During fiscal year 2016, Edgars was the winner of the Women's Clothing Retail Category and the Jeweller Store Category awards from Ask Africa Kasi Star Brands, awarded to brands used most loyally by South Africa's township consumers, and the winner of the Women's Clothing, Men's Clothing, and Best Shoe Store surveys by Times/Sowetan Shopper. During calendar year 2014, Edgars was the winner in four categories, Best Men's Store, Best Ladies' Store, Best Jewellery Store and Best Loyalty Card, in the Target Group International (TGI) Icon Brand survey. That survey involved 15,000 South Africans who scored Edgars as the most iconic brand in the above-mentioned categories. Edgars was also voted second "coolest" clothing store among 8 to 23 year olds in the 2014 South African Sunday Times Generation Next Brand Survey Awards.

3.2.3.2.   We complement our strong private label brand offering with a tailored range of what we believe to be attractive local and international third-party brands that we are able to provide to South African consumers. The introduction of brands such as Mango, TM Lewin, Dune London, Lipsy and River Island demonstrates our ability to secure the rights to sell top international brands, most often on an exclusive basis. These brands increase the breadth of our product offering and help us reach out to a broad audience of customers. In addition, private label brands such as Kelso, Merien Hall, JX and Stone Harbour are well recognized and respected among our consumer base and we are committed to further improving these offerings.

3.2.4.   ***Financial Services Offering***

3.2.4.1.   We instituted South Africa's first customer credit program over 85 years ago, and we currently have approximately 3.4 million active private label store cards, including Edgars Zimbabwe. In 2012, we entered into a long-term strategic relationship with Absa, under

which Absa is responsible for the credit underwriting and funding of the store card book, while we retain all customer-facing functions, including new account processing, customer service and collections. To date we have sold the majority of the South African and Namibian store card book. As at 26 March 2016, we have ceased to classify the trade receivables store card portfolio in Lesotho, Namibia, Botswana and Swaziland as held-for-sale on our statement of financial position as we could not find a buyer at an acceptable price. Edgars Zimbabwe funds and administers its own trade receivables book.

3.2.4.2.    Since our sale of the store card book to Absa, credit sales have consistently declined, with the total number of credit customers reducing from approximately 3.6 million at 29 March 2014 to approximately 3.2 million as of 26 March 2016. The contribution of credit sales to total sales has dropped from 47.3% for fiscal year 2014 to 38.8% for fiscal year 2016. This reduction is due to the introduction of new credit affordability regulations by the South Africa National Credit Regulator in September 2015, Absa's credit requirements, as well as a decline in credit extension in South Africa more generally.

3.2.4.3.    Starting in November 2014, as an alternative to the credit arrangement with Absa, we introduced an NCA-compliant second-look credit book which, although still small, has returned new credit customer acceptance rates to healthier levels and has assisted in slowing the decline in credit sales. The Company will continue to supplement its Absa credit offering through the in-house second look credit solution. See paragraph 4 (*Management's Discussion and Analysis of Financial Condition and Results of Operations),* paragraph 1 of Part G *(Significant Factors Affecting Our Results of* Operations), paragraph 1.6 of Part G (*Credit Sales and Financial Services*) and paragraph 3.3.2 *(Increase Our Sales by Leveraging Our Private Label Store Card Program)*.

3.2.4.4.    We also offer a wide range of insurance products, including home, legal, funeral, hospital cash back, cell-phone, and account protection insurance, to our credit customers. This is an important element of our overall financial services offering. We provide these products together with our joint operation partner, Hollard Insurance, which serves as the underwriter for the products. As a store credit facility is a prerequisite for

obtaining a policy, these revenue streams have also come under pressure due to the decline in credit made available to our customers by Absa.

3.2.5.    ***Largest Loyalty Program in South Africa***

In 2012, we introduced our loyalty program, Thank U rewards, which, as of 26 March 2016, had over 12 million members. This program provides us with data on the spending habits of our member-customers that are essential for targeted marketing and promotional purposes. Over 69.3% of our retail sales have earned loyalty points since the program began. In fiscal year 2017, we are planning on re-launching our Thank U loyalty program with the offering of new benefits tailored to deliver chain value offers to our customers. Our private label store card customers also have access to our Edgars and Jet clubs, which have a combined membership of approximately 1.4 million as of 26 March 2016. Members currently pay a monthly membership fee of R27 to R60, and, in return, members receive a range of benefits, including reduced prices on travel and entertainment, as well as subscriptions to the Edgars and Jet magazines. Jet magazine is the most widely-read lifestyle magazine in South Africa. We believe that our private label cards, loyalty program and membership clubs generate increased customer spending, repeat visits to our stores, and strengthen our customer relationships.

3.2.6.    ***Improved Supply Chain and Cost Reductions are Important for Margins***

3.2.6.1.    Since 2008, we have operated a model that directly sources foreign-manufactured products from overseas without the use of the intermediary. To achieve this, we have offices in Shanghai and Dhaka. To capture efficiencies, we have steadily increased the proportion of direct foreign sourced products. We currently buy a portion of our foreign sourced products via our direct sourcing model, and we intend to continue optimizing our supply chains by reducing costs and lead times for the delivery of imported merchandise. We have streamlined our supplier base, which has decreased complexity and increased efficiency in our supply chain, helping us focus on improving the amount of direct sourcing and quicker supply response times. For fiscal year 2016, gross profit as a percentage of retail sales decreased to 36.7% compared with 37.2% for fiscal year 2015, mainly as a result of increased clearance markdowns particularly in the Edgars division combined with increased input costs as a result of a weaker currency.

3.2.6.2.    We have also initiated quick response systems to react to customer demands and trends. This entails working

with local and regional vendors to develop their capability to support quick response manufacturing, as well as aligning internal merchandising processes to leverage the short lead times of local and regional vendors to provide in-season responses to customer demands.

3.2.6.3. Our revenue growth has been affected by the current challenging conditions in South Africa and cost management has become an important tool to ensure our overall profitability growth. We manage all of our costs both at the head office and at the store level, and we have implemented a store transformation plan. As part of this plan, we undertook three major manpower restructurings over the last three years. This limited the growth in manpower costs at a store level, notwithstanding unionized increases of 9% in fiscal year 2015 and 5% since 28 March 2015, during a time when we continued to grow our number of stores. In February 2015, we addressed overhead costs through the elimination of operational inefficiencies at our head office. This included streamlining roles and responsibilities, the consolidation of certain functions, the elimination of duplications and the leveraging of technological opportunities.

3.2.7.    ***Experienced Management Team and Strong Equity Sponsorship***

3.2.7.1. Our senior leadership team combines years of strong international experience and industry expertise. For over a year, we have been led by our CEO, Bernie Brookes who has significant experience not only in apparel retailing in the southern hemisphere, but also specifically department stores and emerging markets, and who, prior to joining us was CEO of Myers for over eight years. In July 2016, we announced changes to our executive management under the restructured divisions, with the appointment of Richard Vaughan, as Chief Financial Officer (CFO), Andrew Thorndike as Chief Operations Officer (COO), Andrew Levermore as Chief Executive of the Edgars division, Dr. Urin Ferndale (previously Chief Operations Officer) as Chief Executive of the Discount division and Andy Jury as Chief Executive of the Specialty Stores division. Mr. Vaughan has been the Deputy Group Financial Officer for four years, has significant experience in a diverse set of roles including with Goldman Sachs and Deutsche Bank and is a qualified Chartered Accountant. Andrew Thorndike has 23 years' experience as a manager in the development and execution of operational,

organizational and strategic improvement and transformation initiatives on an international level, predominantly in retail and consumer packaged goods industries and has a Master's degree in Mining and Energy Technology. Our executive management team, comprising our CEO, CFO, and COO, together with our Chief Executive of the Discount division, our Chief Executive of the Edgars division and our Chief Executive of the Specialty Stores division, are responsible for implementing our business strategy.

3.2.7.2.   A Transaction Committee was formed as a board sub-committee in April 2016, comprised of three independent directors (i) Keith Warburton, (ii) David Frauman and (iii) Antonio Alvarez III, as well as the CEO and CFO, mandated to manage and review all strategic initiatives and matters relating to the Financial Restructuring, which we believe has provided us with access to valuable know-how and facilitated our interaction and negotiations with our bondholders and bank lenders.

3.3.   ***Our Business Strategy***

We intend to continue to pursue the following key elements of our current business strategy:

3.3.1.   ***Leverage our Large and Diverse Network of Existing Stores to Grow Our Same-Store Sales***

3.3.1.1.   Following the rationalization of our retail store chain portfolio in 2011, the introduction of new specialty stores such as Edgars Active and Edgars Shoe Gallery in 2011 and 2013, and the introduction of various mono-branded stores such as Topshop, Dune, and River Island from June 2012, we believe we are well-placed to leverage our network of stores, which is the largest in South Africa in terms of store count as of 26 March 2016, to grow our same-store sales.

3.3.1.2.   We intend to continue to pursue the following operational customer centric initiatives to grow our existing business:

3.3.1.2.1.   We rigorously assess and monitor evolving customer preferences to better identify and promote new merchandise, brands, and assortments in our stores. This allows us to offer our customers a mix of items and values as a part of the merchandising strategy within our various store chains.

3.3.1.2.2.   We will continue to prepare for the re-launch of our Thank U loyalty program

and we will leverage our Thank U loyalty program through selective direct marketing, and other marketing efforts, including private in-store events and special magazine issues. We also believe our loyalty program helps us attract new customers as well as increase cross-selling to existing ones by raising brand awareness and promoting the full breadth of our merchandise.

3.3.1.2.3.    We will continue to focus on store efficiency and the difficult task of determining service levels in stores, which need to be appropriate for the particular store format.

3.3.2.    ***Increase Our Sales by Leveraging Our Private Label Store Card Program***

3.3.2.1.    Growing same-store sales is highly dependent on growing both cash and credit sales. While cash sales performed well in fiscal year 2016, we have not found a solution to declining credit sales.

3.3.2.2.    In 2012, we sold our South African private store card receivables to Absa as part of a strategy to, among other things, allow us to better focus on our core retail operations, and improve our cash flow. Since our sale of the store card book to Absa, credit sales have consistently declined, with the total number of credit customers reducing from approximately 3.6 million at 29 March 2014 to approximately 3.2 million as of 26 March 2016. Absa, supported by Barclays Bank PLC, brought both global and local expertise in credit management, along with state of the art technology, a strong balance sheet, and the ability to offer a wide range of financial services products and services to our customers. However, this has not resulted in growth of the book, but rather in a decline in credit sales, due to Absa's credit requirements and the introduction of new scorecards, and, more generally, the decline in credit extension in South Africa due to the introduction of new credit affordability regulations by the South African National Credit Regulator in September 2015. We continue to work with Absa to improve the competitiveness of the credit offering for our customers while preserving their return and risk requirements. To that end, we have agreed plans with Absa to drive future credit sales through increased limits and new account distribution between the Group

and Absa. Pursuant to that agreement, Absa will book approximately 20% of new accounts and the balance will be funded by the Group.

3.3.2.3.  Starting in November 2014, as an alternative to the credit arrangement with Absa, we introduced an NCA-compliant second-look credit book which, although still small, has returned new credit customer acceptance rates to healthier levels and has assisted in slowing the decline in credit sales. The Company will continue to supplement its Absa credit offering through the in-house second look credit solution. While our second-look book is still relatively small and will take time to build more significant volumes, initial performance results are promising and have helped returning our new credit customer acceptance rates to healthier levels thus slowing the decline in credit sales.

3.3.3.  ***Focus on Improving Our Operating Margins***

3.3.3.1.  We plan to enhance operating margins by continuing to: (i) improve our retail price management; (ii) leverage our sourcing capabilities and input price management while reducing markdowns; (iii) optimize our store operations to improve merchandise availability and effectively organize promotional schemes; and (iv) improve the efficiency of our head office support functions.

3.3.3.2.  We also remain focused on ensuring ongoing improvements to the efficiency of our store and head office support functions. Slower space growth combined with lower inflation should provide opportunity for improved management of rental cost escalations, which is a challenge considering the structure of the market where contracted escalations are above inflation.  To that end, we are negotiating with 27 of our largest landlords in order to reduce the ratios of our current contractual rental sales on each or their respective leases.

3.3.4.  ***Continue the Implementation of Our New Strategic Plan***

3.3.4.1.  In December 2015, we announced a new strategic plan to improve our financial performance and maximize our liquidity position, comprising: (i) a simplified and more efficient head office, with an optimized headcount and increased control over support functions; (ii) management of profit and loss responsibility at individual stores; (iii) customer focused operations, including leaner stores, with visual merchandising and layouts aligned to customer behavior, improved clothing ranges with less

duplication, the expansion of core categories and key value items, and the rebalancing of our branded and private label offerings; (iv) IT cost optimization; (v) sourcing and logistics consolidation, including renegotiating contracts, optimizing service levels and other supply chain improvements; (vi) alignment of our organizational structure to customer facing propositions; (vii) defined target segments and differentiated value propositions per segment; (viii) customer feedback and follow up structural improvements; (ix) the introduction of incentives and key performance indicators targeted at the empowerment of top performers within the Existing Group; and (xi) a simpler business focus with an improved culture.

3.3.4.2.   We have moreover agreed plans with Absa to drive future credit sales through increased limits and new account distribution between the Group and Absa. Pursuant to that agreement, Absa will book approximately 20% of new accounts and the balance will be funded by the Group. We are also addressing increasing credit limits offered to customers by creating processes to assist customers to obtain the necessary documentation in order to conclude the regulatory required affordability assessment and effect the increase in support of credit sales growth.

3.3.4.3.   The majority of these initiatives have been fully rolled out across the Existing Group and we remain vigilant to cost savings opportunities throughout the organization.

3.3.5.   ***Strategically Invest in New Stores***

3.3.5.1.   Following increased capital expenditures to update our stores in fiscal years 2014 and 2015, during which we spent R1,349 million and R1,037 million in capital expenditures, respectively, we decreased capital expenditure by R485 million (or 46.8%), to R552 million in the fiscal year 2016. In the fiscal year 2016, we grew our average space of around 2.7% space as well as focused on our stores in the countries in which we currently have a presence, rather than further international expansion. We have targeted capital expenditure spending of approximately R600 million in fiscal year 2017, of which we expect to spend approximately R190 million on new stores.

3.3.5.2.   We plan to grow our offering strategically by continuing to selectively add new stores with a focus on our Edgars and Jet offerings.

3.3.5.3.   While not completely discretionary, our intended capital expenditures with respect to the establishment of new stores afford us important planning flexibility.

3.3.6.   ***Our Operations***

Our operations consist of our retail business and our credit and financial services business, both of which are supported by our centralized Group services. Historically, our retail business comprised four key retail divisions: the Edgars division, which consists of department store chains, specialty stores and mono-branded stores targeted at middle- to upper-income consumers; the Discount division, which consists of discount store chains targeted at lower- to middle-income consumers; the CNA division, which consists of our store chain selling books and magazines; and Edgars Zimbabwe, which serves the Zimbabwe market through both Edgars and Jet stores. Together, our retail divisions offer a diverse product portfolio of private label and branded products. Our credit and financial services business provides consumer credit through a strategic partnership with Absa, and other financial and insurance products through an agreement with Hollard Insurance. With approximately 3.4 million customer credit accounts as of 26 March 2016 (including our operations in Zimbabwe), our private label store card program was one of the largest providers of credit in southern Africa by number of customers. Commencing in the first quarter of fiscal year 2017, we reorganized our business division. See paragraph 3.1 (*Overview*), paragraph 4 (*Management's discussion and analysis of financial condition and results of operations*) and paragraph 2.2 (*Implementation of New Reporting Structure*). The responsibilities of our Group services include logistics, IT, property, human resources, finance and treasury management.

3.4. The approximate split of our retail sales in fiscal year 2016 by category is shown below.



3.5. Our continuous drive for efficiency and productivity has resulted in three material operational restructurings in the last three years. In fiscal year 2014, we decreased our store operation costs through a store optimization program which introduced increased operational efficiency. This was mainly carried out in our Edgars division, but was complemented by a voluntary retrenchment program in other divisions. In fiscal year 2015, we addressed overhead costs through the elimination of operational inefficiencies at our head office. This included streamlining the roles and responsibilities of various store personnel, the consolidation of certain functions, the elimination of duplications and the leveraging of technological opportunities. In fiscal year 2016, we conducted a review of the store portfolio in order to optimize performance, introduced a net promoter system across our Edgars and Jet store chains to improve efficiency and reduced operational costs, in particular through (i) the continuation of the reduction of overhead costs, (ii) an overhaul of procurement policies and (iii) improved merchandise sourcing. We expect the measures undertaken in fiscal year 2016 to be carried out through fiscal year 2020, and we estimate that the cumulative financial impact of these initiatives could reach up to R1.7 billion. In addition, we are currently in the process of clearing inventories aged over six months, aimed at improving short-term liquidity and rolling out improvements to our Edgars, Jet and Jet Mart stores, as well as certain Specialty division stores. We continue to assess opportunities to drive productivity and efficiency.

3.6. **Retail Business**
The following discussion of our retail division is based on our historical reporting structure which was in effect through the end of fiscal year 2016. Commencing with the first quarter of fiscal year 2017, we are reporting our business through three new Divisions. See paragraphs 3.1 (*Overview*), paragraph 4 (*Management's discussion and analysis of financial condition*

*and results of operations*) and paragraph 2.2 (*Implementation of New Reporting Structure*).

3.6.1.    **Edgars Division**

Our Edgars division, which is our department store division, is targeted at middle- to upper-income consumers. In addition to Edgars stores, our largest store chain by retail sales, the Edgars division includes complementary specialty store chains, including Boardmans, Red Square, Edgars Shoe Gallery, Edgars Active, and the various mono-branded stores, namely, Topshop, Tom Tailor, Mac, Lipsy, Bobbi Brown, Dune, TM Lewin, Salsa, Jigsaw, Calvin Klein, Khiels, Victoria Secrets Beauty and Accessories, Vince Camuto, River Island, Doc Martens, Jo Malone and Gosh. Our five key specialty store chains, together with our mono-branded stores, are centrally managed, with all marketing and merchandising decisions executed at our head offices. The Edgars division accounted for 51.3% of our retail sales in fiscal year 2016. As of 26 March 2016, the Edgars division comprised 559 stores, and an average retail space of 846,000 sqm

3.6.1.1.    *Edgars*, which began trading in 1929, is our chain of full-line department stores carrying a range of clothing, footwear, cosmetics, mobile phones, homewares and accessories. Edgars including the Edgars sales store accounted for 41.0% of our retail sales in fiscal year 2016. As of 26 March 2016, the Edgars chain including the Edgars sales store comprised 205 stores with an average store size of approximately 3,542 sqm.

3.6.1.2.    *Red Square* is our chain of cosmetics stores carrying international branded cosmetics, skincare products and fragrances. The Red Square brand was launched in 1996. Red Square accounted for 1.5% of our retail sales in fiscal year 2016. As of 26 March 2016, the Red Square chain, comprised 48 stores (including one Cosmetics Emporium) with an average store size of approximately 161 sqm.

3.6.1.3.    *Edgars Shoe Gallery* is our chain of shoe stores that we launched in 2012. Edgars Shoe Gallery provides a fully serviced environment carrying both private label and local and international brands. Edgars Shoe Gallery accounted for 0.1% of our retail sales in fiscal year 2016. As of 26 March 2016, the Edgars Shoe Gallery chain comprised seven stores with an average store size of approximately 328 sqm.

3.6.1.4.    *Boardmans* is our chain of homewares specialty stores that we acquired in 2004 to strengthen our position in the fast-growing home/living retail segment. Boardmans carries homewares products such as kitchenware, DIY, household appliances and textiles.

Boardmans accounted for 1.8% of our retail sales in fiscal year 2016. As of 26 March 2016, the Boardmans chain comprised 34 stores with an average store size of approximately 762 sqm.

3.6.1.5.    *Edgars Active* is our chain of casualwear and mobile phone products that we launched in 2005. Edgars Active accounted for 4.7% of our retail sales in fiscal year 2016. As of 26 March 2016, the Edgars Active chain comprised 180 stores with an average store size of approximately 398 sqm.

3.6.1.6.    Our mono-branded stores include all standalone brand stores. Since the launch of the first Topshop/Topman mono-branded store in 2012, we have secured franchise rights to TM Lewin, Dune, Tom Tailor, Lipsy, Salsa, River Island, Doc Martens, Vince Camuto and Calvin Klein. These brands have been rolled out mainly through the shop-in-shop concept within Edgars, but also through our 85 mono-branded stores. In September 2013, we acquired a controlling stake in the companies holding the exclusive rights to the well-known international brands Accessorize (fashion accessories) La Senza (specialty lingerie) and Inglot (cosmetics), which contributed 39 mono-branded stores at the date of acquisition. We have increased the number of stand-alone stores to 85 as of 26 March 2016. The financial results of both the shop-in-shop and stand-alone stores are included in the Edgars division. As of 26 March 2016, our mono-branded stores accounted for 2.2% of our retail sales in fiscal year 2016, with an average store size of approximately 195 sqm. As of fiscal year 2017, we have taken the strategic decision to exit a number of international brands including Express, Geox, Lucky Brand, One Green Elephant and Tom Taylor and we are assessing the possibility of exit on a number of additional brands, in order to optimize our mono-branded stores performance.

Following the implementation of our new reporting structure in the first quarter of fiscal year 2017, our Edgars Division comprises only of our Edgars stores. For a discussion of the Edgars Division's historical results of operations, see paragraph 4 (*Management's discussion and analysis of financial condition and results of operations)* and paragraph 3 of Part G (*Results of Operations).*

3.6.2.    ***Discount Division***

Our Discount division sells value merchandise targeted at lower- to middle-income consumers. The largest chain in our Discount

division is Jet. In addition to Jet, and its associated brand, Jet Mart, our Discount division also operates specialty stores under the Legit chain (which the Compromise Companies have now agreed to sell). Our three key Discount division chains are centrally managed, with all marketing and merchandising decisions executed at our head offices. The Discount division accounted for 38.8% of our retail sales in fiscal year 2016. As of 26 March 2016, the Discount division comprised 732 stores, and an average retail space of 642,000 sqm.

3.6.2.1.    *Jet*, which began trading in 1979, is a discount C&F (clothing and footwear) retailer serving value-seeking customers. Jet accounted for 21.6% of our retail sales in fiscal year 2016. As of 26 March 2016, the Jet chain comprised 392 stores with an average store size of approximately 902 sqm.

3.6.2.2.    *Jet Mart*, which began trading in 2004, is our discount general merchandise store offering a variety of product lines, including clothing, footwear, kitchenware, music, DIY, household appliances, textiles, and health and beauty products. Jet Mart accounted for 13.5% of our retail sales in fiscal year 2016. As of 26 March 2016, the Jet Mart chain comprised 128 stores with an average store size of approximately 1,805 sqm.

3.6.2.3.    *Legit*, which began trading in 2001, is our youth ladieswear specialty store that caters to value-seeking fashionable women and also offers health and beauty products. Legit accounted for 3.6% of our retail sales in fiscal year 2016. As of 26 March 2016, the Legit chain comprised 212 stores with an average store size of approximately 262 sqm.  On 15 September 2016, the Group agreed to the sale of the Legit business for R637 million to Retailability Proprietary Limited. This sale is aligned with Edcon's strategic plan to create a simpler, more agile business focused on selected offerings where the Group can add value. The sale of Legit remains subject to Competition Commission approval.

Following the implementation of our new reporting structure in the first quarter of fiscal year 2017, our Discount Division comprises Jet and JetMart. For a discussion of the Discount Division's historical results of operations, see paragraph 4 (*Management's Discussion and Analysis of Financial Condition and Results of Operations)* and paragraph 3 of Part G *(Results of Operations)*.

3.6.3.    **CNA Division**

3.6.3.1.    Our CNA division comprises a chain of stores offering books, music, magazines, toys, photographic equipment, greeting cards, movies, computer

accessories and mobile devices. CNA, which is our retail brand under our CNA division, commenced trading in 1896 and is one of the region's oldest and best known retail brands. Included in the division are nine standalone Samsung stores. The CNA division accounted for 6.9% of our retail sales in fiscal year 2016. As of 26 March 2016, the CNA stores comprised 198 stores, each with an average store size of approximately 410,000 sqm.

3.6.3.2.    Following the implementation of our new reporting structure in the first quarter of fiscal year 2017, our CNA Division is included in our new Specialty Division, which comprises Red Square, Boardmans, Edgars Active, Edgars Shoe Gallery, Cellular management costs, Legit and our mono-branded stores. For a discussion of the CNA Division's historical results of operations, see paragraph 4 (*Management's Discussion and Analysis of Financial Condition and Results of Operations)* and paragraph 3 of Part G *(Results of Operations)*.

3.6.4.    **Edgars Zimbabwe**

Our business in Zimbabwe accounted for 3.0% of total retail sales reported in the fiscal year 2016. As of 26 March 2016, we reported 53 stores as part of that business, with a total average store size of 760,000 sqm.

3.6.5.    **Stores**

Our total number of stores, across all of our divisions, increased from 1,500 as of 28 March 2015, to 1,542 as of 26 March 2016 (including 213 outside of South Africa). Total average retail space grew over the same period from approximately 1,565,000 sqm as of 28 March 2015 to approximately 1,607,000 sqm as of 26 March 2016. This expansion and growth of our stores was primarily due to the roll out of more Legit, Edgars Active, Red Square and mono-branded stores. We also grew our store presence outside of South Africa by 13, or 6.5%, from 200 at the end of fiscal year 2015 to 213 at the end of fiscal year 2016, across Zimbabwe, Namibia, Swaziland, Lesotho and Botswana.

3.6.6.    **Credit and Financial Services Business**

3.6.6.1.    As of 26 March 2016, we provided private label store cards to approximately 3.2 million active customers through a partnership with Absa, an affiliate of Barclays Bank PLC. Historically, we financed a portion of our private label store card program through an asset-backed domestic securitization program. In late 2012, we unwound that program, and since then have sold approximately R10 billion aggregate amount of net receivables to Absa through a series of transactions.

See paragraph 3.6.13 (*Absa Master Agreement*). We still hold the remaining non-South African trade receivables book, which includes Botswana, Lesotho, Swaziland and the Namibian book not sold to Absa, although, as of 26 March 2016, we have ceased to classify the trade receivables store card portfolio in Lesotho, Namibia, Botswana and Swaziland as held-for-sale on our statement of financial position as we could not find a buyer at an acceptable price. As of 26 March 2016, our receivable book had a net book value of R606 million, and delinquency rates were slightly in excess of 20%. For credit accounts opened since 2011, approximately 45% of total spend in the first 48 months happens in the first year, and then drops and remains stable thereafter. We still hold our own second-look book and net trade receivables managed by Edgars Zimbabwe. As of 26 March 2016, the net book value of the foreign book is R321 million; the net book value of our own second-look book is R164 million, and the net book value of the net trade receivables managed by Edgars Zimbabwe is R481 million. We estimate our second look credit book to grow its number of accounts by a compounded annual growth rate of 35%. However, despite the estimated growth in our own credit book, we have budgeted for a year-on-year average decline of approximately 6% of credit sales through the end of fiscal year 2020. See paragraph 4 (*Management's Discussion and Analysis of Financial Condition and Results of Operations)* and paragraph 1.6 of Part G *(Credit sales and Financial Services*) for more information.

3.6.6.2.    Our financial services business also offers insurance products, such as home, legal, funeral, hospital cash back, cellphone, and account protection, through an arrangement with Hollard Insurance, which generated operating profits of R725 million for fiscal year 2016.

3.6.6.3.    We partner with financial institutions and insurance providers to offer products in respect of which we only act as a sales agent and for which we do not bear any underwriting risk.

3.6.6.3.1.    We offer Edgars and Jet branded insurance products, pursuant to a joint operation with Hollard Insurance, which underwrites each policy. We offer a range of insurance products including credit, life, funeral plans and mobile phone insurance. Under the provisions

of the agreement with Hollard Insurance, if the policy premiums exceed the claims, the net profit after brand and administration fees is distributed as a dividend to us and Hollard Insurance. As of 26 March 2016, there were approximately 4.5 million insurance policies generating annual gross premiums of R1,590 million.

3.6.6.3.2.  The Existing Group has a closed book for the Edgars and Jet Legal Plan underwritten by Zurich Insurance Ltd. Europe Assistance provides risk management and policy fulfilment services. Under the provisions of the agreement with Zurich and Europe Assistance, if the policy premiums exceed the claims and expenses, the net profit is distributed as a fee to us and our business partners. Since April 2011, new business on the Edgars and Jet Legal Plan has been underwritten by Hollard Insurance, which replaced Zurich as underwriter. Annual gross premiums amounted to R21 million as of 26 March 2016.

3.6.6.4.  See paragraph 13.28 (*The growth of our business is in part dependent on our relationships with Absa as well as with Hollard Insurance, our insurance joint operation partner, and we may enter into additional joint venture relationships. If we were to lose these relationships or if the benefits we derive from these relationships were to diminish, our growth rates and our business would be harmed).*

3.6.7.  **Customers**

We believe our diverse retail store chains and product offerings appeal to customers spanning the full range of socioeconomic groups and ages, but our largest customer demographic group consists of female consumers in the 35-year-old and above age range. Our core customer shops for herself, her family and her home.

3.6.8.  **Competition**

3.6.8.1.  Our market is highly competitive, particularly with respect to product selection and quality, store location and design, price, customer service, credit availability and advertising. We compete at the national and local levels with a wide variety of retailers of varying sizes

and covering different product lines across all of the geographic markets in which we operate.

3.6.8.2.  Our Edgars division operates in the middle- to upper-income segment of the C&F market, and faces competition principally from Truworths, Foschini, Woolworths and Mr Price. Truworths is a public company, which concentrates on specialty retail formats targeted at fashionable clothing and footwear for middle- to upper-income customers throughout southern Africa, with 53% of their sales on credit and an active account base of 2.658 million as of 26 June 2016. Foschini is a public company, which operates specialty stores in the clothing, cosmetics, jewellery, accessories, sporting goods and homewares retail segments and caters to middle- to upper-income customers throughout southern Africa, with 51.7% of their sales on credit and an active account base of 2.56 million for the year ended 31 March 2016. Woolworths is a public company, which targets upper-income customers by seeking to offer a selected range of high-quality clothing, footwear, toiletries, cosmetics and homewares, with 25.9% of their sales in their clothing and general merchandise divisions on credit (as of June 2014) and an active account base of 2.3 million as of 26 June 2016. In recent years, the majority of Woolworths' revenue (excluding David Jones's revenue) has derived from its food and grocery operations. Mr Price is a public company, which targets middle-income customers through four retail chains focused on discount priced high fashion clothing, footwear, accessories and homewares, with 17.2% of their sales on credit and an active account base of 1.401 million as of the year ended 2 April 2016. Mr Price has traditionally competed with our Discount division, but has become increasingly competitive with our Edgars division.

3.6.8.3.  Our Discount division operates in the lower- to middle-income segment of the C&F market, and faces competition principally from Mr. Price, Ackermans and PEP. Ackermans and PEP are both subsidiaries of Steinhoff international. Ackermans targets middle- to low-income customers with low-priced clothing, footwear, accessories and homewares. PEP targets primarily low-income customers with low-priced clothing, footwear, textiles, homewares and mobile phone products. The Discount division also competes with a range of other smaller clothing retailers.

3.6.8.4.    As a result of the type and variety of products it offers, our CNA brand competes with different retailers across its various product lines, including retailers such as Exclusive Books, Musica, Incredible Connection, and HI-Fi Corporation.

3.6.9.    ***Suppliers and Distribution***

3.6.9.1.    Our supplies are sourced from domestic vendors and direct and indirect imports purchased from direct foreign vendors, foreign trading houses and South African sales agents. The purchasing operations of our Edgars and Discount divisions act independently of each other and we often have different business lines purchasing from the same supplier. As an ongoing strategy, we have centralized the sourcing of certain of our direct imports by opening sourcing offices in Shanghai and Dhaka, and have more recently focused on national and regional supplier relationships.

3.6.9.2.    Additionally, we have a Quality Assurance division that fully supports private label products across all the chains within the Existing Group. The Quality Assurance department is structured to support the brand positioning of the respective chains with regard to managing the quality standards and the application thereof.

3.6.9.3.    Our concentration of suppliers varies based on product type, but we effectively manage products from South Africa as well as Mauritius, Madagascar, Lesotho, Swaziland, Tanzania, China, Bangladesh, Pakistan and India. Approximately 85% of our supplies excluding mobile phones are routed through one of our three distribution centres, two of which are located in Johannesburg and the other of which is in Durban. We use sea freight for our imports and we make minimal use of airfreight. We outsource our outbound road transport to two large third-party transport operators. We operate logistics systems that enable us to conduct high-volume, reliable and accurate operations. See paragraph 13.7 (*We face the risk of adverse changes in our supplier relationships).*

3.6.10.    ***Leases***

We generally rent the properties in which our stores are located and, as of 26 March 2016, we had 1,542 leased stores in southern Africa, including 1,329 stores in South Africa, 63 in Namibia, 33 in Botswana, 15 in Lesotho, 16 in Swaziland, 22 in Zambia, seven in Mozambique, four in Ghana and 53 in Zimbabwe. We have a relatively high concentration of landlords, and as of 26 March 2016, we rented 60% of our trading space from our 13 largest

landlords. Our leases have an average initial lease term of ten years for our Edgars stores and five years for our other chains. Our leases typically include four options to extend the lease for further periods of five years each. The leases generally allow us to sublet the leased premises and assign our rights under the leases to our affiliate companies. As of 26 March 2016, the average remaining term of our leases was three years. Rental payments are generally made on a monthly basis and increased at a previously specified percentage rate (typically 7%) compounded annually. As of 26 March 2016, the minimum property operating lease commitments due within one year amounted to R2.3 billion. See paragraph 13.12 of Part C (*If we are unable to renew or replace our store leases or enter into leases for new stores on favorable terms, or if any of our current leases are terminated prior to the expiry of its stated term and we cannot find suitable alternate locations, our growth and profitability could be harmed*).

3.6.11.    ***Sales and Marketing***

3.6.11.1.    We use a broad range of marketing techniques, including national promotional campaigns, in-store advertising and community events to promote our brands and products. Our national campaigns promote our brands and selected products using television, radio and print advertisements. We have window and floor displays in our stores as well as in-store radio and television broadcasts, to enhance our customers' shopping experience, advertise specific retail products and promote additional products and our financial services. We also seek to increase our brand appeal within the communities we serve by sponsoring community events. We employ two types of price markdowns: temporary promotional sales, which are used to bring in new or infrequent customers; and clearance sales, which are intended to sell slow-moving inventory. Our main promotions programs include Red Hanger, Red Carpet, Most Wanted Brands and Celebration of the Stars, all of which are focused on increasing our sales. Due to a weaker than expected 2015 end-of-year holiday season, we increased our clearance activity in the last quarter 2016 and the first quarter of fiscal year 2017.

3.6.11.2.    We seek to expand our customer base through various creative marketing techniques, including our proprietary private label store cards, memberships clubs and loyalty programs. These initiatives provide us the opportunity, through selective direct marketing, to introduce new customers to the quality merchandise and service for which our brands are known. We are

successfully expanding our programs, which at present include marketing features such as private in-store events and special magazine issues, through the use of points accumulated on qualifying purchases. Through limited "double burn" periods, in which the points earned may be redeemed at twice their face value, bonus points occasionally awarded and "10X points" days, these programs allow us to attract new customers and cross-sell our merchandise to our existing customers by increasing their product know-how and brand-awareness and increasing overall foot traffic.

3.6.11.3.   We operate a variety of membership programs in our efforts to increase our customer base. These include our Edgars and Jet clubs which have a combined membership of over 1.4 million dues-paying members.

3.6.11.4.   In 2012, we introduced our loyalty programs, which allow our members to accumulate points in connection with the purchases that they make in-store and online. This program helps create a loyal following for our brands and promotes repeat customers. The Thank U store card loyalty program was launched across all of our stores in February 2012. As of 26 March 2016, our Thank U loyalty program had over 12 million customers and 69.3% of our total retail sales earned Thank U points. This program provides us with data on customer preferences and spending habits, which we believe to be valuable information to tailor targeted marketing and promotional programs. In fiscal year 2017, we are planning on re-launching our Thank U loyalty program with the offering of new benefits tailored to deliver chain value offers to our customers. Also in 2012, we introduced the Edgars Great Price program, which is aimed at informing our customers about our ongoing discount offers to attract them to our stores.

3.6.11.5.   In 2012, we also launched a multi-year project to remodel and refurbish our stores. Our goal was to ensure that our retail space is conducive to selling quality merchandise and that our supporting infrastructure is among the most modern and efficient in the industry. By improving the appearance of our stores and giving them a stylish and fashionable image, we believed we would be able to increase same-store revenues and sales per square meter. This modernization program of our stores was substantially complete by the end of fiscal year 2015.

3.6.11.6.  In addition to sales through our large network of stores, we also offer our customers merchandise through our websites (www.edgars.co.za and www.cna.co.za, www.boardmans.co.za, www.edgarsactive.co.za for example). At present, our CNA, Boardmans, Red Square and Edgars stores offer online sales. Red Square online was officially launched in May 2013, and not only allows consumers to order cosmetics online but also offers a free sampling program and free delivery for purchases over a specified threshold through a dedicated website, based on a new e-commerce technology platform. We expect to introduce this new e-commerce platform to all of our Edgars division retail brands over the next few years, which will increase our exposure to the online market and drive sales. As part of our strategic initiatives, we seek to improve our online customer services, as well as increase the users experience through the development of additional technologies allowing for a more simple and efficient online shopping process.

3.6.12.  ***Seasonality***

Our retail sales, like those of other C&F retailers, are subject to seasonal influences. Historically, our most important trading periods in terms of retail sales have been the Easter and Christmas seasons, with approximately one-third of our retail sales occurring in April, November and December combined for fiscal year 2016. We incur significant additional expenses in advance of the Easter and Christmas seasons in anticipation of higher retail sales during those periods, including the cost of managing additional inventory, inventory purchases, advertising and hiring additional employees. In previous years, our investment in working capital has peaked in early- to mid-March, October and November as a result of increased supply purchases in anticipation of Easter and Christmas. Our results are also affected by periods of abnormal or unseasonal weather conditions, which can lead to a decrease in retail sales and higher markdowns. See paragraph 4 (*Management's discussion and analysis of financial condition and results of operations*) and paragraph 1.9 of Part G (*Seasonality*)

3.6.13.  ***Absa Master Agreement***

On 5 June 2012, we entered into a Master Programme Agreement with Absa, pursuant to which Absa provides credit to our private label store card customers, while we remain responsible for all customer-facing activities, including the distribution of the store cards and credit collection. As part of that agreement, Absa pays us a net fee for administering the accounts. Absa is responsible

for credit scoring and credit decisions based on its own policies and procedures for extending credit, and Absa bears the risk of customer insolvency. When initially put in place, the Master Programme Agreement included certain performance metrics intended to ensure that the credit Absa granted to our current and prospective private label store card customers was not unreasonably restrictive. Since inception of the program, Absa has imposed stringent credit requirements on our current and prospective customers, which in turn has negatively affected our credit sales. We retain the right under the Master Programme Agreement to deliver store cards at our own risk to applicants whose application is denied by Absa, including through a partnership with a third party second-look provider. Since November 2014, we have been testing an in-house National Credit Act compliant second-look credit solution. The book is small and will take time to build up significant volumes but initial results for the book performance are good and indicate the potential for a strategic second-look partner or for the funding of the portfolio on the balance sheet.

3.7. *Human Resources*

3.7.1.   *Human Resources Overview*

As at 26 March 2016, we had a total of 44,516 employees, of whom 21,539 were permanent and 22,977 were temporary. In 2016, we reduced the number of staff at our head office by 270 employees, in order to eliminate operational inefficiencies.

3.7.2.   *Our Employees*

3.7.2.1.   Employee relations in South Africa are regulated by the South African Labour Relations Act No. 66 of 1995 (the "**Labour Relations Act**"), which codifies the rights of employees to belong to trade unions and the rights of trade unions to have access to the workplace. Importantly, the Labour Relations Act provides employees with rights not to be unfairly dismissed or subjected to unfair labor practices, and prescribes the monetary and other compensation available to employees who are considered to have been treated unfairly under the Labour Relations Act. The Labour Relations Act also guarantees employees the right to strike and the right to participate in secondary strikes in certain prescribed circumstances. In addition, the Labour Relations Act recognizes the right of employees to participate in the decision-making of companies through workplace forums. As such, employees must be consulted with respect to a variety of matters insofar as they relate to a range of matters that affect their workplace, including organizational restructuring, partial or total plant closures, mergers and transfers of

ownership. No industrial action has been taken against us in over ten years. We are also subject to Sectoral Determination 9: Wholesale and Retail Sector, promulgated in terms of the Basic Conditions of Employment Act, No. 75 of 1997, which prescribes certain minimum conditions of employment for employees in the sector.

3.7.2.2.   The majority of our employees belonging to a union are members of the South African Commercial, Catering and Allied Workers Union (the "**SACCAWU**"). As of 26 March 2016, approximately 21% of employees in the bargaining unit, and approximately 15% of all active employees, were members of the SACCAWU.

3.7.2.3.   Our current wage agreement with the SACCAWU was entered into for a two-year period in May 2015. That agreement provides for fixed salary increases at 5% for the first year (May 2015 to May 2016) and a similar increase for the second year (May 2016 to May 2017).

3.7.3.   *Training*

We have made significant investments in training in order to be able to attract and retain quality employees. We currently offer our employees several learning opportunities, including learnerships, bursaries, leadership development and coaching, and spent 3% of payroll expenditure on learning in fiscal year 2016. The Edcon Retail Academy (ERA), established in 2005, delivers our training programs to improve retail management, merchandising and operational skills. ERA is also an accredited training provider with the Wholesale and Retails SETA through which we deliver learnership and skills programs aligned to qualifications registered on the National Qualifications Framework (NQF). We are required to pay Skills Development Levies to the Wholesale and Retail SETA in terms of the Skills Development Act, No.97 of 1998 and Skills Development Levies Act, No. 9 of 1999.

3.7.4.   *Other Human Resources Policies*

3.7.4.1.   We provide a variety of services to our employees. These services are diverse and range from general benefits such as medical aid and retirement fund schemes to overall employee care. The Edcon Wellness Centre provides psychological, medical (including free anti-retroviral treatment), legal and financial support to all employees.

3.7.4.2.   In addition, we provide our employees with three retirement fund options, all of which are defined contribution plans: the Edcon Provident Fund and two union provident funds. A retirement savings plan is also

        made available to the flexible staff employed on a limited number of hours per month.

3.7.4.3.   To further incentivize our employees through performance-based rewards, we structured the remuneration package of our senior management so that they can earn up to an additional 67.5% to 100% of their annual package. All other employees are eligible for performance rewards annually. Payments are either based on an annual package or monthly benefit salary and can range from employees receiving up to 37% of their annual package to lower-graded employees receiving up to 202.5% of their monthly benefit salary.

3.7.4.4.   We are also subject to the Employment Equity Act, No. 55 of 1998 (Employment Equity Act), which requires us to submit regular employment equity reports and income differential statement to the Department of Labour. We have also formed an Employment Equity Forum, chaired by our chief executive officer, which provides a forum for representatives of labor, management and other designated groups to review the progress and discuss the direction of our equity employment policies. In addition, the Board has a Social, Ethics and Transformation Committee, which provides oversight. We believe our policies promote equitable human resource practices for greater inclusivity amongst all groups. The Employment Equity Act has also recently been amended to categorise unequal terms and conditions of employment as unfair discrimination.

3.8.   **_Information Technology_**

3.8.1.   From fiscal year 2014 to fiscal year 2016, we invested R566 million on application systems and hardware. For fiscal year 2017, we plan to invest at least R160 million in IT development projects.

3.8.2.   As evident from the financial investment above, we have continued to invest in IT systems and infrastructure principally to support the business in improving customer service, automating new business processes and delivering management information.

3.8.3.   The following represents the major areas of our IT investment:

3.8.3.1.   Implementation of new Merchandise Planning, Replenishment, Size Optimization Assortment Planning and Merchandise Information Systems.

3.8.3.2.   Further integration with Barclays/ABSA in respect of credit sales.

3.8.3.3.   Automation and integration of international brands being rolled out to the Edgars division stores including the mono-brand stores.

3.8.3.4.    Systems changes to support the Existing Group's expansion into Africa.

3.8.3.5.    Re-launch and continued development on the Thank U Rewards program to track and manage the accrual and use of reward points by our loyalty customers.

3.8.3.6.    Implementation of new transactional web sites such as Red Square, Boardmans and CAN.

3.8.4.    As part of the IT strategy developed in 2016, we are working on improving our IT infrastructure to reduce our business risks against IT systems, build up our internal IT capability by adjusting our outsourcing levels and reduce operating costs. The Company expects to obtain real cost savings, productivity benefits and performance improvements in respect of these technological changes over the next years.

3.8.5.    From 2012 to 2014, we invested in new and up-to-date retail software developed by Oracle to upgrade one of our merchandise system modules. The Oracle RPAS system has replaced our old IT systems for merchandise financial planning, demand forecasting, size profile optimization and replenishment. The new merchandising system has resulted in improvements to customer service levels, improved inventory management and better sales planning.  We are planning on updating our other mechandise system modules to reduce business risks inherent to some of our less up-to-date systems.

3.8.6.    We use Nautilus as our logistics management system which interfaces with the Retek Merchandise System to streamline the movement of a product from the delivery order to its final destination store.  We are currently improving our supply chains investments to improve the business and capability benefits delivered through these investments.

3.8.7.    We use a Microsoft based in-store system (Avenew) to support our in-store processes and monitor staff scheduling and attendance.  Within our business strategic priorities, we are planning on upgrading the Avenew system over the next years, in order to further improvements of customer services, and implement further costs saving in IT operational costs.

3.8.8.    In our credit and financial services business, we use VisionPLUS modified with proprietary enhancements. VisionPLUS includes systems such as credit management, financial authorization, and collections tracking and analysis, and we have added customized systems such as plastic card management and personal financial services. In addition, we use the Oracle E-Business Suite Financials in our financial business processes.

3.8.9.    Our IT development policy is to outsource software development to Accenture, and processing and hardware capabilities to Business Connexion. All data processing is performed in BCX's data centre in Midrand. All governance and back-up procedures

are currently being reviewed to ensure robust business continuity and improve our recovery capabilities. We recently launched a global review of our IT initiatives and we expect to be making enhancements to our IT systems following the conclusion of that comprehensive review in order to maximise business value and reduce operational costs.

3.9.    *Intellectual Property*

We have registered, or applied for the registration of, numerous trademarks in connection with our private label products and chain brands in China, South Africa and other countries in Africa. In general, we own the copyrights of the designs created or commissioned by us. We have no material patents. We regard our trademarks and other intellectual property as valuable assets in the marketing of our products and business and we take appropriate actions when necessary to protect our intellectual property rights.

3.10.    *Legal and Regulatory Proceedings*

We are party to various claims and legal actions in the ordinary course of our business. We believe that such claims and actions, either individually or in the aggregate, will not have a material adverse effect on our business, financial condition or results of operations.

3.11.    *Tax Settlement*

3.11.1.    In August 2012, the South African Revenue Service ("**SARS**") notified us that it was considering the issuance of an income tax assessment primarily in connection with our tax treatment of interest payable on the financing of the acquisition of the Existing Group by Bain Capital. We challenged SARS's position and we believe that we were in compliance with applicable South African tax laws and regulations. Nevertheless, we perceived it to be beneficial to engage in settlement discussions with SARS, which led to our entering into a settlement agreement with SARS in December 2012. By agreeing to the settlement agreement, we believe that we avoided protracted litigation with SARS in relation to the matters in dispute.

3.11.2.    The agreement addresses the tax treatment of the issues in dispute for financial periods since the acquisition of the Existing Group by Bain Capital, being financial periods 2008 through 2014, as well as future financial periods. As a result of the settlement, the Existing Group is likely to pay income tax earlier than the Existing Group anticipated prior to entering into the settlement agreement. Nonetheless, we believe that our cash flows should allow us to satisfy the additional income tax payments that may result from the settlement.

3.11.3.    The main terms of the settlement agreement are as follows:

3.11.3.1.    for the financial period 2008 through to 2014, we agreed to reduce our tax losses carry forward by R9 billion;

3.11.3.2.    for the financial period from the beginning of 2014 until an initial public offering or an issuance of

securities representing 20% or more of the Existing Group's equity (if any), we agreed to limit the deduction for tax purposes of interest payable on the senior secured floating rate notes and the senior floating rate notes or any refinancing thereof (the "acquisition indebtedness") to 50% of such interest, on an aggregate principal amount of indebtedness of €1.3 billion or the equivalent thereof in rand or U.S. dollars, subject to certain adjustments. Interest on the portion, if any, of the acquisition indebtedness exceeding such cap will not be deductible for tax purposes. As of 26 March 2016, acquisition indebtedness amounted to €668 million and therefore was in compliance with this cap;

3.11.3.3.   for the period following an initial public offering or an issuance of securities representing 20% or more of the Existing Group's equity (if any), we agreed that interest payable on the acquisition indebtedness would be fully deductible for tax purposes, up to an aggregate principal amount of indebtedness of €711.1 million or the equivalent thereof in rand or U.S. dollars. Interest on the portion, if any, of the acquisition indebtedness exceeding €711.1 million or the equivalent thereof in rand or U.S. dollars will not be deductible for tax purposes; and

3.11.3.4.   for the period from and following the 2014 financial period, interest payable on the subordinated shareholder loan advanced by Luxco to Holdco, if any, will not be deductible for tax purposes.

3.11.4.   The settlement is without prejudice to future changes in South African tax legislation and does not relate to any matter other than those in connection with the acquisition of the Existing Group by Bain Capital. SARS has notified the Existing Group that it is reviewing certain other tax matters, none of which we believe are material to the Existing Group.

4.   **Management's discussion and analysis of financial condition and results of operation**

Management's entire discussion and analysis of the financial condition of the Existing Group and its results of operations is contained in Part G. You are urged to read this Part in its entirety for a full understanding of these items.

5.   **Background to and reasons for the Financial Restructuring**

5.1.   Throughout 2015, the Existing Group was faced with a worsening macroeconomic environment and reduced customer spending following the implementation of new consumer credit regulations, both of which had an adverse impact on the Existing Group's short-term liquidity. With near-term maturities and increasing pressure from its creditors, credit insurers and suppliers, the Existing Group needed to tackle its high leverage and cash

interest burden. In November and December 2015, the Existing Group completed the refinancing of a portion of its capital structure ("Project Starling"). As part of Project Starling, the Existing Group completed an exchange offer (the "Exchange Offer") in respect of Holdco's 13.375% senior notes due 2019, which reduced total leverage by €298.0 million (1.6x LTM EBITDA as of June 2015) and cash-pay leverage by approximately 25.0%. Additionally, as a result of the Exchange Offer, the Existing Group reduced its annual net cash interest payments by approximately R1,000 million. Further, in connection with Project Starling, the Existing Group reached an agreement with all of its bank lenders to extend the maturity of over R7,900 million of the Existing Group's bank debt and secured new commitments for a EUR Super Senior Liquidity Facility which was used to refinance, in full, the 2016 Super Senior ZAR Notes, and the Super Senior Liquidity Facility incurred in July 2015. As part of Project Starling and in continuing support of the Existing Group's operational improvements, the lenders also agreed to revise the Existing Group's financial covenants to increase headroom.

5.2.    Notwithstanding the completion of Project Starling, the Existing Group experienced a weaker than expected Christmas 2015 trading period, and by the autumn of 2016 had significant near-term cash needs due to cash interest payments coming due under the Senior Secured 2018 Notes, the Senior Secured Term Loan Agreement, the ZAR Super Senior RCF Term Loan, the EUR Super Senior Liquidity Facility and operational cash requirements.

5.3.    In May 2016, the Existing Group concluded a successful waiver and consent solicitation process that allowed it, with the consent of its lenders and the Senior Secured 2018 Noteholders, to defer all of its cash interest payment obligations under the Senior Secured 2018 Notes and Senior Secured Term Loan Agreement until 14 December 2016 (subject to the Existing Group's compliance with certain continuing obligations) (the "Cash Interest Deferrals"). The Existing Group have used the additional liquidity made available to it by the Cash Interest Deferrals to fund its near-term working capital requirements, including paying its employees, suppliers and landlords.

5.4.    In July 2016, the Existing Group took further steps to address its liquidity concerns by successfully completing a consent process that allowed it to incur new financing (the "Additional Indebtedness") from certain of its Senior Secured 2018 Noteholders and existing bank lenders in an aggregate principal amount of up to R1,500 million (equivalent).

5.5.    On 20 September 2016, certain entities in the Existing Group and certain of the Existing Group's creditors, accounting for 80% of the outstanding principal amount of the secured debt of the Existing Group, provided signatures in respect of the Lock-Up Agreement, pursuant to which the parties to the Lock-Up Agreement agreed to the key terms of a comprehensive restructuring of the Existing Group's entire capital structure, including a significant decrease in the outstanding amount of its third-party debt and a transfer of control over the Existing Group's operating companies from Bain Capital (through Luxco) to certain of the Existing Group's existing creditors. The Lock-Up Agreement became effective as to the Existing Group on 3 October 2016, and as to all other parties thereto on 13 October 2016.

5.6.   It is anticipated that the Financial Restructuring will materially improve the liquidity position of the Existing Group to ensure its ongoing operations as well as to address the current high structural leverage and cash interest burden on the operating company. Pro forma for the Financial Restructuring, the main operating company will increase its cash interest coverage from 0.8x to 3.1x, and reduce its gross leverage from 18.9x to 4.1x excluding subordinated debt. The Existing Group will raise a new revolving credit facility of R575m at its main operating company to address its working capital requirements more efficiently, and will raise an additional R1.5bn at one of the holding companies upon completion of the Financial Restructuring. The Existing Group believes that the extended maturity profile of the Existing Group's debt and additional funding, each contemplated as part of the Financial Restructuring, should facilitate an ongoing operational turnaround and allow management to refocus onto running the business and executing its strategic plan. This should also facilitate the management of the Existing Group's future capital expenditure requirements and provide headroom for investments in continued growth. Furthermore, the Existing Group is of the view that consummation of the Financial Restructuring should alleviate concerns of its key creditors (for example suppliers, landlords and credit insurers, as well as its employees) and make the Existing Group a more attractive place to work and shop.

6.  **What is the current Existing Group debt and equity structure?**
    The current Existing Group debt and equity structure is as follows:



*Debt figures based on unaudited company accounts as at 25 June 2016.*
*Intra-group Loans are only indicated to the extent that these are related to external Debt financing.*
*All shareholding is 100% unless otherwise stipulated.  The shareholding in the various international subsidiaries and South African subsidiaries are not shown.*

7.    **What will be the debt and equity structure of the Existing Group post-Financial Restructuring?**

A post-Financial Restructuring structure chart setting out the debt and equity holdings in relation to the Existing Group, New Holdco 1, New Holdco 2 and the Parent is set out below:



1. Assumes all Compromise Creditors subscribe in accordance with the New Money Notes Offer.
2. This includes Designated Recipients who are Eligible Persons and the Holding Period Trustee in respect of Ineligible Creditors and Non-Respondent Creditors.
3. The structure assumes that with Facility A1 Loans will be repaid in full at Completion.
4. The exact amount of post Financial Restructuring debt will be calculated and allocated in accordance with the terms of the Restructuring Agreement.
5. All shareholding is 100% unless otherwise specified.  The shareholding in the various international subsidiaries and South African subsidiaries are not shown.

All amounts are estimated by Houlhan Lokey

A summary of the pre and post-Financial Restructuring debt structure is set out below:

| Senior Creditor | Pre Financial Restructuring | Post Financial Restructuring | Currency at Completion | Ranking | Terms |
|---|---|---|---|---|---|
| **THE COMPANY** | | | | | |
| RCF Creditors and RCF Lenders under the New RCF Facility (the "**New RCF Lenders**") | ZAR Super Senior RCF Term Loan and LC Facility | New RCF Facility, Converted Revolving Facility, Term Facility and LC Facility | ZAR | Secured – first ranking Super Senior Debt *pari passu* with SSLF Facilities | Amended and Restated SSCF Facility Agreement |
| Super Senior Secured Liquidity Facility Lenders ("**the SSLF Lenders**") | EUR Super Senior Liquidity Facility | EUR SSLF Facilities | EUR | Secured – first ranking Super Senior Debt *pari passu* with the SSCF Facilities | Amended and Restated SSLF Facility Agreement |
| **NEW HOLDCO 1** | | | | | |
| Holders of the New Holdco 1 PIK A-1 Notes (the "**New Holdco 1 PIK A-1 Noteholders**") | N/A | New Holdco 1 PIK A-1 Notes | USD | Secured – first ranking | On the terms set out in the New Holdco 1 PIK A 1 Notes Indenture |
| Senior Creditor | Pre Financial Restructuring | Post Financial Restructuring | Currency at Completion | Ranking | Terms |
| Holders of New Holdco 1 PIK A-2 Notes (the "**New Holdco 1 PIK A-2 Noteholders**") | Super Senior DOP Hedging Debt (*second ranking Super Senior*) | New Holdco 1 PIK A-2 Notes | USD | Secured – first ranking | Refinanced into new instruments issued by New Holdco 2 in terms of the New Holdco 1 PIK A 2 Notes Indenture |
| **NEW HOLDCO 2** | | | | | |
| Holders of New Holdco 2 PIK A Notes (the "**New Holdco 2 PIK A Noteholders**" | EUR 2019 Super Senior PIK Notes (the "**Super Senior PIK Notes**") (*third ranking Super Senior*) and – EUR Super Senior Term Loan (*third ranking Super Senior*) | New Holdco 2 PIK A Notes | EUR | Secured - first ranking New Holdco 2 PIK Notes (but ranking behind the New Holdco 2 Cure Notes (if applicable)) | Refinanced into new instruments issued by New Holdco 2 in terms of the New Holdco 2 PIK A Notes Indenture |
| Holders of New Holdco 2 PIK B Notes (the "**New Holdco 2 PIK B Noteholders**") | ZAR Senior Secured Term Loan; EUR 2018 Senior | New Holdco 2 PIK B Notes | USD/ZAR | Secured – second ranking New Holdco 2 PIK Notes | Refinanced into new instruments issued by New Holdco 2 in terms of the New Holdco 2 PIK B Notes |

| | Secured Notes; | | | | Indenture |
|---|---|---|---|---|---|
| | USD 2018 Senior Secured Notes | | | | |
| | and - | | | | |
| | EUR 2019 Senior Secured PIK Toggle Notes | | | | |

A summary of New Holdco 2's equity structure post-Financial Restructuring is set out below:

| Shareholder | Reason for Entitlement | % of total issued share capital in New Holdco 2 | Class of Ordinary Share | Voting Right (√ / x) |
|---|---|---|---|---|
| Senior Secured Creditors who are Eligible Creditors (or who have appointed Designated Recipients who are Eligible Persons) or the Holding Period Trustee | Refinanced Senior Secured Debt | Up to 85 | A | √ |
| Participating Creditors (Compromise Creditors who are Eligible Creditors or who have appointed Designated Recipients who are Eligible Persons) | New Money Notes Offer | Up to 9.6 | B | √ |
| Participating Creditors (Facility A3 Lenders) | Refinance of the Facility A3 Loans | Up to 5.4 | B | √ |
| BEE Trust | Reinstated BEE entitlement | 10.6 | C | √ |
| Management Incentive Trust | Management Incentive Plan | Up to 8 | D | X |
| Luxco | Consensual deal | 2 | E | X |

8.    **Implementation of the Financial Restructuring**

8.1.     On 20 September 2016, certain entities in the Existing Group and certain of the Existing Group's creditors, accounting for 80% of the outstanding principal amount of the secured debt of the Existing Group, provided signatures in respect of the Lock-Up Agreement, pursuant to which the parties to the Lock-Up Agreement agreed to the key terms of a comprehensive restructuring of the Existing Group's entire capital structure (referred to as the Financial Restructuring), including a significant decrease in the outstanding amount of third-party debt of the Company and a transfer of control over the Existing Group's operating companies from Bain Capital (through Luxco) to certain of the Existing Group's existing creditors. The Lock-Up Agreement became binding on 13 October 2016, following satisfaction of its conditions precedent.

8.2.     The Financial Restructuring is being implemented across a number of documents. The key documents, together with their purpose, are highlighted below:

  8.2.1.     **Compromises:**

    8.2.1.1.     The Compromises, once approved by the requisite majority of Senior Secured Creditors and Super Senior Third Ranking Creditors (as applicable) and having become unconditional in accordance with their terms, will authorise the Compromise Agent to enter into the Restructuring Agreement and all Execution Documents on behalf of the Compromise Creditors (see 8.2.4.10 below for further details).

    8.2.1.2.     Pursuant to the Restructuring Agreement, GLAS (as the putative New Holdco 2 PIK A Notes Trustee and the New Holdco 2 PIK B Notes Trustee) is authorised by the Compromise Creditors to enter into the Distribution Agreement.

    8.2.1.3.     Prior to the Compromise Agent, GLAS (as the putative New Holdco 2 PIK A Notes Trustee and New Holdco 2 PIK B Notes Trustee) entering into the Restructuring Agreement (and Execution Documents) and the Distribution Agreement respectively, the Compromise Creditors themselves will have an opportunity to accede to such documents.    Please refer to paragraph 8.2.4.3 on page 95 for further information.

  8.2.2.     **Guarantor Compromises**

    8.2.2.1.     Each Compromise Creditor's Compromise Claim is secured by a Guarantee given by a Guarantor pursuant to the terms of the relevant indenture (in respect of Compromise Noteholders) or term loan agreement (in respect of Compromise Lenders).

    8.2.2.2.     In order for each Guarantor's financial obligations under the relevant Guarantee to be arranged or compromised, section 155(2) of the Companies Act requires that such arrangement or compromise of the

Guarantor's financial obligations under its Guarantee must be proposed by the board of such Guarantor.

8.2.2.3.    As such, separate Compromises are being issued by each Guarantor to each of the Senior Secured Creditors and Super Senior Third Ranking Creditors, in their capacity as creditors of such Guarantor by virtue of the Guarantee. Similar to the Senior Secured Company Meeting and the Super Senior Company Meeting being separate, each Guarantor will hold separate class meetings of the Senior Secured Creditors and Super Senior Third Ranking Creditors.

8.2.2.4.    If the Compromise Effective Date occurs, then the Guarantors' respective liabilities under the Guarantees will be fully and effectually discharged in all respects on Completion.

8.2.3.    **Explanatory Statement:**

8.2.3.1.    This document is being included so as to explain in greater detail, the effect of the Compromises on the relevant Compromise Creditors and the actions required of them.

8.2.3.2.    This Explanatory Statement, read with the Account Holder Letter and Proxy Form, also contains the New Money Notes Offer.

8.2.3.3.    By Compromise Creditors validly completing and signing the relevant Account Holder Letter or Proxy Form and agreeing to subscribe for New Money Notes, GLAS (as the putative New Holdco 1 PIK A-1 Notes Trustee) will be authorised to enter into the Escrow Deed on behalf of the Funding Parties (as defined therein).

8.2.3.4.    Prior to GLAS (as the putative New Holdco 1 PIK A-1 Notes Trustee) entering into the Escrow Deed, the Participating Creditors themselves will have an opportunity to accede to such document. Please refer to paragraph 8.2.4.3 on page 95 for further information.

8.2.4.    **Restructuring Agreement:**

8.2.4.1.    This is the umbrella agreement which regulates the implementation of the Financial Restructuring in its entirety and the sequencing of the various Implementation Steps set out therein.

8.2.4.2.    The Company, the Guarantors, New Holdco 1, New Holdco 2 and the Parent (among others) will sign the Restructuring Agreement on or about the date that the Compromises are launched.

8.2.4.3.    The Company will promptly notify each of the RA Creditors, New RCF Lenders and the Committed

Creditors once the Compromise Effective Date has occurred, and the RA Creditors, New RCF Lenders and the Committed Creditors will be invited to accede to the Restructuring Agreement by signing an RA Accession Letter by no later than the RA Accession Deadline. Such creditors (other than the Compromise Creditors) will enter into the Restructuring Agreement and its concomitant schedules or annexures under hand, as opposed to any compromise being proposed in respect of such creditors.

8.2.4.4. Promptly following the RA Accession Deadline, the Compromise Agent will, pursuant to the authority granted to it under the Compromises, execute an RA Accession Letter on behalf of each of the Compromise Creditors that, as at the RA Accession Deadline, has not acceded to the Restructuring Agreement.

8.2.4.5. Each step of the Financial Restructuring is regulated more fully in terms of the documents and/or agreements attached to or referred to in the Restructuring Agreement and the Steps Plan, as the Execution Documents or Implementation Documents.

8.2.4.6. The mechanism for executing the Execution Documents is set out in clause 3 of the Restructuring Agreement which provides that –

8.2.4.6.1. by no later than 13h00 on the Signing Date, each Party (other than the Compromise Agent) shall sign, but leave undated, all Execution Documents to which it is a party and deliver electronic copies of such Execution Documents to all Legal Advisors and deliver the original signed Execution Documents physically to their respective Legal Advisor;

8.2.4.6.2. promptly after 13h00 on the Signing Date, (1) the Compromise Agent (on behalf of each Compromise Creditor that has not complied with paragraph 8.2.4.6.1 above) shall sign, but leave undated, all Execution Documents to which that Compromise Creditor is a party; (2) GLAS (as the putative New Holdco 1 PIK A-1 Notes Trustee, on behalf of each the Funding Party (as defined therein) and Committed Creditor that has not complied with paragraph 8.2.4.6.1 above) shall sign, but leave undated, the

Escrow Deed to which the relevant creditors are party thereto; and (3) GLAS (as the putative New Holdco 2 PIK A Notes Trustee and the putative New Holdco 2 PIK B Notes Trustee, on behalf of each Compromise Creditor that has not complied with paragraph 8.2.4.6.1 above) shall sign, but leave undated, the Distribution Agreement to which the Compromise Creditor is a party, and the Compromise Agent and GLAS shall deliver electronic copies of such Execution Documents to all Legal Advisors and deliver the original signed Execution Documents physically to their respective Legal Advisor.

8.2.4.7.   The Restructuring Agreement prescribes the formulae for determining the allocation of the post-Financial Restructuring debt and equity holding, including, but not limited to, the Compromise Consideration, the New Money Notes, the New Holdco 2 Ordinary B Shares and the CVRs.  The process for finalising these allocations is further described in paragraph 12 commencing on page 139 of this Explanatory Statement.

8.2.4.8.   For information purposes, the key conditions precedent to the Restructuring Agreement are summarised below:

8.2.4.8.1.   the approval of the Competition Authorities and by such Regulators outside South Africa as may be required for the implementation of the Financial Restructuring;

8.2.4.8.2.   the approval from the Financial Surveillance Department of the South African Reserve Bank for such elements of the Financial Restructuring as may be required to be approved under the Exchange Control Regulations promulgated under the Currency and Exchanges Act;

8.2.4.8.3.   the approval of the Registrar, for the Senior Secured Creditors that are banks, to acquire shares in New Holdco 2;

8.2.4.8.4.   the New Holdco 2 MOI has been filed with the South African Companies and Intellectual Property Commission;

8.2.4.8.5.　　the United States Bankruptcy Court for the Southern District of New York has entered an order recognising the South African proceedings related to the Compromises under chapter 15 of the United States Bankruptcy Code; and

8.2.4.8.6.　　the Tax Report (in a form and content reasonably acceptable to the Majority Locked-Up Creditors) has been prepared and delivered to each Senior Creditor that has entered into a Reliance Letter.

8.2.4.9.　　The above conditions precedent represent only those considered key from the Company's perspective, and do not represent all of the conditions precedent to the Financial Restructuring. For the entire list of conditions precedent to the Financial Restructuring, your attention is drawn to clause 4 of the Restructuring Agreement.

8.2.4.10.　　Pursuant to the Restructuring Agreement, with effect from the Completion Date, -

8.2.4.10.1.　　each RA Creditor, New RCF Lender, Super Senior Second Ranking Participant and Committed Creditor in its capacity as such (each a "Creditor Releasing Party"), will irrevocably agree to release in full each Company Party and (in such capacities only) its Affiliates, officers, trustees, directors, managers, partners, employees, advisors, sub-advisors and its Affiliates' officers, trustees, directors, managers, partners, employees, advisors and sub-advisors (each a "Company Released Party");

8.2.4.10.2.　　each Company Party in its capacity as such (each, a "Company Releasing Party", and with each Creditor Releasing Party, each a "Releasing Party") will irrevocably release in full each RA Creditor, New RCF Lender, Super Senior Second Ranking Participant and Committed Creditor and (in such capacities only) its Affiliates, officers, trustees, directors, managers, partners, employees, advisors, sub-advisors and its Affiliates' officers, trustees, directors, managers, partners, employees, advisors and sub-advisors (each, a

> > "Creditor Released Party, and with the Company Released Party, each a "Released Party"),

> in respect of all and any Losses suffered or incurred by that Releasing Party (whether before, on or after the Completion Date) arising out of, or caused by that Released Party's participation in the Financial Restructuring ("Financial Restructuring Release") and/or that Released Party's actions or omissions in respect of the conduct of the business of any Company Party and/or any member of the Existing Group that occurred prior to the Completion Date ("General Release"), but excluding Losses caused by (i) any breach of any Restructuring Proposal Document or Implementation Document by that Released Party which is not remedied or waived; or (ii) any gross negligence, fraud, dishonesty, wilful or fraudulent misrepresentation, recklessness or wilful misconduct of that Released Party.

8.2.4.11.   In relation to the General Release only and any Company Released Party, if (i) the Super Senior First Ranking Debt is not repaid in full within 120 days following any Enforcement Action (save as set out in paragraph (ii)), then any Releasing Party shall be entitled in its sole and absolute discretion to cancel and revoke the General Release; or (ii) any Enforcement Action referred to in paragraph (e) of its definition, is taken against any Company Party or any Insolvency Event occurs in relation to any Company Party, the General Release shall terminate in relation to the Company Released Parties.

8.2.4.12.   If the Super Senior First Ranking Debt is repaid in full (such date being the "Final Discharge Date") within the period referred to in clause 11.5 above, the right of the Releasing Parties to revoke and terminate the General Release is permanently cancelled.   If the Final Discharge Date has occurred and the General Release has not been revoked, then the right to cancel the General Release shall permanently cease on 31 March 2023.

8.2.4.13.   No claims for any Losses incurred or suffered by any Releasing Party shall be time-barred or prescribed and all time periods relating thereto shall be interrupted and cease to run until the Final Discharge Date.

8.2.4.14.   Neither the Financial Restructuring Release nor the General Release shall preclude any Releasing Party from requesting, convening, participating in and/or

prosecuting an enquiry under section 417 of the Old Companies Act or any similar provision.

8.2.4.15.   The Restructuring Agreement terminates automatically on the earlier to occur of the (i) End Date or (ii) Long-Stop Date, in the event that the Restructuring Effective Time has not occurred on or before such date).

8.2.4.16.   The Restructuring Agreement can be terminated by the Majority Locked-Up Creditors and the Company (acting reasonably) –

8.2.4.16.1.   if any Implementation Step does not occur at the time or on the date specified in the Restructuring Agreement, provided that there will be no right to terminate if, within 5 Business Days of such Implementation Step failing to occur (i) such Implementation Step has been amended or waived in accordance with the Restructuring Agreement such that the failure is remedied; or (ii) the Company has sent a notice in accordance with the Restructuring Agreement determining that the subsequent Implementation Steps will occur;

8.2.4.16.2.   if any Insolvency Event occurs (other than in relation to any application commencing insolvency proceedings or business rescue proceedings or any analogous proceedings filed by a creditor in respect of a member of the Existing Group); and

8.2.4.16.3.   upon the occurrence of a Material Adverse Change.

8.2.4.17.   In the event of termination of the Restructuring Agreement, the Restructuring Agreement ceases to have any further force or effect save for the limited provisions set out in clause 19.1 of the Restructuring Agreement.

8.2.5.   **Luxco Accession Letter:**

8.2.5.1.   The Compromise Creditors, the Super Senior Second Ranking Creditors, the Super Senior Second Ranking Participants and the Luxco Parties (including Luxco), Luxco have entered into an Accession Letter (as defined in the Lock-Up Agreement) (the "**Accession Letter**"), in terms of which, *inter alia:*

8.2.5.1.1.    Luxco has acceded as a party to the Lock-Up Agreement;

8.2.5.1.2.    the Luxco Parties will provide certain releases to the Company Parties, as well as any Compromise Creditor, Super Senior Second Ranking Creditor or Super Senior Second Ranking Participant that elects to become a party to the Accession Letter;

8.2.5.1.3.    each Compromise Creditor Super Senior Second Ranking Creditor and Super Senior Second Ranking Participant that elects to become a party to the Accession Letter will provide certain releases to the Luxco Parties;

8.2.5.1.4.    the releases referred to in paragraphs 8.2.5.1.2 and 8.2.5.1.3 above (the "**Releases**"), will replace and supersede the releases provided in:

8.2.5.1.4.1.    clause 11.6(c) of the Lock-Up Agreement; and

8.2.5.1.4.2.    clause 12.7 of the Restructuring Agreement,

insofar as these releases are granted by the Locked-Up Super Senior Term Loan Lenders, the Locked-Up Senior Secured Term Loan Lenders, the Locked-Up Super Senior Noteholders, Locked-Up Senior Secured Noteholders (both as defined in the Lock-Up Agreement), the Super Senior Second Ranking Creditors and/or the Super Senior Second Ranking Participants (as applicable) that have signed the Accession Letter to the Luxco Parties and by the Luxco Parties to the Locked-Up Super Senior Term Loan Lenders, the Locked-Up Senior Secured Term Loan Lenders, Locked-Up Super Senior Creditors Noteholders, Locked-Up Senior Secured Noteholders (both as defined in the Lock-Up Agreement), the Super Senior

Second Ranking Creditors and/or the Super Senior Second Ranking Participants (as applicable) that have signed the Accession Letter.

8.2.5.1.5.   The accession described in 8.2.5.1 and the releases described in 8.2.5.1.2 and 8.2.5.1.3 will become effective on the Accession Effective Deadline being the latest of

8.2.5.1.5.1.   the Completion Date; and

8.2.5.1.5.2.   the date on which the Accession Letter has been signed by Luxco, Holdco, the Company (in its capacity as the Company and on behalf of the other Company Parties). Each Locked-Up Super Senior Term Loan Lender, each Locked-Up Senior Secured Term Loan Lender,. the Locked-Up Super Senior Noteholders holding more than 50% in value of all Super Senior Notes Debt, the Locked-Up Senior Secured Noteholders holding more than 50% in value of all Senior Secured Notes Debt and each of the Super Senior Second Ranking Creditors and Super Senior Second Ranking Participants.

8.2.5.1.6.   As at the date of the Proposal Document, the Accession Letter has been signed by the requisite parties to satisfy the condition set out in paragraph 8.2.5.1.5.2 above and as such the Accession Effective Date will occur on the Completion Date.

8.2.5.2.   Each Compromise Creditor who has not already signed the Accession Letter has the option as to whether or not to become a party to the Accession Letter by contacting the Company's advisors (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or

jpritipaul@ensafrica.com in normal business hours to make arrangements to request an execution version of the Accession Letter), bearing in mind that if a Compromise Creditor elects:

8.2.5.2.1.   to become a party to the Accession Letter, it will receive the releases described in paragraph 8.2.5.1.2 above, and will be required to provide the releases described in 8.2.5.1.3 above: It will also be receiving and providing the releases contained in the Restructuring Agreement insofar as they relate to the Company Parties (as defined in the Restructuring Agreement) other than Holdco; and

8.2.5.2.2.   not to become a party to the Accession Letter, it will not receive the releases described in paragraph 8.2.5.1.2 above and will not be required to provide the releases described in paragraph 8.2.5.1.3 above; however it will be receiving and providing the releases contained in the Restructuring Agreement insofar as they relate to the Company Parties (as defined in the Restructuring Agreement).

**8.2.6.   Implementation Documents:**

8.2.6.1.   As set out above, each Implementation Step of the Financial Restructuring is regulated by reference to an Implementation Document, the execution and delivery of which shall be regulated in accordance with the terms of the Restructuring Agreement. The key Implementation Documents are attached to the Restructuring Agreement in agreed form or otherwise referred to in the detailed documents list, each as scheduled thereto.

8.2.6.2.   The Execution Documents shall not become effective unless and until they are dated and released in accordance with the Implementation Steps. No Implementation Documents shall become effective unless the Restructuring Agreement becomes effective in accordance with its terms and unless all conditions precedent set out in the Restructuring Agreement have been fulfilled.

8.2.6.3.   Super Senior Third Ranking Creditors' attention is drawn to the Step O1_1 Delegation Agreement and Step O1_2 Delegation Agreement attached to the

Restructuring Agreement which regulate the delegation of the Super Senior Term Loans and the Super Senior 2019 Notes to New Holdco 2. The actual terms of the refinance of their Compromise Claims is regulated pursuant to the Step O3 Super Senior Refinance Agreement attached to the Restructuring Agreement. The Step O1 Intercompany Loan Agreement and the Step O2 Intercompany Loan Agreement will regulate the terms of the intercompany loans in place as a result of the Step O1_1 and Step O1_2 Delegation Agreements, which intra-group loans are EUR denominated, bearing interest at 8% PIK per annum. These intra-group loans are subordinated.

8.2.6.4.   The Senior Secured Creditors' attention is drawn to the Step S1_1 Delegation Agreement and Step S1_2 Delegation Agreement attached to the Restructuring Agreement, which regulate the delegation of the Senior Secured Term Loans, Senior Secured 2018 Notes and the Senior Secured 2019 Notes to New Holdco 2. The actual terms of the capitalisation and refinance of their Compromise Claims is regulated pursuant to the Step S2/S3/S4 Capitalisation and Refinancing Agreement attached to the Restructuring Agreement. The Step S1 Intercompany Loan Agreement and Step S2 Intercompany Loan Agreement will regulate the terms of the intercompany loans in place as a result of the S1_1 and S1_2 Delegation Agreements. There will be an intra-group loan denominated in USD, bearing interest at 3% PIK per annum in the amount of the USD Delegation Debt and an intra-group loan denominated in ZAR for the balance of the delegated debt in terms of the Step S1_1 and S1_2 Delegation Agreements. These intra-group loans are subordinated.

9.   **What consideration will I, as a Senior Secured Creditor or a Super Senior Third Ranking Creditor, receive post implementation of the Financial Restructuring pursuant to (i) the Compromises and (ii) the New Money Notes Offer?**

9.1.   **Compromise Consideration**

9.1.1.   Senior Secured Creditors who are Eligible Creditors will receive:

9.1.1.1.   New Holdco 2 Ordinary A Shares, in a ZAR equivalent amount equal to, and in exchange for the capitalisation of, 50% (fifty percent) of their Compromise Claims; and

9.1.1.2.   New Holdco 2 PIK B Notes, in a ZAR or USD equivalent amount equal to, and for the refinancing of, 50% (fifty percent) of their Compromise Claims,

in accordance with the mechanism and allocation methodology set out in Restructuring Agreement, read with the relevant Implementation Document – as

summarised in paragraph 6 (*Compromise Consideration*) of Part B (*Explanation of a Compromise*).

9.1.2.   Super Senior Third Ranking Creditors, who are Eligible Creditors, will have their Compromise Claims refinanced in full into New Holdco 2 PIK A Notes, in accordance with the mechanism and allocation methodology set out in the Restructuring Agreement, read with the relevant Implementation Document – as summarised in paragraph 10 of Part B (*Explanation of a Compromise*).

9.1.3.   Any Compromise Creditor who is an Ineligible Creditor (and who has not validly appointed a Designated Recipient who is an Eligible Person) will have its relevant Compromise Consideration transferred to the Holding Period Trustee to be held in accordance with the terms of the Distribution Agreement. If the Ineligible Creditor's Compromise Consideration is not claimed within the Holding Period, it shall be sold in the manner set out in the Distribution Agreement.

9.1.4.   Any Compromise Creditor who is a Non-Respondent Creditor will have its relevant Compromise Consideration transferred to the Holding Period Trustee to be held in accordance with the terms of the Distribution Agreement. If the Non-Respondent Creditor's Compromise Consideration is not claimed within the Holding Period, it shall be sold in the manner set out in the Distribution Agreement.

9.2.   **New Money Notes Offer**

9.2.1.   Compromise Creditors, who are Eligible Creditors, and who have elected to subscribe for the New Money Notes, will be issued the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in terms of the New Money Notes Offer.

9.2.2.   In order to determine what a Participating Creditor's Pro Rata Participation Share to subscribe for the New Money Notes will be, Compromise Creditors' attention is directed to paragraph 10 (New Money Notes Offer) of Part B (*Explanation of a Compromise*).

9.2.3.   The New Money Notes Offer is included in this Explanatory Statement for the purposes of convenience only, as such offer is being made to the Compromise Creditors. The New Money Notes and the New Money Notes Offer do not, however, form a part of any of the Compromises.

9.3.   **Guarantor Compromises**

Senior Secured Creditors and Super Senior Third Ranking Creditors will not be receiving any Compromise Consideration in relation to the Guarantor Compromises, as these are being proposed to, *inter alia*, release the Compromise Companies from their obligations under the Guarantees.

10.   **Summary of the terms of the New Holdco 2 Ordinary A Shares, the New Holdco 2 Ordinary B Shares and share capital generally of New Holdco 2**

10.1. Following implementation of the Financial Restructuring, the issued share capital of New Holdco 2 will be as follows:

10.1.1. New Holdco 2 Ordinary A Shares, comprising no more than 85% (eighty-five percent) of the issued share capital in New Holdco 2 (subject to dilution by the issuance of New Holdco 2 Ordinary C Shares and New Holdco 2 Ordinary D Shares pursuant to paragraphs 10.1.3 and 10.1.4 below). The New Holdco 2 Ordinary A Shares shall be held by the Senior Secured Creditors (who are Eligible Creditors) and the Holding Period Trustee (in respect of Ineligible Creditors and Non-Respondent Creditors). The total number of New Holdco 2 Ordinary A Shares issued in accordance with the Financial Restructuring shall equal the ZAR equivalent of 50% (fifty percent) of the Senior Secured Creditors' Compromise Claims. Each Senior Secured Creditor's and the Holding Period Trustee's allocation shall be rounded to the nearest whole share;

10.1.2. New Holdco 2 Ordinary B Shares, comprising (when aggregated with the CVRs) no more than 15% (fifteen percent) of the issued share capital in New Holdco 2, (subject to dilution by the issuance of New Holdco 2 Ordinary C Shares and New Holdco 2 Ordinary D Shares pursuant to paragraphs 10.1.3 and 10.1.4 below). The New Holdco 2 Ordinary B Shares shall be held by the Participating Creditors pursuant to the New Money Notes Offer and Facility A3 Lenders pursuant to the refinancing of the Facility A3 Loans, each in accordance with the terms of the Restructuring Agreement. For specificity, the Participating Creditors will, out of the 15% of the issued share capital to be issued as New Holdco 2 Ordinary B Shares or CVRs, be allocated 9.6% (nine point six percent) and the Facility A3 Lenders will be allocated 5.4% (five point four percent). See further paragraph 10.4 below;

10.1.3. New Holdco 2 Ordinary C Shares, comprising no more than 10.6% (ten point six percent) of the issued share capital of New Holdco 2, to be held by the trustees for the time being of the Edcon Staff Employment Trust with Masters Reference Number IT4675/05;

10.1.4. New Holdco 2 Ordinary D Shares (non-voting), comprising no more than 8% (eight percent) of the issued share capital of New Holdco 2, to be held by the Management Incentive Trust under the terms of a management incentive plan to be agreed and formalised in due course following Completion; and

10.1.5. New Holdco 2 Ordinary E Shares (non-voting), comprising no more than 2% (two percent) of the issued share capital of New Holdco 2, to be issued to Luxco.

10.2. The ordinary shares in New Holdco 2 will not be listed on any stock or other securities exchange prior to an Exit (as defined below).

10.3. Any issue of New Holdco 2 Ordinary C Shares, New Holdco 2 Ordinary D Shares and New Holdco 2 Ordinary E Shares will correspondingly dilute the shareholding, when expressed as a percentage, of the holders of the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares.

10.4.    Pursuant to the New Money Notes Offer, each Participating Creditor will have the option to acquire either its specified allocation of the New Holdco 2 Ordinary B Shares or a CVR issued by New Holdco 2 which will be constituted by an instrument and evidenced by a certificate and which, on (i) an Exit (as defined below) or (ii) the liquidation or winding up of New Holdco 2, entitles the holder to receive an amount equal to the amount that it would have received if it had opted to receive its relevant allocation of New Holdco 2 Ordinary B Shares. An "Exit" means a bona fide, arm's length transaction involving:

10.4.1.    a sale of the whole (or a greater part) of the assets of New Holdco 2 and its subsidiaries (the "**New Holdco 2 Group**");

10.4.2.    transfer (or series of related transfers) of New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares which would result in a person (and any connected persons and parties acting in concert) holding more than 50% of the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares in issue (other than as a result of a transfer by a shareholder to an Affiliate);

10.4.3.    a merger or consolidation which accomplishes one of the foregoing; or

10.4.4.    the listing and admission of any shares in any company within the New Holdco 2 group to trading on a market for listed securities.

10.5.    For the purposes of the New Holdco 2 MOI, the CVRs will be deemed to constitute New Holdco 2 Ordinary B Shares for certain limited purposes, namely that they will have one vote per CVR and will be entitled to participate in considering Reserved Matters and granting (or withholding) certain consent requirements set out in the New Holdco 2 MOI. There is no assurances therefore that an active trading market for the CVRs will develop or, if developed, can be sustained.

10.6.    Each of the CVRs and each of the ordinary shares in New Holdco 2 (save for the New Holdco 2 Ordinary D Shares and any New Holdco 2 Ordinary E Shares referred to in paragraphs 10.1.4 and 10.1.5) shall have 1 (one) vote per CVR or share (as applicable). The New Holdco 2 Ordinary A Shares and the New Holdco 2 Ordinary B Shares shall participate *pari passu* in all dividends declared by New Holdco 2. The New Holdco 2 Ordinary C Shares, New Holdco 2 Ordinary D Shares and New Holdco 2 Ordinary E Shares shall not be entitled to participate in any dividends declared by New Holdco 2, save that the New Holdco 2 Ordinary C Shares shall be entitled to receive bi-annual payments as more fully set out in the New Holdco 2 MOI.

10.7.    In the case of a winding-up or reduction in or return of capital other than in terms of an Exit, the holders of the New Holdco 2 Ordinary C Shares, New Holdco 2 Ordinary D Shares and New Holdco 2 Ordinary E Shares will not be entitled to any amount.

10.8.    In the case of an Exit:

10.8.1.    the holders of the New Holdco 2 Ordinary C Shares shall be entitled to a 10.6% (ten point six) of the distributable amount;

10.8.2.    the holders of the New Holdco Ordinary D Shares shall be entitled to an up to a maximum of 8% (eight percent) of the distributable amount;

10.8.3.    the holders of the New Holdco 2 Ordinary E Shares shall be entitled to 2% (two percent) of the distributable amount; and

10.8.4.    the holders of the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares shall be entitled to the balance of such distributable amount.

10.9.    The New Holdco 2 Ordinary A Shares cannot be transferred or disposed of for a period ending on the earlier of (i) 3 years from the Completion Date; and (ii) an Exit, unless the holder also transfers its *pro rata* share of New Holdco 2 PIK B Notes, to the transferee at the same time. This period of time can be extended by a further 1 (one) year period, with the consent of not less than 50% (fifty percent) in value of the holders of the New Holdco 2 Ordinary A Shares.

10.10.    In the event that a sale, to a bona fide arms-length third party purchaser, of more than 50% (fifty percent) of the aggregate number of the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares (a "**Majority A/B Shareholding**") has been agreed to by the holders of more than 50% (fifty percent) of the aggregate value of the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares (the "**A/B Shareholder Majority**"), then, in accordance with the terms of the New Holdco 2 MOI and upon receipt of written notification from the A/B Shareholder Majority, all the remaining shareholders will be bound to transfer up to 100% (one hundred percent) of their New Holdco 2 Shares to the purchaser on the same economic terms as those agreed by the A/B Shareholder Majority.

10.11.    In accordance with the terms of the New Holdco 2 MOI, no transferee (together with its Affiliates, connected persons and parties acting in concert) may acquire a Majority A/B Shareholding from any shareholder(s) selling their New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares (the "**Selling Shareholder(s)**"), unless the transferee has first made a written offer to each holder of the New Holdco 2 Shares (who is not a Selling Shareholder(s)) to purchase the number of their New Holdco 2 Shares pro rata to the number of New Holdco 2 Shares respectively to be sold by the Selling Shareholder(s). Such offer to purchase must be:

10.11.1.    at the higher of the price agreed with the Selling Shareholder(s) and the highest price paid by the transferee (or its Affiliates or connected persons) within the 6 months preceding the date of the proposed transfer; and

10.11.2.    on no less preferential terms and conditions as to be paid and given to and by the Selling Shareholder(s).

10.12.    The New Holdco 2 shareholder holding 20%  or more of the nominal value of A Shares and B Shares on the Completion Date, (and if there is more than one such shareholder, the rights attach to the largest such shareholder (the "**Appointing Large Shareholder**") shall be entitled to appoint, nominate, remove and replace two directors of the board of New Holdco 2 and such right continues as long as the Appointing Large Shareholder continues to hold

at least 12,5% or more of such shares in New Holdco 2.  If the Appointing Large Shareholder falls between 12,5% and 5% their right reduces to appointing, nominating, removing and replacing one director in New Holdco 2.  If the Appointing Large Shareholder falls below 5%, they lose all of the aforementioned rights in relation to director appointment, nomination, removal and replacement and the Appointing Large Shareholder shall not regain such rights even if they subsequently hold 5% or more A Shares and B Shares in New Holdco 2.

10.13. In addition to the Appointing Large Shareholder up to two shareholders holding 7.5% or more of the nominal value of A Shares and B Shares in New Holdco 2 at Completion (and if there more than two such shareholders , the rights attach to the largest two such shareholders) (each a "**Second Appointing Shareholder**") shall each be entitled to appoint, nominate, remove and replace one director each in New Holdco 2.  If, a Second Appointing Shareholder falls below 5% that particular Second Appointing Shareholder shall lose its rights to appoint, nominate, remove and replace a director in New Holdco 2 and such rights shall not be regained if they subsequently hold 5% or more.

10.14. The New Holdco 2 MOI shall provide that special resolutions of New Holdco 2 shall require the support of more than 60% (sixty percent) of the voting rights attaching the New Holdco 2 Ordinary A Shares, the New Holdco 2 Ordinary B Shares and New Holdco 2 Ordinary C Shares exercised on the resolution.

10.15. Save where a matter requires a special resolution by the law of the relevant jurisdiction, the New Holdco 2 MOI reserves the right for certain matters relating to New Holdco 2 to be approved by shareholders holding more than 50% in aggregate of the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares present and voting. Such matters include (but are not limited to), the right to approve an Exit, the incurrence of additional indebtedness over ZAR500,000,000 and the changes to capital structure of New Holdco 2. Full details of such shareholder reserved matters are set out in the New Holdco 2 MOI which is scheduled to the Restructuring Agreement.

10.16. All other relevant rights, privileges and entitlements relating to the aforesaid ordinary shares in New Holdco 2 Shares and the CVR are set out in the New Holdco 2 MOI.

11.     **Summary of the terms of the New Holdco 2 PIK A Notes**

11.1.   The New Holdco 2 PIK A Notes will be issued by New Holdco 2 to the Super Senior Third Ranking Creditors pursuant to the Super Senior Company Compromise as secured, publicly tradeable payment-in-kind ("**PIK**") notes denominated in EUR, pursuant to the New Holdco 2 PIK A Notes Indenture, in exchange for all outstanding Compromise Claims held by the Super Senior Third Ranking Creditors, as determined on the Record Date.

11.2.   The New Holdco 2 PIK A Notes will accrue interest at 8% annually and will mature on 31 December 2022.

11.3.   The New Holdco 2 PIK A Notes benefit from certain limited security and are subject to certain covenants and terms, as set out in full in the New Holdco 2 PIK A Notes Indenture.

11.4.  The New Holdco 2 PIK A Notes will rank behind any New Holdco 2 Cure Notes (as defined in the New Holdcos Intercreditor Umbrella Agreement), but will rank ahead of the New Holdco 2 PIK B Notes and are structurally subordinated to any New Holdco 1 Cure Notes (as defined in the New Holdcos Intercreditor Umbrella Agreement), the New Money Notes and the New Holdco 1 PIK A-2 Notes.

11.5.  The New Holdco 2 PIK A Notes are redeemable at any time at par subject to the ranking described in paragraph 11.4 above and can be redeemed in part or in full (including PIK Interest).  The New Holdco 2 PIK A Notes are purchasable at any time on the open marke subject to the ranking described in paragraph 11.4 abovet.

11.6.  Any redemption or purchase of the New Holdco 2 PIK A Notes will require upstreaming of cash from New Holdco 1 to New Holdco 2, which is limited by the New Holdcos Intercreditor Umbrella Agreementand the New Holdco  PIK Notes Indentures.

12.   **Summary of the terms of the New Holdco 2 PIK B Notes**

12.1.  The New Holdco 2 PIK B Notes will be issued by New Holdco 2 to the Senior Secured Creditors pursuant to the Senior Secured Company Compromise as secured, publicly tradeable PIK notes denominated in USD or ZAR, as applicable, pursuant to the relevant New Holdco 2 PIK B Notes Indenture and in ZAR or USD equivalent amount equal to, and for the refinancing of, 50% of all outstanding Compromise Claims held by the Senior Secured Creditors, as determined on the Record Date or DTC Record Date, as applicable. The New Holdco 2 PIK B Notes will be allocated in accordance with the terms set out in Restructuring Agreement, read with the relevant Implementation Document – as summarised in paragraph 6 (*Compromise Consideration*) of Part B (*Explanation of a Compromise*).

12.2.  The New Holdco 2 PIK B USD Notes will accrue interest at 3% PIK annually.

12.3.  The New Holdco 2 PIK B ZAR Notes will accrue interest annually at 3% plus an additional PIK interest margin, which shall be determined by the Financial Advisers on the Business Day prior to the Pre-Completion Date by reference to the value on such date quoted by Bloomberg of a zero coupon fixed-rate USD/ZAR swap to 31 December 2022, such that the total PIK interest applicable to the New Holdco 2 PIK B ZAR Notes will be equivalent to the total value of PIK interest applicable to the New Holdco 2 PIK B USD Notes.

12.4.  The New Holdco 2 PIK B Notes will mature on 31 December 2022.

12.5.  The New Holdco 2 PIK B Notes will rank behind the New Holdco 2 PIK A Notes and any New Holdco 2 Cure Notes and are structurally subordinated to any New Holdco 1 Cure Notes, the New Money Notes and the New Holdco 1 PIK A-2 Notes.

12.6.  The New Holdco 2 PIK B Notes benefit from certain limited security and are subject to certain covenants and terms as set out in full in the New Holdco 2 PIK B Notes Indenture.

12.7.  An Exit may be effected that would result in the outstanding liabilities under the New Holdco 2 PIK B Notes being redeemed at less than their par value (including all capitalised PIK interest and accrued but unpaid fees, costs and expenses) if the prior written consent of the holders of not less than 60%

(sixty percent) in value then outstanding of the New Holdco 2 PIK B Notes is obtained.

12.8.   The New Holdco 2 PIK B Notes are redeemable at any time at par  subject to the ranking described in paragraph 12.5 above and can be redeemed in part or in full (including PIK Interest).  The New Holdco 2 PIK B Notes are purchasable at any time on the open market subject to the ranking described in paragraph 12.5 above.

12.9.   Any redemption or purchase of the New Holdco 2 PIK B Notes will require upstreaming of cash from New Holdco 1 to New Holdco 2, which is limited by the New Holdcos Intercreditor Umbrella Agreement, the New Holdco 1 PIK A-1 Notes Indenture and the New Holdco 1 PIK A-2 Notes Indenture.

13.   **Summary of the terms of the New Money Notes**

13.1.   New Holdco 1 is offering:

13.1.1.   the USD equivalent of ZAR1,494,486,680.83 to Participating Creditors who are Eligible Creditors pursuant to the New Money Notes Offer; and

13.1.2.   the USD equivalent of approximately ZAR810,000,000 and the accrued and unpaid cash pay interest, together with accrued PIK interest that has not been capitalised, for the period up to and including Completion, on the Facility A3 Loans to the Facility A3 Lenders, who are refinancing their Facility A3 Loans into New Money Notes, thereby subordinating themselves in the Existing Group capital structure from their current position as Super Senior First Ranking Creditors under the Super Senior Liquidity Facility Amended and Restated Agreement; and

13.1.3.   the USD equivalent of up to ZAR69,600,000 to Committed Creditors as a commitment fee for their New Money Notes Commitments,

as secured, publicly tradeable PIK notes denominated in USD, on the terms set out in the New Money Notes Indenture.

13.2.   The New Money Notes (also known as "New Holdco 1 PIK A-1 Notes") will accrue interest at 25% annually and will mature on 31 December 2022.

13.3.   Any Liabilities (as defined in the New Holdco 1 Subordination Deed) owed in respect of the New Money Notes with respect to principal amounts (other than principal amounts reflecting interest or any premia including "make-whole" premia and Additional Amounts (as defined in the New Holdco 1 Subordination Deed) shall rank:

13.3.1.   *pari passu*  and without any preference between them with any Liabilities (as defined in the New Holdco 1 Subordination Deed) with respect to principal amounts (other than principal amounts reflecting interest or any premia including "make-whole" premia and any Additional Amounts (as defined in the New Holdco 1 Subordination Deed) also outstanding under each and any of the New Holdco 1 PIK A-2 Notes, New Holdco 1 Cure Notes and any notes constituting New Holdco 1 Debt Basket Indebtedness (as defined in the New Holdco 1 Subordination Deed);  and

13.3.2.    ahead of all other Liabilities (as defined in the New Holdco 1 Subordination Deed) outstanding in respect of each and any of the New Money Notes, New Holdco 1 PIK A-2 Notes, the New Holdco 1 Cure Notes and any notes constituting New Holdco 1 Debt Basket Indebtedness (as defined in the New Holdco 1 Subordination Deed) that are not Liabilities falling within the meaning of paragraph 13.3.1 above (including, but not limited to, interest and "make-whole" premia and any Additional Amounts (as defined in the New Holdco 1 Subordination Deed)) which shall rank *pari passu* and without any preference between them.

13.4.    All amounts payable under the New Money Notes, the New Holdco 1 PIK A-2 Notes and any New Holdco 1 Cure Notes and any notes constituting New Holdco 1 Debt Basket Indebtedness (as defined in the New Holdco 1 Subordination Deed) will be structurally senior to the New Holdco 2 PIK A Notes and New Holdco 2 PIK B Notes.

13.5.    The New Money Notes will benefit from call protection for a period of 4 (four) years after the Completion Date (the "**Call Protection Period**"). In the event that New Holdco 1 wants to redeem the New Money Notes in this period, New Holdco 1 will be required to pay to the holder of such notes, the value of the New Money Notes outstanding plus a "make whole" premium as agreed upon within the New Money Notes Indenture and as calculated using a discount rate by reference to the relevant U.S. Treasury rate plus 50 (fifty) basis points.

13.6.    If the New Money Notes are redeemed after the Call Protection Period, the New Money Notes will be redeemed at par, plus accrued and unpaid interest (if any), in whole or in part.

13.7.    Any redemptions of the New Holdco 1 PIK A-1 Notes will, at all times, trigger a requirement for New Holdco 1 to redeem a *pro rata* amount of New Holdco 1 PIK A-2 Notes. The mechanics for this *pro rata* calculation are included in the New Holdco 1 PIK A-1 Notes and the New Holdco 1 PIK A-2 Notes.

13.8.    Voluntary partial or full redemptions of New Holdco 1 PIK A-2 Notes will not trigger a corresponding requirement for New Holdco 1 to redeem a *pro rata* amount of New Holdco 1 PIK A-1 Notes.

13.9.    Any purchases by New Holdco 1 of New Holdco 1 PIK A-1 Notes on the open market must follow the same proration requirements as for redemptions.

13.10.    A portion of the proceeds of the New Money Notes shall be retained to enable Holdco to discharge all of its liabilities under the Senior Holdco Notes. Approximately €3.21 million shall be held by the Company until the optimum redemption time (as determined by Holdco) under the Senior Holdco Notes and then upstreamed to Holdco following the Completion Date for that purpose.

14.    **Description of certain other indebtedness: overview**

14.1.    As noted above, the Financial Restructuring is being implemented through the Restructuring Agreement. The Compromise Creditors may either accede to the Restructuring Agreement by signing an RA Accession Letter themselves or, in the absence thereof, will become parties to the Restructuring Agreement by virtue of the Compromise Agent signing an RA Accession Letter

on their behalf, on the basis of the authority granted to the Compromise Agent through the Compromises. In addition to the Compromise Creditors (following the Compromise Effective Date and the RA Effective Date), the following creditors will accede to and be bound by the terms of the Restructuring Agreement:

14.1.1.    the RCF Creditors, who have agreed to amend and restate the terms of the Existing SSCF as the Amended and Restated SSCF, as described at paragraph 15 (*Description of certain other indebtedness: Amended and Restated Super Senior Credit Facility*);

14.1.2.    the Super Senior Liquidity Facility Creditors, who have agreed to amend and restate the terms of the Existing SSLF as the Amended and Restated SSLF, as described at paragraph 16 (*Description of certain other indebtedness: Super Senior Liquidity Facility*); and

14.1.3.    the Super Senior Second Ranking Creditors, who have agreed to refinance their Super Senior Second Ranking Debt as New Holdco 1 PIK A-2 Notes, as described at paragraph 18.10 (*Description of certain other indebtedness: Summary of the terms of the New Holdco 1 PIK A-2 Notes*).

15.    **Description of certain other indebtedness: Amended and Restated Super Senior Credit Facility**

15.1.    **Overview**

15.1.1.    The Amended and Restated SSCF will provide senior secured financing of up to the amount of the principal and interest outstanding under the Existing SSCF, as calculated in accordance with the terms of the Restructuring Agreement, together with an additional ZAR575,000,000 as part of a new revolving facility (the "**New RCF Facility**").

15.1.2.    The Amended and Restated SSCF is tranched into a Term Facility, a Revolving Facility (comprising the amount of the New RCF Facility and ZAR1,250,000,000 of the term facility under the Existing SSCF which shall be converted into a revolving facility to be made available under the Amended and Restated SSCF) and an LC Facility (together, the "SSCF Facilities") (all as defined within the Amended and Restated SSCF).

15.1.3.    The SSCF Facilities will be provided for the general corporate and working capital purposes of the Company and its subsidiaries.

15.1.4.    As at the Completion Date:

15.1.4.1.    the Term Facility (plus all accrued PIK interest and interest that has not been capitalised in accordance with the terms of the Existing SSCF) shall be fully drawn.  As at the end of September 2016 the Term facility indebtedness was ZAR2,046,885,609.93;

15.1.4.2.    the Revolving Facility of ZAR1,825,000,000 of which ZAR1,250,000,000 shall be fully drawn and ZAR575,000,000 shall be undrawn and available for utilisation 1 (one) Business Day after the Completion Date;

15.1.4.3.   the LC Facility of ZAR300,000,000 which shall be utilised by way of an ancillary facility existing under the Existing SSCF and which continues to exist on the same terms under the Amended and Restated SSCF.

15.1.5.   The SSCF Facilities mature on the earliest to occur of (i) 31 December 2019; (ii) the earliest maturity date under the Amended and Restated SSLF; and (iii) the date which is three months prior to the earliest scheduled maturity of any other indebtedness or refinancing thereof that benefits from any security granted by an Obligor directly or indirectly through the SPV Guarantor or which is otherwise subject to the Opco Intercreditor Agreement (other than the Amended and Restated SSLF).   There are extension mechanics in respect of the SSCF which are set out at paragraph 15.4.2 below.

15.1.6.   The Revolving Facility and the LC Facility under the Amended and Restated SSCF can also be utilized by way of ancillary facilities.

15.1.7.   Borrowings under the Term Facility and under the Revolving Facility will bear cash pay interest at a rate per annum equal to JIBAR plus a cash pay margin of 5.00% per annum. Borrowings under the Term Facility will also bear PIK interest at the rate of 3.00% per annum which will be capitalized on the last day of each interest period. A utilisation fee is payable to each Revolving Facility Lender on each Revolving Facility Loan which is calculated by multiplying (a) such Revolving Facility Lender's participation in that Revolving Facility Loan by (b) 0.0082% for each day during the Interest Period of that Revolving Facility Loan.  Such utilisation fee shall be payable when all Revolving Facility Loans can be redrawn.  The aggregate accrued utilisation fee will also accrue (a) utilisation fee in accordance with the above formula and (b) cash pay interest at the same rate as that accruing on Revolving Facility Loans.

15.1.8.   Upon a full and effective refinancing of all amounts under the Amended and Restated SSLF, the interest rate payable in respect of borrowings under the Term Facility and the Revolving Facility shall be adjusted so as to provide for a rate of interest which is substantially equivalent to that under the replacement SSLF .

15.1.9.   There are bank guarantee fees, commitment and agency fees and other fees in relation to the Amended and Restated SSCF.

15.2.   **Mandatory Repayment and Cancellation**

The Amended and Restated SSCF shall include customary mandatory prepayment and cancellation provisions, including in circumstances where it becomes illegal for a lender under the Amended and Restated SSCF to maintain a commitment under the Amended and Restated SSCF, upon a change of control and upon listing. There will also be a requirement to make prepayment of the SSCF Facilities from certain disposal proceeds and insurance proceeds. Certain prepayments shall be applied pro rata to

amounts outstanding under the Amended and Restated SSCF and the Amended and Restated SSLF.

15.3.   **Voluntary Repayment and Cancellation**

The borrower under the Amended and Restated SSCF may voluntarily reduce the unutilized portion of their commitments and prepay the outstanding balance under the Amended and Restated SSCF at any time (subject to giving the relevant notice) together with accrued interest and without premium or penalty other than customary "breakage" costs. Any voluntary prepayment under the Amended and Restated SSLF will also require prepayment of the SSCF Facilities in accordance with the terms of the Amended and Restated SSCF.

15.4.   **Amortization and Final Maturity**

15.4.1.   There will be no scheduled amortization payments under the Amended and Restated SSCF and so the SSCF Facilities (other than the Revolving Facilities which are repayable or roll on the last day of each interest period) are repayable in full in one payment at maturity.

15.4.2.   The maturity date of the facilities under the Amended and Restated SSCF set out above can be extended, provided certain extension criteria are met, until the earliest to occur of (i) 31 December 2020; (ii) the earliest maturity date of the facilities available under the Amended and Restated SSLF; and (iii) the date which is three months prior to the earliest scheduled maturity of any other indebtedness or refinancing thereof that benefits from any security granted by an Obligor directly or indirectly through the SPV Guarantor or which is otherwise subject to the Opco Intercreditor Agreement (other than the Amended and Restated SSLF).

15.5.   **Guarantees and Security**

15.5.1.   All obligations under the Amended and Restated SSCF shall be guaranteed by the guarantors (as contemplated therein) under the Amended and Restated SSCF and will also be guaranteed by any future material subsidiaries. The guarantees will be structured as both counter-indemnities given to a special purpose security vehicle for the lenders under the Amended and Restated SSCF as is customary in South African financing transactions, and direct guarantees in favour of those lenders.

15.5.2.   All obligations under the Amended and Restated SSCF, and the guarantees of those obligations, will be secured by the collateral set out in the Amended and Restated SSCF.

15.6.   **Ranking**

The Amended and Restated SSCF will rank *pari passu* with the Amended and Restated SSLF in right of security over the assets of the Company and the guarantees that secure the Amended and Restated SSCF and the Amended and Restated SSLF will rank senior in right of security to all other existing and future secured and unsecured indebtedness of the Company.

15.7.    **Certain Covenants and Events of Default**

15.7.1.    The Amended and Restated SSCF shall include customary undertakings and covenants, including, but not limited to, restrictions on incurring financial indebtedness, granting security, providing credit, and declaring or paying dividends or other payments to shareholders. The Amended and Restated SSCF shall also include a leverage financial covenant which will be tested at the end of each financial quarter.

15.7.2.    The Amended and Restated SSCF will provide that breach of covenant, including the financial covenant, subject to certain limited cure rights, will be an Event of Default (as defined in the Amended and Restated SSCF). In addition, there will be other customary Events of Default, including, but not limited to, insolvency, creditors process, misrepresentation and material adverse change. If an Event of Default is not remedied or waived, the Majority Lenders, as defined in the Amended and Restated SSCF and being lenders holding over 70% of the total commitments under the Amended and Restated SSCF, may exercise their acceleration rights.

16.    **Description of certain other indebtedness: Amended and Restated Super Senior Secured Liquidity Facility**

16.1.    **Overview**

16.1.1.    The Amended and Restated SSLF will provide senior secured financing of up to EUR123.25 million (plus any accrued and unpaid interest as at the Completion Date) for the general corporate and working capital purposes of the Company and its subsidiaries. The Amended and Restated SSLF will be tranched into two fully drawn EUR term loan facilities, being Facility A1 and Facility A2 (together, the "**SSLF Facilities**").

16.1.2.    Subject to complying with the minimum cash covenant in the Existing SSLF and the New RCF Facility being undrawn on the Completion Date, Facility A1 may be prepaid in whole or in part on the Completion Date from the proceeds of the New Money Notes.

16.1.3.    Any amounts of the Facility A1 that are repaid on the Completion Date will not be available to redraw under Facility A1. Facility A2 will remain available to draw by way of loans only.

16.1.4.    The SSLF Facilities shall mature on the earlier of: (i) 31 December 2017, (ii) the earliest maturity date of the facilities available under the Amended and Restated SSCF; and (iii) the date which is three months prior to the scheduled maturity of any other indebtedness or refinancing thereof that benefits from transaction security. Facility A1 and Facility A2 have separate maturity dates and separate extension mechanics which are summarised below.

16.1.5.    Borrowings under Facility A1 will bear interest at a rate per annum equal to EURIBOR plus a cash margin of 4% and a PIK margin of 8%. Borrowings under Facility A2 will bear interest at a

rate per annum equal to EURIBOR plus a cash margin of 4% and a PIK margin of 8%. In each case, PIK interest is to be capitalized on the last day of each interest period.  Should the maturity date under Facility A1 or Facility A2 be extended, the cash margin under Facility A1 or Facility A2 (as applicable) will increase to 9%.

16.2.   **Voluntary Repayment and Cancellation**

Voluntary prepayments and/or cancellations will be permitted in respect of the outstanding balance under the Amended and Restated SSLF at any time (subject to giving the relevant notice) together with accrued interest without premium or penalty other than customary "breakage" costs.

16.3.   **Amortization and Final Maturity**

16.3.1.   There will be no scheduled amortization payments under the Amended and Restated SSLF therefore the SSCF Facilities are repayable in full in one payment at maturity.

16.3.2.   The maximum extension under the SSLF would provide for a maturity date as follows: the maturity date of the facilities under the Amended and Restated SSLF can be extended, provided certain extension criteria are met, until the earlier of (i) 31 December 2018, (ii) the earliest maturity date of the facilities made available under the Amended and Restated SSCF; and (iii) the date which is three months prior to the scheduled maturity of any other indebtedness or refinancing thereof that benefits from the transaction security.  There are other, shorter, extension periods that would result in a maturity date earlier than as set out here.

16.3.3.   It is noted that the extension mechanic set out above will not apply if any part of Facility A1 remains outstanding following the Effective Date (as defined in the Existing SSLF) such that the maturity date can only be extended to the maturity date of the facilities under the Amended and Restated SSCF.

16.4.   **Guarantees and Security**

16.4.1.   The obligations under the Amended and Restated SSLF will be unconditionally guaranteed by the guarantors under the Amended and Restated SSLF, as set out therein.

16.4.2.   The obligations under the Amended and Restated SSLF and the guarantees thereof, will be, subject to certain exceptions, secured by the collateral under the Amended and Restated SSLF, that will also secure the obligations under the Amended and Restated SSCF.

16.5.   **Rankings**

The Amended and Restated SSLF will rank *pari passu* with the Amended and Restated SSCF in right of security over the assets of the Company and the guarantees that secure the Amended and Restated SSLF and the Amended and Restated SSCF will rank senior in right of security to all other existing and future secured and unsecured indebtedness of the Company.

16.6.   **Certain Covenants and Events of Default**

16.6.1.   The Amended and Restated SSLF shall include customary undertakings and covenants including, but not limited to, restrictions on incurring financial indebtedness, granting security, providing credit and declaring or paying dividends or other payments to shareholders. The Amended and Restated SSLF shall also include a leverage financial covenant which will be tested at the end of each financial quarter.

16.6.2.   The Amended and Restated SSLF shall provide that breach of covenant, including the financial covenant, subject to certain limited cure rights, will be an Event of Default. In addition, there will be other customary events of default, including, but not limited to, insolvency, creditors process, misrepresentation and material adverse change. If an Event of Default is not remedied or waived, the Majority Lenders, as defined in the Amended and Restated SSLF and being lenders holding over 66⅔% of the total commitments under the Amended and Restated SSLF, may exercise their acceleration rights.

17.   **Description of certain other indebtedness: Summary of the terms of the New Holdco 1 PIK A-2 Notes**

17.1.   The New Holdco 1 PIK A-2 Notes will be issued by New Holdco 1 to the Super Senior Second Ranking Creditors as secured, publicly tradeable payment-in-kind (PIK) notes denominated in USD, pursuant to the New Holdco 1 PIK A-2 Notes Indenture, in exchange for the USD equivalent of 95% of the total outstanding amount of Super Senior Second Ranking Debt in ZAR (including accrued and unpaid interest up to and including the Completion Date).

17.2.   The New Holdco 1 PIK A-2 Notes will accrue interest at 5% annually and will mature on 31 December 2022.

17.3.   Any Liabilities (as defined in the New Holdco 1 Subordination Deed) owed in respect of the New Holdco 1 PIK A-2 Notes with respect to principal amounts (other than the principal amounts reflecting interest or any premia including "make-whole" premia, if any, and any Additional Amounts (as defined in the New Holdco 1 Subordination Deed)) shall rank:

17.3.1.   *pari passu* and without any preference between them with any Liabilities (as defined in the New Holdco 1 Subordination Deed) with respect to principal amounts (other than the principal amounts reflecting interest or any premia including "make-whole" premia, if any, and any Additional Amounts (as defined in the New Holdco 1 Subordination Deed)) also outstanding under each and any of the New Money Notes, the New Holdco 1 Cure Notes and any notes constituting New Holdco 1 Debt Basket Indebtedness (as defined in the New Holdco 1 Subordination Deed); and

17.3.2.   ahead of all other Liabilities (as defined in the New Holdco 1 Subordination Deed) outstanding in respect of each and any of the New Money Notes, the New Holdco 1 PIK A-2 Notes, the New Holdco 1 Cure Notes and any notes constituting New Holdco 1 Debt Basket Indebtedness (as defined in the New Holdco 1 Subordination Deed) that are not Liabilities falling within the

meaning of paragraph 17.3.1 above (including, but not limited to, interest and "make-whole" premia and any Additional Amounts (as defined in the New Holdco 1 Subordination Deed)) which shall rank *pari* passu and without any preference between them.

17.4.   All amounts payable under the New Money Notes, New Holdco 1 PIK A-2 Notes and any New Holdco 1 Cure Notes and any notes constituting New Holdco 1 Debt Basket Indebtedness (as defined in the New Holdco 1 Subordination Deed) will be structurally senior to the New Holdco 2 PIK A Notes and New Holdco 2 PIK B Notes.

17.5.   The New Holdco 1 PIK A-2 Notes benefit from certain limited security and are subject to certain covenants and terms as described in full in the New Holdco 1 PIK A-2 Notes Indenture.

18.   **Description of certain other key finance documents: OpCo Intercreditor Agreement**

18.1.   **Overview**

18.1.1.   The OpCo Intercreditor Agreement will be entered into at Completion between, among others (i) the Company, (ii) the Obligors, (iii) the Liquidity Facility Lenders, (iv) the Credit Facility Lenders and (v) K2016470295 (South Africa) Proprietary Limited as the Parent, (all as defined therein).

18.1.2.   The following is a summary of certain provisions to be contained in the OpCo Intercreditor Agreement. It does not restate the OpCo Intercreditor Agreement in its entirety. For further information please see the agreed form OpCo Intercreditor Agreement scheduled to the Restructuring Agreement.

18.2.   **Priority of Debts**

The OpCo Intercreditor Agreement shall provide that all the SSCF Liabilities (as defined in the OpCo Intercreditor Agreement) and the SSLF Liabilities (as defined in the OpCo Intercreditor Agreement) shall rank *pari passu* in right and priority of payment between themselves and ahead of claims in respect Subordinated Liabilities (as defined in the OpCo Intercreditor Agreement) or Intra-Group Liabilities (as defined in the OpCo Intercreditor Agreement).

18.3.   **Priority of Security and Guarantees**

The OpCo Intercreditor Agreement shall provide that the transaction security shall secure claims, *pari passu¸* under the Amended and Restated SSCF and Amended and Restated SSLF and without any preference between them.

18.4.   **Enforcement of Security**

18.4.1.   The OpCo Intercreditor Agreement shall provide that enforcement with respect to the transaction security may only be taken by the SPV Guarantor.

18.4.2.   In circumstances where the transaction security is enforceable, the OpCo Instructing Group (as defined in the OpCo Intercreditor Agreement and set out below) shall have the right to provide instructions in respect of any enforcement. When the SSCF Liabilities are greater than the SSLF Liabilities, then the Majority SSCF Lenders (being lenders holding in aggregate more than 70% of participations under the Amended and Restated SSCF) shall be the OpCo Instructing Group. When the SSLF Liabilities are greater

than the SSCF Liabilities, then the Majority SSLF Lenders (being lenders holding in aggregate more than 66⅔% of participations under the Amended and Restated SSLF) shall be the OpCo Instructing Group.

18.5.   **Consultation Requirements**

The lenders under the Amended and Restated SSCF and the lenders under the Amended and Restated SSLF and the Parent shall consult with each other with respect to any potential distressed disposal or other enforcement action during a consultation period of not more than 15 Business Days subject to customary exceptions including, but not limited to, (a) a delay in enforcement having a material adverse effect on (x) the ability of the Security Administrator and/or the SPV Guarantor to enforce the transaction security, or (y) the likely realization proceeds of any enforcement of the transaction security (in each case as determined by the OpCo Instructing Group acting reasonably and in good faith), (b) receipt of an independent valuation showing the enterprise value of the Company and its subsidiaries on a going concern basis is less than the aggregate of the SSLF Liabilities and/or the SSCF Liabilities; and/or (c) the occurrence of an insolvency Event of Default as defined under either the Amended and Restated SSCF or the Amended and Restated SSLF with respect of any Obligor.

18.6.   **Application of Proceeds**

Proceeds recovered by the Security Administrator shall be applied in the following order:

18.6.1.   in payment of any fees and expenses owing to the Security Administrator and the SPV Guarantor;

18.6.2.   in payment of all costs and expenses incurred by, or on behalf of, the lenders under the Amended and Restated SSCF, the agent under the Amended and Restated SSCF (in its capacity as such), the lenders under the Amended and Restated SSLF or the agent under the Amended and Restated SSLF (in its capacity as such), in connection with the relevant finance documents;

18.6.3.   in payment (a) to the agent under the Amended and Restated SSCF on its own behalf and on behalf of the lenders under the Amended and Restated SSCF for application towards the discharge of the SSCF Liabilities in accordance with the terms of the Amended and Restated SSCF; and (b) to the agent under the Amended and Restated SSLF on its own behalf and on behalf of the lenders under the Amended and Restated SSLF for application towards the discharge of the SSLF Liabilities, (in accordance with the terms of the Amended and Restated SSLF), *pari passu* and on a pro rata basis;

18.6.4.   in payment or distribution to any person to whom the Security Administrator is obliged to pay or distribute in priority to any Obligor; and

18.6.5.   finally, the balance, in payment or distribution to any relevant Obligor.

18.7. **Option to Purchase**

18.7.1. The Parent may purchase (or may designate New Holdco 1 or New Holdco 2 as its nominee to purchase) the SSLF Liabilities and the SSCF Liabilities (in full (but not in part only)) and at par (with accrued but unpaid interest and any applicable make-whole, call protection or prepayment fees), provided that such purchase is funded and completed within 5 Business Days of any payment event of default under the Amended and Restated SSCF and/or the Amended and Restated SSLF and within 15 Business Days of any other event of default under the Amended and Restated SSCF and/or the Amended and Restated SSLF, subject to customary exceptions including, but not limited to, right to recoveries on enforcement, loss of value/value protection and/or the occurrence of an insolvency event of default (the "**Debt Purchase Period**") and provided that such option may only be taken up if all reasonable fees, costs and expenses (including legal fees) incurred by the lenders under the Amended and Restated SSCF, the agent under the Amended and Restated SSCF, the lenders under the Amended and Restated SSLF and the agent under the Amended and Restated SSLF are paid by the party exercising the option.

18.7.2. The lenders under the Amended and Restated SSCF or the Amended and Restated SSLF may purchase the SSCF Liabilities or the SSLF Liabilities (as applicable, and in each case in full (but not in part only) and at par (with accrued but unpaid interest and any applicable make-whole, call protection or prepayment fees) provided that such purchase is funded and completed within the Debt Purchase Period and provided that such option may only be taken up if all reasonable fees, costs and expenses (including legal fees) incurred by the lenders under the Amended and Restated SSCF and the agent under the Amended and Restated SSCF or the lenders under the Amended and Restated SSLF and the agent under the Amended and Restated SSLF (as applicable) are paid by the party exercising the option.

18.7.3. The Parent will have priority over exercising such purchase option provided that the Parent shall purchase both the SSCF Liabilities and the SSLF Liabilities in full.

18.8. **Distressed Disposals**

18.8.1. In the case of a Distressed Disposal or a Liabilities Sale (each as defined in the OpCo Intercreditor Agreement) effected by, or at the request of, the Security Administrator or SPV Guarantor, the Security Administrator and/or SPV Guarantor (as applicable) shall obtain a fair market value of the Company and its subsidiaries and having regard to the prevailing market conditions (through the Security Administrator and/or SPV Guarantor (as applicable)) shall have no obligation to postpone (or request the postponement of ) any Distressed Disposal or Liabilities Sale in order to achieve a higher value.

18.8.2.    The requirement to obtain a fair market value of the Company and its subsidiaries shall be satisfied (and shall be conclusively presumed to be satisfied) if such Distressed Disposal or Liabilities Sale is made: (a) pursuant to any process or proceedings approved or supervised by or on behalf of any Court; (b) at the direction of, or under the control of, a liquidator, receiver, administrative receiver, administrator, business rescue practitioner, compulsory manager or other similar officer or other officer subject to court supervision, appointed in respect of the Company or its subsidiaries or any of the assets of the Company or its subsidiaries; (c) pursuant to a public auction concluded in accordance with South African law; (d) pursuant to any competitive sale process in respect of which a Financial Adviser (as defined in the OpCo Intercreditor Agreement) shall participate in an advisory capacity; or (e) following receipt by the Security Administrator of a Valuation Opinion (as defined in the OpCo Intercreditor Agreement).

18.8.3.    Customary provisions will be included to allow the release/sale/transfer of debt claims on the enforcement of transaction security on the same terms as a Distressed Disposal.

18.9.    **Refinancing**

The OpCo Intercreditor Agreement will incorporate a framework within which the SSCF Liabilities and the SSLF Liabilities may be refinanced in full by new facilities which become subject to the OpCo Intercreditor Agreement without the need for consent of any other creditor.

18.10.    **Equity Cure**

18.10.1.    If:

18.10.1.1.    any Event of Default (as defined in the OpCo Intercreditor Agreement) has occurred (or is reasonably likely to occur but for this equity cure right) as a result of a breach of a financial covenant only under the Amended and Restated SSCF and/or the Amended and Restated SSLF; and/or

18.10.1.2.    the Company reasonably believes that the covenants which are conditions precedent to extending maturity of the SSLF Facilities will not be satisfied,

the Company will be required to notify the board of the Parent.

18.10.2.    The Parent may, at its option:

18.10.2.1.    remedy the Event of Default (if capable of remedy) by no later than 15 Business Days from the date on which the relevant compliance certificate is required to be delivered; or

18.10.2.2.    remedy the potential breach of the maturity extension covenants prior to the relevant termination date under the Amended and Restated SSLF,

18.10.2.3.    in each case, either by (a) the issuance of new equity of New Holdco 2 pursuant to a rights issue to its existing

shareholders or (b) the provision of New Holdco 1 Cure Notes and/or New Holdco 2 Cure Notes.

18.10.3. The proceeds from any such issuance of new equity of New Holdco 2, New Holdco 1 Cure Notes and New Holdco 2 Cure Notes (the **"Cure Amount"**) will be injected into the Parent and subsequently injected by the Parent into Bidco and downstreamed through each of the intermediate holding companies to be ultimately received by the Company by way of new equity or subordinated intercompany loans.

18.10.4. Any Cure Amount received by the Company shall be deemed to have reduced the Company's total debt and shall be applied in mandatory prepayment and cancellation of the SSLF Facilities and the SSCF Facilities pro rata and *pari passu* within 5 Business Days of receipt.

18.10.5. The Company shall be permitted to:

18.10.5.1. in relation to remedying an Event of Default, utilise two equity cures in the first 12 months from the Completion Date and once in every financial year thereafter, provided that there shall be no cures in consecutive financial quarters after the first anniversary from Completion; and

18.10.5.2. in relation to satisfying any conditions precedent to extending maturity of the SSLF, utilise the equity cure at the relevant time in respect of the Maturity Extension and/or the 2018 Maturity Extension (as defined in the Amended and Restated SSLF).

18.11. **Non-Petition Undertakings**

18.11.1. The SSCF Lenders and the SSLF Lenders will undertake not to (and, will undertake not to instruct their respective Representatives (as such term is defined in the OpCo Intercreditor Agreement) to):

18.11.1.1. institute against the Parent any proceeding seeking an order for its winding-up (provisional or final) or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights;

18.11.1.2. present a petition for, or join a petition for, the Parent's winding-up or liquidation or the commencement of business rescue proceedings in respect of it or any part of its business;

18.11.1.3. seek to appoint, or support the appointment of, a liquidator or business rescue practitioner or similar official of the Parent or any part of the business of the Parent; or

18.11.1.4. take any action with respect to the Parent, in any jurisdiction, which is equivalent to those specified above.

18.11.2.    The SSCF Lenders, SSLF Lenders, Representatives and/or the SPV Guarantor may however take any and all other action against the Parent to enforce the rights of the SSCF Lenders, SSLF Lenders, Representatives and/or the SPV Guarantor under any agreement to which the Parent is a party which is not an action precluded by paragraphs 18.11.1.1 to 18.11.1.4 (inclusive) above and notwithstanding that such action may result in the Parent, New Holdco 1 or New Holdco 2 entering into any proceedings described in paragraphs 18.11.1.1 to 18.11.1.4 (inclusive) above (provided that such procedure is not instituted, and its institution is not supported, by the SSCF Lenders, SSLF Lenders, Representatives and/or the SPV Guarantor in breach of its obligations above).

19.    **Description of certain other key finance documents: New Holdco Intercreditor Umbrella Agreement**

19.1.    The New Holdco Intercreditor Umbrella Agreement sets out the relationship between the New Holdco 1 PIK Notes (being the New Money Notes and the New Holdco 1 PIK A-2 Notes) and the New Holdco 2 PIK Notes (being the New Holdco 2 PIK A Notes and the New Holdco 2 PIK B Notes).

19.2.    In particular, the New Holdco Intercreditor Umbrella Agreement sets out protocols with respect to the enforcement of security, the exercise of certain voting rights, the making of any equity cure for the benefit of Bidco and its Subsidiaries, restrictions on amendments to the New Holdco PIK Notes (as defined therein) and the provision of financial and other information from Bidco and its Subsidiaries to New Holdco 1 and New Holdco 2. In addition, the New Holdco Intercreditor Umbrella Agreement governs the interplay between the New Holdco 1 Subordination Deed and the New Holdco 2 Subordination Deed.

19.3.    For a full description of the terms and obligations set out therein, see the New Holdco Intercreditor Umbrella Agreement.

20.    **Description of certain other key finance documents: New Holdco 1 Subordination Deed**

20.1.    The New Holdco 1 Subordination Deed sets out the relationship between the New Holdco 1 PIK A-1 Notes, the New Holdco 1 PIK A-2 Notes, any New Holdco 1 Cure Notes and any notes constituting New Holdco 1 Debt Basket Indebtedness and sets forth the terms of the subordination of liabilities owed to New Holdco 2 by New Holdco 1. The New Holdco 1 Subordination Deed also appoints the New Holdco 1 Security Agent (as defined therein) acting in relation to transaction security provided by New Holdco 1 for the benefit of the New Holdco 1 PIK Notes (as defined therein) through a parallel debt structure.

20.2.    In particular, the New Holdco 1 Subordination Deed sets out protocols with respect to the ranking of the New Holdco 1 PIK Notes Liabilities including the application of proceeds post-enforcement, the New Holdco 1 Transaction Security and the Subordinated Liabilities (each as defined therein). In addition, the mechanic governing the enforcement of the New Holdco 1

Transaction Security and other enforcement actions are also set out therein along with provisions in respect of turnover and release of security in distressed and non-distressed situations.

20.3.  For a full description of the terms and obligations set out therein, see the New Holdco 1 Subordination Deed.

21.  **Description of certain other key finance documents: New Holdco 2 Subordination Deed**

21.1.  The New Holdco 2 Subordination Deed sets out the relationship between the New Holdco 2 PIK A Notes, the New Holdco 2 PIK B Notes and any New Holdco 2 Cure Notes and sets forth the terms of the subordination of liabilities owed to any future subordinated creditor. The New Holdco 2 Subordination Deed also appoints the New Holdco 2 Security Agent (as defined therein) acting in relation to transaction security provided by New Holdco 2 for the benefit of the New Holdco 2 PIK Notes (as defined therein) through a parallel debt structure.

21.2.  In particular, the New Holdco 2 Subordination Deed sets out protocols with respect to the ranking of the New Holdco 2 PIK Notes Liabilities including the application of proceeds post-enforcement, the New Holdco 2 Transaction Security (each as defined therein). In addition, the mechanic governing the enforcement of the New Holdco 2 Transaction Security and other enforcement actions are also set out therein along with provisions in respect of turnover and release of security in distressed and non-distressed situations.

21.3.  For a full description of the terms and obligations set out therein, see the New Holdco 2 Subordination Deed.

**EXPECTED TIMETABLE OF PRINCIPAL EVENTS**

**Compromise Noteholders should observe any deadlines set by any institution or settlement system through which they hold interests in any of the Compromise Notes to ensure that any voting instructions given by them are taken into account at the relevant Compromise Meeting. The Company strongly urges each Compromise Noteholder to contact its relevant Account Holder or Intermediary as soon as possible to ensure they are aware of the Compromises and the process and timetable set out in it.**

| Event | Expected Time and date |
|---|---|
| Date of electronic transmission and delivery of Proposal Document (including this Explanatory Statement), Restructuring Agreement and other ancillary documentation (a copy of all of these documents will be posted on this date to the website of the Information Agent, being www.lucid-is.com/edcon) | 13 December 2016 |
| DTC Record Date, for determining which Compromise Noteholders who hold Compromise Notes through DTC are entitled to (i) vote at the relevant Compromise Meeting; (ii) receive Compromise Consideration; and (iii) participate under the New Money Notes Offer | 17h00 (New York Time) on 20 December 2016, being 5 Business Days prior to the Voting Instruction Deadline |
| Latest time for blocking Compromise Notes in the Clearing Systems for the purposes of delivery of Account Holder Letters containing voting instructions for the purposes of the relevant Compromise Meeting ("**Custody Instruction Deadline**") | For Compromise Notes held through Euroclear or Clearstream (as applicable): 17h00 (CET) on 22 December 2016, being 1 Business Day prior to the Voting Instruction Deadline |
| Voting Instruction Deadline, being the latest time and date for receipt of – <br><br> • Proxy Forms by the Information Agent in order for Compromise Lenders' voting instructions to be taken into account for the purposes of the relevant Compromise Meeting; <br><br> • Account Holder Letters by the Information Agent in order for Compromise Noteholders' voting instructions to be taken into account for the purposes of the relevant Compromise Meeting; | 16h00 (Johannesburg Time) on 23 December 2016, being 2 Business Days prior to the Record Date |

| | |
|---|---|
| • Compromise Creditors' elections –<br><br>    o to appoint a Designated Recipient who is an Eligible Person;<br><br>    o whether, in relation to Senior Secured Creditors only, to subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR, and failing such election, such Senior Secured Creditor shall subscribe for New Holdco 2 PIK B Notes denominated in USD;<br><br>    o to subscribe for New Money Notes in accordance with the terms of the New Money Notes Offer; and<br><br>    o whether to subscribe, for no consideration, for New Holdco 2 Ordinary B Shares or a contingent value right (CVR) and failing such election (but provided that such Compromise Creditor has elected to subscribe for New Money Notes), such Compromise Creditor shall subscribe for New Holdco 2 Ordinary B Shares;<br><br>• Compromise Creditors' confirmations as to their eligibility to receive the relevant Compromise Consideration and New Money Notes to be taken into account for the purposes of distribution of the relevant Compromise Consideration and New Money Notes on the Completion Date; | |
| Record Date for determining which Compromise Creditors (other than Compromise Creditors who hold Compromise Notes through DTC) are entitled to (i) vote at the relevant Compromise Meeting; (ii) receive | 29 December 2016, being the date of the Compromise Meetings |

| | |
|---|---|
| Compromise Consideration; and (iii) participate under the New Money Notes Offer | |
| Senior Secured Company Meeting | 12h00 on 29 December 2016 |
| Senior Secured ECSL Meeting | 13h00 on 29 December 2016 or as soon as the Senior Secured Company Meeting convened for the same date and place shall have been concluded or adjourned |
| Senior Secured Bidco Meeting | 13h15 on 29 December 2016 or as soon as the Senior Secured ECSL Meeting convened for the same date and place shall have been concluded or adjourned |
| Senior Secured Holdco Meeting | 13h30 on 29 December 2016 or as soon as the Senior Secured Bidco Meeting convened for the same date and place shall have been concluded or adjourned |
| Super Senior Company Meeting | 14h00 on 29 December 2016 or as soon as the Senior Secured Holdco Meeting convened for the same date and place shall have been concluded or adjourned |
| Super Senior ECSL Meeting | 15h00 on 29 December 2016 or as soon as the Super Senior Company Meeting convened for the same date and place shall have been concluded or adjourned |
| Super Senior Bidco Meeting | 15h15 on 29 December 2016 or as soon as the Super Senior ECSL Meeting convened for the same date and place shall have been concluded or adjourned |
| Super Senior Holdco Meeting | 15h30 on 29 December 2016 or as soon as the Super Senior Bidco Meeting convened for the same date and place shall have been concluded or adjourned |
| Anticipated date that the Compromises are granted recognition and given effect in the Chapter 15 Proceedings | 17 January 2017 |
| Anticipated Compromise Effective Date (being the date of approval and sanctioning of the Compromises by the Court and filing such orders of the Court with the Commission) | 10 January 2017 |
| Anticipated RA Effective Time | 11 January2017 |

| Calculation Date | 16 January 2017 |
|---|---|
| Anticipated Completion Date | 27 January 2017 |

**NOTES:**

1. Unless otherwise stated, all references to time in this Explanatory Statement are to South African time.

2. The dates in this timetable and mentioned throughout this Explanatory Statement assume that the relevant Compromise Meetings are not adjourned. It is also possible that the orders of the Court sanctioning the Compromises may be suspended if any person appeals the orders.

3. The identity of Compromise Creditors who are entitled to vote on the relevant Compromise and make certain elections as set out in the Account Holder Letter and Proxy Form will be determined as at the Record Date or DTC Record Date (in respect of those Compromise Creditors who hold Compromise Notes through DTC).

4. Compromise Creditors' entitlement to their Pro Rata Participation Share of the relevant Compromise Consideration will also be determined as at the Calculation Date, in accordance with the mechanism set out in the Restructuring Agreement.

5. If all of the Compromises are approved by the requisite majorities at the relevant Compromise Meeting and thereafter sanctioned by the Court and the order filed at the Commission, then the Compromise Creditors will be bound by the terms of the relevant Compromise to which they form part, whether or not such Compromise Creditors elected to deliver Proxy Forms or Account Holder Letters by the Voting Instruction Deadline. **Compromise Creditors who fail to elect to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, through the Proxy Form and/or Account Holder Letter by the Voting Instruction Deadline will not receive New Money Notes, New Holdco 2 Ordinary B Shares or CVRs (as the case may be) pursuant to the terms of the New Money Notes Offer.** As such, all Compromise Creditors are strongly urged to procure that Proxy Forms or Account Holder Letters, as the case may be, are delivered to the Information Agent by the Voting Instruction Deadline.

6. If a Compromise Creditor who is a Senior Secured Creditor fails to deliver an Account Holder Letter or Proxy Form, the New Holdco 2 PIK B Notes to which that Non-Respondent Creditor would otherwise be entitled pursuant to the Compromise will, by default, be denominated in USD and delivered to the Holding Period Trustee.

7. Ineligible Creditors will have the option to elect to have the New Holdco 2 PIK B Notes, to which they would otherwise be entitled pursuant to the Compromise, denominated in USD or ZAR, irrespective of their status as Ineligible Creditor, and have New Holdco 2 PIK B Notes delivered to the Holding Period Trustee.

8. Compromise Noteholders will be blocked from trading their Compromise Notes as of the Record Date (or the DTC Record Date, if such Compromise Notes are held through DTC) until the Completion Date. See further paragraph 2.5 of Part F (*Procedure for blocking Compromise Notes held through Euroclear or Clearstream*).

9. Each Compromise Lender, in respect of which a Proxy Form was completed, may enter into or effect any Transfer in accordance with the terms of the Restructuring Agreement, but only the Compromise Lender who submitted the Proxy Form shall be entitled to vote and receive any Compromise Consideration, subject to confirmation

of their Compromise Claims as at the Record Date against the records of the relevant Representative.

10. The Holding Period Trustee will be appointed on or before the RA Effective Date pursuant to the terms of the Distribution Agreement. The Holding Period Trustee will be appointed to hold the Compromise Consideration on behalf of any Compromise Creditor who is -

    10.1.   an Ineligible Creditor; or

    10.2.   a Non-Respondent Creditor.

11. If a Compromise Creditor falls into either category described above, the relevant Compromise Creditor's Compromise Consideration will be issued to the Holding Period Trustee who will hold the relevant Compromise Consideration on trust for the relevant Compromise Creditor for the length of the Holding Period or until such Ineligible Creditor becomes an Eligible Creditor or appoints a Designated Recipient (who is an Eligible Person) or gives an instruction to sell its allocation of the Compromise Consideration, or such Non-Respondent Creditor delivers the Proxy Form or Account Holder Letter in accordance with the paragraphs below.

12. Non-Respondent Creditors who do not vote at the relevant Compromise Meeting must identify themselves to the Holding Period Trustee by delivering a Proxy Form or Account Holder Letter, as the case may be, before the expiry of the Holding Period so as to receive the Compromise Consideration to which they are entitled under the relevant Compromise. If the Holding Period expires, then any Compromise Consideration being held by the Holding Period Trustee will be sold in accordance with the terms of the Distribution Agreement, and the relevant net proceeds therefrom will, in the case of:

    12.1.   Ineligible Creditors known to the Holding Period Trustee, be paid to such Ineligible Creditors; or

    12.2.   Non-Respondent Creditors, be donated to the Edgars Foundation or any other charity selected as the Holding Period Trustee sees fit.

13. Whilst the Holding Period Trustee will receive and hold in trust all distributions from New Holdco 2 which it receives by virtue of any New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Holdco 2 Ordinary A Shares which it holds pursuant to the relevant Compromise, it has undertaken not to exercise any voting rights which may attach to any of the above instruments.

14. Purchasers of Compromise Claims which are traded after the Record Date or DTC Record Date (if applicable) will not be eligible in terms of the relevant Compromise to receive any Compromise Consideration. This risk is borne solely by such purchasers, without any recourse to the Company or any member of the Existing Group.

15. Account Holders are encouraged to obtain whatever information or instructions they may require from the Compromise Noteholders in sufficient time to enable them to return their valid Account Holder Letters to the Information Agent as soon as possible, having considered this Explanatory Statement carefully.

16. Voting instructions and elections to subscribe for New Money Notes in accordance with the terms of the New Money Notes Offer will not be taken into account in respect of Proxy Forms or Account Holder Letters received after the Voting Instruction Deadline set out above.

17.   Each Compromise Noteholder must ensure that an Account Holder Letter valid for the purposes of confirming eligibility to receive the relevant Compromise Consideration and, if applicable, New Money Notes is delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it, if it is an Eligible Creditor (or, if applicable, its Designated Recipient if it is an Eligible Person), to be entitled to receive the relevant Compromise Consideration in accordance with the terms of the relevant Compromise and, if applicable, New Money Notes, New Holdco 2 Ordinary B Shares or CVRs (as the case may be) to which it is entitled in accordance with the terms of the New Money Notes Offer (if it is an Eligible Creditor) on the Completion Date. Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

18.   Each Compromise Lender must ensure that a Proxy Form valid for the purposes of confirming eligibility to receive the relevant Compromise Consideration and, if applicable, New Money Notes, New Holdco 2 Ordinary B Shares or CVRs (as the case may be) is delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it, if it is an Eligible Creditor (or, if applicable, its Designated Recipient if it is an Eligible Person), to be entitled to receive the relevant Compromise Consideration in accordance with the terms of the relevant Compromise and, if applicable, New Money Notes, New Holdco 2 Ordinary B Shares or CVRs to which it is entitled in accordance with the terms of the New Money Notes Offer (if it is an Eligible Creditor) on the Completion Date. Compromise Lenders requiring any assistance in completing Proxy Forms should contact the Information Agent using the contact details in the Proxy Form.

19.   The Senior Secured Company Meeting will commence at the time stated, with the Guarantor Meetings concerning the Senior Secured Class being scheduled to convene sequentially thereafter, beginning at 12h00. The Super Senior Secured Company Meeting will commence at the time stated, or so soon thereafter following adjournment or closure of the Senior Secured Holdco Meeting. The various Guarantor Meetings concerning the Super Senior Class are scheduled to convene sequentially thereafter, beginning at 15h00 (or as soon as the Super Senior Company Meeting shall have been concluded or adjourned).

20.   Compromise Creditors that wish to attend the relevant Compromise Meeting must produce a duplicate copy of the valid Proxy Form or Account Holder Letter delivered on its behalf, evidence of corporate authority (in the case of a company or other corporation) (for example, a valid power of attorney and/or board minutes) and evidence of personal identity (for example, a passport or other picture identification) at the registration desk by no later than one hour before the scheduled time of the relevant Compromise Meeting.

21.   The Court will be requested to sanction the Compromises. The date for the hearing has not yet been settled, although it is expected to be on or about 10 January 2017. If this date changes, the dates of all subsequent steps, including the Completion Date, may be affected. In this event, the date of the hearing will be announced at the Compromise Meetings to the extent then known or otherwise notified to the Compromise Creditors. A notice regarding the date and time of the hearing(s) will be circulated once the hearing(s) have been scheduled.

22.   One of the conditions precedent to Completion under the Restructuring Agreement is that the Compromises be recognised in the United States pursuant to chapter 15 of the United States Bankruptcy Code.   The Compromise Companies will file a petition for relief under chapter 15 in the relevant bankruptcy court in the United States in order to commence a case for purposes of obtaining entry of an order recognising the Compromises. If the chapter 15 petition is unopposed, it is likely to take approximately 30 days from the date at which recognition is sought to the entry of an order recognising the Compromises. If the chapter 15 petition is opposed, then this period of time will be extended by the period necessary to resolve such opposition, including potential appeals. Any delay in fulfilling this condition precedent would cause a consequential delay to Completion. It is the Compromise Companies' intention to file the chapter 15 petition at the same time as they seek the Court's sanctioning of the Compromises (or, if later, at the earliest time possible under the United States Bankruptcy Code), so as to expedite this process.

**ARE YOU A PERSON WITH AN INTEREST IN ANY OF THE COMPROMISE NOTES?**

1.      The following persons have interests in the Compromise Notes:

    1.1.    Account Holders: You are an Account Holder if you are recorded directly in the records of –

        1.1.1.    a Clearing System (other than DTC) as holding an interest at the Record Date in any Compromise Notes in an account with that Clearing System (other than DTC); or

        1.1.2.    DTC, as holding an interest at the DTC Record Date in any Compromise Notes in an account with DTC outside Euroclear or Clearstream.

    1.2.    Intermediaries: You are an intermediary if you hold an interest at the Record Date or DTC Record Date (if applicable) in any Compromise Notes on behalf of another person or other persons and you do not hold that interest as an Account Holder ("**Intermediary**").

    1.3.    Compromise Noteholders: You are a Compromise Noteholder if you are the beneficial owner of and/or the owner of the ultimate economic interest in any of the Compromise Notes, whose interest in the relevant Compromise Notes is held through and shown on records maintained in book entry form by a Clearing System at the Record Date or DTC Record Date (if applicable). For the avoidance of doubt, an Account Holder may also be a Compromise Noteholder.

    1.4.    The Common Depositary and the Trustees.

2.      Compromise Noteholders who are Compromise Creditors are entitled to take, or direct the taking of, certain actions in respect of the relevant Compromise. For the purposes of the relevant Compromise, the following persons are relevant Compromise Creditors –

    2.1.    the Trustees;

    2.2.    the Common Depositary; and

    2.3.    the Compromise Noteholders, as contingent creditors.

3.      In order to avoid double-counting of votes, the Common Depository and Trustees will not be able to vote in the Compromise Meetings to the extent that the beneficial owners of the Compromise Notes have voted on their Compromise Claims.

4.      Account Holders are not Compromise Creditors unless and to the extent that they are Compromise Noteholders. The assistance of Account Holders will be required, in accordance with their custodial duties, to deliver e-mail versions of the completed Account Holder Letters in accordance with the instructions provided to them by the Compromise Noteholders and to arrange for the Compromise Notes to be blocked in accordance with the instructions contained in the Explanatory Statement and Account Holder Letter.

5.      Account Holder Letters are required in relation to the Compromise Noteholders for the purposes of (i) voting on the relevant Compromise, (ii) electing to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with the terms of the New Money Notes Offer, (iii) in relation to Senior Secured Creditors only, electing whether to subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR and (iv) appointing a Designated Recipient who is

an Eligible Person; (v) confirming eligibility to receive the relevant Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVR, as the case may be.

6.  In determining whether a particular person is the ultimate beneficial owner and therefore a Compromise Noteholder, entitled to a particular principal amount of Compromise Notes as aforesaid, each of the Company and the Information Agent may rely on such evidence and/or information and/or certification as it shall, in its absolute discretion, think fit and, if it does so rely, such evidence and/or information and/or certification shall, in the absence of manifest error, be conclusive and binding on all concerned.

7.  If you are a Compromise Noteholder that is not an Account Holder, then you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes the appropriate action required.

8.  The following diagram illustrates the relationship between certain Persons with interests in the Compromise Notes, which are held in global form through the Clearing Systems (other than DTC):

| **Common Depositary** |
| The Bank of New York Mellon |

| Each Common Depositary holds the relevant Global Note(s) as common depositary for the Clearing Systems |

| **Clearing System** |
| (Euroclear or Clearstream, Luxembourg) |

| Each Clearing System has a number of Account Holders who have accounts with Euroclear or Clearstream, Luxembourg |

| **Account Holder** |
| (For example, a bank or brokerage house) |

| Each Account Holder has interests in the Compromise Notes either for its own account (in which case it is the Compromise Noteholder in respect of those interests) or on behalf of its client (in which case it is not the Compromise Noteholder in respect of those interests) |

| **Intermediary** |
| (For example a bank or brokerage house which does not have an account with a Clearing System) |

| There may be one or more Intermediaries between an Account Holder and a Compromise Noteholder |
|---|
| **Compromise Noteholder**<br>(The beneficial owner of and/or the owner of the ultimate economic interest in any of the Compromise Notes) |

| **Voting**<br>Each Compromise Noteholder will be entitled to appoint a proxy (either the Chairman or another person selected by the Compromise Noteholder) to attend and vote at the relevant Compromise Meeting or to attend and vote at the relevant Compromise Meeting in person. |
|---|

9.     The following diagram illustrates the relationship between certain Persons with interests in the Compromise Notes, which are held in global form through DTC:

| **Registered Holder of Global Note**<br><br>*Cede & Co. as nominee for DTC*<br><br>The Global Notes representing interests in the Compromise Notes are registered in the name of Cede & Co. as nominee for DTC |
|---|
| **Clearing System**<br><br>*DTC*<br><br>Interests in the Compromise Notes are held in the Clearing System as Book Entry Interests in the accounts of Account Holders who are DTC Participants |
| **DTC Participant**<br><br>*(For example, a bank or brokerage house, with a securities account at DTC)*<br><br>The book entry interests are held by a DTC Participants either for its own account (in which case, it is the beneficial owner of and/or the owner of the ultimate economic interest in the relevant Compromise Note) or as custodian for the Compromise Noteholder in which case, it is not the holder of the ultimate economic interest in the relevant Compromise Note<br><br>For Compromise Noteholders holding interests in the Compromise Notes through Euroclear, the relevant book entry interests are held by the relevant DTC Participant, as a custodian<br><br>For Compromise Noteholders holding interests in the Compromise Notes through Clearstream, the relevant book entry interests are held by the relevant DTC Participant, as a custodian |
| **Account Holders**<br><br>*(For example, a bank or brokerage house, with a securities account at a Clearing System)*<br><br>Each Account Holder holds interests in the Compromise Notes either for its own account (in which case it is the beneficial owner of and/or the owner of the ultimate economic interest in the relevant Compromise Note) or as trustee or agent for the Compromise Noteholder (in which case it is not the holder of the ultimate economic interest in the relevant Compromise |

| Note) |
| --- |
| **Intermediary** |
| *(For example a bank or brokerage house which does not have an account with a Clearing System)* |
| There may be one or more Intermediaries between an Account Holder and a Compromise Noteholder |
| **Compromise Noteholder** |
| The beneficial owner of and/or the owner of the ultimate economic interest in the relevant Compromise Notes |
| **Voting** |
| Each Compromise Noteholder will be entitled to attend and vote (or to direct a duly authorised proxy to attend and vote on its behalf) at the relevant Compromise Meeting |

**IMPORTANT EXPLANATORY INFORMATION**

1.  If you are a **Compromise Lender** who is a **Senior Secured Creditor**, then your attention is directed to the following sections which immediately proceed this section, namely –

    1.1.   "*Summary of Action Required By All Compromise Creditors Generally*";

    1.2.   "*Summary of Action to be Taken by All Compromise Lenders Only*"; and

    1.3.   "*Summary of Action Required by the Senior Secured Creditors Generally*".

2.  If you are a **Compromise Noteholder** who is a **Senior Secured Creditor**, then your attention is directed to the following sections which immediately proceed this section, namely –

    2.1.   "*Summary of Action Required By All Compromise Creditors Generally*";

    2.2.   "*Summary of Action to be Taken by All Compromise Noteholders Only*"; and

    2.3.   "*Summary of Action Required by the Senior Secured Creditors Generally*".

3.  If you are a **Compromise Lender** who is a **Super Senior Third Ranking Creditor**, then your attention is directed to the following sections which immediately proceed this section, namely –

    3.1.   "*Summary of Action Required By All Compromise Creditors Generally*";

    3.2.   "*Summary of Action to be Taken by All Compromise Lenders Only*"; and

    3.3.   "*Summary of Action Required by the Super Senior Third Ranking Creditors Generally*".

4.  If you are a **Compromise Noteholder** who is a **Super Senior Third Ranking Creditor**, then your attention is directed to the following sections which immediately proceed this section, namely –

    4.1.   "*Summary of Action Required By All Compromise Creditors Generally*";

    4.2.   "*Summary of Action to be Taken by All Compromise Noteholders Only*"; and

    4.3.   "*Summary of Action Required by the Super Senior Third Ranking Creditors Generally*".

5.  For further information relating to Compromise Creditors participation under the Guarantor Compromises, your attention is directed (in addition to the above) to the section entitled "*Summary of Action Required by the Compromise Creditors in relation to the Guarantor Compromises*".

**SUMMARY OF ACTION REQUIRED BY ALL COMPROMISE CREDITORS GENERALLY**

**Compromise Creditors are invited to vote at the relevant Compromise Meeting; elect to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with the terms of the New Money Notes Offer; in relation to Senior Secured Creditors only, elect whether to subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR; appointing a Designated Recipient who is an Eligible Person and confirm their eligibility to receive Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, by, (i) in relation to Compromise Noteholders, directing their Account Holder to complete and deliver to the Information Agent the Account Holder Letter; and (ii) in relation to Compromise Lenders, completing and delivering to the Information Agent, their Proxy Form.**

1.  You should read the Proposal Document as a whole, in conjunction with the documents that accompany it (including the Proxy Form and Account Holder Letter).

2.  Part F of this Explanatory Statement sets out instructions and guidelines for all Compromise Creditors for voting at the relevant Compromise Meeting and procedures to receive the Compromise Consideration and certain additional matters.

3.  A valid Proxy Form or Account Holder Letter for the purposes of voting at the relevant Compromise Meeting, electing to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with the terms of the New Money Notes Offer, appointing a Designated Recipient who is an Eligible Person; electing whether to subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR and confirming eligibility to receive the relevant Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, can be delivered as one Proxy Form or Account Holder Letter, as the case may be, provided that it is delivered prior to the Voting Instruction Deadline.

4.  The Proxy Form and Account Holder Letter includes elections pursuant to which the Compromise Creditor is able (i) to attend and vote at the relevant Compromise Meeting in person or by a duly appointed representative if a company or other corporation, (ii) to instruct the Chairman as its proxy to cast its vote in accordance with the wishes of that Compromise Creditor, or (iii) to appoint another person as its proxy to attend and vote at the relevant Compromise Meeting in person on its behalf.

5.  If the relevant Compromise is approved by the requisite majorities at the relevant Compromise Meeting, Compromise Creditors will be bound by the terms of the relevant Compromise to which they form part, whether or not such Compromise Creditors elect to deliver Proxy Forms or Account Holder Letters by the Voting Instruction Deadline. As such, all Compromise Creditors are strongly urged to procure that Proxy Forms or Account Holder Letters, as the case may be, are delivered to the Information Agent by the Voting Instruction Deadline.

6.  It is important that as many votes as possible are cast at the relevant Compromise Meeting so that the Court may be satisfied that there is a fair and reasonable representation of opinion of Compromise Creditors of that class. You are therefore strongly urged to deliver valid Proxy Forms and Account Holder Letters.

7.  A Compromise Creditor who delivers a Proxy Form, or on whose behalf a valid Account Holder Letter is delivered prior to the relevant Compromise Meeting, may still attend and vote for or against the relevant Compromise at the relevant Compromise Meeting.

8.  If you are an Ineligible Creditor, you are entitled to appoint a Person as your Designated Recipient but such Person must be an Eligible Person.

9.  None of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Trustees, the Information Agent or any other person will be responsible for any loss or liability incurred by a Compromise Creditor as a result of any determination by Information Agent that a Proxy Form or an Account Holder Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

10. In relation to the New Money Notes Offer, in order to validly elect to subscribe for the relevant allocation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, Compromise Creditors will be required to indicate on the Proxy Form and Account Holder Letter –

    10.1. whether such Compromise Creditor will subscribe for its Pro Rata Participation Share of New Money Notes or a fixed USD value of New Money Notes (on the basis that if the latter option is selected, the Compromise Creditor will receive the lesser of its Pro Rata Participation Share and the fixed USD value);

    10.2. if such Compromise Creditor has elected to subscribe for New Money Notes as aforesaid, whether such Compromise Creditor will subscribe, for no consideration payable by such Creditor, for-

        10.2.1. its relevant allocation of New Holdco 2 Ordinary B Shares in the issued share capital of New Holdco 2; or

        10.2.2. its CVR,

        and failing such election (but provided that the Compromise Creditor has elected to subscribe for New Money Notes as aforesaid), such Compromise Creditor shall receive its relevant allocation of New Holdco 2 Ordinary B Shares.

11. If you are in any doubt as to what action you should take in connection with the Proposal Document, the Compromises contained in it or the documents that accompany it, you are recommended to seek your own independent advice immediately from your legal, financial, tax or other authorised independent adviser.

12. Once the RA Effective Date has occurred, then the following actions or deliverables will become relevant (for a full analysis, please read the Restructuring Agreement) in relation to the Senior Secured Creditors and Super Senior Third Ranking Creditors (their allocation of Compromise Consideration, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, shall be calculated in the manner set out in paragraphs 8 to 10 (inclusive) of Part B):

    12.1. within 3 Business Days of the Compromise Meetings (provided that the Compromises were approved in accordance with section 155 of the Companies Act at such Compromise Meetings), the Information Agent shall provide Houlihan Lokey, the New Holdco 1 Notes Trustee, New Holdco 1 and New Holdco 2 with a notice (the "**New Holdco 1 PIK A-1 Subscription Notice**") setting out, amongst others, the amount of New Money Notes, New

Holdco 2 Ordinary B Shares or CVRs that the Participating Creditors have elected to subscribe for;

12.2. by no later than 12h00 (Johannesburg time) on the Calculation Date, the Company will issue a notice ("**Fx Notice**") to the Information Agent and each Representative, confirming the foreign exchange rates quoted by Bloomberg on the Calculation Date to be used to calculate the relevant currency conversions;

12.3. on the Calculation Date (and by way of summary only) –

12.3.1. the Super Senior Term Loan Agent and the Information Agent will collectively provide (in accordance with the Restructuring Agreement), *inter alios*, the Company with a written notice confirming, *inter alia*, (1) the names of the Super Senior Term Loan Lenders as at the Record Date; (2) those who submitted valid Proxy Forms; and (3) each Super Senior Term Loan Lender's aggregate Compromise Claims outstanding as at the Record Date and interest thereon outstanding as at the Completion Date;

12.3.2. the Information Agent will provide (in accordance with the Restructuring Agreement), *inter alios*, the Company with a written notice confirming, *inter alia*, (1) the names of the Super Senior 2019 Noteholders who submitted valid Account Holder Letters; (2) each Super Senior 2019 Noteholder's aggregate Compromise Claims outstanding as at the Record Date and interest thereon outstanding as at the Completion Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Super Senior 2019 Notes; (3) the aggregate value of all Super Senior 2019 Notes outstanding as at the Record Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Super Senior 2019 Notes; and (4) the aggregate value of all Super Senior 2019 Notes outstanding as at the Record Date which are held by Ineligible Creditors (who have not appointed a Designated Recipient) and the Non-Respondent Creditors;

12.3.3. the Senior Secured Term Loan Agent and Information Agent will collectively provide (in accordance with the Restructuring Agreement), *inter alios*, the Company with a written notice confirming, *inter alia*, (1) the names of the Senior Secured Term Loan Lenders as at the Record Date and those that elected to subscribe for New Holdco 2 PIK B ZAR Notes or New Holdco 2 PIK B USD Notes or did not make any election in respect of the currency of the New Holdco 2 PIK B Notes; (2) those who submitted valid Proxy Forms; and (3) each Senior Secured Term Loan Lender's aggregate Compromise Claims outstanding as at the Record Date and interest thereon outstanding as at the Completion Date; and

12.3.4. the Information Agent will provide (in accordance with the Restructuring Agreement), *inter alios*, the Company with a written notice confirming, *inter alia*, (1) the names of the Senior Secured

2018 Noteholders and Senior Secured 2019 Noteholders who submitted valid Account Holder Letters; (2) each Senior Secured 2018 Noteholder's and Senior Secured 2019 Noteholder's aggregate Compromise Claims outstanding as at the Record Date or DTC Record Date (as applicable) and interest thereon outstanding as at the Completion Date and those that elected to subscribe for New Holdco 2 PIK B ZAR Notes or New Holdco 2 PIK B USD Notes or did not make any election in respect of the currency of the New Holdco 2 PIK B Notes; (3) the aggregate value of all Senior Secured 2018 Notes and Senior Secured 2019 Notes outstanding as at the Record Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Senior Secured Notes; and (4) the aggregate value of all Senior Secured 2019 Notes and Senior Secured 2018 Notes outstanding as at the Record Date which are held by Ineligible Creditors (who have not appointed a Designated Recipient) and the Non-Respondent Creditors.

12.4.    Houlihan Lokey shall complete the Allocation and Entitlement Table based on the aforesaid information by 15h00 (Johannesburg Time) on the first Business Day after the Calculation Date and deliver it to, *inter alios*, each Financial Advisor and set out, *inter alia*, –

12.4.1.    the name of each Participating Creditor as set out in the New Holdco 1 A-1 PIK Subscription Notice;

12.4.2.    the amount of New Money Notes (denominated in USD) that each Participating Creditor (or its Designated Recipient) has elected to subscribe for (such amounts calculated in terms of the New Money Notes Offer and Restructuring Agreement);

12.4.3.    whether the Participating Creditor elected to receive, or elected for its Designated Recipient to receive, New Holdco 2 Ordinary B Shares or a CVR as its Subscription Fee (in such amounts as is calculated in terms of the New Money Notes Offer and Restructuring Agreement);

12.4.4.    the amount in EUR of each Super Senior Term Loan Lender's New Holdco 2 PIK A Notes Commitments (such amounts calculated in terms of the Restructuring Agreement);

12.4.5.    the amount in EUR of each Super Senior 2019 Noteholder's (who has submitted an Account Holder Letter and who is an Eligible Creditor or who has appointed an Designated Recipient who is an Eligible Person) New Holdco 2 PIK A Notes Commitments (such amounts calculated in terms of the Restructuring Agreement) and the aggregate amount of the New Holdco 2 PIK A Notes Commitments to be allocated to the Holding Period Trustee in respect of Ineligible Creditors and/or Non-Respondent Creditors;

12.4.6.    the amount in either USD or ZAR of each Senior Secured Term Loan Lender's New Holdco 2 PIK B Notes Commitments (such amounts calculated in terms of the Restructuring Agreement);

12.4.7.    the amount in either USD or ZAR of each Senior Secured 2018 Noteholder's (who has submitted an Account Holder Letter and who is an Eligible Creditor or who has appointed an Designated Recipient who is an Eligible Person) New Holdco 2 PIK B Notes Commitments (such amounts calculated in terms of the Restructuring Agreement) and the aggregate amount of the New Holdco 2 PIK B Notes Commitments to be allocated to the Holding Period Trustee in respect of Ineligible Creditors and/or Non-Respondent Creditors;

12.4.8.    the amount in either USD or ZAR of each Senior Secured 2019 Noteholder's (who has submitted an Account Holder Letter and who is an Eligible Creditor or who has appointed an Designated Recipient who is an Eligible Person) New Holdco 2 PIK B Notes Commitments (such amounts calculated in terms of the Restructuring Agreement) and the aggregate amount of the New Holdco 2 PIK B Notes Commitments to be allocated to the Holding Period Trustee in respect of Ineligible Creditors and/or Non-Respondent Creditors;

12.4.9.    the number of fully paid New Holdco 2 Ordinary A Shares that each Senior Secured Term Loan Lender shall be entitled to subscribe for and be issued with (such amounts calculated in terms of the Restructuring Agreement);

12.4.10.    the number of fully paid New Holdco 2 Ordinary A Shares that each Senior Secured 2018 Noteholder shall be entitled to subscribe for and be issued with (such amounts calculated in terms of the Restructuring Agreement); and

12.4.11.    the number of fully paid New Holdco 2 Ordinary A Shares that each Senior Secured 2019 Noteholder shall be entitled to subscribe for and be issued with (such amounts calculated in terms of the Restructuring Agreement);

12.5.    the Financial Advisors have until 17h00 (Johannesburg Time) on the second Business Day after the Calculation Date ("**Review Date**") to settle and agree the Initial Allocation and Entitlement Table. Once agreed, on or prior to 17h00 (Johannesburg time) on the Review Date, the Information Agent shall issue each Participating Creditor with a Completion Funding Notice (being the notice in the form attached to the Restructuring Agreement):

12.5.1.    setting out the USD amount that the relevant Participating Creditor shall be required to pay to New Holdco 1 at Completion to subscribe for its allocation of the New Money Notes as set out opposite its name(s) in the Initial Allocation and Entitlement Table ("**New Holdco 1 Completion Amount**") and instructing the relevant Participating Creditor to either transfer directly, or arrange to transfer via Euroclear or Clearstream, its New Holdco 1 Completion Amount to the Escrow Agent's bank account stated in the Completion Funding Notice ("**Completion Funding Account**"), to hold in accordance with the terms of the Escrow Deed; and

12.5.2.  instructing the Participating Creditors to transfer its New Holdco 1 Completion Amount to the Completion Funding Account by 11h00 (Johannesburg time) on the Funding Date (being a date falling eight Business Days after the date of the CP Notice) and if such New Holdco 1 Completion Amount is not so transferred as aforesaid, such Participating Creditor will no longer be entitled to subscribe for its allocation of New Money Notes or receive its allocation of New Holdco 2 Ordinary B Shares or CVRs as its Subscription Fee; and

12.6.  following receipt of the Completion Funding Notice, Participating Creditors are obliged to transfer the amount of their New Holdco 1 Completion Amount to the Completion Funding Account in accordance with the terms of the Completion Funding Notice.

_____

**SUMMARY OF ACTION TO BE TAKEN BY ALL COMPROMISE NOTEHOLDERS ONLY**

_____

1.    Compromise Noteholders are invited to vote at the relevant Compromise Meeting by completing and delivering, or directing their Account Holder to complete and deliver, to the Information Agent as set out the Account Holder Letter.

2.    Detailed instructions on the actions which Compromise Noteholders (including Intermediaries and Account Holders) should take are set out in this Explanatory Statement and are summarised below.

3.    Compromise Noteholders should read the full instructions set out in Part F (*Instructions and Guidance for Compromise Creditors*).

**Appointment of the Information Agent**

4.    The Information Agent has been appointed to facilitate communications with Compromise Noteholders. The Information Agent's remuneration and expenses, and all costs incurred by it on behalf of New Holdco 2, New Holdco 1 and the Company, shall be discharged by the Company.

**General**

5.    You should read the Proposal Document as a whole, in conjunction with the documents that accompany it (including this Explanatory Statement and the Account Holder Letter) which contains, amongst other things, the voting form relating to the relevant Compromise Meeting).

6.    An Account Holder may complete and submit an Account Holder Letter on behalf of a Compromise Noteholder if the Account Holder has the authority to do so and it discloses the identity of such Compromise Noteholder.

7.    Each Compromise Noteholder should immediately contact its Account Holder (through any Intermediaries, if appropriate) to ensure that a valid Account Holder Letter in respect of the relevant Compromise is delivered to and received by the Information Agent.

8.    It will be the responsibility of Account Holders to obtain from the Compromise Noteholders (through any Intermediaries, if applicable) on whose behalf they are acting in accordance with the procedures established between them, whatever information or instructions they may require to identify in an Account Holder Letter, the relevant Compromise Noteholder and to provide the information, instructions, confirmations and representations required to be given by the Account Holder Letter for and on behalf of the relevant Compromise Noteholder. To assist this process, each Compromise Noteholder is strongly encouraged to contact its Account Holder (through any Intermediaries, if appropriate) to enable that Account Holder to complete an Account Holder Letter and deliver such Account Holder Letter to the Information Agent before the Voting Instruction Deadline.

9.    A Compromise Noteholder who –

    9.1.    **is not** an Account Holder and who wishes to vote at the relevant Compromise Meeting should –

        9.1.1.    be aware that the New Notes will only be eligible for clearing and settlement through Euroclear and Clearstream, and that DTC's

ATOP (Automated Tender Offer Program) system will not be used for the processing of Custody Instructions. Any Compromise Noteholder that is not an Account Holder is highly recommended to instruct its Account Holder to move its High Yield Notes from DTC to an account with Euroclear or Clearstream before taking any of the steps outlined below;

9.1.2.    direct your Account Holder to take the relevant steps to be taken in respect of interests in the Compromise Notes held through DTC or Compromise Notes held through Euroclear or Clearstream (as applicable) set out in Part F (*Instructions and guidance for Compromise Creditors*); and

9.1.3.    direct his Account Holder to complete the appropriate parts of the Account Holder Letter set out in the Account Holder Letter and deliver the completed Account Holder Letter as soon as possible to the Information Agent and, in any event, so as to be received before the Voting Instruction Deadline;

9.2.    **is** an Account Holder and wishes to vote at the relevant Compromise Meeting in accordance with the terms of the relevant Compromise should –

9.2.1.    be aware that the Compromise Notes will only be eligible for clearing and settlement through Euroclear and Clearstream, and that DTC's ATOP (Automated Tender Offer Program) system will not be used for the processing of Custody Instructions. Any Compromise Noteholder that is an Account Holder is highly recommended to move its Compromise Notes from DTC to an account with either Euroclear or Clearstream before taking any of the steps outline below;

9.2.2.    take the relevant steps to be taken in respect of interests in the Compromise Notes held through DTC or Compromise Notes held through Euroclear or Clearstream (as applicable) set out in Part F (*Instructions and guidance for Compromise Creditors*); and

9.2.3.    complete the appropriate parts of the Account Holder Letter set out in the Account Holder Letter and deliver the completed Account Holder Letter as soon as possible to the Information Agent and, in any event, so as to be received before the Voting Instruction Deadline.

10.    Part 2, Section 1 (*Voting Instructions*) of the Account Holder Letter includes elections pursuant to which the Compromise Noteholder is able (i) to appoint the Chairman of the relevant Compromise Meeting as its proxy to attend and vote on its behalf at the relevant Compromise Meeting; (ii) to appoint a proxy (other than the Chairman of the relevant Compromise Meeting) to attend and vote on its behalf at the Compromise Meeting; or (iii) to attend and vote at the Compromise Meeting in person.

11.    Each Compromise Noteholder that wishes to vote at the relevant Compromise Meeting will be required to ensure that prior to delivering an Account Holder Letter to the Information Agent (i) if it is the Account Holder, it instructs or (ii) if it is not the Account Holder, its Account Holder instructs on its behalf either Euroclear or Clearstream to block those Compromise Notes. This can be effected by giving

Custody Instructions to that effect to the relevant Clearing System prior to the Custody Instruction Deadline. As the procedure for blocking Compromise Notes may take a considerable period of time, Compromise Noteholders should ensure that Custody Instructions are given as early as possible so that the relevant Compromise Notes are blocked prior to the Custody Instruction Deadline. For Compromise Notes held through DTC outside Euroclear or Clearstream, the Compromise Noteholder must procure that the Account Holder through whom it holds its Compromise Notes medallion guarantee stamps its Account Holder Letter and confirms it holds a position in such Existing Notes as at the DTC Record Date. The procedure for doing this is described at paragraph 2.4 of Part F (*Instructions and Guidance for Creditors*). **Failure to deliver a valid Account Holder Letter on behalf of a Compromise Noteholder by the Voting Instruction Deadline will mean that the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the Compromise Noteholder will not be entitled to vote at the relevant Compromise Meeting or subscribe for the New Money Notes, New Holdco 2 Ordinary B Shares or CVRS, as the case may be.**

12.     Each Compromise requires the approval of a majority in number representing at least 75% in value of the relevant Compromise Creditors together present and voting in person or represented at the relevant Compromise Meeting.

13.     The amount of the relevant Compromise Claim held by each Compromise Noteholder which submits a valid Account Holder Letter in respect of the Compromise Notes will be calculated as at the Record Date provided that the relevant Compromise Claims of the Compromise Noteholders who hold their positions through DTC will be determined as at the DTC Record Date and will be recorded in the omnibus proxy provided by DTC confirming the positions and identity of the Compromise Noteholders who hold their position through DTC. This will be based on information confidentially provided to the Company by the Information Agent.

14.     The Compromise Creditors are referred to the relevant section entitled "*Summary of Action required by the Senior Secured Creditors Generally*" or "*Summary of Action required by the Super Senior Third Ranking Creditors Generally*" in respect of the foreign exchange rates and conversion of the currencies for the purpose of calculating the relevant Compromise Claims for voting purposes.

15.     This information will be used by the Chairman to determine whether the relevant Compromise is approved at the relevant Compromise Meeting by using such information to determine the number and value of the aggregate Compromise Claims held by the relevant Compromise Noteholders voting in favour of the relevant Compromise.

16.     It is important that as many votes as possible are cast at the Compromise Meetings so that the Court may be satisfied that there is a fair and reasonable representation of opinion of Compromise Creditors. You are therefore strongly urged to complete and sign or direct your Account Holder to complete and sign the relevant parts of your Account Holder Letter.

17.     Completed Account Holder Letters for the purposes of voting at the relevant Compromise Meeting should be delivered to the Information Agent. Account Holder Letters should not in any circumstances be delivered to any of the Common

Depositary, the Trustees, the Company or Existing Group or any other person. None of the Common Depositary, the Trustees, the Company or Existing Group and any of their respective Affiliates, officers, directors or employees or any other person will be under any duty to give notification of any defects, irregularities or delays in any Account Holder Letter, nor will any of such entities or persons incur any liability for failure to give such notification.

18. **Completed Account Holder Letters for the purposes of voting should be delivered to the Information Agent so as to be received by the Information Agent as soon as possible and in any event before the Voting Instruction Deadline.**

19. If a person is in any doubt as to whether or not it is a Compromise Noteholder, such person should contact the Information Agent using the contact details in the Account Holder Letter.

20. Compromise Noteholders may also wish to refer to the diagrams set out in the section entitled "*Are you a person with an interest in any of the Compromise Notes?*" to see the relationship between Compromise Noteholders, Intermediaries and Account Holders.

**Procedure for blocking Compromise Notes held in a Clearing System**

21. Each Account Holder should ensure that the relevant Clearing System has received irrevocable instructions (with which it has have complied), with valid Custody Instruction Reference Number/s, to block the Compromise Notes which are the subject of an Account Holder Letter. See further paragraph 2.5 of Part F (*Procedure for blocking Compromise Notes held through Euroclear or Clearstream*).

22. Compromise Notes held in a Clearing System should be blocked in accordance with the procedures of the relevant Clearing System and the deadlines required by that Clearing System. It is the responsibility of Account Holders to ensure that they comply with any particular deadlines imposed by the Information Agent and the relevant Clearing System for blocking the Compromise Notes. See further paragraph 2.5 of Part F (*Procedure for blocking Compromise Notes held through Euroclear or Clearstream*).

23. The Information Agent will request the Clearing Systems to confirm to its satisfaction that the relevant Compromise Notes have been blocked with effect from or before the date of receipt by the Information Agent of an Account Holder Letter. In the event that a Clearing System fails to do so, the Information Agent may reject that Account Holder Letter. In order to give the requested confirmation for the purpose of voting, the Clearing Systems will need to have received the Custody Instructions no later than 17h00 (local time in the place of the relevant Clearing System) on 22 December 2016, being the Business Day before the Voting Instruction Deadline.

24. The Information Agent will use all reasonable endeavours to assist Compromise Noteholders to complete their Account Holder Letters validly, should it receive any Account Holder Letters which are not valid. However, failure to deliver a valid Account Holder Letter on behalf of a Compromise Noteholder to the Information Agent in the manner and within the deadlines referred to above will mean that –

   24.1. the voting instructions contained in such Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the relevant Compromise Noteholder will not be entitled to vote at the relevant Compromise Meeting;

24.2.   the relevant Compromise Noteholder will not be entitled to receive the Compromise Consideration to which the Compromise Noteholder is entitled on the Completion Date (in respect of an Eligible Noteholder), but rather such Compromise Consideration will be held by the Holding Period Trustee until such Compromise Noteholder submits a valid Account Holder Letter to the Holding Period Trustee prior to the expiry of the Holding Period;

24.3.   the Compromise Noteholder will not be entitled to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs (as the case may be), pursuant to the New Money Notes Offer.

**Completing the Account Holder Letter**

25.   Each Compromise Noteholder must give its Account Holder important information and instructions as to voting and certain other matters. See further paragraph 2.7 of Part F (*Completing the Account Holder Letter for the purposes of voting*).

26.   Each Compromise Noteholder is recommended to appoint a proxy (either the Chairman or someone else of its choice who would be willing to attend the relevant Compromise Meeting) in any event, even if that Compromise Noteholder intends to attend and vote in person or by a duly authorised representative, if a company or other corporation, in case such Compromise Noteholder is unable to do so for some reason. If a Compromise Noteholder appoints a proxy and then decides to attend and vote at the relevant Compromise Meeting in person or by a duly authorised representative, if the Compromise Noteholder is a company or other corporation, that Compromise Noteholder will be entitled to do so.

27.   Each Compromise Noteholder which submits, delivers or procures the delivery of an Account Holder Letter will be required to make (or authorise its Account Holder to make on its behalf) the representations, warranties and undertakings to New Holdco 2, New Holdco 1, the Company, Existing Group and the Information Agent set out therein.

28.   Any Compromise Noteholder that is unable to give any of the representations, warranties and undertakings should contact the Information Agent directly as soon as possible, as there may be additional procedures involved in respect of that Compromise Noteholder's participation in the relevant Compromise. A valid Account Holder Letter for the purposes of confirming eligibility to receive Compromise Consideration means an Account Holder Letter which has been signed by an Account Holder duly authorised by a Compromise Noteholder and in respect of which all relevant parts have been completed, including all confirmations required to be given by the Account Holder.

29.   Each Compromise Noteholder should also ensure that certain necessary information is included in its Account Holder Letter. See further paragraph 2.7.8 of Part F (*Completing the Account Holder Letter for the purposes of voting*).

**Delivery of Account Holder Letters**

30.   Account Holder Letters for the purposes of voting at the relevant Compromise Meeting and making the elections as set out above should be delivered by Account Holders as soon as possible to the Information Agent and, in any event, before the Voting Instruction Deadline. Failure to do so will have a number of important consequences - see further paragraph 2.8 of Part F (*Delivery of Account Holder letters for the purposes of voting*).

31.     Any Account Holder Letter delivered will be irrevocable, as further described at paragraph 2.8.3 of Part F (*Delivery of Account Holder letters for the purposes of voting*).

32.     By delivering an Account Holder Letter to the Information Agent, the Account Holder will be making a number of confirmations and instructions to certain persons. See further paragraph 2.8.4 of Part F (*Delivery of Account Holder Letters for the purposes of voting*).

33.     All Compromise Noteholders (whether Eligible Creditors or Ineligible Creditors) will be entitled to vote in person or by representation or proxy at the relevant Compromise Meeting.

34.     Any proxy attending the relevant Compromise Meeting on behalf of a Compromise Noteholder should ensure that it complies with the proxy requirements set out at paragraph 2.9.3 of Part F (*Attending the Compromise Meetings*), failing which they may not be admitted to the relevant Compromise Meeting.

35.     If a Compromise Noteholder appoints the Chairman as its proxy, there is no need for the Chairman to take the Account Holder Letter to the relevant Compromise Meeting.

**Actions to be taken in relation to the relevant Compromise for the purposes of confirming eligibility to receive Compromise Consideration**

36.     Each Compromise Noteholder will need to give its Account Holder information and instructions as to its eligibility to receive Compromise Consideration and, if applicable, New Money Notes, under applicable securities and other laws.

37.     A Compromise Noteholder who –

37.1.   **is not** an Account Holder and who wishes to receive the Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which it is entitled on the Completion Date (or, to the extent it is not eligible to receive such Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, and has not appointed a Designated Recipient who is an Eligible Person), must direct his Account Holder to complete the appropriate parts of the Account Holder Letter and deliver the completed Account Holder Letter as soon as possible to the Information Agent and, in any event, so as to be received before the Voting Instruction Deadline; or

37.2.   **is** an Account Holder and wishes to receive the Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which it is entitled on the Completion Date (or, to the extent it is not eligible to receive such Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, and has not appointed a Designated Recipient who is an Eligible Person), must complete the appropriate parts of the Account Holder Letter and deliver the completed Account Holder Letter as soon as possible to the Information Agent and, in any event, so as to be received before the Voting Instruction Deadline.

38.     The Account Holder Letter enables a Compromise Noteholder to designate a Designated Recipient who is an Eligible Person to receive the relevant Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B

Shares or CVRs, as the case may be, to which that Compromise Noteholder will be entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer.

39.     The Account Holder Letter includes an eligibility section in which the Account Holder is required to confirm on behalf of itself and the Compromise Noteholder (or, if the Compromise Noteholder has appointed a Designated Recipient who is an Eligible Person, its Designated Recipient) certain statements relating to eligibility to receive the relevant Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which that Compromise Noteholder is entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer.

40.     Failure to deliver a valid Account Holder Letter (including the eligibility representations contained in Section 4 (*Eligible* Persons) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) on behalf of a Compromise Noteholder by the Voting Instruction Deadline will mean that the Compromise Noteholder (irrespective of whether it would otherwise be eligible to receive Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be) will not be entitled to receive any Compromise Consideration to which it would be entitled in accordance with the terms of the relevant Compromise, and the relevant Compromise Consideration would instead be issued to the Holding Period Trustee.

41.     Completed Account Holder Letters for the purposes of confirming eligibility to receive Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, should be delivered to the Information Agent. Account Holder Letters should not in any circumstances be delivered to any of the Common Depositary, the Trustees, the Company or Existing Group or any other person. None of the Common Depositary, the Trustees, the Company or Existing Group and any of their respective Affiliates, officers, directors or employees or any other person will be under any duty to give notification of any defects, irregularities or delays in any Account Holder Letter, nor will any of such entities or persons incur any liability for failure to give such notification.

42.     In summary each Compromise Noteholder may elect –

    42.1.   to receive the Compromise Consideration and/or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which it is entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer, in which case it must instruct its Account Holder to confirm on its behalf that it is an Eligible Creditor;

    42.2.   for a Designated Recipient who is an Eligible Person to receive the Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which that Compromise Noteholder is entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer, in which case it must instruct its Account Holder to confirm on its behalf that its Designated Recipient is an Eligible Person; or

    42.3.   for the Compromise Consideration to which that Compromise Noteholder is entitled to be transferred to the Holding Period Trustee to be held in trust for the Holding Period pursuant to the terms of the Distribution Agreement and

as soon as reasonably practicable after receipt by an instruction from such Compromise Creditor to sell such Compromise Consideration or following expiry of the Holding Period, to be sold and for the net proceeds of the sale of that Compromise Consideration to be paid to that Compromise Noteholder, in which case it must instruct its Account Holder to confirm on its behalf that it is not an Eligible Creditor and it must not appoint a Designated Recipient who is an Eligible Person,

in each case, by ensuring that such election is recorded in the Account Holder Letter delivered on its behalf and that the details of its Designated Recipient, if applicable, are included in the Account Holder Letter.

**Actions to be taken by Compromise Noteholders for the purposes of subscribing for the New Money Notes**

43.     A Compromise Noteholder who –

43.1.   **is not** an Account Holder and wishes to elect to subscribe for New Money Notes pursuant to the terms of the New Money Notes Offer, should direct its Account Holder to complete the appropriate parts of the Account Holder Letter and deliver the completed Account Holder Letter as soon as possible to the Information Agent and, in any event, so as to be received before the Voting Instruction Deadline; or

43.2.   **is** an Account Holder and wishes to elect to subscribe for New Money Notes pursuant to the terms of the New Money Notes Offer, should complete the appropriate parts of the Account Holder Letter and deliver the completed Account Holder Letter as soon as possible to the Information Agent and, in any event, so as to be received before the Voting Instruction Deadline.

44.     The Account Holder Letter enables a Compromise Noteholder to elect –

44.1.   to appoint a Person as a Designated Recipient, but such Person must be an Eligible Person;

44.2.   in respect of Senior Secured Creditors only, whether the New Holdco 2 PIK B Notes to be issued to it should be denominated in USD or ZAR, and failing any such election, such Compromise Noteholder shall receive its relevant allocation of New Holdco 2 PIK B Notes denominated in USD;

44.3.   whether such Compromise Noteholder will subscribe for its Pro Rata Participation Share of New Money Notes or a fixed USD value of New Money Notes (on the basis that if the latter option is selected, the Compromise Noteholder will receive the lesser of its Pro Rata Participation Share and the fixed USD value);

44.4.   whether it will subscribe for the New Holdco 2 Ordinary B Shares or CVR, for no consideration payable by such Compromise Noteholder and failing such election (but provided that the Compromise Noteholder has elected to subscribe for New Money Notes as aforesaid), such Compromise Noteholder shall receive its relevant allocation of New Holdco 2 Ordinary B Shares.

45.     Any Compromise Noteholder wishing to participate in the New Money Notes Offer should note that, in addition to instructing its Account Holder to make the appropriate elections in relation to the New Money Notes Offer in the Account Holder Letter, it must also ensure that its Account Holder confirms on its behalf in the Account Holder Letter that the Compromise Noteholder is an Eligible Creditor or, if it has appointed a Designated Recipient who is an Eligible Person, that the

Designated Recipient is an Eligible Person and that the duly completed and valid Account Holder Letter is delivered to and received by the Information Agent before the Voting Instruction Deadline. Failure to do so will result in that Compromise Noteholder not being entitled to participate in the New Money Notes Offer.

46.    Failure to deliver a valid Account Holder Letter on behalf of a Compromise Noteholder by the Voting Instruction Deadline will mean that any election to subscribe for New Money Notes pursuant to the terms of the New Money Notes Offer in that Account Holder Letter will be disregarded for the purposes of the New Money Notes Offer.

47.    Each Compromise Noteholder should note that, unless a valid Account Holder Letter is delivered on its behalf to the Information Agent containing the requisite elections and confirmations that the Compromise Noteholder is an Eligible Creditor (or, if it has appointed a Designated Recipient, its Designated Recipient who is an Eligible Person) before the Voting Instruction Deadline, the elections contained in that Account Holder Letter in relation to the New Money Notes Offer will be disregarded and that Compromise Noteholder will not be entitled to participate in the New Money Notes Offer.

48.    Completed Account Holder Letters for the purposes of electing to subscribe for New Money Notes should be delivered to the Information Agent so as to be received by the Information Agent as soon as possible and in any event before the Voting Instruction Deadline. Account Holder Letters should not in any circumstances be delivered to any of the Common Depositary, the Trustees, the Company or Existing Group or any other person. None of the Common Depositary, the Trustees, the Company or Existing Group and any of their respective Affiliates, officers, directors or employees or any other person will be under any duty to give notification of any defects, irregularities or delays in any Account Holder Letter, nor will any of such entities or persons incur any liability for failure to give such notification.

----

**SUMMARY OF ACTION TO BE TAKEN BY ALL COMPROMISE LENDERS ONLY**

----

1.  Compromise Lenders are invited to vote at the relevant Compromise Meeting by completing and delivering, or directing their Proxy Form to complete and deliver, to the Information Agent as set out the Account Holder Letter.

2.  Detailed instructions on the actions which Compromise Lenders should take are set out in this Explanatory Statement and are summarised below.

3.  Compromise Lenders should read the full instructions set out in Part F (*Instructions and Guidance for Compromise Creditors*).

**Appointment of the Information Agent**

4.  The Information Agent has been appointed to facilitate communications with Compromise Lenders. The Information Agent's remuneration and expenses, and all costs incurred by it on behalf of New Holdco 2, New Holdco 1 and the Company, shall be discharged by the Company.

**General**

5.  You should read the Proposal Document as a whole, in conjunction with the documents that accompany it (including this Explanatory Statement and the Proxy Form) which contains, amongst other things, the voting form relating to the relevant Compromise Meeting).

6.  Part 2, Section 1 (*Voting Instructions*) of the Proxy Form includes elections pursuant to which the Compromise Lender is able (i) to appoint the Chairman of the relevant Compromise Meeting as its proxy to attend and vote on its behalf at the relevant Compromise Meeting; (ii) to appoint a proxy (other than the Chairman of the relevant Compromise Meeting) to attend and vote on its behalf at the Compromise Meeting; or (iii) to attend and vote at the Compromise Meeting in person.

    **Failure to deliver a valid Proxy Form on behalf of a Compromise Lender by the Voting Instruction Deadline will mean that the voting instructions contained in that Proxy Form will be disregarded for the purposes of voting at the relevant Compromise Meeting and the Compromise Lender will not be entitled to vote at the relevant Compromise Meeting or subscribe for the New Money Notes, New Holdco 2 Ordinary B Shares or CVRS, as the case may be.**

7.  Each Compromise requires the approval of a majority in number representing at least 75% in value of the relevant Compromise Creditors together present and voting in person or represented at the relevant Compromise Meeting.

8.  The amount of the relevant Compromise Claims held by each Compromise Lender which submits a valid Proxy Form in respect of such Compromise Claims will be calculated as at the Record Date based on information known to the Company and the Information Agent as at such date, and verified by the Compromise Lender's completion of the Proxy Form. This information will be used by the Chairman to determine whether the relevant Compromise is approved at the relevant Compromise Meeting by using such information to determine the number and value of the aggregate Compromise Claims held by the relevant Compromise Lenders voting in favour of the relevant Compromise. Accordingly, Compromise Lenders do

not need to take any action in respect of confirming the amount of their relevant Compromise Claims other than providing the details requested in the Proxy Form.

9. The Compromise Creditors are referred to the relevant section entitled "*Summary of Action required by the Senior Secured Creditors Generally*" or "*Summary of Action required by the Super Senior Third Ranking Creditors Generally*" in respect of the foreign exchange rates and conversion of the currencies for the purpose of calculating the relevant Compromise Claims for voting purposes.

10. It is important that as many votes as possible are cast at the Compromise Meetings so that the Court may be satisfied that there is a fair and reasonable representation of opinion of Compromise Creditors. You are therefore strongly urged to complete and sign the relevant parts of your Proxy Form.

11. **Completed Proxy Forms for the purposes of voting should be delivered to the Information Agent so as to be received by the Information Agent as soon as possible and in any event before the Voting Instruction Deadline.**

12. If a person is in any doubt as to whether or not it is a Compromise Lender, such person should contact the Information Agent using the contact details in the Proxy Form.

**Completing the Proxy Form**

13. Each Compromise Lender must give its instructions as to voting and certain other matters. See further paragraph 3.5 of Part F (*Completing the Proxy Form for the purposes of voting*).

14. Each Compromise Lender is recommended to appoint a proxy (either the Chairman or someone else of its choice who would be willing to attend the relevant Compromise Meeting) in any event, even if that Compromise Lender intends to attend and vote in person or by a duly authorised representative, if a company or other corporation, in case such Compromise Lender is unable to do so for some reason. If a Compromise Lender appoints a proxy and then decides to attend and vote at the relevant Compromise Meeting in person or by a duly authorised representative, if the Compromise Lender is a company or other corporation, that Compromise Lender will be entitled to do so.

15. Each Compromise Lender which submits, delivers or procures the delivery of a Proxy Form will be required to make the representations, warranties and undertakings to New Holdco 2, New Holdco 1, the Compromise Companies and the Existing Group set out therein.

16. Any Compromise Lender that is unable to give any of the representations, warranties and undertakings should contact the Company directly as soon as possible, as there may be additional procedures involved in respect of that Compromise Lender's participation in the relevant Compromise. A valid Proxy Form for the purposes of confirming eligibility to receive Compromise Consideration means a Proxy Form which has been signed by the Compromise Lender concerned and in respect of which all relevant parts have been completed, including all confirmations required to be given by the Compromise Lender.

17. Each Compromise Lender should also ensure that certain necessary information is included in its Proxy Form. See further paragraph 3.5.1 of Part F (*Completing the Proxy Form for the purposes of voting*).

**Delivery of Proxy Forms**

18.    Proxy Forms for the purposes of voting at the relevant Compromise Meeting and making the elections as set out above should be delivered by Compromise Lenders as soon as possible to the Information Agent and, in any event, before the Voting Instruction Deadline. Failure to do so will have a number of important consequences - see further paragraph 3.6 of Part F (*Delivery of Proxy Forms for the purposes of voting*).

19.    Each Compromise Lender should note that, unless a valid Proxy Form is delivered to the Information Agent before the Voting Instruction Deadline, -

19.1.    the voting instructions contained in that Proxy Form will be disregarded for the purposes of voting at the relevant Compromise Meeting and the Compromise Lender will not be entitled to vote at the relevant Compromise Meeting; and

19.2.    its other elections set out in the Proxy Form will be disregarded.

20.    Any Proxy Form delivered will be irrevocable, as further described at paragraph 3.6 of Part F (*Delivery of Proxy Forms for the purposes of voting*).

21.    By delivering a Proxy Form to the Information Agent, the Compromise Lender will be making a number of confirmations and instructions to certain persons. See further paragraph 3.6 of Part F (*Delivery of Proxy Forms for the purposes of voting*).

22.    All Compromise Lenders (whether Eligible Creditors or Ineligible Creditors) will be entitled to vote in person or by representation or proxy at the relevant Compromise Meeting.

23.    Any proxy attending the relevant Compromise Meeting on behalf of a Compromise Lender should ensure that it complies with the proxy requirements set out at paragraph 3.7 of Part F (*Attending the Compromise Meetings*), failing which they may not be admitted to the relevant Compromise Meeting.

24.    If a Compromise Lender appoints the Chairman as its proxy, there is no need for the Chairman to take the Proxy Form to the relevant Compromise Meeting.

**Actions to be taken in relation to the relevant Compromise for the purposes of confirming eligibility to receive Compromise Consideration**

25.    A Compromise Lender who **is not** an Account Holder or does not have any relationship or account with an Account Holder and who wishes to receive New Holdco 2 PIK B Notes, New Holdco 2 PIK A Notes and, if applicable, New Money Notes to which it is entitled on the Completion Date (or, to the extent it is not eligible to receive such Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, and has not appointed a Designated Recipient who is an Eligible Person), must –

25.1.    be aware that the New Notes will only be eligible for clearing and settlement through Euroclear and Clearstream; and

25.2.    ensure that it has appointed an Account Holder (or is itself an Account Holder) prior to the Completion Date, so that it may receive the New Notes before taking any of the steps outlined below.

26.    A Compromise Lender who wishes to receive its relevant Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which it is entitled on the Completion Date must be an Eligible Creditor. If such Compromise Lender is an Ineligible Creditor and has not appointed a Designated Recipient who is an Eligible Person or is a Non-Respondent Creditor, its

Compromise Consideration will be transferred to the Holding Period Trustee to be held in trust for the duration of the Holding Period.

27.     The Proxy Form enables a Compromise Lender to designate a Designated Recipient who is an Eligible Person to receive the relevant Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which that Compromise Lender will be entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer.

28.     The Proxy Form includes an eligibility section in which the Compromise Lender is required to confirm that it is an Eligible Creditor (or, if the Compromise Lender has appointed a Designated Recipient, its Designated Recipient is an Eligible Person) certain statements relating to eligibility to receive the relevant Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which that Compromise Lender is entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer.

29.     Failure to deliver a valid Proxy Form (including the eligibility representations contained in Section 4 (*Eligible* Persons) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) on behalf of a Compromise Lender by the Voting Instruction Deadline will mean that the Compromise Lender (irrespective of whether it would otherwise be eligible to receive Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be) will not be entitled to receive any Compromise Consideration to which it would be entitled in accordance with the terms of the relevant Compromise and the relevant Compromise Consideration would instead be issued to the Holding Period Trustee.

30.     Completed Proxy Forms for the purposes of confirming eligibility to receive Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, should be delivered to the Information Agent.

31.     In summary each Compromise Lender may elect –

31.1.   to receive the Compromise Consideration and/or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which it is entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer, in which case it must confirm that it is an Eligible Creditor;

31.2.   for a Designated Recipient who is an Eligible Person to receive the Compromise Consideration and, if applicable, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which that Compromise Lender is entitled in accordance with the terms of the relevant Compromise and New Money Notes Offer, in which case it must confirm that its Designated Recipient is an Eligible Person; or

31.3.   for the Compromise Consideration to which that Compromise Lender is entitled to be transferred to the Holding Period Trustee to be held in trust for the Holding Period pursuant to the terms of the Distribution Agreement, in which case it must confirm that it is not an Eligible Creditor and it must not appoint a Designated Recipient who is an Eligible Person,

in each case, by ensuring that such election is recorded in the Proxy Form delivered to the Information Agent and that the details of its Designated Recipient, if applicable, are included in the Proxy Form.

**Actions to be taken by Compromise Lenders for the purposes of subscribing for the New Money Notes**

32.     A Compromise Lender who wishes to elect to subscribe for New Money Notes pursuant to the terms of the New Money Notes Offer, should complete the appropriate parts of the Proxy Form and deliver the completed Proxy Form as soon as possible to the Information Agent and, in any event, so as to be received before the Voting Instruction Deadline.

33.     The Proxy Form enables a Compromise Lender to elect –

33.1.   to appoint a Person as a Designated Recipient, but such Person must be an Eligible Person;

33.2.   in respect of Senior Secured Creditors only, whether the New Holdco 2 PIK B Notes to be issued to it should be denominated in USD or ZAR, and failing any such election, such Compromise Lender shall receive its relevant allocation of New Holdco 2 PIK B Notes denominated in USD;

33.3.   whether such Compromise Lender will subscribe for its Pro Rata Participation Share of New Money Notes or a fixed USD value of New Money Notes (on the basis that if the latter option is selected, the Compromise Lender will receive the lesser of its Pro Rata Participation Share and the fixed USD value); and

33.4.   whether it will subscribe for the New Holdco 2 Ordinary B Shares or CVR, for no consideration payable by such Compromise Lender and failing such election (but provided that the Compromise Lender has elected to subscribe for New Money Notes as aforesaid), such Compromise Lender shall receive its relevant allocation of New Holdco 2 Ordinary B Shares.

34.     Any Compromise Lender wishing to participate in the New Money Notes Offer should note that, in addition to making the appropriate elections in relation to the New Money Notes Offer in the Proxy Form, it must also ensure that it confirms in the Proxy Form that the Compromise Lender is an Eligible Creditor, or, if it has appointed a Designated Recipient, that the Designated Recipient is an Eligible Person and that the duly completed and valid Proxy Form is delivered to and received by the Information Agent before the Voting Instruction Deadline. Failure to do so will result in that Compromise Lender not being entitled to participate in the New Money Notes Offer.

35.     Failure to deliver a valid Proxy Form on behalf of a Compromise Lender by the Voting Instruction Deadline will mean that any election to subscribe for New Money Notes pursuant to the terms of the New Money Notes Offer in that Proxy Form will be disregarded for the purposes of the New Money Notes Offer.

36.     Each Compromise Lender should note that, unless a valid Proxy Form is delivered to the Information Agent containing the requisite elections and confirmations that the Compromise Lender is an Eligible Creditor (or, if it has appointed a Designated Recipient, its Designated Recipient is an Eligible Person) before the Voting Instruction Deadline, the elections contained in that Proxy Form in relation to the New Money Notes Offer will be disregarded and that Compromise Lender will not be entitled to participate in the New Money Notes Offer.

37.     Completed Proxy Forms for the purposes of electing to subscribe for New Money Notes should be delivered to the Information Agent so as to be received by the Information Agent as soon as possible and in any event before the Voting Instruction Deadline.

**Important KYC Note for Compromise Lenders only**:

- As funding for any New Money Notes will require Compromise Lenders to wire funds directly to the US Dollar account of the Escrow Agent, certain "Know Your Customer " requirements are required – namely:

| Evidence required |
|---|
| The Escrow Agent will require evidence of the party's: |
| 1. registered company/firm number; |
| 2. registered full company/firm name (including "limited", "plc", "LLP", "LLC", etc.); |
| 3. names of directors, partners or principals; |
| 4. registered company/firm address; and |
| 5. the names of individuals who control or own 25% or more of its shares or voting rights. |

- Any Compromise Lender, or its Designated Recipient, who elects to participate in the New Money Notes Offer must comply with such "Know Your Customer" requirements and provide satisfactory evidence to the Information Agent by email or facsimile when submitting its Proxy Form. Proxy Forms received from Compromise Lenders without such "Know Your Customer" documents will be rejected and such Compromise Lender will not be entitled to participate under the New Money Notes Offer.

---

**SUMMARY OF ACTION REQUIRED BY THE SENIOR SECURED CREDITORS GENERALLY**

---

**Please take careful note of the following provisions regarding the action to be taken by the Senior Secured Creditors:**

1. The Senior Secured Company Meeting (being the meeting of the Senior Secured Creditors of the Company as contemplated by section 155 of the Companies Act) will be held at 12h00 on 29 December 2016, to consider and if deemed fit, pass the Senior Secured Company Resolution.

2. The Senior Secured ECSL Meeting (being the meeting of the Senior Secured Creditors of ECSL as contemplated by section 155 of the Companies Act) will be held at 13h00 on 29 December 2016, to consider and if deemed fit, pass the Senior Secured Holdco Resolution.

3. The Senior Secured Bidco Meeting (being the meeting of the Senior Secured Creditors of Holdco as contemplated by section 155 of the Companies Act) will be held at 13h15 on 29 December 2016, to consider and if deemed fit, pass the Senior Secured Bidco Resolution.

4. The Senior Secured Holdco Meeting (being the meeting of the Senior Secured Creditors of Holdco as contemplated by section 155 of the Companies Act) will be held at 13h30 on 29 December 2016, to consider and if deemed fit, pass the Senior Secured ECSL Resolution.

5. Notices convening such meetings are attached to, and forms part of, this Proposal Document.

**6. Voting:**

6.1. The Senior Secured 2018 Noteholders and the Senior Secured 2019 Noteholders, as the beneficial owners of and/or the persons with the ultimate economic interest in the Senior Secured 2018 Notes and Senior Secured 2019 Notes respectively, are the persons with the "real" interest in the Senior Secured 2018 Notes and Senior Secured 2019 Notes and accordingly they will be entitled to vote in respect of the Senior Secured Company Meeting and Senior Secured Guarantor Meetings.

6.2. In order to avoid double-counting of votes, the Common Depository and Trustees will not be able to vote in the Compromise Meetings to the extent that the beneficial owners of the Compromise Notes have voted on their Compromise Claims.

6.3. In determining whether a particular Person is the ultimate beneficial owner of –

6.3.1. a Senior Secured 2018 Note and therefore a Senior Secured 2018 Noteholder; and/or

6.3.2. a Senior Secured 2019 Note and therefore a Senior Secured 2019 Noteholder,

entitled to a particular principal amount of Senior Secured 2018 Notes or Senior Secured 2019 Notes respectively as aforesaid –

6.3.3. the amount of the Compromise Claims of each Compromise Creditor which submits a valid Proxy Form or Account Holder Letter, as the case may be, will be calculated as at the Voting

Instruction Deadline based on information known to the Company or confidentially provided to the Company by the Information Agent. This information will be used by the Chairman to determine whether the Senior Secured Company Resolution, Senior Secured Holdco Resolution, Senior Secured Bidco Resolution and Senior Secured ECSL Resolution are approved at the relevant Senior Secured Company Meeting and Senior Secured Guarantor Meeting by using such information to determine the number and value of the aggregate Compromise Claims held by the relevant Compromise Creditors voting in favour of the Senior Secured Company Resolution, Senior Secured Holdco Resolution, Senior Secured Bidco Resolution and Senior Secured ECSL Resolution. Accordingly, Compromise Creditors do not need to take any action in respect of confirming the amount of their Compromise Claims other than providing the details requested in the Proxy Form or Account Holder Letter; and

6.3.4.    the Chairman, the Compromise Companies and their advisors may rely on such other evidence and/or information and/or certification as they shall, in their absolute discretion, deem fit and, if they do so rely, such evidence and/or information and/or certification shall, in the absence of patent error, be conclusive and binding on all concerned.

6.4.    Each Senior Secured Creditor, who attends the relevant Compromise Meeting and votes, or who appoints a proxy (either pursuant to the Proxy Form or the Account Holder Letter), will be entitled to 1 (one) vote. The number of Senior Secured Creditors voting and the votes cast by them will be taken into account for both value and number purposes in relation to the relevant Compromise.

6.5.    If the Senior Secured Term Loan Lenders wish to vote at the relevant Compromise Meeting but will not be present in person or by representation, then the Senior Secured Term Loan Lenders must complete a Proxy Form and submit such Proxy Form to the Information Agent so that it is received by the Information Agent before the Voting Instruction Deadline. Completed Proxy Forms must **not** be sent to the Company, as the Information Agent has been appointed by the Company to liaise with Compromise Lenders. Senior Secured Term Loan Lenders must **not** complete an Account Holder Letter, as Account Holder Letters are for the use of Compromise Noteholders only by virtue of the Compromise Notes being listed securities.

6.6.    If the Compromise Noteholders wish to vote at the relevant Compromise Meeting but will not be present in person or by representation, then the Compromise Noteholders must complete an Account Holder Letter and submit such Account Holder Letter to the Information Agent so that it is received by the Information Agent before the Voting Instruction Deadline. Completed Account Holder Letters must **not** be sent to the Company, as the Company has appointed the Information Agent to liaise with Compromise Noteholders. The relevant Compromise Noteholders must **not** complete a

Proxy Form, as Proxy Forms are for the use of Senior Secured Term Loan Lenders only by virtue of the Senior Secured Term Loans being unlisted debt.

6.7. If Compromise Creditors do not send their Proxy Form or Account Holder Letter to the Information Agent, then this may result in otherwise valid Proxy Forms or Account Holder Letters being lost or unaccounted for.

6.8. Failure to deliver a valid Proxy Form or Account Holder Letter on behalf of a Senior Secured Creditor by the Voting Instruction Deadline will mean that the voting instructions contained in that Proxy Form or Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the Senior Secured Creditor will not be entitled to vote at the relevant Compromise Meeting.

6.9. Notwithstanding any other provision of the Proposal Document, the Chairman will be entitled, at the sole discretion of the Chairman, to permit a Senior Secured Creditor in respect of which a completed Proxy Form or Account Holder Letter has not been delivered prior to the Voting Instruction Deadline to vote at the Senior Secured Company Meeting if the Chairman considers that the relevant Senior Secured Creditor has produced sufficient proof that it is a Senior Secured Creditor as at the Record Date or DTC Record Date, as applicable.

6.10. The value of the Senior Secured 2018 Notes, Senior Secured 2019 Notes and the Senior Secured Term Loan for the purposes of voting at the relevant Compromise Meeting will be determined as follows:

6.10.1. As the Senior Secured 2018 Notes are denominated in USD and EUR currencies, for the purposes of calculating whether the votes cast at the relevant Compromise Meeting would represent at least 75% (seventy five percent) in value of the aggregate principal amount of the Compromise Claims then outstanding and held by Compromise Creditors in the Senior Secured Class who are present in person or represented by proxy at such Compromise Meeting, the relevant Compromise Company's indebtedness in respect of the Senior Secured 2018 USD Notes will be notionally converted into EUR at the foreign exchange rate quoted by Bloomberg for USD to EUR by not later than 11h00 on the Voting Instruction Deadline.

6.10.2. As the Senior Secured Term Loans are denominated in ZAR currency, for the purposes of calculating whether the votes cast at the relevant Compromise Meeting would represent at least 75% (seventy five percent) in value of the aggregate principal amount of the Compromise Claims then outstanding and held by Compromise Creditors in the Senior Secured Class who are present in person or represented by proxy at such Compromise Meeting, the relevant Compromise Company's indebtedness in respect of the Senior Secured Term Loans will be notionally converted at the foreign exchange rate quoted by Bloomberg for ZAR to EUR by not later than 11h00 on the Voting Instruction Deadline.

6.11.   The foreign exchange rates have been fixed by the Compromise Companies in order to create transparency in relation to the treatment of the Senior Secured 2018 Notes and Senior Secured Term Loans under the terms of the Senior Secured Company Compromise and to assist Compromise Creditors in determining whether the relevant Compromise has been validly approved by the Senior Secured Creditors.

6.12.   The assessment of –

6.12.1.   the Senior Secured Creditors' entitlement to Compromise Consideration;

6.12.2.   those Senior Secured Creditors who are Participating Creditors, entitlement to New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be,

will be determined pursuant to the allocation mechanism set out in the Restructuring Agreement.

6.13.   The assessment of the Compromise Claims for voting purposes shall be carried out by the Chairman. The Chairman may, for voting purposes only, reject a determination of any Compromise Claim held by a Compromise Creditor in whole or in part if he considers that it does not constitute a fair and reasonable assessment of the relevant sums owed to the relevant Compromise Creditor by the relevant Compromise Company or if the relevant Compromise Creditor has not complied with the voting procedures described in the Proposal Document.

6.14.   If any Compromise Claim is unascertained, contingent or disputed (in part) but the Chairman is able to place a minimum value, he/she may admit the Compromise Claim for voting purposes at that value. If the Compromise Claim held by a Compromise Creditor is disputed in its entirety, or the Chairman is otherwise unable to place a minimum value on it, that Compromise Claim may be valued at EUR1 for voting purposes.

6.15.   The Chairman will report to the Court, at the hearing to sanction the relevant Compromise, his decision to reject any Compromise Claim (if any), with details of the Compromise Claim and the reasons for rejection.

6.16.   The admission and valuation of any Compromise Claims for voting purposes does not (in itself) constitute an admission of the existence or value of the Compromise Claim and will not bind the Compromise Companies or the Compromise Creditors concerned.

**7.   Attendance and representation at the Compromise Meetings in respect of the Senior Secured Class**

Each Senior Secured Creditor may –

7.1.   attend, participate in and vote at the Senior Secured Company Meeting, Senior Secured Holdco Meeting, Senior Secured Bidco Meeting and Senior Secured ECSL Meeting; and/or

7.2.   appoint a proxy (including the Chairman) to represent it at the aforesaid meetings and in this regard –

7.2.1.   Compromise Lenders who are Senior Secured Creditors are directed to the section of this Explanatory Statement under the heading "*Summary of Action to be taken by Compromise Lenders*"; and

7.2.2.   Compromise Noteholders who are Senior Secured Creditors are directed to the section of this Explanatory Statement under the heading "*Summary of Action to be taken by Compromise Noteholders*".

**8.     Compromise Effective Date**

The Senior Secured Company Compromise, Senior Secured Holdco Compromise, Senior Secured Bidco Compromise and Senior Secured ECSL Compromise will become binding on the Senior Secured Creditors from the Compromise Effective Date, from which time all Senior Secured Creditors, irrespective of whether they voted in favour of the relevant Compromise, will be bound by the terms of the Senior Secured Company Compromise, Senior Secured Holdco Compromise, Senior Secured Bidco Compromise and Senior Secured ECSL Compromise.

**SUMMARY OF ACTION REQUIRED BY THE SUPER SENIOR THIRD RANKING CREDITORS GENERALLY**

**Please take careful note of the following provisions regarding the action to be taken by the Super Senior Third Ranking Creditors:**

1.   The Super Senior Company Meeting (being the meeting of the Super Senior Third Ranking Creditors of the Company as contemplated by section 155 of the Companies Act) will be held at 14h00 on 29 December 2016, or as soon as the Senior Secured Holdco Meeting convened for the same date and place shall have been concluded or adjourned, to consider and if deemed fit, with or without modification, pass the Super Senior Company Resolution.

2.   The Super Senior ECSL Meeting (being the meeting of the Super Senior Third Ranking Creditors of ECSL as contemplated by section 155 of the Companies Act) will be held at 15h00 on 29 December 2016, to consider and if deemed fit, pass the Super Senior ECSL Resolution.

3.   The Super Senior Bidco Meeting (being the meeting of the Super Senior Third Ranking Creditors of Bidco as contemplated by section 155 of the Companies Act) will be held at 15h15 on 29 December 2016, to consider and if deemed fit, pass the Super Senior Bidco Resolution.

4.   The Super Senior Holdco Meeting (being the meeting of the Super Senior Third Ranking Creditors of Holdco as contemplated by section 155 of the Companies Act) will be held at 15h30 on 29 December 2016, to consider and if deemed fit, pass the Super Senior Holdco Resolution.

5.   Notice convening such meetings are attached to, and forms part of, the Proposal Document.

6.   **Voting**:

6.1.   The Super Senior 2019 Noteholders, as the beneficial owners of and/or the persons with the ultimate economic interest in the Super Senior 2019 Notes, are the persons with the "real" interest in the Super Senior 2019 Notes and accordingly they will be entitled to vote in respect of the Super Senior Company Compromise and the Super Senior Guarantor Meetings.

6.2.   In order to avoid double-counting of votes, the Common Depository and Trustees will not be able to vote in the Compromise Meetings to the extent that the beneficial owners of the Compromise Notes have voted on their Compromise Claims.

6.3.   In determining whether a particular Person is the ultimate beneficial owner of a Super Senior 2019 Note and therefore a Super Senior 2019 Noteholder entitled to a particular principal amount of Super Senior 2019 Notes as aforesaid –

6.3.1.   the amount of the Compromise Claims of each Compromise Creditor which submits a valid Proxy Form or Account Holder Letter, as the case may be, will be calculated as at the Voting Instruction Deadline based on information known to the Company or confidentially provided to the Company by the Information Agent. This information will be used by the Chairman to determine whether the Super Senior Company Resolution, Super

Senior Holdco Resolution, Super Senior Bidco Resolution and Super Senior ECSL Resolution are approved at the relevant Super Senior Company Meeting and relevant Super Senior Guarantor Meeting by using such information to determine the number and value of the aggregate Compromise Claims held by the relevant Creditors voting in favour of the Super Senior Company Resolution, Super Senior Holdco Resolution, Super Senior Bidco Resolution and Super Senior ECSL Resolution. Accordingly, Compromise Creditors do not need to take any action in respect of confirming the amount of their Compromise Claims other than providing the details requested in the Proxy Form or Account Holder Letter; and

6.3.2. the Chairman, the Compromise Companies and their advisors may rely on such evidence and/or information and/or certification as they shall, in their absolute discretion, deem fit and, if they do so rely, such evidence and/or information and/or certification shall, in the absence of patent error, be conclusive and binding on all concerned.

6.4. Each Super Senior Third Ranking Creditor, who attends the relevant Compromise Meeting and votes, or who appoints a proxy, will be entitled to 1 (one) vote. The number of Super Senior Third Ranking Creditors voting and the votes cast by them will be taken into account for both value and number purposes in relation to the relevant Compromise.

6.5. If the Super Senior Term Loan Lenders wish to vote at the relevant Compromise Meeting but will not be present in person or by representation, then the Super Senior Term Loan Lenders must complete a Proxy Form and submit such Proxy Form to the Information Agent so that it is received by the Information Agent before the Voting Instruction Deadline. Completed Proxy Forms must **not** be sent to the Company, as the Information Agent has been appointed by the Company to liaise with Compromise Lenders. Super Senior Term Loan Lenders must **not** complete an Account Holder Letter, as Account Holder Letters are for the use of Compromise Noteholders only by virtue of the Compromise Notes being listed securities.

6.6. If the relevant Compromise Noteholders wish to vote at the relevant Compromise Meeting but will not be present in person or by representation, then the relevant Compromise Noteholders must complete an Account Holder Letter and submit such Account Holder Letter to the Information Agent so that it is received by the Information Agent before the Voting Instruction Deadline. Completed Account Holder Letters must **not** be sent to the Company, as the Company has appointed the Information Agent to liaise with Compromise Noteholders. The relevant Compromise Noteholders must **not** complete a Proxy Form, as Proxy Forms are for the use of Super Senior Term Loan Lenders only by virtue of the Super Senior Term Loans being unlisted debt.

6.7. If Compromise Creditors do not send their Proxy Form or Account Holder Letter to the Information Agent, then this may result in otherwise valid Proxy Forms or Account Holder Letters being lost or unaccounted for.

6.8. Failure to deliver a valid Proxy Form or Account Holder Letter on behalf of a Super Senior Third Ranking Creditor by the Voting Instruction Deadline will mean that the voting instructions contained in that Proxy Form or Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the Super Senior Third Ranking Creditor will not be entitled to vote at the relevant Compromise Meeting.

6.9. Notwithstanding any other provision of the Proposal Document, the Chairman will be entitled, at the sole discretion of the Chairman, to permit a Super Senior Third Ranking Creditor in respect of which a completed Proxy Form or Account Holder Letter has not been delivered prior to the Voting Instruction Deadline to vote at the relevant Compromise Meeting if the Chairman considers that the relevant Super Senior Third Ranking Creditor has produced sufficient proof that it is a Super Senior Third Ranking Creditor as at the Record Date or DTC Record Date, as applicable.

6.10. As the debts which comprise the Super Senior 2019 Notes and the Super Senior Term Loan are both denominated in EUR currency, no notional conversion is required to be made.

6.11. The determination of whether the relevant Compromise has been validly approved by the Super Senior Third Ranking Creditors will be calculated by reference to their Compromise Claims as at the Voting Instruction Deadline.

6.12. The assessment of –

6.12.1. the Super Senior Third Ranking Creditors entitlement to Compromise Consideration;

6.12.2. those Super Senior Third Ranking Creditors who are Participating Creditors, entitlement to New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be,

will be determined pursuant to the allocation mechanism set out in the Restructuring Agreement.

6.13. The assessment of the Compromise Claims for voting purposes shall be carried out by the Chairman. The Chairman may, for voting purposes only, reject a determination of any Compromise Claim held by a Compromise Creditor in whole or in part if he considers that it does not constitute a fair and reasonable assessment of the relevant sums owed to the relevant Compromise Creditor by the relevant Compromise Company or if the relevant Compromise Creditor has not complied with the voting procedures described in the Proposal Document.

6.14. If any Compromise Claim is unascertained, contingent or disputed (in part) but the Chairman is able to place a minimum value, he/she may admit the Compromise Claim for voting purposes at that value. If the Compromise Claim held by a Compromise Creditor is disputed in its entirety, or the Chairman is otherwise unable to place a minimum value on it, that Compromise Claim may be valued at EUR1 for voting purposes.

6.15. The Chairman will report to the Court, at the hearing to sanction the relevant Compromise, his decision to reject any Compromise Claims (if any), with details of the Compromise Claim and the reasons for rejection.

6.16. The admission and valuation of any Compromise Claim for voting purposes does not (in itself) constitute an admission of the existence or value of the

Compromise Claim and will not bind the Compromise Companies or the Compromise Creditors concerned.

**7.     Attendance and representation at the Compromise Meetings in respect of the Super Senior Class**

Each Super Senior Third Ranking Creditor may –

7.1.    attend, participate in and vote at the Super Senior Company Meeting, Super Senior Holdco Meeting, Super Senior Bidco Meeting and Super Senior ECSL Meeting; and/or

7.2.    appoint a proxy (including the Chairman) to represent it at the aforesaid meetings and in this regard –

7.2.1.    Compromise Lenders who are Super Senior Third Ranking Creditors are directed to the section of this Explanatory Statement under the heading "*Summary of Action to be taken by Compromise Lenders*"; and

7.2.2.    Compromise Noteholders who are Super Senior Third Ranking Creditors are directed to the section of this Explanatory Statement under the heading "*Summary of Action to be taken by Compromise Noteholders*".

**8.     Compromise Effective**

The Super Senior Company Compromise, Super Senior Holdco Compromise, Super Senior Bidco Compromise and Super Senior ECSL Compromise will become binding on the Super Senior Third Ranking Creditors from the Compromise Effective Date, from which time all Super Senior Third Ranking Creditors, irrespective of whether they voted in favour of the relevant Compromise, will be bound by the terms of the Super Senior Company Compromise, Super Senior Holdco Compromise, Super Senior Bidco Compromise and Super Senior ECSL Compromise.

**SUMMARY OF ACTION REQUIRED BY THE COMPROMISE CREDITORS IN RELATION TO THE GUARANTOR COMPROMISES**

**Please take careful note of the following provisions regarding the action to be taken by the Compromise Creditors in relation to the Guarantor Compromises:**

1.     Each of Holdco, Bidco and ECSL is a Compromise Company (in addition to the Company). Each of them are providing the Proposal Document to the Senior Secured Creditors and Super Senior Third Ranking Creditors in relation to the relevant Guarantor Compromises.

2.     The Guarantor Meetings will be held as follows:

2.1.    The Senior Secured ECSL Meeting (being the meeting of the Senior Secured Creditors of ECSL as contemplated by section 155 of the Companies Act) will be held at 13h00 on 29 December 2016 (or as soon as the Senior Secured Company Meeting convened for the same date and place shall have been concluded or adjourned), to consider and if deemed fit, pass the Senior Secured ECSL Resolution.

2.2.    The Senior Secured Bidco Meeting (being the meeting of the Senior Secured Creditors of Bidco as contemplated by section 155 of the Companies Act) will be held at 13h15 on 29 December 2016 (or as soon as the Senior Secured ECSL Meeting convened for the same date and place shall have been concluded or adjourned), to consider and if deemed fit, pass the Senior Secured Bidco Resolution.

2.3.    The Senior Secured Holdco Meeting (being the meeting of the Senior Secured Creditors of Holdco as contemplated by section 155 of the Companies Act) will be held at 13h30 on 29 December 2016 (or as soon as the Senior Secured Bidco Meeting convened for the same date and place shall have been concluded or adjourned), to consider and if deemed fit, pass the Senior Secured Holdco Resolution.

2.4.    The Super Senior ECSL Meeting (being the meeting of the Super Senior Third Ranking Creditors of ECSL as contemplated by section 155 of the Companies Act) will be held at 15h00 on 29 December 2016 (or as soon as the Super Senior Company Meeting convened for the same date and place shall have been concluded or adjourned), to consider and if deemed fit, pass the Super Senior ECSL Resolution.

2.5.    The Super Senior Bidco Meeting (being the meeting of the Super Senior Third Ranking Creditors of Bidco as contemplated by section 155 of the Companies Act) will be held at 15h15 on 29 December 2016 (or as soon as the Super Senior ECSL Meeting convened for the same date and place shall have been concluded or adjourned), to consider and if deemed fit, pass the Super Senior Bidco Resolution.

2.6.    The Super Senior Holdco Meeting (being the meeting of the Super Senior Third Ranking Creditors of Holdco as contemplated by section 155 of the Companies Act) will be held at 15h30 on 29 December 2016 (or as soon as the Super Senior Bidco Meeting convened for the same date and place shall have been concluded or adjourned), to consider and if deemed fit, pass the Super Senior Holdco Resolution.

3.    Notices convening each Guarantor Meeting are attached to, and forms part of, the Proposal Document.

**4.**    **Voting:**

4.1.    Each Senior Secured Creditor shall have the same vote (in terms of number and value) in each Senior Secured Guarantor Meeting as it has under the Senior Secured Company Meeting.

4.2.    Each Super Senior Third Ranking Creditor shall have the same vote (in terms of number and value) in each Super Senior Guarantor Meeting as it has under the Super Senior Company Meeting.

**5.**    **Attendance and representation at the Guarantor Meetings**

Each Compromise Creditor may –

5.1.    attend, participate in and vote at each of the Guarantor Meetings; and/or

5.2.    appoint a proxy (including the Chairman) to represent it at each of the Guarantor Meetings and in this regard –

5.2.1.    Compromise Lenders who are Senior Secured Creditors are directed to sign and complete a Proxy Form; and

5.2.2.    Compromise Noteholders who are Senior Secured Creditors are directed to the section of this Explanatory Statement under the heading "*Summary of Action to be taken by Compromise Noteholders*".

**6.**    **Compromise Effective Date**

The Guarantor Compromises will become binding on the Compromise Creditors from the Compromise Effective Date, from which time all Compromise Creditors, irrespective of whether they voted in favour of the Guarantor Compromises or not, will be bound by the terms of the Guarantor Compromises.

PART B

**EXPLANATION OF A COMPROMISE IN TERMS OF SECTION 155 OF THE SOUTH AFRICAN COMPANIES ACT AND ACTION REQUIRED BY THE COMPROMISE CREDITORS**

*This section contains a brief overview of the Compromises. The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by references to, the more detailed information presented elsewhere in the Proposal Document and to the Compromises.*

1.    **What is a compromise process in terms of section 155 of the Companies Act?**

1.1.    In terms of section 155 of the Companies Act, a board of directors of a company may propose an arrangement or a compromise of its financial obligations to all of its creditors, or to all of the members of any class of its creditors, by delivering a copy of the proposal and notice of the meeting to consider the proposal to every creditor or every member of the relevant class of creditor, and to the Commission.

1.2.    A proposal contemplated in section 155 of the Companies Act will have been adopted by the creditors, or the members of a relevant class of creditors, if it is supported by a majority in number, representing at least 75% (seventy five percent) in value of the creditors or class, as the case may be, present and voting in person or by proxy, at a meeting called for that purpose.

1.3.    There is no minimum quorum requirement applicable to meetings to approve a compromise in terms of section 155 of the Companies Act.

1.4.    There is also no prescribed notice period applicable to the calling of a meeting of creditors, or a class of creditors, in terms of section 155 of the Companies Act.

1.5.    Accordingly, the Company strongly recommends that Compromise Creditors attend the relevant Compromise Meeting, whether in person or by way of proxy.

1.6.    If a proposal has been adopted as contemplated in section 155 of the Companies Act, the company may apply to Court for an order sanctioning the compromise (which the Compromise Companies shall do as soon as possible).

1.7.    A compromise sanctioned by the Court becomes final and binding on all the company's creditors or all of the members of the class of creditors, as the case may be, as of the date that the Court order is filed with the Commission (which the company is obliged to do within five business days of such Court order being granted).

1.8.    The date that a compromise takes effect, however, is determined in accordance with the terms of the compromise proposal itself.

2.    **Identity of Compromise Creditors**

2.1.    The Senior Secured Company Compromise, Senior Secured Holdco Compromise, Senior Secured Bidco Compromise and Senior Secured ECSL Compromise are being proposed by the Compromise Companies amongst the Senior Secured Creditors.

2.2.    The Super Senior Company Compromise, Super Senior Holdco Compromise, Super Senior Bidco Compromise and Super Senior ECSL Compromise are

being proposed by the Compromise Companies amongst the Super Senior Third Ranking Creditors.

3.      **Nature of the relevant Compromise**

3.1.    By way of summary only, each of the Senior Secured Company Compromise and the Super Senior Company Compromise operates so as to –

3.1.1.  bind the Senior Secured Creditors and the Super Senior Third Ranking Creditors to the Financial Restructuring, more fully set out in the Implementation Documents; and

3.1.2.  authorise the Compromise Agent and GLAS (as the putative New Holdco 2 PIK A Notes Trustee and New Holdco 2 PIK B Notes Trustee) to execute such documents (to the extent relevant, and on the terms and subject to the mechanism as set out in the Proposal Document) on behalf of the Senior Secured Creditors and the Super Senior Third Ranking Creditors.

3.2.    By way of summary only, the Guarantor Compromises operate so as to:

3.2.1.  release the Guarantors from their obligations under the Guarantees; and

3.2.2.  authorise the Compromise Agent to execute such documents (to the extent relevant, and on the terms and subject to the mechanism as set out in the Proposal Document) on behalf of the Senior Secured Creditors and the Super Senior Third Ranking Creditors.

3.3.    This Explanatory Statement has been drafted widely on the basis that it seeks to summarise and highlight, for the Compromise Creditors benefit, the effect and consequences of the implementation of the Restructuring Agreement and the Implementation Documents insofar as they impact on the Compromise Creditors, as opposed to the narrow effect and consequences of the Compromise itself.

4.      **Compromise Meetings process and voting**

4.1.    The Compromise Companies consider that –

4.1.1.  as described in more detail in Part A (*Company Information, Background to and Reasons for the Financial Restructuring*) there are only two realistic outcomes for the Company following the launch of the Compromises, which are either its Financial Restructuring following successful implementation of Implementation Steps set out in the Restructuring Agreement or a failure of the Financial Restructuring, resulting in the Company being subject to business rescue proceedings or liquidation. The Company believes that its Financial Restructuring through the Restructuring Agreement would be substantially more beneficial to the Compromise Creditors; and

4.1.2.  if the Company goes into business rescue or insolvency proceedings, the Compromise Creditors would receive the compensation more fully set out in the Proposal Document.

Senior Secured Creditors:

4.2.    In relation to the Senior Secured Creditors, the Compromise Companies consider that the rights of all Senior Secured Creditors (including, without

limitation, the right to participate in the New Money Notes Offer) are sufficiently similar so as to make it possible for them to consult together with a view to a common interest because –

4.2.1.      as secured creditors of the Compromise Companies, subordinated to the Super Senior First, Second and Third Ranking Creditors, but ranking in priority to concurrent creditors, and ranking *pari passu* as between themselves in the capital structure, they have materially the same rights against the Compromise Companies and, as described above, are likely to receive the same recovery if the Company enters into an insolvency proceeding; and

4.2.2.      if the Senior Secured Company Compromise and Senior Secured Guarantor Meetings become effective in accordance with each of their terms, those rights will be compromised in materially the same way,

irrespective of the fact that (i) some Senior Secured Creditors constitute Senior Secured Term Loan Lenders and some constitute Senior Secured Noteholders; and (ii) some Senior Secured Noteholders may hold different series of the Compromise Notes and Compromise Notes in different denominations.

4.3.     Accordingly, the Company has concluded that it is appropriate for the Senior Secured Creditors to vote together as one class at the Senior Secured Company Meeting and each of the Senior Secured Guarantor Meetings.

4.4.     A notice of the Senior Secured Company Meeting is included in the Proposal Document. Notices of the Senior Secured Guarantor Meetings by the Guarantors are included in the Proposal Document. For the avoidance of doubt and as the Compromises are subject to an order of the Court, the procedure for the relevant Compromise Meetings are set out in the Proposal Document and not, in relation to the Senior Secured 2018 Notes and Super Senior 2019 Notes, the procedures for convening noteholder meetings as set out in the Senior Secured 2018 Indenture or Senior Secured 2019 Indenture.

4.5.     If a Compromise Lender has not submitted a valid Proxy Form for the purposes of voting to the Information Agent before the Voting Instruction Deadline, that Compromise Lender will not be entitled to vote at any Compromise Meeting.

4.6.     If a Compromise Noteholder has not submitted a valid Account Holder Letter for the purposes of voting to the Information Agent before the Voting Instruction Deadline, that Compromise Noteholder will not be entitled to vote at any Compromise Meeting.

Super Senior Third Ranking Creditors:

4.7.     In relation to the Super Senior Third Ranking Creditors, the Compromise Companies consider that the rights of all Super Senior Third Ranking Creditors (including, without limitation, the right to participate in the New Money Notes Offer) are sufficiently similar so as to make it possible for them to consult together with a view to a common interest because –

4.7.1.      as third ranking super senior secured creditors of the Company, subordinated to first and second ranking super senior creditors but ranking in priority to the Senior Secured Creditors, and

ranking *pari passu* as between themselves in the capital structure, they have materially the same rights against the Compromise Companies and, as described above, are likely to receive the same recovery if the Company enters into an insolvency proceeding and, while not a decisive factor (due to the notional conversion mechanism applied to the Compromise Claims of the Senior Secured Creditors in this instance), their Compromise Claims are denominated in the same currency; and

4.7.2.    if the Guarantor Compromises become effective in accordance with each of their terms, those rights will be compromised in materially the same way,

irrespective of the fact that some Super Senior Third Ranking Creditors constitute Super Senior Term Loan Lenders and some constitute Super Senior 2019 Noteholders.

4.8.    Accordingly, the Compromise Companies have concluded that it is appropriate for the Super Senior Third Ranking Creditors to vote together as one class at the Super Senior Company Meeting.

4.9.    A notice of the Super Senior Company Meeting is included in the Proposal Document. A notice of the Super Senior Guarantor Meetings by the Guarantor Companies are included in the Proposal Document. For the avoidance of doubt and as the Compromises are subject to an order of the Court, the procedure for the relevant Compromise Meetings are set out in the Proposal Document and not, in relation to the Super Senior 2019 Notes, the procedures for convening noteholder meetings as set out in the Super Senior 2019 Indenture.

4.10.    If a Compromise Lender has not submitted a valid Proxy Form for the purposes of voting to the Information Agent before the Voting Instruction Deadline, that Compromise Lender will not be entitled to vote at the Super Senior Company Meeting.

4.11.    If a Compromise Noteholder has not submitted a valid Account Holder Letter for the purposes of voting to the Information Agent before the Voting Instruction Deadline, that Compromise Noteholder will not be entitled to vote at the Super Senior Company Meeting.

5.    **When will the relevant Compromise be effective?**

5.1.    In terms of section 155 of the Companies Act, a compromise becomes effective in accordance with its terms and is binding on the company and creditors subject to it when the order of the Court sanctioning the compromise is delivered to the Commission. The Company expects that the relevant sanction hearing for the Compromises will take place on or about 10 January 2017. Following the Compromise Effective Date, the relevant Compromises will become unconditional and the relevant Compromises will be implemented in accordance with their terms.

5.2.    Once the Compromise Effective Date has occurred, the Company will (i) Announce the same through the Clearing Systems and on the Information Agent's website at www.lucid-is.com/edcon and (ii) give notice thereof to the Senior Secured Term Loan Lenders and the Super Senior Term Loan Lenders

by delivering notice thereof to their Representative (as defined in the Intercreditor Agreement).

5.3.    At the relevant sanction hearing of the Compromises, the Compromise Agent may consent on behalf of all relevant Compromise Creditors to vary or amend any term or condition of the relevant Compromise which the Court may think fit to approve or impose and which variations or amendments are not material to the relevant Compromise Creditors and would not change any right or obligation of any Compromise Creditor or impose an additional obligation on the Compromise Creditor if the Compromises are approved other than in the manner contemplated in the Proposal Document as at the date hereof.

5.4.    As soon as reasonably practicable after determining that the Compromise Effective Date has occurred, -

5.4.1.    the Company shall give the Compromise Creditors notice by the (i) issue of an Announcement through the Clearing Systems and on the Information Agent's website at www.lucid-is.com/edcon; and giving of notice thereof to the Senior Secured Term Loan Lenders and the Super Senior Term Loan Lenders by delivering notice thereof to their Representative (as defined in the Intercreditor Agreement); and

5.4.2.    the relevant Compromise will become binding on all of the relevant Compromise Creditors, (whether or not such Compromise Creditors voted in favour of such Compromise), including any purchasers of Compromise Notes after the Record Date or DTC Record Date (as applicable).

5.5.    The Restructuring Agreement terminates automatically on the earlier to occur of the (i) End Date or (ii) Long-Stop Date, in the event that the Restructuring Effective Time has not occurred on or before such date).

5.6.    The Restructuring Agreement can be terminated by the Majority Locked-Up Creditors and the Company (acting reasonably) –

5.6.1.    if any Implementation Step does not occur at the time or on the date specified in the Restructuring Agreement, provided that there will be no right to terminate if, within 5 Business Days of such Implementation Step failing to occur (i) such Implementation Step has been amended or waived in accordance with the Restructuring Agreement such that the failure is remedied; or (ii) the Company has sent a notice in accordance with the Restructuring Agreement determining that the subsequent Implementation Steps will occur;

5.6.2.    if any Insolvency Event occurs (other than in relation to any application commencing insolvency proceedings or business rescue proceedings or any analogous proceedings filed by a creditor in respect of a member of the Existing Group); and

5.6.3.    upon the occurrence of a Material Adverse Change.

5.7.    In the event of termination of the Restructuring Agreement, the Restructuring Agreement ceases to have any further force or effect save for the limited provisions set out in clause 19.1 of the Restructuring Agreement.

6.     **Compromise Consideration**

6.1.   The Restructuring Agreement provides that, on the Completion Date and subject to the terms of the relevant Compromise, the Company shall issue the relevant Compromise Consideration to those Compromise Creditors who held the relevant Compromise Claims which is subject to such Compromise as at the Record Date or DTC Record Date (as applicable). Compromise Consideration will not be issued to any Compromise Creditor who acquired any Compromise Claims after the Record Date or DTC Record Date (as applicable).

6.2.   The Company shall utilise the foreign exchange rates determined in accordance with the Restructuring Agreement, by reference to the Calculation Date. The allocations and entitlements of the Compromise Creditors to receive their share of the relevant Compromise Consideration shall be determined by reference to the Initial Allocation and Entitlement Table, to be prepared in accordance with the Restructuring Agreement by reference to the Calculation Date.

6.3.   The Compromise Consideration to which –

6.3.1.   Senior Secured Creditors are entitled, subject to the terms of the Senior Secured Company Compromise, are the New Holdco 2 Ordinary A Shares and the New Holdco 2 PIK B Notes; and

6.3.2.   Super Senior Third Ranking Creditors are entitled, subject to the terms of the Super Senior Company Compromise, are the New Holdco 2 PIK A Notes.

6.4.   The Guarantor Compromises are part and parcel of the overall Financial Restructuring.  So while no Compromise Consideration will be issued in relation to any Guarantor Compromises, the Senior Secured Creditors and the Super Senior Third Ranking Creditors will receive the benefits that the Financial Restructuring seeks to achieve.

7.     **New Money Notes Offer**

It is recorded that the New Money Notes to be issued pursuant to the New Money Notes Offer does not form part of the Compromise Consideration of any Compromise. The New Money Notes Offer is included within this document for the sake of convenience only, as such offer is being made to the Compromise Creditors.

8.     **Calculation of entitlements to Compromise Consideration**

8.1.   The terms determining the calculation and allocation of the Compromise Consideration are set out in the Restructuring Agreement.

8.2.   By not later than 12h00 (Johannesburg Time) on the Calculation Date, the Company shall issue a written notice (the "**Fx Notice**") to the Information Agent and each Representative confirming the foreign exchange rates quoted by Bloomberg on the Calculation Date to be used to calculate the following currency conversions:

8.2.1.   ZAR to USD;

8.2.2.   EUR to USD;

8.2.3.   USD to ZAR; and

8.2.4.   EUR to ZAR.

8.3. The Information Agent shall collectively provide the Company, the Financial Advisers, New Holdco 1 and New Holdco 2 with a written notice (the "**Senior Secured Term Loan Debt Notice**") on the Calculation Date confirming:

8.3.1. the names of the Senior Secured Term Loan Lenders who submitted a valid Proxy Form as confirmed by the Information Agent;

8.3.2. the names of each such Senior Secured Term Loan Lender that:

8.3.2.1. elected to subscribe for New Holdco 2 PIK B ZAR Notes; and

8.3.2.2. elected to subscribe for New Holdco 2 PIK B USD Notes or did not make any election in respect of the currency of the New Holdco 2 PIK B Notes;

8.3.3. the names of each Senior Secured Term Loan Lender as at the Record Date as confirmed by the Senior Secured Term Loan Agent;

8.3.4. each Senior Secured Term Loan Lender's aggregate Senior Secured Term Loans outstanding as at the Record Date as confirmed by the Senior Secured Term Loan Agent; and

8.3.5. each Senior Secured Term Loan Lender's Interest in respect of its Senior Secured Term Loans that will be outstanding as at the Completion Date as confirmed by the Senior Secured Term Loan Agent.

8.4. The Information Agent shall provide the Company, the Financial Advisers, New Holdco 1, New Holdco 2 and the Senior Secured Notes Trustee with a written notice (the "**Senior Secured Notes Debt Notice**") on the Calculation Date confirming:

8.4.1. the names of the Senior Secured 2018 Noteholders who submitted a valid Account Holder Letter as confirmed by the Information Agent;

8.4.2. the names of the Senior Secured 2019 Noteholders who submitted a valid Account Holder Letter as confirmed by the Information Agent;

8.4.3. the names of each Senior Secured 2018 Noteholder and Senior Secured 2019 Noteholder that:

8.4.3.1. elected to subscribe for New Holdco 2 PIK B ZAR Notes; and

8.4.3.2. elected to subscribe for New Holdco 2 PIK B USD Notes or did not make any election in respect of the currency of the New Holdco 2 PIK B Notes;

8.4.4. each such Senior Secured 2018 Noteholder's aggregate Senior Secured 2018 Notes outstanding as at the Record Date or DTC Record Date (as applicable), to the extent confirmed with The Bank of New York Mellon as the paying agent under the Senior Secured Notes;

8.4.5. each such Senior Secured 2019 Noteholder's aggregate Senior Secured 2019 Notes outstanding as at the Record Date, to the

extent confirmed with The Bank of New York Mellon as the paying agent under the Senior Secured Notes;

8.4.6.      each such Senior Secured 2018 Noteholder's Interest in respect of its Senior Secured 2018 Notes that will be outstanding as at the Completion Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Senior Secured Notes;

8.4.7.      each such Senior Secured 2019 Noteholder's Interest in respect of its Senior Secured 2019 Notes that will be outstanding as at the Completion Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Senior Secured Notes;

8.4.8.      the aggregate value of the Senior Secured 2018 Notes and the Senior Secured 2019 Notes outstanding as at the Record Date or DTC Record Date (as applicable), to the extent confirmed with The Bank of New York Mellon as the paying agent under the Senior Secured Notes; and

8.4.9.      the aggregate value of the Senior Secured 2018 Notes and the Senior Secured 2019 Notes outstanding as at the Record Date or DTC Record Date (as applicable), which are held by Ineligible Creditors (who have not appointed a Designated Recipient) and the Non-Respondent Creditors.

8.5.    The Super Senior Term Loan Agent and the Information Agent shall provide the Company, the Financial Advisors, New Holdco 1 and New Holdco 2 with a written notice (the "**Super Senior Term Loan Debt Notice**") on the Calculation Date confirming:

8.5.1.      the names of the Super Senior Term Loan Lenders who submitted a valid Proxy Form as confirmed by the Information Agent;

8.5.2.      the names of each Super Senior Term Loan Lender as at the Record Date as confirmed by the Super Senior Term Loan Agent;

8.5.3.      each Super Senior Term Loan Lender's aggregate Super Senior Term Loans outstanding as at the Record Date as confirmed by the Super Senior Term Loan Agent; and

8.5.4.      each Super Senior Term Loan Lender's Interest in respect of its Super Senior Term Loans that will be outstanding as at the Completion Date as confirmed by the Super Senior Term Loan Agent.

8.6.    The Information Agent shall provide the Company, the Financial Advisers, New Holdco 1, New Holdco 2 and the Super Senior Notes Trustee with a written notice (the "**Super Senior Notes Debt Notice**") confirming:

8.6.1.      the names of the Super Senior 2019 Noteholders who submitted a valid Account Holder Letter as confirmed by the Information Agent;

8.6.2.      each such Super Senior 2019 Noteholder's aggregate Super Senior Notes outstanding as at the Record Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Super Senior Notes;

8.6.3.      each such Super Senior 2019 Noteholder's Interest in respect of its Super Senior Notes that will be outstanding as at the

Completion Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Super Senior Notes;

8.6.4.    the aggregate value of all Super Senior Notes outstanding as at the Record Date, to the extent confirmed with The Bank of New York Mellon as the paying agent under the Super Senior Notes; and

8.6.5.    the aggregate value of the Super Senior Notes outstanding as at the Record, which are held by Ineligible Creditors (who have not appointed a Designated Recipient) and the Non-Respondent Creditors.

8.7.    Upon receipt of the Fx Notice, and *inter alia* the Senior Secured Term Loan Debt Notice, the Senior Secured Notes Debt Notice, the Super Senior Term Loan Debt Notice and the Super Senior Notes Debt Notice, Houlihan Lokey shall complete an allocation and entitlement table ("**Allocation and Entitlement Table**"), which will include the above information in paragraphs 8.3, 8.4, 8.5 and 8.6 as well as the information contained in similar notices received from the RCF Creditors, Super Senior Secured Liquidity Facility Creditors and the Super Senior Second Ranking Creditors.

8.8.    The calculation of entitlements to the Compromise Consideration as per the Allocation and Entitlement table will be:

8.8.1.    The amount in either USD or ZAR of each Senior Secured Term Loan Lender's New Holdco 2 PIK B Notes Commitments, such amount being calculated in accordance with the formulae set out in Part 1 (Senior Secured Term Loan Lenders) of Part E (New Holdco 2 PIK B Notes Allocations) of Schedule 3 (Allocation and Entitlement) to the Restructuring Agreement, provided that if the Senior Secured Term Loan Lender fails to elect to subscribe for its New Holdco 2 PIK B Notes in ZAR or USD in their Proxy Form, the Senior Secured Term Loan Lender shall be deemed to have elected to subscribe for its New Holdco 2 PIK B USD Notes.

8.8.1.1.    The formula to calculate New Holdco 2 PIK B USD Notes is as follows:

$$\$2BN = \left(\frac{STLP + STLI}{2}\right) x \, ZUSD$$

*$2BN* = the aggregate USD New Holdco 2 PIK B Notes that the Senior Secured Term Loan Lender is entitled to receive at the Completion Date.

*STLI* = in respect of a Senior Secured Term Loan Lender, the aggregate amount of accrued and unpaid interest on the Senior Secured Term Loan Debt in ZAR owed to that Senior Secured Term Loan Lender up to and including the Completion Date as set out in the Senior Secured Term Loan Debt Notice.

*STLP* = in respect of a Senior Secured Term Loan Lender, the principal amount of Senior Secured Term Loan Lender Debt in ZAR owed to that Senior Secured Term Loan Lender calculated as at the Record Date and

as set out in the Senior Secured Term Loan Debt Notice.

*ZUSD* has the meaning given to that term in Part 1 (*Participating Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations*) of the Restructuring Agreement.

8.8.1.2.    The formula to calculate New Holdco 2 PIK B ZAR Notes is as follows:

$$Z2BN = \left(\frac{STLP + STLI}{2}\right)$$

*STLI* = in respect of a Senior Secured Term Loan Lender, the aggregate amount of accrued and unpaid interest on the Senior Secured Term Loan Debt in ZAR owed to that Senior Secured Term Loan Lender up to and including the Completion Date as set out in the Senior Secured Term Loan Debt Notice.

*STLP* = in respect of a Senior Secured Term Loan Lender, the principal amount of Senior Secured Term Loan Lender Debt in ZAR owed to that Senior Secured Term Loan Lender calculated as at the Record Date and as set out in the Senior Secured Term Loan Debt Notice.

*Z2BN* = the aggregate ZAR New Holdco 2 PIK B Notes that the Senior Secured Term Loan Lender is entitled to receive at the Completion Date.

8.8.2.    The amount in either USD or ZAR of each Senior Secured 2018 Noteholder's (who has submitted an Account Holder Letter and is Eligible Creditor or has appointed a Designated Person (such Designated Person being an Eligible Person)) New Holdco 2 PIK B Notes Commitments, such amount being calculated in accordance with the formulae set out in Part 2 (Senior Secured 2018 Noteholders) of Part E (New Holdco 2 PIK B Notes Allocations) of Schedule 3 (Allocation and Entitlement) to the Restructuring Agreement, provided that:

8.8.2.1.    if the Senior Secured 2018 Noteholder fails to elect to subscribe for its New Holdco 2 PIK B Notes in ZAR or USD in their Account Holder Letter, the Senior Secured 2018 Noteholder shall be deemed to have elected to subscribe for its New Holdco 2 PIK B USD Notes; or

8.8.2.2.    the New Holdco 2 PIK B Notes Commitments of each Senior Secured 2018 Noteholder who is an Ineligible Creditor and/or a Non-Respondent Creditor shall be allocated to the Holding Period Trustee to hold and distribute the Distribution Agreement.

8.8.3.    The formula to calculate USD Senior Secured 2018 Notes Debt to USD New Holdco 2 PIK B Notes is as follows:

$$\$2BN = \left(\frac{SNP + SNI}{2}\right)$$

$2BN = the aggregate USD New Holdco 2 PIK B Notes that the Senior Secured 2018 Noteholder is entitled to receive at the Completion Date.

*SNI* = in respect of a Senior Secured 2018 Noteholder, the aggregate amount of Interest on the Senior Secured 2018 Notes Debt in USD owed to that Senior Secured 2018 Noteholder up to and including the Completion Date as set out in the Senior Secured 2018 Notes Debt Notice.

*SNP* = in respect of a Senior Secured 2018 Noteholder, the principal amount of Senior Secured Notes Debt in USD owed to that Senior Secured 2018 Noteholder calculated as at the Record Date and as set out in the Senior Secured 2018 Notes Debt Notice.

8.8.4.   The formula to calculate USD Senior Secured 2018 Notes Debt to ZAR New Holdco 2 PIK B Notes is as follows:

$$Z2BN = \left(\frac{SNP + SNI}{2}\right) x \, USDZ$$

*SNI* = in respect of a Senior Secured 2018 Noteholder, the aggregate amount of Interest on the Senior Secured 2018 Notes Debt in USD owed to that Senior Secured 2018 Noteholder up to and including the Completion Date as set out in the Senior Secured 2018 Notes Debt Notice.

*SNP* = in respect of a Senior Secured 2018 Noteholder, the principal amount of Senior Secured Notes Debt in USD owed to that Senior Secured 2018 Noteholder calculated as at the Record Date and as set out in the Senior Secured 2018 Notes Debt Notice.

*Z2BN* = the aggregate ZAR New Holdco 2 PIK B Notes that the Senior Secured 2018 Noteholder is entitled to receive at the Completion Date.

*USDZ* = the Calculation Date foreign exchange rate for the conversion of USD to ZAR as set out in the Fx Notice.

8.8.5.   The formula to calculate the EUR Senior Secured 2018 Notes Debt to USD New Holdco 2 PIK B Notes is as follows:

$$\$2BN = \left(\frac{SNPE + SNIE}{2}\right) x \, EUSD$$

*$2BN* = the aggregate USD New Holdco 2 PIK B Notes that the Senior Secured 2018 Noteholder is entitled to receive at the Completion Date.

*SNIE*= in respect of a Senior Secured 2018 Noteholder, the aggregate amount of Interest on the Senior Secured 2018 Notes Debt in EUR owed to that Senior Secured 2018 Noteholder up to and including the Completion Date as set out in the Senior Secured 2018 Notes Debt Notice.

*SNPE* = in respect of a Senior Secured 2018 Noteholder, the principal amount of Senior Secured Notes Debt in EUR owed to that Senior Secured 2018 Noteholder calculated as at the Record Date and as set out in the Senior Secured 2018 Notes Debt Notice.

*EUSD* = has the meaning given to that term in Part 1 (*Participating Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations*) of the Restructuring Agreement).

8.8.6.   The formula to calculate EUR Senior Secured 2018 Notes Debt to ZAR New Holdco 2 PIK B Notes is as follows:

$$Z2BN = \left(\frac{SNPE + SNIE}{2}\right) x\, EURZ$$

*EURZ* = the Calculation Date foreign exchange rate for the conversion of EUR to ZAR as set out in the Fx Notice.

*SNIE*= in respect of a Senior Secured 2018 Noteholder, the aggregate amount of Interest on the Senior Secured 2018 Notes Debt in EUR owed to that Senior Secured 2018 Noteholder up to and including the Completion Date as set out in the Senior Secured 2018 Notes Debt Notice.

*SNPE* - in respect of a Senior Secured 2018 Noteholder, the principal amount of Senior Secured Notes Debt in EUR owed to that Senior Secured 2018 Noteholder calculated as at the Record Date and as set out in the Senior Secured 2018 Notes Debt Notice.

*Z2BN* = the aggregate ZAR New Holdco 2 PIK B Notes that the Senior Secured 2018 Noteholder is entitled to receive at the Completion Date.

8.8.7.   The amount in either USD or ZAR of each Senior Secured 2019 Noteholder's (who has submitted an Account Holder Letter and is Eligible Creditor or has appointed a Designated Person (such Designated Person being an Eligible Person)) New Holdco 2 PIK B Notes Commitments, such amount being calculated in accordance with the formulae set out in Part 3 (Senior Secured 2019 Noteholder) of Part E (New Holdco 2 PIK B Notes Allocations) of Schedule 3 (Allocation and Entitlement) to the Restructuring Agreement, provided that:

8.8.7.1.   if the Senior Secured 2019 Noteholder fails to elect to subscribe for its New Holdco 2 PIK B Notes in ZAR or USD in their Account Holder Letter, the Senior Secured 2019 Noteholder shall be deemed to have elected to subscribe for its New Holdco 2 PIK B USD Notes; or

8.8.7.2.   the New Holdco 2 PIK B Notes Commitments of each Senior Secured 2019 Noteholder who is an Ineligible Creditor and/or a Non-Respondent Creditor shall be allocated to the Holding Period Trustee to hold and distribute in accordance with the Distribution Agreement.

8.8.8.   The formula to calculate the EUR Senior Secured 2019 Notes Debt to USD New Holdco 2 PIK B Notes is as follows:

$$\$2BN = \left(\frac{SNP19 + SNIE19}{2}\right) x\, EUSD$$

*$2BN* = the aggregate USD New Holdco 2 PIK B Notes that the Senior Secured 2019 Noteholder is entitled to receive at the Completion Date.

*SNI19*= in respect of a Senior Secured 2019 Noteholder, the aggregate amount of Interest on the Senior Secured 2019 Notes Debt in EUR owed to that Senior Secured 2019 Noteholder up to and including the Completion Date as set out in the Senior Secured 2019 Notes Debt Notice.

*SNP19* - in respect of a Senior Secured 2019 Noteholder, the principal amount of Senior Secured Notes Debt in EUR owed to that Senior Secured 2019 Noteholder calculated as at the Record Date and as set out in the Senior Secured 2019 Notes Debt Notice.

*EUSD* - has the meaning given to that term in Part 1 (*Participating Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations*) of the Restructuring Agreement.

8.8.9.   The formula to calculate the EUR Senior Secured 2019 Notes Debt to ZAR New Holdco 2 PIK B Notes is as follows:

$$Z2BN = \left(\frac{SNP19 \ + \ SNI19}{2}\right) x \ EURZ$$

*EURZ* = the Calculation Date foreign exchange rate for the conversion of EUR to ZAR as set out in the FX Notice.

*SNI19*= in respect of a Senior Secured 2019 Noteholder, the aggregate amount of Interest on the Senior Secured 2019 Notes Debt in EUR owed to that Senior Secured 2019 Noteholder up to and including the Completion Date as set out in the Senior Secured 2019 Notes Debt Notice.

*SNP19* - in respect of a Senior Secured 2019 Noteholder, the principal amount of Senior Secured Term Loan Lender Debt in EUR owed to that Senior Secured 2019 Noteholder calculated as at the Record Date and as set out in the Senior Secured 2019 Notes Debt Notice.

*Z2BN* = the aggregate ZAR New Holdco 2 PIK B Notes that the Senior Secured 2019 Noteholder is entitled to receive at the Completion Date

8.9.   The number of fully paid New Holdco 2 Ordinary A Shares that each Senior Secured Creditor shall be entitled to subscribe for, and be issued with, which shall be calculated in accordance with the formulae set out in Part F (*New Holdco 2 Ordinary A Shares Allocations*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement, the consideration for which shall be the delegated and exchanged Secured Term Loan Debt, Senior Secured 2018 Notes Debt and the Senior Secured 2019 Notes Debt, provided that any New Holdco 2 Ordinary A Shares of Ineligible Creditors and/or Non-Respondent Creditors at the Record Date or DTC Record Date (as applicable) shall be allocated to the Holding Period Trustee to hold and distribute in accordance with the Distribution Agreement:

$$CCOAS = \frac{Senior \ Claim}{SSD} x \ OAS$$

*$SCI* = the aggregate amount of Interest in USD on the Completion Date.

*Senior Claim* = ($SC+$SCI) + (€SC+€SCI) + (ZSC+ZSCI)

*CCOAS* = the aggregate amount of New Holdco 2 Ordinary A Shares that the Senior Secured Creditor is entitled to receive at the Completion Date rounded to the nearest whole share.

*EURZ* = the Calculation Date foreign exchange rate for the conversion of EUR to ZAR as set out in the Fx Notice.

*OAS* = the total amount of New Holdco 2 Ordinary A Shares issued by New Holdco 2 at the Completion Date.

*SSD* = has the meaning given to that term in Part 1 (*Participating Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocation*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement.

8.10.   The amount in EUR of each Super Senior Term Loan Lender's New Holdco 2 PIK A Notes Commitments, such amount being calculated in accordance with the formulae set out in Part 1 (*Super Senior Term Loan Lenders*) of Part D (*New Holdco 2 PIK A Notes Allocations*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement:

$$€2AN = (SSTLP + SSTLI)$$

*€2AN* = the aggregate New Holdco 2 PIK A Notes that the Super Senior Term Loan Lender is entitled to receive at the Completion Date.

*SSTLI* = in respect of a Super Senior Term Loan Lender, the aggregate amount of accrued and unpaid interest on the Super Senior Term Loan Debt in EUR owed to that Super Senior Term Loan Lender up to and including the Completion Date as set out in the Super Senior Term Loan Debt Notice.

*SSTLP* = in respect of a Super Senior Term Loan Lender, the principal amount of Super Senior Term Loan Lender Debt in EUR owed to that Super Senior Term Loan Lender calculated as at the Record Date and as set out in the Super Senior Term Loan Debt Notice.

8.11.   The amount in EUR of each Super Senior 2019 Noteholder's (who has submitted an Account Holder Letter and is Eligible Creditor or has appointed a Designated Person (such Designated Person being an Eligible Person)) New Holdco 2 PIK A Notes Commitments, such amount being calculated in accordance with the formulae set out in Part 2 (*Super Senior Noteholders*) of Part D (*New Holdco 2 PIK A Notes Allocations*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement provided that any New Holdco 2 PIK A Notes of Ineligible Creditors and/or Non-Respondent Creditors at the Record Date shall be allocated to the Holding Period Trustee to hold and distribute in accordance with the Distribution Agreement:

$$€2AN = SSNP + SSNI$$

*€2AN* = the aggregate New Holdco 2 PIK A Notes that the Super Senior Noteholder is entitled to receive at the Completion Date.

*SSNI* = in respect of a Super Senior Noteholder, the aggregate amount of accrued and unpaid interest on the Super Senior Notes Debt in EUR owed to that Super Senior Noteholder up to and including the Completion Date as set out in the Super Senior Notes Debt Notice.

*SSNP* = in respect of a Super Senior Noteholder, the principal amount of Super Senior Notes Debt in EUR owed to that Super Senior Noteholder calculated as at the Record Date and as set out in the Super Senior Notes Debt Notice.

8.12.    The Company shall procure that Houlihan Lokey delivers a copy of the Allocation and Entitlement Table to, *inter alia*, each Financial Advisor by 15h00 (Johannesburg Time) on the first Business Day after the Calculation Date. Each Financial Advisor and the Super Senior Liquidity Facility Agent is irrevocably authorised in terms of the Restructuring Agreement to review, amend and agree the allocations and subscriptions set out in the Initial Allocation and Entitlement Table by no later than 17h00 (Johannesburg Time) on the Review Date (being two Business Days after the Calculation Date). Once agreed by each of the Financial Advisors, the Super Senior Liquidity Facility Agent, New Holdco 1 and New Holdco 2 on the Review Date, the content of the Initial Allocation and Entitlement Table shall, in the absence of manifest error, be conclusive and binding on all parties to the Restructuring Agreement.

9.    **Issuance of Compromise Consideration and Holding Period arrangements**

9.1.    In order to receive Compromise Consideration to which it is entitled in accordance with the terms of the relevant Compromise, each Compromise Creditor is required to comply with the procedures described in the Part A which apply to it, having regard to the nature of the Compromise Claims it holds as well as the relevant Compromise it forms a part of.

9.2.    The Company will issue Compromise Consideration on the Completion Date to Compromise Creditors which have confirmed that they are Eligible Creditors (or have appointed other Designated Recipients and have confirmed that those other persons are Eligible Persons) and on whose behalf a valid (i) Proxy Form has been delivered to and received by the Information Agent before the Voting Instruction Deadline; or (ii) Account Holder Letter has been delivered to and received by the Information Agent before the Voting Instruction Deadline.

9.3.    The Holding Period Trustee will be appointed on or before the RA Effective Date pursuant to the terms of the Distribution Agreement to hold Compromise Consideration on behalf of –

9.3.1.    Compromise Creditors which have confirmed that they are not Eligible Creditors and have not appointed Designated Recipients who are Eligible Persons (such Compromise Creditors are referred to in the relevant Compromise as "**Ineligible Creditors**") and on whose behalf valid Proxy Forms or Account Holder Letters have been delivered to and received by the Information Agent before the date of the Voting Instruction Deadline; and

9.3.2.    Compromise Creditors on whose behalf a valid Proxy Forms or Account Holder Letters have not been delivered to and received by the Information Agent before the Voting Instruction Deadline, but to whom the Company is obliged to issue Compromise Consideration on the Completion Date (referred to in the relevant Compromise as "**Non-Respondent Creditors**").

9.4.    The Holding Period Trustee will hold Compromise Consideration on behalf of Ineligible Creditors and Non-Respondent Creditors on bare trust in accordance with the terms of the Distribution Agreement and the relevant Compromise.

9.5.    If a Compromise Creditor whose Compromise Consideration has been issued to the Holding Period Trustee does not provide the Information Agent with a validly completed Account Holding Letter and/or Proxy Form and a request in writing to transfer the relevant Compromise Consideration to it (or its Designated Recipient(s) who is an Eligible Person) within the Holding Period then, upon the expiration of the Holding Period, the Holding Period Trustee will sell such Compromise Consideration and the cash proceeds of such sale (after deduction of the reasonable costs and expenses of the Holding Period Trustee incurred in respect of such sale) shall be paid to that Compromise Creditor (if such Compromise Creditor's identity is known). If that is not possible, then the Holding Period Trustee shall gift the net cash proceeds to the Edgars Foundation or any other charity selected as the Holding Period Trustee sees fit.

9.6.    The Holding Period Trustee shall have the power to appoint an additional or replacement trustee over the relevant Compromise Consideration at any time, subject to any additional or replacement trustee agreeing to be bound by the terms of the relevant Compromise.

9.7.    During the Holding Period, any Ineligible Creditor whose Compromise Consideration is held by the Holding Period Trustee may request that the Holding Period Trustee sells its Compromise Consideration. To the extent that the Holding Period Trustee receives such a request in writing, the Holding Period Trustee will sell the relevant Compromise Consideration and account to that Compromise Creditor for the net sale proceeds of such sale in terms of the Distribution Agreement.

9.8.    Non-Respondent Creditors entitlement to the Compromise Consideration will be determined in accordance with the allocation mechanism as set out in the Restructuring Agreement, provided that such Non-Respondent Creditor held Compromise Claims on the Record Date or DTC Record Date, as applicable. To the extent that any notional conversion of currency is required, such notional conversion shall be applied in the manner at on the date as set out in this Explanatory Statement and the Restructuring Agreement.

10.    **New Money Notes Offer**

*Overview*

10.1.    Each Compromise Creditor is entitled to subscribe for New Money Notes and to receive New Holdco 2 Ordinary B Shares or CVRs as a Subscription Fee in accordance with the terms of the New Money Notes Offer.

10.2.    The New Money Notes will be issued by New Holdco 1. The New Holdco 2 Ordinary B Shares and CVRs will be issued by New Holdco 2. All references in this section to the Company are made on the basis that the Company will perform all such acts in this section on behalf of New Holdco 1 and New Holdco 2.

10.3.    The New Money Notes Offer is included in this Explanatory Statement for the purposes of convenience only as such offer is being made to the Compromise Creditors. The New Money Notes do not, however, form a part of any of the Compromises.

10.4.   The Facility A3 Lenders will receive the USD equivalent of ZAR810,000,000 and the accrued and unpaid cash pay interest, together with accrued PIK interest that has not been capitalised, for the period up to and including Completion, on the Facility A3 Loans in New Money Notes in order to refinance the Facility A3 Loans. The Facility A3 Lenders are Super Senior First Ranking Creditors in the current debt structure of the Company and will be structurally subordinating themselves in the post-Financial Restructuring debt structure through this refinancing.

10.5.   Any Compromise Creditor wishing to participate in the New Money Notes Offer will be entitled to elect –

10.5.1.   to subscribe for its Pro Rata Participation Share of New Money Notes or a fixed USD value of New Money Notes (on the basis that if the latter option is selected, the Compromise Creditor will receive the lesser of its Pro Rata Participation Share and the fixed USD value); and

10.5.2.   to subscribe for the New Holdco 2 Ordinary B Shares or CVR, for no consideration payable by such Compromise Creditor and failing such election (but provided that the Compromise Creditor has elected to subscribe for New Money Notes as aforesaid), such Compromise Creditor shall receive its relevant allocation of New Holdco 2 Ordinary B Shares.

10.6.   The amount of New Money Notes available for subscription by the Compromise Creditors is ZAR1,494,486,680.83.

10.7.   Committed Creditors have committed to subscribe for New Money Notes in the amount up to their New Money Notes Commitments in terms of the Lock-Up Agreement. The Committed Creditors shall at Completion in the same proportion as New Money Notes Commitments subscribe for any New Money Notes that any Compromise Creditors have not committed to subscribe for. In return for their commitment to take up their share and underwrite the balance of the New Money Notes, the Committed Creditors will receive a Commitment Fee of up to ZAR69,600,000 (approximately 3% of the aggregate principal amount of their commitments). The Commitment Fee shall be settled at Completion by the issuance of additional New Money Notes ("**Commitment Fee Notes**") at no additional cost to the Committed Creditors. Only those Committed Creditors who signed or acceded to the Lock-Up Agreement in such capacity will be entitled to receive their allocation of the Commitment Fee.

10.8.   Any Compromise Creditor wishing to subscribe for New Money Notes in the New Money Notes Offer should –

10.8.1.   in the case of Compromise Noteholders, instruct its Account Holder to make the appropriate elections in the Account Holder Letter delivered on its behalf; or

10.8.2.   in the case of Compromise Lenders, make the appropriate elections in the Proxy Form to be delivered to the Information Agent.

10.9.   In order for a Compromise Creditor to participate in the New Money Notes Offer, a valid Proxy Form or Account Holder Letter in respect of that

Compromise Creditor must be delivered to and received by the Information Agent before the Voting Instruction Deadline.

10.10. The Proxy Form or Account Holder Letter must include (i) either the Pro Rata Participation Share of New Money Notes or a fixed USD value of the New Money Notes for which that Compromise Creditor wishes to subscribe in accordance with the terms of the New Money Notes Offer and (ii) confirmation that the Compromise Creditor is an Eligible Creditor or, if that Compromise Creditor has appointed a Designated Recipient, the Designated Recipient is an Eligible Person. The delivery and receipt of a valid Proxy Form or Account Holder Letter will constitute a legally binding agreement by the relevant Compromise Creditor to subscribe for up to its Pro Rata Participation Share, the acceptance of which by the Company will be effected and evidenced by notification of the number of New Money Notes allocated to that Participating Creditor.

10.11. Any Non-Respondent Creditors (irrespective of whether they are an Eligible Creditor that would otherwise have been entitled to subscribe for New Money Notes) will not be entitled to subscribe for New Money Notes or to receive New Holdco 2 Ordinary B Shares or CVRs as a Subscription Fee.

*The calculation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs to be issued to Participating Creditors*

10.12. Any Participating Creditor will be entitled to receive New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with and subject to the terms of the New Money Notes Offer.

10.13. Within 3 Business Days of the Compromise Meetings, the Information Agent shall provide the New Holdco 1 Notes Trustee, New Holdco 1, New Holdco 2 and Houlihan Lokey with a notice (the "**New Holdco 1 PIK A-1 Subscription Notice**") setting out –

    10.13.1.   the name, address and jurisdiction of incorporation each Compromise Creditor that is an Eligible Creditor (or its Designated Recipient) which has elected to, or has been nominated to be a Participating Creditor;

    10.13.2.   the certified Compromise Principal Outstandings of each Participating Creditor as at the Record Date or DTC Record Date (as applicable);

    10.13.3.   the amount of New Money Notes (such amount shall not exceed its Pro Rata Participation Share) that the Participating Creditor has elected to subscribe for; and

    10.13.4.   whether the Participating Creditor has elected to receive, or elected for its Designated Recipient to receive, New Holdco 2 Ordinary B Shares or a CVR as its Subscription Fee. If the Participating Creditor has failed to elect to receive either the New Holdco 2 Ordinary B Shares or a CVR, the Participating Creditor shall be deemed to have elected to receive its pro rata allocation of the New Holdco 2 Ordinary B Shares.

10.14. The calculations of the New Money Notes to be issued to each Participating Creditor will be included in the Initial Allocation and Entitlement Table as follows:

10.14.1.   the amount of New Holdco 1 PIK A-1 Notes Commitments in USD that each Participating Creditor (or their Designated Recipient's) (other than the Committed Creditors) has elected to subscribe for, such amounts being calculated in accordance with the formulae set out in Part 1 (Participating Creditors) of Part B (New Holdco 1 PIK A-1 Notes Allocations) of Schedule 3 (Allocation and Entitlement) to the Restructuring Agreement:

$$A1PN = \frac{Senior\ Claim + 3RSS\ Claim}{(SSTRD + SSD)} x\ 1{,}494{,}486{,}680.83 * ZUSD$$

*Senior Claim* = ($SC+$SCI) + (€SC+€SCI) + (ZSC+ZSCI)

3RSS Claim = (€SSC + €SSCI)

*$SC* = the aggregate amount of Compromise Principal Outstandings in USD in respect of the Senior Secured Debt owed to that Participating Creditor and as at the Record Date  or DTC Record Date (as applicable) as set out  in the Senior Secured Notes Debt Notice x USDZ.

*$SCI* = the aggregate amount of Interest outstanding in USD on the $SC owed to that Participating Creditor, as calculated as at the Calculation Date for the period up to and including the Completion Date and as set out in the Senior Secured Notes Debt Notice x USDZ.

*$SP* = the aggregate amount of Compromise Principal Outstandings in USD in respect of the Senior Secured Debt as at the Record Date or DTC Record Date (as applicable) as set out in the Senior Secured Notes Debt Notice x USDZ.

*$SD* = the aggregate amount of Interest outstanding in USD on the $SP, calculated as at the Calculation Date, for the period up to and including the Completion Date and as set out in the Senior Secured Notes Debt Notice x USDZ.

*€SC* = the aggregate amount of Compromise Principal Outstandings in EUR in respect of the Senior Secured Notes Debt, owed to that Participating Creditor and as at the Record Date as set out in the Senior Secured Notes Debt Notice  x EURZ.

€SCI = the aggregate amount of Interest outstanding in EUR on the €SC owed to that Participating Creditor, as calculated as at the Calculation Date for the period up to and including the Completion Date and as set out in the Senior Secured Notes Debt Notice,  x EURZ.

€SSC = the aggregate amount of Compromise Principal Outstandings in EUR in respect of the Super Senior Third Ranking

Debt owed to that Participating Creditor and as at determined by the Information Agent as at the Record Date in the relevant Debt Notice x EURZ.

€SSCI = the aggregate amount of Interest outstanding in EUR on the €SSC owed to that Participating Creditor, as calculated as at the Calculation Date for the period up to and including the Completion Date and as set out in the Super Senior Notes Debt Notice and the Super Senior Term Loan Debt Notice x EURZ.

$€SD$ = the aggregate amount of Interest outstanding in EUR on the Senior Secured Debt,calculated as at the Calculation Date for the period up to and including the Completion Date and as set out in the Senior Secured Notes Debt Notice x EURZ.

$€SP$ = the aggregate amount of Compromise Principal Outstandings in USD in respect of the Senior Secured Debt as at the Record Date as set out in the Senior Secured Notes Debt Notice x USDZ.

$SSD$ = $SD+$SP+€SD+€SP+ZSP+ZSD

$A1PN$ = the aggregate New Holdco 1 PIK A-1 Notes in USD that the Participating Creditor is entitled to receive at the Completion Date.

$EURZ$ = the Calculation Date foreign exchange rate for the conversion of EUR to ZAR as set out in the Fx Notice.

$SSTRD$ = the aggregate amount of Compromise Principal Outstandings in EUR in respect of the Super Senior Third Ranking Debt as at the Record Date plus the aggregate amount of Interest outstanding in respect thereof, as calculated as at the Calculation Date for the period up to and including the Completion Date and, in each case, as set out in the Super Senior Notes Debt Notice and the Super Senior Notes Debt Notice x EURZ.

$USDZ$ = the Calculation Date foreign exchange rate for the conversion of USD to ZAR as set out in the Fx Notice.

$ZSC$ = the aggregate amount of Compromise Principal Outstandings in ZAR in respect of the Senior Secured Term Loan Debt owed to that Participating Creditor as at the Record Date as set out in the Senior Secured Term Loan Notice.

$ZSCI$ = the aggregate amount of Interest outstanding in ZAR on the ZSC owed to that Participating Creditor, as calculated as at the Calculation Date for the period up to and including the Completion Date and as set out in the Senior Secured Term Loan Debt Notice.

$ZSD$ = the aggregate amount of Interest in ZAR on the Senior Secured Term Loan Debt calculated as at the Calculation Date, for the period up to and including the Completion Date and as set out in the Senior Secured Term Loan Debt Notice.

$ZSP$ = the aggregate amount of Compromise Principal Outstandings in ZAR in respect of the Senior Secured Term Loan

Debt as at the Record Date as set out in the Super Senior Secured Term Loan Debt Notice.

*ZUSD* = the Calculation Date foreign exchange rate for the conversion of ZAR to USD as set out in the Fx Notice.

10.14.2.     the amount of New Holdco 1 PIK A-1 Notes Commitments in USD (up to a maximum amount equal to their New Holdco 1 PIK A-1 Notes Commitments) that each Committed Creditor's (or their Designated Recipient's) (other than the Facility A3 Lenders) has agreed to subscribe for, such amounts being calculated in accordance with the formulae set out in in Part 2 (*Committed Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement:

$$CCA1PN = \left( \frac{TC \; x \; ZUSD}{1,494,486,680.83 \; x \; ZUSD} \right) x \; UnA1PN$$

*CCA1PN* = in respect of the relevant Committed Creditor, the aggregate New Holdco 1 PIK A-1 Notes in USD that the Committed Creditor is obligated to subscribe to in addition to its Pro Rata Commitment Share (A1PN). For the avoidance of doubt, by construction, each Committed Creditor's total participation in the New Holdco1 PIK A-1 Notes will be no more than its TC (defined below).

*TC* = in respect of the relevant Committed Creditor, the amount set forth next to such Committed Creditors' name in the fourth column in Part A of Schedule 4 of the Restructuring Agreement.

*UnA1PN* = the aggregate New Holdco 1 PIK A-1 Notes in USD which Participating Creditors do not subscribe to.

*ZUSD* = the Calculation Date foreign exchange rate for the conversion of ZAR to USD as set out in the Fx Notice.

Provided that, if, as a result of the above, any Committed Creditor's CCA1PN and Pro Rata Participation Share would exceed its TC, that Committed Creditor may, in its sole discretion, elect to subscribe for such additional allocations.  If such Committed Creditor does not elect to subscribe for the additional allocations, such additional allocations shall be reallocated to the Committed Creditors who have subscribed for less than their TC and in the proportions that those Committed Creditors' whose CCA1PN and Pro Rata Commitment Share is less than such Committed Creditors' TC divided by 1,494,486,680.83 minus the TC of any Committed Creditor whose CCA1PN and Pro Rata Commitment Share equals or exceeds their TC and who elects, in such Committed Creditors' sole discretion, not to subscribe to the additional allocations.  To the extent that any UnA1PN remains after such allocation, the calculation in the previous sentence will be repeated until all UnA1PN have been allocated.

10.14.3. the amount in USD of each Committed Creditor's (including, for the avoidance of doubt, each Facility A3 Lender), or their Designated Recipient, additional New Holdco 1 PIK A-1 Notes that the Committed Creditor shall be entitled to subscribe for, and be issued with, as Commitment Fee Notes in accordance with the formulae set out in Part 3 (*Commitment Fee Notes*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement at a subscription price of USD 0 (zero) per New Holdco 1 PIK A-1 Note:

*NBCFN= (TC/(0.97)-TC)x ZUSD*

*NBCFN* = in respect of the relevant Committed Creditor, the portion of the aggregate New Holdco 1 PIK A-1 Notes in USD that the Committed Creditor is entitled to receive (for no additional cash consideration) as a Commitment Fee.

*TC* = in respect of the relevant Committed Creditor, the amount set forth next to such Committed Creditors' name in the fourth column in Part A of Schedule 4 (*Completion Funding Commitments*) of the Restructuring Agreement.

*ZUSD* has the meaning given to that term in Part 1 (*Participating Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations*) of the Restructuring Agreement.

either:

10.14.4. the number of fully paid New Holdco 2 Ordinary B Shares that each Participating Creditor (other than the Facility A3 Lenders) or their Designated Recipient shall be entitled to subscribe for and be issued with in accordance with the formulae set out in Part 2 (*Participating Creditors*) of Part G (*New Holdco 2 Ordinary B Shares Allocations*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement and at a subscription price of ZAR0.01 per New Holdco 2 Ordinary B Share:

$$PCOBS = \frac{A1PN + CCA1PN}{(TFA3L + 1,494,486,680.83 * ZUSD)} * OBS$$

*A1PN* has the meaning given to that term in Part 1 (*Participating Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocation*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement.

*CCA1PN* has the meaning given to that term in Part (i) of Part 2 (*Unsubscribed Portion of Holdco 1 PIK A-1 Notes*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations)* to the Restructuring Agreement.

*OBS* = the total amount of New Holdco 2 Ordinary B Shares issued by New Holdco 2 at the Completion Date.

*PCOBS* = the aggregate amount of New Holdco 2 Ordinary B Shares that the Participating Creditor is entitled to receive at the Completion Date rounded to the nearest whole share.

*TFA3L* has the meaning given to that term in Part 1 (*Facility A3 Lenders*) of Part G (*New Holdco 2 Ordinary B Shares Allocations*) of the Restructuring Agreement.

*ZUSD* has the meaning given to that term in Part 1 (*Participating Creditors*) of Part B (*New Holdco 1 PIK A-1 Notes Allocations*) of the Restructuring Agreement.

or

10.14.5.   the number of CVRs, that each Participating Creditor (other than the Facility A3 Lenders) shall be entitled to be issued with that would be the equivalent to their entitlement of New Holdco 2 Ordinary B Shares calculated in accordance with the formulae set out in Part 2 (*Participating Creditors*) of Part G (*New Holdco 2 Ordinary B Shares Allocation*) of Schedule 3 (*Allocation and Entitlement*) to the Restructuring Agreement,

provided that if the Participating Creditor (other than the Facility A3 Lenders) or their Designated Recipient fails to elect to receive either New Holdco 2 Ordinary B Shares or CVRs in their Account Holder Letter or Proxy Form (as applicable), the Participating Creditor (other than the Facility A3 Lenders) or their Designated Recipient shall be deemed to have elected to receive New Holdco 2 Ordinary B Shares.

*Completion Funding Notice and the Funding Date*

10.15.   Promptly once the Initial Allocation and Entitlement Table has become conclusive and binding on all parties to the Restructuring Agreement, the Information Agent shall issue each Participating Creditor at the contact details provided on the Account Holder Letter or Proxy Form (as applicable) with a notice ("**Completion Funding Notice**"):

10.15.1.   setting out the USD amount that the relevant Participating Creditor shall be required to pay to New Holdco 1 at Completion to subscribe for its allocation of the New Money Notes as set out opposite its name(s) in the Initial Allocation and Entitlement Table (the "New Holdco 1 Completion Amount") and instructing the relevant Participating Creditor to either transfer directly, or arrange to transfer via Euroclear or Clearstream, its New Holdco 1 Completion Amount to the Escrow Agent's bank account stated in the Completion Funding Notice ("**Completion Funding Account**"), to hold in accordance with the terms of the Escrow Deed; and

10.15.2.   instructing the Participating Creditors to transfer its New Holdco 1 Completion Amount to the Completion Funding Account by 11h00 (Johannesburg time) on the Funding Date, and if such New Holdco 1 Completion Amount is not so transferred as aforesaid, such Participating Creditor will no longer be entitled to subscribe for its allocation of the New Money Notes or receive its allocation of the New Holdco 2 Ordinary B Shares or CVRs as its Subscription Fee.

11.   **Directions to the Clearing Systems**

11.1.   On the Completion Date and in relation to Compromise Noteholders only, the Company will issue directions for itself and/or on behalf of each relevant

Compromise Creditor pursuant to the authority granted under the relevant Compromise to each relevant Clearing System in accordance with the rules and procedures of that Clearing System to –

11.1.1.     debit from the Custody Account with a Clearing System of each Account Holder, all the interests in the relevant Compromise Notes held by that Account Holder; and

11.1.2.     arrange for the cancellation therefor.

11.2.   If necessary, the Company shall execute any document required in connection with the transfer and cancellation of the Compromise Notes on behalf of each relevant Compromise Creditor pursuant to the authority granted under the relevant Compromise.

12.   **Distribution Agreement**

12.1.   The Company, the Holding Period Trustee and GLAS (as putative New Holdco 2 PIK A Notes Trustee and New Holdco 2 PIK B Notes Trustee) (on behalf of the Compromise Creditors that have not already acceded to the Distribution Agreement) will execute the Distribution Agreement pursuant to the timing set out in the Restructuring Agreement and pursuant to the instructions and authorisation under the Account Holder Letters and Proxy Forms.

12.2.   The role of the Holding Period Trustee will be to hold Compromise Consideration for the Holding Period on behalf of (i) Ineligible Creditors and (ii) Non-Respondent Creditors in accordance with the terms of the Distribution Agreement. The Holding Period Trustee will not exercise any voting, conversion or other rights attaching to any Compromise Consideration which it is holding on bare trust.

12.3.   A Non-Respondent Creditor on whose behalf a valid Proxy Form or Account Holder Letter has been delivered to and received by the Information Agent before the end of the Holding Period which includes a confirmation that such Compromise Creditor is an Eligible Creditor (or, if such Non-Respondent Creditor has appointed a Designated Recipient, its Designated Recipient is an Eligible Person) for the purposes of the relevant Compromise, will become an Eligible Creditor.

12.4.   As soon as reasonably practicable following the date on which the Information Agent delivers a certificate evidencing any distribution of Compromise Consideration to a Non-Respondent Creditor who has become an Eligible Creditor (a "**Distribution Instruction Certificate**") to the Holding Period Trustee, the Holding Period Trustee shall deliver the Compromise Consideration to which that Eligible Creditor is entitled in accordance with the terms of the relevant Compromise (including any interest, dividends, distributions (or any other rights or benefits) or other payments received by the Holding Period Trustee in respect of such Compromise Consideration, in each case net of any applicable taxes (including, without limitation, any withholding taxes but excluding any stamp duty and/or stamp duty reserve tax (if applicable) payable upon the issue and/or allotment of Compromise Consideration to that Eligible Creditor which the Company will pay on behalf of that Eligible Creditor under the terms of the Distribution Agreement) to that Eligible Creditor (or, if applicable, its Designated Recipient who is an Eligible Person).

12.5.   A Non-Respondent Creditor on whose behalf a valid Proxy Form or Account Holder Letter has been delivered to and received by the Information Agent before the end of the Holding Period which includes a confirmation that such Compromise Creditor is not an Eligible Creditor and has not appointed a Designated Recipient who is an Eligible Person, will be deemed to be an Ineligible Person for the purposes of the relevant Compromise. The Compromise Consideration attributable to such Ineligible Creditor will be held in trust by the Holding Period Trustee for the duration of the Holding Period subject to the terms of the Distribution Agreement.

12.6.   An Ineligible Creditor is entitled to request that the Holding Period Trustee at any time during the Holding Period sell any of its allocated Compromise Consideration. In addition, any Compromise Consideration held by the Holding Period Trustee at the end of the Holding Period shall be sold in accordance with the terms of the Distribution Agreement. As soon as reasonably practicable following receipt of any request as aforesaid from an Ineligible Creditor or following the expiry of the Holding Period, the Holding Period Trustee shall sell the relevant Compromise Consideration in accordance with the terms of the Distribution Agreement.

12.7.   Any sale of Compromise Consideration shall be effected in accordance with the terms of the Distribution Agreement. The Distribution Agreement provides that any such sale shall be effected upon the best terms available in the market at the time of the sale and none of the Holding Period Trustee, the Company, New Holdco 2, the Existing Group, the Information Agent or any other person shall be responsible for any loss or alleged loss arising from the price, terms, manner or timing of any such sale or the failure to procure any purchaser for any of the Compromise Consideration.

12.8.   Following the sale of any such Compromise Consideration (or any part thereof), the Holding Period Trustee shall distribute –

12.8.1.   the proceeds of such sale (after deduction of any applicable expenses); and

12.8.2.   any interest, dividends, distributions (or any other rights or benefits) or other payments received by the Holding Period Trustee in respect of such Compromise Consideration,

in each case net of any applicable taxes (including, without limitation, any withholding taxes), to the Ineligible Creditors and, in respect of any Non-Respondent Creditors, by way of gift to the Edgars Foundation or any other charity selected as the Holding Period Trustee sees fit in accordance with the terms of the Distribution Agreement.

12.9.   If, having used reasonable efforts to sell the Compromise Consideration which the Holding Period Trustee is holding at the end of the Holding Period within three months of the end of the Holding Period and having consulted with the Company and the Holding Period Trustee has been unable to sell any such Compromise Consideration, the Holding Period Trustee shall be irrevocably authorised and instructed by each relevant Compromise Creditor Beneficiary (as defined in the Distribution Agreement) to transfer such Compromise Consideration by way of gift to the Edgars Foundation or any other charity selected as the Holding Period Trustee sees fit.

12.10. The Holding Period Trustee will undertake not to exercise any voting, conversion or other rights attaching to any Compromise Consideration which it is holding on behalf of any Compromise Creditors.

12.11. The form of the Distribution Agreement is attached to the Restructuring Agreement.

PART C

## RISK FACTORS

The following risk factors are the principal risk factors that arise in connection with the proposed Compromises. These risk factors should be read in conjunction with all of the other information contained in this Explanatory Statement.

Additional risks and uncertainties not presently known to the Company or that the Company currently deems immaterial may also have a material adverse effect on the business, financial condition or results of operations of the Company or any other member of the Existing Group. Moreover, except as set forth in the section below entitled "Risks relating to a failure to implement or a delay in implementing the Compromises", these risk factors assume that the Compromises will be implemented and do not describe all of the risks that would be applicable to the Company should the Compromises not be implemented.

All statements in this Explanatory Statement are to be read subject to, and are qualified in their entirety by, the matters referred to in this section.

For ease of reference only, this part of the Explanatory Statement is divided into two main sections:

(1)     Risks relating to the implementation of or a failure to implement or a delay in implementing the Compromises; and

(2)     Risks relating to the Compromises, including those relating to the Company, the Compromise Consideration and the New Money Notes.

**RISKS RELATING TO THE IMPLEMENTATION OF OR A FAILURE TO IMPLEMENT OR A DELAY IN IMPLEMENTING THE COMPROMISES**

13.     **Risks Relating to Our Business and Industry**

13.1.     **If our cash provided by operating and financing activities continues to be insufficient to fund our cash requirements, we will face substantial short-term liquidity problems.**

13.1.1.     We used a substantial amount of cash in our operating activities during fiscal year 2016. Our cash uses are currently projected to exceed our cash provided by operating activities in 2017 and we have extremely limited availability under our existing facilities. Our cash uses (outside of operating activities) are primarily capital expenditures and interest expense. Our financing costs are substantial, and amounted to ZAR4,272 million during fiscal year 2016. Our working capital requirements and cash provided by operating activities can vary greatly from quarter to quarter and from year to year, depending in part on the level, variability and timing of our sales and general market conditions.

13.1.2.     If our cash requirements exceed the cash provided by our operating activities, then we would look to our cash balance to satisfy those needs, which will likely not be sufficient in the near term. Our existing facilities are fully drawn. Current credit and capital market conditions combined with our recent history of

operating losses and negative cash flows, as well as projected industry and macroeconomic conditions in South Africa, may restrict our ability to access capital markets in the near term and any such access would likely be at an increased cost and under more restrictive terms and conditions than the ones of our current debt. Further, such constraints may also affect our agreements and payment terms with vendors. We may face further liquidity pressure if our suppliers require us to pay up front or upon delivery of products. On 8 July 2016, the Existing Group secured a combined ZAR1.5 billion in bridge financing, denominated in U.S. dollars and Euros, which was made available by a group of Noteholders and bank lenders in two tranches upon the satisfaction of certain conditions precedent. On 12 July 2016, the Existing Group received the first tranche in the amount of ZAR651 million, which has eased some of our liquidity pressure. However, absent access to additional liquidity and/or other sources of external financial support, including accommodations from key customers, we expect that our liquidity position, which is severely constrained, is likely to deteriorate further.

13.2. **We may be required to sell assets or cease operations to improve our short-term liquidity, even though such asset sales may impair our ability to operate our business and compete effectively, which may depress the long-term value of our business, and such measures may be unsuccessful or only temporarily successful in improving our liquidity position.**

13.2.1.   Our liquidity continues to be adversely affected by the recent and ongoing adverse economic and industry conditions. Additionally, the deferral of cash pay interest on our  Senior Secured 2018 Notes and the Senior Secured Term Loan will expire in December 2016, which, if not extended, would further increase our cash-pay obligations.

13.2.2.   While we have agreed a path to the restructuring of our capital structure with certain of our creditors, there can be no guarantee that the proposed restructuring of our debt will be successfully implemented. Should the restructuring proposal fail, we would revisit the options we have previously considered, including asset disposals, sales of business lines and other measures to raise cash. However, such measures may either be unsuccessful or only temporarily successful in improving our liquidity situation. Such measures could also harm our long-term prospects and undermine our future potential for growth and profitability. Ultimately, however, no assurance can be given that such measures would be effective, and we may be required to pursue a restructuring through insolvency proceedings, which would involve significant uncertainties, potential delays and risks of extended, multi-jurisdictional litigation for us and our creditors.

13.3. **A long and protracted process of engaging with capital providers, including in connection with the implementation of an out-of-court restructuring,**

**could adversely impact our management and otherwise adversely affect our business.**

A protracted process of engaging with our capital providers, including in connection with the implementation of the Financial Restructuring, could disrupt our business and would divert the attention of our management from operation of our business and implementation of our business plan, and may also cause some of our members of management to leave our company. If we fail to implement the Financial Restructuring on a timely basis, any alternative we pursue, including a South African business rescue or another in-court restructuring, may take substantial time to consummate. A protracted business rescue process would also likely result in a large amount of negative publicity, which would harm our brand. It is also likely that such a prolonged Financial Restructuring or bankruptcy proceeding would cause many of our suppliers to ship product to us only on terms that are unfavourable to us, or not at all. If we are unable to obtain inventory on customary terms, we would likely not be able to continue to operate our business.

13.4. **Continued unfavourable macroeconomic factors may decrease consumer demand for our retail goods.**

13.4.1.    Macroeconomic factors such as interest rates, consumer indebtedness, Rand devaluation, rising inflation and employment levels affect consumer demand for our goods. South African households are still considered to be financially fragile, exacerbated by the recent slowdown in unsecured lending, following strong growth in credit in the recent past. Moreover, South Africans at the lower end of the socioeconomic spectrum have continued to feel the effect of the global economic downturn more severely due to low employment growth coupled with wage strikes, power outages and significant increases in electricity, food and property rates, interest rate hikes and taxes in South Africa. The expansion of the provision of social grants has also slowed more recently, impacting lower-end consumer spending. Consumer indebtedness, persistently high unemployment, strike action, limited power infrastructure, a levelling off of social grants and lower consumer confidence have had and could continue to have a material adverse effect on our retail sales and results of operations.

13.4.2.    Our results are also affected by other macroeconomic factors, such as the prevailing economic climate, levels of unemployment, real disposable income, salaries and wage rates, including any increase as a result of payroll cost inflation or governmental action to increase minimum wages or contributions to pension provisions, the availability of consumer credit and consumer perception of economic conditions. Economic growth performance and prospects have deteriorated in South Africa over the past few years, affecting public finances and exacerbating social and political tensions. The national

government net debt continues to rise. The substantial portion of our revenues are generated from our South African stores, and the general slowdown in South African GDP growth and the uncertain economic outlook has and will likely continue to adversely affect consumer spending habits, which may reduce our retail sales and adversely impact our results of operations.

13.4.3.   Moreover, many of the items we sell, particularly higher margin fashion and homeware products, represent discretionary purchases, and we have experienced a marked decrease in sales in certain of our product categories. Given the continuing difficult macroeconomic climate, we expect to continue to experience a decline in retail sales, particularly in higher margin fashion and homeware products, which may be proportionally greater than the level of general economic decline. Therefore, continued unfavourable economic conditions in South Africa have had and will likely continue to have a material adverse effect on our financial condition and results of operations.

13.5.   **Our credit sales could further decline due to a reduction in the availability of credit under our existing consumer credit programs, changes in the terms of our private label store card program, including any future regulatory requirements, or other factors.**

13.5.1.   We maintain Edgars and Jet private label store card programs, and through an arrangement with Absa, Absa extends credit to our customers in South Africa and a large portion of our customers in Namibia. Absa issues our private label store cards to our customers and we receive a net fee for providing certain IT and administrative services with respect to the program. During fiscal year 2016, purchases completed with our private label store cards accounted for 38.8%, down from 42.7% in the prior comparative period. The continued inability or unwillingness of Absa to provide support for our private label store card program may continue to result in a decrease in store card sales to our customers, which could negatively impact our overall sales given customers' reduced purchasing capacity. As the credit provider with the ultimate exposure to the credit risks of our cardholders, Absa has discretion to turn down store card applicants upon an assessment of each applicant's credit risks and in light of Absa's screening and credit requirements. Furthermore, changes in local regulation governing store card business practices, including marketing, underwriting, pricing and billing that may come into effect in the future or tightening of credit from a deterioration of the economic situation in South Africa, could place additional restrictions on consumer credit programs, including limiting the types of promotional credit offerings that may be offered to consumers. These changes could make it even more difficult for Absa to extend credit to our customers, which could also have a material adverse effect on our results of operations. In September

2015, the National Credit Regulator implemented credit affordability regulations which has negatively affected our retail sales and may continue to affect our retail sales in the future.

13.5.2.    In addition to our strategic partnership with Absa, we continue to explore measures to address the credit sales decline, including the continued roll-out of our in-house National Credit Act compliant second-look credit solution, as well as seeking out a possible second-look credit provider to supplement the Absa funded credit proposition. However, efforts to secure a third party second-look credit provider have stagnated in light of negative publicity about uncertainty around our capital structure. If our credit sales do not improve, which also depends on a successful cooperation with any potential second-look credit provider, this would also have a material adverse effect on our results of operations.

13.6.    **An increase of bad debts among our credit card customers or restrictions on our ability to charge market interest rates could have a negative impact on the performance of our credit and financial services business.**

An increase of bad debts as a percentage of our credit card receivables could have a material adverse effect on our revenue, results of operations and liquidity. In addition, existing or future statutory usury provisions may prevent us from increasing the interest rates we charge on our credit cards beyond a specified threshold even though our cost of credit may increase. Such restrictions could have a material adverse effect on our revenue, results of operations and liquidity.

13.7.    **We face the risk of adverse changes in our supplier relationships.**

While we believe that our relationships with our suppliers are generally satisfactory, and that our size and consequent purchasing needs make us an important partner to many of our suppliers, they may nonetheless modify the terms of our relationships due to our financial and operational performance or position, general economic conditions currently prevailing in South Africa or otherwise. We do not have long-term arrangements with most of our suppliers to guarantee availability of merchandise, particular payment terms or the extension of credit limits. Instead, most of these arrangements are short-term in nature, typically on standard 30 to 75-day payment terms dependent on the nature of the supplier. We have recently experienced increased pressure from suppliers as a result of news reports surrounding the sustainability of our capital structure. In some cases, the banks through which our suppliers factor our receivables have been messaging suppliers that they should reduce their exposure to Edcon. Should any of our current suppliers decide to terminate or substantially curtail their relationship with us over concerns that we may not be able to pay for supplies, we may not be able to find alternative suppliers, and our retail sales, results of operations and liquidity may be adversely affected. If our current suppliers were to stop selling merchandise to us on acceptable terms, including as a result of our financial condition, we may be unable to procure the same merchandise from other suppliers in a timely and efficient manner and on acceptable terms, or at all. A significant unfavourable change in our relationships with key

suppliers could adversely impact our business, and could mean that we cannot supply merchandise in our stores on an acceptable basis. In addition, any significant change in the terms that we have with our key suppliers including, payment terms, return policies, the discount or margin on products could adversely affect our financial condition and liquidity. For example, if our suppliers do not extend trade credit to us and require payment on demand, we would have a significant liquidity crisis and would not likely be able to find alternative financing to fund our trade payables. If several material suppliers ceased to extend trade credit, and we could not access other means of paying for necessary supplies, we would likely not be able to continue to do business as a going concern and could file for a South African Business Rescue proceeding. Many of our suppliers rely on credit insurers to guarantee our payment of trade payables with respect to the merchandise those suppliers provide to us. We do not have a direct relationship with these credit insurers, but if they perceive our financial condition as weak, they may require us to post collateral or guarantees to continue to provide credit insurance, or may cease providing credit insurance entirely. News reports regarding challenges with our capital structure have led and may lead credit insurers to take steps, such as those described above, to mitigate perceived risks associated with exposure to us. In the absence of factoring, these suppliers reduce credit lines, ask for shorter terms, or seek cash on delivery or payment in advance.

**13.8.   Our business could be adversely affected by disruptions in our supply chain.**

13.8.1.   Any significant disruption or other adverse event affecting our relationship with any of our major suppliers could have a material adverse effect on the results of our financial condition and our operations. If we need to replace any of our major suppliers, we may face risks and costs associated with a transfer of operations. In addition, a failure to replace any of our major suppliers on commercially reasonable terms, or at all, could have a material adverse effect on our financial condition and results of our operations.

13.8.2.   The concentration of our suppliers will increase as we proceed with our ongoing strategy to reduce the number of our suppliers. Our ongoing strategy to expand our supplier base in markets such as China, Mauritius, Bangladesh, Madagascar and various countries in sub-Saharan Africa places us at risk if merchandise is in short supply in those locations. In addition, such suppliers may be unwilling to provide us with merchandise if we do not place orders at an internationally competitive order level or at a level competitive with large-volume customers. In the event that one or more of our major suppliers chooses to cease providing us with merchandise or experiences operational difficulties, and we are unable to secure alternative sources in a timely manner or on commercially beneficial terms, we may experience inventory shortages or other adverse effects on our business. If our suppliers are unable or unwilling to continue providing us with

merchandise under our presently agreed terms, including as a result of our significantly increased leverage, or if we are unable to obtain goods from our suppliers at prices that will allow our merchandise to be competitively priced, there could be a material adverse effect on our retail sales, results of operations and liquidity.

13.8.3. The cost and availability of our supplies are dependent on many factors, including: (i) the base price of raw material costs, such as cotton and wool, as well as the cost of individual product components; (ii) freight costs; and (iii) rebates and discounts earned from suppliers.

13.8.4. Moreover, we purchase a portion of our products in markets outside of South Africa, principally in Asia, and the number of our foreign suppliers may increase as we proceed with our strategy to partner with suppliers in low-cost countries. We face a variety of risks generally associated with doing business in foreign markets and importing merchandise from these regions, including: (i) currency risks; (ii) political instability; (iii) increased security requirements applicable to foreign goods; (iv) the imposition of duties and taxes, other charges and restrictions on imports; (v) risks related to our suppliers' labor practices, environmental matters or other issues in the foreign countries or factories in which our merchandise is manufactured; (vi) delays in shipping; and (vii) increased costs of transportation.

13.8.5. The ongoing challenging economic environment could have a number of adverse effects on our supply chain. The inability of suppliers to access liquidity, or the insolvency of suppliers, could lead to delivery delays or failures. In addition, failures of other counterparties, including banks, insurance providers and counterparties to contractual arrangements, could negatively impact our business.

13.8.6. Any of these risks, in isolation or in combination, could adversely affect our reputation, financial condition and results of operations. New initiatives may be proposed that may have an impact on the trading status of certain countries and may include retaliatory duties or other trade sanctions which, if enacted, could increase the cost of products purchased from suppliers in such countries or restrict the importation of products from such countries. The future performance of our business will partly depend on our foreign suppliers and may be adversely affected by the factors listed above, all of which are beyond our control.

13.9. **We are dependent upon certain major suppliers for our private-label merchandise.**

We do not manufacture the majority of our own merchandise but instead work closely with a number of suppliers. During fiscal year 2016, our largest supplier of our private-label apparel accounted for 3.5% of our total purchases, and our largest five suppliers accounted for 14.9% of such

purchases. We depend on our suppliers to ship merchandise on time and within our quality standards. The loss of one or more of our major suppliers, particularly at critical times during the year, could have a material adverse effect on our results of operations or financial condition.

13.10. **We may not be able to accurately predict or fulfil customer preferences or demand.**

13.10.1.   A large portion of our sales are from fashion-related products, which are subject to volatile and rapidly changing customer tastes. The availability of new products and changes in customer preferences make it more difficult to predict sales demand accurately. As a multi-product retailer, our success depends, in part, on our ability to effectively predict and respond to quickly changing consumer demands and preferences and to translate market trends into attractive product offerings. Our ability to anticipate and effectively respond to changing customer preferences and tastes depends, in part, on our ability to attract and retain key personnel in our buying, design, merchandising, marketing and other functions. Competition for such personnel is intense, and we may not be able to attract and retain a sufficient number of qualified personnel in future periods.

13.10.2.   Furthermore, many of our products are manufactured offshore. Accordingly, in some instances we must enter into contracts for the purchase and manufacture of merchandise well in advance of the applicable selling season. The long lead times between ordering and delivery make it more important to accurately predict, and more difficult to fulfil, the demand for items.

13.10.3.   There can be no assurance that our orders will match actual demand. If we are unable to successfully predict or respond to sales demand or to changing styles or trends, our sales will be lower and we may be forced to rely on additional markdowns or promotional sales to dispose of excess or slow-moving inventory or we may experience inventory shortfalls on popular products, any of which could have a material adverse effect on our financial condition and results of operations. In addition, a number of other factors, including changes in personnel in the buying and merchandising function, could adversely affect product availability.

13.11. **Our business is affected by foreign currency fluctuations.**

13.11.1.   We realise a majority of our revenue, and incur a significant portion of our costs and expenses, in rand. We purchase approximately 8.6% of our products directly from markets outside of South Africa denominated in a foreign currency, principally in Asia, and the number of our foreign suppliers may increase as we proceed with our strategy to partner with suppliers in countries with low production costs. A part of our costs are incurred through indirect suppliers, who denominate their costs in rand but are exposed to foreign currency fluctuation. The cost of

foreign-sourced products is affected by the fluctuation of the relevant local currency against the rand or, if priced in other currencies, the price of the merchandise in currencies other than the rand. Although we hedge approximately 76% of all committed orders, changes in the value of the rand relative to foreign currencies may increase our cost of goods sold and, if we are unable to pass such cost increases on to our customers, decrease our gross margins, our sales and ultimately our earnings.

13.11.2.   In addition, a substantial portion of our indebtedness, including our outstanding 2018 EUR fixed rate notes, 2018 USD fixed rate notes, EUR Super Senior Liquidity Facility, EUR Super senior term loan, EUR super senior PIK notes, EUR senior secured PIK-toggle notes and the EUR senior secured fixed rate notes are denominated in foreign currency, i.e., the euro and the U.S. dollar. We currently have no hedging arrangements in place with respect to these notes, and currency fluctuations in the future may affect our ability to service our foreign currency denominated indebtedness, including payments in euro on the 2018 EUR fixed rate notes and the EUR Super Senior Liquidity Facility, and payment in U.S. dollar on the 2018 USD fixed rate notes.

13.11.3.   In recent years, the value of the rand as measured against the euro or the U.S. dollar has fluctuated considerably. The rand has fallen from an exchange rate of R12.04 to the U.S. dollar on 28 March 2015 to R15.46 to the U.S. dollar on 26 March 2016 and from R13.12 to the euro on 28 March 2015 to R17.26 to the euro on 26 March 2016. Weakness of the rand may adversely affect our profitability as we purchase significant quantities of merchandise denominated in foreign currency. See paragraph 4 *(Management's discussion and Analysis of Audited Consolidated Results)* for discussion of the effects of the weakening Rand on our business.

13.11.4.   We cannot assure you that we will be able to manage our currency risks effectively or that any volatility in currency exchange rates will not have a material adverse effect on our financial condition or results of operations or on our ability to make principal and interest payments on our indebtedness.

13.12.  **If we are unable to renew or replace our store leases or enter into leases for new stores on favourable terms, or if any of our current leases are terminated prior to the expiry of its stated term and we cannot find suitable alternate locations, our growth and profitability could be harmed.**

13.12.1.   We lease all of our store locations. We typically occupy our stores under operating leases with fixed terms of between five and ten years, with options to renew for additional multi-year periods thereafter. In the future, we may not be able to negotiate favourable lease terms. Our ability to renew any expired lease on favourable terms, or, if such lease cannot be renewed, our ability

to lease a suitable alternative location, as well as our ability to enter into leases for new stores on favourable terms, depend on many factors beyond our control, such as conditions in the local real estate market, competition for desirable properties and our relationships with current and prospective landlords. In addition, many of our lease agreements have defined escalating rent provisions over the initial term and any extensions. Our inability to renew the lease agreements in relation to our stores or to meet the requirement for higher rental payments may cause our occupancy costs to be higher in future years or may force us to close stores in desirable locations. Some of our leases have early cancellation clauses, which permit the lease to be terminated by us or the landlord if certain sales levels are not met in specific periods or if the shopping centre in which the relevant store is located does not meet specified occupancy standards. In addition to future minimum lease payments, some of our store leases provide for additional rental payments based on a percentage of net sales, or percentage of rent, if sales at the respective stores exceed specified levels, as well as the payment of common area maintenance charges, real property insurance and real estate taxes. As we expand our store base, our lease expense and our cash outlays for rent under the lease terms will increase. An adverse change in the terms of our store lease agreement or our inability to satisfy the requirements under these agreements may have a material adverse effect on the results of our operations, profitability and financial condition. In addition, if we are unable to renew existing leases or lease suitable alternative locations, or enter into leases for new stores on favourable terms, our growth and our profitability may be significantly harmed.

13.12.2.    We depend on cash flow from operations to pay our lease expenses. If our business does not generate sufficient cash flow from operating activities to fund these expenses, we may not be able to service our lease expenses, which could materially harm our business. If an existing or future store is not profitable, and we decide to close it, we may nonetheless be committed to perform our obligations under the applicable lease including, amongst other things, paying the base rent for the balance of the lease term. Moreover, even if a lease has an early cancellation clause, we may not satisfy the contractual requirements for early cancellation under that lease. Our inability to enter into new leases or renew existing leases on terms acceptable to us or be released from our obligations under leases for stores that we close could materially adversely affect our financial condition and results of operations.

13.13. **Any negative impact on the reputation of, and value associated with, our brand names could adversely affect our business.**

Our brand names represent an important asset of our business. Maintaining the reputation of, and value associated with, our brand names is essential to the success of our business. Significant negative publicity (including with respect to our liquidity position), widespread product recalls or other events could also cause damage to our brand names. We rely on marketing to strengthen our brand names, but our marketing initiatives may prove to be ineffective. Substantial erosion in the reputation of, or value associated with, our brand names could have a material adverse effect on our financial condition and results of operations. Similarly, any erosion in the reputation of a third-party brand for which we have exclusive license agreements in South Africa could have a material adverse effect on our financial condition and results of operations.

13.14. **Our business could suffer as a result of weak retail sales during peak selling seasons.**

Our business is subject to seasonal peaks. Historically, our most important trading periods in terms of retail sales, operating results and cash flow have been the Easter and Christmas seasons, with approximately one third of our retail sales occurring in April, November and December combined, for our fiscal year 2016. We incur significant additional expenses in advance of the Easter and Christmas seasons in anticipation of higher retail sales during those periods, including the cost of additional inventory, advertising and hiring additional employees. In previous years, our investment in working capital has peaked in early to mid-March, October and November and has fallen significantly in April and January. If, for any reason, retail sales during our peak seasons are significantly lower than we expect, we may be unable to adjust our expenses in a timely fashion and may be left with a substantial amount of unsold inventory, especially in seasonal merchandise that is difficult to liquidate. In that event, we may be forced to rely on significant markdowns or promotional sales to dispose of excess inventory, which could have a material adverse effect on our financial condition and results of operations. At the same time, if we fail to purchase a sufficient quantity of merchandise, we may not have an adequate supply of products to meet consumer demand, which may cause us to lose retail sales.

13.15. **Our business can be adversely affected by unseasonal weather conditions.**

Our results are affected by periods of abnormal or unseasonal weather conditions. For example, periods of warm weather in the winter could render a portion of our inventory incompatible with such unseasonal conditions. Adverse weather conditions early in the season could lead to a slowdown in retail sales at full price followed by more extensive markdowns at the end of the season. Prolonged unseasonal weather conditions during one of our peak trading seasons could adversely affect our turnover and, in turn, our financial condition and results of operations. In addition, extreme weather conditions, such as floods, may make it difficult for our employees and customers to travel to our stores.

13.16. **The sector in which our business operates is highly competitive.**

13.16.1.    The retail markets in which we operate are highly competitive, particularly with respect to product selection and quality, store

location and design, price, customer service, credit availability and advertising. We compete at national and local levels with a wide variety of retailers of varying sizes and covering different product lines across all geographic markets in which we operate. For example, in the Edgars division, we compete directly with Woolworths, Truworths and Foschini. In the Discount division, we compete with Mr. Price, Ackermans and PEP. In addition, the South African retail sector has experienced a consolidation of market formats as retail companies diversify in other sectors of the retail market. Our credit and financial services business faces competition from other retail companies, such as Truworths and Foschini, which offer financial services to their customers. Increased competition from our existing competitors or new entrants to the market could result in lower prices and margins or a decrease in our market share, any of which could have a material adverse effect on our financial condition and results of operations. In addition, international competitors have entered our market, creating increased competition, as in the case of Cotton On, Zara, H&M and, through its acquisition stake in Massmart, Wal-Mart.

13.16.2.    We face a variety of competitive challenges including: (i) anticipating and quickly responding to changing consumer demands; (ii) maintaining favourable brand recognition and effectively marketing our products to consumers in several diverse market segments; (iii) developing innovative fashion products in styles that appeal to consumers of varying age groups and tastes; (iv) sourcing and distributing merchandise efficiently; (v) competitively pricing our products; and (vi) responding to changes in consumer behaviour resulting from changes in the economic conditions and consumer spending patterns.

13.16.3.    Actions taken by our competitors, as well as actions taken by us to maintain our competitiveness and reputation, can and will continue to place pressure on our pricing strategy, margins and profitability, and could have a material adverse effect on our financial condition and results of operations. Some of our competitors may have greater financial resources, greater purchasing economies of scale and/or lower cost bases, any of which may give them a competitive advantage over us. Our competitors also may merge or form strategic partnerships, which could cause significant additional competition for us.

13.17. **We may not be able to obtain the capital required to implement our business plan, which may force us to limit the scope of our operations and adversely impact our revenues.**

In connection with implementing our business plans, we have significantly reduced our capital needs in the medium term, for example by streamlining our operations and store management. However, we still may not have sufficient capital to fund our future operations without additional capital

investments. Our capital needs will depend on numerous factors, including our profitability, our ability to secure financing, our ability to generate revenues and our ability to attract and retain customers. We cannot assure you that we will be able to obtain capital in the future to meet our needs. If we cannot obtain additional funding, we may be required to limit the implementation our business plan, limit our marketing efforts and decrease or eliminate our intended capital expenditures.

13.18. **Our growth depends in part on our ability to open and operate new stores profitably.**

One of our business strategies is to expand our base of retail stores. For fiscal year 2017, we plan to spend approximately R600 million of total capital expenditure, of which we expect to spend approximately R190 million on new stores. Should we be unable to implement this strategy, our ability to increase our sales, profitability and cash flow could be impaired. Although the anticipated growth in new space is expected to decrease, to the extent that we are unable to open and operate new stores profitably, our sales growth would come only from increases in same-store sales. We may be unable to implement our strategy if we cannot identify suitable sites for additional stores, negotiate acceptable leases, access sufficient capital to support store growth, or hire and train a sufficient number of qualified employees. This could be exacerbated by our intention to decrease our level of capital expenditure in the coming years.

13.19. **We rely on our key personnel and we face strong competition to attract and retain qualified managers and employees.**

We are highly dependent on our key personnel who have extensive experience in, and knowledge of, our industry. In addition, our business faces significant and increasing competition for qualified management and skilled employees. We have instituted a number of programs to improve the recruitment and retention of managers and employees, and we invest substantially in their training and professional development. However, these programs may prove unsuccessful and, in conditions of constrained supply of skilled employees, there is a risk that our well-trained managers and employees will accept employment with our competitors. The loss of the service of our key personnel or our failure to recruit, train and retain skilled managers and employees could have a material adverse effect on our retail sales, results of operations and liquidity.

13.20. **We depend heavily on our IT systems to operate our business.**

We rely to a significant degree on the efficient and uninterrupted operation of our various computer and communications systems to operate and monitor all aspects of our retail business and our credit and financial services business, including, in respect of our retail business, sales, warehousing, distribution, purchasing, inventory control, and merchandise planning and replenishment. Any significant breakdown or other significant disruption to the operations of our primary sites for all of our computer and communications systems could significantly affect our ability to manage our IT systems, which in turn could have a material adverse effect on our financial condition and results of operations.

13.21. **A continued reduction in the availability or failure to maintain the full functionality and integrity of our IT systems that are used to manage our private label store card program underwritten by Absa could have an adverse effect on our financial condition and results of operations.**

Our IT and telecommunications systems are used to manage our private label store card program underwritten by Absa. The failure of these systems, or the termination of a third-party software license or service agreement on which any of these systems is based, could interrupt the operation of our private label store card program. Because our IT and telecommunications systems interface depends on third-party systems, we could experience service denials if demand for such services exceeds capacity or such third-party systems fail or experience interruptions. If sustained or repeated, system failures or service denials could result in a deterioration of Absa's ability to process new credit applications, collect payments and provide customer service, thereby compromising our ability to support our private label store card program effectively, which may result in damage to our reputation and/or result in a loss of customer business, any of which could have a material adverse effect on our financial condition and results of operations.

13.22. **We could experience labour disputes that could disrupt our business.**

13.22.1.    Most of our store and warehouse employees are represented by trade unions and covered by collective bargaining or similar agreements that are subject to periodic renegotiation. Although we negotiated a new two-year collective bargaining agreement in May 2015 with the South African Commercial, Catering and Allied Workers Union (the "SACCAWU"), the biggest trade union active amongst our employees, current and future collective bargaining negotiations may not prove successful and could result in the disruption of our operations. Such current and future collective bargaining negotiations may result in an increase in our labour costs. In addition, our employees could join in national labour strikes, boycotts or other collective actions. Any work stoppages and labour disruptions or any increase in our labour costs could materially adversely affect our retail sales, results of operations and financial condition.

13.22.2.    Labour disputes and other workforce-related issues have been prevalent in certain industries in South Africa. Labour disputes affecting our suppliers or social unrest in South Africa generally may also negatively impact our business, by disrupting our supply chain or causing a reduction in the spending capacity of our customers. We have had no recent labour disputes which have resulted in material stoppages.

13.23. **We are subject to complaints, claims and legal actions that could affect us.**

We are, and may become in the future, party to various complaints, claims and legal actions in the ordinary course of our business. These complaints, claims and legal actions, (whether actual or potential) even if successfully disposed of without direct adverse financial effect, could have a material

adverse effect on our reputation and divert our financial and management resources from more beneficial uses. If we were to be found liable under any such claims, our results of operations could be adversely affected.

13.24. **Changes in tax regulations may have an adverse effect on our results of operations and financial condition.**

Changes in tax regulations have had and may in the future have negative effects on our business, financial condition, results of operations and prospects. Uncertainties exist with respect to the interpretation of complex tax regulations, changes in tax laws and the amount and timing of taxable income. Such uncertainties with respect to tax regulations may hinder our ability to effectively plan for the future and to implement our business plan. Our tax and similar payments, as well as customs duties and foreign currency payments, are subject to audits by the tax authorities and, should any irregularities be identified, interest and monetary penalties could be imposed on us. In addition, some transactions with our subsidiaries may also be challenged for tax reasons.

13.25. **Compliance with privacy and information laws and requirements could be costly, and a breach of information security or privacy could adversely affect our business.**

13.25.1. We are subject to privacy and information laws and requirements governing our use of identifiable data relating to customers, employees and others. At present, data protection in South Africa is regulated under the Protection of Personal Information Act, 2013 (the "**POPI Act**"). The right to privacy is a fundamental right that is protected both under South Africa's common law and under section 14 of the Constitution of the Republic of South Africa, which provides individuals with the right to have their private or personal information protected against disclosure by other persons.

13.25.2. The POPI Act aims to bring South Africa in line with international data protection law, including that of the European Union, by introducing measures to ensure that the processing of personal information (of both natural and legal persons) is safeguarded. The POPI Act introduces eight "Information Protection Conditions" which regulate the processing (both automated and non-automated) of personal information. These include the collection, receipt, recording, organization, collation, storage, updating or modification, retrieval, alteration, consultation or use, the dissemination by means of transmission, distribution or making available in any other form, and the merging, linking, as well as the restriction, degradation, erasure or destruction of information. The POPI Act also regulates the transfer and storage of information outside of South Africa as well as the use of personal information for direct marketing. In addition, the POPI Act establishes an information regulator which is empowered to monitor and enforce compliance with its provisions. A failure to comply with the POPI Act, once the relevant provisions come into

effect, will be an offence and may also attract financial penalties for the Issuer.

13.25.3.  Compliance with such laws and requirements may require us to make necessary systems changes and implement new administrative processes. If a data security breach occurs, our reputation could be damaged and we could experience lost sales, fines or lawsuits.

13.26. **We may be unable to protect our trademarks and other intellectual property or may otherwise have our brand names harmed.**

We believe that our registered trademarks and other intellectual property have significant value and are important to the marketing of our products and business. While we intend to take appropriate action to protect our intellectual property rights, we may not be able to sufficiently prevent third parties from using our intellectual property without our authorization. The use of our intellectual property by others could reduce or eliminate any competitive advantage we have developed, causing us to lose sales or otherwise harm the reputation of our brands names. In addition, we may be subject to claims of breaches of intellectual property rights from third parties, which may result in legal proceedings and negative publicity.

13.27. **Maintenance of our competitive position is partially dependent on our ability to license well-recognised international apparel brands.**

Although we own many of our own private-label brands, we also rely on our ability to attract, retain and maintain good relationships with apparel licensors that have strong, well-recognized brands and trademarks, such as Nike, Adidas, Guess, Playtex, Puma, Levis, Mango, Forever New, Tom Tailor, Lipsy, TM Lewin, Topshop and Topman and River Island. Our license agreements are generally for an initial term of five years, subject to renewal, and there can be no assurance that we will be able to renew these licenses. Furthermore, many of our license agreements require minimum royalty payments, and if we are unable to generate sufficient sales and profitability to cover these minimum royalty requirements, we may be required to make additional payments to the licensors that could have a material adverse effect on our business and results of operations. These relationships with licensors may be affected by our current or future liquidity status. In addition, because certain of our license agreements are non-exclusive, new or existing competitors may obtain licenses with overlapping product or geographic terms, resulting in increased competition for a particular market.

13.28. **The growth of our business is in part dependent on our relationships with Absa as well as with Hollard Insurance, our insurance joint operation partner, and we may enter into additional joint venture relationships. If we were to lose these relationships, or the benefits we derive from these relationships were to diminish, our growth rates and our business would be harmed.**

13.28.1.  We rely on certain commercial and corporate partners to help drive our net revenues and profitability growth rates. In November 2012, for example, we entered into a long-term strategic relationship with Absa to continue to provide our

customers with access to credit under our private label store card program. Absa provides critical services, such as credit underwriting and funding of the book, and we earn an administration fee for our front-facing services and maintenance of the credit book. In addition, we offer our customers Edgars and Jet branded insurance products through our business arrangement formed with Hollard Insurance. Hollard Insurance underwrites all insurance products and provides the insurance business with actuarial and compliance support. We also earn a fee for use of our brands in marketing the insurance products. We have considered entering into joint venture relationships with certain other parties in connection with sales of our assets to raise liquidity, and will monitor any such opportunities that arise in the future in order to improve liquidity.

13.28.2.    If our relationships with these partners were to be damaged or lost, or the benefits we derive from these relationships were to be diminished, whether by our own actions, the actions of one or more governmental entities, the actions of our competitor or the actions of Absa or Hollard Insurance themselves, our growth rates and our business would be harmed. Furthermore, if these partners are unable to continue operations or perform obligations under their respective contractual arrangements with us, we may be required to identify new commercial and corporate partners which may divert management resources from other matters and otherwise interrupt our sales cycle. Moreover, we may be unsuccessful in finding replacement partners, which could have a material adverse effect on our profitability and operations.

13.29. **An adverse change in economic, political and social conditions in South Africa or regionally may adversely affect economic conditions generally and demand for our products specifically, and cause our revenue, profitability and cash flow to decline**.

13.29.1.    We generated 88% of our retail sales in South Africa in fiscal year 2016. Economic, political and social conditions in South Africa have a significant direct impact on our business. South Africa has relatively high levels of unemployment, poverty and crime, and a relatively low level of education. These problems, in part, have hindered investments in South Africa, prompted the emigration of skilled workers and negatively affected economic growth. Although it is difficult to predict the effect of these problems on South African businesses or the South African government's efforts to solve them, these problems, or the policy prescriptions enacted, may adversely affect economic conditions generally and demand for our products specifically. Government policies aimed at alleviating and redressing the disadvantages and lack of services suffered by the majority of citizens under previous South African governments may also have an adverse effect on economic conditions and our operations. There has also been

economic, political and social instability in the countries surrounding South Africa, which may negatively affect South African economic, political or social conditions. An adverse change in the economic, political or social conditions in South Africa as well as regional instability may have a material adverse effect on our profitability, financial condition and results of operations.

13.29.2.    Xenophobic attacks on foreigners in South Africa, and consequently negative South African sentiment in countries in the rest of Africa, may have a negative material adverse effect on our profitability, financial condition and results of operations.

13.29.3.    There are risks associated with an investment in emerging markets such as South Africa, including: (i) adverse changes in economic and governmental policy; (ii) relatively low levels of disposable consumer income; (iii) relatively high levels of crime, including the risk of robberies of cash in transit; (iv) unpredictable changes in the legal and regulatory environment; (v) relatively high levels of corruption; (vi) the inconsistent application of existing laws and regulations; and (vii) relatively slow or insufficient legal remedies.

13.29.4.    Since 1999, during the years of GDP growth, the SARB has focused on controlling inflation as its primary monetary policy. Since the global economic downturn in 2008, the SARB has adjusted its focus on inflation in favour of growth-oriented monetary policies, although growth has slowed somewhat in recent years. Year-on-year inflation is currently within the target range of 3% to 6%, with inflation for April 2016 recorded at 6.2%, above the central bank's target range. There is a risk that the inflation outlook in South Africa may destabilise South Africa's macroeconomic performance. This may be impacted by global and local circumstances including the strength of the South African currency, which continues to be volatile.

13.29.5.    An adverse change in economic, political or social conditions in South Africa or neighbouring countries or emerging markets generally may adversely affect the value of the rand, economic conditions in South Africa generally or demand for our products specifically, which may have a material adverse effect on our profitability, financial condition and results of operations. In addition, any such adverse change may negatively affect investor sentiment towards South Africa or emerging markets generally.

13.30.    **Our results may be adversely affected by increases in energy costs.**
Energy costs in South Africa have increased dramatically in the past. These fluctuations may result in an increase in our transportation costs for distribution, utility costs for our retail stores and costs to purchase products from our suppliers. Future rises in energy costs could adversely affect consumer spending and demand for our products and could increase our operating costs, both of which could have a material adverse effect on our financial condition and results of operations.

13.31. **Until the implementation of the Financial Restructuring, we continue to be indirectly owned and controlled by investment funds advised by Bain Capital, and their interests as equity holders may conflict with yours as a Holder.**

We continue to be indirectly owned and controlled by investment funds advised by Bain Capital. The interests of our equity holders may not in all cases be aligned with your interests. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of our equity holders might conflict with those of the Holders. In addition, our equity holders may have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to Holders. Furthermore, such investment funds or their affiliates may in the future own businesses that directly or indirectly compete with us. They also may pursue acquisition opportunities that may be complementary to our business, and as a result, those acquisition opportunities may not be available to us.

13.32. **Disruptions or breakdowns in South African infrastructure could disrupt our business.**

Our operations rely on the continued ability of South African infrastructure to support our business activities. Disruptions in the provision of basic services such as transport, water and electricity impact our ability to reach our customers and our customers' ability to shop in our stores. For example, the strikes at rail and other transportation providers in the past have delayed the transportation of our merchandise. The rapid growth of the population and economy of South Africa has placed pressure on the existing infrastructure of the country. For example, over the last few year significant power shortages by Eskom, the state-owned electricity provider have resulted in rolling load shedding. This results in planned power outages during which time all power to a particular suburb or area is switched off for up to several hours, depending on the level of load shedding required. Stage 1 to 3 load shedding is well understood in the country and information on these outages is made available on short notice based on unplanned or planned maintenance requirements as well as unplanned shortages. These arrangements have been implemented to prevent a total blackout of power for the country. The impact of these arrangements on industry are significant and are expected to continue to have a material impact in the future. The continued short supply of power and any failure on the part of the South African government to invest in adequate infrastructure could adversely affect our retail sales, financial condition and results of operations.

13.33. **South African currency exchange control restrictions could hinder our ability to procure and/or repay foreign-denominated financings.**

13.33.1. The Exchange Control Regulations restrict the exchange of currency between residents of South Africa, the Republic of Namibia and the Kingdoms of Lesotho and Swaziland (the "Common Monetary Area") on the one hand, and non-residents of the Common Monetary Area, on the other hand. In particular,

South African companies are: (i) generally not permitted to export capital from South Africa, or grant security or financial assistance (including guarantees) to non-residents, hold foreign currency in excess of certain limits or incur indebtedness denominated in foreign currencies without the approval of the South African exchange control authorities; (ii) prohibited from using transfer pricing and excessive interest rates on foreign loans as a means of expatriating currency; and (iii) generally not permitted to acquire an interest in a foreign venture without the approval of the South African exchange control authorities and are subject to compliance with the investment criteria of the South African exchange control authorities.

13.33.2.   These restrictions could hinder our ability to procure financings provided by non-resident lenders in the future. While the South African government has relaxed exchange controls in recent years, it is difficult to predict what action, if any, the government may take in the future with respect to exchange controls. The government may continue to relax or abolish exchange controls in the future. However, if the government were to tighten exchange controls, these restrictions could further hinder our ability to procure foreign-denominated financings in the future and could adversely impact our liquidity and results of operations.

13.34.   **The high rates of HIV infection in South Africa could cause us to lose skilled employees, incur additional costs or adversely affect economic conditions generally or demand for our products specifically, each of which could cause our retail sales, liquidity and results of operations to decline.**

South Africa has one of the highest reported HIV infection rates in the world. The exact impact of increased mortality rates due to AIDS-related deaths on the cost of doing business in South Africa and the potential growth rate of the economy is unclear at this time. We may lose employees with valuable skills due to AIDS-related deaths, and our results of operations and financial condition could be materially adversely affected if we lose such employees. In addition, we may incur education and prevention costs. Our results of operations and liquidity could be materially adversely affected if our employee health-related expenses increase. Moreover, increased mortality rates due to AIDS-related deaths may slow the population growth rate, cause the South African population to decline or significantly increase the overall cost of doing business in South Africa, which may affect economic conditions generally and demand for our products specifically. The effect of HIV infection on both our employees and on the South African market may have a material adverse effect on profitability, financial condition and results of our operations.

13.35.   **Our consolidated financial statements for fiscal year 2016 have not yet been audited by our independent auditors.**

As of the date of this Explanatory Statement, our consolidated financial statements for fiscal year 2016 have not yet been audited or reviewed by our

I independent auditors, Deloitte & Touche, South Africa, and we have not yet published our consolidated financial statements for fiscal year 2016 and the first and second quarters 2017. Under our existing finance documents, we were required to publish our audited annual consolidated financial statements for fiscal year 2016 within 120 days from the end of fiscal year 2016 and our unaudited interim consolidated financial statements for the first and second quarters 2017 within 60 days from the end of the relevant quarter. While we have obtained waivers from the relevant numbers of creditors under our existing finance documents to postpone the publication of such financial statements until 31 December 2016, there can be no guarantee that we will be in a position to publish our annual and interim financial statements by that date. Additionally, while we are in discussions with our independent auditors to finalize the audit of our financial statements for fiscal year 2016, we cannot guarantee that we will obtain such audit prior to 31 December 2016 or that such audit will be issued with an unqualified audit opinion or not include an emphasis of matter remark.

Furthermore, in this Explanatory Statement, we discuss and present certain unaudited preliminary financial information for fiscal year 2016 and the 26-week periods ended 24 September 2016 and 26 September 2015. This unaudited preliminary financial information has been derived from the unaudited consolidated management accounts of Holdco and has not been audited or reviewed by Deloitte & Touche, South Africa. As a result, the Compromise Companies cannot assure you that, upon completing the preparation of the financial statements for fiscal years 2016 or 2017 (as applicable) and the review by the independent auditors of the Existing Group of the results for fiscal years 2016 or 2017, as applicable, the Existing Group will not report materially different results for fiscal year 2016 or the 26-week periods ended 24 September 2016 and 26 September 2015, respectively, than those indicated herein.

Lastly, the recipients of this Explanatory Statement should be aware that our independent auditors, Deloitte & Touche South Africa, have not compiled or performed any procedures with respect to any of the financial data included in this Explanatory Statement, and does not express an opinion or any other form of assurance with respect thereto.

14. **Insolvency Proceedings**

If the Compromises are not implemented in accordance with their respective terms, or are not implemented on or before the Long-Stop Date, then there is a high probability of the Company entering into business rescue proceedings alternatively liquidation proceedings.

15. **If the conditions precedent to the Restructuring Agreement are not satisfied, the Compromises may not become operative**

15.1.   The transactions contemplated by the relevant Compromise will not become operative unless all the conditions precedent to the Restructuring Agreement are satisfied in accordance with the terms of the Restructuring Agreement.

15.2.    It is important to highlight that even if the Compromises are sanctioned and the order filed with the Commission (at which point they become binding on the creditors who are party thereto), they will only become operative if the remaining conditions precedent to the Compromises and the Restructuring Agreement all are fulfilled in accordance with their respective terms.

15.3.    The Senior Secured Company Compromise and the Super Senior Company Compromise are, by their nature, inter-conditional and interdependent on one another, meaning that neither can become operative on their own.

16.    **Right to object**

16.1.    Even if each Compromise is validly approved at the relevant Compromise Meeting, it is possible for a Person (whether a relevant Compromise Creditor or any other Person who has an interest) to apply to intervene in the application to sanction such Compromise and to oppose the sanctioning of the Compromise. If the order sanctioning the Compromise is granted, the Person who intervened and objected to the granting thereof may apply for leave to appeal against the order. The effect of an application for leave to appeal is to suspend the order sanctioning the Compromise pending the determination of the appeal process.

16.2.    A party in interest will also have the ability to file an objection to the Compromise Companies' request for the entry of a recognition order under chapter 15 of the United States Bankruptcy Code.  Further, a party could potentially appeal such order once it is entered.

16.3.    If this occurs, the implementation of the Compromises as well as the Financial Restructuring pursuant to the Restructuring Agreement will be delayed. If such delay exists beyond the Long-Stop Date, then the Compromises may fail (unless the Long-Stop Date is extended by the Company).

17.    **Requirement for the Compromises to be sanctioned by the South African courts and Chapter 15 Recognition**

17.1.    In order for the relevant Compromise to become effective under South African law –

17.1.1.    it must receive the sanction of the Court; and

17.1.2.    the order sanctioning the relevant Compromise must –

17.1.2.1.    be filed with the Commission within five business days; and

17.1.2.2.    be attached to each copy of the Company's memorandum of incorporation kept at its registered office or elsewhere as contemplated in section 25 of the Companies Act.

17.2.    The Court will not sanction the relevant Compromise unless it is satisfied that it is just and equitable to do so, having regard to the number of creditors of any affected class of creditors, who were present or represented at the meeting, and who voted in favour of the relevant Compromise.

17.3.    In addition, the court will consider whether –

17.3.1.    the class of relevant Compromise Creditors has been properly constituted; and

17.3.2.   as a matter of discretion, whether it is proper to sanction the relevant Compromise having regard to issues of fairness generally.

17.4.   There can be no assurance that the Court will sanction the relevant Compromise. If the Court does not sanction the relevant Compromise, or approves it subject to conditions or amendments which (i) the Company deems unacceptable or (ii) would have (directly or indirectly) a material adverse effect on the interests of any relevant Compromise Creditors and such conditions or amendments are not approved by the Compromise Creditors, then the relevant Compromise will not become effective and, as a consequence, the Financial Restructuring will not be implemented.

17.5.   One of the conditions precedent to Completion under the Restructuring Agreement is that the South African proceedings related to the Compromises be recognised in the United States pursuant to chapter 15 of the United States Bankruptcy Code.  The Compromise Companies will file a petition for relief under chapter 15 in the relevant bankruptcy court in the United States in order to commence a case for purposes of obtaining entry of an order recognising the Compromises. The length of the period between the date of filing the petition and the entry of the recognition order depends on whether the petition is opposed. If the chapter 15 petition is unopposed, it is likely to take approximately 30 days from the date at which recognition is sought to the entry of an order recognising the Compromises. If the chapter 15 petition is opposed, then this period of time will be extended by the period necessary to resolve such opposition, including potential appeals. Any delay in fulfilling this condition precedent would cause a consequential delay to Completion. It is the Compromise Companies' intention to file the chapter 15 petition at the same time as they seek the Court's sanctioning of the Compromises (or, if later, at the earliest time possible under the United States Bankruptcy Code), so as to expedite this process.

18.   **Risks relating to the Compromises, including those relating to the Company's Business, the Compromise Consideration and the New Money Notes**

18.1.   If the Senior Secured Company Compromise is implemented in accordance with its terms, the Senior Secured Creditors will receive Compromise Consideration comprising New Holdco 2 Ordinary A Shares and New Holdco 2 PIK B Notes. The Senior Secured Creditors may also elect to subscribe for New Money Notes in accordance with the terms of the New Money Notes Offer pursuant to which they will be issued New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be.

18.2.   If the Super Senior Company Compromise is implemented in accordance with its terms, the Super Senior Third Ranking Creditors will receive Compromise Consideration comprising New Holdco 2 PIK A Notes. The Super Senior Third Ranking Creditors may also elect to subscribe for New Money Notes in accordance with the terms of the New Money Notes Offer, pursuant to which they will be issued New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be.

18.3.   An investment in any or all of the Compromise Consideration or any New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, (whether effected by way of the relevant Compromise, New Money

Notes Offer or otherwise) has risks and Compromise Creditors' should carefully review and consider the risks set out below in respect of the Company and the relevant Compromise Consideration and New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, that a Compromise Creditor will receive before making a decision in respect of the relevant Compromise and New Money Notes Offer.

19.    **Risks relating to the LUA and expiry of the Deferral Period**

*Risks*

19.1.    The LUA includes various conditions which required satisfaction by 31 October 2016 ("**Second Milestone Date**"), including (i) the launch by the Compromise Companies of the Compromises required to implement the Financial Restructuring; and (ii) the Tax Report (in form and content reasonably acceptable to the Majority Locked-Up Creditors) having been prepared and delivered to each Senior Creditor that has entered into a Reliance Letter (as such terms are defined therein).

19.2.    Due to the complexity of the Financial Restructuring –

19.2.1.    The Tax Report has not been finalised as at 12 December 2016 and the finalisation and delivery thereof has been included as a condition precedent to the Restructuring Agreement; and

19.2.2.    and to ensure that the Compromises are structured effectively and appropriately, the Compromises were only launched on 12 December 2016.

19.3.    As such, the Compromise Companies –

19.3.1.    did not technically comply with, and technically breached, the Second Milestone Date by not launching the Compromises as aforesaid; and

19.3.2.    remain in continuing default under the LUA.

19.4.    A breach of the Second Milestone Date gave rise to a termination right on 5 Business Days' notice from any Individual Group of Majority Locked-Up Creditors (as defined in the LUA).

19.5.    While the Compromise Companies are not aware of any intention by any Individual Group of Majority Locked-Up Creditors (or Super Majority Locked-Up Creditors (as applicable)) to terminate the LUA as permissible following the occurrence of certain specified events (for example (i) an order of a governmental body or court of competent jurisdiction restraining or otherwise preventing implementation of the Financial Restructuring, (ii) the occurrence of a material impediment (in the opinion of such Individual Group of Super Majority Locked-Up Creditors acting reasonably) preventing implementation of the Financial Restructuring by the Long-Stop Date with such material impediment incapable of cure within 5 Business Days' of its occurrence, (iii) following the commencement of any Enforcement Action or an Enforcement Event (other than as contemplated in the Steps Paper or which relates to liabilities less than R2 million) under the terms of the LUA, the Compromise Companies highlight that any such termination of the LUA would result in the Financial Restructuring not being achieved and the Compromise Companies withdrawing the Compromises.

19.6. In addition, the Deferral Period expires on 14 December 2016. If the Deferral Period expires, then payment of the March Coupon (being the payment due March 2016 in respect of the Senior Secured 2018 Notes) and the September Coupon (being the cash interest payment due 15 September 2016 on the Senior Secured 2018 Notes) and all cash interest payments that are due or will fall due under the Senior Secured Term Loans up to and including 14 December 2016 (being the "**Deferred Coupons**") will immediately become due, owing and payable by the Company.

*Steps taken to address these risks:*

19.7. The Compromise Companies and the creditors who are a party to the LUA having entered into an amendment to the LUA ("**Amendment Agreement**") to, *inter alia,* (i) extend the Long Stop Date under the LUA to 28 February 2017; and (ii) require each Locked-Up Creditor not to, *inter alia,* take any Enforcement Action in relation to any member of the Existing Group as a consequence of any Specified Default. For the purpose hereof, "Specified Default" is defined in such amendment agreement to mean all Defaults that arise or may arise:

19.7.1. under the Finance Documents as a result of:

19.7.1.1. the Deferral Period (as such term is defined in the LUA) terminating;

19.7.1.2. the Deferred Coupons and the Deferred Term Loan Interest falling due and not being paid immediately following the expiry of the Deferral Period; and/or

19.7.1.3. the Senior Creditors Waivers terminating in accordance with their terms; and/or

19.7.2. under the Amendment Agreement as a result of:

19.7.2.1. the Tax Report (in form and content reasonably acceptable to the Majority Locked-Up Creditors) having not been prepared and delivered to each Senior Creditor that has entered into a Reliance Letter; and

19.7.2.2. each Company Party (other than the BEE Trust or the Management Trust) having failed to launch any compromise proceedings necessary to implement the Financial Restructuring,

on or prior to 31 October 2016.

19.8. Accordingly, once the Amendment Agreement has been entered into and has become unconditional in accordance with its terms, then the risk of –

19.8.1. the failure of the conditions referred to in paragraph 19.1 to have been satisfied by the Second Milestone Date;

19.8.2. the expiry of the Long Stop Date; and

19.8.3. the expiry of the Deferral Period,

will have been addressed.

19.9. If the Compromises are validly approved by the Compromise Creditors and sanctioned by the Court, the Compromise Creditors will be bound to implement the Financial Restructuring set out in the Restructuring Agreement. As such, the risk relating to the Deferred Coupons will, by

implication, be addressed by virtue of the fact that the Financial Restructuring does not make provision for payment of the Deferred Coupons.

20. **The Company, the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, the New Holdco 2 PIK A Notes, the New Holdco 2 PIK B Notes, the New Money Notes and CVRs**

    20.1. Where a Holder of a Note offers such Note for sale in South Africa or to a South African investor, such Holder should obtain its own professional advice as to whether there are any requirements (including but not limited to any disclosure requirements and exchange control requirements) in connection with such offer or sale.

    20.2. Compromise Creditors should carefully consider the factors and risks associated with any investment in the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes, New Money Notes, CVRs and the Company's business and the non-food retail industry in South Africa in which the Company operates.

    20.3. Compromise Creditors should note that the risks relating to the Company, the non-food retail industry in South Africa and the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes, New Money Notes and CVRs set out herein are risks that the Company believes to be the most essential to an assessment by the relevant Compromise Creditor of whether to consider an investment in the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes, depending which class such Compromise Creditor falls within.

    20.4. The risks which the Company faces relate to events and depend on circumstances that may or may not occur in the future. There may be other risks and uncertainties which are currently not known to the Company or which the Company currently does not consider to be material. Should any of the risks described below, or any other risks or uncertainties, occur, this could, individually or cumulatively, have a material adverse effect on the Company's business, results of operation, financial condition or prospects which in turn would be likely to cause the price of the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes, CVRs and/or New Money Notes to indirectly decline and, as a result, an investor in the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes, CVRs and/or New Money Notes could lose some or all of its investment. Compromise Creditors should consider carefully whether an investment in the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes, CVRs and/or New Money Notes is suitable for them in the light of the information contained herein and their personal circumstances.

21. **The Intra-group loans created pursuant to Implementation Steps D, G, O, P and S of the Restructuring Agreement**

    21.1. ZAR denominated, non-interest bearing intercompany loans will be in place between Bidco and ECSL and ECSL and the Company subsequent to Implementation Steps D and G.

21.2.   Intercompany loans will be in place between New Holdco 2 and New Holdco 1, New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and ECSL and the Company, some of which will be foreign denominated.

21.2.1.   There will be USD denominated debt between the New Holdco Group of companies, Parent, Bidco, ECSL and the Company bearing interest at 3% PIK per annum.

21.2.2.   There will be EUR denominated debt between the New Holdco Group of companies, Parent, Bidco, ECSL and the Company bearing interest at 8% PIK per annum.

21.2.3.   There will be USD denominated debt between the New Holdco Group of companies, Parent, Bidco, ECSL and the Company bearing interest at 5% PIK per annum.

21.2.4.   There will be USD denominated debt between New Holdco 1, Parent, Bidco, ECSL and the Company, bearing interest at 25% PIK per annum.

21.2.5.   There will be an interest free ZAR denominated debt between the New Holdco Group of companies, Parent, Bidco, ECSL and the Company.

21.3.   These loans (other than the loans described in paragraph 21.2.4 above), as well as certain other ZAR denominated intercompany debt are all deeply subordinated in terms of intercompany loan documents in terms of Implementation Steps D, G, O, P and S as follows:

21.3.1.   The loans are irrevocably and unconditionally subordinated by each relevant lender under such intercompany loan (each an Intercompany Lender) in favour of each relevant borrower under such intercompany loan (each an Intercompany Borrower) in favour of, and for the benefit, of all other creditors of such Intercompany Borrower on terms and conditions set out in each intercompany loan; and

21.3.2.   in the event of a liquidation or business rescue of the borrower company, the lender company waives their voting rights and undertakes not to prove a claim against the borrower company.

21.4.   Where a Binding Private Ruling is not obtained as concerns the payment of the ZAR intercompany loans through set-off, ZAR denominated debt may remain on the Company's balance sheet as non-interest bearing liabilities with no fixed terms of repayment, being deeply subordinated to all creditors, and with repayment made subject to meeting solvency requirements. But for the subordination of the loans, the liabilities of the Company would exceed its assets. The Company has taken advice from its advisors and is satisfied that the subordination of the intercompany loans will enable the Company to meet the solvency and liquidity requirements as set out in section 4 of the Companies Act.

21.5.   In respect of the foreign denominated intra-group debt, which arose due to the delegation of third party debt to New Holdco 1 and New Holdco 2, this will remain in place on the Company's balance sheet as back-to-back debt as concerns the New Holdco 2 PIK A Notes, the USD denominated New Holdco 2 PIK B Notes, the New Holdco 1 PIK A-1 Notes and the New Holdco 1 PIK A-2

Notes. Such foreign denominated intra-group debt will bear interest at the interest rate of the respective Notes and have the same maturity dates. The Company's Net Income will be impacted by the interest on such intra-group debt, as well as by any foreign exchange differences arising on such intra-group debt. Additionally such interest expenditure and foreign exchange losses would decelerate the utilisation of the Company's assessed tax loss while foreign exchange gains would accelerate such utilisation. The foreign denominated intra-group debt (other than in relation to the New Holdco 1 PIK A-1 Notes) will be deeply subordinated to all creditors, with repayment made subject to meeting solvency requirements.

22. **Valuation**

22.1.   There has been no prior trading market for the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes.

22.2.   The value of the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes may, in addition to being indirectly affected by the Company's actual or forecast operating results, fluctuate significantly as a result of a large number of factors, some specific to the Company and its operations or Existing Group and some which may affect the non-food retail sector generally and which are outside the Company's control, including, among others –

22.2.1.   changes in the financial performance of the Company, its peers or the financial services industry;

22.2.2.   changes in laws, rules and regulations applicable to the Company and its operations;

22.2.3.   general economic, political and other conditions; and/or

22.2.4.   fluctuations in the equity and debt capital markets.

22.3.   Any of these events could result in an indirect decline in the market price of the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and the New Money Notes. In general, prospective investors should be aware that the value of an investment in New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes may go down as well as up. Neither New Holdco 2, New Holdco 1 nor the Company can give any assurance that the market price of New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or the New Money Notes will not decline below the implied price of the New Holdco 2 PIK A Notes or New Holdco 2 PIK B Notes issued pursuant to the relevant Compromise or the New Money Notes issued pursuant to the New Money Notes Offer. Similarly, neither New Holdco 2 nor the Company can give any assurance that the fair value of the New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares will not decline below the original subscription cost thereof.

23.   **The security interests in the Collateral (as defined in the relevant New Holdco PIK Notes Indenture will be granted to a Security Agent (as defined in the relevant New Holdco PIK Notes Indenture) rather than directly to the holders of the New Notes and certain Collateral will be granted subsequent to the issuance of the New Notes. The ability of the relevant Security Agent to enforce certain of the Collateral may be restricted by local law and by the relevant New Holdco Intercreditor Arrangements (as defined below)**

The security interests in the Collateral that will secure New Holdco 1 and New Holdco 2's obligations under the New Notes will not be granted directly to the holders of the New Notes.  Instead, an obligation (the "**Parallel Debt Obligation**") owed by the relevant debt Issuer and each Guarantor (if applicable) to the relevant Security Agent will be created in the relevant Holdco Subordination Deed (as defined in the relevant New Holdco PIK Notes Indenture) which mirrors the obligation (the "**Principal Debt Obligation**") owed by the relevant Issuer and the Guarantors (if applicable) to the holders of the New Notes, but the Collateral will be granted only in favour of the Security Agent to secure the Parallel Debt Obligation.

The New Holdco PIK Notes Indentures will provide (along with the New Holdco Intercreditor Agreement (as defined in the relevant New Holdco PIK Notes Indenture) and/or the relevant New Holdco Subordination Deed (collectively, the "**New Holdco Intercreditor Arrangements**") that only the relevant Security Agent has the right to enforce the Collateral and will not be entitled to take enforcement action in respect of the Collateral securing the New Notes, except through the relevant trustee under the relevant New Holdco PIK Notes Indenture, which will (subject to the provisions of the relevant New Holdco Intercreditor Arrangements) provide instructions to the Security Agent in respect of the Collateral.  In terms of the provisions of the relevant Holdco Subordination Deed, the relevant Security Agent will distribute the proceeds from any enforcement of the Collateral to the holders of the New Notes in accordance with the provisions of the Holdco Subordination Deed.

The ability of the Security Agent to enforce the security interests in the Collateral is subject to mandatory provisions of the laws of each jurisdiction in which security interests over the Collateral are taken.

The Parallel Debt Obligation is in the same amount and payable at the same time as the Principal Debt Obligation, and any payment in respect of the Principal Debt Obligation will discharge the corresponding Parallel Debt Obligation and any payment in respect of the Parallel Debt Obligation will discharge the corresponding Principal Debt Obligations.

Although the Security Agent will have, pursuant to the Parallel Debt Obligation, a claim against the relevant issuer of the New Notes for the full principal amount of the relevant New Notes, the parallel debt structure has not been tested in the courts of South Africa, and there is no judicial guidance as to its efficacy or validity. Therefore, the ability of the Security Agent to enforce the Collateral may be restricted, or the parallel debt structure might not be capable of creating a valid security interest in favour of the Security Agent.

In addition, holders of the New Notes bear risk associated with a possible insolvency or bankruptcy of the relevant Security Agent which could in particular, under certain

circumstances, result in a delay in enforcement, diminishing value or even loss of the Collateral.

Compromise Creditors should consult independent professional advisers and satisfy themselves as to the validity and efficacy of the parallel debt structure.

24. **The New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares are unlisted**

24.1. On completion of the Financial Restructuring, the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares will not be listed on any stock or other securities exchange. As a result, New Holdco 2 will not be subject to any listings requirements or rules beyond those which New Holdco 2 will be subject pursuant to the listing of the New Holdco 2 PIK A Notes and the New Holdco 2 PIK B Notes. Furthermore, insofar as the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares are concerned, New Holdco 2 will not be obliged to comply with any corporate governance disclosure requirements for listed companies beyond those which New Holdco 2 will be subject pursuant to the listing of the New Holdco 2 PIK A Notes and the New Holdco 2 PIK B Notes.

24.2. However, the New Holdco 2 PIK A Notes and the New Holdco 2 PIK B Notes to be issued by New Holdco 2 pursuant to the Financial Restructuring will be listed on the Euro MTF Market of the Luxembourg Stock Exchange, the Global Exchange Market of the Irish Stock Exchange or another "recognised stock exchange" as defined in the UK Income Tax Act 2007 prior to the first interest payment date of each of the New Holdco 2 PIK Notes. As a result, New Holdco 2 will be subject to certain, but less extensive, rules and regulations as a result of the listing of its debt securities.

24.3. There has been no prior trading market for the New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares. As a result, the realisation of an investment by a shareholder in New Holdco 2 given New Holdco 2's current status as an unlisted company (insofar as its ordinary shares are concerned) is likely to be more difficult than the realisation of an investment in a company whose shares are listed on any stock exchange.

24.4. New Holdco 2 has a stated intention to explore the possibility of a listing of its ordinary shares within approximately 3 to 4 years of the completion of the Financial Restructuring subject to meeting the necessary eligibility criteria. However, New Holdco 2 can give no assurance that such discussions or applications will be successful, that New Holdco 2 will meet the required eligibility criteria or that, should such discussions or applications be successful, an active trading market for the New Holdco 2 Ordinary A Shares or New Holdco 2 Ordinary B Shares will develop or, if developed, can be sustained. If an active trading market is not developed or maintained, the liquidity and trading price of the New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares could be materially and adversely affected.

24.5. For the Initial Staple Period, being the period ending on the earlier of (i) 3 (three) years from the Completion Date and (ii) an Exit, the New Holdco 2 Ordinary A Shares cannot be transferred or otherwise disposed of unless the holder of New Holdco 2 Ordinary A Shares transfers its *pro rata* holdings in the New Holdco 2 PIK B Notes (calculated as a percentage of the face value of

the New Holdco 2 PIK B Notes issued to the New Holdco 2 PIK B Noteholder on the Completion Date) (the "**Stapled Notes**") to the transferee at the same time. The Initial Staple Period can be extended by a further 1 (one) year each time with the consent of not less than 50% (fifty percent) in value of the holders of the New Holdco 2 Ordinary A Shares (together with the Initial Staple Period, the "**Staple Period**"). The directors of New Holdco 2 will be restricted from registering any transfer of the New Holdco 2 Ordinary A Shares unless the transferor has provided the directors with a transfer certificate in an agreed form certifying that the Stapled Notes are being transferred to the same transferee.

24.6.   The New Holdco 2 Ordinary A Shares and New Holdco 2 Ordinary B Shares may therefore be difficult to sell compared to the shares of companies with more liquid trading markets and the share price may be subject to greater fluctuations than might otherwise be the case.

25.   **Potential dilution**

25.1.   The subscriptions by the BEE Trust for the New Holdco 2 Ordinary C Shares and the Management Incentive Trust for the New Holdco 2 Ordinary D Shares in terms of the Restructuring Agreement (read with the Steps Plan) will correspondingly dilute the shareholding, when expressed as a percentage, of holders of the New Holdco 2 Ordinary A Shares (being Senior Secured Creditors who are Eligible Creditors or who have appointed a Designated Recipient who is an Eligible Person, and the Holding Period Trustee) and the New Holdco 2 Ordinary B Shares (being the Participating Creditors who are Compromise Creditors (in terms of the New Money Notes Offer) and the Participating Creditors who are Facility A3 Lenders (in terms of the refinancing of the Facility A3 Loans)).

25.2.   In addition, Luxco (and/or the Original Investors or Sponsor Group) acceded to the LUA and became a party to the Restructuring Agreement and in doing so, will be allocated New Holdco 2 Ordinary E Shares. The issue of further ordinary shares by New Holdco 2 will correspondingly dilute the shareholding by up to a maximum of 2%, when expressed as a percentage, of all holders of ordinary shares in New Holdco 2.

25.3.   New Holdco 2 may seek to raise equity financing in the future and issue additional shares or convertible equity securities in connection with share incentive and share option plans. Future offers could dilute the holdings of New Holdco 2's shareholders (including those shareholders who acquire New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares in New Holdco 2 pursuant to the terms of the Senior Secured Company Compromise and New Money Notes Offer), which may adversely affect the fair value of the New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares and could impair New Holdco 2's ability to raise capital through future sales of equity securities. However, existing shareholders will have a pre-emptive right as set out in the New Holdco 2 MOI, to subscribe for their pro rata share of any shares to be issued by New Holdco 2.

26.  **Potential unwind of the Financial Restructuring**

26.1.  The Financial Restructuring will be implemented before and on the Completion Date, across a number of Implementation Documents. The Restructuring Agreement contains a mechanism that (in simplistic terms) enables the Financial Restructuring to be unwound (unless otherwise agreed by the Majority Locked-Up Creditors) if any Implementation Step is not implemented in accordance with the terms and sequence set out in the Restructuring Agreement for any reason whatsoever.

26.2.  If the Financial Restructuring is unwound, then:

26.2.1.  Accordingly:

26.2.1.1.  the Compromise Creditors will not receive any Compromise Consideration, with their Compromise Claims continuing in force and effect as if the Compromises were never proposed; and

26.2.1.2.  the New Money Notes Offer will not be implemented and shall fall away,

on the basis that the Compromises and New Money Notes Offer shall be regarded as being *void ab initio*; and

26.2.2.  your attention is directed to paragraph (1) above for further information as to the consequences if the Financial Restructuring is not implemented.

27.  **New Money Notes**

27.1.  Compromise Creditors are reminded that the New Money Notes will not be issued by New Holdco 2, but rather by its wholly-owned subsidiary, New Holdco 1.

27.2.  The proceeds of the issue of the New Money Notes is intended to finance the operations of the Company as more fully set out as follows.

| Sources of Proceeds | ZARm |
|---|---|
| Net proceeds from the issuance of New HoldCo 1 PIK A-1 Notes | 1,494 |
| Cash on Balance Sheet as at Completion Date | 748 |
| Total Sources of Proceeds | 2,242 |

| Use of Proceeds | |
|---|---|
| *[Repayment of the Super Senior Liquidity Facility A1]* | 682 |
| Payment of Advisor Fees | 350 |
| Payment of the Super Senior Liquidity Facility A1 Fees | 63 |
| Retained as Cash on Balance Sheet as at Completion Date | 1,148 |
| Total Use of Proceeds | 2,242 |

27.3.  Accordingly, such proceeds will be lent by New Holdco 1 to its wholly-owned subsidiary, Parent who will in turn on-lend such proceeds to its wholly-owned subsidiary, Bidco. Bidco will, in turn, on-lend such proceeds to its wholly-owned subsidiary, ECSL. ECSL will thereafter on-lend such proceeds to its wholly-owned subsidiary, the Company.

27.4.  Compromise Creditors' attention is directed towards the New Money Notes Indenture, which is an annex to the Restructuring Agreement which more fully sets out the terms and conditions attaching to the New Money Notes.

28. **Shareholders may earn a negative or no return on their investment in New Holdco 2**

   28.1. New Holdco 2's results of operations and financial condition are entirely dependent on the trading performance of the Company and the other members of its group. There can be no assurance that New Holdco 2 will pay dividends in the future nor as to the level of future dividends.

   28.2. A dividend may never be paid and at present there is no expectation that New Holdco 2 will pay dividends in the near future.

   28.3. There will be a general restriction on all payments to any direct or indirect shareholder of the Company (other than those expressly permitted) within 2 years from the date of the Amended and Restated SSCF or Amended and Restated SSLF (as applicable).

   28.4. New Holdco 2's ability to pay dividends will also depend on the level of distributions, if any, received from its operating subsidiaries. As such, the directors of New Holdco 2 will reconsider the dividend policy as appropriate as the Company continues to develop and implement its strategy, taking into account factors such as the Company's financial position, cash requirements and liquidity and profits available regulatory requirements, the Company's regulatory outlook, capital position, investment needs and principal relevant risk factors subsisting at the time.

29. **Taxation legislation or interpretation changes**

   Any change in taxation legislation or the interpretation of tax legislation could affect New Holdco 2's ability to provide returns to shareholders. Statements in this Explanatory Statement concerning the taxation of investors are based on current tax law and practice in South Africa, which is subject to change. The taxation of an investment in New Holdco 2 depends on the individual circumstances of the relevant investor.

30. **Shareholders eligibility to participate in future equity offerings**

   Securities laws of certain jurisdictions may restrict New Holdco 2's ability to allow participation by holders of New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares in future offerings. In particular, holders of New Holdco 2 Ordinary A Shares and/or New Holdco 2 Ordinary B Shares in the United States may not be entitled to exercise these rights unless either the rights and the ordinary shares are registered under the U.S. Securities Act, or the rights and the ordinary shares are offered pursuant to an exemption from, or transaction not subject to, the registration requirements of the U.S. Securities Act.

31. **The ability of ordinary shareholders outside South Africa to bring actions or enforce judgments against New Holdco 2 or the directors may be limited**

   31.1. The ability of a shareholder outside South Africa to bring an action against New Holdco 2 may be limited under law. New Holdco 2 is a public limited company incorporated in South Africa.

   31.2. The rights of holders of New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares and the other ordinary shares in New Holdco 2 are governed by South African law and by New Holdco 2's MOI. These rights differ from the rights of shareholders in typical US corporations and UK corporations.

31.3. The rights of the holders of New Holdco 2 PIK A Notes and New Holdco 2 PIK B Notes, as holders of securities, will be regulated by the governing law of the relevant indenture pursuant to which such Compromise Notes are issued. It will be the responsibility of such holders to accustom themselves to the rights attaching to such Compromise Notes in the aforesaid jurisdictions.

31.4. The rights of the holders of New Money Notes, as holders of securities, will be regulated by the governing law of the New Money Notes Indenture. It will be the responsibility of such holders to accustom themselves to the rights attaching to the New Money Notes in the aforesaid jurisdictions.

31.5. A shareholder or securities holder from outside South Africa may not be able to enforce a judgment against some or all of the directors of New Holdco 2 or effect service of process upon the directors within that shareholder's country of residence or to enforce against the directors, judgments of courts of that shareholder's or securities holder's country of residence based on civil liabilities under that country's laws.

32. **Following the Completion Date, New Holdco 2 will have other shareholders**

32.1. Immediately following the completion of the Financial Restructuring, the share capital of New Holdco 2 will be divided into five classes of shares, namely the New Holdco 2 Ordinary A Shares, New Holdco 2 Ordinary B Shares, New Holdco 2 Ordinary C Shares, New Holdco 2 Ordinary D Shares. and New Holdco 2 Ordinary E Shares. Neither the New Holdco 2 Ordinary D Shares nor the New Holdco 2 Ordinary E Shares will give the holder thereof the right to vote on matters concerning the shareholders generally.

32.2. The subscription by Participating Creditors of New Money Notes will entitle such Participating Creditors to be issued, at no consideration to them, if they elect, either New Holdco 2 Ordinary B Shares pursuant to the terms of the New Money Notes Offer or the CVR. If Compromise Creditors fail to make such election (but provided that such Compromise Creditors have elected to subscribe for New Money Notes), they will be issued their specified allocation of New Holdco 2 Ordinary B Shares.

33. **An investment in New Holdco 2 and New Holdco 1 is speculative and carries a considerable degree of risk and Compromise Creditors should inform themselves appropriately**

33.1. An investment in New Holdco 2 and New Holdco 1 is highly speculative, involves a considerable degree of risk and is suitable only for persons or entities which have substantial financial means and who can afford to hold their ownership interests for an indefinite amount of time. All Compromise Creditors are cautioned that the Proposal Document, including this Explanatory Statement, has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and consequently, the information contained in the Proposal Document may not be sufficient or appropriate for the purpose for which a recipient might use it.

33.2.   Nothing in this Explanatory Statement is intended to be, and no statement herein shall be construed to constitute, investment, financial, legal, tax or other advice and each Compromise Creditor is strongly advised to consult its own investment, financial, legal and tax advisors in connection with the matters set forth herein. Each Compromise Creditor is expected to conduct its own due diligence and consider the appropriateness of the information in the Proposal Document having regard to its own objectives, financial situations and needs. The summary information contained in the Proposal Document does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by reference to, the full terms of the Existing Group's post-Financial Restructuring debt and equity instruments appended to the Proposal Document, which should be read in conjunction with the Restructuring Agreement.

34.   **US Foreign Account Tax Compliance Act**

34.1.   Pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the Treasury Regulations promulgated thereunder (provisions commonly known as "**FATCA**"), a "foreign financial institution" may be required to withhold U.S. tax on certain foreign passthru payments to the extent such payments are treated as attributable to certain U.S. source payments.

34.2.   The U.S. Treasury Department has announced that withholding for foreign passthru payments will not start until the later of January 1, 2019 or the publication date of final regulations defining foreign passthru payments. Obligations characterized as debt (or which are not otherwise characterized as equity and have a fixed term) for U.S. federal income tax purposes that are issued on or prior to the date that is six months after the date on which applicable final U.S. Treasury Regulations defining foreign passthru payments are filed generally would be "grandfathered" from FATCA unless "materially modified" (for U.S. federal income tax purposes) after such date.

34.3.   Accordingly, if New Holdco 1 or  New Holdco 2 is treated as a foreign financial institution, FATCA would apply to payments on the New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes only if (i) the New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes are not characterized as debt for U.S. federal income tax purposes or (ii) there is a significant modification of the New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes for U.S. federal income tax purposes after expiration of the grandfather period. Non-U.S. governments have entered into agreements with the United States (and additional non-U.S. governments are expected to enter into such agreements) to implement FATCA in a manner that alters the rules described herein. Prospective holders of New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes should consult their own tax advisors on how these rules may apply to their investment in the New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes. In the event any withholding under FATCA is required or advisable with respect to any payments on the New Holdco 2 PIK A Notes, New  Holdco 2 PIK B Notes and/or New Money Notes, there

generally will be no additional amounts payable to compensate for the withheld amount.

35.  **Annual Financial Statements**

The latest available annual financial statements, namely for FY2014 and FY2015, are attached as Part H.

36.  **Competition Approvals**

36.1.  South Africa

36.1.1.  The Financial Restructuring has been approved by the South African Competition Tribunal (the "**SA Tribunal**") (with conditions) and accordingly is capable of lawful implementation under and in terms of the South African Competition Act, No. 89 of 1998 (as amended) (the "**South African Competition Act**").

36.1.2.  Organised labour representing the employees of the acquiring or target firms are also entitled to take the SA Tribunal's decision on appeal or review to the South African Competition Appeal Court (the "**SACAC**").   The South African Minister of Economic Development may launch a review (but not an appeal) against the SA Tribunal's decision.  Third parties affected by the SA Tribunal's decision may make application to the SACAC for the SA Tribunal's decision to be reviewed.

36.1.3.  An appeal/review in terms of the South African Competition Act does not automatically stay (i.e. pend) the implementation of the decision which is the subject of the appeal/review (in this case, the SA Tribunal's decision).  The only impediment to the implementation of the Financial Restructuring in such circumstances will be an order granted by the SA Tribunal interdicting the implementation of the transaction pending the outcome of the appeal/review.  The party seeking such an interdict is required to motivate that the balance of convenience favours its position (i.e. the harm to the transacting parties if they are precluded from implementing the Financial Restructuring is outweighed by the harm to the applicant if the Financial Restructuring is implemented before the SACAC decides the matter).

36.2.  Botswana

36.2.1.  The Financial Restructuring was approved on an unconditional basis by the Botswana Competition Authority (the "**BCA**") on 24 October 2016.

36.2.2.  Under the Botswana Competition Act, No. 17 of 2009, any aggrieved person is entitled to take a decision of the BCA on appeal/review to the High Court of Botswana.

36.3.  Namibia

36.3.1.  The Financial Restructuring has been approved by the Namibian Competition Commission (the "**NCC**") and accordingly is capable of lawful implementation under and in terms of the Namibian Competition Act, No. 2 of 2003 (the "**Namibian Competition Act**").

36.3.2.    Under the Namibian Competition Act, any party is entitled to take a decision of the NCC on review to the Minister of Trade and Industry; and on appeal to the High Court of Namibia.

36.4.  Swaziland

36.4.1.    The Financial Restructuring has been approved by the Swaziland Competition Commission (the "**SCC**") and accordingly is capable of lawful implementation under and in terms of the Swaziland Competition Act, No. 8 of 2007 (the "**Swaziland Competition Act**").

36.4.2.    Under the Swaziland Competition Act, any aggrieved person is entitled to take a decision of the SCC on appeal to the Swaziland High Court.

36.5.  Zambia

36.5.1.    The Financial Restructuring must be approved by the Zambian Competition and Consumer Protection Commission (the "**CCPC**") (with or without conditions) before it is capable of lawful implementation under and in terms of the Zambian Competition and Consumer Protection Act, No. 24 of 2010 (the "**Zambian Competition Act**").

36.5.2.    Under the Zambian Competition Act, any party is entitled to –

36.5.2.1.    take a decision of the CCPC on appeal/review to the Competition and Consumer Protection Tribunal (the **CCPT**); and

36.5.2.2.    take a decision of the CCPT on appeal/review to the High Court of Zambia.

36.6.  Zimbabwe

36.6.1.    The Financial Restructuring must be approved by the Zimbabwean Competition and Tariff Commission (the "**ZCTC**") (with or without conditions) before it is capable of lawful implementation under and in terms of the Zimbabwean Competition Act, Chapter 14-28 (the "**Zimbabwean Competition Act**").

36.6.2.    Under the Zimbabwean Competition Act, any aggrieved person is entitled to take a decision of the ZCTC on appeal/review to the Administrative Court of Zimbabwe, and thereafter, the Supreme Court of Zimbabwe.

**PART D**

1.  **ELIGIBLE CREDITORS**

    1.1.    Any Compromise Creditor in respect of which –

        1.1.1.    a valid Proxy Form is completed and delivered to the Information Agent and the Compromise Creditor has confirmed that (a) the Compromise Creditor is an Eligible Creditor or (b) if the Compromise Creditor has appointed a Designated Recipient, the Designated Recipient is an Eligible Person; or

        1.1.2.    a valid Account Holder Letter is completed and delivered by its Account Holder to the Information Agent and its Account Holder has confirmed on its behalf in the Account Holder Letter that (a) the Compromise Noteholder is an Eligible Creditor or (b) if the Compromise Noteholder has appointed a Designated Recipient, the Designated Recipient is an Eligible Person,

        will be an Eligible Creditor for the purposes of the relevant Compromise.

    1.2.    Any Compromise Consideration to which an Eligible Creditor is entitled, and on whose behalf a valid Proxy Form or Account Holder Letter has been delivered to and received by the Information Agent after the Voting Instruction Deadline but before the end of the Holding Period, will be held by the Holding Period Trustee on trust for such Eligible Creditor, in accordance with the terms of the relevant Compromise and the Distribution Agreement.

    1.3.    Each Eligible Creditor (or, to the extent applicable, its Designated Recipient who is an Eligible Person) will receive the Compromise Consideration to which it is entitled in accordance with the terms of the relevant Compromise –

        1.3.1.    on the Completion Date if, before the Voting Instruction Deadline, –

            1.3.1.1.    in respect of Compromise Lenders, a valid Proxy Form in respect of that Eligible Creditor is delivered to and received by the Information Agent; or

            1.3.1.2.    in respect of Compromise Noteholders, a valid Account Holder Letter in respect of that Eligible Creditor is delivered to and received by the Information Agent;

        1.3.2.    on the Completion Date if, between the Voting Instruction Deadline and the Business Day preceding the Completion Date, –

            1.3.2.1.    in respect of Compromise Lenders, a valid Proxy Form in respect of that Eligible Creditor is received by the Information Agent; or

            1.3.2.2.    in respect of Compromise Noteholders, a valid Account Holder Letter in respect of that Eligible Creditor is received by the Information Agent,

            and the Company exercises its discretion to issue the relevant Compromise Consideration to that Eligible Creditor; or

        1.3.3.    as soon as reasonably practicable after the date on which the Information Agent delivers a Distribution Instruction Certificate

relating to that Eligible Creditor to the Holding Period Trustee, if, between the Voting Instruction Deadline and the expiry of the Holding Period, -

1.3.3.1.   in respect of Compromise Lenders, a valid Proxy Form in respect of that Eligible Creditor has been delivered to the Information Agent ; or

1.3.3.2.   in respect of Compromise Noteholders, a valid Account Holder in respect of that Eligible Creditor has been delivered to the Information Agent.

1.4.   In respect of any Eligible Creditor on whose behalf a valid Proxy Form or Account Holder Letter has been delivered to and received by the Information Agent after the Voting Instruction Deadline but before the end of the Holding Period, as soon as reasonably practicable following the date on which that Proxy Form or Account Holder Letter has been delivered to and received by the Information Agent and the Distribution Instruction Certificate relating thereto has been delivered by the Information Agent to the Holding Period Trustee in accordance with the terms of the Distribution Agreement, the Holding Period Trustee shall deliver the relevant Compromise Consideration to which that Eligible Creditor is entitled in accordance with the terms of the relevant Compromise (including any interest, dividends, distributions (or any other rights or benefits) or other payments received by the Holding Period Trustee in respect of such Compromise Consideration, in each case net of any applicable taxes (including, without limitation, any withholding taxes but excluding any stamp duty and/or stamp duty reserve tax (if applicable) payable upon the issue of the New Notes to that Eligible Creditor in accordance with the terms of the Distribution Agreement) to that Eligible Creditor or, to the extent applicable, its Designated Recipient if it is an Eligible Person.

1.5.   Any Compromise Consideration to which an Eligible Creditor is entitled to receive under the terms of the relevant Compromise will be delivered on the Completion Date –

1.5.1.   in respect of the New Holdco 2 Ordinary A Shares, by –

1.5.1.1.   delivering to such Eligible Creditor, appropriate share certificates in respect of such New Holdco 2 Ordinary A Shares; and

1.5.1.2.   updating the securities register of New Holdco 2 to reflect such Eligible Creditor as being the holder such New Holdco 2 Ordinary A Shares; and

1.5.2.   in respect of the New Holdco 2 PIK A Notes and New Holdco 2 PIK B Notes, by crediting the account of the relevant Account Holder in the Clearing Systems in which the Account Holder holds the relevant Compromise Notes on behalf of that Eligible Creditor (or, if that Eligible Creditor is an Account Holder, the account of that Eligible Creditor in the Clearing Systems in which that Eligible Creditor holds its Compromise Notes), irrespective of whether such Compromise Consideration is to be delivered to that Eligible

Creditor or, if applicable, the Designated Recipient who is an Eligible Person appointed by that Eligible Creditor.

1.6.    Any New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to which an Eligible Creditor is entitled to receive under the terms of the New Money Notes Offer will be delivered on the Completion Date –

1.6.1.    in respect of the New Holdco 2 Ordinary B Shares, by –

1.6.1.1.    delivering to such Eligible Creditor, appropriate share certificates in respect of such New Holdco 2 Ordinary B Shares; and

1.6.1.2.    updating the securities register of New Holdco 2 to reflect such Eligible Creditor as being the holder such New Holdco 2 Ordinary B Shares;

1.6.2.    any CVRs allocated to an Eligible Creditor shall be allocated and implemented in terms of the New Holdco 2 MOI and the CVR Instrument and evidenced by the certificate; and

1.6.3.    in respect of the New Money Notes, by crediting the account of the relevant Account Holder in the Clearing Systems in which the Account Holder is to hold the New Money Notes on behalf of that Eligible Creditor (or, if that Eligible Creditor is an Account Holder, the account of that Eligible Creditor in the Clearing Systems in which that Eligible Creditor is to hold the New Money Notes), irrespective of whether such New Money Notes are to be delivered to that Eligible Creditor or, if applicable, the Designated Recipient who is an Eligible Person appointed by that Eligible Creditor.

2.    **INELIGIBLE CREDITORS**

Any Compromise Creditor in respect of which –

2.1.    a valid Proxy Form is completed and delivered to the Information Agent and such Compromise Creditor has confirmed that it is not an Eligible Creditor and has not appointed a Designated Recipient who is an Eligible Person; or

2.2.    a valid Account Holder Letter is completed and delivered by its Account Holder to the Information Agent and its Account Holder has confirmed on its behalf in the Account Holder Letter that the Compromise Noteholder is not an Eligible Creditor and it has not appointed a Designated Recipient who is an Eligible Person,

will be deemed to be an Ineligible Creditor for the purposes of the relevant Compromise and unless the Ineligible Creditor appoints a Designated Recipient (who is an Eligible Person), the Ineligible Creditor's Compromise Consideration will be delivered to the Holding Period Trustee to be held in accordance with the terms of the Distribution Agreement. Please see section 12 of Part B of this Explanatory Statement for further information.

3.    **NON-RESPONDENT CREDITORS**

3.1.    Any Compromise Creditor in respect of which –

3.1.1.    a valid Proxy Form is not completed and delivered to the Information Agent; or

3.1.2.     a valid Account Holder Letter is not completed and delivered by its Account Holder Letter to the Information Agent,

before the Voting Instruction Deadline (other than any Eligible Creditor on whose behalf a valid Proxy Form or Account Holder Letter has been delivered to and received by the Information Agent between the Voting Instruction Deadline and the Business Day preceding the Completion Date and in relation to whom the Company exercises its discretion to issue Compromise Consideration on the Completion Date in accordance with the terms of the relevant Compromise) will be a Non-Respondent Creditor for the purposes of the relevant Compromise.

3.2.    Each Non-Respondent Creditor will not receive the Compromise Consideration to which it is entitled in accordance with the terms of the relevant Compromise on the Completion Date.

3.3.    Any Compromise Consideration to which a Non-Respondent Creditor is entitled in accordance with the terms of the relevant Compromise shall be delivered to the Holding Period Trustee on the Completion Date. The Holding Period Trustee shall hold any such Compromise Consideration on trust for the relevant Non-Respondent Creditor for the Holding Period in accordance with the terms of the relevant Compromise and the Distribution Agreement.

3.4.    A Non-Respondent Creditor that subsequently arranges for a valid Proxy Form or Account Holder Letter to be delivered to the Information Agent before the end of the Holding Period shall become either an Eligible Creditor or an Ineligible Creditor.

3.5.    Each Eligible Creditor (or, to the extent applicable, its Designated Recipient who is an Eligible Person) will receive the Compromise Consideration to which it is entitled in accordance with the terms of the relevant Compromise (including any accrued and paid dividends and interest or other payments received by the Holding Period Trustee in respect of such Compromise Consideration, in each case net of any applicable taxes (including, without limitation, any withholding taxes but excluding any stamp duty and/or stamp duty reserve tax (if applicable) which the Company will pay on behalf of that Eligible Creditor under the terms of the Distribution Agreement)) as soon as reasonably practicable after the receipt by the (i) Company of a valid Proxy Form in respect of that Eligible Creditor which is a Compromise Lender; or (ii) Information Agent of a valid Account Holder Letter in respect of that Eligible Creditor which is a Compromise Noteholder.

3.6.    Any Non-Respondent Creditor in respect of which a Proxy Form or an Account Holder Letter is delivered to the Information Agent during the Holding Period, following the occurrence of the Completion Date, will also need to –

3.6.1.     in the case of Compromise Lenders –

3.6.1.1.     provide all information required by the Information Agent to enable the Information Agent to verify that the Non-Respondent Creditor was a relevant Compromise Creditor as at the Record Date or DTC Record Date (if applicable) in respect of the Compromise Claims referred to in the Proxy Form; and

3.6.1.2.   confirm that it is an Eligible Creditor or if a Designated Recipient is to be appointed who is an Eligible Person, to confirm that such Designated Recipient is an Eligible Person; or

3.6.2.   in the case of Compromise Noteholders –

3.6.2.1.   instruct its Account Holder to provide all information required by the Information Agent to enable the Information Agent to verify that the Non-Respondent Creditor was a relevant Compromise Creditor as at the Record Date or DTC Record Date (if applicable) in respect of the Compromise Notes referred to in the Account Holder Letter; and

3.6.2.2.   procure that its Account Holder confirms on its behalf that it is an Eligible Creditor or if a Designated Recipient is to be appointed who is an Eligible Person, to confirm that such Designated Recipient is an Eligible Person.

4.   **IMPLEMENTATION**

4.1.   The Company, the Guarantors, New Holdco 1, New Holdco 2 and the Parent (among others) will sign the Restructuring Agreement on or about the date that the Compromises are launched.

4.2.   By the requisite majority of Senior Secured Creditors and Super Senior Third Ranking Creditors (as applicable) approving the Senior Secured Company Compromise, the Super Senior Company Compromise and the Guarantor Compromises, and such compromises becoming unconditional in accordance with their terms and the filing of a copy of each Court order sanctioning each Compromise with the South African Companies and Intellectual Property Commission, the Compromise Effective Date shall occur.

4.3.   The Company will promptly notify each of the RA Creditors, New RCF Lenders and the Committed Creditors once the Compromise Effective Date has occurred, and the RA Creditors, New RCF Lenders and the Committed Creditors will accede to the Restructuring Agreement by signing an RA Accession Letter by no later than 1:00 p.m. on the following Business Day ("RA Accession Deadline").   Such creditors (other than the Compromise Creditors) will enter into the Restructuring Agreement and its concomitant schedules or annexures under hand, as opposed to any compromise being proposed in respect of such creditors.

4.4.   Promptly following the RA Accession Deadline, the Compromise Agent will, pursuant to the authority granted to it under the Compromises, execute an RA Accession Letter on behalf of each of the Compromise Creditors that, as at the RA Accession Deadline, has not acceded to the Restructuring Agreement.

4.5.   The Senior Secured Creditors and Super Senior Third Ranking Creditors shall be bound by the Restructuring Agreement on the RA Effective Date and the Execution Documents on the Signing Date.

4.6. On the Completion Date, the following steps shall happen (amongst many others) and those steps shall take effect in the order set out below, namely that –

4.6.1. the Company shall procure the cancellation of the Senior Secured 2018 Notes, the Senior Secured 2019 Notes and the Super Senior 2019 Notes;

4.6.2. New Holdco 2 and New Holdco 1 shall issue the relevant Compromise Consideration to the relevant Compromise Creditors who are Eligible Creditors or Designated Recipients who are Eligible Persons or the Holding Period Trustee in respect of Ineligible Creditors and Non-Respondent Creditors; and

4.6.3. New Holdco 1 shall issue the New Money Notes and New Holdco 2 shall issue the New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to the Participating Creditors.

4.7. The issue of the Compromise Consideration and the performance of its other obligations under the relevant Compromise will discharge the Company's obligation to the relevant Compromise Creditors under the relevant Compromise.

4.8. On and from the RA Effective Date (but subject to the other provisions of the relevant Compromise) each relevant Compromise Creditor shall be entitled to the rights and benefits accruing to that relevant Compromise Creditor under the relevant Compromise and each of the Restructuring Agreement and Implementation Documents (to the extent they are a party).

5. **ASSIGNMENTS OR TRANSFERS**

The Company shall be under no obligation to recognise any assignment or transfer of any Compromise Claims after the Record Date or DTC Record Date (if applicable) for the purposes of determining entitlements under the relevant Compromise.

6. **OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY**

If any sum is due or obligation is to be performed under the terms of the relevant Compromise on a day other than a Business Day, the relevant payment shall be made, or obligation performed on the next Business Day.

7. **GOVERNING LAW AND JURISDICTION**

7.1. The operative terms of the relevant Compromise and any non-contractual obligations arising out of or in connection with the relevant Compromise shall be governed and construed in accordance with the laws of South Africa.

7.2. The Compromise Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which arises out of or in connection with the terms of the relevant Compromise or their implementation or out of any action taken or omitted to be taken under the relevant Compromise or in connection with the administration of the relevant Compromise and for such purposes the Compromise Creditors irrevocably submit to the jurisdiction of the Court, provided, however, that nothing in this clause shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the relevant Compromise Creditors, whether contained in contract or otherwise.

7.3.    The terms of the relevant Compromise and the obligations imposed on the Company hereunder shall take effect subject to any prohibition or condition imposed by applicable law.

**PART E1**

### Transfer Restrictions

1. Each Eligible Creditor is advised to consult legal counsel prior to making any offer, resale, pledge or other transfer of any of the Compromise Consideration or New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, offered hereby.

2. None of the New Notes and New Shares (together the "**New Securities**") has been registered under the U.S. Securities Act or any state securities laws and, unless so registered, they may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and applicable securities laws in any jurisdiction. Accordingly, the New Securities offered hereby are being offered and sold within the United States in reliance on Section 4(a)(2) of the U.S. Securities Act or any other exemption available thereunder to QIBs or to IAIs, and outside the United States to non U.S. persons in offshore transactions (as such term is defined in Regulation S under the U.S. Securities Act) in reliance on Regulation S under the U.S. Securities Act.

3. Each Eligible Creditor exercising its interests in any Compromise Claims for any New Securities, by its acceptance thereof, will be deemed to have acknowledged, represented to and agreed with New Holdco 1, New Holdco 2 (together, the "**Issuers**") and the Company as follows:

   3.1. it is, with respect to Compromise Noteholders, the person that exercises investment discretion (the "**Beneficial Owner**") with respect to the Compromise Notes tendered hereby, or is a duly authorized representative of one or more Beneficial Owners of the Compromise Notes tendered hereby, and, with respect to any Eligible Creditor, it has full power and authority to tender, exchange, sell, assign and transfer the Compromise Claims tendered hereby;

   3.2. when the Compromise Claims tendered hereby is accepted for exchange, the Issuers and the Company, as applicable, will acquire good, marketable and unencumbered title thereto, free and clear of all liens, restrictions, charges, pledges, security interests, encumbrances, and rights of any kind of third parties, and the Compromise Claims tendered hereby is not subject to any adverse claims or proxies when such Compromise Claim is accepted for exchange by the relevant Issuer, as applicable;

   3.3. it will not sell, pledge, hypothecate or otherwise encumber or transfer any Compromise Claims tendered hereby from the date of the Electronic Instruction Notice, and any purported sale, pledge, hypothecation or other encumbrance or transfer will be void and of no effect;

   3.4. it is, or, in the event that the Eligible Creditor is acting on behalf of a Beneficial Owner of the Compromise Notes tendered hereby, the Eligible Creditor has received a written certification from that Beneficial Owner, dated as of a specific date on or since the close of that Beneficial Owner's most recent fiscal year, to the effect that such Beneficial Owner is:

      3.4.1. with respect to a U.S. holder, not an "affiliate" (as defined in Rule 144 under the U.S. Securities Act) of the relevant Issuer or acting on the Relevant Issuer's behalf and is either:

        3.4.1.1.    a QIB transacting in a private transaction in reliance upon an exemption from the registration requirements of the U.S. Securities Act; or

        3.4.1.2.    an IAI that is not a QIB; or

3.4.2.    outside of the United States and a holder who is not a "U.S. person" (as that term is defined in Rule 902 under the U.S. Securities Act) transacting in an offshore transaction in accordance with, and in reliance on, Regulation S; and

3.4.3.    currently a holder of a Compromise Claim, and falls within one or more of the categories of investors referred to in sections 96(1)(a)(i) to (vii) of the Companies Act.

3.5.    it is not receiving the New Securities in violation of the selling restrictions set forth hereunder and under "Important Notice" and "Important Securities Laws Notice;"

3.6.    the New Securities are being offered in transactions not involving any public offering in the United States within the meaning of the U.S. Securities Act, that the New Securities have not been registered under the U.S. Securities Act or any securities laws of any state of the United States or other applicable jurisdiction and that for so long as the New Securities are "restricted securities" for purposes of the U.S. Securities Act:

3.6.1.    it will not offer, sell, pledge or otherwise transfer the New Securities except (i) to the Issuers or any of their respective subsidiaries, (ii) with respect to a U.S. holder, to a person it reasonably believes to be a QIB in a transaction complying with Rule 144A under the U.S. Securities Act or to an IAI that is not a QIB and that is purchasing for its own account or for the account of another IAI, in each case in a minimum principal amount of New Notes of $250,000, or its equivalent, as applicable (iii) outside the United States to non-U.S. persons in compliance with Rule 903 or 904 of Regulation S under the U.S. Securities Act, (iv) pursuant to an exemption from registration under the U.S. Securities Act (if available) or (v) pursuant to an effective registration statement under the U.S. Securities Act, subject, in each of the foregoing cases to any requirement of law that the disposition of its property or the property of such investor account or accounts be at all times within its or their control and to compliance with any applicable state securities laws, and any applicable local laws and regulations, and further subject to the relevant Issuer's and the Trustee's rights, as applicable, prior to any such offer, sale or transfer (I) pursuant to clause (v) to require the delivery of an opinion of counsel, certification and/or other information satisfactory to each of them and (II) in each of the foregoing cases, to require that a certificate of transfer in the form appearing on the reverse of the security is completed and delivered by the transferor to the Trustee. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date (as defined below); and

3.6.2.    the Eligible Creditor will, and each subsequent holder is required to, notify any subsequent purchaser from it of the resale restrictions set forth in (a) above prior to the Resale Restriction Termination Date;

3.7.    it agrees on its own behalf and on behalf of any investor account for which it is investing in the New Securities, and each subsequent holder of the relevant New Security by its acceptance thereof will be deemed to agree, to offer, sell or otherwise transfer such New Securities [*in the case of a Rule 144A or IAI New Security*: prior to the date that is one year after the later of the original issue date thereof and the last date on which the relevant Issuer or any Affiliate of the such Issuer was the owner of such New Security (or any predecessor of such New Security) only] [*in the case of a Regulation S New Security*: prior to the date which is 40 days after the later of the date of commencement of the distribution of such New Security and the original issue date of such New Security only] (i) to the Issuers or the Company, as applicable, (ii) pursuant to a registration statement that has been declared effective under the U.S. Securities Act, (iii) for so long as the New Securities are eligible pursuant to Rule 144A under the U.S. Securities Act, to a person it reasonably believes is a QIB that purchases for its own account or for the account of a QIB to whom notice is given that the transfer is being made in reliance on Rule 144A under the U.S. Securities Act, (iv) pursuant to offers and sales to non-U.S. persons that occur outside the United States in compliance with Regulation S under the U.S. Securities Act, (v) to an IAI that is not a QIB and that is purchasing for its own account or for the account of another IAI that is not a QIB, in each case in a minimum principal amount of New Notes of $1,000, €1,000 or R1,000, as applicable or (vi) pursuant to any other available exemption from the registration requirements of the U.S. Securities Act;

3.8.    it will, upon request, execute and deliver any additional documents reasonably deemed by the Issuers, or the Information Agent to be necessary to complete the exchange, assignment and transfer of the Compromise Claims tendered hereby, including the Account Holder Letter or the Proxy Form, as applicable;

3.9.    it is not a person to whom it is unlawful to make an invitation to participate in, or solicit a tender pursuant to, the relevant Compromise or the New Money Notes Offer under any applicable securities laws;

3.10.    in evaluating the relevant Compromise and the New Money Notes Offer and in making its decision whether to participate in the relevant Compromise or the New Money Notes Offer by submitting an Account Holder Letter or Proxy Form, as applicable, and tendering its Compromise Claims, it has made its own independent appraisal of the matters referred to in the Proposal Document and is not relying on any statement, representation or warranty, express or implied, made to it by the Existing Group, the Trustees or the Information Agent, other than those contained in the Proposal Document, as amended or supplemented by the Voting Instruction Deadline;

3.11.    with respect to the Compromise Notes, if the Compromise Notes are assets of (i) an "employee benefit plan" as defined in Section 3(3) of the Employee

Retirement Income Security Act of 1974, as amended ("**ERISA**") that is subject to Title I of ERISA, (ii) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**"), (iii) a "governmental plan" as defined in Section 3(32) of ERISA or any other plan that is subject to a law substantially similar to Title I of ERISA or Section 4975 of the Code, or (iv) an entity deemed to hold plan assets of any of the foregoing, the exchange of Compromise Notes and the acquisition, holding and disposition of New Securities will not result in a non-exempt prohibited transaction under ERISA, Section 4975 of the Code or any substantially similar applicable law;

3.12.  it has such knowledge and experience in financial and business matters, that it is capable of evaluating the merits and risks of participating in the relevant Compromise or the New Money Notes Offer and that it, and any accounts for which it is acting, are each able to bear the economic risks of its, or their, investment;

3.13.  it is not acquiring the New Securities with a view towards any distribution thereof in a transaction that would violate the U.S. Securities Act or the securities laws of any state of the United States or any other applicable jurisdiction; provided that the disposition of its property and the property of any accounts for which it is acting as fiduciary will remain at all times within its control;

3.14.  it understands and acknowledges that the New Securities have not been and will not be registered under the U.S. Securities Act or any other applicable securities laws and that the New Securities are being offered in transactions not requiring registration under the U.S. Securities Act or any other securities laws, and, unless so registered, may not be offered, sold or otherwise transferred except in compliance with the registration requirements of the U.S. Securities Act or any other applicable securities laws, pursuant to an exemption therefrom or in any transaction not subject thereto and, in each case, in compliance with the terms and conditions for transfer set forth in clauses 3.4 and 3.5 above;

3.15.  it acknowledges that until 40 days after either (i) the Completion Date (with respect to the Compromise Consideration issued pursuant to the relevant Compromise) or (ii) the date on which the Participating Creditors receive their New Money Notes in accordance with the Restructuring Agreement and the New Money Notes Offer), any offer or sale of the New Securities within the United States by a dealer (whether or not participating in the relevant Compromise and/or New Money Notes Offer) may violate the registration requirements of the U.S. Securities Act if such offer or sale is made otherwise than in accordance with Rule 144A under the U.S. Securities Act;

3.16.  it acknowledges that the Issuers, the Company, the Trustees and the Information Agent and others will rely upon the truth and accuracy of its acknowledgements, representations, warranties and agreements and agrees that if any of the acknowledgements, representations, warranties and agreements deemed to have been made by its purchase of the New Securities are no longer accurate, it shall promptly notify each of them;

3.17.   it acknowledges that none of the Issuers or the Company, nor any person representing any of them, has made any representation to it with respect to themselves or the offer of any of the New Securities other than the information contained in the Proposal Document, which Proposal Document has been delivered to it and upon which it is relying in making its investment decision with respect to the New Securities. It acknowledges that it has had access to such financial and other information concerning the Existing Group and the New Securities as it has deemed necessary in connection with its decision to invest in any of the New Securities including an opportunity to ask questions and request information;

3.18.   it acknowledges that each New Note will contain a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR OTHER SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES, ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY [in the case of a Rule 144A Security or IAI Security: PRIOR TO THE DATE THAT IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY)][in the case of a Regulation S Security: DURING THE DISTRIBUTION COMPLIANCE PERIOD, WHICH IS THE 40-DAY PERIOD COMMENCING ON THE LATER OF THE DATE OF COMMENCEMENT OF THE DISTRIBUTION OF SUCH SECURITY AND THE DATE OF THE ORIGINAL ISSUE OF SUCH SECURITY] ONLY (A) TO THE ISSUER OR A SUBSIDIARY THEREOF (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-US PERSONS THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A)(1), (2), (3) OR (7) UNDER THE U.S. SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE OF NEW SECURITIES IN A MINIMUM

PRINCIPAL AMOUNT OF THE SECURITIES OF [€ / $ / R]1,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE U.S. SECURITIES ACT, OR (F) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT, SUBJECT IN EACH OF THE FOREGOING CASES TO ANY REQUIREMENT OF LAW THAT THE DISPOSAL OF ITS PROPERTY OR THE PROPERTY OF SUCH INVESTOR ACCOUNT OR ACCOUNTS BE AT ALL TIMES WITHIN ITS OR THEIR CONTROL AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, AND ANY APPLICABLE LOCAL LAWS AND REGULATIONS AND FURTHER SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHTS PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM.

EACH PURCHASER OF THIS SECURITY IS HEREBY NOTIFIED THAT THE SELLER OF THIS SECURITY MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE U.S. SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

[THIS SECURITY HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") AS DEFINED IN SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. FOR INFORMATION REGARDING THE ISSUE DATE, THE ISSUE PRICE, THE YIELD TO MATURITY AND THE AMOUNT OF OID, IF ANY, PER $1.00 OF PRINCIPAL AMOUNT OF THIS SECURITY PLEASE CONTACT THE COMPANY AT EDCON LIMITED, EDGARDALE, 1 PRESS AVENUE, CROWN MINES, JOHANNESBURG, 2092, REPUBLIC OF SOUTH AFRICA, ATTENTION: INVESTOR RELATIONS]

3.19.   it acknowledges that each New Holdco 2 Ordinary A Share will contain a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR OTHER SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES, ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY [in the case of a Rule 144A Security or IAI Security: PRIOR TO THE DATE THAT IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY)][in the case of a Regulation S Security: DURING THE DISTRIBUTION COMPLIANCE PERIOD, WHICH IS THE 40-DAY PERIOD COMMENCING ON THE LATER OF THE DATE OF COMMENCEMENT OF THE DISTRIBUTION OF SUCH SECURITY AND THE DATE OF THE ORIGINAL ISSUE OF

SUCH SECURITY] ONLY (A) TO THE ISSUER OR A SUBSIDIARY THEREOF (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-US PERSONS THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A)(1), (2), (3) OR (7) UNDER THE U.S. SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE OF NEW SECURITIES IN A MINIMUM PRINCIPAL AMOUNT OF THE SECURITIES OF [€ / $ / R]1,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE U.S. SECURITIES ACT, OR (F) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT, SUBJECT IN EACH OF THE FOREGOING CASES TO ANY REQUIREMENT OF LAW THAT THE DISPOSAL OF ITS PROPERTY OR THE PROPERTY OF SUCH INVESTOR ACCOUNT OR ACCOUNTS BE AT ALL TIMES WITHIN ITS OR THEIR CONTROL AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, AND ANY APPLICABLE LOCAL LAWS AND REGULATIONS AND FURTHER SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHTS PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM.

3.20.   it acknowledges that each New Holdco 2 Ordinary B Share will contain a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR OTHER SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES, ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY [in the case of a Rule 144A Security or IAI Security: PRIOR TO THE DATE THAT IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF

THIS SECURITY)][in the case of a Regulation S Security: DURING THE DISTRIBUTION COMPLIANCE PERIOD, WHICH IS THE 40-DAY PERIOD COMMENCING ON THE LATER OF THE DATE OF COMMENCEMENT OF THE DISTRIBUTION OF SUCH SECURITY AND THE DATE OF THE ORIGINAL ISSUE OF SUCH SECURITY] ONLY (A) TO THE ISSUER OR A SUBSIDIARY THEREOF (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-US PERSONS THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A)(1), (2), (3) OR (7) UNDER THE U.S. SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE OF NEW SECURITIES IN A MINIMUM PRINCIPAL AMOUNT OF THE SECURITIES OF [€ / $ / R]1,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE U.S. SECURITIES ACT, OR (F) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT, SUBJECT IN EACH OF THE FOREGOING CASES TO ANY REQUIREMENT OF LAW THAT THE DISPOSAL OF ITS PROPERTY OR THE PROPERTY OF SUCH INVESTOR ACCOUNT OR ACCOUNTS BE AT ALL TIMES WITHIN ITS OR THEIR CONTROL AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, AND ANY APPLICABLE LOCAL LAWS AND REGULATIONS AND FURTHER SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHTS PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM.

3.21.   it understands that no action has been taken in any jurisdiction (including the United States) by any of the Issuers, the Company or any member of the Existing Group or the Information Agent that would result in a public offering of the New Securities or the possession, circulation or distribution of the Proposal Document or any other material relating to the Existing Group or the New Securities in any jurisdiction where action for such purpose is required;. Consequently, any transfer of the New Securities will be subject to the selling restrictions set forth hereunder and under "Important Notice" and "Important Securities Laws Notice;" and

**it agrees to, and each subsequent holder is required to, notify any participant of the New Securities from it, or any transferee, of the resale or transfer restrictions referred to above, if then applicable.**

**PART E2**
**South African Tax Implications for the holders of the New Notes**

*This information is not a substitute for independent advice pertaining to any person's particular circumstances as a holder of New Notes. It is intended as a general guide only. Prospective purchasers of the New Notes are advised to consult their own tax advisers as to the tax consequences, under the tax laws of the country of which they are resident or otherwise subject to tax, of a purchase of New Notes including without limitation, the consequences of receipt of interest and premium or gain, if any, on and sale or redemption of, the New Notes or any interest therein.*

**Certain South African Tax Considerations**

The following is a summary of certain aspects of the potential South African tax consequences of the acquisition, ownership and disposition of the New Notes by South African tax residents and non- residents who are beneficial owners of the New Notes.[1]

***South African tax residents***

*Interest received or accrued*

In terms of the resident basis of taxation, South African residents are subject to tax on their worldwide income, irrespective of source.

Interest received or accrued interest received by or accruing to a South African tax resident holder of the New Notes will be subject to income tax in such holders' hands (subject to certain qualifying persons being exempt from income tax and further subject to certain nominal exemptions for natural persons). Where the New Notes  will be denominated in USD, the interest accruing to the holders of the New Notes must be converted to Rand.

*Issue, sale and redemption of the New Notes*

A sale of the New Notes by a South African tax resident holder may result in a capital gain or loss if the New Notes were held as capital assets or an income gain or loss if the New Notes were held on revenue account. Any such capital gain or income gain will be subject to capital gains tax or income tax, respectively, in the holder's hands.

The issue, sale and redemption of the New Notes are not subject to value-added tax or any transfer taxes.

*Taxation of foreign exchange gains and losses*

Where the New Notes will be denominated in USD, a South African tax resident holder who is (1) a company, (2) trust carrying on a trade, or (3) a natural person who holds the New Notes as trading stock will be required to include in their taxable income any realized and unrealised exchange gains on the New Notes. Generally, the realized and unrealized exchange losses are deductible for tax purposes.

Non-trading trusts and natural persons who hold the New Notes as capital assets will be required to take currency fluctuations into account in determining the capital gain or loss in respect of the disposal of the New Notes.

---

[1] The summary is in respect of the provisions of the South African Income Tax Act, No. 58 of 1962 as is effective at the date of this Offering Memorandum. The summary does not cover all aspects of South African income tax that may be relevant. South African income tax legislation is subject to frequent changes which may have a retroactive effect and could significantly affect the South African income tax consequences discussed below. We have not obtained any advance tax rulings from the South African Revenue Services ("SARS") with respect to the statements made and the conclusions reached in the summary below and there is no assurance that SARS or a court will agree with our statements and conclusions or that a court would not sustain any challenge by SARS in the event of litigation

### Non-residents

#### Interest received or accrued

Generally income arising from business activities in South Africa will be regarded as being from a South African source.  Non-residents are only taxed on income from a South African source, subject to the application of a relevant agreement for the avoidance of double taxation (DTA).  In general, the source of income is the location of the originating cause of its receipt.

Interest received or accrued interest received by non-residents of South Africa are generally exempt from income tax, unless that person:

a)   is a natural person who was physically present in South Africa for a period exceeding 183 days in aggregate during the twelve-month period preceding the date on which the interest is received or accrued by or to that person; or

b)   the debt from which the interest arises is effectively connected to a permanent establishment of that person in South Africa.

If a holder does not qualify for the exemption, a reduction of any income tax liability or an exemption therefrom may be available under an applicable double taxation treaty.

#### Issue, sale and redemption of the New Notes

A sale or redemption of New Notes by a non-resident holder will only be subject to capital gains or income tax, as applicable, in South Africa if the New Notes are attributable to a permanent establishment of that person in South Africa. This tax treatment will be subject to the provisions of any applicable tax treaty.

The issue, sale and redemption of the New Notes are not subject to value-added tax or any transfer taxes.

#### Withholding tax

As the New Notes will be listed on the Irish Stock Exchange, the exemption to withholding tax on interest will apply. Consequently, interest paid on the New Notes should not be subject to the withholding tax which is currently imposed in South Africa at 15%.

PART F

**Instructions and guidance for Compromise Creditors**


**THIS PART F SETS OUT INSTRUCTIONS AND GUIDANCE FOR VOTING AT THE RELEVANT COMPROMISE MEETING.**

**ALL COMPROMISE CREDITORS ARE REQUESTED TO READ -**

**(1)     THE GENERAL GUIDANCE IN SECTION 1 OF THIS PART F;**

**(2)     THE GUIDANCE ON VOTING AT THE RELEVANT COMPROMISE MEETING IN SECTION 2 OF THIS PART F FOR COMPROMISE NOTEHOLDERS;**

**(3)     THE GUIDANCE ON VOTING AT THE RELEVANT COMPROMISE MEETING IN SECTION 3 OF THIS PART F FOR COMPROMISE LENDERS;**


1.      **GENERAL GUIDANCE**

1.1.    **Compromise Meetings**

1.1.1.    Before the Compromises can become effective and binding on the Company and the Compromise Creditors, a resolution to approve it must be passed by the Compromise Creditors by the requisite majority required by Section 155 of the Companies Act. The requisite majority is a majority in number representing at least 75% in value of the Compromise Creditors who, being so entitled, are present in person, by a duly authorised representative if a company or other corporation, or by proxy and vote at the relevant Compromise Meeting.

1.1.2.    The Senior Secured Company Meeting will commence at the time stated, with the Guarantor Meetings concerning the Senior Secured Class being scheduled to convene sequentially thereafter, beginning at 13h00. The Super Senior Secured Company Meeting will commence at the time stated, or so soon thereafter following adjournment or closure of the Senior Secured Holdco Meeting. The various Guarantor Meetings concerning the Super Senior Class are scheduled to convene sequentially thereafter, beginning at 15h (or as soon as the Super Senior Company Meeting shall have been concluded or adjourned).

1.1.3.    Formal notice of each Compromise Meeting is included within this Proposal Document.

1.1.4.    If the Compromise Creditors do not approve the relevant Compromise at the relevant Compromise Meeting, then the Compromise Creditors will not be able to implement the Compromises and/or the Financial Restructuring.

1.2.    **Deadline for voting at the Compromise Meetings – Compromise Noteholders**

1.2.1.    Voting will take place at the Compromise Meetings by appearing in person, by a duly authorised representative or by proxy as explained in more detail in paragraph 2 of this Part F.

1.2.2.    As explained in more detail in paragraph 2 of this Part F, each Compromise Noteholder must ensure that it completes and submits or its Account Holder on its behalf completes and submits a valid Account Holder Letter to the Information Agent in order to vote at the relevant Compromise Meeting. Account Holder Letters for the purpose of voting must be submitted to the Information Agent before the Voting Instruction Deadline.

1.2.3.    A valid Account Holder Letter for the purposes of voting means an Account Holder Letter which has been signed by an Account Holder duly authorised by a Compromise Noteholder and in respect of which Part 2 Section 1: Voting Instructions of the relevant Account Holder Letter has been completed, including all confirmations required to be given by the Account Holder.

1.2.4.    Failure to deliver a valid Account Holder Letter on behalf of a Compromise Noteholder by the Voting Instruction Deadline will mean that the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the relevant Compromise Noteholder will not be entitled to vote at the relevant Compromise Meeting.

1.2.5.    Notwithstanding any other provision of this Explanatory Statement, the Chairman will be entitled, at his sole discretion, to permit a Compromise Noteholder in respect of which a completed Account Holder Letter has not been delivered prior to the Voting Instruction Deadline to vote at the relevant Compromise Meeting if the Chairman considers that the relevant Compromise Noteholder has produced sufficient proof that it is a Compromise Creditor as at the relevant Record Date or DTC Record Date (as applicable).

1.2.6.    Compromise Noteholders should immediately contact their Account Holders (through any Intermediaries, if appropriate) to ensure that a valid Account Holder Letter is submitted in respect of their interests in the Compromise Notes.

1.3.    **Deadline for voting at the Compromise Meetings – Compromise Lenders**

1.3.1.    Voting will take place at the Compromise Meetings by appearing in person, by a duly authorised representative or by proxy as explained in more detail in paragraph 3 of this Part F.

1.3.2.    As explained in more detail in in paragraph 3 of this Part F, each Compromise Lender must ensure that it completes and submits or its Proxy Forms to the Information Agent in order to vote at the relevant Compromise Meeting. Proxy Forms for the purpose of voting must be submitted to the Information Agent before the Voting Instruction Deadline.

1.3.3.    A valid Proxy Form for the purposes of voting means an Proxy Form which has been signed by a Compromise Lender and in respect of which Part 2 Section 1: Voting Instructions of the relevant Proxy Form has been completed, including all confirmations required to be given by the Compromise Lender.

1.3.4.    Failure to deliver a valid Proxy Form on behalf of a Compromise Lender by the Voting Instruction Deadline will mean that the voting instructions contained in that Proxy Form will be disregarded for the purposes of voting at the relevant Compromise Meeting and the relevant Compromise Lender will not be entitled to vote at the relevant Compromise Meeting.

1.3.5.    Notwithstanding any other provision of this Explanatory Statement, the Chairman will be entitled, at his sole discretion, to permit a Compromise Lender in respect of which a completed Proxy Form has not been delivered prior to the Voting Instruction Deadline to vote at the relevant Compromise Meeting if the Chairman considers that the relevant Compromise Lender has produced sufficient proof that it is a Compromise Creditor as at the relevant Record Date or DTC Record Date (as applicable).

1.4.    **Assessment of Compromise Claims for Voting Purposes**

1.4.1.    The amount of the Compromise Claims of each Compromise Creditor which submits a valid Account Holder Letter or Proxy Form will be calculated in accordance with paragraph 10 of Part B (*Explanation of a Compromise*).

1.4.2.    The assessment of Compromise Claims for voting purposes shall be carried out by the Chairman. The Chairman may, for voting purposes only, reject a Compromise Claim in whole or in part if he considers that it does not constitute a fair and reasonable assessment of the relevant sums owed to the relevant Compromise Creditor by the Company or if the relevant Compromise Creditor has not complied with the voting procedures described in this Explanatory Statement. If a Compromise Claim is unascertained, contingent or disputed (in part) but the Chairman is able to place a minimum value on that Compromise Claim, he/she may admit the Compromise Claim for voting purposes at that value. If a Compromise Claim is disputed in its entirety, or the Chairman is otherwise unable to place a minimum value on it, that Compromise Claim may be valued at EUR1 (one euro) for voting purposes under the relevant Compromise.

1.4.3.    The Chairman will report to the Court, at the hearing to sanction the relevant Compromises (which it is anticipated will take place on or about 10 January 2017), his decision to reject Compromise Claims (if any), with details of those Compromise Claims and the reasons for rejection.

1.4.4.    The admission and valuation of any Compromise Claim for voting purposes does not (in itself) constitute an admission of the

existence or value of the Compromise Claim and will not bind the Company or the Compromise Creditors concerned.

1.5.   **Transfers / Assignments after the Record Date or DTC Record Date**

Under the Compromises, the Company is under no obligation to recognise any assignment or transfer of any Compromise Claims after the Record Date or DTC Record Date, as applicable.

2.   **VOTING – COMPROMISE NOTEHOLDERS**

2.1.   **General**

2.1.1.   Each Compromise Noteholder should immediately contact its Account Holder (through any Intermediaries, if appropriate) to ensure that a valid Account Holder Letter in respect of its Compromise Claim is delivered to and received by the Information Agent.

2.1.2.   It will be the responsibility of Account Holders to obtain from the Compromise Noteholders (through any Intermediaries, if applicable) on whose behalf they are acting in accordance with the procedures established between them, whatever information or instructions they may require to identify in an Account Holder Letter the relevant Compromise Noteholder and to provide the information, instructions, confirmations and representations required to be given by the Account Holder Letter for and on behalf of the relevant Compromise Noteholder. To assist this process, each Compromise Noteholder must contact its Account Holder (through any Intermediaries, if appropriate) to enable that Account Holder to complete an Account Holder Letter and deliver such Account Holder Letter to the Information Agent before the Voting Instruction Deadline.

2.1.3.   Before the Voting Instruction Deadline, each Compromise Noteholder that wishes to attend and vote at the relevant Compromise Meeting (or to instruct a person to attend the relevant Compromise Meeting and vote on its behalf) and in respect of which an Account Holder Letter is completed will be required to ensure that its Account Holder has instructed the relevant Clearing System in which the Notes which are the subject of the Account Holder Letter are held to block those interests in the Notes, by giving Custody Instructions to that effect to the relevant Clearing System or, in the case of Compromise Notes held through DTC outside of Euroclear or Clearstream, procuring that its Account Holder medallion guarantee stamps its Account Holder Letter and confirms it holds a position in the Compromise Notes as at the DTC Record Date. The procedure for doing this is described further below.

2.1.4.   If a person is in any doubt as to whether or not it is a Compromise Noteholder, such person should contact the Information Agent using the contact details in the Account Holder Letter.

2.1.5.   Compromise Noteholders may also wish to refer to the overview set out in the section entitled "Summary of Action to be Taken by

All Compromise Noteholders Only" at pages 144 to 152 in Part A (*Company Information, Background to and Reasons for the Financial Restructuring*) of this Explanatory Statement and "Are you a person with an interest in any of the Compromise Notes" beginning at each of pages 134 and 135 in Part A (*Company Information, Background to and Reasons for the Financial Restructuring*) of this Explanatory Statement to see the relationship between Compromise Noteholders, Intermediaries and Account Holders.

2.2. **Appointment of the Information Agent**

The Information Agent has been appointed to facilitate communications with Compromise Noteholders. The Information Agent's remuneration and expenses, and all costs incurred by it on behalf of New Holdco 2, New Holdco 1 and the Company, shall be discharged by the Company.

2.3. **Voting at the Compromise Meetings**

In order to vote for or against the Compromises, each Compromise Noteholder (through any Intermediaries, if applicable) should instruct its Account Holder to complete and sign an Account Holder Letter as described below and deliver the completed and signed Account Holder Letter to the Information Agent before the Voting Instruction Deadline.

2.4. **Procedure for blocking Compromise Notes held through DTC**

2.4.1. Where interests in the Compromise Notes are held through DTC outside of Euroclear or Clearstream, Account Holders should, prior to delivering an Account Holder Letter to the Information Agent -

2.4.1.1. confirm the instructions contained in the Account Holder Letter; and

2.4.1.2. arrange for the Compromise Notes referred to in the Account Holder Letter to be signature medallion guarantee stamped by the Account Holder.

2.4.2. The Company will request DTC to provide an omnibus proxy confirming the identity of Account Holders and their positions as of the DTC Record Date. In the event that DTC fails to do so, the Information Agent may reject the Account Holder Letter.

2.4.3. The New Notes will only be eligible for clearing and settlement through Euroclear and Clearstream. It is highly recommended that Account Holders move any positions in the Compromise Notes that they may currently hold in an account with DTC to an account with either Euroclear or Clearstream to receive their Compromise Consideration without delay.

2.5. **Procedure for blocking Compromise Notes held through Euroclear or Clearstream**

2.5.1. Where interests in the Compromise Notes are held through Euroclear or Clearstream, Account Holders should, prior to delivering an Account Holder Letter to the Information Agent, submit Custody Instructions in respect of the Compromise Notes referred to in the Account Holder Letter to the relevant Clearing

System in accordance with the procedures of the relevant Clearing System and the deadlines required by that Clearing System. The relevant Custody Instruction reference numbers should then be listed and cross-referenced in Section 2 (Holding Details) of Part 1 (Compromise Noteholder and Holding Details and Confirmations) of the Account Holder Letter.

2.5.2.   Failure to include a valid Custody Instruction Reference Number in an Account Holder Letter delivered on behalf of a Compromise Noteholder to the Information Agent will invalidate that Account Holder Letter. The voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the relevant Compromise Noteholder will not be entitled to vote at the relevant Compromise Meeting.

2.5.3.   Custody Instructions in respect of any Compromise Notes held in Euroclear which are the subject of an Account Holder Letter should be given to Euroclear in accordance with the deadlines specified by Euroclear and its standard practices. Euroclear will assign a Custody Instruction Reference Number in respect of each Custody Instruction and the Custody Instruction Reference Number must be cross referenced in the Account Holder Letter relating to the Compromise Notes in respect of which the Custody Instruction Reference Number has been obtained. An Account Holder Letter will not be valid if it does not contain the relevant Custody Instruction Reference Number(s). This will enable the Information Agent to verify the blocking of the Compromise Notes.

2.5.4.   Custody Instructions in respect of any Compromise Notes held in Clearstream, Luxembourg which are the subject of an Account Holder Letter should be given to Clearstream, Luxembourg in accordance with the deadlines specified by Clearstream, Luxembourg and its standard practices. Clearstream, Luxembourg will assign a Custody Instruction Reference Number in respect of each Custody Instruction and the Custody Instruction Reference Number must be cross referenced in the Account Holder Letter relating to the Compromise Notes in respect of which the Custody Instruction Reference Number has been obtained. An Account Holder Letter will not be valid if it does not contain the relevant Custody Instruction Reference Number(s). This will enable the Information Agent to verify the blocking of the Compromise Notes.

2.5.5.   The Information Agent will request the relevant Clearing System to confirm to its satisfaction that the Compromise Notes that are the subject of the relevant Compromise Notes Account Holder Letter have been blocked with effect from or before the date of the relevant Account Holder Letter. In the event that the Clearing System fails to do so, the Information Agent may reject the

Account Holder Letter and the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the relevant Compromise Noteholder will not be entitled to vote at the relevant Compromise Meeting.

2.5.6.    In order to give the requested confirmation for the purpose of voting, the Clearing Systems will need to have received the Custody Instructions no later than the Custody Instruction Deadline, being 17h00  (local time in the place of the relevant Clearing System) on the Business Day preceding the Voting Instruction Deadline.

2.5.7.    After submitting Custody Instructions to the Clearing Systems, the Account Holder's position will be blocked until the occurrence of any of the following events and cannot be transferred or sold thereafter -

2.5.7.1.    at a relevant Compromise Meeting at which a vote takes place, the relevant Compromise is not approved by the requisite majorities of the Compromise Creditors specified in Section 155 of the Companies Act;

2.5.7.2.    any of the Compromises are not sanctioned by the relevant South African court;

2.5.7.3.    the earlier of the Completion Date and the Long-Stop Date;

2.5.7.4.    the Company gives the Compromise Noteholder or any other Compromise Noteholder written notice of an intention either -

2.5.7.4.1.    not to proceed with the relevant Compromise; or

2.5.7.4.2.    to proceed with a proposed compromise or arrangement on terms which are different to the relevant Compromise in any material respect.

2.6.    **Instructions Irrevocable**

Any Account Holder Letter delivered will be irrevocable after the Record Date or DTC Record Date, as applicable, until the occurrence of any of the following events -

2.6.1.    at a Compromise Meeting at which a vote takes place, the relevant Compromise is not approved by the requisite majorities of the Compromise Creditors specified in section 155 of the Companies Act;

2.6.2.    the earlier of the Completion Date and the Long-Stop Date; or

2.6.3.    any other date as set out in the Account Holder Letter.

2.7.    **Completing the Account Holder Letter for the purposes of voting**

2.7.1.    The Information Agent will use its reasonable endeavours to assist Compromise Noteholders to complete their Account Holder Letters validly, should it receive any Account Holder Letters which

are not valid. However, failure to deliver a valid Account Holder Letter on behalf of a Compromise Noteholder to the Information Agent in the manner and within the deadlines referred to above will mean that the voting instructions contained in such Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the relevant Compromise Noteholder will not be entitled to vote at the relevant Compromise Meeting.

2.7.2.    None of the Company, the Existing Group, the Trustees, the Information Agent or any other person will be responsible for any loss or liability incurred by a Compromise Noteholder as a result of any determination by the Information Agent that an Account Holder Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

2.7.3.    Each Compromise Noteholder will need to give its Account Holder information and instructions as to voting and certain other matters.

2.7.4.    In Summary, each Compromise Noteholder may make the following elections, in each case by ensuring that such election is recorded in the Account Holder Letter delivered on its behalf and that the voting intention section of the Account Holder Letter is completed, including whether to -

2.7.4.1.    attend and vote at the relevant Compromise Meeting in person or by a duly authorised representative if the Compromise Noteholder is a company or other corporation;

2.7.4.2.    instruct the Chairman as its proxy to cast its vote in accordance with the wishes of that Compromise Noteholder;

2.7.4.3.    appoint someone else as its proxy to attend and vote at the relevant Compromise Meeting in person on its behalf;

2.7.4.4.    appoint a Designated Recipient who is an Eligible Person;

2.7.4.5.    in respect of Senior Secured Creditors only, subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR and failing such election, the Compromise Noteholder who is a Senior Secured Creditor shall be issued New Holdco 2 PIK B Notes denominated in USD;

2.7.4.6.    whether such Compromise Noteholder will subscribe for its Pro Rata Participation Share of New Money Notes or a fixed USD value of New Money Notes (on the basis that if the latter option is selected, the Compromise Noteholder will receive the lesser of its Pro Rata Participation Share and the fixed USD value);

2.7.4.7.    if such Compromise Noteholder has elected to subscribe for New Money Notes as aforesaid, whether

such Compromise Noteholder will subscribe, for no consideration payable by such Compromise Noteholder, for its relevant allocation:

2.7.4.7.1.    of New Holdco 2 Ordinary B Shares in the issued share capital of New Holdco 2; or

2.7.4.7.2.    as a CVR,

and failing such election (but provided that the Compromise Noteholder has elected to subscribe for New Money Notes as aforesaid), such Compromise Noteholder shall receive its relevant allocation of New Holdco 2 Ordinary B Shares.

2.7.5.    Each Compromise Noteholder is recommended to appoint a proxy (either the Chairman or someone else of its choice who would be willing to attend the relevant Compromise Meeting) in any event, even if that Compromise Noteholder intends to attend and vote in person or by a duly authorised representative, if a corporation, in case such Compromise Noteholder is unable to do so for some reason. If a Compromise Noteholder appoints a proxy and then decides to attend and vote at the relevant Compromise Meeting in person or by a duly authorised representative, if a company or other corporation, that Compromise Noteholder will be entitled to do so.

2.7.6.    Each Compromise Noteholder which submits, delivers or procures the delivery of an Account Holder Letter will be required to make (or authorise its Account Holder to make on its behalf) the representations, warranties and undertakings to the Company, the Existing Group and the Information Agent set out in Part 1 (Compromise Noteholder and Holding Details and Confirmations), Section 3 (Account Holder Confirmations) and Section 4 (Eligible Person) of the relevant Account Holder Letter.

2.7.7.    Any Compromise Noteholder that is unable to give any of the representations, warranties and undertakings referred to in clause 2.7.6 of this Part F should contact the Information Agent directly as soon as possible, as there may be additional procedures involved in respect of that Compromise Noteholder's participation in the relevant Compromise. A valid Account Holder Letter for the purposes of confirming eligibility to receive Compromise Consideration and/or New Money Notes means an Account Holder Letter which has been signed by an Account Holder duly authorised by a Compromise Noteholder and in respect of which Part 1 (Compromise Noteholder and Holding Details and Confirmations), Section 3 (Account Holder Confirmations) and Section 4 (Eligible Person) of the relevant Account Holder Letter has been completed, including all confirmations required to be given by the Account Holder.

2.7.8.    Each Compromise Noteholder should also ensure that the following is included in the Account Holder Letter delivered on its behalf -

2.7.8.1.    its identity (or the identity of its representatives);

2.7.8.2.    details of the Compromise Notes which are the subject of the Account Holder Letter, including the ISIN and CUSIP number(s), the principal amount of the Compromise Notes held at the relevant Clearing System(s), the identity of the relevant Clearing System(s), the account number of the Account Holder in the relevant Clearing System(s) and the Custody Instruction Reference Number(s);

2.7.8.3.    the appropriate confirmations to be given by the Account Holder;

2.7.8.4.    its voting instructions;

2.7.8.5.    its intention to subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR; and

2.7.8.6.    its intention to subscribe for the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be.

**2.8.    Delivery of Account Holder Letters for the purposes of voting**

2.8.1.    Account Holder Letters for the purposes of voting at the relevant Compromise Meeting should be delivered by Account Holders as soon as possible to the Information Agent and, in any event, before the Voting Instruction Deadline, being 28 December 2016.

2.8.2.    Each Compromise Noteholder should note that, unless a valid Account Holder Letter is delivered on its behalf to the Information Agent before the Voting Instruction Deadline:

2.8.2.1.    the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the relevant Compromise Meeting and the Compromise Noteholder will not be entitled to vote at the relevant Compromise Meeting; and

2.8.2.2.    its other elections set out in the Account Holder Letter will be disregarded.

2.8.3.    Any Account Holder Letter delivered will be irrevocable from and after the Voting Instruction Deadline unless and until the relevant Compromise is not approved by the requisite majorities at the relevant Compromise Meeting or the relevant Compromise is withdrawn.

2.8.4.    By delivering an Account Holder Letter to the Information Agent, the Account Holder -

2.8.4.1.    confirms to the Company, the Existing Group and the Information Agent that Custody Instructions in respect of the Compromise Notes which are the subject of that Account Holder Letter have been issued to the relevant Clearing System with effect from or before the Voting

Instruction Deadline in accordance with the normal procedures of such Clearing System and after taking into account the deadlines imposed by such Clearing System;

2.8.4.2. instructs the relevant Clearing System to transmit to the Information Agent (for onward transmission to the Company) the information contained within the Custody Instructions; and

2.8.4.3. gives the other confirmations required by the Account Holder Letter in favour of the Company, the Existing Group and the Information Agent.

2.9. **Attending the Compromise Meetings**

2.9.1. The Senior Secured Company Meeting will commence at the time stated, with the Guarantor Meetings concerning the Senior Secured Class being scheduled to convene sequentially thereafter, beginning at 13h00. The Super Senior Secured Company Meeting will commence at the time stated, or so soon thereafter following adjournment or closure of the Senior Secured Holdco Meeting. The various Guarantor Meetings concerning the Super Senior Class are scheduled to convene sequentially thereafter, beginning at 15h00 (or as soon as the Super Senior Company Meeting shall have been concluded or adjourned).

2.9.2. If a Compromise Noteholder wishes to attend the relevant Compromise Meeting, it should produce a duplicate copy of the Account Holder Letter delivered on its behalf, evidence of corporate authority (in the case of a company or other corporation) (for example, a valid power of attorney and/or board minutes) and evidence of personal identity (for example, a passport or other picture identification) at the registration desk no later than one hour before the scheduled time of the relevant Compromise Meeting.

2.9.3. Any proxy attending the Compromise Meetings on behalf of a Compromise Noteholder should produce a duplicate copy of the Account Holder Letter in which he/she is named as proxy. Where this copy can be matched against one of the copies provided by the relevant Account Holder to the Information Agent on behalf of the Company, that Compromise Noteholder's proxy will be admitted to the relevant Compromise Meeting upon providing evidence of his/her personal identity (for example, a passport or other picture identification). Where the Account Holder Letter cannot be produced by the person purporting to have been appointed by a Compromise Noteholder as its proxy, that person will need to provide evidence of his/her personal identity (for example, a passport or other picture identification) and, provided that the evidenced identity conforms with the details in the relevant copy of the Account Holder Letter provided by the relevant Account Holder to the Information Agent on behalf of

the Company, that person will be admitted to the relevant Compromise Meeting.

2.9.4.    If a Compromise Noteholder appoints the Chairman as its proxy, there is no need for the Chairman to take the Account Holder Letter to the relevant Compromise Meeting.

3.    **VOTING – COMPROMISE LENDERS**

3.1.    **General**

3.1.1.    It will be the responsibility of Compromise Lenders to provide the information, instructions, confirmations and representations required to be given by the Proxy Form. Each Compromise Lender must complete a Proxy Form and deliver such Proxy Form to the Information Agent before the Voting Instruction Deadline.

3.1.2.    Before the Voting Instruction Deadline, each Compromise Lender that wishes to attend and vote at the relevant Compromise Meeting (or to instruct a person to attend the relevant Compromise Meeting and vote on its behalf) and in respect of which a Proxy Form is completed will be required to undertake not to transfer or dispose of its Compromise Claims after the Record Date.

3.1.3.    If a person is in any doubt as to whether or not it is a Compromise Lender, such person should contact the Information Agent using the contact details in the Proxy Form.

3.1.4.    Compromise Lenders may also wish to refer to the overview set out in the section entitled "*Summary of Action to be Taken by All Compromise Lenders Only*" at pages 153 to 158 in Part A (*Company Information, Background to and Reasons for the Financial Restructuring*) of this Explanatory Statement.

3.2.    **Appointment of the Information Agent**

The Information Agent has been appointed to facilitate communications with Compromise Noteholders. The Information Agent's remuneration and expenses, and all costs incurred by it on behalf of New Holdco 2, New Holdco 1 and the Company, shall be discharged by the Company.

3.3.    **Voting at the Compromise Meetings**

In order to vote for or against the Compromises, each Compromise Lender must complete and sign a Proxy Form as described below and deliver the completed and signed a Proxy Form to the Information Agent before the Voting Instruction Deadline.

3.4.    **Instructions Irrevocable**

Any Proxy Form delivered will be irrevocable after the Record Date until the occurrence of any of the following events -

3.4.1.    at a Compromise Meeting at which a vote takes place, the relevant Compromise is not approved by the requisite majorities of the Compromise Creditors specified in section 155 of the Companies Act;

3.4.2.    any of the Compromises are not sanctioned by the relevant South African court;

3.4.3.    the earlier of the Completion Date and the Long-Stop Date; or

3.4.4.    any other date as set out in the Proxy Form.

3.5.    **Completing the Proxy Form for the purposes of voting**

3.5.1.    The Company will use its reasonable endeavours to assist Compromise Lenders to complete their Proxy Forms validly, should it receive any Proxy Forms which are not valid. However, failure to deliver a valid Proxy Form on behalf of a Compromise Lender to the Information Agent in the manner and within the deadlines referred to above will mean that the voting instructions contained in such Proxy Form will be disregarded for the purposes of voting at the relevant Compromise Meeting and the relevant Compromise Lender will not be entitled to vote at the relevant Compromise Meeting.

3.5.2.    None of the Company, the Existing Group, the Information Agent or any other person will be responsible for any loss or liability incurred by a Compromise Lender as a result of any determination by the Information Agent that a Proxy Form contains an error or is incomplete, even if this is subsequently shown not to have been the case.

3.5.3.    In summary, each Compromise Lender may make the following elections, in each case by ensuring that such election is recorded in the Proxy Form delivered by it and the voting intention section of the Account Holder Letter is completed, including whether to:

3.5.3.1.    attend and vote at the relevant Compromise Meeting in person or by a duly authorised representative if the Compromise Lender is a company or corporation;

3.5.3.2.    instruct the Chairman as its proxy to cast its vote in accordance with the wishes of that Compromise Lender;

3.5.3.3.    appoint someone else as its proxy to attend and vote at the relevant Compromise Meeting in person on its behalf;

3.5.3.4.    appoint a Designated Recipient who is an/ Eligible Person;

3.5.3.5.    in respect of Senior Secured Creditors only, subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR and failing such election, the Compromise Lender who is a Senior Secured Creditor shall be issued New Holdco 2 PIK B Notes denominated in USD;

3.5.3.6.    whether such Compromise Lender will subscribe for its Pro Rata Participation Share of New Money Notes or a fixed USD value of New Money Notes (on the basis that if the latter option is selected, the Compromise Lender will receive the lesser of its Pro Rata Participation Share and the fixed USD value);

3.5.3.7.    if such Compromise Lender has elected to subscribe for New Money Notes as aforesaid, whether such Compromise Lender will subscribe, for no

consideration payable by such Compromise Lender, for its relevant allocation –

3.5.3.7.1.    of New Holdco 2 Ordinary B Shares in the issued share capital of New Holdco 2; or

3.5.3.7.2.    as a CVR,

and failing such election (but provided that the Compromise Lender has elected to subscribe for New Money Notes as aforesaid), such Compromise Lender shall receive its relevant allocation of New Holdco 2 Ordinary B Shares.

3.5.4.    Each Compromise Lender is recommended to appoint a proxy (either the Chairman or someone else of its choice who would be willing to attend the relevant Compromise Meeting) in any event, even if that Compromise Lender intends to attend and vote in person or by a duly authorised representative, if a company or corporation, in case such Compromise Lender is unable to do so for some reason. If a Compromise Lender appoints a proxy and then decides to attend and vote at the relevant Compromise Meeting in person or by a duly authorised representative, if a company or other corporation, that Compromise Lender will be entitled to do so.

3.5.5.    Each Compromise Lender which submits, delivers or procures the delivery of a Proxy Form will be required to make the representations, warranties and undertakings to the Company, the Existing Group and the Information Agent set out in Part 1 (*Compromise Lender and Holding Details and Confirmations*), Section 3 (*Confirmations*) and Section 4 (*Eligible Person*) of the relevant Proxy Form.

3.5.6.    Any Compromise Lender that is unable to give any of the representations, warranties and undertakings referred to in clause 3.5.5 of this Part F should contact the Company directly as soon as possible, as there may be additional procedures involved in respect of that Compromise Lender's participation in the relevant Compromise. A valid Proxy Form for the purposes of confirming eligibility to receive Compromise Consideration and/or New Money Notes means a Proxy Form which has been signed by Compromise Lender and in respect of which Part 1 (*Compromise Lender and Holding Details and Confirmations*), Section 3 (*Confirmations*) and Section 4 (*Eligible Person*) of the relevant Proxy Form has been completed, including all confirmations required to be given by the Compromise Lender.

3.5.7.    Each Compromise Lender should also ensure that the following is included in the Proxy Form delivered on its behalf -

3.5.7.1.    its identity (or the identity of its Designated Recipient);

3.5.7.2.    details of the Compromise Claims which are the subject of the Proxy Form, including the principal amount and

accrued interest of the Compromise Claims as at the Voting Instruction Deadline;

3.5.7.3.   the appropriate confirmations to be given by the Compromise Lender;

3.5.7.4.   its voting instructions;

3.5.7.5.   its intention to subscribe for New Holdco 2 PIK B Notes denominated in USD or ZAR; and

3.5.7.6.   its intention to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be.

3.6.   **Delivery of Proxy Forms for the purposes of voting**

3.6.1.   Proxy Forms for the purposes of voting at the relevant Compromise Meeting should be delivered by Compromise Lenders as soon as possible to the Information Agent and, in any event, before the Voting Instruction Deadline, being 23 December 2016.

3.6.2.   Each Compromise Lender should note that, unless a valid Proxy Form is delivered on its behalf to the Information Agent before the Voting Instruction Deadline:

3.6.2.1.   the voting instructions contained in that Proxy Form will be disregarded for the purposes of voting at the relevant Compromise Meeting and the Compromise Lender will not be entitled to vote at the relevant Compromise Meeting; and

3.6.2.2.   its other elections set out in the Proxy Form will be disregarded.

3.6.3.   Any Proxy Form delivered will be irrevocable from and after the Voting Instruction Deadline unless and until the relevant Compromise is not approved by the requisite majorities at the relevant Compromise Meeting or the relevant Compromise is withdrawn.

3.6.4.   By delivering a Proxy Form to the Information Agent, the Compromise Lender -

3.6.4.1.   agrees not to transfer its Compromise Claims following the Record Date;

3.6.4.2.   gives the other confirmations required by the Compromise Lender in favour of the Company, the Existing Group and the Information Agent.

3.7.   **Attending the Compromise Meetings**

3.7.1.   The Senior Secured Company Meeting will commence at the time stated, with the Guarantor Meetings concerning the Senior Secured Class being scheduled to convene sequentially thereafter, beginning at 13h00. The Super Senior Secured Company Meeting will commence at the time stated, or so soon thereafter following adjournment or closure of the Senior Secured Holdco Meeting. The various Guarantor Meetings concerning the Super Senior Class are scheduled to convene sequentially thereafter, beginning

at 15h00 (or as soon as the Super Senior Company Meeting shall have been concluded or adjourned).

3.7.2.   If a Compromise Lender wishes to attend the relevant Compromise Meeting, it should produce a duplicate copy of the Proxy Form delivered on its behalf, evidence of corporate authority (in the case of a company or other corporation) (for example, a valid power of attorney and/or board minutes) and evidence of personal identity (for example, a passport or other picture identification) at the registration desk no later than one hour before the scheduled time of the relevant Compromise Meeting.

3.7.3.   Any proxy attending the Compromise Meetings on behalf of a Compromise Lender should produce a duplicate copy of the Proxy Form in which he/she is named as proxy. Where this copy can be matched against one of the copies provided by the Information Agent, that Compromise Lender's proxy will be admitted to the relevant Compromise Meeting upon providing evidence of his/her personal identity (for example, a passport or other picture identification). Where the Proxy Form cannot be produced by the person purporting to have been appointed by a Compromise Lender as its proxy, that person will need to provide evidence of his/her personal identity (for example, a passport or other picture identification) and, provided that the evidenced identity conforms with the details in the relevant copy of the Proxy Form provided by the Compromise Lender to the Information Agent, that person will be admitted to the relevant Compromise Meeting.

3.7.4.   If a Compromise Lender appoints the Chairman as its proxy, there is no need for the Chairman to take the Proxy Form to the relevant Compromise Meeting.

**Part G**

**Management's discussion and analysis of financial condition and results of operation**

1. **Significant Factors Affecting Our Results of Operations**

   1.1. **Economic Conditions in South Africa**

      1.1.1. In fiscal year 2016, 88% of our retail sales were generated in South Africa, which has undergone significant social, political and economic transformation in the last 15 years. Our future results of operations are dependent on continued economic, political and social stability in South Africa. Changes in economic conditions may affect, among other things, demand for our products and the creditworthiness of our customers.

      1.1.2. Historically, the South African economy has experienced moderate economic growth, in part due to a rapidly emerging middle class with increased spending power, and the government's commitment to macroeconomic growth. However, recently, these growth drivers were offset by certain structural problems in South Africa, such as the large gap between rich and poor, frequent labour unrest, high unemployment, deteriorating infrastructure, and high corruption and crime rates, all of which have affected our trading performance. During fiscal year 2016 and the 26-week period ended 24 September 2016 the overall trading environment remained challenging primarily due to an increase in income taxes, rising unemployment, rising interest rates, drought-induced rise in domestic grain prices and a sustained weak Rand exchange rate. These factors affected the growth of household income, and consumer confidence as reported by the South African Bureau for Economic Research declined close to its lowest point in 14 years during FY 2016, which further weighed on consumer spending.

      1.1.3. South Africa's real GDP increased by 1.5% and 0.5% in calendar years 2014 and 2015, respectively, and, over the same periods, consumer price inflation has been 6.1% and 5.2%.

   1.2. **Growth in the Clothing and Footwear Market**
   Our sales are partly dependent on growth in the C&F (clothing and footwear) market. Growth in this market has historically resulted from a number of factors, including the overall growth of the South African economy, the rapidly emerging middle class, which historically spends a higher percentage of its disposable income on C&F goods, and the movement of market share from the informal market to more established medium-sized and large-sized retailers, which is in part due to continuing urbanization in the country.

   1.3. **Levered Capital Structure**

      1.3.1. Our high leverage and historically significant cash interest expense has had a significant impact on our business and results of operations during fiscal years 2014, 2015, 2016 and the 26-week period ended 24 September 2016. As a result of our high leverage and negative publicity around our capital structure, certain suppliers have limited supply of product to us, whilst

others have discontinued their supply entirely. Additionally, the high cost of credit insurance, a need for extended payment terms and a focus on short-term cash generation have placed further pressure on the cost of goods sold and led to increased levels of clearance and promotional activity, which has affected our gross profit margin. Furthermore, we believe that the publicity around our capital structure has, in recent years, affected our ability to hire and retain staff resulting in a high number of vacancies within key merchandising positions. Additionally, management's engagement with bank lenders, bondholders and other creditors to agree a resolution for deleveraging and reorganizing our capital structure has proved to be a significant distraction for management across the business.

1.3.2.    Additionally, in November 2015, we completed the exchange offer (the "Exchange Offer") for our 13.375% senior notes due 2019, which significantly reduced our cash interest expense and reduced our leverage. Furthermore, during November 2015, we secured a EUR Super Senior Liquidity Facility in the amount of €123 million which we utilized to refinance our R1,010 million ZAR-denominated floating rate notes due 2016 and the original super senior liquidity facility due 20 September 2016, which we had previously incurred as emergency liquidity facility in connection with the Exchange Offer in July 2015. In November 2015, we also reached an agreement with our bank lenders to amend certain terms of our bank loans and extend their maturity until at least December 2017.

1.3.3.    To bridge a short-term liquidity shortfall, we obtained the necessary creditor consents in July 2016 to incur short-term bridge financing. See also paragraph 14.14 (*Liquidity and Capital Resources*).

1.4.    **Cost of Sales**

A key component of our growth strategy is to continue to consolidate our procurement and leverage our market scale to obtain better pricing for our products, decreasing our cost of sales. Since the establishment of our offices in Shanghai (China) and Dhaka (Bangladesh) in 2012, we have continually strengthened our strategic relationships with low-cost suppliers in those countries. Our gross margin on private labels directly sourced by our offices in Shanghai and Dhaka increased to 49.4% in fiscal year 2016 from 49.2% in fiscal year 2015 We also continue to focus on sourcing on the national and regional levels and switching from indirect supply sources to local and global direct supply sources. For a number of external factors that can affect our costs of sales, see paragraph 2702.1 (*Revenue and Cost of Sales*).

1.5.    **Same Store Growth**

Our retail sales and profitability are primarily dependent on the amount of retail sales that we generate from our existing stores. Retail sales from existing stores, in turn, are determined by a number of factors, including average spending per customer, customer retention and merchandise

assortment and allocation. Our same store sales growth decreased by 3.2% in fiscal year 2016 as compared to fiscal year 2015. Over the same period, our trading density decreased from R17,576 per sqm to 16,893 per sqm. This trend has continued since 2012 due to increased competition and credit tightening after the sale of our South African receivables book to Absa allowing Absa to approve new credit customers.

1.6. **Credit Sales and Financial Services**

    1.6.1. Our business depends in part on credit sales. We maintain Edgars and Jet private label store card programs through an arrangement with Absa in which Absa extends credit to our customers. In fiscal year 2016, private label store card sales accounted for 38.8% of our retail sales, a decrease from 42.7% in fiscal year 2015. As a result of challenging macroeconomic conditions, including a high private household debt burden and persistently high unemployment, private credit extension in South Africa has decreased significantly, which has affected our credit sales and in turn negatively affected our business across all divisions. Furthermore, in September 2015, the South African National Credit Regulator (NCA) implemented strict new credit affordability regulations, which further affected private credit extension, and which we estimate negatively affected retail sales by approximately R297 million in fiscal year 2016. We believe that the decline in credit sales has been somewhat deeper for us than for our competitors because Absa has imposed stricter credit criteria on our customers.

    1.6.2. Starting in November 2014, as an alternative to the credit arrangement with Absa, we introduced an NCA-compliant second-look credit book which, although still small, has returned new credit customer acceptance rates to healthier levels and has assisted in slowing the decline in credit sales. We will continue to supplement the Absa credit offering through the in-house second look credit solution.

1.7. **New Store Openings and Improvements**

    1.7.1. Historically, we have increased retail sales by opening new stores. We increased our total average retail space by 2.7% in fiscal year 2016 and added a net of 42 stores (including mono-branded stores) during this period. We opened a net of 97 stores (including mono-branded stores) in fiscal year 2015. Our property development committee applies strict criteria to potential new sites, and reviews site performance annually to determine if sites are meeting their targets or can be used more efficiently.

    1.7.2. We also have committed considerable resources to improving our existing stores. From fiscal year 2014 through to fiscal year 2016, we invested R1,164 million in existing stores in our Edgars and Discount divisions and implemented a new customer-centric proposition designed to increase foot traffic in our stores, through which we hope to gain new customers.

1.7.3.    Our ability to open new stores in the future will depend on our ability to find new sites that meet our investment criteria for expansion as much as our capital resources.

1.8.    **African Expansion**

In fiscal year 2016, we generated 12% (9.2% excluding Zimbabwe) of our retail sales in other African countries, including Zimbabwe, Namibia, Swaziland, Lesotho, Ghana, Zambia, Mozambique and Botswana, compared to 11.8% (8.9% excluding Zimbabwe) in fiscal year 2015. The total number of our stores outside of South Africa increased by 13, or 6.5%, from 200 at the end of fiscal year 2015 to 213 at the end of fiscal year 2016. Retail sales from these stores decreased marginally by 0.1% (1.1% excluding Zimbabwe) during fiscal year 2016 compared to fiscal year 2015. Retail sales in other Southern African countries were primarily affected by credit tightening in Swaziland, Lesotho, Botswana and, in particular, Namibia, following the sale of the Namibian book to Absa on July 1, 2014, as well as reduced consumer confidence in Zimbabwe as a result of macro-economic factors in that country. The negative impact on retail sales as a result of credit tightening and reduced consumer confidence in Zimbabwe was offset by foreign exchange rate gains as a result of the weaker Rand on our consolidation of foreign entities.

1.9.    **Seasonality**

Our retail sales, like those of most other retailers, are subject to seasonal influences. Historically, our most important trading periods in terms of retail sales have been the Easter and Christmas seasons, with approximately one third of our retail sales occurring in April, November and December combined for fiscal year 2016. We incur significant additional expenses in advance of the Easter and Christmas seasons in anticipation of higher retail sales during those periods, including the cost of additional inventory, advertising and hiring additional employees. In previous years, our investment in working capital has peaked in early to mid-March, October and November as a result of increased supply purchases in anticipation of Easter and Christmas. Our results are also affected by periods of abnormal or unseasonal weather conditions, which can lead to a decrease in retail sales and higher markdowns.

1.10.    **Cost Management**

Given the continued decline in credit sales, our ability to manage our operating costs effectively has become important to our overall profitability growth. We manage all of our costs both at the store and head office level. At store level, we focus on stock control thereby reducing store stock losses, and we actively manage our store manpower costs. During fiscal years 2014 and 2015, we implemented a transformation plan that included two major manpower restructurings, which helped to offset higher costs in other areas, such as rental costs. Furthermore, during fiscal year 2016, following a restructuring of senior personnel in November and December 2015, which included streamlining the roles and responsibilities of various store personnel, the consolidation of certain functions, the elimination of duplications and the leveraging of technological opportunities, we

commenced a major head office restructuring in February 2016. We continue to assess opportunities to drive productivity and efficiency.

1.11. **Products and Competition**

A large portion of our sales are from fashion-related products, which are subject to rapidly changing customer tastes and make it difficult to predict sales demand accurately. We also face a large amount of competition in our relevant markets, both from existing players as well as new market entrants, such as H&M and Zara, and, as such, aim to manage the pricing of our products and our product mix across our stores in light of the specific competitive environment.

1.12. **Currencies**

We operate internationally and as a result, are exposed to various currency risks, including with respect to sourcing products and our international stores. In addition, a significant amount of our future outstanding indebtedness will be denominated in currencies other than the South African Rand, our reporting currency. Whenever possible, we set up procedures to hedge our foreign exchange exposures to the Rand, subject to the approval of the Board. During fiscal year 2015 and fiscal year 2016, our business was negatively affected by the declining South African Rand. See paragraph 18.1 (*Foreign Currency Risk*).

1.13. **Implementation of New Reporting Structure**

During the 13-week period ended 25 March 2016, we completed the implementation of a new reporting structure for our operational business divisions. Starting with the financial results for the 13-week period ended 25 June 2016, our Edgars division comprises Edgars; our Discount division comprises Jet and JetMart; and our Specialty division comprises CNA, Red Square, Boardmans, Edgars Active, Edgars Shoe Gallery, Cellular managements costs, Legit (which the Compromise Companies have now agreed to sell) and our mono-branded stores. To present our financial results on a comparative basis, we have restated our divisional results for the 26-week periods ended 26 September 2015. As a result of the implementation of our new reporting structure, our divisional results for fiscal years 2014, 2015 and 2016 are not presented on the same basis, and are not directly comparable to, our financial results for the 26-week period ended 26 September 2015 and 24 September 2016, respectively.

2. **Key Group Statement of Comprehensive Income Items**

2.1. **Revenue and Cost of Sales**

2.1.1. We derive revenue primarily from the sale of retail products, which accounted for 93.2% of our revenues in fiscal year 2014, 93.1% of our revenues in fiscal year 2015, and 92.5% of our revenues in fiscal year 2016. During the 26-week period ended 24 September 2016, sale of retail products accounted for 91.7% compared to 91.6% during the 26-week period ended 26 September 2015. Our retail products were available for sale in 1,548 stores as of 24 September 2016, 1,335 of which are in South Africa, with the remainder in Namibia, Botswana, Lesotho, Swaziland, Zimbabwe, Mozambique, Ghana and Zambia.

2.1.2.    Changes to our retail sales from period to period are generally affected by the following factors:

2.1.2.1.    the general economic conditions in South Africa and the other southern African countries in which we operate;

2.1.2.2.    the quality and availability of our products;

2.1.2.3.    the extent to which we are able to predict, plan for and implement changes to our product mix to reflect customer trends;

2.1.2.4.    the prices at which we sell our products, which may change depending on markdowns;

2.1.2.5.    the volume of our products sold and changes in the mix of products sold within our different product lines; and

2.1.2.6.    exchange rates.

2.1.3.    Changes to our cost of sales from period to period result from a number of factors, including:

2.1.3.1.    the base price of raw materials;

2.1.3.2.    exchange rates;

2.1.3.3.    the amount of duties paid on purchases of products imported to South Africa;

2.1.3.4.    freight cost;

2.1.3.5.    import quotas;

2.1.3.6.    rebates and discounts earned from suppliers; and

2.1.3.7.    the level of our marketing and advertising costs.

2.2.    **Store Costs**

2.2.1.    Our store costs primarily consist of: (i) payroll for our store-based employees, including salaries, bonuses, payroll taxes and pension costs; (ii) establishment costs such as rent, local taxes, service charges, and other operating costs at our stores, including cleaning, maintenance, security and gas/electricity; (iii) depreciation expense related to capital expended on our stores; (iv) stock shrinkage; and (v) store card commissions. Establishment costs also include assessment rates, which are local taxes charged to landlords by local authorities. Based on current practice, landlords on-charge any increases in these costs to lessees.

2.2.2.    Changes in our store costs from period to period are the result of a number of factors, including:

2.2.2.1.    the general level of payroll and benefit increases given to our store-based employees;

2.2.2.2.    increases in cost for security measures to curb theft and as a result of increased crime rates and unrest;

2.2.2.3.    rent increases agreed as part of our store lease agreements;

2.2.2.4.    increases in the price of energy;

2.2.2.5.    the opening of new stores, including pre-opening costs, and the modernization of existing stores, including the associated depreciation charge; and

2.2.2.6.    costs related to the volume of products sold, including increases in transaction charges related to store card sales.

2.3.    **Other Operating Costs**

2.3.1.    Other operating costs primarily consist of: (i) various corporate overhead costs associated primarily with our head office, including human resources, procurement, communications, finance, IT, strategy and facilities; depreciation expense related to our head office assets and the amortization of other intangible assets; (ii) other human resource costs, such as our BBBEE programs, our training programs and the maintenance of our wellness program for employees; (iii) depreciation and maintenance expenses related to certain IT systems; (iv) costs related to group marketing; (v) other head office facility costs; (vi) costs associated with logistics in our distribution and supply chains; and (vii) expenses from credit in relation to the management of the South African accounts receivable book sold to Absa and the remaining trade accounts receivable that were not sold to Absa (excluding those related to discontinued operations).

2.3.2.    Changes in our other operating costs from period to period are primarily the result of:

2.3.2.1.    the general level of payroll and benefit increases given to selected head office employees;

2.3.2.2.    costs associated with implementing employee incentive plans;

2.3.2.3.    expenses related to new and revised IT systems;

2.3.2.4.    changes to our head offices, including expansion of our head offices to accommodate any increase in head office resources;

2.3.2.5.    changes to our overhead costs;

2.3.2.6.    changes in costs associated with our logistics in our distribution and supply chains; and

2.3.2.7.    non-recurring or once-off costs.

2.4.  **Share of Profits from Insurance Business**

2.4.1.  In addition to our retail sales, we generate profits from our associated holding in an insurance business. Profits primarily consists of: (i) share of profits from insurance business, which earns money from premiums paid by customers; (ii) administration fees; (iii) costs associated with running the financial services business, including payroll for our financial services business employees, and (iv) taxes incurred on the profit of the financial services business.

2.4.2.  Profits from period to period are generally affected by the following factors:

2.4.2.1.  the level of sales of insurance products;

2.4.2.2.  the level of insurance claims made by customers; and

2.4.2.3.  the general level of payroll and benefit increases given to financial service employees.

3.  **Results of Operations**

The table presented below presents a selection of key line items from our income statement.

| | 52 weeks ended | | | 26 weeks ended | |
| | (in millions) | | | (in millions) | |
| | 29 March 2014* | 28 March 2015* | 26 March 2016 | 26 Sept 2015 | 24 Sept 2016 |
|---|---|---|---|---|---|
| **Income statement data** | | | | | |
| Retail sales ........................................ | R26,974 | R27,510 | R27,147 | R12,681 | R11,734 |
| Cost of sales ..................................... | (17,132) | (17,265) | (17,173) | (8,024) | (7,747) |
| Gross profit ...................................... | 9,842 | 10,245 | 9,974 | 4,657 | 3,987 |
| Gross profit as % of retail sales ....... | 36.5 | 37.2 | 36.7 | 36.7 | 34.0 |
| Other income .................................... | 1,189 | 1,256 | 1,411 | 708 | 701 |
| Store costs ........................................ | (5,700) | (6,277) | (6,463) | (3,155) | (3,368) |
| Other operating costs ........................ | (4,857) | (4,666) | (4,665) | (2,054) | (2,520) |
| Share of profits of associates and insurance business............................. | 739 | 747 | 725 | 425 | 323 |
| Trading profit / (loss) ........................ | 1,213 | 1,305 | 987 | 581 | (877) |
| Depreciation and amortization.......... | 1,137 | 1,079 | 1,004 | 500 | 483 |
| Net financing costs ........................... | (2,628) | (3,381) | (4,208) | (2,111) | (1,832) |
| Taxation ............................................ | 834 | (243) | 335 | 810 | 31 |

*Re-presented following the re-classification of the store card portfolio for Lesotho, Namibia, Botswana and Swaziland. See Part A(2)(*Presentation of Financial Information*).

**26-week period ended 26 September 2015 compared to 26-week period ended 24 September 2016.**

3.1.  The total number of our stores increased by 1.4%, from 1,527 at the end of H2/2016 to 1,548 at the end of H1/2017. Our average trading space increased by 0.5%, from 1,603,000 sqm at the end of H1/2016 to 1,611,000 sqm at the end of H1/2017.

3.2.  **Retail Sales**

Our total retail sales decreased by R947 million, or 7.5%, from 12,681 million in H1/2016 to R11,734 million in H1/2017, mainly as a result of weaker retail

sales as a result of credit sales declining a further 16.8% during the period compared to the prior period, while retail cash sales decreased by 1%. The overall trading environment remained subdued with weak economic growth, combined with higher inflation, currency weakness, increased interest rates, unemployment and rising food prices continuing to weigh on consumer confidence and the overall macroeconomic environment.

3.3.    **Edgars**

3.3.1.    The Edgars division reported total retail sales of R4,690 million in H1/2017, a decrease of 8.6% compared to R5,129 million in H1/2016, primarily due to a warmer winter, a shift in the Easter period to the end of FY 2016, the impact of the new credit regulations leading to further declining credit sales, product assortment and availability as well as a persistently subdued trading environment. Total cash sales decreased by 2.0% during H1/2017 compared to H1/2016 and credit sales decreased by 14.8% during H1/2017 compared to H1/2016.

3.3.2.    Average space in our Edgars division increased by 1.1% to 728,000 square meters when compared to H1/2016. During H1/2017, we opened four Edgars stores bringing the total number of stores in the Edgars division to 206 as at 24 September 2016, 1 more than the 205 Edgars stores as at 24 September 2016.

3.3.3.    Same-store sales in H1/2017 were 10.3% lower compared to H1/2016, mainly due to the decline in credit sales and challenging trading environments particularly within central business district localized stores.

3.3.4.    Gross margin in the Edgars division was 38.7% for H1/2017, a decrease of 2.7 percentage points from 41.4% in H1/2016 mainly as a result of the weaker Rand and increased mark-downs and clearance activity. During H1/2017, the division initiated a focus on better entry-price points which to date has not had the expected traction.

3.4.    **Discount**

3.4.1.    The Discount division has been significantly affected by our declining credit sales, as well as the warmer winter, stock availability and uncompetitive entry price points resulting in poor performance across all merchandise categories. Total retail sales decreased by R335 million, or 7.4%, from R4,517 million in H1/2016 to R4,182 million in H1/2017. Cash sales were flat, while credit sales declined by 20.8%.

3.4.2.    Average space decreased by 0.9% to 582,000 sqm meters as of 24 September 2016. During the period we opened six Jet stores and closed eight Jet stores, bringing the total number of stores in our Discount division to 518 as of 24 September 2016 compared to 522 as at 26 September 2015.

3.4.3.    Same-store sales in our Discount division declined by 7.8% in H1/2017 compared to H1/2016.

3.4.4.   Gross profit margin in our Discount division decreased to 29.0% in H1/2017 from 33.0% in H1/2016, mainly as a result of increased markdown activity and the impact of the weaker Rand.

3.5.   **Specialty**

3.5.1.   Our Specialty division reported total retail sales of R2,531 million in H1/2017, a decrease of 5.2% compared to R2,671 million in H1/2016, primarily due to the availability of stock and the impact of the new credit regulations. Credit sales decreased 18.2% in H1/2017 compared to H1/2016 while cash sales remained relatively flat during the same period.

3.5.2.   Average space increased by 1.2% to 260,000 sqm as of 24 September 2016. In H1/2017, we opened 3 Edgars Active stores, 4 Boardmans stores, 2 Red Squares, 3 Legit stores, 4 CNA stores and 10 mono-branded stores, and closed 3 Legit stores, 1 Edgars Active store, 2 CNA stores, 5 mono-branded stores and 5 Edgars Shoe Gallery stores, increasing the total number of stores in the Specialty division to 773 stores as at 24 September 2016 compared to 747 stores as at 26 September 2015.

3.5.3.   Same-store sales decreased by 9.0% in H1/2017 compared to H1/2016.

3.5.4.   Gross margin declined to 32.2% for H1/2017 compared to 32.8% in H1/2016, mainly as a result of a change in product mix , the impact of the weaker Rand as well as increased clearance activity ahead of the peak trading quarter to improve the age profile of the division's inventory.

3.6.   **African Expansion**

Sales from countries other than South Africa decreased by 4.5% during H1/2017, mainly due to the ongoing negative effect of credit tightening in foreign countries such as Namibia and Botswana, partially offset by continued growth in retail sales in Zambia, Ghana and Mozambique. Sales from countries other than South Africa accounted for 12.4% (9.6% excluding Zimbabwe) of retail sales for H1/2017, an increase from 12% (9.1% excluding Zimbabwe) of retail sales reported in the prior comparative period. As of 24 September 2016, we had 213 stores outside of South Africa (including 51 in Zimbabwe).

4.   **Credit and Financial Services**

4.1.   As of 24 September 2016, excluding Edgars Zimbabwe, we had 351,000 fewer credit customers compared to the end of the six months of 2016. On a twelve month rolling basis, credit sales (excluding Zimbabwe) decreased from 40.3% of total retail sales in H1/2016 to 37.1% in H1/2017.

4.2.   The Compromise Companies continued to be affected by the affordability regulations implemented by the National Credit Regulator in September 2015.  The impact of the affordability regulations on the current period sales is estimated to be approximately R348 million. The Company continues rolling out an in-house, National Credit Act-compliant credit solution to customers and Absa has agreed to the Group's initiative to drive future credit sales through increased limits and new account distribution between Absa

and the Group. In terms of our arrangement with Absa, Absa will book roughly 20% of new accounts and the balance will be funded by the Group. The in-house trade receivables book at 24 September 2016 was R177 million and is expected to continue to grow on the back of credit initiatives being implemented.

5.   **Gross Profit**

Gross profit decreased by R670 million, or 14.4%, from R4,657 million in H1/2016 to R3,987 million in H1/2017. Gross profit as a percentage of retail sales was 34.0% in H1/2017 compared to 36.7%in H1/2016, mainly as a result of increase clearance activity to improve the inventory profile ahead of our peak trading season and the unfavourable trading environment, particularly the weaker Rand, in which we could not fully pass through higher input costs to our customers, as well as the introduction of lower price points.

6.   **Store Costs**

Total store costs increased by R213 million, or 6.8%, from R3,155 million in H1/2016 to R3,368 million in H1/2017, mainly due to higher rental costs that increased (up 8.9%), an increase in manpower costs (up 6.6%) and higher utility costs (up 14.2%). We continue to focus on managing our rental costs. Rental and manpower costs constituted 60.0% of our total costs in H1/2017.

7.   **Other Operating Costs**

Other operating costs, excluding non-recurring and store card credit administration costs, decreased by R8 million, or 4.9%, from R1,730 million in H1/2016 to R1,646 million in H1/2017.

8.   **Depreciation and Amortization**

The depreciation and amortization charge decreased by R17 million, or 3.4%, from R500 million in the first quarter of fiscal year 2016 to R483 million in H1/2017, mainly as a result of a reduction in the depreciation charge to our profit and loss account relating to IT capital expenditure which we have continuously reduced over the past three years.

9.   **Share of Profits from Insurance Business**

During H1/2017, our share of the profits from the insurance business decreased by 24% compared to H1/2017 and amounted to R323 million, largely due to a R151 million early dividend received in the second quarter of fiscal year 2016 which was not repeated in the current period.

10.  **Net Financing Costs**

Net financing costs decreased by R279 million, or 13.2%, from R2,111 million in H1/2016 to 1,832 million in H1/2017. This decrease is primarily the result of an acceleration of fee amortisation to financing costs of R193 million following the derecognition of the €425,000,000 13.375% Senior Notes due 2019 under the Exchange Offer in the first half of fiscal year 2016 and lower debt levels in the second quarter of fiscal year 2017 compared to the first half of fiscal year 2016.

11.  **Foreign Exchange Management**

We have historically applied a strategy of hedging all committed foreign denominated orders. These forward contracts have historically absorbed some of the impact of currency volatility on input prices. We manage our foreign exchange risk on liabilities on an ongoing basis. At the end of H1/2017, 29% of our total gross debt was hedged by virtue of it being denominated in local currency, whilst 71%, was

unhedged. The net positive exchange movement during the first half of fiscal year 2017 is the result of the ZAR appreciating against the EUR from EUR:R17.26 as at 26 March 2016 to EUR: R15.20 as at 24 September 2016 and against the USD from USD:R15.46 to USD:R13.55. The Rand strengthened when compared to the first half of fiscal year 2016, appreciating against the EUR from EUR: R15.60 to EUR: 15.20 and against the USD from USD: R13.92 to USD: R13.55.

12.    **Taxation**

Taxation increased by R841 million from a taxation credit of R810 million in H1/2016 to a taxation debit of R31 million for H1/2017. The increase was primarily due to a decrease in loss before taxation from R3,782 million in H1/2016 to R274 million in H1/2017.

13.    **Fiscal Year 2016 Compared to Fiscal Year 2015**

The total number of our stores increased by 2.8%, from 1,500 in fiscal year 2015 to 1,541 in fiscal year 2016. Our average trading space increased by 2.7%, from 1,565,000 sqm in fiscal year 2015 to 1,607,000 sqm in fiscal year 2016.

13.1.   **Retail Sales**

Our total retail sales decreased by R363 million, or 1.3%, from 27,510 million in fiscal year 2015 to R27,147 million in fiscal year 2016, due to the challenging trading environment, which resulted from an increase in income taxes, rising unemployment and rising interest rates, the drought as well as a sharp depreciation in the Rand. On a same store basis, our total retail sales decreased by R857 million, or 3.2%, from R26,937 million in fiscal year 2015 to R26,080 million in fiscal year 2016.

13.2.   **Edgars**

13.2.1.    The Edgars division, which includes mono-branded stores, reported total retail sales of R13,929 million, in line with the R13,929 million reported in financial year 2015, primarily due to an 8.5% decline in credit sales. In fiscal year 2016, credit sales contributed 44.8% of total sales compared to 48.9% of total sales in fiscal year 2015. During the same period, cash sales increased 8.2%. Edgars stores showed strong performance in cosmetics, homewares and menswear which was offset by a weaker than expected performance in ladieswear and cellular.

13.2.2.    Average space in our Edgars division increased by 4.6% to 846,000 square meters when compared to fiscal year 2015. During the year ended 26 March 2016, we opened 10 Edgars stores, 6 Boardmans, 14 Edgars Active, 5 Red Square, one Edgars Sale store and 13 new mono-branded stores. During the same period, we closed 23 stores in the Edgars division (7 Edgars, 4 Edgars Active, 6 Boardmans and 6 monobranded stores) bringing the total number of stores in the Edgars division to 559, including mono-branded stores.

13.2.3.    Comparable store sales decreased by 2.8% mainly due to the decline in credit sales and challenging trading environments within central business district localized stores.

13.2.4.    Gross margin of the Edgars division for financial year 2016 was 38.5%, a decrease from 39.5% for financial year 2015, primarily

due to increased clearance activity and higher cost of sales and other costs as a result of the weaker Rand.

13.3. **Discount**

13.3.1. Retail sales in the Discount division decreased by R242 million, or 2.2%, from R10,771 million in fiscal year 2015 to R10,529 million in fiscal year 2016, primarily as a result of poor performances in childrenswear and footwear as well as a 15.2% decline in credit sales. In fiscal year 2016, credit sales contributed 31.6% of total retail sales which is a significant decrease compared to fiscal year 2015, when credit sales contributed 36.4% of total retail sales. During the same period, cash sales increased by only 5.1%. Menswear performed well and the remaining categories performed in line or slightly better than in fiscal year 2015.

13.3.2. Average space increased by 1.4% to 642,000 square meters when compared to the 2015 financial year. During the year we opened twenty-four Jet stores, eleven Legit and four Jet Marts and closed twenty-six stores (nineteen Jet, three Jet Marts and four Legit stores) bringing the total number of stores in the Discount division to 732.

13.3.3. Same store retail sales decreased by 3.8% in fiscal year 2016 when compared to fiscal year 2015.

13.3.4. Gross profit margin of the Discount division increased from 34.9% for financial year 2015 to 35.0% for financial year 2016, mainly as a result of well managed input costs and lower clearance activity as well as our continued focus on improving our buying and pricing strategies.

13.4. **CNA**

CNA retail sales decreased by 7.2% and same store retail sales decreased by 7.1%, primarily as a result of a reduction in average space by 6.2%, and negative cash and credit sales of 3.4% and 17.9% respectively, which negatively affected sales performance. During fiscal year 2016, we opened 8 new stores and closed 5, resulting in a total of 198 CNA stores. Gross margin decreased from 30.5% for financial year 2015 to 29.9% for financial year 2016 mainly as a result of an unfavourable product sales mix.

13.5. **African Expansion**

13.5.1. Sales from operations outside of South Africa were in line with sales reported in fiscal year 2015, despite credit tightening during fiscal year 2016 in Swaziland, Lesotho, Botswana and, particularly, Namibia, following the sale of the majority of the Namibian trade accounts receivable book to Absa on July 1, 2014 as well as a decrease in consumer confidence in Zimbabwe, which negatively affected sales growth in local currency in that country. The negative impact on retail sales as a result of credit tightening and reduced consumer confidence in Zimbabwe was offset by exchange gains as a result of the weaker Rand on consolidation of foreign entities. Retail sales in Zambia and Ghana continued to perform well. Sales from stores outside South Africa contributed

12.0% (9.2% excluding Zimbabwe) of retail sales for the financial year 2016, up from 11.8% (8.9% excluding Zimbabwe) in the prior comparative period.

13.5.2.  The total number of our stores outside of South Africa increased by 13, from 200 at the end of fiscal year 2015, to 213 at the end of fiscal year 2016.

13.6.  **Credit and Financial Services**

13.6.1.  As of 26 March 2016, excluding Edgars Zimbabwe, we had 108,000 fewer credit customers compared to the end of fiscal year 2015. On a twelve month rolling basis excluding Edgars Zimbabwe, credit sales decreased from 42.3% of total retail sales during fiscal year 2015 to 37.9% of total retail sales in fiscal year 2016. This decrease was primarily due to new credit affordability regulations which the National Credit Regulator implemented in September 2015. We estimate that the new regulations negatively affected retail sales by approximately R297 million during fiscal year 2016.

13.6.2.  Our in-house second look trade receivables book, although still small, has returned acceptance rates to healthier levels and has assisted in slowing the decline in credit sales. As of 26 March 2016, our second look trade receivables book has grown by R88 million, or 116% to R164 million compared to R76 million as of 28 March 2015, we plan to continue supplementing its Absa credit offering through the in-house second look credit solution.

13.6.3.  As at 26 March 2016, we have ceased to classify the trade receivables store card portfolio in Lesotho, Namibia, Botswana and Swaziland as held-for-sale on our statement of financial position as we could not find a buyer at an acceptable price. In July 2015, we outsourced existing consumer credit services excluding those carried out by Edgars Stores Limited in Zimbabwe, which is separately managed. The arrangement is expected to result in an approximate R200 million service cost reduction in the initial two year period of the arrangement.

13.7.  **Gross Profit**

Gross profit decreased by R271 million, or 2.6%, from R10,245 million in fiscal year 2015 to R9,974 million in fiscal year 2016. Gross profit as a percentage of retail sales was 36.7% in fiscal year 2016, a decrease from 37.2% during fiscal year 2015, mainly due to higher levels of promotional activity required to offset negative credit sales. Furthermore, we were unable to pass through to our customers higher product costs caused by a weaker Rand in fiscal year 2016. Margin improvements in the Discount division were offset by declining margins in the Edgars, CNA and Zimbabwe divisions.

13.8.  **Store Costs**

Total store costs increased moderately by R186 million, or 3.0%, from R6,277 million in fiscal year 2015 to R6,463 million in fiscal year 2016 mainly as a result of an improved focus on stock control at stores, thereby reducing store stock losses, lower transactional fees, a reduction in the straightlining

component on store leases based on the lease age profile and a decrease in asset write-offs as capital expenditure normalized, offset by an increase in security and utility costs compared to fiscal year 2015. Manpower costs increased by 2.4%. Rental and manpower costs constituted 62.0% of total store costs in fiscal year 2016.

### 13.9. Other Operating Costs

Other operating costs, excluding non-recurring and non-comparable costs associated with administrating the trade accounts receivable book, decreased by R154 million, or 4.0%, from R3,804 million in fiscal year 2015 to R3,650 million in fiscal year 2016.

### 13.10. Depreciation and Amortization

The depreciation and amortization charge decreased by R75 million, or 7.0%, from R1,079 million in fiscal year 2015 to R1,004 million for fiscal year 2016, mainly due to a return of capital expenditures to normal levels following our prior period of significant store investments, an increase in landlord contributions for our store re-fittings and an ageing IT infrastructure.

### 13.11. Share of Profits from Insurance Business

During fiscal year 2016, our share of profits from the insurance business decreased by R22 million or 2.9%, to R725 million for financial year 2016 from R747 million in financial year 2015. The decline in profits was primarily the result of a decrease in the number of credit customers as the ownership of Edcon store credit is a prerequisite for a policy.

### 13.12. Net Financing Costs

Net financing costs increased by R827 million, or 24.5%, from R3,381 million in financial year 2015 to R4,208 million in financial year 2016. This increase is primarily as a result of the devaluation of the Rand against the Euro and US dollar coupled with financing costs incurred in connection with Edcon Holdings's Exchange Offer and the Amend & Extend of our bank debt in July and November/December 2015. Cash paid net finance costs decreased by R1,320 million, or 42.5%, from R3,103 million in fiscal year 2015 to R1,783 million in fiscal year 2016 following the successful settlement of the Exchange Offer in November 2015. Additionally, in March 2016, we approached the holders of its USD 250 million, EUR617 million 9.5% senior secured fixed rate notes due 2018 and lenders under its ZAR-denominated term loan due 2017 with a proposal to defer certain cash interest payments until December 2016. The proposal to defer cash interest payments on these debt instruments was accepted by the requite number of noteholders and lenders and concluded on 14 April 2016, as a result of which we deferred our cash interest payment obligations on these debt instruments until mid-December 2016, thus decreasing our cash interest expense for fiscal year 2016.

### 13.13. Foreign Exchange Management

We have historically applied a strategy of hedging all committed foreign denominated orders. These forward contracts have historically absorbed some of the impact of currency volatility on input prices. We manage our foreign exchange risk on liabilities on an ongoing basis. At the end of fiscal year 2016, 28% of the Existing Group's total gross debt was hedged by virtue of it being denominated in local currency, whilst 72% was unhedged. During

fiscal year 2016, the ZAR depreciated against the Euro from EUR:R13.12 at 28 March 2015 to EUR:R17.26 at 26 March 2016, and the US dollar likewise depreciated from USD:R12.04 to USD:R15.46. The significant movement in the Rand equivalent of unhedged Euro and US dollar denominated debt resulted in significant net foreign exchange losses.

13.14. **Taxation**

Taxation increased by R92 million from a taxation debit of R243 million in fiscal year 2015 to a taxation debit of R335 million in fiscal year 2016 due to R710 million in deferred tax assets not recognised offset by lower trading profits and significant foreign currency losses as a result of the devalued Rand in fiscal year 2016.

14. **Fiscal Year 2015 Compared to Fiscal Year 2014**

The total number of our stores increased by 6.9%, from 1,403 in fiscal year 2014 to 1,500 in fiscal year 2015. Our average trading space increased by 4.9%, from 1,492,000 sqm in fiscal year 2014 to 1,565,000 sqm in fiscal year 2015.

14.1. **Retail Sales**

Our total retail sales increased by R536 million, or 2.0%, from R26,974 million in fiscal year 2014 to R27,510 million in fiscal year 2015, due to an increase in retail sales at the Discount and Edgars divisions, while sales at CNA continued to decline. On a same store basis, our total retail sales decreased by R415 million, or 1.6%, from R25,972 million in fiscal year 2014 to R25,557 million in fiscal year 2015.

14.2. **Edgars**

14.2.1.    The Edgars division's retail sales increased by 1.8% in fiscal year 2015, but were negatively impacted by an 8.2% decline in credit sales over the same period. Credit sales contributions decreased from 54.3% of total sales in fiscal year 2014 to 48.9% of total sales in fiscal year 2015. Cash sales increased 13.6% over the same period. We recorded a strong performance in our specialty and mono-branded stores.

14.2.2.    Average space increased by 6.6% to 809,000 sqm when compared to fiscal year 2014. During the year ended 28 March 2015, we opened 19 new Edgars Active stores (including one conversion), 17 new Edgars stores, four Boardmans, one Edgars Shoe Gallery, one Red Square, one Cosmetics Emporium and one Edgars Sales store and 29 new mono-branded stores. During the same period there were 18 closures (seven Edgars, four Edgars Active, four Boardmans and three mono-branded stores) bringing the total number of stores in the Edgars division to 533, including mono-branded stores.

14.2.3.    Same-store sales decreased 2.6% compared to fiscal year 2014. All specialty chain stores, including mono-branded stores, achieved year-on-year same-store sales growth of 8.0%.

14.2.4.    Gross margin was 39.5% for fiscal year 2015, an increase from 38.6% for fiscal year 2014 largely due to pricing changes but also

enhanced through improved sourcing and lower clearance activity.

14.3.  **Discount**

14.3.1.  The Discount division's sales increased by 2.5% in fiscal year 2015, but were negatively impacted by an 8.5% decline in credit sales. Credit sales contributions decreased from 40.7% of total sales in fiscal year 2014 to 36.4% of total sales in fiscal year 2015. Cash sales increased 10.0% over the same period. Sales performance was supported by a solid performance in ladieswear, footwear and menswear.

14.3.2.  Average space increased by 3.9% to 633,000 sqm when compared to fiscal year 2014. During the year ended 28 March 2015, 34 Jet stores, two new Jet Marts and 20 new Legit stores were opened while 22 stores were closed or converted (10 Jet, six Jet Marts, one Jet Shoes and five Legit stores) bringing the total number of stores in the Discount division to 719.

14.3.3.  Same-store sales decreased by 0.3% when compared to fiscal year 2014.

14.3.4.  Gross profit margin increased from 34.1% for fiscal year 2014 to 34.9% for fiscal year 2015, as higher input costs were well managed within the Discount division and strategies to improve buying and pricing architecture continued to deliver results.

14.4.  **CNA**

CNA sales decreased by 5.6% in fiscal year 2015 compared to fiscal year 2014, primarily due to the reduction in space in a challenging market segment. Same-store sales decreased by 7.5% as trading densities dropped. The continued right-sizing of existing stores resulted in a reduction in average space of 4.5% from the prior comparative period, to 84,000 sqm. During fiscal year 2015, 13 new stores were opened and nine were closed, bringing the total number of CNA stores to 195. Gross margin decreased from 31.1% for fiscal year 2014 to 30.5% for fiscal year 2015 mainly due to the mix variance with an increased contribution from digital sales.

14.5.  **African Expansion**

The total number of our stores outside South Africa increased by 31 from 169 at the end of fiscal year 2014 to 200 at the end of fiscal year 2015. The sales from these stores increased by 10.9% (7.3% excluding Zimbabwe) mainly due to an increase in the number of stores, as currency depreciation negatively impacted results. These sales contributed 11.8% (8.9% excluding Zimbabwe) of retail sales for fiscal year 2015, up from 10.9% (8.7% excluding Zimbabwe) in the prior comparable period.

14.6.  **Credit and Financial Services**

14.6.1.  We ended the fiscal year 2015 with 293,000 fewer credit customers than in fiscal year 2014. Credit sales decreased from 46.3% of total retail sales in fiscal year 2014 to 42.7% of total retail sales in fiscal year 2015, primarily due to the continued contraction in credit being offered to our customers by Absa. Consequently, we are testing an in-house National Credit Act

compliant second-look credit solution. Initial results for the book performance are good and indicate the potential for a strategic second look partner to supplement the Absa funded credit proposition. We continue to explore further second-look credit provider options, however, recent negative publicity around the sustainability of our capital structure has materially reduced the likelihood that we will be able to secure a third party second-look credit provider until that uncertainty is resolved.

14.6.2.   R369 million, or 43.8%, of our net trade receivables book was classified as "held-for-sale." These trade receivables accounts related only to non-South African jurisdictions not sold to Absa, including Botswana, Lesotho, Swaziland and the remaining Namibian book. The R473 million, or 56.2% held in trade accounts receivable, separate from those classified as "held-for-sale," relates primarily to the Zimbabwean book, which was never part of the sale to Absa and is separately managed and funded, as well as the in-house South African trade receivables book we are testing with a net value of R76 million.

14.6.3.   Share of profits from the insurance business increased by 1.1% over the prior comparative period, to R747 million for the fiscal year 2015. The pace of insurance growth was again impacted by the lower number of credit customers. A store credit facility remains a prerequisite for a policy.

14.7.   **Gross Profit**

14.7.1.   Gross profit increased by R403 million, or 4.1%, from R9,842 million in fiscal year 2014 to R10,245 million in fiscal year 2015. Gross profit as a percentage of retail sales was 37.2% in fiscal year 2015 which was an increase of 0.7% compared to fiscal year 2014, due to more effective pricing of goods, improved buying and lower clearance activity and increased margin generated through our expansion outside of South Africa.

14.7.2.   Gross profit as a percentage of retail sales for our Edgars division increased from 38.6% in fiscal year 2014 to 39.5% in fiscal year 2015, due to improved pricing, sourcing and lower clearance activity.

14.7.3.   Gross profit as a percentage of retail sales in CNA decreased from 31.1% in fiscal year 2014 to 30.5% in fiscal year 2015 mainly due to the mix variance with an increased contribution from digital sales.

14.7.4.   In the Discount division, gross profit as a percentage of retail sales increased from 34.1% in fiscal year 2014 to 34.9% in fiscal year 2015, primarily due to improved buying and more effective pricing of goods.

14.8.   **Store Costs**

Total store costs increased by R577 million, or 10.1%, from R5,700 million in fiscal year 2014 to R6,277 million in fiscal year 2015, mainly due to new space and contractual lease escalations, resulting in rental costs that increased by

12.0%. Manpower costs remained flat as productivity improvements were maintained following staff restructuring within the stores early in the year. Rental and manpower costs constituted 59.6% of total store costs.

14.9.   **Other Operating Costs**

Other operating costs increased by R13 million, or 0.3%, from R3,791 million in fiscal year 2014 to R3,804 million in fiscal year 2015 excluding costs relating to onerous lease contracts of R137 million (2014: Rnil million), employee restructuring costs of R69 million (2014: R93 million), costs associated with the sale of trade receivables of R73 million (2014: R116 million), a one-off adjustment relating to straight-lining of leases of R49 million (2014: Rnil million) and store card credit administration costs of R557 million (2014: R800 million), set-off by a reversal of costs for the post retirement liability buy-out of R23 million (2014: R57 million expense). Income from Absa of R763 million (2014: R748 million) for administering the book in fiscal year 2015 is included in other income.

14.10.   **Depreciation and Amortization**

14.10.1.   The depreciation and amortization charge for fiscal year 2015 decreased by 5.1% to R1,079 million mainly due to certain intangible assets that were raised following our acquisition by Bain in 2007 now being fully amortized.

14.10.2.   Share of Profits from Insurance Business

14.10.3.   Profits from the insurance business increased by R8 million, or 1.1%, from R739 million in fiscal year 2014 to R747 million in fiscal year 2015, as a result of lower operating costs and product price increases.

14.11.   **Net Financing Costs**

Net financing costs increased by R753 million, or 28.7%, from R2,628 million in fiscal year 2014 to R3,381 million in fiscal year 2015. This increase is primarily as a result of higher debt levels and higher effective interest rates when compared to the prior comparative period.

14.12.   **Foreign Exchange Management**

We apply a strategy of hedging all committed foreign denominated orders. These forward contracts absorb some of the impact of currency volatility on input prices. We manage our foreign exchange risk on liabilities on an ongoing basis. At the end of financial year 2015, 73% of our total gross debt is hedged by virtue of it being denominated in ZAR or through hedging with foreign currency call options. The ZAR appreciated by 9.8% against the EUR from EUR1:R14.54 to EUR1:R13.12 during the period.

14.13.   **Taxation**

Taxation costs from continuing operations increased by R1,077 million, from a taxation credit of R834 million in fiscal year 2014 to a taxation expense of R243 million in fiscal year 2015. The increase was primarily due to the recognition of deferred tax liabilities relating to the application of Section 24I of the South Africa Income Tax Act.

14.14.   **Liquidity and Capital Resources**

14.14.1.   The primary source of short-term liquidity is cash on hand. The amount of cash on hand is influenced by a number of factors,

including retail sales, working capital levels, supplier and debt service payment terms, timing of payments for capital expenditure projects and tax payment requirements. Working capital requirements fluctuate during each month, depending on when suppliers are paid and when sales are generated, and throughout the year depending on the seasonal build-up of net working capital. We fund peaks in its working capital cycle, which typically occur in October and March, with cash flows from operations, drawings under its various facilities and other initiatives.

14.14.2.   As part of its ongoing effort to improve its financial performance, implement its strategic plan and maximize the liquidity position of the Existing Group, on 14 April 2016, we obtained creditor support to defer up to R1.6 billion of certain cash interest payments under our 9.5% Euro and US dollar denominated senior notes due in 2018 and our senior term loan facility to December 2016. Furthermore, to bridge a short-term gap in our liquidity position, on 8 July 2016, we obtained the necessary approvals from our creditors to access up to R1.5 billion in bridge financing which was made available in several tranches by a group of bondholders and bank lenders. The bridge financing was approved by the South African Reserve Bank in July 2016 and is denominated in US dollars and Euros. We received the first tranche of R651 million on July 12, 2016.  On 24 October 2016 and 25 October 2016 the Group received a net amount of R574 million and R103 million respectively being the second tranche under the bridge financing.

## 15.   Analysis of Cash Flow

As of 24 September 2016, we had cash and cash equivalents of R1,297 million, a decrease of R396 million or 23.4%, compared to R1,693 million as of 26 March 2016. As at 24 September 2016, net debt was R25, 938 million, an increase of R559 million, or 2.2%, from R25,379 million reported as of 26 March 2016.

The table below summarizes our historical cash flows for fiscal years 2014, 2015 and 2016 as well as H1/2016 and H1/2017, respectively:

|  | 52 weeks ended 29 March 2014* | 52 weeks ended 28 March 2015* | 52 weeks ended 26 March 2016 | 26 weeks ended 26 Sept 2015 | 26 weeks ended 24 Sept 2016 |
|---|---|---|---|---|---|
|  | (in millions) | | | | |
| **Cash flow data** | | | | | |
| Operating cash inflow before changes in working capital.............................................. | 2,540 | 2,502 | 1,716 | 982 | (185) |
| Working capital movement.................................. | (114) | 573 | (292) | 596 | (102) |
| Cash inflow / (outflow) from operating | 2,426 | 3,075 | 1,424 | 328 | (753) |

| | | | | |
|---|---|---|---|---|
| activities ....................................................... | | | | |
| Net cash outflow from investing activities .......... | (1,331 ) | (855) | (604) | (369) | (286) |
| Net cash inflow/(outflow) from financing activities ......................................................... | 752 | 1,898 | 1,453 | 294 | 647 |
| Increase / (decrease) in cash and cash equivalents..................................................... | (303) | 878 | 402 | 253 | (392) |

*Re-presented following the re-classification of the store card portfolio for Lesotho, Namibia, Botswana and Swaziland. See Part A(2)(*Presentation of Financial Information*).

15.1. **26-week period ended 26 September 2015 compared to 26-week period ended 26 September 2016**

15.1.1. Operating cash inflow before changes in working capital decreased by R1,167 million from R982 million inflow in H1/2016 to R185 million outflow in H1/2017 mainly due to our weaker trading performance as well as an increase in non-reccuring costs during H1/2017.

15.1.2. Cash outflow from working capital amounted to R102 million outflow in H1/2017, compared to an inflow of R596 million in H1/2016, attributable to: mainly to lower inventory purchases of approximately R664 million thereby reducing amounts owing to trade creditors in H1/2017 compared to H1/2016 and R331 million income received in advance in H1/2016 which did not repeat in H1/2017, offset, by an inflow of R308 million on the reduction of inventory through the Existing Group's focused efforts to improve the ageing profile of inventory leading up to the peak trading season.

15.1.3. Net cash outflow from operating activities was R753 million, a decrease of R1,081 million, compared to an inflow of R328 million in the prior comparative quarter mainly due to weaker trading performance, higher non-recurring costs and negative working capital as described above.

15.1.4. Our net cash flow used in investing activities decreased by R83 million to a net outflow of R286 million in H1/2017, compared to a net outflow of R369 million in H1/2016.

15.1.5. Our net cash flow used in financing activities increased by R353 million to a net inflow of R647 million in H1/2017, compared to a net inflow of R294 million in H1/2016. This increase was primarily due to R733 million cash received of bridge funding secured during H1/2017, excluding associated fees compared to an increase in current interest-bearing debt in H1/2016 of R339 million.

15.2. **Fiscal Year 2016 Compared to Fiscal Year 2015**

15.2.1. Operating cash inflow before changes in working capital decreased by R786 million, or 31.4%, from R2,502 million in fiscal year 2015 to R1,716 million in fiscal year 2016, mainly as a result of weaker trading performance resulting in a reduction in trading profit by R318 million, or 24.4%, from R1,305 million in fiscal year

2015 to R987 million for fiscal year 2016, as well as fees in the amount of R550 million paid in connection with the July/November 2015 Exchange Offer.

15.2.2.   In FY 2016, we recorded a working capital outflow of R292 million compared to an inflow of R573 million in financial year 2015 due to: (i) a decrease in proceeds from the sale of our trade accounts receivable books, which were R29 million in financial year 2016 compared to R356 million in financial year 2015; (ii) a net decrease in trade receivables of R12 million in financial year 2016 compared to a net increase in trade receivables of R181 million in financial year 2015; (iii) an increase in sundry receivables and prepayments of R90 million in financial year 2016 compared to an increase of R78 million in 2015 financial year, mainly due to amounts owed to us by a newly-formed associate; (iv) an increase in inventory of R271 million in financial year 2016 compared to a decrease in inventory of R80 million in financial year 2015, mainly due to a weaker than anticipated retail trading performance during Christmas 2015; and (v) an increase in trade and other payables of R28 million in financial year 2016 compared to an increase of R396 million in financial year 2015 due to working capital initiatives which extended supplier payment terms for our business vis-á-vis certain suppliers.

15.2.3.   Net cash outflow from operating activities decreased by R282 million from an outflow of R165 million in fiscal year 2015 to an outflow of R447 million in fiscal year 2016, primarily as a result of a weaker trading performance, fees incurred in connection with the July/November 2015 Exchange Offer and negative working capital cash flows as detailed above.

15.2.4.   Our net cash flow used in investing activities decreased by R251 million to a net outflow of R604 million in fiscal year 2016, compared to a net outflow of R855 million in fiscal year 2015. The decrease was primarily due to a reduction in the investment to expand operations.

15.2.5.   Net finance cash costs decreased by R1,320 million, or 42.5%, from R3,103 million in fiscal year 2015 to R1,783 million in fiscal year 2016 following the successful conclusion of the Exchange Offer in November 2015 and the acceptance by certain of our creditors of the Existing Group's proposal to defer certain cash interest payments until December 2016, as well as a reduction in the amount of income taxes paid by R49 million, or 35.8%, from R137 million in fiscal year 2015 to R88 million in fiscal year 2016 as a result of weaker trading results.

**15.3.  Fiscal Year 2015 Compared to Fiscal Year 2014:**

15.3.1.   Operating cash inflow before changes in working capital decreased by R38 million from R2,540 million in fiscal year 2014 to R2,502 million in fiscal year 2015 mainly due to operating costs increasing faster than sales.

15.3.2.    Working capital showed an inflow of R573 million in fiscal year 2015, compared to an outflow of R114 million in fiscal year 2014 due to: (i) the proceeds from the sales of the trade accounts receivable books of R356 million in fiscal year 2015 compared to R575 million in fiscal year 2014; (ii) a net increase in trade receivables of R181 million in fiscal year 2015 compared to a net decrease of R39 million in fiscal year 2014; (iii) an increase in other receivables and prepayments of R79 million in fiscal year 2015 compared to an increase of R306 million in fiscal year 2014; (iv) a decrease in inventory of R81 million in fiscal year 2015 compared to an increase of R635 million in fiscal year 2014, mainly as part of the working capital initiatives; and (v) an increase in trade and other payables of R396 million in fiscal year 2015 compared to an increase of R220 million in fiscal year 2014, due to the working capital initiatives, such as standardization of payment terms across the business.

15.3.3.    Consequently, operating activities generated cash of R3,075 million, R649 million higher than the R2,426 million in the prior comparative period.

15.3.4.    Our net cash flow used in investing activities decreased by R476 million to a net outflow of R855 million in fiscal year 2015, compared with a net outflow of R1,331 million in fiscal year 2014. The decrease was primarily due to additional investment made to modernize our stores under our store optimization program completed in the Edgars division in fiscal year 2014.

15.3.5.    Our net cash flow used in financing activities increased by R1,146 million to a net inflow of R1,898 million in fiscal year 2015, compared with a net inflow of R752 million in fiscal year 2014. The increase was primarily due to the drawdown of our Super Senior Revolving Credit Facility in February 2015, which we undertook in order to increase our cash on hand to fund operations, coupled with net proceeds received of R227 million in connection with the early settlement of certain derivatives and option premiums paid compared to net proceeds received in fiscal 2014 of R1,346 million on settlement of certain derivatives and option premiums paid.

16.    **Capital Expenditures**

16.1.    **26-week Period Ended 26 September 2015 Compared to 26-week Period Ended 24 September 2016**

Capital expenditure increased by R12 million, or 4.4%, to R286 million in H1/2017 from R274 million in H1/2016. In H1/2017, we opened 35 new stores which, combined with store refurbishments, resulted in investments in stores of R169 million (excluding Zimbabwe), compared to H1/2016 during which we opened 54 new stores resulting in an investment in stores of R174 million (excluding Zimbabwe). In H1/2017, we invested R72 million in IT infrastructure compared to R81 million in H1/2016. We are planning to spend over R600 million for fiscal year 2017.

16.2. **Fiscal Year 2016 Compared to Fiscal Year 2015**

Capital expenditure decreased by R485 million, or 46.8%, to R552 million for the financial year 2016, from R1,037 million in the financial year 2015. In the financial year 2016, we opened 96 new stores were opened which, combined with store refurbishments, resulted in investments in stores of R354 million (excluding Edgars Zimbabwe), compared to financial year 2015 during which we opened 142 new stores, resulting in an investment in stores of R771 million (excluding Edgars Zimbabwe). We invested R149 million in information systems infrastructure in the financial year 2016 compared to R223 million in the financial year 2015.

16.3. **Fiscal Year 2015 Compared to Fiscal Year 2014**:

Capital expenditure decreased by R312 million, or 23.1%, to R1,037 million for fiscal year 2015 from R1,349 million in fiscal year 2014. In fiscal year 2015, we opened 142 new stores (excluding Edgars Zimbabwe) which, combined with store refurbishments, resulted in investments in stores of R771 million compared to fiscal year 2014 during which we opened 138 new stores (excluding 8 conversions) resulting in an investment in stores, combined with expansion and refurbishments, of R1,101 million (excluding Edgars Zimbabwe). We invested R223 million in IT infrastructure in fiscal year 2015 compared to R194 million in fiscal year 2014.

17. **Future Liquidity and Capital Resources**

It is anticipated that the Financial Restructuring will materially improve the liquidity position of the Existing Group to ensure its ongoing operations as well as to address the current high structural leverage and cash interest burden on the operating company. Pro forma for the Financial Restructuring, the main operating company will increase its cash interest coverage from 0.6x to 2.3x, and reduce its gross leverage from 18.9x to 4.1x excluding subordinated debt. The Existing Group will raise a new revolving credit facility of R575m at its main operating company to address its working capital requirements more efficiently, and will raise an additional R1.5bn at one of the holding companies upon completion of the Financial Restructuring. The Existing Group believes that the extended maturity profile of the Existing Group's debt and additional funding, each contemplated as part of the Financial Restructuring, should facilitate an ongoing operational turnaround and allow management to refocus onto running the business and executing its strategic plan. This should also facilitate the management of the Existing Group's future capital expenditure requirements and provide headroom for investments in continued growth. Furthermore, the Existing Group is of the view that consummation of the Financial Restructuring should alleviate concerns of its key creditors (for example suppliers, landlords and credit insurers, as well as its employees) and make the Existing Group a more attractive place to work and shop.

18. **Financial Market Risk**

18.1. **Foreign Currency Risk**

We are exposed to the exchange rate movement of the South African Rand, our operating currency, against other currencies in respect of the merchandise we import. Furthermore, a substantial portion of our

indebtedness is denominated in euro and U.S. dollars. Future foreign exchange rate fluctuations may affect our ability to service our foreign-currency denominated indebtedness, including payments in euro and U.S. dollars on the New Notes being issued. We currently do not have foreign currency hedges in place. See paragraph 13.11 of Part C (*Our business is affected by foreign currency fluctuations*).

18.2.  **Interest Rate Risk**

As a result of the significant inter-seasonal and intra-month swings in working capital in our business, our short-term net debt can fluctuate significantly. Therefore, our treasury actively monitors our interest rate exposure. Where appropriate we use swaps, options and forwards to manage our interest rate risk against any unexpected fluctuations in the interest rate, but we currently do not have interest rate hedges in place. We also actively manage our fixed and floating rate interest-bearing debt and our cash and cash equivalents mix as part of this exposure management process. In order to hedge the specific interest rate exposure of our existing borrowings and anticipated peak additional borrowings, we make use of interest rate derivatives where appropriate within approved policy limits which require approval of our chief executive officer and, in some cases, the Board, depending on the size of the derivative. We are unhedged with respect to our rand borrowings.

18.3.  **Counterparty Risk**

Counterparty risk for deposits with financial institutions is managed by clearly defined bank mandates and delegation of authority. We carefully assess the creditworthiness of financial counterparties on an ongoing basis. Exposure limits are managed and monitored by our treasury department.

18.4.  **Critical Accounting Policies and Use of Estimates**

18.4.1.  In preparing our audited consolidated financial statements, our management is required to make estimates and assumptions that affect reported income, expenses, assets, liabilities and disclosure of contingent assets and liabilities. Actual results in the future could differ from these estimates, which could be material to our audited consolidated financial statements.

18.4.2.  Significant estimates, assumptions and judgments made at the reporting date, as reflected in the audited consolidated financial statements, relate to credit risk valuation adjustments in determining the fair value of derivative instruments to reflect non-performance risk, fair value of financial instruments, a provision for impairment of receivables, derecognition of financial instruments, allowances for slow-moving inventory, residual values, useful lives and depreciation methods for property, fixtures, equipment and vehicles, fair value measurements and valuation processes in respect of land and buildings, impairment of non-financial assets including goodwill and intangibles with indefinite lives, measurement of pension fund and medical aid obligations, operating leases, current and deferred tax, value of

warrants issued and loyalty points deferred revenue. Other judgments made relate to classifying financial assets and liabilities into categories and raising provisions related to onerous leases.

18.4.3.  For a full discussion of our use of estimates, judgments and assumptions in the preparation of our financial statements, see note 1 to our audited consolidated financial statements for fiscal years 2014 and 2015 included elsewhere in this Explanatory Statement.

18.5.  **Revenue Recognition**

18.5.1.  Revenue is recognized to the extent that it is probable that the economic benefits will flow to the Existing Group and the revenue can be reliably measured, regardless of when payment is made. Revenue is measured at the fair value of the consideration received, net of returns and customer loyalty points excluding discounts, rebates and sales taxes or duty. The Existing Group assesses its revenue arrangements against specific criteria to determine if it is acting as principal or agent.

18.5.2.  Revenue comprises retail sales of merchandise, manufacturing sales, club fees, revenue from the insurance business, dividends, finance charges and administration fees accrued to the Existing Group.

18.5.3.  The specific recognition criteria below must also be met before revenue is recognized.

18.6.  **Sales of Merchandise**

Revenue from sales of merchandise is recognized when the significant risks and rewards of ownership of the goods have passed to the buyer, usually on delivery of goods. Such income represents the net invoice value of merchandise provided to such third parties, excluding discounts, the fair value of loyalty points, value-added tax and general sales tax. The Existing Group chains that contribute to the revenue from sale of merchandise are the Edgars division, the Specialty division, Discount division and the Edgars Zimbabwe division.

18.7.  **Loyalty Points Program**

The Existing Group operates a loyalty points program that allows customers to accumulate points when they purchase merchandise, subject to certain criteria, in the Existing Group's retail stores. The points can then be redeemed as discounts against merchandise purchases. The fair value, which includes the expected redemption rate attributed to the credits awarded, is deferred as a provision and recognized as revenue on redemption of points by customers.

18.8.  **Manufacturing Sales**

Revenue from manufacturing and other operations is recognized when the sale transactions giving rise to such revenue are concluded.

18.9.  **Club Fees**

Club fees are recognized as revenue as and when incurred.

18.10.  **Finance Charges**

Finance charges on arrear account balances are accrued on a time proportion basis, recognizing the effective yield on the underlying assets.

18.11. **Share of Profits from Insurance Business**

18.11.1.   Group customers are offered Edgars and Jet branded insurance products, in pursuance of a business arrangement with Hollard Insurance. Hollard Insurance underwrites all insurance products and provides the business with actuarial and compliance support. The Existing Group provides product distribution, marketing and billing, and premium collection services. The insurance business sells to both credit customers and cash customers and is managed by a dedicated team of people from both Hollard Insurance and the Existing Group. The insurance business is accounted for using the equity method. Under the provision of the agreement, the Existing Group charges a fee for the continued management of the debtors and the maintenance of administrative systems used with respect to the business. The Existing Group also charges a fee for the use of the Existing Group's brands in the marketing of the insurance products. This fee income is recognized by the Existing Group as and when it is accrued.

18.11.2.   Profit is shared on a product-by-product basis applying the profit share percentage as agreed between the parties from time to time.

18.11.3.   The Existing Group has a closed book for the Edgars and Jet Legal Plan underwritten by Zurich Insurance Limited. Europe Assistance provides risk management and policy fulfilment services. Under the provisions of the agreement, if the policy premiums exceed the claims and expenses, the net profit is distributed as a dividend.

18.12. **Finance and Administration Fee Income**

Interest received is recognized using the effective interest rate method. Administration fees are recognized as they are accrued based on the services provided.

18.13. **Leases**

The determination of whether an arrangement is a lease, or contains a lease, is based on the substance of the arrangement at inception date and whether the fulfilment of the arrangement is dependent on the use of a specific asset or assets or the arrangement conveys a right to use the asset, even if that right is not explicitly specified in an arrangement.

18.14. **Group as Lessee**

18.14.1.   Leases are classified as finance leases when substantially all the risks and rewards associated with ownership of an asset are transferred from the lessor to the Existing Group as lessee. Assets subject to finance leases are capitalized at the lower of the fair value of the asset and the present value of the minimum lease payments, with the related lease obligation recognized at the

same value. Capitalized leased assets are depreciated over the shorter of the lease term and the estimated useful life if the Existing Group does not obtain ownership thereof.

18.14.2.  Finance lease payments are allocated using the effective interest rate method, between the lease finance cost, which is included in financing costs, and the capital repayment, which reduces the liability to the lessor.

18.14.3.  Operating leases are those leases which do not fall within the scope of the above definition. Operating lease rentals with fixed escalation clauses are charged against trading profit on a straight-line basis over the term of the lease. The resulting difference between the lease expenses arising from the application of straight-line basis and the contractual amounts actually paid or accrued is recognised as a lease equalisation obligation or asset.

18.14.4.  In the event of a sub-lease classified as an operating lease, lease rentals received are included in profit or loss on a straight-line basis.

18.15.  **Group as Lessor**

Leases in which the Existing Group does not transfer substantially all the risks and rewards of ownership of an asset are classified as operating leases. Initial direct costs incurred in negotiating an operating lease are added to the carrying amount of the leased asset and recognized over the lease term on the same basis as rental income. Contingent rentals are recognized as revenue in the period in which they are earned.

18.16.  **Onerous Leases**

A provision for onerous contracts is recognized when the expected benefits to be derived by the Existing Group from a contract are lower than the unavoidable cost of meeting the obligations under the contract. The provision is measured at the present value of the lower of the expected cost of terminating the contract and the net cost of continuing with the contract. Before a provision is established, the Existing Group recognizes any impairment loss on the asset associated with that contract.

18.17.  **Inventories**

18.17.1.  Retail trading inventories are valued at the lower of cost, using the weighted average cost, and net realizable value, less an allowance for slow-moving items. Net realizable value is the estimated selling price in the ordinary course of business less costs necessary to make the sale. In the case of own-manufactured inventories, costs include the total cost of manufacture, based on normal production facility capacity, and excludes financing costs. Work-in-progress is valued at actual cost, including direct material costs, labour costs and manufacturing overheads. Factory raw materials and consumable stores are valued at average cost, less an allowance for slow-moving items.

18.17.2.  The allowance for slow-moving inventory is made with reference to an inventory age analysis. All inventory older than 18 months is

provided for in full because it is not deemed to be readily disposable.

### 18.18. Goodwill

18.18.1.   Goodwill is initially measured at cost, being the excess of the aggregate of the consideration transferred and the amount recognized for non-controlling interests, and any previous interest held, over the net identifiable assets acquired and liabilities assumed. After initial recognition, goodwill is measured at cost less any accumulated impairment losses. Goodwill is not amortized; it is tested annually for impairment and, additionally, when an indication of impairment exists at the end of each reporting period. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Existing Group's cash-generation units that are expected to benefit from the combination, irrespective of whether other assets or liabilities of the acquiree are assigned to those units.

18.18.2.   For goodwill impairment testing purposes, the segments reported are separate cash-generating units, since this is the level at which the performance of investments is reviewed and assessed by management. The recoverable amount of a segment is determined on the basis of its value in use.

18.18.3.   Where goodwill has been allocated to a cash-generating unit and part of the operation within that unit is disposed of, the goodwill associated with the disposed operation is included in the carrying amount of the operation when determining the gain or loss on disposal. Goodwill disposed in these circumstances is measured based on the relative values of the disposed operation and the cash-generating unit retained.

### 18.19. Intangible Assets

18.19.1.   Intangible assets comprise separately identifiable intangible items arising from business combinations and certain purchased intangibles. Intangible assets acquired separately are initially measured at cost. The cost of intangible assets acquired in a business combination are measured at their fair value as of the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortization and accumulated impairment losses. Internally generated intangible assets, excluding capitalized development costs, are not capitalized and expenditure is reflected in profit or loss in the year in which the expenditure is incurred.

18.19.2.   The useful lives of intangible assets are assessed as either finite or indefinite.

18.19.3.   Intangible assets with finite lives are amortized using the straight-line method over their estimated useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortization period and

the amortization method for an intangible asset with a finite useful life is reviewed at least at the end of each reporting period. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset is accounted for by changing the amortization period or method, as appropriate, and are treated as changes in accounting estimates. The amortization expense on intangible assets with finite lives is recognized in profit or loss in the expense category consistent with the function of the intangible assets.

18.19.4.  Intangible assets with indefinite useful lives are not amortized, but are tested for impairment annually, either individually or at the cash-generating unit level. The assessment of the indefinite life is reviewed annually to determine whether the indefinite life basis continues to be supportable. If not, the change in useful life from indefinite to finite is made on a prospective basis. Intangible assets are derecognized on disposal or when no future economic benefits are expected through use of the intangible asset. Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the intangible asset and are recognized in profit or loss when the intangible asset is derecognized. Expenditure on internally developed and maintained intangible assets are expensed through profit or loss. Expenditure incurred to maintain brand names is charged in full to profit or loss as incurred.

18.20. **Derivative Financial Instruments and Hedge Accounting**

18.20.1.  The Existing Group uses derivative financial instruments such as foreign currency forward contracts, foreign currency call options, cross currency swaps and interest rate swaps to manage the financial risks associated with their underlying business activities and the financing of those activities. The Existing Group does not undertake any trading activity in derivative financial instruments.

18.20.2.  Derivative financial instruments are initially measured at their fair value on the date on which a derivative portfolio contract is entered into and are subsequently re-measured at fair value. Any gains or losses arising from changes in the fair value of derivatives are taken directly to profit or loss, except for the effective portion of cash flow hedges, which is recognized in other comprehensive income.

18.20.3.  The fair value of foreign currency forward contracts, foreign currency call options and cross currency swaps is calculated by reference to current forward exchange rates for contracts with similar maturity profiles. The fair value of interest rate swap contracts is determined by reference to market interest rates for similar instruments. The fair value of cross currency swaps is determined by reference to market interest rates and forward exchange rates for similar instruments. A credit risk valuation

adjustment is incorporated to appropriately reflect the Existing Group's own non-performance risk and the respective counterparty's non-performance risk in the fair value measurement. The significant inputs to the overall valuations are based on market observable data or information derived from or corroborated by market observable data, including transactions, broker or dealer quotations, or alternative pricing sources with reasonable levels of price transparency.

18.20.4.   Where models are used, the selection of a particular model to value the derivative depends upon the contractual terms of, and specific risks inherent in the instrument as well as the availability of pricing information in the market. The Existing Group uses similar models to value similar instruments. Valuation models require a variety of inputs including contractual terms, market prices, yield curves and credit curves.

18.20.5.   The credit risk valuation adjustments are calculated by determining the net exposure of each derivative portfolio (including current and potential future exposure) and then applying the Existing Group's credit spread and each counterparty's credit spread to the applicable exposure.

18.20.6.   The inputs utilized for the Existing Group's own credit spread are based on estimated fair market spreads for entities with similar credit ratings to the Existing Group. For counterparties with publicly available credit information, the credit spreads over the benchmark rate used in the calculations represent implied credit default swap spreads obtained from a third party credit provider. In adjusting the fair value of derivative contracts for the effect of non-performance risk, the Existing Group has not considered the impact of netting and any applicable credit enhancements such as collateral postings, thresholds, mutual puts and guarantees. The Existing Group actively monitors counterparty credit ratings for any significant changes.

18.20.7.   For the purposes of hedge accounting, hedges are classified as either fair value hedges where they hedge the exposure to changes in the fair value of a recognized asset or liability or an unrecognized firm commitment, or cash flow hedges where they hedge exposure to variability in cash flows that is either attributable to a particular risk associated with a recognized asset or liability or a highly probable transaction or the foreign currency risk in an unrecognized firm commitment.

18.20.8.   At the inception of a hedge relationship, the Existing Group formally designates and documents the hedge relationship to which the Existing Group wishes to apply hedge accounting, and documents the risk management objective and strategy for undertaking the hedge. The documentation includes identification of the hedging instrument, the hedged item or transaction, the nature of the risk being hedged and how the entity will assess the

effectiveness of changes in the hedging instrument's fair value in offsetting the exposure to changes in the hedged item's fair value or cash flows attributable to the hedged risk. Such hedges are expected to be highly effective in achieving offsetting changes in fair value or cash flows and are assessed on an ongoing basis to determine that they actually have been highly effective throughout the financial reporting periods for which they were designated.

18.20.9.   In relation to cash flow hedges which meet the conditions for hedge accounting, the portion of the gain or loss on the hedging instrument that is determined to be an effective hedge is recognized in other comprehensive income in the cash flow hedging reserve. The ineffective portion is recognized in profit or loss.

18.20.10.   For cash flow hedges, the gains or losses that are recognized in other comprehensive income are transferred to profit or loss in the same period in which the hedged item affects the profit or loss.

18.20.11.   Hedge accounting is discontinued when the hedging instrument expires or is sold, terminated or exercised, or no longer qualifies for hedge accounting. At that point in time, any cumulative gain or loss on the hedging instrument recognized in other comprehensive income is kept in other comprehensive income until the forecasted transaction occurs. If a hedged transaction is no longer expected to occur, the net cumulative gain or loss recognized in other comprehensive income is transferred to profit or loss for the period.

18.21.   **Properties, Fixtures, Equipment and Vehicles**

18.21.1.   Fixtures, equipment and vehicles are stated at cost, net of accumulated depreciation and accumulated impairment losses, if any. Such cost includes the cost of replacing part of the fixtures, equipment and vehicles and borrowing costs for long-term construction projects if the recognition criteria are met. When significant parts of property, plant and equipment are required to be replaced at intervals, the Existing Group recognizes such parts as individual assets with specific useful lives and depreciates them accordingly. Likewise, when a major inspection is performed, its cost is recognized in the carrying amount of the plant and equipment as a replacement if the recognition criteria are satisfied. All other repair and maintenance costs are recognized in profit or loss as incurred.

18.21.2.   Land is initially measured at cost and subsequently revalued by recognized professional valuers, every three years and annually by internal valuers to net realizable open-market value using the alternative or existing-use basis as appropriate, ensuring carrying amounts do not differ materially from those that would be determined using fair value at the reporting date. Buildings are

also measured at fair value less accumulated depreciation and impairment losses at the date of revaluation. Land and buildings are valued by reference to market-based evidence using comparable prices adjusted for specific market factors such as nature, location and condition of the property. Any revaluation surplus is recorded in other comprehensive income and hence credited to the asset revaluation reserve in equity, except to the extent that it reverses a revaluation decrease of the same asset previously recognized in profit or loss, in which case the increase is recognized in profit or loss. A revaluation deficit is recognized in profit or loss, except to the extent that it offsets an existing surplus on the same asset recognized in the asset revaluation reserve. The amount in the revaluation surplus reserve is transferred to retained earnings/loss upon disposal of a particular asset. Additionally, accumulated depreciation, for buildings, as of the revaluation date is eliminated against the gross carrying amount of the asset and the net amount is restated to the revalued amount of the asset.

18.21.3.   Expenditure relating to leased premises is capitalized as appropriate and depreciated to expected residual value over the remaining period of the lease on a straight-line basis.

18.21.4.   Leasehold improvements for leasehold land and buildings are depreciated over the lease periods which range from five to 10 years, or such shorter periods as may be appropriate.

18.21.5.   Fixtures, equipment and vehicles are carried at cost less accumulated depreciation and impairment loss, and are depreciated on a straight-line basis to their expected residual values over the estimated useful lives.

18.21.6.   Property, fixtures, equipment and vehicles are reviewed at each reporting date, to determine whether there is any indication of impairment. When impairment indicators are present, the impairment recognized in the profit or loss (or other comprehensive income for revalued property limited to the extent of the revaluation surplus) is the excess of the carrying value over the recoverable amount (the greater of fair value less cost to sell and value in use). Recoverable amounts are estimated for individual assets or, when an individual asset does not generate cash flows independently, the recoverable amount is determined for the larger cash-generating unit to which the asset belongs.

18.21.7.   In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. In determining fair value less costs to sell, recent market transactions are taken into account. If no such transactions can be identified, an appropriate

valuation model is used. These calculations are corroborated by valuation multiples or other available fair value indicators.

18.21.8.  The Existing Group bases its impairment calculation on detailed budgets and forecast calculations, which are prepared separately for each of the Existing Group's cash generating units to which the individual assets are allocated. These budgets and forecast calculations generally cover a period of five years. For longer periods, a long-term growth rate is calculated and applied to project future cash flows after the fifth year.

18.21.9.  An assessment is made at each reporting date to determine whether there is an indication that previously recognized impairment losses no longer exist or have decreased. If such indication exists, the Existing Group estimates the assets or the cash generating units recoverable amount. A previously recognized impairment loss is reversed only if there has been a change in the assumptions used to determine the asset's recoverable amount since the last impairment loss was recognized. The reversal is limited so that the carrying amount of the asset does not exceed its recoverable amount, nor exceed the carrying amount that would have been determined, net of depreciation, had no impairment loss been recognized for the asset in prior periods. Such reversal is recognized in the statement of comprehensive income unless the asset is carried at a revalued amount, in which case the reversal is treated as a revaluation increase.

18.21.10.  An item of property, fixtures, equipment and vehicles is derecognized on disposal or when no future economic benefits are expected through its continued use. Gains or losses that arise on derecognition are included in profit or loss in the year of derecognition. The gain or loss is calculated as the difference between the net disposal proceeds and the carrying amount of the property, fixtures, equipment or vehicles at the date of sale.

18.21.11.  Buildings, fixtures, equipment and vehicles are depreciated over their useful life taking into account any residual values where appropriate. The estimated useful life of these assets and depreciation methods are assessed at each reporting date and could vary as a result of technological innovations and maintenance programs. In addition, residual values are reviewed at each reporting date after considering future market conditions, the remaining life of the asset and projected disposal values. Changes in asset lives and residual values are accounted for on a prospective basis as a change in estimate.

18.21.12.  Packaged software and the direct cost associated with the development and installation thereof are capitalized as computer software and are an integral part of computer hardware.

18.22. **Provisions**

18.22.1.   Provisions are recognized when the Existing Group has a present obligation (legal or constructive) as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation. The amount recognized as a provision will be reassessed at each reporting date taking into account the latest estimates of expenditure required and the probability of the outflows. If the effect of the time value of money is material, provisions are determined by discounting the expected future cash flows at a pre-tax rate that reflects current market assessments of the time value of money and, where appropriate, the risks specific to the liability except those that have been taken into account in the estimate of future cash flows. Where discounting is used, the increase in a provision due to the passage of time is recognized as an interest expense in profit or loss. A provision is used only for the expenditures for which the provision was originally recognized.

18.22.2.   When the Existing Group expects some or all of a provision to be reimbursed, for example, under an insurance contract, the reimbursement is recognized as a separate asset, but only when the reimbursement is virtually certain. The expense relating to a provision is presented in the statement of comprehensive income net of any reimbursement.

18.23.  **Loyalty Points Deferred Revenue**

18.23.1.   The Existing Group operates a loyalty points program which allows customers to accumulate points when they purchase merchandise, subject to certain criteria, in the Existing Group's retail stores. The points can then be redeemed as discounts against merchandise purchases. The Existing Group accounts for award credits as a separately identifiable component of the sales transaction in which they are granted. The consideration in respect of the initial sale is allocated to award credits at their fair value and is accounted for as a provision (deferred revenue) in the statement of financial position.

18.23.2.   The fair value of an individual award credit is determined using estimation techniques reflecting the weighted average of a number of factors. A rolling 12-month historical trend forms the basis of the calculations. The number of points not expected to be redeemed by members is also factored into the estimation of fair value. Historical redemption trends are also used to determine the long- and short-term portion of the deferred revenue liability. A level of judgment is exercised by management in determining the fair value of the points.

18.24.  **Short-Term Employee Benefits**

The cost of all short-term employee benefits is recognized during the period in which the employee renders the related service. The accruals for employee

entitlements to wages, salaries, annual and sick leave represent the amount which the Existing Group has a present obligation to pay as a result of employees' services provided to the reporting date. The short-term employee benefits have been calculated at undiscounted amounts based on current wage and salary rates.

18.25.  **Post-Employment Benefits**

18.25.1.   The Existing Group operates a number of retirement benefit plans for its employees. These plans include both defined benefit and defined contribution provident funds and other retirement benefits such as medical aid benefit plans.

18.25.2.   Retirement benefit schemes are regulated in South Africa under the Pension Funds Act, No. 24 of 1956 (the "PFA") and the regulator appointed under the PFA, the Financial Services Board ("FSB"). Retirement benefit schemes must have FSB approved rules. Retirement benefit schemes must also provide minimum benefits, conduct audits and valuations (unless exempt), and have performed a surplus apportionment exercise.

18.25.3.   Obligations for contributions to defined contribution pension, provident and retirement funds are recognized as an employee benefit expense in profit or loss when they are due. Prepaid contributions are recognized as an asset to the extent that a cash refund or a reduction in future payments is available.

18.25.4.   Under the Existing Group's defined benefit plans, the Existing Group uses the projected unit credit actuarial method to determine the present value of its defined benefit plans and the related current service cost and, where applicable, past service costs. Contribution rates to defined benefit plans are adjusted for any unfavourable experience adjustments. Favourable experience adjustments are retained within the funds. Net benefit assets are only brought into account in the Existing Group's financial statements when it is certain that economic benefits will be available to the Existing Group. Actuarial gains or losses are recognized in full the period in which they occur in other comprehensive income. Such actuarial gains and losses are also immediately recognized in retained earnings and are not reclassified to profit or loss in subsequent periods. Past service cost is recognized in profit or loss in the period of a plan amendment. Net interest is calculated by applying the discount rate at the beginning of the period to the net defined benefit liability or asset. The Existing Group presents service costs and net interest expense or income in profit or loss in other operating costs and financing costs in the Statement of Comprehensive income. Curtailment gains and losses are accounted for as past service costs.

18.25.5.   The defined benefit asset or liability comprises the present value of the defined benefit obligation, less unrecognized past service costs and less the fair value of any plan assets out of which the

obligations are to be settled. Plan assets are assets that are held by a long-term employee benefit fund or qualifying insurance policies. Plan assets are neither available to the creditors of the Existing Group, nor can they be paid directly to the Existing Group. Fair value is based on market price information and, in the case of quoted securities, it is the published bid price. The value of any defined benefit asset recognized is restricted to the sum of any unrecognized past service costs and the present value of any economic benefits available in the form of refunds from the plan or reductions in the future contributions to the plan.

18.26. **Current Income Taxation**

18.26.1.    Current income tax assets and liabilities are measured at the amount expected to be recovered from or paid to the taxation authorities. The tax rates and tax laws used to compute the amount are those that are enacted or substantively enacted at the reporting date in the countries where the Existing Group operates and generates taxable income.

18.26.2.    Current income tax relating to items recognized directly in other comprehensive income or equity is recognized in other comprehensive income or equity and not in profit or loss. Management periodically evaluates positions taken in the tax returns with respect to situations in which applicable tax regulations are subject to interpretation, and establishes provisions where appropriate.

18.26.3.    Uncertainties exist with respect to the interpretation of complex tax regulations, changes in tax laws, and the amount and timing of future taxable income. Given the wide range of international business relationships and the long-term nature and complexity of existing contractual agreements, differences arising between the actual results and the assumptions made, or future changes to such assumptions, could necessitate future adjustments to tax income and expense already recorded. The Existing Group establishes provisions, based on reasonable estimates, for the possible consequences of audits by the tax authorities of the respective countries in which it operates. The amount of such provisions is based on various factors, such as experience of previous tax audits and differing interpretations of tax regulations by the taxable entity and the responsible tax authority. Such differences of interpretation may arise on a wide variety of issues depending on the prevailing conditions in the respective domicile of the Existing Group companies.

18.27. **Deferred Taxation**

18.27.1.    Deferred tax is provided using the liability method on temporary differences at the reporting date between the tax base of the assets and liabilities and their carrying amounts for financial reporting purposes. Deferred tax liabilities are recognized for all taxable deductible differences, except:

18.27.1.1. when the deferred tax liability arises from the initial recognition of goodwill or an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss; and

18.27.1.2. in respect of taxable temporary differences associated with investments in subsidiaries, associates and interests in joint ventures, when the timing of the reversal of the temporary differences can be controlled and it is probable that the temporary differences will not reverse in the foreseeable future.

18.27.1.3. Deferred tax assets are recognized for all temporary differences, carry forward of unused tax credits and unused tax losses, which will result in deductible amounts in future periods, but only to the extent that it is probable that sufficient taxable profits will be available against which these deductible temporary differences, and carry forward of unused tax credits and unused tax losses can be utilized, except:

18.27.1.4. when the deferred tax asset relating to the deductible temporary difference arises from the initial recognition of an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss; and

18.27.1.5. in respect of deductible temporary differences associated with investments in subsidiaries, associates and interests in joint ventures, deferred tax assets are recognized only to the extent that it is probable that the temporary differences will reverse in the foreseeable future and taxable profit will be available against which the temporary differences can be utilized.

18.27.2. Significant management judgment is required to determine the amount of deferred tax assets that can be recognized, based upon the likely timing and the level of future taxable profits together with future tax planning strategies.

18.27.3. The carrying amount of deferred income tax assets is reviewed at each reporting date and reduced to the extent that it is no longer probable that sufficient taxable profit will be available to allow all or part of the deferred income tax asset to be utilized. Unrecognized deferred income tax assets are reassessed at each reporting date and are recognized to the extent that it has become probable that future taxable profit will allow the deferred tax asset to be recovered.

18.27.4. Deferred tax assets and liabilities are measured at the tax rates that are expected to apply in the period in which the asset will be

realized or the liability will be settled, based on enacted or substantively enacted rates at the reporting date. Deferred tax relating to items recognized outside profit or loss is recognized outside profit or loss. Deferred tax items are recognized in correlation to the underlying transaction either in other comprehensive income or directly in equity.

18.27.5.   Tax benefits acquired as part of a business combination, but not satisfying the criteria for separate recognition at that date, are subsequently recognized if new information about facts and circumstances change. The adjustment is either treated as a reduction to goodwill (as long as it does not exceed goodwill) if it was incurred during the measurement period, or recognized in profit or loss.

**PART H**
**ANNUAL FINANCIAL STATEMENTS**

**EDCON LIMITED**
Incorporated in South Africa
(Registration number: 2007/003525/06)

_____

_____

**NOTICE BY THE BOARD OF DIRECTORS OF THE COMPANY TO THE SENIOR SECURED**

**CREDITORS OF THE SENIOR SECURED COMPANY MEETING**

_____

_____

1.  Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice and, in particular, in the resolution set out below.

2.  Notice is hereby given to all Senior Secured Creditors of the Company and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior Secured Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton, Gauteng  at 12h00 (Johannesburg time) on 29 December  2016 for the purpose of considering, and if deemed fit, approving the Senior Secured Company Resolution more fully set out below with or without modification.

3.  The meeting will commence with an explanatory address by the Chairman.

4.  All Senior Secured Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Senior Secured Company Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.  A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior Secured Creditor, will not be permitted access to the Senior Secured Company Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SENIOR SECURED COMPANY COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Senior Secured Company Compromise by the Company as set out in the Company Proposal at page 746 be and is hereby approved by the Senior Secured Creditors in terms of section 155(6) of the Companies Act on the basis that the Senior Secured Company Compromise will take effect on and as from the Compromise Effective Date.*"

The Senior Secured Company Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Company Meeting.

6.  Proxy Form**:**

6.1.    Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured Company Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Secured Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

6.3.    Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.4.    The Proxy Form is attached to this Proposal Document at page 670.

6.5.    You may use one Proxy Form for all Compromise Meetings.

6.6.    It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured Company Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7.    Account Holder Letter:

7.1.    Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes, it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder.  If a Secured Noteholder also holds Super Senior 2019 Notes, it will still only submit **one** Account Holder Letter per Account Holder in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 705.

7.6.    In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured Company Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Senior Secured Company Compromise and that you complete and return it in accordance with the instructions contained in it.

8.    Copies of the following documents will be available for inspection at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg

time) on Business Days up to, and including the Business Day immediately preceding the date of the Senior Secured Company Meeting –

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Senior Secured 2018 Notes Indenture;

8.6.    the Senior Secured 2019 Notes Indenture; and

8.7.    the Senior Secured Term Loan Agreement.


By order of the board of directors of the Company


_____


**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDCON LIMITED**

12 December 2016

**EDGARS CONSOLIDATED STORES LIMITED**

Incorporated in  South Africa
(Registration Number 1946/022751/06)

_____

_____

**NOTICE BY THE BOARD OF DIRECTORS OF ECSL TO THE SENIOR SECURED CREDITORS OF**

**THE SENIOR SECURED ECSL MEETING**

_____

_____

1.   Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice and, in particular, in the resolution set out below.

2.   Notice is hereby given to all Senior Secured Creditors of ECSL and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior Secured Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 13h00 (Johannesburg time) on 29 December  2016, or as soon as the Senior Secured Company Meeting has closed, for the purpose of considering, and if deemed fit, approving the Senior Secured ECSL Resolution more fully set out below with or without modification.

3.   The meeting will commence with an explanatory address by the Chairman.

4.   All Senior Secured Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Senior Secured ECSL Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.   A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior Secured Creditor, will not be permitted access to the Senior Secured ECSL Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SENIOR SECURED ECSL COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Senior Secured ECSL Compromise by the Company as set out in the ECSL Proposal at page 916 be and is hereby approved by the Senior Secured Creditors in terms of section 155(6) of the Companies Act on the basis that the Senior Secured ECSL Compromise will take effect on and as from the Compromise Effective Date.*"

The Senior Secured ECSL Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may

be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured ECSL Meeting.

6. Proxy Form**:**

6.1. Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured ECSL Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2. If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

6.3. Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.4. The Proxy Form is attached to this Proposal Document at page 670.

6.5. You may use one Proxy Form for all Compromise Meetings.

6.6. It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured ECSL Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7. Account Holder Letter:

7.1. Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2. If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes,  it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder.  If a Secured Noteholder also holds Super Senior 2019 Notes, it will still only submit **one** Account Holder Letter in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3. You may use one Account Holder Letter for all Compromise Meetings.

7.4. Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5. The Account Holder Letter is attached to this Proposal Document at page 705.

7.6. In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured ECSL Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7. It is important that you read the Account Holder Letter carefully for information about the Senior Secured ECSL Compromise and that you complete and return it in accordance with the instructions contained in it.

8. Copies of the following documents will be available for inspection at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on

+27 11 269 7813 or +27 82 560 5834 or [jpritipaul@ensafrica.com](mailto:jpritipaul@ensafrica.com) to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to and including the Business Day immediately preceding the date of the Senior Secured ECSL Meeting –

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Senior Secured 2018 Notes Indenture;

8.6.    the Senior Secured 2019 Notes Indenture; and

8.7.    the Senior Secured Term Loan Agreement.


By order of the board of directors of ECSL


_____


**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDGARS CONSOLIDATED STORES LIMITED**

12 December 2016

**EDCON ACQUISITION PROPRIETARY LIMITED**
Incorporated in South Africa
(Registration Number 2007/000518/07)

_____

_____

**NOTICE BY THE BOARD OF DIRECTORS OF BIDCO TO THE SENIOR SECURED CREDITORS OF**

**THE SENIOR SECURED BIDCO MEETING**

_____

_____

1.      Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice and, in particular, in the resolution set out below.

2.      Notice is hereby given to all Senior Secured Creditors of Bidco and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior Secured Creditors, under the chairmanship of the Chairman, will be held at the offices Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 13h15 (Johannesburg time) on 29 December 2016, or as soon as the Senior Secured ECSL Meeting has closed, for the purpose of considering, and if deemed fit, approving the Senior Secured Bidco Resolution more fully set out below with or without modification.

3.      The meeting will commence with an explanatory address by the Chairman.

4.      All Senior Secured Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Senior Secured Bidco Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.      A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior Secured Creditor, will not be permitted access to the Senior Secured Bidco Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SENIOR SECURED BIDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Senior Secured Bidco Compromise by the Company as set out in the Bidco Proposal at page 1019 be and is hereby approved by the Senior Secured Creditors in terms of section 155(6) of the Companies Act on the basis that the Senior Secured Bidco Compromise will take effect on and as from the Compromise Effective Date.*"

The Senior Secured Bidco Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Bidco Meeting.

6.      Proxy Form**:**

6.1.    Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured Bidco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

6.3.    Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.4.    The Proxy Form is attached to this Proposal Document at page 670.

6.5.    You may use one Proxy Form for all Compromise Meetings.

6.6.    It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured Bidco Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7.    Account Holder Letter:

7.1.    Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes,  it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder.  If a Secured Noteholder also holds Super Senior 2019 Notes, it will still only submit **one** Account Holder Letter in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 705.

7.6.    In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured Bidco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Senior Secured Bidco Compromise and that you complete and return it in accordance with the instructions contained in it.

8.    Copies of the following documents will be available for inspection at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg

time) on Business Days up to and including the Business Day immediately preceding the date of the Senior Secured Bidco Meeting –

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Senior Secured 2018 Notes Indenture;

8.6.    the Senior Secured 2019 Notes Indenture; and

8.7.    the Senior Secured Term Loan Agreement.


By order of the board of directors of Bidco

_____


**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDCON ACQUISITION PROPRIETARY LIMITED**

12 December 2016

## EDCON HOLDINGS LIMITED
Incorporated in South Africa
(Registration Number 2006/036903/06)

_____

_____

## NOTICE BY THE BOARD OF DIRECTORS OF HOLDCO TO THE SENIOR SECURED CREDITORS

## OF THE SENIOR SECURED HOLDCO MEETING

_____

_____

1.      Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice and, in particular, in the resolution set out below.

2.      Notice is hereby given to all Senior Secured Creditors of Holdco and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Senior Secured Creditors, under the chairmanship of the Chairman, will be held at the office of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 13h30 (Johannesburg time) on 29 December 2016, or as soon as the Senior Secured Bidco Meeting has closed, for the purpose of considering, and if deemed fit, approving the Senior Secured Holdco Resolution more fully set out below with or without modification.

3.      The meeting will commence with an explanatory address by the Chairman.

4.      All Senior Secured Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Senior Secured Holdco Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.      A Person that is not a Senior Secured Creditor, or does not hold a valid proxy for any Senior Secured Creditor, will not be permitted access to the Senior Secured Holdco Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SENIOR SECURED HOLDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Senior Secured Holdco Compromise by the Company as set out in the Holdco Proposal at page 1123 be and is hereby approved by the Senior Secured Creditors in terms of section 155(6) of the Companies Act on the basis that the Senior Secured Holdco Compromise will take effect on and as from the Compromise Effective Date.*"

The Senior Secured Holdco Compromise will have been adopted by the Senior Secured Creditors if it is approved by a majority in number of the Senior Secured Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date or DTC Record Date (as the case may be) held by Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Holdco Meeting.

6.      Proxy Form**:**

6.1.  Each Senior Secured Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Senior Secured Holdco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.  If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit **one** Proxy Form as regards all its Compromise Claims.

6.3.  Senior Secured Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.4.  The Proxy Form is attached to this Proposal Document at page 670.

6.5.  You may use one Proxy Form for all Compromise Meetings.

6.6.  It is important that you read the Proposal Document (including the Proxy Form and the Explanatory Statement) carefully for information about the Senior Secured Holdco Compromise and that you complete and return the Proxy Form in accordance with the instructions contained in it.

7.  Account Holder Letter:

7.1.  Each Senior Secured Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.  If a Senior Secured Noteholder holds Senior Secured 2018 Notes and Senior Secured 2019 Notes,  it must submit **one** Account Holder Letter for all Compromise Notes that it holds per Account Holder.  If a Secured Noteholder also holds Super Senior 2019 Notes, it will still only submit **one** Account Holder Letter in respect of both its Senior Secured Notes and its Super Senior 2019 Notes.

7.3.  You may use one Account Holder Letter for all Compromise Meetings.

7.4.  Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.  The Account Holder Letter is attached to this Proposal Document at page 705.

7.6.  In relation to the Senior Secured Noteholders only, whether or not you intend to attend the Senior Secured Holdco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter in the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.  It is important that you read the Account Holder Letter carefully for information about the Senior Secured Holdco Compromise and that you complete and return it in accordance with the instructions contained in it.

8.  Copies of the following documents will be available for inspection at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements) during normal business hours (being 08h30 – 17h00) (Johannesburg

time) on Business Days up to and including the Business Day immediately preceding the date of the Senior Secured Holdco Meeting –

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Senior Secured 2018 Notes Indenture;

8.6.    the Senior Secured 2019 Notes Indenture; and

8.7.    the Senior Secured Term Loan Agreement.


By order of the board of directors of Holdco


_____


**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDCON HOLDINGS LIMITED**

12 December 2016

**EDCON LIMITED**
Incorporated in South Africa
(Registration number: 2007/003525/06)

_____

_____

**NOTICE BY THE BOARD OF DIRECTORS OF THE COMPANY TO THE SUPER SENIOR THIRD**

**RANKING CREDITORS OF THE SUPER SENIOR COMPANY MEETING**

_____

_____

1.    Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice of meeting and, in particular, in the resolution set out below.

2.    Notice is hereby given to all Super Senior Third Ranking Creditors of the Company and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Super Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnenbergs, 150 West Street, Sandton, South Africa at 14h00 (Johannesburg time) on 29 December 2016, or as soon as the Senior Secured Holdco Meeting convened for the same date and place is concluded or adjourned, for the purpose of considering, and if deemed fit, the Super Senior Company Resolution more fully set out below with or without modification.

3.    The meeting will commence with an explanatory address by the Chairman.

4.    All Super Senior Third Ranking Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Super Senior Company Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.    A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior Company Meeting, save with the  consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR COMPANY COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Super Senior Company Compromise by the Company as set out in the Company Proposal at page 746 be and is hereby approved by the Super Senior Third Ranking Creditors in terms of section 155(6) of the Companies Act on the basis that the Super Senior Company Compromise will take effect on and as from the Compromise Effective Date.*"

The Super Senior Company Compromise will have been adopted by the Super Senior Third Ranking Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date  held by Super Senior Third

Ranking Creditors who are present and voting in person or by proxy at the Super Senior Company Meeting.

6.      Proxy Form:

6.1.    Each Super Senior Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Super Senior Company Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.    If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit one Proxy Form as regards all its Compromise Claims.

6.3.    You may use one Proxy Form for all Compromise Meetings.

6.4.    Super Senior Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.5.    The Proxy Form is attached to this Proposal Document at page 670.

6.6.    It is important that you read the Proxy Form carefully for information about the Super Senior Company Compromise and that you complete and return it in accordance with the instructions contained in it.

7.      Account Holder Letter:

7.1.    Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.    If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for Compromise Notes that it holds.

7.3.    You may use one Account Holder Letter for all Compromise Meetings.

7.4.    Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.    The Account Holder Letter is attached to this Proposal Document at page 705.

7.6.    In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior Company Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies this Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.    It is important that you read the Account Holder Letter carefully for information about the Super Senior Company Compromise and that you complete and return it in accordance with the instructions contained in it.

8.      Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior Company Meeting–

8.1.    the Lock-Up Agreement;

8.2.    the Amendment Agreement;

8.3.    the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Super Senior 2019 Notes Indenture; and

8.6.    the Super Senior Term Loan Agreement.


By order of the board of directors of the Company


_____


**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDCON LIMITED**

12 December 2016

**EDGARS CONSOLIDATED STORES LIMITED**
Incorporated in South Africa
(Registration Number 1946/022751/06)

_____

_____

**NOTICE BY THE BOARD OF DIRECTORS OF ECSL TO THE SUPER SENIOR THIRD RANKING**

**CREDITORS OF THE SUPER SENIOR ECSL MEETING**

_____

_____

1.   Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice of meeting and, in particular, in the resolution set out below.

2.   Notice is hereby given to all Super Senior Third Ranking Creditors of ECSL and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Super Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnebergs at 150 West Street, Sandton, South Africa at 15h00 (Johannesburg time) on 29 December 2016, or as soon as the Super Senior Company Meeting convened for the same date and place is concluded or adjourned, for the purpose of considering, and if deemed fit, the Super Senior ECSL Resolution more fully set out below with or without modification.

3.   The meeting will commence with an explanatory address by the Chairman.

4.   All Super Senior Third Ranking Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Super Senior ECSL Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.   A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior ECSL Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR ECSL COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Super Senior ECSL Compromise as set out in the ECSL Proposal at page 916 of the Proposal Document be and is hereby approved by the Super Senior Third Ranking Creditors in terms of section 155(6) of the Companies Act on the basis that the Super Senior ECSL Compromise will take effect on and as from the Compromise Effective Date.*"

The Super Senior ECSL Compromise will have been adopted by the Super Senior Third Ranking Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date held by Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super Senior ECSL Meeting.

6.   Proxy Form**:**

6.1.   Each Super Senior Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Super Senior ECSL Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2.   If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit one Proxy Form as regards all its Compromise Claims.

6.3.   You may use one Proxy Form for all Compromise Meetings.

6.4.   Super Senior Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.5.   The Proxy Form is attached to this Proposal Document at page 670.

6.6.   It is important that you read the Proxy Form carefully for information about the Super Senior ECSL Compromise and that you complete and return it in accordance with the instructions contained in it.

7.   Account Holder Letter:

7.1.   Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2.   If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for all Compromise Notes that it holds.

7.3.   You may use one Account Holder Letter for all Compromise Meetings.

7.4.   Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5.   The Account Holder Letter is attached to this Proposal Document at page 705.

7.6.   In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior ECSL Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7.   It is important that you read the Account Holder Letter carefully for information about the Super Senior ECSL Compromise and that you complete and return it in accordance with the instructions contained in it.

8.   Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior ECSL Meeting–

8.1.   the Lock-Up Agreement;

8.2.   the Amendment Agreement;

8.3.   the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Super Senior 2019 Notes Indenture; and

8.6.    the Super Senior Term Loan Agreement.


By order of the board of directors of ECSL


_____


**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDGARS CONSOLIDATED STORES LIMITED**

12 December 2016

**EDCON ACQUISITION PROPRIETARY LIMITED**
Incorporated in South Africa
(Registration Number 2007/000518/07)

_____

_____

**NOTICE BY THE BOARD OF DIRECTORS OF BIDCO TO THE SUPER SENIOR THIRD RANKING**

**CREDITORS OF THE SUPER SENIOR BIDCO MEETING**

_____

_____

1. Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice of meeting and, in particular, in the resolution set out below.

2. Notice is hereby given to all Super Senior Third Ranking Creditors of Bidco and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Super Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held the offices of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 15h15 (Johannesburg time) on 29 December 2016, or as soon as the Super Senior ECSL Meeting convened for the same date and place is concluded or adjourned, for the purpose of considering, and if deemed fit, the Super Senior Bidco Resolution more fully set out below with or without modification.

3. The meeting will commence with an explanatory address by the Chairman.

4. All Super Senior Third Ranking Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Super Senior Bidco Meeting. Forms of identification include valid identity documents, driver's licenses and passports.

5. A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior Bidco Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR BIDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Super Senior Bidco Compromise as set out in the Bidco Proposal at page 1019 of the Proposal Document be and is hereby approved by the Super Senior Third Ranking Creditors in terms of section 155(6) of the Companies Act on the basis that the Super Senior Bidco Compromise will take effect on and as from the Compromise Effective Date.*"

The Super Senior Bidco Compromise will have been adopted by the Super Senior Third Ranking Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date held by Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super Senior Bidco Meeting.

6. Proxy Form**:**

6.1. Each Super Senior Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Super Senior Bidco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

6.2. If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit one Proxy Form as regards all its Compromise Claims.

6.3. You may use one Proxy Form for all Compromise Meetings.

6.4. Super Senior Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

6.5. The Proxy Form is attached to this Proposal Document at page 670.

6.6. It is important that you read the Proxy Form carefully for information about the Super Senior Bidco Compromise and that you complete and return it in accordance with the instructions contained in it.

7. Account Holder Letter:

7.1. Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

7.2. If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for all Compromise Notes that it holds.

7.3. You may use one Account Holder Letter for all Compromise Meetings.

7.4. Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

7.5. The Account Holder Letter is attached to this Proposal Document at page 705.

7.6. In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior Bidco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies the Proposal Document in accordance with the instructions printed thereon as soon as possible.

7.7. It is important that you read the Account Holder Letter carefully for information about the Super Senior Bidco Compromise and that you complete and return it in accordance with the instructions contained in it.

8. Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or [jpritipaul@ensafrica.com](mailto:jpritipaul@ensafrica.com) to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior Bidco Meeting–

8.1. the Lock-Up Agreement;

8.2. the Amendment Agreement;

8.3. the Accession Letter;

8.4.    the Existing Intercreditor Agreement;

8.5.    the Super Senior 2019 Notes Indenture; and

8.6.    the Super Senior Term Loan Agreement.

By order of the board of directors of Bidco

_____

**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDCON ACQUISITION PROPRIETARY LIMITED**

12 December 2016

**EDCON HOLDINGS LIMITED**
Incorporated in South Africa
(Registration Number 2006/036903/06)

_____

_____

**NOTICE BY THE BOARD OF DIRECTORS OF HOLDCO TO THE SUPER SENIOR THIRD RANKING**

**CREDITORS OF THE SUPER SENIOR HOLDCO MEETING**

_____

_____

1.    Where appropriate and applicable, the terms defined in the Proposal Document to which this notice is attached and forms part of, will bear the same meanings in this notice of meeting and, in particular, in the resolution set out below.

2.    Notice is hereby given to all Super Senior Third Ranking Creditors of Holdco and to the Commission in terms of section 155(2) of the Companies Act that a meeting of the Super Senior Third Ranking Creditors, under the chairmanship of the Chairman, will be held at the offices of Edward Nathan Sonnenbergs at 150 West Street, Sandton, South Africa at 15h30 (Johannesburg time) on 29 December 2016, or as soon as the Super Senior Bidco Meeting convened for the same date and place is concluded or adjourned, for the purpose of considering, and if deemed fit, the Super Senior Holdco Resolution more fully set out below with or without modification.

3.    The meeting will commence with an explanatory address by the Chairman.

4.    All Super Senior Third Ranking Creditors (including their proxies) are required to provide reasonably satisfactory identification before being entitled to attend or participate in the Super Senior Holdco Meeting.  Forms of identification include valid identity documents, driver's licenses and passports.

5.    A Person that is not a Super Senior Third Ranking Creditor, or does not hold a valid proxy for any Super Senior Third Ranking Creditor, will not be permitted access to the Super Senior Holdco Meeting, save with the consent of the Chairman.

**RESOLUTION – APPROVAL OF THE SUPER SENIOR HOLDCO COMPROMISE IN TERMS OF SECTION 155(6) OF THE COMPANIES ACT**

"*Resolved that the Super Senior Holdco Compromise as set out in the Holdco Proposal at page 1123 of the Proposal Document be and is hereby approved by the Super Senior Third Ranking Creditors in terms of section 155(6) of the Companies Act on the basis that the Super Senior Holdco Compromise will take effect on and as from the Compromise Effective Date.*"

The Super Senior Holdco Compromise will have been adopted by the Super Senior Third Ranking Creditors if it is approved by a majority in number of the Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the aggregate principal amount of the Compromise Claims outstanding at the Record Date held by Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super Senior Holdco Meeting.

6. Proxy Form**:**

    6.1. Each Super Senior Term Loan Lender must ensure that if it does not intend to attend (or have its Designated Recipient attend) the Super Senior Holdco Meeting, a Proxy Form is completed, executed and delivered to the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

    6.2. If a Compromise Lender is both a Senior Secured Term Loan Lender and a Super Senior Term Loan Lender, it must submit one Proxy Form as regards all its Compromise Claims.

    6.3. You may use one Proxy Form for all Compromise Meetings.

    6.4. Super Senior Term Loan Lenders requiring any assistance in completing a Proxy Form should contact the Information Agent using the contact details in the Proxy Form.

    6.5. The Proxy Form is attached to this Proposal Document at page 670.

    6.6. It is important that you read the Proxy Form carefully for information about the Super Senior Holdco Compromise and that you complete and return it in accordance with the instructions contained in it.

7. Account Holder Letter:

    7.1. Each Super Senior 2019 Noteholder must ensure that an Account Holder Letter is completed, executed and delivered to and received by the Information Agent before the Voting Instruction Deadline in order for it (or, if applicable, its Designated Recipient) to vote.

    7.2. If a Super Senior 2019 Noteholder holds Super Senior 2019 Notes and Senior Secured Notes, it must only submit **one** Account Holder Letter per Account Holder for all Compromise Notes that it holds.

    7.3. You may use one Account Holder Letter for all Compromise.

    7.4. Account Holders requiring any assistance in completing Account Holder Letters should contact the Information Agent using the contact details in the Account Holder Letter.

    7.5. The Account Holder Letter is attached to this Proposal Document at page 705.

    7.6. In relation to the Super Senior 2019 Noteholders only, whether or not you intend to attend the Super Senior Holdco Meeting, you are requested to ensure that your Account Holder completes, executes and returns the Account Holder Letter which accompanies the Proposal Document in accordance with the instructions printed thereon as soon as possible.

    7.7. It is important that you read the Account Holder Letter carefully for information about the Super Senior Holdco Compromise and that you complete and return it in accordance with the instructions contained in it.

8. Copies of the following documents will be available for inspection at the office of Edward Nathan Sonnenbergs, 150 West Street, Sandton (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or jpritipaul@ensafrica.com to make arrangements)during normal business hours (being 08h30 – 17h00) (Johannesburg time) on Business Days up to, and including the Business Day immediately preceding the date of the Super Senior Holdco Meeting–

    8.1. the Lock-Up Agreement;

    8.2. the Amendment Agreement;

8.3.    the Accession Letter;
8.4.    the Existing Intercreditor Agreement;
8.5.    the Super Senior 2019 Notes Indenture; and
8.6.    the Super Senior Term Loan Agreement.


By order of the board of directors of Holdco


_____


**RICHARD VAUGHAN, CHIEF FINANCIAL OFFICER**

on behalf of the board of directors of

**EDCON HOLDINGS LIMITED**

12 December 2016

**EDCON LIMITED**
Incorporated in South Africa
(Registration number: 2007/003525/06)
**EDCON ACQUISITION PROPRIETARY LIMITED**
Incorporated in South Africa
(Registration Number 2007/000518/07)
**EDGARS CONSOLIDATED STORES LIMITED**
Incorporated in South Africa
(Registration Number 1946/022751/06)
**EDCON HOLDINGS LIMITED**
Incorporated in South Africa
(Registration Number 2006/036903/06)

---

**PROXY FORM FOR USE BY COMPROMISE LENDERS ONLY**

---

**PROXY FORM**

**For use by Compromise Lenders in respect of**

1.    the "**Senior Secured Term Loans**", namely the term loans lent and advanced to the Company under the term loan facility agreement dated 28 March 2013 and as amended and restated from time to time made between, among others, Holdco, the Company and the Senior Secured Term Loan Lenders; and

2.    the "**Super Senior Term Loans**", namely the term loans lent and advanced to the Company under the super senior term loan agreement on or around 27 November 2015 and made between, among others, Holdco and its subsidiaries named therein and the Super Senior Term Loan Lenders,

owing by

**EDCON LIMITED**
Incorporated in the Republic of South Africa
(Registration Number: 2007/003525/06)
("**Company**")

in relation to

each Compromise Company's proposal pursuant to the provisions of section 155 of the Companies Act relating to an arrangement or compromise of certain of such Compromise Company's financial obligations in respect of the Senior Secured Creditors and the Super Senior Third Ranking Creditors.

1.    Unless the contrary intention clearly appears, capitalised terms used in this Proxy Form but not defined in it have the same meaning as given to them in the section entitled "*Definitions*" in the Proposal Document to which this Proxy Form is attached.

2.    The Senior Secured Company Compromises, Senior Secured ECSL Compromises, Senior Secured Bidco Compromises and the Senior Secured Holdco Compromises will, if implemented, materially affect the Senior Secured Term Loan Lenders.

3.    The Super Senior Company Compromises, Super Senior ECSL Compromises, Super Senior Bidco Compromises and the Super Senior Holdco Compromises will, if implemented, materially affect the Super Senior Term Loan Lenders.

4.    All of the Compromises are inter-conditional on each other, such that if one Compromise is not validly approved then no Compromise will become unconditional and binding on the Compromise Creditors.

5.    Compromise Lenders must use this Proxy Form to register details of their interests in the Compromise Claims and to make certain elections in relation to the relevant Compromise and the New Money Notes Offer.

6.    **The New Notes will only be eligible for clearing and settlement through Euroclear and Clearstream. It is highly recommended that Compromise Lenders open an account with either Euroclear or Clearstream to receive their New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes, without delay.**

7.    **The Voting Instruction Deadline is 16h00 on 23 December 2016.**

**THIS PROXY FORM HAS 6 PARTS.**

1.    **IN ALL CASES PART 1 OF THIS PROXY FORM MUST BE COMPLETED. ONLY COMPLETE PROXY FORMS WILL BE TAKEN INTO CONSIDERATION. PARTIALLY**

**COMPLETED PROXY FORMS WILL BE DISREGARDED. EMAIL VERSIONS OF THIS PROXY FORM ARE SUFFICIENT – ORIGINALS ARE NOT REQUIRED.**

**IN ADDITION:**

2. **IN ORDER TO VOTE**

   **Part 2 of this Proxy Form**: In order to vote in respect of the relevant Compromise, Part 2 (*Voting Instructions*) of this Proxy Form must be completed and, together with the others parts of this Proxy Form, be received by the Information Agent by email by no later than the Voting Instruction Deadline. Proxy Forms received after the Voting Instruction Deadline will not constitute valid voting instructions for the purposes of the relevant Compromise.

   **For the avoidance of doubt, any Compromise Lender who ticks the box marked "No" in paragraph D of Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form to indicate its status as an Ineligible Creditor will still be entitled to vote in respect of the relevant Compromise, irrespective of its status as an Ineligible Creditor.**

3. **IN ORDER TO ELECT TO RECEIVE NEW HOLDCO 2 PIK B NOTES DENOMINATED IN USD OR ZAR**

   **Part 3 of this Proxy Form:** In order to elect to receive New Holdco 2 PIK B Notes denominated in USD or ZAR in respect of the Senior Secured Company Compromise, Part 3 (*New Holdco 2 PIK B Notes Currency Election*) of this Proxy Form must be completed and, together with the other parts of this Proxy Form, must be received by the Information Agent by email by no later than the Voting Instruction Deadline. Proxy Forms received after the Voting Instruction Deadline will not constitute valid currency elections for the purposes of the Senior Secured Company Compromise.

4. **IN ORDER TO ELECT TO PARTICIPATE IN THE NEW MONEY NOTES OFFER AND TO ELECT TO SUBSCRIBE FOR NEW HOLDCO 2 ORDINARY B SHARES OR CVRS**

   **Part 4 of this Proxy Form:** In order to elect to subscribe for any New Money Notes and to elect to subscribe for New Holdco 2 Ordinary B Shares or CVR in accordance with the New Money Notes Offer, Part 4 (*New Money Notes Offer*) of this Proxy Form must be completed and, together with the other parts of this Proxy Form, must be received by the Information Agent by email by no later than the Voting Instruction Deadline. Such delivery will constitute an irrevocable offer by the relevant Compromise Lender to subscribe for New Money Notes and to subscribe for New Holdco 2 Ordinary B Shares or CVR pursuant to the New Money Notes Offer (if Part 4 (*New Money Notes Offer*) is validly completed in full).

   If Part 4 (*New Money Notes Offer*) of this Proxy Form is completed, Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form must also be completed so as to confirm that the Compromise Lender is an Eligible Creditor or, if the Compromise Lender has appointed a Designated Recipient, its Designated Recipient is an Eligible Person.

**Evidence required**

The Escrow Agent will require evidence of the party's:

1.  registered company/firm number;

2.  registered full company/firm name (including "limited", "plc", "LLP", "LLC", etc.);

3.  names of directors, partners or principals;

4.  registered company/firm address; and

5.  the names of individuals who control or own 25% or more of its shares or voting rights.

As funding for any New Money Notes will require Compromise Lenders to wire funds directly to the US Dollar account of the Escrow Agent, certain "Know Your Customer " requirements are required as below:

**ANY COMPROMISE LENDER, OR ITS DESIGNATED RECIPIENT, WHO ELECTS TO PARTICIPATE IN THE NEW MONEY NOTES OFFER MUST COMPLY WITH SUCH "KNOW YOUR CUSTOMER" REQUIREMENTS AND PROVIDE SATISFACTORY EVIDENCE TO THE INFORMATION AGENT BY EMAIL OR FACSIMILE WHEN SUBMITTING THIS PROXY FORM. PROXY FORMS RECEIVED FROM COMPROMISE LENDERS WITHOUT SUCH "KNOW YOUR CUSTOMER" DOCUMENTS WILL BE REJECTED.**

5.  **IN ORDER TO APPOINT A DESIGNATED RECIPIENT, RECEIVE THE RELEVANT COMPROMISE CONSIDERATION, AND, IF APPLICABLE, RECEIVE THE RELEVANT NEW MONEY NOTES (TOGETHER WITH NEW HOLDCO 2 ORDINARY B SHARES OR CVRs)**

**Part 5 of this Proxy Form**: In order to (if applicable) appoint a Designated Recipient who is an Eligible Person to receive the relevant Compromise Consideration pursuant to the terms of the relevant Compromise; and (if applicable) to receive the relevant New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, pursuant to the terms of the New Money Notes Offer on the Completion Date, Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Proxy Form must be completed, and, together with the other parts of this Proxy Form, must be received by the Information Agent by email by no later than the Voting Instruction Deadline.

6.  **IN ALL CASES PART 6 OF THIS PROXY FORM SHOULD BE COMPLETED.**

**Part 6 of this Proxy Form**: In order to be valid, this Proxy Form must be signed by the Compromise Lender.

**You do not need to submit multiple copies of a Proxy Form if you hold separate Compromise Claims.  You are strongly encouraged (to ensure a smooth and orderly process) to only submit ONE Proxy Form which details the interests of all the Compromise Claims you hold – regardless of the class that such Compromise Claim falls in.  In addition, the ONE Proxy Form you submit above will also be valid for voting purposes at each of the Guarantor Meetings.**
**Before you complete the Proxy Form, you are strongly advised to read the Proposal Document and the Explanatory Statement attached hereto and, in particular, Part F**

(*Instructions and guidance for Compromise Creditors*) of the Explanatory Statement which contains detailed information on the various elections and instructions contained in this Proxy Form.

If the Compromise Effective Date occurs, the Compromises will become effective and binding on all Compromise Creditors, regardless of whether you voted in favour or against the relevant Compromise or abstained from voting. The Compromise Consideration and the New Notes, New Holdco 2 Ordinary B Shares or CVRs, as the case may be, will be issued on the Completion Date.

This Proxy Form and any non-contractual obligations arising out of or in relation to this Proxy Form shall be governed by, and interpreted in accordance with, South African law.

**FOR ASSISTANCE CONTACT THE INFORMATION AGENT:**

**Lucid Issuer Services Limited**

**Tankerton Works**

**12 Argyle Walk**

**London WC1H 8HA**

**United Kingdom**

**www.lucid-is.com/edconAttention: Paul Kamminga**

**Telephone: +44 20 7704 0880**

**Facsimile: + 44 20 3004 1590**

**Email: edcon@lucid-is.com**

**TO BE VALID IN ALL RESPECTS, THE PROXY FORM MUST BE DULY COMPLETED AND DELIVERED SO AS TO BE RECEIVED BY THE INFORMATION AGENT PRIOR TO THE VOTING INSTRUCTION DEADLINE. IF IT IS RECEIVED AFTER THE VOTING INSTRUCTION DEADLINE, IT WILL NOT CONSTITUTE VALID VOTING INSTRUCTIONS FOR THE PURPOSES OF THE RELEVANT COMPROMISE NOR WILL ANY OF THE ELECTIONS MADE HEREUNDER BE VALID (SUCH AS THE NEW HOLDCO 2 PIK B NOTES CURRENCY ELECTION, THE NEW MONEY NOTES OFFER (AND CONCOMITANT NEW HOLDCO 2 ORDINARY B SHARES OR CVRs, AS THE CASE MAY BE)). ANY DULY COMPLETED PROXY FORMS SUBMITTED AFTER THE VOTING INSTRUCTION DEADLINE, BUT BEFORE THE EXPIRY OF THE HOLDING PERIOD, WILL BE DEALT WITH AS SET OUT IN THE EXPLANATORY STATEMENT AND THE DISTRIBUTION AGREEMENT.**

**PART 1**: **COMPROMISE LENDER AND HOLDING DETAILS AND CONFIRMATIONS**

**SECTION 1: COMPROMISE LENDER DETAILS**

Please provide all information required below.
**You do not need to submit multiple copies of the Proxy Form if you hold separate beneficial holdings of/interests in multiple Compromise Claims.   You are strongly encouraged (to ensure a smooth and orderly process) to only submit <u>ONE</u> Proxy Form which details the interests of all the Compromise Claims you hold – regardless of the class that such Compromise Claim falls in.  In addition, the <u>ONE</u> Proxy Form you submit above will also be valid for voting purposes at each of the Guarantor Meetings.**
**To be completed for all Compromise Lenders:**

| | |
|---|---|
| Full Name of Compromise Lender | |
| Country2 | |
| E-mail Address | |
| Telephone Number (with country code) | |

**To be completed if the Compromise Lender is an institution:**

| | |
|---|---|
| Jurisdiction of Incorporation of Compromise Lender | |
| Name of Authorised Employee or Representative of Compromise Lender | |

**To be completed if the Compromise Lender is an investment fund, managed account, discretionary account or similar over which a manager, adviser or general partner has discretionary authority:**

| | |
|---|---|
| Name of Investment Manager / Investment Adviser / General Partner | |

---

2 Enter the country in which its registered office is located. The Compromise Lender should refer to the section(s) entitled "Restrictions" in the Explanatory Statement.

## SECTION 2: HOLDING DETAILS

**If this Proxy Form is delivered before the Voting Instruction Deadline, the relevant Compromise Lender warrants and confirms that the Compromise Lender holds the following Compromise Claims to which this Proxy Form relates, and will continue to hold those Compromise Claims until the Completion Date.**

**If this Proxy Form is delivered after the Voting Instruction Deadline, the relevant Compromise Lender warrants and confirms that such Compromise Lender held the following Compromise Claims to which this Proxy Form relates on the Record Date.**

**Details of the Compromise Claims to which this Proxy Form relates**

| Type of Term Loan (indicate if Senior Secured Term Loan or Super Senior Term Loan) | Principal as at Record Date | Currency |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

## SECTION 3: COMPROMISE LENDER CONFIRMATIONS

**This Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form must be completed in all cases.**

**The Compromise Lender named below in Part 6 (*Execution of Proxy Form by Compromise Lender*) hereby confirms to the Company, New Holdco 2, New Holdco 1, the Existing Group, the Holding Period Trustee and the Information Agent as follows (tick "yes" or "no" as appropriate for each item):**

A.      that all authority conferred or agreed to be conferred pursuant to this Proxy Form and every obligation of the Compromise Lender under this Proxy Form (including any elections made in this Proxy Form) shall be binding upon the successors and assigns of the Compromise Lender (in the case of a corporation or institution) or the successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Compromise Lender (in the case of a natural person) and shall not be affected by, and shall survive, the insolvency, bankruptcy, dissolution, death or incapacity (as the case may be) of the Compromise Lender and that all of the information in this Proxy Form is complete and accurate:

| | |
|---|---|
| | Yes |
| | No |

B.      that, if this Proxy Form is submitted before the Voting Instruction Deadline, it will not transfer any of its Compromise Claims until the Completion Date.

| | |
|---|---|
| | Yes |
| | No |

C.      that it has the authority to (i) give the confirmations set out in this Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form (or, if the Compromise Lender has appointed a Designated Recipient/s, its Designated Recipient/s), (ii) identify the person who is to be the Designated Recipient/s of the relevant Compromise Consideration and the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, (iii) give, on behalf of its Designated Recipient (as applicable), the confirmation and request set out in Section 2 (*Delivery of the Relevant Compromise Consideration*) and Section 3 (*Delivery of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of Part 5 of this Proxy Form; (iv) make the election for the currency denomination of the New Holdco 2 PIK B Notes (if applicable) as set out in Part 3 (*New Holdco 2 PIK B Notes Currency Election*) of this Proxy Form; (v) make the election to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, on the terms of the New Money Notes Offer (if applicable) as set out in Part 4 (*New Money Notes Offer*) of this Proxy Form:

| | |
|---|---|
| | Yes |
| | No |

D.      By ticking the box below marked "Yes", the Compromise Lender confirms (or, if the Compromise Lender has appointed a Designated Recipient, its Designated Recipient) that it agrees that it, or the Designated Recipient (as applicable), shall be deemed to have made the representations, warranties and undertakings set out in paragraph 2 (*Securities law confirmations and undertakings*) of Schedule 1

(*Representations, Warranties and Undertakings*) of this Proxy Form (an "**Eligible Person**") in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and the Information Agent and the Holding Period Trustee as at the date on which this Proxy Form is delivered to the Information Agent or the Holding Period Trustee (as applicable), on the Voting Instruction Deadline (to the extent not already passed), and, to the extent the Completion Date has already occurred, the date on which the Holding Period Trustee transfers the relevant Compromise Consideration, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to the Compromise Lender. **If the Compromise Lender is unable to give the confirmation below, it must only tick the box below marked "No" below and (i) should contact the Information Agent or the Holding Period Trustee using the contact details set out in this Proxy Form for assistance; and (ii) the Compromise Lender will be deemed to be an Ineligible Creditor and will not receive the relevant Compromise Consideration to which it would otherwise be entitled under the terms of the relevant Compromise on the Completion Date or the date of distribution thereof by the Holding Period Trustee (in respect of Proxy Forms submitted after the Completion Date but before the expiry of the Holding Period).** For more details please see the section entitled "Overview of the Compromise" set out in the Explanatory Statement.

**Eligible Person**

|  | Yes |
|---|---|
|  | No |

By ticking the box above marked "No", the Compromise Lender (or, if the Compromise Lender has appointed a Designated Recipient, on behalf of such Designated Recipient) will still be entitled to (i) vote in respect of the relevant Compromise by completing Section 2 (*Voting Instructions*) of Part 2 of this Proxy Form; and (ii) express its election with respect to the currency denomination of the New Holdco 2 PIK B Notes to which it would otherwise be entitled by completing Part 3 (*New Holdco 2 PIK B Notes Currency Election*) of this Proxy Form.

**A Compromise Lender who is unable to confirm "yes" in respect of any of paragraphs A to D above should contact the Information Agent or Holding Period Trustee using the contact details set out in this Proxy Form for assistance.**

PART 2:

## SECTION 1: VOTING INSTRUCTIONS

**By ticking any of relevant boxes below, the Compromise Lender confirms that it (or, if the Compromise Lender has appointed a Designated Recipient, its Designated Recipient) confirms, agrees and represents or is deemed to have confirmed, agreed or represented the statements set out in paragraph 1 (*Voting Representations, Warranties and Undertakings*) of Schedule 1 (*Representations, Warranties and Undertakings*) of this Proxy Form in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and the Information Agent as at the date on which this Proxy Form is received by the Information Agent. If the Compromise Lender is unable to give the aforesaid confirmations, it must contact the Information Agent or the Holding Period Trustee using the contact details set out in this Proxy Form for assistance.**

**For the avoidance of doubt, any Compromise Lender who ticks the box marked "No" in paragraph D of Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form to indicate its status as an Ineligible Creditor will still be entitled to vote in respect of the relevant Compromise below, irrespective of its status as an Ineligible Creditor.**

**A.      Attendance at each relevant Compromise Meeting**

**Tick only ONE of the boxes below.**

The Compromise Lender wishes –

|  | |
|---|---|
|  | to appoint the Chairman as its proxy to attend and vote on its behalf at each of the relevant Compromise Meetings [**if this box is ticked, please continue to paragraph B (*Appointment of proxy and voting instructions to proxy*) below**]; |
|  | to appoint a proxy (other than the Chairman) to attend and vote on its behalf at each of the relevant Compromise Meetings [**if this box is ticked, please continue to paragraph B (*Appointment of proxy and voting instructions to proxy*) below**]; or |
|  | to attend and vote at each of the relevant Compromise Meetings in person or by a duly authorised representative, if a company or other corporation [**if this box is ticked, please skip to paragraph C (*Indication of voting intention*) below**]. |

**B.      Appointment of proxy and voting instructions to proxy**

**Tick only ONE of the boxes below.**

The Compromise Lender wishes to appoint (and the Compromise Lender is hereby authorised to appoint on its behalf) –

|  | |
|---|---|
|  | the Chairman; (tick box if appropriate); or |
|  | the following individual (tick box if appropriate and fill in the details immediately below); |

| | |
|---|---|
| Name | |
| Address | |
| Passport number | |
| **or failing him** ("**Alternate 1**")**:** | |
| Name | |
| Address | |
| Passport number | |
| **or failing Alternate 1:** the Chairman | |

as its proxy for each Compromise Meeting and wishes its proxy to vote for the relevant Compromise as set out below:

**Senior Secured Company Compromise - Tick only ONE of the boxes below.**

| | |
|---|---|
| | **FOR** the Senior Secured Company Compromise, with or without modification; or |
| | **AGAINST** the Senior Secured Company Compromise |

**Senior Secured ECSL Compromise - Tick only ONE of the boxes below.**

| | |
|---|---|
| | **FOR** the Senior Secured ECSL Compromise, with or without modification; or |
| | **AGAINST** the Senior Secured ECSL Compromise |

**Senior Secured Bidco Compromise - Tick only ONE of the boxes below.**

| | |
|---|---|
| | **FOR** the Senior Secured Bidco Compromise, with or without modification; or |
| | **AGAINST** the Senior Secured Bidco Compromise |

**Senior Secured Holdco Compromise - Tick only ONE of the boxes below.**

| | |
|---|---|
| | **FOR** the Senior Secured Holdco Compromise, with or without modification; or |
| | **AGAINST** the Senior Secured Holdco Compromise |

**Super Senior Company Compromise - Tick only ONE of the boxes below.**

| | |
|---|---|
| | **FOR** the Super Senior Company Compromise, with or without modification; or |
| | **AGAINST** the Super Senior Company Compromise |

**Super Senior ECSL Compromise - Tick only ONE of the boxes below.**

| | |
|---|---|
| | **FOR** the Super Senior ECSL Compromise, with or without modification; or |
| | **AGAINST** the Super Senior ECSL Compromise |

**Super Senior Bidco Compromise - Tick only ONE of the boxes below.**

| | **FOR** the Super Senior Bidco Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Super Senior Bidco Compromise |

**Super Senior Holdco Compromise - Tick only ONE of the boxes below.**

| | **FOR** the Super Senior Holdco Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Super Senior Holdco Compromise |

**C.      Indication of voting intention**

The Compromise Lender wishes to vote at the relevant Compromise Meeting as follows. The Compromise Lender understands that this expression of intention is not binding and that it may vote as it sees fit at the Compromise Meeting (provided the authorised representative of a Compromise Lender wishing to attend the relevant Compromise Meeting must bring his or her passport to the relevant Compromise Meeting):

**Senior Secured Company Compromise - Tick only ONE of the boxes below.**

| | **FOR** the Senior Secured Company Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Senior Secured Company Compromise |

**Senior Secured ECSL Compromise - Tick only ONE of the boxes below.**

| | **FOR** the Senior Secured ECSL Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Senior Secured ECSL Compromise |

**Senior Secured Bidco Compromise - Tick only ONE of the boxes below.**

| | **FOR** the Senior Secured Bidco Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Senior Secured Bidco Compromise |

**Senior Secured Holdco Compromise - Tick only ONE of the boxes below.**

| | **FOR** the Senior Secured Holdco Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Senior Secured Holdco Compromise |

**Super Senior Company Compromise - Tick only ONE of the boxes below.**

| | **FOR** the Super Senior Company Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Super Senior Company Compromise |

**Super Senior ECSL Compromise - Tick only ONE of the boxes below.**

|  | **FOR** the Super Senior ECSL Compromise, with or without modification; or |
|---|---|
|  | **AGAINST** the Super Senior ECSL Compromise |

**Super Senior Bidco Compromise - Tick only ONE of the boxes below.**

|  | **FOR** the Super Senior Bidco Compromise, with or without modification; or |
|---|---|
|  | **AGAINST** the Super Senior Bidco Compromise |

**Super Senior Holdco Compromise - Tick only ONE of the boxes below.**

|  | **FOR** the Super Senior Holdco Compromise, with or without modification; or |
|---|---|
|  | **AGAINST** the Super Senior Holdco Compromise |

**PART 3A**

**(NEW HOLDCO 1 A-1 PIK NOTES (IN CASE OF NEW MONEY PROVIDERS), NEW HOLDCO 2 PIK A NOTES (IN THE CASE OF SUPER SENIOR THIRD RANKING CREDITORS) AND NEW HOLDCO 2 PIK B NOTES (IN CASE OF SENIOR SECURED CREDITORS) AND  ELECTION OF FORM OF NOTES TO BE RECEIVED (tick only one of the boxes below as appropriate).**

By ticking one of the three following boxes, the Compromise Lender expressly acknowledges and confirms that it is aware of the representations, warranties and undertakings set forth in Schedule 1 (*Representation, Warranties and Undertakings*) and that based on the representations, warranties and undertakings in such Schedule 1, it is eligible to make the election set forth in this Part 3A.

By ticking one of the three following boxes, the Compromise Lender expressly confirms, represents and warrants that (i) in the case of ticking the Regulation S Notes box, it a person that is not a "U.S. person" as defined in Regulation S under the U.S. Securities Act, acquiring the Regulation S Notes in reliance on the exemption from registration pursuant to Regulation S under the U.S. Securities Act, and acquiring the Regulation S Notes for its own account or for one or more managed accounts, each of which is a non-U.S. Person and as to each of which it exercises sole investment discretion, or (ii) (A) in the case of ticking the 144A Notes box, (x) it is a "qualified institutional buyer" as defined in Rule 144A under the U.S. Securities Act or (y) in the case of ticking the IAI Notes box, it is an institutional "accredited investor" as defined in Rule 501(A)(1), (2), (3) or (7) under the U.S. Securities Act, (B) it is aware that the sale of the 144A Notes and the IAI Notes, as applicable, to it is being made in reliance on one or more exemptions from registration under the U.S. Securities Act, including Section 4(a)(2) and Regulation D thereunder, and (c) it is acquiring the144A Notes or the IAI Notes, as applicable, for its own account or for one or more managed accounts, each of which is a "qualified institutional buyer" or an institutional "accredited investor" and as to each of which it exercises sole investment discretion.

| New Holdco 1 A-1 PIK Notes | |
|---|---|
| Regulation S Notes | |
| 144A Notes | |
| IAI Notes | |

| New Holdco 2 PIK A Notes | |
|---|---|
| Regulation S Notes | |
| 144A Notes | |

| IAI Notes | |
|-----------|--|

| **New Holdco 2 PIK B Notes** | |
|------------------------------|--|
| Regulation S Notes | |
| 144A Notes | |
| IAI Notes | |

## PART 3B (*NEW HOLDCO 2 PIK B NOTES CURRENCY ELECTION*)

**THIS PART 3 IS ONLY APPLICABLE TO SENIOR SECURED CREDITORS – SENIOR SECURED CREDITORS ARE AFFORDED AN ELECTION AS TO WHETHER THE NEW HOLDCO 2 PIK B NOTES TO BE ISSUED TO THEM PURSUANT TO THE SENIOR SECURED COMPANY COMPROMISE SHOULD BE DENOMINATED IN USD OR ZAR.**

**EVEN IF A SENIOR SECURED CREDITOR WISHES TO VOTE AGAINST THE SENIOR SECURED COMPANY COMPROMISE, IT IS IN THE SENIOR SECURED CREDITOR'S BEST INTERESTS TO COMPLETE AND DELIVER THIS PART 3 TO THE INFORMATION AGENT USING THE CONTACT DETAILS SET OUT BELOW TO BE RECEIVED BY THE INFORMATION AGENT BY NO LATER THAN THE VOTING INSTRUCTION DEADLINE, BECAUSE THE SENIOR SECURED COMPANY COMPROMISE MAY NEVERTHELESS BE VALIDLY APPROVED BY THE NECESSARY MAJORITIES OF THE SENIOR SECURED CREDITORS AND BECOME BINDING ON ALL SENIOR SECURED CREDITORS.**

**PROXY FORMS RECEIVED AFTER THE VOTING INSTRUCTION DEADLINE WILL NOT CONSTITUTE A VALID CURRENCY ELECTION FOR THE PURPOSES OF THE SENIOR SECURED COMPANY COMPROMISE AND THEREFORE THE DEFAULT ELECTION SHALL APPLY TO YOUR SUBSCRIPTION OF NEW HOLDCO 2 PIK B NOTES AS SET OUT BELOW.**

**IF YOU LEAVE THIS PART 3 (*NEW HOLDCO 2 PIK B NOTES CURRENCY ELECTION*) BLANK, THE DEFAULT ELECTION SHALL APPLY TO YOUR SUBSCRIPTION OF NEW HOLDCO 2 PIK B NOTES AS SET OUT BELOW.**

**For the avoidance of doubt, any Compromise Lender who ticks the box marked "No" in paragraph D of Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form to indicate its status as an Ineligible Creditor will still be entitled to elect the currency of the New Holdco 2 PIK B Notes to which it would otherwise be entitled in paragraph C below, irrespective of its status as an Ineligible Creditor.**

A.    The Compromise Lender named in Part 6 (*Execution of Proxy Form by Compromise Lender*) confirms to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and the Information Agent that, in relation to the Compromise Claims identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form and which form part of the

Senior Secured Company Compromise, the Compromise Lender has the authority to make the election set out in this Part 3 (*New Holdco 2 PIK B Notes Currency Election*) below (tick "yes" or "no" as appropriate).

|  | Yes |
|--|-----|
|  | No |

B.  **[For Eligible Creditors]** Compromise Lenders who are Eligible Creditors subject to the Senior Secured Company Compromise, by ticking the appropriate box below, will receive New Holdco 2 PIK B Notes denominated in the currency which corresponds to the box ticked below. Should no election be made, such Compromise Lenders will receive, by default, New Holdco 2 PIK B Notes denominated in USD on the Completion Date:

|  | USD |
|--|-----|
|  | ZAR |

C.  **[For Ineligible Creditors]** Compromise Lenders who are Ineligible Creditors subject to the Senior Secured Company Compromise, by ticking the appropriate box below, will designate the currency denomination of New Holdco 2 PIK B Notes to be delivered to the Holding Period Trustee in accordance with the currency election box ticked below. Should no election be made, the Holding Period Trustee will receive, by default, New Holdco 2 PIK B Notes denominated in USD on the Completion Date:

|  | USD |
|--|-----|
|  | ZAR |

## PART 4: NEW MONEY NOTES OFFER

### SECTION 1: ELECTION TO SUBSCRIBE

**To participate in the New Money Notes Offer, this Section 1 (*Election to Subscribe*) must be delivered to the Information Agent by no later than the Voting Instruction Deadline. If you do not wish to participate in the New Money Notes Offer, please leave this Section 1 (*Election to Subscribe*) blank.**

**The mechanics relating to the New Money Notes Offer is summarised in paragraph 10 (*New Money Notes Offer*) of Part B (*Explanation of a Compromise*) in the Explanatory Statement.  Your attention is also directed to the Restructuring Agreement, which is the principal document regulating the implementation of (amongst others) the New Money Notes Offer.**

**ALL SENIOR SECURED CREDITORS AND SUPER SENIOR THIRD RANKING CREDITORS WILL BE ENTITLED TO PARTICIPATE IN THE NEW MONEY NOTES OFFER. THE EXTENT OF EACH PARTICIPATING CREDITOR'S ENTITLEMENT TO SUBSCRIBE FOR NEW MONEY NOTES (AND CONCOMITANT NEW HOLDCO 2 ORDINARY B SHARES OR CVRS) IS DETERMINED BY REFERENCE TO THE RESTRUCTURING AGREEMENT. ALTERNATIVELY, YOU MAY SUBSCRIBE FOR UP TO YOUR PRO RATA PARTICIPATION SHARE OF THE NEW MONEY NOTES. YOU MAY ELECT A FIXED USD VALUE WHICH IS LESS THAN YOUR PRO RATA PARTICIPATION SHARE. AN EXAMPLE OF THE PRO RATA PARTICIPATION SHARE IS INCLUDED BELOW FOR INFORMATION PURPOSES ONLY.**

**A COMPROMISE LENDER IS ENTITLED TO PARTICIPATE IN THE NEW MONEY NOTES OFFER REGARDLESS OF WHETHER IT VOTES FOR OR AGAINST THE RELEVANT COMPROMISE. THE NEW MONEY NOTES OFFER IS CONDITIONAL ON ALL OF THE COMPROMISES BECOMING UNCONDITIONAL AND BINDING ON THE COMPROMISE CREDITORS.  IF YOU HAVE NOT ELECTED TO PARTICIPATE IN THE NEW MONEY NOTES OFFER, YOU WILL BE EXCLUDED FROM DOING SO IF YOU DID NOT MAKE YOUR ELECTIONS BELOW (EVEN IF YOU VOTE AGAINST THE RELEVANT COMPROMISE) AND SUBMIT SUCH PROXY FORM TO THE INFORMATION AGENT BY NOT LATER THAN THE VOTING INSTRUCTION DEADLINE.**

The Compromise Lender named in Part 6 (*Execution of Proxy Form by Compromise Lender*) of this Proxy Form hereby confirms to the Company, New Holdco 2, New Holdco 1, the Existing Group and the Information Agent that, in relation to the Compromise Claims identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form, the Compromise Lender has authority to make the elections and/or give the confirmations set out in this Section 1 (*Election to Subscribe*) below on behalf of the Compromise Lender (tick "yes" or "no" as appropriate).

|  | Yes |
|---|---|
|  | No |

Compromise Lenders who wish to elect to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, pursuant to the New Money Notes Offer and who procure that their Compromise Lender completes and returns this Section 1 (*Election to Subscribe*) will be issued New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with the terms of the New Money Notes

Offer on the Completion Date.

Compromise Lenders wishing to elect to subscribe for the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, pursuant to the New Money Notes Offer should ensure that a Proxy Form including a duly completed Section 1 (*Election to Subscribe*) Part 4 is received by the Information Agent by no later than the Voting Instruction Deadline, after which time any election received will not be valid.

Any issue of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, is subject to the eligibility confirmation being provided in Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form in respect of the Compromise Lender or its Designated Recipient (as applicable) at the same time as this Part 4 (*New Money Notes Offer*) of the Proxy Form is delivered to the Information Agent.

**Election in respect of New Money Notes**

Please tick the appropriate box below indicating the extent of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, that you elect to subscribe for. By ticking below, you irrevocably and unconditionally –

(a) agree to subscribe for the relevant New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, and to pay the corresponding subscription price attaching to such New Money Notes (with the New Holdco 2 Ordinary B Shares and CVRs being issued for no subscription consideration);

(b) agree to be bound by the terms of the Restructuring Agreement and instruct the Compromise Agent (on your behalf as a Participating Creditor) to execute the Restructuring Agreement; and

(c) instruct GLAS Trust Corporation Limited (as the putative the New Holdco 1 PIK A-1 Notes Trustee (on your behalf as a Participating Creditor)) to execute the Escrow Deed in substantially the form scheduled to the Restructuring Agreement.

| | |
|---|---|
| | I hereby elect to subscribe for my Pro Rata Participation Share of the USD Equivalent of approximately ZAR1.49 billion aggregate principal amount of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be |
| | I hereby elect to subscribe for the following fixed USD value of New Money Notes, and to receive the concomitant number of New Holdco 2 Ordinary B Shares or CVRs, as the case may be. [*If this box is ticked, then insert the relevant USD fixed value below which may not exceed your Pro Rata Participation Share of such New Money Notes*] |
| | **Fixed USD value:** $ _____ |

BY WAY OF EXAMPLE:

If a Compromise Creditor's total Compromise Claims are $x$, then it can subscribe for up to $(\frac{x}{Total\ Debt})$ x ZAR1.49billion). In this example, "Total Debt" means the aggregate

Compromise Claims held by all Compromise Creditors.  For further specificity, please see the calculations as set out in the Restructuring Agreement.

**Election in respect of New Holdco 2 Ordinary B Shares or CVRs**

Please tick the appropriate box below indicating whether you wish to subscribe for New Holdco 2 Ordinary B Shares or CVRs. By ticking, you irrevocably and unconditionally agree to subscribe for the New Holdco 2 Ordinary B Shares or CVRs, as the case may be, that you are entitled to subscribe for in terms of your aforesaid election as regards your allocation of the New Money Notes. If you fail to make any election (but provided that you have elected to subscribe for New Money Notes as aforesaid), then you will be issued your concomitant allocation of New Holdco 2 Ordinary B Shares.

| | New Holdco 2 Ordinary B Shares |
| --- | --- |
| | CVRs |

**Allocation Payments for New Money Notes**

The delivery and receipt of a valid Proxy Form with this Section 1 (*Election to Subscribe*) duly completed constitutes an irrevocable offer to New Holdco 1 and New Holdco 2 by the relevant Compromise Lender to subscribe for the relevant allocation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, as indicated above. The acceptance of this offer will be effected and evidenced by notification by New Holdco 1 to the relevant Compromise Lender of the relevant Compromise Lender's allocation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with the terms of the New Money Notes Offer.

The allocation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, the amount to be paid in respect of such allocation and instructions as to payments to be made to New Holdco 1 in respect of any New Money Notes issued to a Compromise Lender or its Designated Recipient shall be notified to the Compromise Lender by New Holdco 1 or the Information Agent prior to the Completion Date, in accordance with the terms of the Restructuring Agreement.

If this Section 1 (*Election to Subscribe*) had been completed, Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Proxy Form must also be completed.

**By completing any of relevant boxes above, the Compromise Lender (or, if the Compromise Lender has appointed a Designated Recipient, its Designated Recipient) confirms, agrees and represents or is deemed to have confirmed, agreed or represented the statements set out in paragraph 2 (*Securities law confirmations and undertakings*) of Schedule 1 (*Representations, Warranties and Undertakings*) of this Proxy Form in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and  the Information Agent as at the date on which this Proxy Form is received by the Information Agent.**

**ANY COMPROMISE LENDER, OR ITS DESIGNATED RECIPIENT, WHO ELECTS TO PARTICIPATE IN THE NEW MONEY NOTES OFFER MUST COMPLY WITH SUCH "KNOW YOUR CUSTOMER" REQUIREMENTS AND PROVIDE SATISFACTORY EVIDENCE TO THE INFORMATION AGENT BY EMAIL OR FACSIMILE WHEN SUBMITTING THIS PROXY FORM. PROXY FORMS RECEIVED FROM COMPROMISE LENDERS WITHOUT SUCH "KNOW YOUR CUSTOMER" DOCUMENTS WILL BE REJECTED.**

**PART 5**: **DESIGNATED RECIPIENT, DELIVERY OF THE RELEVANT COMPROMISE CONSIDERATION AND DELIVERY OF THE NEW MONEY NOTES AND NEW HOLDCO 2 ORDINARY B SHARES OR CVRS**

**IN ORDER TO APPOINT A DESIGNATED RECIPIENT, RECEIVE THE RELEVANT COMPROMISE CONSIDERATION IN ACCORDANCE WITH THE TERMS OF THE RELEVANT COMPROMISE ON THE COMPLETION DATE AND TO RECEIVE THE NEW MONEY NOTES AND NEW HOLDCO 2 ORDINARY B SHARES OR CVRS IN ACCORDANCE WITH THE TERMS OF THE NEW MONEY NOTES OFFER, THIS PART OF THE PROXY FORM MUST BE DELIVERED BY EMAIL TO THE INFORMATION AGENT USING THE CONTACT DETAILS SET OUT ABOVE AND MUST BE RECEIVED BY THE INFORMATION AGENT BY NO LATER THAN THE VOTING INSTRUCTION DEADLINE.**

Delivery of this Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs)* to the Information Agent or Holding Period Trustee after the Voting Instruction Deadline will be dealt with in accordance with the procedures set out in the Explanatory Statement.

**Any Designated Recipient must comply with the requirements set out in Section 1 (*Designated Recipient*) of Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs*) of this Proxy Form and confirm for itself, or for the Eligible Person on whose behalf it is acting, that it agrees that it, or such Eligible Person (as applicable), shall be deemed to have made the representations, warranties and undertakings set out in paragraph 1 (*Voting representations, warranties and undertakings*) and paragraph 2 (*Securities law confirmations and undertakings*) of Schedule 1 (*Representations, Warranties and Undertakings*) to this Proxy Form in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent and the Holding Period Trustee as at the date on which this Proxy Form is delivered to the Information Agent.**

## SECTION 1: DESIGNATED RECIPIENT

**Option to appoint Designated Recipient**
**IF A DESIGNATED RECIPIENT IS TO BE APPOINTED, THE COMPROMISE CONSIDERATION IN RESPECT OF THE SENIOR SECURED COMPANY COMPROMISE, BEING THE NEW HOLDCO 2 PIK B NOTES AND THE NEW HOLDCO 2 ORDINARY A SHARES, MAY ONLY BE ISSUED TO THE SAME DESIGNATED RECIPIENT.    ACCORDINGLY, YOU MAY ONLY NOMINATE THE SAME DESIGNATED RECIPIENT TO RECEIVE THE NEW HOLDCO 2 PIK B NOTES AND THE NEW HOLDCO 2 ORDINARY A SHARES.**
**SAVE AS AFORESAID, YOU MAY NOMINATE A DESIGNATED RECIPIENT FOR EACH SECURITY OR SHARE THAT YOU WILL BE ISSUED IN TERMS OF THE SUPER SENIOR COMPANY COMPROMISE AND (IF APPLICABLE) NEW MONEY NOTES OFFER, BY SUBMITTING MULTIPLE COMPLETED AND VALID COPIES OF THIS SECTION 1 (*DESIGNATED RECIPIENT*) TO THE INFORMATION AGENT BY NO LATER THAN THE VOTING INSTRUCTION DEADLINE.**

A Compromise Lender may nominate a Designated Recipient to whom, if such Compromise Lender is –
1.        a Senior Secured Creditor –
        1.1.        the New Holdco 2 PIK B Notes; and
        1.2.        the New Holdco 2 Ordinary A Shares;
2.        a Super Senior Third Ranking Creditor, the New Holdco 2 PIK A Notes; and/or
3.        a Participating Creditor under the New Money Notes Offer –
        3.1.        the New Money Notes; and
        3.2.        New Holdco 2 Ordinary B Shares or CVRs, as the case may be,
can be distributed on behalf of the Compromise Lender.  The details of the Designated Recipient/s, if applicable, must be completed below.

Does the Compromise Lender wish to nominate a Designated Recipient?

|  | **Yes** (Please provide details below) |
|---|---|
|  | **No** (Please now only complete Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*)) |

**DESIGNATED RECIPIENT DETAILS**

| | |
|---|---|
| **Type of security or share referenced in this Proxy Form to be issued to the Designated Recipient** | |
| Designated Recipient's Name | |
| Jurisdiction of incorporation | |
| Address of Designated Recipient | |
| City | |
| State | |
| Postal Code | |
| Country | |
| Contact Name: | |
| Telephone no. of Designated Recipient (with country code) | |
| E-mail of Designated Recipient | |

## SECTION 2: DELIVERY OF THE RELEVANT COMPROMISE CONSIDERATION

The Compromise Lender named below in Part 6 (*Execution of Proxy Form by Compromise Lender*) of this Proxy Form confirms, acknowledges and agrees to the Company, New Holdco 2, New Holdco 1, the Parent, Information Agent and Holding Period Trustee that, subject to the eligibility confirmation set out in Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form above having been provided, any –

1. New Holdco 2 PIK A Notes and/or New Holdco 2 PIK B Notes, as the case may be, to be delivered to the Compromise Lender (or, if applicable, its Designated Recipient) in connection with the relevant Compromise shall be delivered to the Clearing System Custody Account referred to in Part 6 (*Execution of Proxy Form by Compromise Lender*) of this Proxy Form; and

2. in respect of the Senior Secured Creditors only (and subject to the aforesaid eligibility confirmation), share certificates in respect of the New Holdco 2 A Ordinary Shares -

   2.1. in respect of Eligible Creditors or, if applicable, their Designated Recipient shall be –

      2.1.1. delivered to the relevant Eligible Creditor's Legal Advisers for distribution to the shareholders; or

      2.1.2. made available for collection at the registered offices of the Company, being Edgardale, 1 Press Avenue, Crown Mines, Johannesburg, 2025, Gauteng, South Africa; or

3. in respect of Ineligible Creditors and Non-Respondent Creditors, be delivered to the Holding Period Trustee to hold in accordance with the terms of the Distribution Agreement.

**SECTION 3: DELIVERY OF THE NEW MONEY NOTES AND NEW HOLDCO 2 ORDINARY B SHARES OR CVRS, AS THE CASE MAY BE**

The Compromise Lender named below in Part 6 (*Execution of Proxy Form by Compromise Lender*) of this Proxy Form confirms, acknowledges and agrees to the Company, New Holdco 2, New Holdco 1, the Parent, Information Agent and Holding Period Trustee that, subject to the eligibility confirmation set out in Section 3 (*Compromise Lender Confirmations*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form above having been provided, any -

1.  New Money Notes to be delivered to the Compromise Lender (or, if applicable, its Designated Recipient) in connection with the New Money Notes Offer shall be delivered to the Clearing System Custody Account referred to in Part 6 (*Execution of Proxy Form by Compromise Lender*) of this Proxy Form; and

2.  share certificates in respect of the New Holdco 2 Ordinary B Shares in the name of the Compromise Lender or, if applicable, its Designated Recipient in connection with the New Money Notes Offer shall be delivered to the Johannesburg office of Edward Nathan Sonnenbergs, Inc at 150 West Street, Sandton, Johannesburg, 2196, save for those share certificates relating to Participating Creditors that elected to receive New Holdco 2 Ordinary B Shares or who did not make any election and who opt, by written notice to the Company, to hold their share certificates directly; or

3.  CVRs and associated CVR certificates in the name of the Compromise Lender or, if applicable, its Designated Recipient in connection with the New Money Notes Offer (who elected to receive CVRs) shall be delivered to those Participating Creditors who elected to receive CVRs.

**PART 6: EXECUTION OF PROXY FORM BY COMPROMISE LENDER**

| | |
|---|---|
| *Settlement Details:*<br>Full name of Euroclear or Clearstream Account Holder | |
| Account Number of Account Holder or Participant at Clearing System<br>Contact Name of Account Holder or Participant at<br>Clearing System<br><br>Contact email of Account Holder or Participant at<br>Clearing System<br>Contact Telephone of Account Holder or Participant at Clearing System | |
| *Execution of Proxy Form by Compromise Lender:*<br>Authorised Employee of Compromise Lender (print name) | |
| Telephone no. of Authorised Employee (with country code) | |
| E-mail of Authorised Employee | |
| Authorised Employee Signature | |
| Date: | |
| Signature: | |

1.   By signing above, the Compromise Lender warrants and confirms that it has obtained all necessary consents, authorisations, approvals and/or permissions required to be obtained by it under the laws and regulations applicable to it in any jurisdiction in order to sign this Proxy Form.

2.   Before returning this Proxy Form or either part of this Proxy Form, please make certain that you have provided all the information requested.

3.   Acceptance of Part 5 (*Designated Recipient, Delivery of the relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Proxy Form by the Information Agent or the Holding Period Trustee (as applicable) is subject to receipt by the Information Agent or the Holding Period Trustee (as applicable) of evidence satisfactory to it that the Compromise Lender held the Compromise Claims to which Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Proxy Form relates on the Record Date.  The records held by the Super Senior Term Loan Agent and the Senior Secured Term Loan Agent shall constitute satisfactory evidence of the fact that the Compromise Lender held the Compromise Claims to which Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Proxy Form relates on the Record Date.

4.   Scanned, facsimile or pdf copies of this Proxy Form will be accepted and originals are

not required.

**Schedule 1**

**REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS**

1.      **Voting representations, warranties and undertakings**

1.1.    Each Compromise Lender which submits, delivers or procures the delivery of a Proxy Form represents, warrants and undertakes to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes and the Information Agent that:

1.1.1.    it has received, and has reviewed, the Proposal Document and the Explanatory Statement;

1.1.2.    it accepts and acknowledges the statements made in "Important Notice," "Important Securities Law Notice" and Part E (*Transfer Restrictions*) in the Explanatory Statement;

1.1.3.    it has complied with all laws and regulations applicable to it with respect to the Compromises and this Proxy Form;

1.1.4.    it is lawful to seek voting instructions and elections from that Compromise Lender in respect of the Compromises and/or the New Money Notes Offer;

1.1.5.    it is assuming all of the risks inherent in that Compromise Lender participating in the Compromises and/or New Money Notes Offer and has undertaken all the appropriate analysis of the implications of participating in the Compromises and/or the New Money Notes Offer for that Compromise Lender without relying on the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group or the Information Agent (other than any representations or warranties given in favour of that Compromise Lender by the Company, New Holdco 2, New Holdco 1, the Parent and the Existing Group under the Explanatory Statement and, if applicable, a Lock-up Agreement to which that Compromise Lender is a party);

1.1.6.    the Compromise Claims which are the subject of the Proxy Form are, at the time of delivery of such Proxy Form, held by it (and that Compromise Lender will use all reasonable endeavours to ensure that those Compromise Claims will continue to be so held up to and including the Completion Date);

1.1.7.    it has not given voting instructions or submitted a Proxy Form with respect to Compromise Claims other than those which are the subject of this Proxy Form;

1.1.8.    it agrees that it will, without delay, open an account with either Euroclear or Clearstream and designated such account to receives its New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes, as the case may be;

1.1.9.    it agrees to be bound by the terms of the Compromises from (and including) the RA Effective Date, regardless of whether it voted for or against the Compromises or abstained from voting, and agrees not to take any step, action or proceeding to challenge the Compromises or enforce the terms of the Compromise Claims in effect prior to the RA Effective Date unless permitted to do so

(and only to the extent permitted) by the Senior Secured Term Loan Agreements and/or Super Senior Term Loan Agreements;

1.1.10.  it empowers, authorises, requests and instructs its Representative, the trustees under the New Notes, the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent and any of their officers, employees or agents to do all such things as may be necessary or expedient to carry out or give effect to the Compromises, the New Money Notes Offer and the Financial Restructuring and it declares and acknowledges that:

1.1.10.1.  none of the trustees under the New Notes, the Information Agent, the Trustees or any of their officers, employees, agents and advisers (each a "**Relying Person**") will be held responsible for any liabilities or consequences arising directly or indirectly as a result of acts taken by them or pursuant to the Financial Restructuring (other than by reason of their fraud, gross negligence or wilful default which will not be the case if any Relying Person acts in accordance with the steps and instructions contemplated in the Restructuring Documents) and it further declares that none of the Relying Persons has responsibility for the terms of the Financial Restructuring, and

1.1.10.2.  it will not take any action or commence or pursue any proceeding or claim against any of the Relying Persons in respect of any claim it might have against any of them or in respect of any act or omission of any kind by any Relying Person in relation to the Financial Restructuring (other than by reason of their fraud, gross negligence or wilful default which will not be the case if such Relying Person acts in accordance with the steps and instructions contemplated in the Restructuring Documents), and it hereby expressly and unreservedly waives its rights to take such proceedings;

1.1.11.  neither the Information Agent, the Trustees nor any of their Affiliates, directors, officers or employees has made any recommendation to that Compromise Lender as to whether, or how, to vote in relation to the Compromises or its election, if any, with respect to the New Money Notes Offer, and that it has made its own decision with regard to voting in the Compromises and any subscriptions pursuant to the New Money Notes Offer, based on any legal, tax or financial advice that it has deemed necessary to seek;

1.1.12.  all authority conferred or agreed to be conferred pursuant to these representations, warranties and undertakings shall be binding on the successors and assigns of that Compromise Lender

(in the case of a corporation or institution) or the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of that Compromise Lender (in the case of a natural person) and shall not be affected by, and shall survive, the insolvency, bankruptcy, dissolution, death or incapacity (as the case may be) of that Compromise Lender; and

1.1.13.   no information has been provided to it by the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent, the Trustees or any of their respective Affiliates, directors, officers, advisers or employees with regard to the tax consequences to that Compromise Lender arising from voting in favour of the Compromises, and that it is solely liable for any taxes or similar payments imposed on it under the laws of any applicable jurisdiction as a result of voting in favour of the Compromises, and that it will not and does not have any right of recourse (whether by way of reimbursement, indemnity or otherwise) against the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent or any of their Affiliates, directors, officers, advisers or employees in respect of such taxes or similar payments.

1.2.   In relation to the Compromise Claims identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Lender and Holding Details and Confirmations*) of this Proxy Form, the Compromise Lender has the authority to give the voting instructions set out in Part 2 Section 1 (*Voting Instructions*) of this Proxy Form and to nominate the person named in Part 2 Section 1 (*Voting Instructions*) of this Proxy Form (if applicable) to attend and speak at the relevant Compromise Meeting.

1.3.   The Compromise Lender which submits or delivers a Proxy Form represents and warrants to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Holding Period Trustee and the Information Agent that-

1.3.1.   it is legally entitled and able to control the exercise and the casting of votes in relation to its Compromise Claims in order to comply with the undertakings set out herein; and

1.3.2.   it has all requisite power, authority and legal capacity to give and carry out the transactions contemplated by, and to perform its obligations under, the undertakings set out in herein.

1.4.   Subject to paragraph 1.5 below, the undertakings set out herein will terminate immediately upon the occurrence of any of the following events:

1.4.1.   on the earlier of the Completion Date and the Long-Stop Date;

1.4.2.   the Compromise Companies give the Compromise Lender or any other Compromise Lender written notice of an intention either –

1.4.2.1.   not to proceed with the relevant Compromises; or

1.4.2.2.   to proceed with a proposed compromise or other arrangement on terms which are different to the relevant Compromises in any material respect;

1.4.3.   the Compromise Lender sells, transfers, assigns or otherwise disposes of all of its Compromise Claims in the manner permitted

by paragraph 1.6; or

1.4.4.    if –

1.4.4.1.    the Senior Secured Creditors vote against any of the Senior Secured Company Compromise and Senior Secured Guarantor Compromises such that any of them fail to be passed by the necessary majorities; and/or

1.4.4.2.    the Super Senior Third Ranking Creditors vote against the Super Senior Company Compromise and Super Senior Guarantor Compromises such that any of them fail to be passed by the necessary majorities.

1.5.    The Compromise Lender named below confirms that the Compromise Lender agrees and acknowledges to each of the Holding Period Trustee, the Company, New Holdco 2 and New Holdco 1 that damages may not be an adequate remedy for a breach of any of the undertakings set out herein by it and specific performance and/or relief to compel performance are appropriate remedies for any such breach and any such remedies shall not be exclusive but shall be cumulative and in addition to any other remedies available to the Holding Period Trustee, the Company, New Holdco 2 and New Holdco 1.

1.6.    No undertaking set out herein will prevent the Compromise Lender from buying Compromise Claims (including Compromise Claims which are not subject to the Lock-Up Arrangement prior to the Voting Instruction Deadline) provided that the Compromise Lender named below undertakes to the Company that it will deliver an additional Proxy Form which will include the undertakings set out in herein in respect of such Compromise Claims unless and to the extent that such Compromise Claims are (i) held in custody for a third party; or (ii) (unless and to the extent that the Compromise Lender agrees otherwise) held or otherwise acquired by one or more of the Compromise Lender's proprietary trading desks when acting as a market maker.

**2.    Securities law and other confirmations and undertakings**

2.1.    In connection with the relevant Compromises, pursuant to which Compromise Consideration will be issued by New Holdco 2 and the New Money Notes Offer, pursuant to which New Money Notes and New Holdco 2 Ordinary B Shares or CVRs (together with the Compromise Consideration, the "**New Securities**") will be issued by New Holdco 1 (together with New Holdco 2, the "**Issuers**"), as part of the Financial Restructuring and in connection with the acquisition of the New Securities, each Compromise Lender which submits, delivers or procures the delivery of a Proxy Form represents, warrants and undertakes to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes, the Compromise Agent and the Information Agent that:

2.1.1.    It has not received a prospectus or other offering document and has not relied on any information relating to the Existing Group other than the Proposal Document, the Explanatory Statement, the PSG Valuation, the PWC Tax Report, the Restructuring

Agreement and the other Implementation Documents, as well as information that is publicly available. It has had an opportunity to conduct its own investigation with respect to the New Securities and the Existing Group in connection with its decision to acquire New Securities and it acknowledges that it is not relying on any investigation other than its own with respect to the New Securities or the Existing Group.

2.1.2.   In making its investment decision: (i) it has relied on its own, independent examination of the Existing Group and the Restructuring Documents; (ii) it understands that an investment in the New Securities involves certain risks, including the risk of loss of all or a substantial part of its investment under certain circumstances; (iii) it has made its own assessment of the Existing Group, the New Securities and the terms of the Offering and the New Money Notes Offer based on the Restructuring Documents and such information as is publicly available; (iv) it has consulted its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary or otherwise has satisfied itself concerning, without limitation, relevant legal, currency and other economic considerations and the effects of United States federal, state and local income tax laws and foreign tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, the U.S. Investment Company Act of 1940 and the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**"), and it has made its own investment decision based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Issuers or any other member of the Existing Group; and (iv) it has had access to such financial and other information concerning the Existing Group as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the New Securities. It is able to bear the economic risk, and to withstand a complete loss, of an investment in the New Securities.

2.1.3.   It is a sophisticated investor familiar with transactions similar to its investment in the New Securities.  It believes, by reason of its business or financial experience and its own independent investigation that it is capable of evaluating the merits and risks of the Financial Restructuring and of protecting its own interest in connection with the Financial Restructuring.

2.1.4.   It represents that it is either (i) a person that is not a "U.S. person" as defined in Regulation S under the U.S. Securities Act, acquiring the New Securities in reliance on the exemption from registration pursuant to Regulation S under the U.S. Securities Act, and acquiring the New Securities for its own account or for one or more managed accounts, each of which is a non-U.S. Person and as to each of which it exercises sole investment discretion; or (ii)

(a) either (x) a "qualified institutional buyer" as defined in Rule 144A under the U.S. Securities Act (a "**QIB**") or (y) an institutional "accredited investor" as defined in Rule 501(A)(1), (2), (3) or (7) under the U.S. Securities Act (an "**IAI**"), (b) aware that the sale of the New Securities to it is being made in reliance on one or more exemptions from registration under the U.S. Securities Act, including Section 4(a)(2) and Regulation D thereunder, and (c) acquiring the New Securities for its own account or for one or more managed accounts, each of which is a QIB or an IAI and as to each of which it exercises sole investment discretion.

2.1.5.    It understands (and each beneficial owner of New Securities has been advised) that the New Securities have not been and will not be registered under the U.S. Securities Act or with any State or other jurisdiction of the United States, nor approved or disapproved by the U.S. New Securities and Exchange Commission, any state securities commission in the United States or any other United States regulatory authority, and it agrees not to re-offer, resell, pledge or otherwise transfer New Securities except: (i) outside the United States in offshore transactions in accordance with Rule 904 of Regulation S under the U.S. Securities Act; (ii) pursuant to Rule 144A under the New Securities Act (if available); or (iii) pursuant to any other exemptions available under the U.S. Securities Act, and in any case in compliance with any applicable United States state laws and regulations governing the offer and sale of securities and all other applicable laws.

2.1.6.    It acknowledges that no representation has been made as to the availability of Section (4)(a)(2) of the U.S. Securities Act, Regulation D under the U.S. Securities Act or any other exemption under the U.S. Securities Act for the re-offer, resale, pledge or transfer of the New Securities and it understands that there can be no assurance that the exemption provided by Section 4(a)(2) of the U.S. Securities Act, Regulation D under the U.S. Securities Act or any other exemptions under the U.S. Securities Act will be available for any re-offer, resale, pledge or transfer of the New Securities. It agrees to notify any transferee to whom it subsequently re-offers, resells, pledges or otherwise transfers New Securities of the foregoing restrictions on transfer.

2.1.7.    It acknowledges that the New Securities sold in the United States are being offered and sold pursuant to one or more exemptions from registration under the U.S. Securities Act or in transactions not involving any public offering (within the meaning of Section 4(2) of the U.S. Securities Act) and are "restricted securities" within the meaning of Rule 144(a)(3) under the U.S. Securities Act and represents and warrants that, so long as the New Securities are "restricted securities", it will not deposit New Securities into any unrestricted depositary receipt facility in the United States

established or maintained by any depositary bank in respect of the New Securities and will only transfer New Securities in accordance with paragraph 2.1.6 above.

2.1.8.    It expressly acknowledges and confirms that (i) it is aware that applicable securities laws may prohibit any person who has received from an issuer of securities or one of its Affiliates or related persons material non-public information concerning the matters that are the subject of the Financial Restructuring from purchasing or selling securities of such issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (ii) it is familiar with the U.S. Securities Exchange Act of 1934, as amended (the "**U.S. Exchange Act**") and the rules and regulations promulgated thereunder, the Regulation 596/2014 on market abuse and Directive 2014/57/EU on criminal sanctions for market abuse (together, the "**Market Abuse Regulations**"), and agrees that it will not use, or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any such information in contravention of the U.S. Exchange Act or any of its rules and regulations, including Rule 10b-5, and any similar rules of any non-U.S. jurisdiction, including the Market Abuse Regulations;

2.1.9.    It is not a resident in a Member State of the European Economic Area which has implemented the Prospectus Directive (each a "**Relevant Member State**") or, if it is resident in a Relevant Member State, it is a "qualified investor" (within the meaning of Article 2(1)(e) of the Prospectus Directive and any relevant implementing measure in such Relevant Member State). The expression "Prospectus Directive" means Directive 2003/71/EC (as amended, including by Directive 2010/73/EU) and includes any relevant implementing measure in such Relevant Member State;

2.1.10.   It acknowledges that the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes and the Information Agent and Compromise Agent are all relying on the representations, warranties and undertakings made by it in this Schedule 1 (*Representations, Warranties and Undertakings*) to engage in the Financial Restructuring and the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes and the Information Agent and Compromise Agent would not engage in the Financial Restructuring on the terms set forth in the Restructuring Documents in the absence of the representations, warranties and undertakings made by it in this Schedule 1 (*Representations, Warranties and Undertakings*).

2.1.11.   All agreements, covenants, representations and warranties made in this Schedule 1 (*Representations, Warranties and Undertakings*)

to the Proxy Form shall survive beyond the Completion Date. It shall immediately notify the Company, the Information Agent and the Trustees in writing upon discovering that any of the representations or warranties made herein was false when made or has, as a result of changes in circumstances, become false or misleading. Until such notice, the Company, the Issuers, the Parent, the Existing Group, the Trustees, any of their affiliates or any person acting on their behalf may rely on the representations, warranties, covenants and agreements contained herein in connection with any matter related to the Company and the Issuers and its investment in New Securities. It will execute, deliver, acknowledge and file any and all further documents and provide any and all further information which the Issuers, the Company, the Trustees or the Information Agent may deem necessary or appropriate in connection with such representations, warranties and covenants and agreements.

2.1.12.    It understands that the foregoing representations, warranties, covenants, agreements and acknowledgements are required in connection with United Stated and other securities laws.

2.2.    The Compromise Lender (or, if the Compromise Lender has appointed a Designated Recipient, its Designated Recipient) confirms, agrees, represents and warrants, with and in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent and the Holding Period Trustee, that the offer or issue to, or subscription by, it in respect of any of the applicable Compromise Consideration and New Money Notes (including the New Holdco 2 Ordinary B Shares and CVRs to be issued pursuant to the New Money Notes Offer):

2.2.1.    would not be unlawful or prohibited under the laws or regulations of any applicable jurisdiction;

2.2.2.    the Compromise Lender or, if applicable, its Designated Recipient are persons to whom any of the exemptions set out in section 96(1) of the Companies Act would apply; and

2.2.3.    would not, or would not be likely to result in the Holding Period Trustee, the Company, New Holdco 2 or New Holdco 1 being required to comply with any filing, registration, prospectus, disclosure or other onerous requirement in any jurisdiction where that person is a citizen or subject to the laws of (including South African laws) or in which that person is domiciled or resident.

**EDCON LIMITED**
Incorporated in South Africa
(Registration number: 2007/003525/06)
**EDCON ACQUISITION PROPRIETARY LIMITED**
Incorporated in South Africa
(Registration Number 2007/000518/07)
**EDGARS CONSOLIDATED STORES LIMITED**
Incorporated in South Africa
(Registration Number 1946/022751/06)
**EDCON HOLDINGS LIMITED**
Incorporated in South Africa
(Registration Number 2006/036903/06)

---

**ACCOUNT HOLDER LETTER FOR USE BY COMPROMISE NOTEHOLDERS ONLY**

---

## FORM OF ACCOUNT HOLDER LETTER

**For use by Account Holders in DTC, Euroclear and Clearstream, Luxembourg in respect of**

1.   the "**Senior Secured 2018 Notes**", namely the –

    1.1.   €300,000,000 9.5% Senior Secured Notes due 2018 (ISIN: XS0888937272 / XS0888936118; Common Code: 088893727 / 088893611);

    1.2.   €317,000,000 9.5% Senior Secured Notes due 2018 (ISIN: XS0596918648 / XS0596918135; Common Code: 059691864 / 059691813); and

    1.3.   $250,000,000 9.5% Senior Secured Notes due 2018 (ISIN: US27929TAB35 / XS0596919026; Common Code: 059691902; CUSIP: 27929TAB3);

2.   the "**Senior Secured 2019 Notes**", namely the €36,195,706 Senior Secured 9.75%/12.75% PIK Toggle Notes due 2019 (ISIN: XS1314899433 / XS1314900462; Common Code: 131489943 / 131490046); and

3.   the "**Super Senior 2019 Notes**", namely the –

    3.1.   €24,130,471 New Super Senior 8% PIK Notes due 2019 (Series B) (ISIN: XS1314902757 / XS1314902914; Common Code: 131490275 / 131490291);

    3.2.   €70,643,115 New Super Senior 8% PIK Notes due 2019 (Series A) (ISIN: XS1314901783 / XS1314901940; Common Code: 131490178 / 131490194); and

    3.3.   €21,663,779 New Super Senior 8% PIK Notes due 2019 (Series 1) (ISIN: XS1262391656 / XS1262394247; Common Code: 12623916 / 12623942),

issued by

**EDCON LIMITED**
Incorporated in the Republic of South Africa
(Registration Number: 2007/003525/06)
("**Company**")

in relation to

each Compromise Company's proposal pursuant to the provisions of section 155 of the Companies Act, No.71 of 2008, as amended, relating to an arrangement or compromise of certain of such Compromise Company's financial obligations in respect of the Senior Secured Creditors and the Super Senior Third Ranking Creditors.

1.   This Account Holder Letter is made by way of deed.

2.   Unless the contrary intention clearly appears, capitalised terms used in this Account Holder Letter but not defined in it have the same meaning as given to them in the section entitled "*Definitions*" in the proposal document to which this Account Holder Letter is attached ("**Proposal Document**").

3.   The Senior Secured Company Compromise, Senior Secured ECSL Compromise, Senior Secured Bidco Compromise and the Senior Secured Holdco Compromise will, if implemented, materially affect the holders of the Senior Secured 2018 Notes and the Senior Secured 2019 Notes.

4.   The Super Senior Company Compromise, Super Senior ECSL Compromise, Super Senior Bidco Compromise and the Super Senior Holdco Compromise will, if implemented, materially affect the holders of the Super Senior 2019 Notes.

5.   All of the Compromises are inter-conditional on each other, such that if one Compromise is not validly approved then no Compromise will become unconditional

and binding on the Compromise Creditors.

6.    Account Holders must use this Account Holder Letter to register details of their interests in the Compromise Notes and to make certain elections in relation to the relevant Compromise and the New Money Notes Offer.

7.    **The New Notes will only be eligible for clearing and settlement through Euroclear and Clearstream. It is highly recommended that Account Holders move any positions in the Compromise Notes that they may currently hold from DTC to an account with either Euroclear or Clearstream to receive their New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes, without delay.**

8.    **The New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes are not eligible in DTC.  Accordingly, if an Account Holder does not move its positions in the Compromise Notes to Euroclear or Clearstream, the Company still requires the Account Holder to complete the table contained in section 1 (*Designated Recipient*) of Part 5 (*Designated Recipient, delivery of the relevant Compromise Consideration and delivery of the New Money Notes and New Holdco 2 Ordinary B Shares OR CVRs*) so that the Company is able to distribute the relevant New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes to the Compromise Noteholder.**

9.    **The Voting Instruction Deadline is 16h00 on 23 December 2016.**


**THIS ACCOUNT HOLDER LETTER HAS 6 PARTS.**

1.    **IN ALL CASES PART 1 OF THIS ACCOUNT HOLDER LETTER MUST BE COMPLETED. ONLY COMPLETE ACCOUNT HOLDER LETTERS WILL BE TAKEN INTO CONSIDERATION. PARTIALLY COMPLETED ACCOUNT HOLDER LETTERS WILL BE DISREGARDED. EMAIL VERSIONS OF THIS ACCOUNT HOLDER LETTER ARE SUFFICIENT – ORIGINALS ARE NOT REQUIRED.**

**IN ADDITION:**

2.    **IN ORDER TO VOTE**

       **Part 2 of this Account Holder Letter**: In order to vote in respect of the relevant Compromise, Part 2 (*Voting Instructions*) of this Account Holder Letter must be completed and, together with the others parts of this Account Holder Letter, be received by the Information Agent by email by no later than the Voting Instruction Deadline. Account Holder Letters received after the Voting Instruction Deadline will not constitute valid voting instructions for the purposes of the relevant Compromise. The Compromise Notes identified in this Account Holder Letter must be blocked by the Custody Instruction Deadline, being 22 December 2016.

       **For the avoidance of doubt, any Compromise Noteholder who ticks the box marked "No" in paragraph D of Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter to indicate its status as an Ineligible Noteholder will still be entitled to vote in respect of the relevant Compromise, irrespective of its status as an Ineligible Noteholder.**

3.    **IN ORDER TO ELECT TO RECEIVE NEW HOLDCO 2 PIK B NOTES DENOMINATED IN USD OR ZAR**

       **Part 3 of this Account Holder Letter:** In order to elect to receive New Holdco 2 PIK B Notes denominated in USD or ZAR in respect of the Senior Secured Company

Compromise, Part 3 (*New Holdco 2 PIK B Notes Currency Election*) of this Account Holder Letter must be completed and, together with the other parts of this Account Holder Letter, must be received by the Information Agent by email by no later than the Voting Instruction Deadline. Account Holder Letters received after the Voting Instruction Deadline will not constitute valid currency elections for the purposes of the Senior Secured Company Compromise.

4.  **IN ORDER TO ELECT TO PARTICIPATE IN THE NEW MONEY NOTES OFFER AND TO ELECT TO SUBSCRIBE FOR NEW HOLDCO 2 ORDINARY B SHARES OR CVRS**

    **Part 4 of this Account Holder Letter:** In order to elect to subscribe for any New Money Notes and to elect to subscribe for New Holdco 2 Ordinary B Shares or CVR in accordance with the New Money Notes Offer, Part 4 (*New Money Notes Offer*) of this Account Holder Letter must be completed and, together with the other parts of this Account Holder Letter, must be received by the Information Agent by email by no later than the Voting Instruction Deadline. Such delivery will constitute an irrevocable offer by the relevant Compromise Noteholder to subscribe for New Money Notes and to subscribe for New Holdco 2 Ordinary B Shares or CVR pursuant to the New Money Notes Offer (if Part 4 (*New Money Notes Offer*) is validly completed in full).

    If Part 4 (*New Money Notes Offer*) of this Account Holder Letter is completed, Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter must also be completed so as to confirm that the Account Holder and Compromise Noteholder are Eligible Creditors or, if the Compromise Noteholder has appointed a Designated Recipient, its Designated Recipient is an Eligible Person.

5.  **IN ORDER TO APPOINT A DESIGNATED RECIPIENT, RECEIVE THE RELEVANT COMPROMISE CONSIDERATION, AND, IF APPLICABLE, RECEIVE THE RELEVANT NEW MONEY NOTES (TOGETHER WITH NEW HOLDCO 2 ORDINARY B SHARES OR CVRS)**

    **Part 5 of this Account Holder Letter**: In order to (if applicable) appoint a Designated Recipient who is an Eligible Person to receive the relevant Compromise Consideration pursuant to the terms of the relevant Compromise; and (if applicable) to receive the relevant New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, pursuant to the terms of the New Money Notes Offer on the Completion Date, Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Account Holder Letter must be completed, and, together with the other parts of this Account Holder Letter, must be must be received by the Information Agent by email by no later than the Voting Instruction Deadline.

6.  **IN ALL CASES PART 6 OF THIS ACCOUNT HOLDER LETTER SHOULD BE COMPLETED.**

    **Part 6 of this Account Holder Letter**: In order to be valid, this Account Holder Letter must be signed by the Account Holder.

**You do not need to submit multiple copies of an Account Holder Letter if you hold separate beneficial holdings/interests in multiple Compromise Notes. You are strongly encouraged (to ensure a smooth and orderly process) to only submit <u>ONE</u> Account Holder Letter per beneficial holder which details the interests of all the Compromise Notes you hold – regardless of the class that such Compromise Notes fall in.  In addition, the <u>ONE</u>**

**Account Holder Letter you submit above will also be valid for voting purposes at each of the Guarantor Meetings.**

**Before you complete the Account Holder Letter, you are strongly advised to read the Proposal Document and the Explanatory Statement attached hereto and, in particular, Part F (*Instructions and guidance for Compromise Creditors*) of the Explanatory Statement which contains detailed information on the various elections and instructions contained in this Account Holder Letter.**

**If the Compromise Effective Date occurs, the Compromises will become effective and binding on all Compromise Creditors, regardless of whether you voted in favour or against the relevant Compromise or abstained from voting. The Compromise Consideration and the New Notes, New Holdco 2 Ordinary B Shares or CVRs, as the case may be, will be issued on the Completion Date.**

This Account Holder Letter and any non-contractual obligations arising out of or in relation to this Account Holder Letter shall be governed by, and interpreted in accordance with, South African law.

**FOR ASSISTANCE CONTACT THE INFORMATION AGENT:**

**Lucid Issuer Services Limited**

**Tankerton Works**

**12 Argyle Walk**

**London WC1H 8HA**

**United Kingdom**

**www.lucid-is.com/edcon**

**Attention: Paul Kamminga**

**Telephone: +44 20 7704 0880**

**Email: edcon@lucid-is.com**

**TO BE VALID IN ALL RESPECTS, THE ACCOUNT HOLDER LETTER MUST BE DULY COMPLETED AND DELIVERED SO AS TO BE RECEIVED BY THE INFORMATION AGENT PRIOR TO THE VOTING INSTRUCTION DEADLINE. IF IT IS RECEIVED AFTER THE VOTING INSTRUCTION DEADLINE, IT WILL NOT CONSTITUTE VALID VOTING INSTRUCTIONS FOR THE PURPOSES OF THE RELEVANT COMPROMISE NOR WILL ANY OF THE ELECTIONS MADE HEREUNDER BE VALID (SUCH AS THE NEW HOLDCO 2 PIK B NOTES CURRENCY ELECTION, THE NEW MONEY NOTES OFFER (AND CONCOMITANT NEW HOLDCO 2 ORDINARY B SHARES OR CVRs, AS THE CASE MAY BE)). ANY DULY COMPLETED ACCOUNT HOLDER LETTERS SUBMITTED AFTER THE VOTING INSTRUCTION DEADLINE, BUT BEFORE THE EXPIRY OF THE HOLDING PERIOD, WILL BE DEALT WITH AS SET OUT IN THE EXPLANATORY STATEMENT AND THE DISTRIBUTION AGREEMENT.**

**THE COMPROMISE NOTES IDENTIFIED IN THIS ACCOUNT HOLDER LETTER MUST BE BLOCKED BY THE CUSTODY INSTRUCTION DEADLINE OR THE DTC RECORD DATE, AS APPLICABLE.**

**PART 1**: **COMPROMISE NOTEHOLDER AND HOLDING DETAILS AND CONFIRMATIONS**

**SECTION 1: COMPROMISE NOTEHOLDER DETAILS**

If you are an Account Holder who has interests in the Compromise Notes for your own account (in which case, you are the beneficial owner of and/or the holder of the ultimate economic interest in the relevant Compromise Notes held in global form through the Clearing Systems with a claim in respect of any amount outstanding under the Compromise Notes as at the Record Date (being 29 December 2016) or the DTC Record Date (being 20 December 2016), as applicable, please provide all information required below.

If you are an Account Holder who has interests in the Compromise Notes on behalf of a Compromise Noteholder (in which case, you are not the beneficial owner of and/or the holder of the ultimate economic interest in the relevant Compromise Notes held in global form through the Clearing System with a claim in respect of any amount outstanding under the Compromise Notes as at the Record Date (being 29 December 2016) or the DTC Record Date (being 20 December 2016), as applicable, please identify below the Compromise Noteholder on whose behalf you are submitting this Account Holder Letter. If such Compromise Noteholder does not wish to provide details of its identity, please identify a person with full legal right and authority to act on behalf of that Compromise Noteholder as its representative.

**You do not need to submit multiple copies of the Account Holder Letter if you hold separate beneficial holdings of/interests in multiple the Compromise Notes.   You are strongly encouraged (to ensure a smooth and orderly process) to only submit ONE Account Holder Letter which details the interests of all the Compromise Notes you hold – regardless of the class that such Compromise Notes falls in.  In addition, the ONE Account Holder Letter you submit above will also be valid for voting purposes at each of the Guarantor Meetings.**

**To be completed for all Compromise Noteholders:**

| | |
|---|---|
| Full Name of Compromise Noteholder | |
| Country3 | |
| E-mail Address | |
| Telephone Number (with country code) | |

---

3 If the Compromise Noteholder is an institution, enter the country in which its registered office is located. If the Compromise Noteholder is an individual, enter the country in which the individual's home address is located. If a country other than South Africa is entered, the Compromise Noteholder should refer to the section(s) entitled "Restrictions" in the Explanatory Statement.

**To be completed if the Compromise Noteholder is an institution:**

| | |
|---|---|
| Jurisdiction of Incorporation of Compromise Noteholder | |
| Name of Authorised Employee or Representative of Compromise Noteholder | |

**To be completed if the Compromise Noteholder is an investment fund, managed account, discretionary account or similar over which a manager, adviser or general partner has discretionary authority:**

| | |
|---|---|
| Name of Investment Manager / Investment Adviser / General Partner | |

## SECTION 2: HOLDING DETAILS

**If this Account Holder Letter is delivered before the Voting Instruction Deadline, the Account Holder on behalf of the relevant Compromise Noteholder warrants and confirms that the Compromise Noteholder holds the following Compromise Notes to which this Account Holder Letter relates, which have been "blocked" (i) in the case of Account Holders in Euroclear or Clearstream, through delivery of Custody Instructions to the relevant Clearing System, the Custody Instruction Reference Number(s) in relation to which is/are identified below, or (ii) in the case of Account Holders who hold positions in the Compromise Notes in DTC and outside of Euroclear or Clearstream by affixing a Signature Medallion Guarantee Stamp to this Section 2 (*Holding Details*) below.**

**If this Account Holder Letter is delivered after the Voting Instruction Deadline, the Account Holder, on behalf of the relevant Compromise Noteholder warrants and confirms that such Compromise Noteholder held the following Compromise Notes to which this Account Holder Letter relates, on the Record Date or DTC Record Date, as applicable.**

**Details of the Compromise Notes to which this Account Holder Letter relates**

| ISIN or CUSIP | Amount blocked at Clearing System | Clearing System | Clearing System Account number | Custody Instruction Reference Number[4] |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

---

[4] Where the Compromise Notes are held through Euroclear or Clearstream, as applicable, the reference number should be the reference number of the Custody Instructions submitted in respect of the Compromise Notes to Euroclear or Clearstream, as applicable.

**For Account Holders who hold positions in the Compromise Notes in DTC and outside of Euroclear or Clearstream**

Signature Medallion Guarantee Stamp*

\* By affixing its Signature Medallion Guarantee Stamp, the Account Holder is hereby instructed by the Compromise Noteholder in respect of which this Account Holder Letter is being submitted to confirm to the Company and the Information Agent that such Compromise Noteholder (i) holds the Compromise Notes detailed in this Section 2 (*Holding Details*) and will do so as at the DTC Record Date; (ii) will not trade such Compromise Notes until the earlier of the Completion Date or the relevant date set out in paragraph 1.5 of Schedule 1 (*Representations, Warranties and Undertakings*); and (iii) agrees that the Company shall be entitled to treat such Compromise Noteholder (or its Designated Recipient) as the party entitled to receive the Compromise Consideration (if any) in respect of such holding of Compromise Notes.

| | |
|---|---|
| Compromise Noteholder's Account Holder's authorised employee/representative | _____ |
| | Name |
| Executed as a DEED[5] by authorised employee/representative for and on behalf of Compromise Noteholder's Account Holder | _____ |
| | (sign) |
| in the presence of | _____ |
| Witness's signature | _____ |
| Name: | _____ |
| Address: | _____ |

---

[5] Please note that the authorised employee/representative signature must be witnessed by a separate individual.

Occupation:    _____

_____

Date

_____

## SECTION 3: ACCOUNT HOLDER CONFIRMATIONS

**This Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter must be completed in all cases.**

**The Account Holder named below in Part 6 (*Execution of Account Holder Letter by Account Holder*) for itself and on behalf of the Compromise Noteholder hereby confirms to the Company, New Holdco 2, New Holdco 1, the Existing Group, the Holding Period Trustee and the Information Agent as follows (tick "yes" or "no" as appropriate for each item):**

A.    that all authority conferred or agreed to be conferred pursuant to this Account Holder Letter and every obligation of the Account Holder under this Account Holder Letter (including any elections made in this Account Holder Letter) shall be binding upon the successors and assigns of the Account Holder (in the case of a corporation or institution) or the successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Account Holder (in the case of a natural person) and shall not be affected by, and shall survive, the insolvency, bankruptcy, dissolution, death or incapacity (as the case may be) of the Account Holder and that all of the information in this Account Holder Letter is complete and accurate:

|  | Yes |
|---|---|
|  | No |

B.    that it has irrevocably instructed Euroclear or Clearstream, as the case may be, to block the Compromise Notes identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter before the date that this Account Holder Letter is delivered to the Information Agent and that the applicable reference number for each such Custody Instruction appears in this Account Holder Letter under "Custody Instruction Reference Number" in Section 2 (*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter or the affixing of a signature medallion guarantee stamp, if a DTC Account Holder.

|  | Yes |
|---|---|
|  | No |

C.    that it has the authority to (i) give the confirmations set out in this Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter for itself and for the Compromise Noteholder (or, if the Compromise Noteholder has appointed a Designated Recipient/s, its Designated Recipient/s), (ii) identify the person who is to be the Designated Recipient/s of the relevant Compromise Consideration and the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, (iii) give, on behalf of the Compromise Noteholder or its Designated Recipient (as applicable), the confirmation and request set out in Section 2 (*Delivery of the Relevant Compromise Consideration*) and Section 3 (*Delivery of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of Part 5 of this Account Holder Letter; (iv) make the election for the currency denomination of the New Holdco 2 PIK B Notes (if applicable) as set out in Part 3 *(New Holdco 2 PIK B Notes Currency Election)* of this Account Holder Letter; (v) make the election to subscribe for New Money Notes and New Holdco 2 Ordinary B

Shares or CVRs, as the case may be, on the terms of the New Money Notes Offer (if applicable) as set out in Part 4 (*New Money Notes Offer*) of this Account Holder Letter:

|  | Yes |
| --- | --- |
|  | No |

D.    By ticking the box below marked "Yes", the Account Holder confirms for itself, or for the Compromise Noteholder on whose behalf it is acting (or, if the Compromise Noteholder has appointed a Designated Recipient, its Designated Recipient) that it agrees that it, or the Compromise Noteholder or Designated Recipient (as applicable), shall be deemed to have made the representations, warranties and undertakings set out in paragraph 2 (*Securities law confirmations and undertakings*) of Schedule 1 (*Representations, Warranties and Undertakings*) of this Account Holder Letter (an "**Eligible Person**") in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and the Information Agent and the Holding Period Trustee as at the date on which this Account Holder Letter is delivered to the Information Agent or the Holding Period Trustee (as applicable), on the Voting Instruction Deadline (to the extent not already passed), and, to the extent the Completion Date has already occurred, the date on which the Holding Period Trustee transfers the relevant Compromise Consideration, New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, to the Compromise Noteholder. **If the Account Holder is unable to give the confirmation below, it must only tick the box below marked "No" below and (i) should contact the Information Agent or the Holding Period Trustee using the contact details set out in this Account Holder Letter for assistance; and (ii) the Compromise Noteholder will be deemed to be an Ineligible Creditor and will not receive the relevant Compromise Consideration to which it would otherwise be entitled under the terms of the relevant Compromise on the Completion Date or the date of distribution thereof by the Holding Period Trustee (in respect of Account Holder Letters submitted after the Completion Date but before the expiry of the Holding Period).** For more details please see the section entitled "Overview of the Compromise" set out in the Explanatory Statement.

**Eligible Person**

|  | Yes |
| --- | --- |
|  | No |

By ticking the box above marked "No", the Account Holder, on behalf of itself or the Compromise Noteholder on whose behalf it is acting (or, if the Compromise Noteholder has appointed a Designated Recipient, on behalf of such Designated Recipient) will still be entitled to (i) vote in respect of the relevant Compromise by completing Section 2 (*Voting Instructions*) of Part 2 of this Account Holder Letter; and (ii) express its election with respect to the currency denomination of the New Holdco 2 PIK B Notes to which it would otherwise be entitled by completing Part 3 (*New Holdco 2 PIK B Notes Currency Election*) of this Account Holder Letter.

**An Account Holder who is unable to confirm "yes" in respect of any of paragraphs A to D above should contact the Information Agent or Holding Period Trustee using the contact details set out in this Account Holder Letter for assistance.**

PART 2:

SECTION 1: VOTING INSTRUCTIONS

**By ticking any of relevant boxes below, the Account Holder confirms that it and the Compromise Noteholder (or, if the Compromise Noteholder has appointed a Designated Recipient, its Designated Recipient) confirm, agree and represent or are deemed to have confirmed, agreed or represented the statements set out in paragraph 1 (*Voting Representations, Warranties and Undertakings*) of Schedule 1 (*Representations, Warranties and Undertakings*) of this Account Holder Letter in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and the Information Agent as at the date on which this Account Holder Letter is received by the Information Agent. If the Account Holder is unable to give the aforesaid confirmations, it must contact the Information Agent or the Holding Period Trustee using the contact details set out in this Account Holder Letter for assistance.**

**For the avoidance of doubt, any Compromise Noteholder who ticks the box marked "No" in paragraph D of Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter to indicate its status as an Ineligible Noteholder will still be entitled to vote in respect of the relevant Compromise below, irrespective of its status as an Ineligible Noteholder.**

**A.      Attendance at each relevant Compromise Meeting**

**Tick only ONE of the boxes below.**

The Compromise Noteholder wishes –

| | |
|---|---|
| | to appoint the Chairman as its proxy to attend and vote on its behalf at each of the relevant Compromise Meetings [**if this box is ticked, please continue to paragraph B (*Appointment of proxy and voting instructions to proxy*) below**]; |
| | to appoint a proxy (other than the Chairman) to attend and vote on its behalf at each of the relevant Compromise Meetings [**if this box is ticked, please continue to paragraph B (*Appointment of proxy and voting instructions to proxy*) below**]; or |
| | to attend and vote at each of the relevant Compromise Meetings in person or by a duly authorised representative, if a company or other corporation [**if this box is ticked, please skip to paragraph C (*Indication of voting intention*) below**]. |

**B.      Appointment of proxy and voting instructions to proxy**

**Tick only ONE of the boxes below.**

The Compromise Noteholder wishes to appoint (and the Account Holder is hereby authorised to appoint on its behalf) –

| | |
|---|---|
| | the Chairman; (tick box if appropriate); or |
| | the following individual (tick box if appropriate and fill in the details |

| | |
|---|---|
| immediately below); | |
| Name | |
| Address | |
| Passport number | |
| **or failing him** ("**Alternate 1**")**:** | |
| Name | |
| Address | |
| Passport number | |
| **or failing Alternate 1:** the Chairman | |

as its proxy for each Compromise Meeting and wishes its proxy to vote for the relevant Compromise as set out below:

**Senior Secured Company Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

| | |
|---|---|
| | **FOR** the Senior Secured Company Compromise, with or without modification; or |
| | **AGAINST** the Senior Secured Company Compromise |

**Senior Secured ECSL Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

| | |
|---|---|
| | **FOR** the Senior Secured ECSL Compromise, with or without modification; or |
| | **AGAINST** the Senior Secured ECSL Compromise |

**Senior Secured Bidco Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

| | |
|---|---|
| | **FOR** the Senior Secured Bidco Compromise, with or without modification; or |
| | **AGAINST** the Senior Secured Bidco Compromise |

**Senior Secured Holdco Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 /**

XS1314900462]

| | **FOR** the Senior Secured Holdco Compromise, with or without modification; or |
| --- | --- |
| | **AGAINST** the Senior Secured Holdco Compromise |

**Super Senior Company Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

| | **FOR** the Super Senior Company Compromise, with or without modification; or |
| --- | --- |
| | **AGAINST** the Super Senior Company Compromise |

**Super Senior ECSL Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

| | **FOR** the Super Senior ECSL Compromise, with or without modification; or |
| --- | --- |
| | **AGAINST** the Super Senior ECSL Compromise |

**Super Senior Bidco Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

| | **FOR** the Super Senior Bidco Compromise, with or without modification; or |
| --- | --- |
| | **AGAINST** the Super Senior Bidco Compromise |

**Super Senior Holdco Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

| | **FOR** the Super Senior Holdco Compromise, with or without modification; or |
| --- | --- |
| | **AGAINST** the Super Senior Holdco Compromise |

C.    **Indication of voting intention**

The Compromise Noteholder wishes to vote (and the Account Holder is hereby authorised to vote on its behalf) at the relevant Compromise Meeting as follows. The Noteholder understands that this expression of intention is not binding and that it may vote as it sees fit at the Compromise Meeting (provided the authorised representative of a Compromise Noteholder wishing to attend the relevant Compromise Meeting must bring his or her passport to the relevant Compromise Meeting):

**Senior Secured Company Compromise - Tick only ONE of the boxes below.**

**Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

| | **FOR** the Senior Secured Company Compromise, with or without |
| --- | --- |

| | modification; or |
|---|---|
| | **AGAINST** the Senior Secured Company Compromise |

**Senior Secured ECSL Compromise - Tick only ONE of the boxes below.**

**Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

| | **FOR** the Senior Secured ECSL Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Senior Secured ECSL Compromise |

**Senior Secured Bidco Compromise - Tick only ONE of the boxes below.**

**Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

| | **FOR** the Senior Secured Bidco Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Senior Secured Bidco Compromise |

**Senior Secured Holdco Compromise - Tick only ONE of the boxes below.**

**Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

| | **FOR** the Senior Secured Holdco Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Senior Secured Holdco Compromise |

**Super Senior Company Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

| | **FOR** the Super Senior Company Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Super Senior Company Compromise |

**Super Senior ECSL Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

| | **FOR** the Super Senior ECSL Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Super Senior ECSL Compromise |

**Super Senior Bidco Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

| | **FOR** the Super Senior Bidco Compromise, with or without modification; or |
|---|---|
| | **AGAINST** the Super Senior Bidco Compromise |

**Super Senior Holdco Compromise - Tick only ONE of the boxes below.**

**[Relevant ISINS are XS1314902757 / XS1314902914; XS1314901783 / XS1314901940 and XS1262391656 / XS1262394247]**

|  |  |
|---|---|
|  | **FOR** the Super Senior Holdco Compromise, with or without modification; or |
|  | **AGAINST** the Super Senior Holdco Compromise |

**PART 3A**
**(NEW HOLDCO 1 A-1 PIK NOTES (IN CASE OF NEW MONEY PROVIDERS), NEW HOLDCO 2 PIK A NOTES (IN THE CASE OF SUPER SENIOR THIRD RANKING CREDITORS) AND NEW HOLDCO 2 PIK B NOTES (IN CASE OF SENIOR SECURED CREDITORS) AND ELECTION OF FORM OF NOTES TO BE RECEIVED (tick only one of the boxes below as appropriate).**

By ticking one of the three following boxes, the Compromise Noteholder expressly acknowledges and confirms that it is aware of the representations, warranties and undertakings set forth in Schedule 1 (*Representation, Warranties and Undertakings*) and that based on the representations, warranties and undertakings in such Schedule 1, it is eligible to make the election set forth in this Part 3A.

By ticking one of the three following boxes, the Compromise Noteholder expressly confirms, represents and warrants that (i) in the case of ticking the Regulation S Notes box, it a person that is not a "U.S. person" as defined in Regulation S under the U.S. Securities Act, acquiring the Regulation S Notes in reliance on the exemption from registration pursuant to Regulation S under the U.S. Securities Act, and acquiring the Regulation S Notes for its own account or for one or more managed accounts, each of which is a non-U.S. Person and as to each of which it exercises sole investment discretion, or (ii) (A) in the case of ticking the 144A Notes box, (x) it is a "qualified institutional buyer" as defined in Rule 144A under the U.S. Securities Act or (y) in the case of ticking the IAI Notes box, it is an institutional "accredited investor" as defined in Rule 501(A)(1), (2), (3) or (7) under the U.S. Securities Act, (B) it is aware that the sale of the 144A Notes and the IAI Notes, as applicable, to it is being made in reliance on one or more exemptions from registration under the U.S. Securities Act, including Section 4(a)(2) and Regulation D thereunder, and (c) it is acquiring the144A Notes or the IAI Notes, as applicable, for its own account or for one or more managed accounts, each of which is a "qualified institutional buyer" or an institutional "accredited investor" and as to each of which it exercises sole investment discretion.

| New Holdco 1 A-1 PIK Notes | |
|---|---|
| Regulation S Notes | |
| 144A Notes | |
| IAI Notes | |

| New Holdco 2 PIK A Notes | |
|---|---|
| Regulation S Notes | |
| 144A Notes | |

| | |
|---|---|
| IAI Notes | |

| | |
|---|---|
| **New Holdco 2 PIK B Notes** | |
| Regulation S Notes | |
| 144A Notes | |
| IAI Notes | |

## PART 3B (*NEW HOLDCO 2 PIK B NOTES CURRENCY ELECTION*)

**THIS PART 3 IS ONLY APPLICABLE TO SENIOR SECURED CREDITORS – SENIOR SECURED CREDITORS ARE AFFORDED AN ELECTION AS TO WHETHER THE NEW HOLDCO 2 PIK B NOTES TO BE ISSUED TO THEM PURSUANT TO THE SENIOR SECURED COMPANY COMPROMISE SHOULD BE DENOMINATED IN USD OR ZAR.**

**EVEN IF A SENIOR SECURED CREDITOR WISHES TO VOTE AGAINST THE SENIOR SECURED COMPANY COMPROMISE, IT IS IN THE SENIOR SECURED CREDITOR'S BEST INTERESTS TO COMPLETE AND DELIVER THIS PART 3 TO THE INFORMATION AGENT USING THE CONTACT DETAILS SET OUT BELOW TO BE RECEIVED BY THE INFORMATION AGENT BY NO LATER THAN THE VOTING INSTRUCTION DEADLINE, BECAUSE THE SENIOR SECURED COMPANY COMPROMISE MAY NEVERTHELESS BE VALIDLY APPROVED BY THE NECESSARY MAJORITIES OF THE SENIOR SECURED CREDITORS AND BECOME BINDING ON ALL SENIOR SECURED CREDITORS.**

**ACCOUNT HOLDER LETTERS RECEIVED AFTER THE VOTING INSTRUCTION DEADLINE WILL NOT CONSTITUTE A VALID CURRENCY ELECTION FOR THE PURPOSES OF THE SENIOR SECURED COMPANY COMPROMISE AND THEREFORE THE DEFAULT ELECTION SHALL APPLY TO YOUR SUBSCRIPTION OF NEW HOLDCO 2 PIK B NOTES AS SET OUT BELOW.**

**IF YOU LEAVE THIS PART 3 (*NEW HOLDCO 2 PIK B NOTES CURRENCY ELECTION*) BLANK, THE DEFAULT ELECTION SHALL APPLY TO YOUR SUBSCRIPTION OF NEW HOLDCO 2 PIK B NOTES AS SET OUT BELOW.**

**For the avoidance of doubt, any Compromise Noteholder who ticks the box marked "No" in paragraph D of Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter to indicate its status as an Ineligible Noteholder will still be entitled to elect the currency of the New Holdco 2 PIK B Notes to which it would otherwise be entitled in paragraph C below, irrespective of its status as an Ineligible Noteholder.**

> **[Relevant ISINS are XS0888937272 / XS0888936118; XS0596918648 / XS0596918135; US27929TAB35 / XS0596919026 and XS1314899433 / XS1314900462]**

A. The Account Holder named in Part 6 (*Execution of Account Holder Letter by Account Holder*) for itself hereby confirms to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and the Information Agent that, in relation to the Compromise Notes identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter and which form part of the Senior Secured Company Compromise, the Account Holder has the authority to make the election set out in this Part 3 (*New Holdco 2 PIK B Notes Currency Election*) below on behalf of the Compromise Noteholder (tick "yes" or "no" as appropriate).

|  | Yes |
|---|---|
|  | No |

B. **[For Eligible Creditors]** Compromise Noteholders who are Eligible Noteholders subject to the Senior Secured Company Compromise, by ticking the appropriate box below, will receive New Holdco 2 PIK B Notes denominated in the currency which corresponds to the box ticked below. Should no election be made, such Compromise Noteholders will receive, by default, New Holdco 2 PIK B Notes denominated in USD on the Completion Date:

|  | USD |
|---|---|
|  | ZAR |

C. **[For Ineligible Creditors]** Compromise Noteholders who are Ineligible Creditors subject to the Senior Secured Company Compromise, by ticking the appropriate box below, will designate the currency denomination of New Holdco 2 PIK B Notes to be delivered to the Holding Period Trustee in accordance with the currency election box ticked below. Should no election be made, the Holding Period Trustee will receive, by default, New Holdco 2 PIK B Notes denominated in USD on the Completion Date:

|  | USD |
|---|---|
|  | ZAR |

## PART 4: NEW MONEY NOTES OFFER

### SECTION 1: ELECTION TO SUBSCRIBE

**To participate in the New Money Notes Offer, this Section 1 (*Election to Subscribe*) must be delivered to the Information Agent by no later than the Voting Instruction Deadline. If you do not wish to participate in the New Money Notes Offer, please leave this Section 1 (*Election to Subscribe*) blank.**

**The mechanics relating to the New Money Notes Offer is summarised in paragraph 10 (*New Money Notes Offer*) of Part B (*Explanation of a Compromise*) in the Explanatory Statement.  Your attention is also directed to the Restructuring Agreement, which is the principal document regulating the implementation of (amongst others) the New Money Notes Offer.**

**ALL SENIOR SECURED CREDITORS AND SUPER SENIOR THIRD RANKING CREDITORS WILL BE ENTITLED TO PARTICIPATE IN THE NEW MONEY NOTES OFFER. THE EXTENT OF EACH PARTICIPATING CREDITOR'S ENTITLEMENT TO SUBSCRIBE FOR NEW MONEY NOTES (AND CONCOMITANT NEW HOLDCO 2 ORDINARY B SHARES OR CVRS) IS DETERMINED BY REFERENCE TO THE RESTRUCTURING AGREEMENT. ALTERNATIVELY, YOU MAY SUBSCRIBE FOR UP TO YOUR PRO RATA PARTICIPATION SHARE OF THE NEW MONEY NOTES. YOU MAY ELECT A FIXED USD VALUE WHICH IS LESS THAN YOUR PRO RATA PARTICIPATION SHARE. AN EXAMPLE OF THE PRO RATA PARTICIPATION SHARE IS INCLUDED BELOW FOR INFORMATION PURPOSES ONLY.**

**A COMPROMISE NOTEHOLDER IS ENTITLED TO PARTICIPATE IN THE NEW MONEY NOTES OFFER REGARDLESS OF WHETHER IT VOTES FOR OR AGAINST THE RELEVANT COMPROMISE. THE NEW MONEY NOTES OFFER IS CONDITIONAL ON ALL OF THE COMPROMISES BECOMING UNCONDITIONAL AND BINDING ON THE COMPROMISE CREDITORS.  IF YOU HAVE NOT ELECTED TO PARTICIPATE IN THE NEW MONEY NOTES OFFER, YOU WILL BE EXCLUDED FROM DOING SO IF YOU DID NOT MAKE YOUR ELECTIONS BELOW (EVEN IF YOU VOTE AGAINST THE RELEVANT COMPROMISE) AND SUBMIT SUCH ACCOUNT HOLDER LETTER TO THE INFORMATION AGENT BY NOT LATER THAN THE VOTING INSTRUCTION DEADLINE.**

The Account Holder named in Part 6 (*Execution of Account Holder Letter by Account Holder*) of this Account Holder Letter for itself and on behalf of the Compromise Noteholder hereby confirms to the Company, New Holdco 2, New Holdco 1, the Existing Group and the Information Agent that, in relation to the Compromise Notes identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter, the Account Holder has the authority to make the elections and/or give the confirmations set out in this Section 1 (*Election to Subscribe*) below on behalf of the Compromise Noteholder (tick "yes" or "no" as appropriate).

| | |
|---|---|
| | **Yes** |
| | **No** |

The Account Holder named in Part 6 (*Execution of Account Holder Letter by Account Holder*) of this Account Holder Letter for itself and on behalf of the Compromise Noteholder hereby confirms to the Company, New Holdco 2, New Holdco 1, the Existing Group and the Information Agent that, in relation to the Compromise Notes identified in Section 2

(*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter, that the Compromise Noteholder is a Committed Creditor (tick "yes" or "no" as appropriate).

|  | Yes |
| --- | --- |
|  | No |

Compromise Noteholders who wish to elect to subscribe for New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, pursuant to the New Money Notes Offer and who procure that their Account Holder completes and returns this Section 1 (*Election to Subscribe*) will be issued New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with the terms of the New Money Notes Offer on the Completion Date.

Compromise Noteholders wishing to elect to subscribe for the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, pursuant to the New Money Notes Offer should ensure that an Account Holder Letter including a duly completed Section 1 (*Election to Subscribe*) Part 4 is received by the Information Agent by no later than the Voting Instruction Deadline, after which time any election received will not be valid.

Any issue of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, is subject to the eligibility confirmation being provided in Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter in respect of the Compromise Noteholder or its Designated Recipient (as applicable) at the same time as this Part 4 (*New Money Notes Offer*) of the Account Holder Letter is delivered to the Information Agent.

**Election in respect of New Money Notes**

Please tick the appropriate box below indicating the extent of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, that you elect to subscribe for. By ticking below, you irrevocably and unconditionally

(a) agree to subscribe for the relevant New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, and to pay the corresponding subscription price attaching to such New Money Notes (with the New Holdco 2 Ordinary B Shares and CVRs being issued for no subscription consideration)

(b)  agree to be bound by the terms of the Restructuring Agreement and instruct the Compromise Agent (on your behalf as a Participating Creditor) to execute the Restructuring Agreement; and

(c) instruct GLAS Trust Corporation Limited (as the putative the New Holdco 1 PIK A-1 Notes Trustee (on your behalf as a Participating Creditor)) to execute the Escrow Agreement in substantially the form scheduled to the Restructuring Agreement.

|  | I hereby elect to subscribe for my Pro Rata Participation Share of the USD Equivalent of approximately ZAR1.49 billion aggregate principal amount of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be |
| --- | --- |

| | I hereby elect to subscribe for the following fixed USD value of New Money Notes, and to receive the concomitant number of New Holdco 2 Ordinary B Shares or CVRs, as the case may be. [*If this box is ticked, then insert the relevant USD fixed value below which may not exceed your Pro Rata Participation Share of such New Money Notes*]  If your value exceeds the Pro Rata Participation Share, your Pro Rata Participation Share will be applied instead. |
|---|---|
| **Fixed USD value:** | $ _____ |

BY WAY OF EXAMPLE:

If a Compromise Creditor's total Compromise Claims are *x,* then it can subscribe for up to $(\frac{x}{Total\ Debt})$ *x ZAR1.49billion).*  In this example, "Total Debt" means the aggregate Compromise Claims held by all Compromise Creditors.  For further specificity, please see the calculations as set out in the Restructuring Agreement.

**Election in respect of New Holdco 2 Ordinary B Shares or CVRs**

Please tick the appropriate box below indicating whether you wish to subscribe for New Holdco 2 Ordinary B Shares or CVRs. By ticking, you irrevocably and unconditionally agree to subscribe for the New Holdco 2 Ordinary B Shares or CVRs, as the case may be, that you are entitled to subscribe for in terms of your aforesaid election as regards your allocation of the New Money Notes. If you fail to make any election (but provided that you have elected to subscribe for New Money Notes as aforesaid), then you will be issued your concomitant allocation of New Holdco 2 Ordinary B Shares.

| | New Holdco 2 Ordinary B Shares |
|---|---|
| | CVRs |

**Allocation Payments for New Money Notes**

The delivery and receipt of a valid Account Holder Letter with this Section 1 (*Election to Subscribe*) duly completed constitutes an irrevocable offer to New Holdco 1 and New Holdco 2 by the relevant Compromise Noteholder to subscribe for the relevant allocation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, as indicated above. The acceptance of this offer will be effected and evidenced by notification by New Holdco 1 to the relevant Compromise Noteholder of the relevant Compromise Noteholder's allocation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, in accordance with the terms of the New Money Notes Offer.

The allocation of New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be, the amount to be paid in respect of such allocation and instructions as to

payments to be made to New Holdco 1 in respect of any New Money Notes issued to a Compromise Noteholder or its Designated Recipient shall be notified to the Compromise Noteholder by New Holdco 1 or the Information Agent prior to the Completion Date, in accordance with the terms of the Restructuring Agreement.

If this Section 1 (*Election to Subscribe*) had been completed, Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Account Holder Letter must also be completed.

**By completing any of relevant boxes above, the Account Holder confirms that it and the Compromise Noteholder (or, if the Compromise Noteholder has appointed a Designated Recipient, its Designated Recipient) confirm, agree and represent or are deemed to have confirmed, agreed or represented the statements set out in paragraph 2 (*Securities law confirmations and undertakings*) of Schedule 1 (*Representations, Warranties and Undertakings*) of this Account Holder Letter in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group and the Information Agent as at the date on which this Account Holder Letter is received by the Information Agent.**

**PART 5**: **DESIGNATED RECIPIENT, DELIVERY OF THE RELEVANT COMPROMISE CONSIDERATION AND DELIVERY OF THE NEW MONEY NOTES AND NEW HOLDCO 2 ORDINARY B SHARES OR CVRS**

**IN ORDER TO APPOINT A DESIGNATED RECIPIENT, RECEIVE THE RELEVANT COMPROMISE CONSIDERATION IN ACCORDANCE WITH THE TERMS OF THE RELEVANT COMPROMISE ON THE COMPLETION DATE AND TO RECEIVE THE NEW MONEY NOTES AND NEW HOLDCO 2 ORDINARY B SHARES OR CVRS IN ACCORDANCE WITH THE TERMS OF THE NEW MONEY NOTES OFFER, THIS PART OF THE ACCOUNT HOLDER LETTER MUST BE DELIVERED BY EMAIL TO THE INFORMATION AGENT USING THE CONTACT DETAILS SET OUT ABOVE AND MUST BE RECEIVED BY THE INFORMATION AGENT BY NO LATER THAN THE VOTING INSTRUCTION DEADLINE.**

Delivery of this Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs)* to the Information Agent or Holding Period Trustee after the Voting Instruction Deadline will be dealt with in accordance with the procedures set out in the Explanatory Statement.

This Part 5 must be completed by Account Holders in DTC holding Compromise Notes outside Euroclear or Clearstream.

**Any Designated Recipient must comply with the requirements set out in Section 1 (*Designated Recipient*) of Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares Or CVRs*) of this Account Holder Letter and confirm for itself, or for the Eligible Person on whose behalf it is acting, that it agrees that it, or such Eligible Person (as applicable), shall be deemed to have made the representations, warranties and undertakings set out in paragraph 1 (*Voting representations, warranties and undertakings*) and paragraph 2 (*Securities law confirmations and undertakings*) of Schedule 1 (*Representations, Warranties and Undertakings*) to this Account Holder Letter in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent and the Holding Period Trustee as at the date on which this Account Holder Letter is delivered to the Information Agent.**

## SECTION 1: DESIGNATED RECIPIENT

**Option to appoint Designated Recipient**

**IF A DESIGNATED RECIPIENT IS TO BE APPOINTED, THE COMPROMISE CONSIDERATION IN RESPECT OF THE SENIOR SECURED COMPANY COMPROMISE, BEING THE NEW HOLDCO 2 PIK B NOTES AND THE NEW HOLDCO 2 ORDINARY A SHARES, MAY ONLY BE ISSUED TO THE SAME DESIGNATED RECIPIENT.    ACCORDINGLY, YOU MAY ONLY NOMINATE THE SAME DESIGNATED RECIPIENT TO RECEIVE THE NEW HOLDCO 2 PIK B NOTES AND THE NEW HOLDCO 2 ORDINARY A SHARES.**

**SAVE AS AFORESAID, YOU MAY NOMINATE A DESIGNATED RECIPIENT FOR EACH SECURITY OR SHARE THAT YOU WILL BE ISSUED IN TERMS OF THE SUPER SENIOR COMPANY COMPROMISE AND (IF APPLICABLE) NEW MONEY NOTES OFFER, BY SUBMITTING MULTIPLE COMPLETED AND VALID COPIES OF THIS SECTION 1 (*DESIGNATED RECIPIENT*) TO THE INFORMATION AGENT BY NO LATER THAN THE VOTING INSTRUCTION DEADLINE.**

A Compromise Noteholder may nominate a Designated Recipient to whom, if such Compromise Noteholder is –

1.      a Senior Secured Creditor –

    1.1.      the New Holdco 2 PIK B Notes; and

    1.2.      the New Holdco 2 Ordinary A Shares;

2.      a Super Senior Third Ranking Creditor, the New Holdco 2 PIK A Notes; and/or

3.      a Participating Creditor under the New Money Notes Offer –

    3.1.      the New Money Notes; and

    3.2.      New Holdco 2 Ordinary B Shares or CVRs, as the case may be,

can be distributed on behalf of the Compromise Noteholder.  The details of the Designated Recipient/s, if applicable, must be completed below.

The New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes are not eligible in DTC.  In respect of Compromise Noteholders who hold their Compromise Notes through DTC and whose Account Holder has not moved its positions in the Compromise Notes to Euroclear or Clearstream, the Company still requires the Account Holder to complete the table set out below to enable the Company to distribute the relevant New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and New Money Notes to the Compromise Noteholder.

| | |
|---|---|
| Clearing System Account Name | |
| Account Number | |
| Name of contact person (for purposes of settlement) | |
| Email address | |
| Phone number | |

.

Does the Compromise Noteholder wish to nominate a Designated Recipient?

| | |
|---|---|
| **Yes** (Please provide details below) | |

| | **No** (Please now only complete Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*)) |
|---|---|

**Please note that where a Compromise Noteholder holds Compromise Notes through Euroclear or Clearstream, any Designated Recipient appointed by that Compromise Noteholder to receive the Compromise Consideration must hold an account with the same Account Holder at the same Clearing System as that Compromise Noteholder.**

**DESIGNATED RECIPIENT DETAILS**

| | |
|---|---|
| **Type of security or share referenced in this Account Holder Letter to be issued to the Designated Recipient** | |
| Designated Recipient's Name | |
| Jurisdiction of incorporation | |
| Address of Designated Recipient | |
| City | |
| State | |
| Postal Code | |
| Country | |
| Contact Name: | |
| Telephone no. of Designated Recipient (with country code) | |
| E-mail of Designated Recipient | |

### SECTION 2: DELIVERY OF THE RELEVANT COMPROMISE CONSIDERATION

The Account Holder named below in Part 6 (*Execution of Account Holder Letter by Account Holder*) of this Account Holder Letter confirms, acknowledges and agrees to the Company, New Holdco 2, New Holdco 1, the Parent, Information Agent and Holding Period Trustee that, subject to the eligibility confirmation set out in Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter above having been provided, any –

1.    New Holdco 2 PIK A Notes and/or New Holdco 2 PIK B Notes, as the case may be, to be delivered to the Account Holder (on behalf of the Compromise Noteholder or, if applicable, its Designated Recipient) in connection with the relevant Compromise shall be delivered to the Clearing System Custody Account referred to in Part 6 (*Execution of Account Holder Letter by Account Holder*) of this Account Holder Letter; and

2.    in respect of the Senior Secured Creditors only (and subject to the aforesaid eligibility confirmation), share certificates in respect of the New Holdco 2 A Ordinary Shares –

    2.1.    in respect of Eligible Creditors or, if applicable, their Designated Recipient shall be –

        2.1.1.    delivered to the relevant Eligible Creditor's Legal Advisers for distribution to the shareholders; or

        2.1.2.    made available for collection at the registered offices of the Company, being Edgardale, 1 Press Avenue, Crown Mines, Johannesburg, 2025, Gauteng, South Africa; or

    2.2.    in respect of Ineligible Creditors and Non-Respondent Creditors, be delivered to the Holding Period Trustee to hold in accordance with the terms of the Distribution Agreement.

**SECTION 3: DELIVERY OF THE NEW MONEY NOTES AND NEW HOLDCO 2 ORDINARY B SHARES OR CVRS, AS THE CASE MAY BE**

The Account Holder named below in Part 6 (*Execution of Account Holder Letter by Account Holder*) of this Account Holder Letter confirms, acknowledges and agrees to the Company, New Holdco 2, New Holdco 1, the Parent, Information Agent and Holding Period Trustee that, subject to the eligibility confirmation set out in Section 3 (*Account Holder Confirmations*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter above having been provided, any -

1.   New Money Notes to be delivered to the Account Holder (on behalf of the Compromise Noteholder or, if applicable, its Designated Recipient) in connection with the New Money Notes Offer shall be delivered to the Clearing System Custody Account referred to in Part 6 (*Execution of Account Holder Letter by Account Holder*) of this Account Holder Letter; and

2.   share certificates in respect of the New Holdco 2 Ordinary B Shares in the name of the Compromise Noteholder or, if applicable, its Designated Recipient in connection with the New Money Notes Offer shall be delivered to the Johannesburg office of Edward Nathan Sonnenbergs, Inc at 150 West Street, Sandton, Johannesburg, 2196, save for those share certificates relating to Participating Creditors that elected to receive New Holdco 2 Ordinary B Shares or who did not make any election and who opt, by written notice to the Company, to hold their share certificates directly; or

3.   CVRs and associated CVR certificates in the name of the Compromise Noteholder or, if applicable, its Designated Recipient in connection with the New Money Notes Offer (who elected to receive CVRs), shall be delivered to those Participating Creditors who elected to receive CVRs.

**PART 6: EXECUTION OF ACCOUNT HOLDER LETTER BY ACCOUNT HOLDER**

| | |
|---|---|
| *Settlement Details:*<br>Full name of Euroclear or Clearstream Account Holder | |
| Account Number of Account Holder or Participant at Clearing System<br>Contact Name of Account Holder or Participant at<br>Clearing System<br><br>Contact email of Account Holder or Participant at<br>Clearing System<br>Contact Telephone of Account Holder or Participant at Clearing System | |
| *Execution of Account Holder Letter by Compromise Noteholder:*<br>Authorised Employee of Account Holder (print name) | |
| Telephone no. of Authorised Employee (with country code) | |
| E-mail of Authorised Employee | |
| Authorised Employee Signature | |
| Date: | |
| Signed as a deed:[6] | |
| Name: | |
| Witness signature: | |
| Witness name: | |

1. By signing above, the Account Holder warrants and confirms that it has obtained all necessary consents, authorisations, approvals and/or permissions required to be obtained by it under the laws and regulations applicable to it in any jurisdiction in order to sign this Account Holder Letter on behalf of the Compromise Noteholder.

2. Before returning this Account Holder Letter or either part of this Account Holder Letter, please make certain that you have provided all the information requested.

3. Acceptance of Part 2 (*Voting Instructions*) of this Account Holder Letter by the Information Agent is subject to (i) DTC confirming to the satisfaction of the Company that the Compromise Notes identified in Part 2 (*Voting Instructions*) of this Account Holder Letter are consistent with the positions represented in the Omnibus Proxy as of the DTC Record Date; and (ii) the relevant Clearing System confirming to the satisfaction of the Information Agent that the Compromise Notes identified in Part 2 (*Voting Instructions*) of this Account Holder Letter have been blocked with effect from the date of this Account Holder Letter. In addition, where the Compromise Noteholder on whose behalf this Account Holder Letter is submitted holds its interests in the Compromise Notes identified in Part 2 (*Voting Instructions*) of this

---

[6] Please note that this signature must be witnessed by a separate individual.

Account Holder Letter through Euroclear or Clearstream, as applicable, acceptance of this Account Holder Letter by the Information Agent is subject to the Information Agent reconciling the Custody Instruction reference number allocated by Euroclear or Clearstream, as applicable. **Information in this Account Holder Letter must be consistent with such Custody Instructions and in the event of any ambiguity, the Custody Instructions shall take precedence.**

4.   Acceptance of Part 5 (*Designated Recipient, Delivery of the relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Account Holder Letter by the Information Agent or the Holding Period Trustee (as applicable) is subject to receipt by the Information Agent or the Holding Period Trustee (as applicable) of evidence satisfactory to it that the Compromise Noteholder held the Compromise Notes to which Part 5 (*Designated Recipient, Delivery of the Relevant Compromise Consideration and Delivery of the New Money Notes and New Holdco 2 Ordinary B Shares or CVRs, as the case may be*) of this Account Holder Letter relates on the Record Date or the DTC Record Date, as applicable.

5.   Scanned pdf copies of this Account Holder Letter will be accepted and originals are not required.

Schedule 1

**REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS**

1.      **Voting representations, warranties and undertakings**

1.1.    Each Compromise Noteholder which submits, delivers or procures the delivery of an Account Holder Letter represents, warrants and undertakes to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes and the Information Agent that:

1.1.1.   it has received, and has reviewed, the Proposal Document and the Explanatory Statement;

1.1.2.   it accepts and acknowledges the statements made in "Important Notice," "Important Securities Law Notice" and Part E (*Transfer Restrictions*) in the Explanatory Statement;

1.1.3.   it has complied with all laws and regulations applicable to it with respect to the Compromises and this Account Holder Letter;

1.1.4.   it is lawful to seek voting instructions and elections from that Compromise Noteholder in respect of the Compromises and/or the New Money Notes Offer;

1.1.5.   it is assuming all of the risks inherent in that Compromise Noteholder participating in the Compromises and/or New Money Notes Offer and has undertaken all the appropriate analysis of the implications of participating in the Compromises and/or the New Money Notes Offer for that Compromise Noteholder without relying on the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group or the Information Agent (other than any representations or warranties given in favour of that Compromise Noteholder by the Company, New Holdco 2, New Holdco 1, the Parent and the Existing Group under the Explanatory Statement and, if applicable, a Lock-up Agreement to which that Compromise Noteholder is a party);

1.1.6.   the Compromise Notes which are the subject of the Account Holder Letter are, at the time of delivery of such Account Holder Letter, held by it (directly or indirectly) or on its behalf at the relevant Clearing System (and that Compromise Noteholder will use all reasonable endeavours to ensure that those Compromise Notes will continue to be so held up to and including the Completion Date);

1.1.7.   it has not given voting instructions or submitted an Account Holder Letter with respect to Compromise Notes other than those which are the subject of this Account Holder Letter;

1.1.8.   it agrees that it will, without delay, move any positions in the Compromise Notes that it may currently hold from DTC to an account with either Euroclear or Clearstream and designated such account to receives its New Holdco 2 PIK A Notes, New Holdco 2 PIK B Notes and/or New Money Notes, as the case may be;

1.1.9.   it agrees to be bound by the terms of the Compromises from (and including) the RA Effective Date, regardless of whether it voted for or against the Compromises or abstained from voting, and agrees

not to take any step, action or proceeding to challenge the Compromises or enforce the terms of the Compromise Notes in effect prior to the RA Effective Date unless permitted to do so (and only to the extent permitted) by the Indentures;

1.1.10.    it empowers, authorises, requests and instructs the Trustees, the trustees under the New Notes, the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent and any of their officers, employees or agents to do all such things as may be necessary or expedient to carry out or give effect to the Compromises, the New Money Notes Offer and the Financial Restructuring and it declares and acknowledges that:

1.1.10.1.    none of the trustees under the New Notes, the Information Agent, the Trustees or any of their officers, employees, agents and advisers (each a "**Relying Person**") will be held responsible for any liabilities or consequences arising directly or indirectly as a result of acts taken by them or pursuant to the Financial Restructuring (other than by reason of their fraud, gross negligence or wilful default which will not be the case if any Relying Person acts in accordance with the steps and instructions contemplated in the Restructuring Documents) and it further declares that none of the Relying Persons has responsibility for the terms of the Financial Restructuring, and

1.1.10.2.    it will not take any action or commence or pursue any proceeding or claim against any of the Relying Persons in respect of any claim it might have against any of them or in respect of any act or omission of any kind by any Relying Person in relation to the Financial Restructuring (other than by reason of their fraud, gross negligence or wilful default which will not be the case if such Relying Person acts in accordance with the steps and instructions contemplated in the Restructuring Documents), and it hereby expressly and unreservedly waives its rights to take such proceedings;

1.1.11.    neither the Information Agent, the Trustees nor any of their Affiliates, directors, officers or employees has made any recommendation to that Compromise Noteholder as to whether, or how, to vote in relation to the Compromises or its election, if any, with respect to the New Money Notes Offer, and that it has made its own decision with regard to voting in the Compromises and any subscriptions pursuant to the New Money Notes Offer, based on any legal, tax or financial advice that it has deemed necessary to seek;

1.1.12.    all authority conferred or agreed to be conferred pursuant to these representations, warranties and undertakings shall be

binding on the successors and assigns of that Compromise Noteholder (in the case of a corporation or institution) or the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of that Compromise Noteholder (in the case of a natural person) and shall not be affected by, and shall survive, the insolvency, bankruptcy, dissolution, death or incapacity (as the case may be) of that Compromise Noteholder; and

1.1.13.  no information has been provided to it by the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent, the Trustees or any of their respective Affiliates, directors, officers, advisers or employees with regard to the tax consequences to that Compromise Noteholder arising from voting in favour of the Compromises, and that it is solely liable for any taxes or similar payments imposed on it under the laws of any applicable jurisdiction as a result of voting in favour of the Compromises, and that it will not and does not have any right of recourse (whether by way of reimbursement, indemnity or otherwise) against the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent or any of their Affiliates, directors, officers, advisers or employees in respect of such taxes or similar payments.

1.2.  The Account Holder has irrevocably instructed Euroclear and/or Clearstream, as the case may be, pursuant to Custody Instructions to block the Compromise Notes identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter on or before the date that this Account Holder Letter is delivered to the Information Agent and that a Custody Instruction Reference Number for each such Custody Instruction appears in this Account Holder Letter under "Custody Instruction Reference Number" in Section 2 (*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of the Account Holder Letter or the affixing of a signature medallion guarantee stamp, for Compromise Notes held in DTC and outside of Euroclear or Clearstream.

1.3.  In relation to the Compromise Notes identified in Section 2 (*Holding Details*) of Part 1 (*Compromise Noteholder and Holding Details and Confirmations*) of this Account Holder Letter, the Account Holder has the authority to give the voting instructions set out in Part 2 Section 1 (*Voting Instructions*) of this Account Holder Letter and to nominate the person named in Part 2 Section 1 (*Voting Instructions*) of this Account Holder Letter (if applicable) to attend and speak at the relevant Compromise Meeting.

1.4.  The Compromise Noteholder which submits, delivers or procures the submission and/or delivery of an Account Holder Letter represents and warrants to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Holding Period Trustee and the Information Agent that-

1.4.1.  it is legally entitled and able to control the exercise and the casting of votes in relation to its Compromise Notes in order to

comply with the undertakings set out herein; and

1.4.2.  it has all requisite power, authority and legal capacity to give and carry out the transactions contemplated by, and to perform its obligations under, the undertakings set out in herein.

1.5.  Subject to paragraph 1.5 below, the undertakings set out herein will terminate immediately upon the occurrence of any of the following events:

1.5.1.  on the earlier of the Completion Date and the Long-Stop Date;

1.5.2.  the Compromise Companies give the Compromise Noteholder or any other Compromise Noteholder written notice of an intention either –

1.5.2.1.  not to proceed with the relevant Compromises; or

1.5.2.2.  to proceed with a proposed compromise or other arrangement on terms which are different to the relevant Compromises in any material respect;

1.5.3.  the Compromise Noteholder sells, transfers, assigns or otherwise disposes of all of its Locked-up Notes in the manner permitted by paragraph 1.6; or

1.5.4.  if –

1.5.4.1.  the Senior Secured Creditors vote against any of the Senior Secured Company Compromise and Senior Secured Guarantor Compromises such that any of them fail to be passed by the necessary majorities; and/or

1.5.4.2.  the Super Senior Third Ranking Creditors vote against the Super Senior Company Compromise and Super Senior Guarantor Compromises such that any of them fail to be passed by the necessary majorities.

1.6.  The Account Holder named below confirms that the Compromise Noteholder agrees and acknowledges to each of the Holding Period Trustee, the Company, New Holdco 2 and New Holdco 1 that damages are not an adequate remedy for a breach of any of the undertakings set out herein by it and specific performance and/or relief to compel performance are appropriate remedies for any such breach and any such remedies shall not be exclusive but shall be cumulative and in addition to any other remedies available to the Holding Period Trustee, the Company, New Holdco 2 and New Holdco 1.

1.7.  No undertaking set out herein will prevent the Compromise Noteholder from buying Compromise Notes (including Compromise Notes which are not subject to the Lock-Up Agreement prior to the Voting Instruction Deadline) provided that the Account Holder named below confirms that the Compromise Noteholder undertakes to the Company that it will deliver an additional Account Holder Letter which will include the undertakings set out in herein in respect of such Compromise Notes unless and to the extent that such Compromise Notes are (i) held in custody for a third party; or (ii) (unless and to the extent that the Compromise Noteholder agrees otherwise) held or otherwise acquired by one or more of the Compromise Noteholder's proprietary trading desks when acting as a market maker.

2. **Securities law and other confirmations and undertakings**

2.1. In connection with the relevant Compromises, pursuant to which Compromise Consideration will be issued by New Holdco 2 and the New Money Notes Offer, pursuant to which New Money Notes and New Holdco 2 Ordinary B Shares or CVRs (together with the Compromise Consideration, the "**New Securities**") will be issued by New Holdco 1 (together with New Holdco 2, the "**Issuers**"), as part of the Financial Restructuring and in connection with the acquisition of the New Securities, each Compromise Noteholder which submits, delivers or procures the delivery of an Account Holder Letter represents, warrants and undertakes to the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes, the Compromise Agent and the Information Agent that:

2.1.1. It has not received a prospectus or other offering document and has not relied on any information relating to the Existing Group other than the Proposal Document, the Explanatory Statement, the Restructuring Agreement and the other Restructuring Documents, as well as information that is publicly available. It has had an opportunity to conduct its own investigation with respect to the New Securities and the Existing Group in connection with its decision to acquire New Securities and it acknowledges that it is not relying on any investigation other than its own with respect to the New Securities or the Existing Group.

2.1.2. In making its investment decision: (i) it has relied on its own, independent examination of the Existing Group and the Restructuring Documents; (ii) it understands that an investment in the New Securities involves certain risks, including the risk of loss of all or a substantial part of its investment under certain circumstances; (iii) it has made its own assessment of the Existing Group, the New Securities and the terms of the Compromises and the New Money Notes Offer based on the Restructuring Documents and such information as is publicly available; (iv) it has consulted its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary or otherwise has satisfied itself concerning, without limitation, relevant legal, currency and other economic considerations and the effects of United States federal, state and local income tax laws and foreign tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, the U.S. Investment Company Act of 1940 and the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**"), and it has made its own investment decision based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Issuers or any other member of the Existing Group; and (iv) it has had access to such financial and other information concerning the Existing Group as it deemed necessary or appropriate in order to make an informed investment decision with respect to its

purchase of the New Securities. It is able to bear the economic risk, and to withstand a complete loss, of an investment in the New Securities.

2.1.3.    It is a sophisticated investor familiar with transactions similar to its investment in the New Securities.  It believes, by reason of its business or financial experience and its own independent investigation that it is capable of evaluating the merits and risks of the Financial Restructuring and of protecting its own interest in connection with the Financial Restructuring.

2.1.4.    It represents that it is either (i) a person that is not a "U.S. person" as defined in Regulation S under the U.S. Securities Act, acquiring the New Securities in reliance on the exemption from registration pursuant to Regulation S under the U.S. Securities Act, and acquiring the New Securities for its own account or for one or more managed accounts, each of which is a non-U.S. Person and as to each of which it exercises sole investment discretion; or (ii) (a) either (x) a "qualified institutional buyer" as defined in Rule 144A under the U.S. Securities Act (a "**QIB**") or (y) an institutional "accredited investor" as defined in Rule 501(A)(1), (2), (3) or (7) under the U.S. Securities Act (an "**IAI**"), (b) aware that the sale of the New Securities to it is being made in reliance on one or more exemptions from registration under the U.S. Securities Act, including Section 4(a)(2) and Regulation D thereunder, and (c) acquiring the New Securities for its own account or for one or more managed accounts, each of which is a QIB or an IAI and as to each of which it exercises sole investment discretion.

2.1.5.    It understands (and each beneficial owner of New Securities has been advised) that the New Securities have not been and will not be registered under the U.S. Securities Act or with any State or other jurisdiction of the United States, nor approved or disapproved by the U.S. New Securities and Exchange Commission, any state securities commission in the United States or any other United States regulatory authority, and it agrees not to re-offer, resell, pledge or otherwise transfer New Securities except: (i) outside the United States in offshore transactions in accordance with Rule 904 of Regulation S under the U.S. Securities Act; (ii) pursuant to Rule 144A under the New Securities Act (if available); or (iii) pursuant to any other exemptions available under the U.S. Securities Act, and in any case in compliance with any applicable United States state laws and regulations governing the offer and sale of securities and all other applicable laws.

2.1.6.    It acknowledges that no representation has been made as to the availability of Section (4)(a)(2) of the U.S. Securities Act, Regulation D under the U.S. Securities Act or any other exemption under the U.S. Securities Act for the re-offer, resale, pledge or transfer of the New Securities and it understands that there can

be no assurance that the exemption provided by Section 4(a)(2) of the U.S. Securities Act, Regulation D under the U.S. Securities Act or any other exemptions under the U.S. Securities Act will be available for any re-offer, resale, pledge or transfer of the New Securities. It agrees to notify any transferee to whom it subsequently re-offers, resells, pledges or otherwise transfers New Securities of the foregoing restrictions on transfer.

2.1.7.   It acknowledges that the New Securities sold in the United States are being offered and sold pursuant to one or more exemptions from registration under the U.S. Securities Act or in transactions not involving any public offering (within the meaning of Section 4(2) of the U.S. Securities Act) and are "restricted securities" within the meaning of Rule 144(a)(3) under the U.S. Securities Act and represents and warrants that, so long as the New Securities are "restricted securities", it will not deposit New Securities into any unrestricted depositary receipt facility in the United States established or maintained by any depositary bank in respect of the New Securities and will only transfer New Securities in accordance with paragraph 2.1.6 above.

2.1.8.   It expressly acknowledges and confirms that (i) it is aware that applicable securities laws may prohibit any person who has received from an issuer of securities or one of its Affiliates or related persons material non-public information concerning the matters that are the subject of the Financial Restructuring from purchasing or selling securities of such issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (ii) it is familiar with the U.S. Securities Exchange Act of 1934, as amended (the "**U.S. Exchange Act**") and the rules and regulations promulgated thereunder, the Regulation 596/2014 on market abuse and Directive 2014/57/EU on criminal sanctions for market abuse (together, the "**Market Abuse Regulations**"), and agrees that it will not use, or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any such information in contravention of the U.S. Exchange Act or any of its rules and regulations, including Rule 10b-5, and any similar rules of any non-U.S. jurisdiction, including the Market Abuse Regulations;

2.1.9.   It is not a resident in a Member State of the European Economic Area which has implemented the Prospectus Directive (each a "**Relevant Member State**") or, if it is resident in a Relevant Member State, it is a "qualified investor" (within the meaning of Article 2(1)(e) of the Prospectus Directive and any relevant implementing measure in such Relevant Member State). The expression "Prospectus Directive" means Directive 2003/71/EC (as

amended, including by Directive 2010/73/EU) and includes any relevant implementing measure in such Relevant Member State;

2.1.10.  It acknowledges that the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes and the Information Agent and Compromise Agent are all relying on the representations, warranties and undertakings made by it in this Schedule 1 (*Representations, Warranties and Undertakings*) to engage in the Financial Restructuring and the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the trustees under the New Notes and the Information Agent and Compromise Agent would not engage in the Financial Restructuring on the terms set forth in the Restructuring Documents in the absence of the representations, warranties and undertakings made by it in this Schedule 1 (*Representations, Warranties and Undertakings*).

2.1.11.  All agreements, covenants, representations and warranties made in this Schedule 1 (*Representations, Warranties and Undertakings*) to the Account Holder Letter shall survive beyond the Completion Date. It shall immediately notify the Company, the Information Agent and the Trustees in writing upon discovering that any of the representations or warranties made herein was false when made or has, as a result of changes in circumstances, become false or misleading. Until such notice, the Company, the Issuers, the Parent, the Existing Group, the Trustees, any of their affiliates or any person acting on their behalf may rely on the representations, warranties, covenants and agreements contained herein in connection with any matter related to the Company and the Issuers and its investment in New Securities. It will execute, deliver, acknowledge and file any and all further documents and provide any and all further information which the Issuers, the Company, the Trustees or the Information Agent may deem necessary or appropriate in connection with such representations, warranties and covenants and agreements.

2.1.12.  It understands that the foregoing representations, warranties, covenants, agreements and acknowledgements are required in connection with United Stated and other securities laws.

2.2.  Each of the Account Holder and Compromise Noteholder (or, if the Compromise Noteholder has appointed a Designated Recipient, its Designated Recipient) confirm, agree, represent and warrant, with and in favour of the Company, New Holdco 2, New Holdco 1, the Parent, the Existing Group, the Information Agent and the Holding Period Trustee, that the offer or issue to, or subscription by, it in respect of any of the applicable Compromise Consideration and New Money Notes (including the New Holdco 2 Ordinary B Shares and CVRs to be issued pursuant to the New Money Notes Offer):

2.2.1.  would not be unlawful or prohibited under the laws or regulations of any applicable jurisdiction;

2.2.2.    the Account Holder, Compromise Noteholder or, if applicable, its Designated Recipient are persons to whom any of the exemptions set out in section 96(1) of the Companies Act would apply; and

2.2.3.    would not, or would not be likely to result in the Holding Period Trustee, the Company, New Holdco 2 or New Holdco 1 being required to comply with any filing, registration, prospectus, disclosure or other onerous requirement in any jurisdiction where that person is a citizen or subject to the laws of (including South African laws) or in which that person is domiciled or resident.

**EDCON LIMITED**

Incorporated in South Africa

(Registration Number: 2007/003525/06)

---

**COMPANY PROPOSAL:**

**INFORMATION REASONABLY REQUIRED TO FACILITATE COMPROMISE CREDITORS IN DECIDING WHETHER OR NOT TO ACCEPT OR REJECT THE COMPANY COMPROMISES AS REQUIRED IN TERMS OF SECTION 155(3) OF THE COMPANIES ACT**

---

The definitions and interpretations commencing on page 7] of the Proposal Document apply throughout, including this cover page (unless the context indicates a contrary intention).

**YOU ARE STRONGLY URGED TO READ THE EXPLANATORY STATEMENT IN ITS ENTIRETY FOR MORE INFORMATION AS TO THE EFFECTS AND CONSEQUENCES SHOULD THE COMPROMISES BECOME OPERATIVE.  THE EXPLANATORY STATEMENT SUMMARISES THE EFFECT AND CONSEQUENCES OF NOT ONLY THE COMPROMISES, BUT ALSO THE RELEVANT TRANSACTIONS IN THE RESTRUCTURING DOCUMENTS WHICH WILL IMPACT ON, AND BIND, THE SENIOR SECURED CREDITORS AND SUPER SENIOR THIRD RANKING CREDITORS RESPECTIVELY SHOULD THE COMPROMISES BECOME EFFECTIVE.  THE AFORESAID TRANSACTIONS WILL BE IMPLEMENTED PURSUANT TO THE AUTHORITIES CONTAINED IN THE RELEVANT COMPROMISE TO BIND THE RESPECTIVE COMPROMISE CREDITORS THERETO.**

1.    **STRUCTURE OF THE COMPROMISES**

For the purposes of section 155(3) of the Companies Act, the terms of the Company Compromises are divided into 3 (three) parts as follows –

1.1.    **PART A - BACKGROUND**

In accordance with section 155(3)(a) of the Companies Act, this part sets out:

1.1.1.    a complete list of all the material assets of the Company, as well as an indication as to which assets are held as security by creditors as at 26 November 2016;

1.1.2.    a complete list of the creditors of the Company as at 26 November 2016, as well as an indication as to which creditors would qualify as secured, statutory preferent and concurrent in terms of the laws of insolvency, and an indication of which of the creditors have proved their claims;

1.1.3.    the probable dividend that would be received by creditors, in their specific classes, if the Company were to be placed in liquidation;

1.1.4.    a complete list of the holders of the Company issued securities, and the effect that the proposal in respect of the Company Compromises would have on them, if any; and

1.1.5.    whether the proposal in respect of the Company Compromises includes a proposal made informally by a creditor of the Company.

(See pages 747 to 757).

1.2.    **PART B - TERMS OF THE COMPROMISES**

In accordance with section 155(3)(b) of the Companies Act, this part describes in detail the terms of each Company Compromise, including:

1.2.1.    noting that there is a debt moratorium proposed pursuant to the Company Compromises;

1.2.2.    the extent to which the Company is to be released from the payment of its debts, and the extent to which any debt is proposed to be converted to equity in the Company, or another Company;

1.2.3.    the treatment of contracts and ongoing role of the Company;

1.2.4.    the property of the Company that is proposed to be available to pay creditors' claims;

1.2.5.    the order of preference in which the proceeds of property of the Company will be applied to pay creditors if the proposal is adopted; and

1.2.6.    the benefits of adopting the proposals in respect of the Company Compromises as opposed to the benefits that would be received by creditors if the Company were to be placed in liquidation.

This part also states that if (i) the Senior Secured Company Resolution is adopted by a majority of the relevant Senior Secured Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding as at the Record Date or DTC Record Date (as applicable) held by the Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Company Meeting; and (ii) the Super Senior Company

Resolution is adopted by a majority of the relevant Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding as at the Record Date held by the Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super Senior Company Meeting, then the Compromises will become effective once all the Company Conditions have been fulfilled upon the Compromise Effective Date

(See pages 757 to 765).

**1.3.    PART C – ASSUMPTIONS AND CONDITIONS**

In accordance with section 155(3)(c) of the Companies Act, this part sets out:

1.3.1.     a statement of the Company Conditions that must be satisfied, if any, for the Company Compromises to —

1.3.1.1.    come into operation; and

1.3.1.2.    be fully implemented;

1.3.2.     the effect, if any, that the Company Compromises contemplates having on the number of employees, and their terms and conditions of employment; and

1.3.3.     a projected —

1.3.3.1.    balance sheet for the Company; and

1.3.3.2.    statement of income and expenses for the ensuing three years,

prepared on the assumption that the Company Compromises are accepted.

(See pages 765 to 766).

**PART A: BACKGROUND**

2.    **LIST OF MATERIAL ASSETS OF THE COMPANY AND SECURITY OVER SUCH ASSETS [SECTION 155(3)(a)(i)]**

2.1.    A complete list of all of the material assets of the Company at book value and the security given in relation thereto as at 26 November 2016 is attached hereto marked Annexure A.

2.2.    The financial information of the Existing Group is calculated as at 26 November 2016 being the most recent financial information available as at the date of this Proposal Document.  There has been no change to the financial information between 26 November 2016 and the date of the Proposal Document which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

3.    **CREDITORS OF THE COMPANY [SECTION 155(3)(a)(ii)]**

A complete list of the creditors of the Company as at 26 November 2016 is attached as Annexure B, which furthermore identifies creditors as secured, statutory preferent and concurrent in terms of South African insolvency laws.  There has been no change to the list of creditors between 26 November 2016 and the date of the Proposal Document which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

No creditors have proved any claims against the Company as the Company is not in liquidation.  Further details relating to the employees are available upon request from Jaslin Pritipaul, details as above.

4.      **PROBABLE LIQUIDATION DIVIDEND [SECTION 155(3)(a)(iii)]**

4.1.    The Company engaged the services of Matuson & Associates to calculate the probable dividend which would be received by the Senior Secured Creditors and the Super Senior Third Ranking Creditors if the Company was to be put into liquidation, as at 26 November 2016. A copy of the report prepared by Matuson & Associates reflecting the probable dividend calculation is attached hereto as Annexure C.

4.2.    Based on the dividend calculation, the probable dividend which creditors would receive as at such date is as follows:

    4.2.1.    Secured Creditors:

        4.2.1.1.    Super Senior First Ranking Creditors: at best 42c in the Rand (based on scenario 1 in the report at Annexure C);

        4.2.1.2.    Super Senior Second Ranking Creditors: nil

        4.2.1.3.    Super Senior Third Ranking Creditors : nil

        4.2.1.4.    Senior Secured Creditors: nil

    4.2.2.    Preferent Creditors: nil

    4.2.3.    Concurrent Creditors: nil.

5.      **SUMMARY OF THE PROPOSED FINANCIAL RESTRUCTURING**

5.1.    The Financial Restructuring provides for the re-organisation of the following intercompany loans in the Edcon Group:

    5.1.1.    "**A Loan**" being the loan owing by ECSL to Bidco in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

    5.1.2.    "**B Loan**" being the loan owing by the Company to Bidco in an amount of ZAR2 187 328 092 (two billion one hundred and eighty seven million three hundred and twenty eight thousand and ninety two Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

    5.1.3.    "**C Loan**" being the loan owing by Bidco to the Company in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

    5.1.4.    "**D Loan**" being the loan owing by ECSL to Holdco in an amount of ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

    5.1.5.    "**E Loan**" being the loan owing by Holdco to Bidco in an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) as at the Pre-Completion Date, which is non-interest bearing;

    5.1.6.    "**F Loan**" being the loan owing by the Company to Holdco in an amount of ZAR820 000 000.00 (eight hundred and twenty million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

    5.1.7.    "**G Loan**" being the loan owing by the Company to Holdco in an amount of ZAR458 156 570.22 (four hundred and fifty eight

million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.8.   "**H Loan**" means the loan owing by ECSL to the Company in an amount of ZAR16 508 588.87 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and eighty seven cents) as at the Pre-Completion Date, the loan being non-interest bearing; and

5.1.9.   "**I Loan**" means the loan owing by the Company to ECSL in an amount of ZAR35 241 162.48 (thirty five million two hundred and forty one thousand one hundred and sixty two Rand and forty eight cents) as at the Pre-Completion Date, the loan being non-interest bearing.

5.2.   With effect from the Pre-Completion Date, each of the A Loan, B Loan, C Loan, D Loan, E Loan, F Loan, G Loan, H Loan and I Loan are hereby deemed to be immediately due, owing and payable.

5.3.   The Company's obligation to discharge the B Loan will be set-off against Bidco's obligation to pay the C Loan, leaving an amount of ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand) shall remain immediately due, owing and payable under the B Loan to Bidco ("**Remaining B Loan**").

5.4.   The Company will delegate the Remaining B Loan in its entirety to ECSL, which delegation ECSL will accept.  As a result of the delegation, the Company shall become indebted to ECSL in an amount equal to the face value of the Remaining B Loan ("**B.1 Loan**"), which B.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.5.   ECSL will delegate the D Loan in its entirety to Bidco, which delegation Bidco will accept.  As a result of the delegation, ECSL shall become indebted to Bidco in an amount equal to the face value of the D Loan ("**D.1 Loan**"), which D.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.6.   The Company will delegate the F Loan in its entirety to Bidco, which delegation Bidco will accept.  As a result of the delegation, the Company shall become indebted to Bidco in an amount equal to the face value of the F Loan ("**F.1 Loan**"), which F.1 Loan shall be immediately due, owing and payable and which shall not bear interest.  The Company will thereafter delegate the F.1 Loan in its entirety to ECSL, which delegation ECSL will accept.  As a result of the thereof, the Company will become indebted to ECSL in an amount equal to the face value of the F.1 Loan ("**F.2 Loan**"), which F.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.7.   The Company will hereby delegate the G Loan in its entirety to Bidco, which delegation Bidco will accepts.  As a result of the delegation the Company shall become indebted to Bidco in an amount equal to the face value of the G Loan ("**G.1 Loan**"), which G.1 Loan shall be immediately due, owing and payable and which shall not bear interest.  The Company will thereafter delegate the G.1 Loan in its entirety to ECSL, which delegation ECSL will accept. As a result of thereof, the Company shall become indebted to ECSL in an amount equal

to the face value of the G.1 Loan ("**G.2 Loan**"), which G.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.8.    Following the above mentioned delegations, Holdco owes the E Loan to Bidco, in an amount equal to ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents);

    5.8.1.    Bidco owes –

        5.8.1.1.    the D Loan to Holdco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

        5.8.1.2.    the F Loan to Holdco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

        5.8.1.3.    the G Loan to Holdco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents);

    5.8.2.    ECSL owes -

        5.8.2.1.    the A Loan to Bidco, in an amount equal to ZAR892 000 000.00 (eight hundred and ninety two million Rand);

        5.8.2.2.    the Remaining B Loan to Bidco, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

        5.8.2.3.    the D.1 Loan to Bidco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

        5.8.2.4.    the F.1 Loan to Bidco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand);

        5.8.2.5.    the G.1 Loan to Bidco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents); and

        5.8.2.6.    the H Loan to the Company, in an amount equal to ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents); and

    5.8.3.    The Company owes -

        5.8.3.1.    the I Loan to ECSL, in an amount equal to ZAR35 248 162 (thirty five million two hundred and forty eight thousand one hundred and sixty two Rand);

        5.8.3.2.    the B.1 Loan to ECSL, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

5.8.3.3.   the F.2 Loan to ECSL, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

5.8.3.4.   the G.2 Loan to ECSL, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents).

5.9.   Holdco's obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Bidco in terms of the E Loan shall be set-off against Bidco's obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Holdco under the G Loan, with the result that -

5.9.1.   the E Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.9.2.   an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed in terms of the G Loan shall be discharged through such set-off; and

5.9.3.   an amount of ZAR457 228 899.66 (four hundred and fifty seven million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents) shall remain owing under the G Loan to Holdco ("**Remaining G Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.10.   ECSL's obligation to repay the ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to the Company in terms of the H Loan shall be set-off against the Company's obligation to repay an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to ECSL under the G.2 Loan, with the result that -

5.10.1.   the H Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.10.2.   an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed in terms of the G.2 Loan shall be discharged through such set-off; and

5.10.3.   an amount of ZAR441 647 981.55 (four hundred and forty one million six hundred and forty seven thousand nine hundred and eighty one Rand and fifty five cents) shall remain owing under the G.2 Loan to ECSL ("**Remaining G.2 Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.11.   The effect of the above re-organisation of the intercompany loans will have the following effect:

5.11.1.   There will be "**Holdco-Bidco Loans**" being collectively, the D Loan, the F Loan, and the Remaining G Loan, all of which are owing by Bidco to Holdco and which in total amount to ZAR3 631 228 899.66 (three billion six hundred and thirty one

                million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents).

5.11.2.     There will be "**Bidco-ECSL Loans**" being Loan A in the amount of R6 047 million;

5.11.3.     There will be "**ECSL-Company Loans**" being the remaining loan H in the amount of R2 819 million.

5.12.    Holdco will subscribe for a Bidco Share for a subscription price equal to an amount of ZAR3 631 228 899.66 (three billion six hundred and thirty one million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty nine cents) ("**Bidco Share Subscription Consideration**"), with the Bidco Share Subscription Consideration left outstanding and being immediately due, owing and payable. On demand Holdco's obligation to pay the Bidco Share Subscription Consideration shall be set-off against Bidco's obligation to repay the Holdco-Bidco Loans, with the result that all payment obligations referred to in this clause shall be discharged and accordingly extinguished in their entirety, with such set-off constituting full discharge of the respective payment obligations.

5.13.    The effect hereof is that there will be no Holdco-Bidco Loans outstanding and the only intercompany debt will be the Bidco-ECSL Loans and the ECSL-Company Loans.

The Implementation Documents

5.14.    In terms of the Financial Restructuring, the following Implementation Steps will be implemented:

5.14.1.     The Senior Secured Creditors will have their indebtedness refinanced and capitalised in accordance with the documents to be executed in terms of Implementation Step S (see clause 8.32 and 8.33 of the Restructuring Agreement).

5.14.1.1.    50% of the Senior Secured Debt will be refinanced as New Holdco 2 PIK B Notes and 50% of the Senior Secured Debt will be capitalised at New Holdco 2 as follows:

5.14.1.1.1.    The Senior Secured Term Lenders can elect whether to be issued New Holdco 2 PIK B Notes in USD or ZAR. If they elect to be issued New Holdco 2 PIK B Notes in USD, the Senior Secured Term Loan Debt will be redenominated into USD ("USD Senior Secured Term Loan Debt").

5.14.1.1.2.    The Senior Secured Notes will be retranched into ZAR and USD denominated notes through a supplemental indenture, with such tranches being proportionate to the election made by Senior Secured Noteholders to ultimately take up New

Holdco 2 PIK B Notes denominated in either USD or ZAR.

5.14.1.2. The Company will delegate the USD Senior Secured Term Loan Debt and the obligation to pay the USD Senior Secured Notes Debt to New Holdco 2 and as a result of such delegation will incur an amount, denominated in USD, equal to the face value of the USD denominated Senior Secured Debt being delegated (the "USD Delegation Debt"), which will bear interest at 3% PIK per annum and which will be deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.3. The Company will delegate the ZAR Senior Secured Term Loan and the obligation to pay the ZAR denominated Senior Secured Notes Debt to New Holdco 2 for an amount, denominated in ZAR, equal to the face value of the ZAR denominated Senior Secured Debt being delegated ("the ZAR Delegation Debt") denominated in ZAR, being non-interest bearing and being deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.4. The USD Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in USD.  This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company. All of these intra-group debts are denominated in USD, bear interest at 3% PIK per annum and are deeply subordinated.

5.14.1.5. The ZAR Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in ZAR.  This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company.  All of these intra-group debts are denominated in ZAR, do not bear interest and are deeply subordinated.

5.14.1.6. New Holdco 2 will capitalise 50% of the Senior Secured Debt to New Holdco 2, by Senior Secured Creditors subscribing for New Holdco 2 Ordinary A Shares for an amount equal to 50% of the ZAR equivalent amount of the face value of their Senior Secured Debt ("the subscription debt"), with the subscription proceeds left outstanding on loan account. The subscription debt of the Senior Secured Term Loan Lenders is set-off against

an equal amount of the face value of the Senior Secured Term Loan Debt, with a portion of the Senior Secured Term Loan Debt remaining outstanding.  The subscription debt of the Senior Secured Noteholders is set-off against an equal amount of the face value of New Holdco 2's obligation to pay in terms of the Senior Secured Notes with a portion of the obligation to pay in terms of the Senior Secured Notes remaining outstanding.

5.14.1.7.    New Holdco 2 will refinance on a value-for-value basis the remaining 50% of the Senior Secured Debt as New Holdco 2 PIK B Notes, which are either USD denominated bearing interest at 3% PIK per annum or ZAR denominated bearing interest at 3% PIK  plus the value on the Business Day prior to the Pre-Completion Date quoted by Bloomberg of a zero coupon fixed-rate USD / ZAR swap to 31 December 2022.  The New Holdco 2 PIK B Notes are issued in full settlement of the Senior Secured Debt.  The Senior Secured Debt will accordingly cease to exist.

5.14.1.8.    A USD denominated Delegation Debt corresponding in value to the New Holdco 2 PIK B Notes will be maintained between New Holdco 2 and New Holdco 1 as deeply subordinated intragroup debt.  The remainder of the USD denominated Delegation Debt will be converted to ZAR.  The ZAR denominated Delegation Debt does not bear interest.  Similarly, USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes plus the value of the Commitment Fee Notes will be maintained between New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and ECSL and the Company.  The USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes (but not the portion corresponding to the Commitment Fee Notes) will be deeply subordinated to all creditors.  The remainder of the USD denominated Delegation Debt intra-group will be converted to ZAR.  The ZAR denominated Delegation Debt will not bear interest and will be deeply subordinated to all creditors.

5.15.    The Super Senior Term Loan Debt and Super Senior 2019 Notes will be refinanced as New Holdco 2 PIK A Notes, which are EUR denominated bearing interest at 8% PIK per annum, in accordance with the documents to be executed in terms of Implementation Step O (see clause 8.27 of the Restructuring Agreement.)

5.15.1.    The Super Senior Term Loan Debt and the obligation to pay the Super Senior 2019 Notes will be delegated by the Company to

New Holdco 2, with the Company becoming indebted to New Holdco 2 for an amount equal thereto.

5.15.2.    This debt owing by the Company to New Holdco 2 is then further delegated by the Company to New Holdco 1, by the Company to Parent, by the Company to Bidco and by the Company to ECSL. All of these intra-group debts are of equal value denominated in EUR and bearing interest at 8% PIK per annum.

5.15.3.    New Holdco 2 will refinance the Super Senior Term Loan Debt as New Holdco 2 PIK A Notes. New Holdco 2 will issue PIK A Notes to the Super Senior Noteholders in full settlement of the Super Senior Notes Debt. The Super Senior Notes will cease to exist.

5.16.    The Super Senior Hedging Debt will be refinanced as New Holdco 1 PIK A-2 Notes in accordance with the documents to be executed in terms of Implementation Step P (see clause 8.28 of the Restructuring Agreement.)

5.16.1.    The Super Senior Hedging Debt will be redenominated to USD ("USD Super Senior Hedging Debt").

5.16.2.    95% of the USD Super Senior Hedging Debt will be delegated by the Company to New Holdco 1, with the Company becoming indebted to New Holdco 1 for an amount equal to the USD Super Senior Hedging Debt. This Delegation Debt will be denominated in USD, and will bear interest at 5% PIK per annum.

5.16.3.    The delegated USD Super Senior Hedging Debt will be further delegated by the Company to Parent, by the Company to Bidco and by the Company to ECSL. All of these intra-group debts are of equal value denominated in USD and bear interest at 5% PIK per annum.

5.16.4.    New Holdco 1 will refinance the delegated USD Super Senior Hedging Debt as New Holdco 1 PIK A-2 Notes, which are USD denominated and bear interest at 5% PIK per annum.

5.16.5.    The remaining 5% of the USD Super Senior Hedging Debt will remain enforceable at the Company and will only be released upon Completion.

5.17.    The terms of the Existing SSLF and Existing SSCF will be amended and a New RCF will be created in accordance with the documents to be executed in terms of Implementation Step N (see clause 8.26 of the Restructuring Agreement).

5.17.1.    A new RCF Facility of R575million will be made available at Completion Date to the Company.

5.18.    New Holdco 1 will issue New Holdco 1 PIK A Notes and the proceeds will be injected into the Company in accordance with the documents to be executed in terms of Implementation Step Q (see clause 8.29 and 8.30 of the Restructuring Agreement).

5.18.1.    New Holdco 1 will issue the USD equivalent of approximately ZAR2.25billion in New Holdco 1 PIK A Notes, which are USD denominated and bear interest at 25% PIK per annum as follows:

5.18.1.1.    The ZAR Committed Amount of ZAR1.49billion; and

5.18.1.2.    The refinancing of the Facility A3 Lenders.

5.18.2.    In addition, New Holdco 1 will issue the Commitment Fee Notes (up to ZAR69,600,000) as a Commitment Fee to the Committed Creditors.

5.18.3.    The cash issue proceeds from the issue of the New Holdco 1 PIK A Notes will be loaned by New Holdco 1 to the Company as a USD denominated loan via loans to Parent, Bidco and ECSL, which intra-group loans will all be USD denominated and bear interest at 25% PIK per annum.

5.18.4.    The Participating Creditors will also receive either New Holdco 2 Ordinary B Shares with a nominal amount equal to not more than 15% (when aggregated with the CVRs) of the equity at New Holdco 2 or the CVRs.

6.    **LIST OF HOLDERS OF THE COMPANY'S ISSUED SECURITIES AND EFFECT OF THE COMPANY COMPROMISES THEREON [SECTION 155(3)(a)(iv)]**

6.1.    The Company's issued securities comprise, as at the date of this Proposal Document, of–

6.1.1.    897 ordinary shares ("**Shares**"), held entirely by ECSL;

6.1.2.    the Senior Secured 2018 Notes, held by the Senior Secured 2018 Noteholders;

6.1.3.    the Senior Secured 2019 Notes, held by the Senior Secured 2019 Noteholders; and

6.1.4.    the Super Senior 2019 Notes, held by the Super Senior 2019 Noteholders.

6.2.    On the Compromise Effective Date:

6.2.1.    The Compromise Companies, including the Company, and Compromise Creditors shall be bound by and shall comply with each of the obligations under each Implementation Document at such time as such Implementation Document becomes effective in accordance with its terms and the terms of the Restructuring Agreement.

6.2.2.    In terms of the Financial Restructuring and the Implementation Steps as summarised in clause 5 above, ECSL will be affected as follows:

6.2.2.1.    The following intercompany loans will be in place as a result of the re-organisation of the intercompany loans in Implementation Step D:

6.2.2.1.1.    The ECSL-Company Loans will be in place, with the Company owing an amount of R2,819 million to ECSL;

6.2.2.1.2.    The ECSL-Bidco Loans will be in place, with ECSL owing an amount of R6,047 million to Bidco.

6.2.2.2.    The following intra-group loans will be in place following the refinancing of the Senior Secured Debt:

6.2.2.2.1.    A USD denominated Delegation Debt, bearing interest at 3% PIK per annum; and

6.2.2.2.2.  A ZAR denominated Delegation Debt bearing no interest.

6.2.2.3.  The following intra-group loans will be in place following the refinancing of the Super Senior Third Ranking Debt:

6.2.2.3.1.  A EUR denominated Delegation Debt bearing interest at 8% PIK per annum.

6.2.2.4.  The following intra-group loans will be in place following the refinancing of the USD Super Senior Hedging Delegation Debt:

6.2.2.4.1.  A USD denominated USD Super Hedging Delegation Debt bearing interest at 5% PIK per annum.

6.2.3.  The Senior Secured 2018 Notes, the Senior Secured 2019 Notes and the Super Senior 2019 Notes will be refinanced as set out in clause above and will be fully and finally settled.

## 7.   INFORMAL PROPOSAL [SECTION 155(3)(a)(v)]

7.1.  The Company Compromises are based on the restructuring and revised steps plan as contemplated in the Lock-Up Agreement as amended (and the annexures thereto), to which the Company (by virtue of being a party thereto) and certain of its creditors are contractually obliged to propose and support the Company Compromises respectively and, as regards such creditors, to vote in favour of the relevant Company Compromise Resolutions and to execute and implement the Implementation Documents.

7.2.  The following percentage by value of the Company's creditors signed the Lock-Up Agreement:

7.2.1.  100% of the RCF Creditors;

7.2.2.  100% of the Senior Secured Liquidity Facility Lenders;

7.2.3.  100% of the Super Senior Second Ranking Creditors;

7.2.4.  72% of the Super Senior Third Ranking Creditors; and

7.2.5.  77% of the Senior Secured Creditors.

## PART B: COMPANY PROPOSALS

## 8.   TERMS OF THE COMPROMISES [SECTION 155(3)(b)]

8.1.  Senior Secured Company Compromise:

This clause 8.1 applies to the Senior Secured Creditors only.  With effect on and as from the Compromise Effective Date –

8.1.1.  The Senior Secured Creditors irrevocably and unconditionally approve the terms of, and transactions contemplated by the Implementation Documents insofar as the Senior Secured Creditors are expressed to be a party thereto.

8.1.2.  The Senior Secured Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

8.1.3.  The Company will promptly notify each of the RA Creditors once the Compromise Effective Date has occurred and invite each of the RA Creditors to accede to the Restructuring Agreement as RA

Creditor by signing an RA Accession Letter by no later than 13h00 (London time) on the RA Creditor Accession Deadline.

8.1.4.  Promptly following the RA Creditor Accession Deadline, the Compromise Agent will, pursuant to the authority granted to it under the Compromises, execute an RA Accession Letter to the Restructuring Agreement on behalf of each of the Compromise Creditors that, as at the RA Creditor Accession Deadline, has not acceded to the Restructuring Agreement.

8.1.5.  Once each of the Senior Secured Creditors has acceded to the Restructuring Agreement in accordance with clause 8.1.4 above, the RA Effective Date shall occur (provided that the Super Senior Third Ranking Creditors, RCF Lenders, the Super Senior Secured Liquidity Lenders, the Super Senior Second Ranking Creditors and the Super Senior Second Ranking Participants have also acceded to the Restructuring Agreement).

8.1.6.  The Compromise Agent is irrevocably and unconditionally authorised and empowered, on behalf of the Senior Secured Creditors, to

8.1.6.1.  promptly following the RA Accession Deadline execute an RA Accession Letter to the Restructuring Agreement on behalf of each of the Senior Secured Creditor that, as at the RA Creditor Accession Deadline, has not acceded to the Restructuring Agreement; and

8.1.6.2.  promptly after 13h00 on the Signing Date, sign, but leave undated all Execution Documents to which each Senior Secured Creditor is a party, on behalf of each such Senior Secured Creditor that has not signed such Execution Documents by 13h00 on the Signing Date and thereafter deliver electronic copies of such Execution Documents to all Legal Advisors and deliver the original signed Execution Documents physically to their respective Legal Advisor.

8.1.7.  Once all Execution Documents have been executed in accordance with clause 8.1.6 above, the Company shall promptly serve a notice on each party to the Restructuring Agreement confirming the same (the "**Signing Completion Notice**").

8.1.8.  The Restructuring Agreement and the Execution Documents are annexed to this Proposal Document (in the case of the Restructuring Agreement) in agreed form provided that such documents may be amended in accordance with clause 23 (*Amendments*) of the Restructuring Agreement:

8.1.8.1.  to insert the calculation and completion of any loans owed to, commitments of, or allocations to any Senior Secured Creditor or any other party under the Implementation Documents;

8.1.8.2.    to complete any blanks (including, without limitation, any bank account details, notice provisions or legal entity names), lists of parties and/or signature blocks;

8.1.8.3.    to make any mechanical amendments reasonably required by the Company, provided that such mechanical amendment does not change any right or obligation of or impose an additional obligation on (as at the date hereof) or prejudice in any way a Senior Secured Creditor under the Implementation Documents;

8.1.8.4.    to effect other minor, non-material or technical amendments; and/or

8.1.8.5.    in any way which is beneficial to the Senior Secured Creditors.

8.1.9.    GLAS shall, pursuant to the authority granted in the relevant Account Holder Letter or Proxy Form, and the terms of the Restructuring Agreement, on behalf of each Participating Creditor and Committed Creditor, that has not complied with Clause 8.1.3 above sign, but leave undated, the Escrow Deed to which that Participating Creditor and Committed Creditor is a party.

8.1.10.    GLAS shall, pursuant to the terms of the Restructuring Agreement, on behalf of each Compromise Creditor that has not complied with clause 8.1.3 above sign, but leave undated the Distribution Agreement to which that Compromise Creditor is a party.

8.1.11.    The Senior Secured Creditors shall be bound by and shall comply with each of their obligations under each Implementation Document at such time as such Implementation Document becomes effective in accordance with its terms and the terms of the Restructuring Agreement.

8.1.12.    In the event that the Restructuring Agreement is terminated in accordance with clause 20 of its provisions, then the Senior Secured Company Compromise will fail and will be of no force and effect and the Senior Secured Creditors will be restored to the positions they were in prior to the Senior Secured Company Meeting.

8.2.    <u>Super Senior Company Compromise:</u>

This clause 8.2 applies to the Super Senior Third Ranking Creditors only. With effect on and as from the Compromise Effective Date –

8.2.1.    The Super Senior Third Ranking Creditors hereby approve the terms of, and transactions contemplated by, the Implementation Documents insofar as the Super Senior Third Ranking Creditors are expressed to be a party thereto.

8.2.2.    The Super Senior Third Ranking Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

8.2.3.    The Company will promptly notify each of the RA Creditors once the Compromise Effective Date has occurred and invite each of

the RA Creditors to accede to the Restructuring Agreement as RA Creditor by signing an RA Accession Letter by no later than 13h00 (London time) on the RA Accession Deadline.

8.2.4. Promptly following the RA Creditor Accession Deadline, the Compromise Agent will, pursuant to the authority granted to it under the Compromises, execute an RA Accession Letter to the Restructuring Agreement on behalf of each of the Compromise Creditors that, as at the RA Creditor Accession Deadline, has not acceded to the Restructuring Agreement.

8.2.5. Once each of the Super Senior Third Ranking Creditors has acceded to the Restructuring Agreement in accordance with clause 8.2.3 above, the RA Effective Date shall occur (provided that the Senior Secured Creditors, RCF Lenders, the Super Senior Secured Liquidity Lenders, the Super Senior Second Ranking Creditors and the Super Senior Second Ranking Participants have also acceded to the Restructuring Agreement).

8.2.6. The Compromise Agent is irrevocably and unconditionally authorised and empowered, on behalf of the Super Senior Third Ranking Creditors, to -

8.2.6.1. promptly following the RA Accession Deadline execute an RA Accession Letter to the Restructuring Agreement on behalf of each of the Super Senior Third Ranking Creditors that, as at the RA Creditor Accession Deadline, has not acceded to the Restructuring Agreement; and

8.2.6.2. promptly after 13h00 (London time) on the Signing Date, sign, but leave undated all Execution Documents to which that Super Senior Third Ranking Creditor is a party, on behalf of each Super Senior Third Ranking Creditor that has not signed such Execution Documents by 13h00 on the Signing Date and deliver electronic copies of such Execution Documents to all Legal Advisors and deliver the original signed Execution Documents physically to their respective Legal Advisor.

8.2.7. Once all Implementation Documents have been executed in accordance with clause 8.2.3 above the Company shall promptly serve a notice on each party to the Restructuring Agreement confirming the same (the "**Signing Completion Notice**").

8.2.8. The Restructuring Agreement and Execution Documents are annexed to this Proposal Document (in the case of the Restructuring Agreement) in agreed form provided that such documents may be amended in accordance with clause 23 (*Amendments*) of the Restructuring Agreement –

8.2.8.1. to insert the calculation and completion of any loans owed to, commitments of, or allocations to any Super Senior Third Ranking Creditor or any other party under the Implementation Documents;

8.2.8.2.   to complete any blanks (including, without limitation, any bank account details, notice provisions or legal entity names), lists of parties and/or signature blocks;

8.2.8.3.   to make any mechanical amendments reasonably required by the Company, provided that such mechanical amendment does not change any right or obligation of or impose an additional obligation (as at the date hereof) or prejudice in any way on a Super Senior Third Ranking Creditor under the Implementation Documents;

8.2.8.4.   to effect other minor or technical amendments; and/or

8.2.8.5.   in any way which is beneficial to the Super Senior Third Ranking Creditors.

8.2.9.   GLAS shall, pursuant to the authority granted in the relevant Account Holder Letter or Proxy Form, and the terms of the Restructuring Agreement, on behalf of each Participating Creditor and Committed Creditor, that has not complied with Clause 8.2.3 above sign, but leave undated, the Escrow Deed to which that Participating Creditor and Committed Creditor is a party.

8.2.10.   GLAS shall, pursuant to the terms of the Restructuring Agreement, on behalf of each Compromise Creditor that has not complied with clause 8.2.3 above sign, but leave undated the Distribution Agreement to which that Compromise Creditor is a party.

8.2.11.   The Super Senior Third Ranking Creditors shall be bound by and shall comply with each of their obligations under each Implementation Document at such time as such Implementation Document becomes effective in accordance with the terms of the Restructuring Agreement.

8.2.12.   In the event that the Restructuring Agreement is terminated in accordance with clause 20 of its provisions, then the Super Senior Company Compromise will fail and will be of no force and effect and the Super Senior Third Ranking Creditors will be restored to the positions they were in prior to the approval of the Super Senior Company Meeting.

9.   **NATURE AND DURATION OF ANY DEBT MORATORIUM [SECTION 155(3)(b)(i)]**

A debt moratorium ("**Debt Moratorium**") is being proposed in terms of the Company Compromises as follows:

9.1.   the payment by the Company of –

9.1.1.   the March Coupon (being the payment of interest due 15 March 2016 in respect of the Senior Secured 2018 Notes) and the September Coupon (being the cash interest payment due 15 September 2016 on the Senior Secured 2018 Notes); and

9.1.2.   all cash interest payments that are due or will fall due under the Senior Secured Term Loans up to and including 14 December 2016,

is hereby deferred until 28 February 2017;

9.2.  the aforesaid deferral is subject to the occurrence of a Deferral Termination Event arising, as such term is defined in the LUA as amended by the Amendment Agreement ; and

9.3.  save as aforesaid, no other debt moratorium is being proposed in terms of the Company Compromises.

10.  **EXTENT TO WHICH THE COMPANY WILL BE RELEASED FROM THE PAYMENT OF DEBTS AND EXTENT TO WHICH ANY DEBT IS PROPOSED TO BE CONVERTED TO EQUITY [SECTION 155(3)(b)(ii)]**

As set out in clause 5 above:

10.1.  The Company will be released from the obligation to discharge the Liabilities owed to Senior Secured Noteholders by virtue of the delegation thereof to New Holdco 2.

10.2.  The Company will be released from the obligation to discharge the Liabilities owed to the Senior Secured Term Lenders by virtue of the delegation thereof to New Holdco 2.

10.2.1.  There will be intra-group debts between New Holdco 2 and New Holdco 1, New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and ECSL and the Company as a result of the delegations of the Senior Secured Debt.  These intra-group debts will be:

10.2.1.1.  USD denominated and bear interest at 3% PIK per annum; and

10.2.1.2.  ZAR denominated bearing no interest.

10.2.2.  New Holdco 2 will capitalise 50% of the USD Delegation Debt and 50% of the ZAR Delegation Debt delegated to New Holdco 2 by issuing New Holdco s Ordinary A Shares.  The subscription price of the New Holdco 1 Ordinary A Shares will be set-off against the subscription debt.

10.2.3.  New Holdco 2 will refinance the remaining 50% of the Delegated Debt as New Holdco 2 PIK B Notes, which are either USD denominated bearing interest at 3% PIK per annum or ZAR denominated bearing interest at 3% PIK plus the value on the Business Day prior to the Pre-Completion Date quoted by Bloomberg of a zero coupon fixed-rate USD / ZAR swap to 31 December 2022.

10.2.4.  A USD denominated Delegation Debt corresponding in value to the New Holdco 2 PIK B Notes will be maintained between New Holdco 2 and New Holdco 1.  The remainder of the USD denominated Delegation Debt will be converted to ZAR.  Similarly, a USD denominated Delegation Debt will be maintained between New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and ECSL and the Company.  The remainder of the USD denominated Delegation Debt intra-group will be converted to ZAR.  The ZAR denominated Delegation Debt will not bear interest.

10.3.  The Company will be released from the obligation to discharge the Super Senior Third Ranking Debt, by virtue of the delegation of the Super Senior Third Ranking Debt to New Holdco 2.

10.3.1.   The Company will become indebted to New Holdco 2 for an amount equal to the amount of the Super Senior Third Ranking Debt delegated to New Holdco 2.

10.3.2.   Intra-group debts will come into existence between New Holdco 2 and New Holdco 1, New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and the Company and ECSL. All of these intra-group debts are of equal value, denominated in EUR and will bear interest at 8% PIK per annum.

10.3.3.   New Holdco 2 will refinance the Super Senior Term Loan Debt as New Holdco 2 PIK A Notes. New Holdco 2 will issue PIK A Notes to the Super Senior Noteholders in full settlement of the Super Senior Notes Debt. The Super Senior Notes will be fully and finally settled.

11.   **TREATMENT OF CONTRACTS AND ONGOING ROLE OF THE COMPANY [SECTION 155(3)(b)(iii)]**

11.1.   The Senior Secured 2018 Notes Indentures, the Senior Secured 2019 Notes Indentures and the Super Senior 2019 Notes Indentures will be cancelled pursuant to the refinancing of the Senior Secured Debt as set out in clauses 5 and 10 above.

11.2.   The Senior Secured Term Loans and Super Senior Term Loans will be refinanced as set out in clauses 5 and 10 above.

11.3.   As set out in clause 5 above, the Restructuring Agreement also affects the following contracts and agreements:

11.3.1.   the terms of the Existing SSLF and Existing SSCF will be amended and a New RCF Facility created;

11.3.2.   the Super Senior Second Ranking Debt will be refinanced as New Holdco 1 PIK A 2 Notes; and

11.3.3.   the debt of the Facility A3 Lenders will be refinanced as part of the New Money Notes Offer (see clause 8.30 of the Restructuring Agreement).

(see also Part A of the Explanatory Statement (*Company Information, Background and Reasons for the Financial Restructuring*))

11.4.   The purpose of the Company Compromises is to enable the Company, insofar as is possible, to continue operating its business as a going concern in the ordinary course, taking into account the circumstances and facts available to the board of directors of the Company as at the date of the Proposal Document. As such, if the Company Compromises become operative on the Compromise Effective Date, the ongoing role of the Company will be to continue in the ordinary and usual course, insofar as is possible, and will not be altered in any way.

11.5.   The purpose of the Guarantor Compromises is to release the Guarantors from their obligations under the Guarantees. The Guarantor Compromises will be effective once the Company Compromise is effective.

11.6.   If the Compromises fail to become operative on the Compromise Effective Date, then the board of directors of the Company and each board of directors of each of the Guarantors will need to consider all alternatives available to them at the time, which may include, but not be limited to, voluntary

business rescue and/or a notice in terms of section 129(7) of the Companies Act and/or liquidation proceedings.

12. **PROPERTY OF THE COMPANY PROPOSED TO BE AVAILABLE TO PAY CREDITORS' CLAIMS [SECTION 155(3)(b)(iv)]**

12.1. No property of the Company is proposed to be made available to pay creditors claims by virtue of the fact that the Company is not in liquidation proceedings.

12.2. The Compromise Consideration that will be received by –

12.2.1. the Senior Secured Creditors will be New Holdco 2 Ordinary A Shares and the New Holdco 2 PIK B Notes issued by New Holdco 2;

12.2.2. the Super Senior Third Ranking Creditors will be New Holdco 2 PIK A Notes issued by New Holdco 2,

as more fully described in the Restructuring Agreement and above.

13. **ORDER OF PREFERENCE IN WHICH THE PROCEEDS OF THE PROPERTY OF THE COMPANY WILL BE APPLIED TO PAY CREDITORS IF THE COMPROMISES ARE ADOPTED [SECTION 155(3)(b)(v)]**

13.1. There is no order of preference that will apply to payments to the Compromise Creditors in relation to the Company Compromises because no proceeds of the property of the Company will be applied under the Compromises.

13.2. The Compromise Consideration that will be received by –

13.2.1. the Senior Secured Creditors will be New Holdco 2 Ordinary A Shares and the New Holdco 2 PIK B Notes issued by New Holdco 2; and

13.2.2. the Super Senior Third Ranking Creditors will be New Holdco 2 PIK A Notes issued by New Holdco 2,

as more fully described in the Restructuring Agreement and above.

14. **BENEFITS OF ADOPTING THE COMPROMISES AS OPPOSED TO BENEFITS THAT WOULD BE RECEIVED BY CREDITORS IF THE COMPANY WERE TO BE PLACED INTO LIQUIDATION [SECTION 155(3)(b)(vi)]**

14.1. If the Company were to be placed into liquidation, the creditors of the Company would only receive the benefits as set out in clause 4 above in the Matuson & Associates report, namely –

14.1.1. the creditors of the Company would receive (as an estimate) –

14.1.1.1. in respect of secured creditors, R2 960 000 000 rand in respect of the Super Senior First Ranking Creditors only;

14.1.1.2. in respect of preferent creditors, R0 (zero rand); and

14.1.1.3. in respect of concurrent creditors, R0 (zero rand).

14.1.2. the Super Senior Third Ranking Creditors would receive (as an estimate) R0 (zero rand); and

14.1.3. the Senior Secured Creditors would receive (as an estimate) R0 (zero rand).

14.2. The benefits to be received by the creditors if the Compromises become operative on the Compromise Effective Date is that the Company will be able to continue to trade in the ordinary course and the Financial Restructuring

will be implemented in accordance with its terms which will have the result of deleveraging the Company.  The Compromise Creditors will receive the Compromise Consideration.

14.3.    As a result of the Financial Restructuring, the New Money Notes will be issued by New Holdco 1 which will result in funds flowing into the Company which will enable it to continue trading.

**PART C: ASSUMPTIONS AND CONDITIONS**

15.    **STATEMENT OF CONDITIONS TO THE PROPOSAL [SECTION 155(3)(c)(i)]**

15.1.    Save for this clause 15 and clauses 18 to 22 (both inclusive) which will remain of full force and effect, the remainder of the Company Proposal is subject to the fulfilment of the following conditions precedent that, by not later than the 5 (five) Business Days prior to the Long-Stop Date –

15.1.1.    the Senior Secured Company Resolution has been lawfully passed by the Senior Secured Creditors at the Senior Secured Company Meeting;

15.1.2.    the Super Senior Company Resolution has been lawfully passed by the Super Senior Third Ranking Creditors at the Super Senior Company Meeting;

15.1.3.    the Guarantor Resolutions have been lawfully passed by the relevant Compromise Creditors at the relevant Compromise Meetings;

15.1.4.    the Compromises have been approved and sanctioned by the Court ("**Court Order/s**") in terms of section 155(7)(b) of the Companies Act, without any conditions attaching thereto or if subject to conditions, such conditions being acceptable to the Company and the applicable Compromise Creditors; and

15.1.5.    a copy of the Court Order/s have been filed with the Commission in terms of section 155(8)(a) of the Companies Act within 5 (five) Business Days of being handed down by the relevant Court.

15.2.    The Company Conditions have been inserted for the benefit of the Company and the Compromise Creditors and the fulfilment of such Company Conditions may only be waived (in whole or in part), to the extent capable of being legally waived, by the Company and not less than a majority in number and 75% of the aggregate Compromise Claims held by Compromise Creditors in each class.

15.3.    Unless the Company Conditions have been fulfilled or waived by not later than the above dates, the provisions of the Company Proposal, save for this clause 15 and clauses 18 to 22 which will remain of full force and effect, will never become of any force or effect.

16.    **EMPLOYEES [SECTION 155(3)(c)(ii)]**

16.1.    The Compromises, if they become operative, will not affect the –

16.1.1.    number of employees employed by the Company as at the Compromise Effective Date; and

16.1.2.    terms and conditions of employment of such employees.

16.2.    The BEE Trust currently holds 10.6% of the shares in the issued share capital of Holdco.  Pursuant to the Financial Restructuring, the BEE Trust will be

issued with approximately 10.6% of the ordinary shares in New Holdco 2 in the form of New Holdco 2 Ordinary C Shares.

16.3.   New Holdco 2 Ordinary D shares will be issued to the Management Incentive Trust and will constitute up to approximately 8% of the shareholding at New Holdco 2 level.

17.   **PROJECTED FINANCIALS [SECTION 155(3)(c)(iii)]**

17.1.   On the assumption that each Compromise is accepted and becomes effective on the Compromise Effective Date, the Company refers the Compromise Creditors to the documents attached as follows –

17.1.1.   projected balance sheet of the Company immediately following the Completion Date  attached as Annexure D;

17.1.2.   a projected statement of income and expenses for the ensuing three years following the Completion Date attached as Annexure E.

17.2.   The assumptions used in preparing the projected statement of income and expenses are as follows:

17.2.1.   Macroeconomic conditions are not expected to improve; inflation is assumed to run at 6% using IMF forecast inflation and no additional substantial and adverse Rand devaluation has been assumed.

17.2.2.   In terms of the **EBITDA** projections:

17.2.2.1.   sales improvements are primarily driven by:

17.2.2.1.1.   a gradual reversal of the negative credit sales trends (return to positive credit sales growth in FY18) experienced during the past couple of years which is explained in subsequent cash versus credit sales slides;

17.2.2.1.2.   further improvements in customer focus, in-store merchandising, product management and overall retail execution result in improved store sales densities (years FY19 & FY20), thereby reaching growth exceeding inflation in FY20 (whereas the Company is currently underperforming its peers);

17.2.2.1.3.   this results in year-on-year changes in sales of -5.8% (FY17), +1.4% (FY18), +5.0% (FY19), and +7.6% (FY20) respectively, against an underlying inflation of 6%;

17.2.2.2.   gross margins improve slightly in part due to the implementation of COGS savings initiatives. Gross profit is forecast on a chain level. Financial gross profit grows from 36.5% in FY16 to 36.7% in FY17, 37.6% in FY18, 37.8% in FY19 and 37.9% in FY20;

17.2.2.3.    planned cost increases (most at 8°/0 annual increase) are partially offset by significant cost reduction initiatives in overheads and Goods Not For Resale (GNFR); and

17.2.2.4.    FY16 monthly seasonality was applied to future year projections.

17.2.3.    Impact of the Financial Restructuring:

17.2.3.1.    super senior cash pay interest is forecast as per the current agreed documentation.


17.2.4.    Store Expenses:

17.2.4.1.    Manpower & wages (stores): +4% (FY17); +6% (FY18), +7% (FY19) and +9% in (FY20); reflects headcount reduction in FY17; and

17.2.4.2.    manpower & wages (other): +4% (FY17); +8% (FY18), +8% (FY19) and +9% (FY20); reflects headcount reduction in FY17;

17.2.4.3.    utilities: +83% per annum; and

17.2.4.4.    other expenses forecast at inflation.

17.2.5.    Other costs:

17.2.5.1.    Chain Management: wages growing at wages rate increase, other costs growing at inflation;

17.2.5.2.    Corporate overheads: manpower costs growing at wages rate increase; other costs growing at inflation thereafter;

17.2.5.3.    club income: flat for all years;

17.2.5.4.    credit & Financial Services: EBITDA +7% (FY17); -4% (FY18-19); -1% (FY20);

17.2.5.5.    advertising: growing at inflation after FY17;

17.2.5.6.    other overheads: growing at inflation;

17.2.5.7.    capex: R638m (FY17); R600m (FY17); R600m (FY19); R600m (FY20);

17.2.5.8.    restructuring fees: estimated at R956m in FY17 (incl. c. R280m success fees); and

17.2.5.9.    taxes: estimated at 0.4% of net sales and adjusted monthly for seasonality.

17.2.6.    Leases expiring/ closure of stores:

17.2.6.1.    In each year, it is assumed 33% of expiring leases will not be renewed, 33% will be renewed without rent escalation and 33% will be renewed assuming a 10% rent reduction.

17.2.6.2.    Expiry of leases assumed:

17.2.6.2.1.    FY17 - 14% of leases expire;

17.2.6.2.2.    FY18 - 15% of leases expire;

17.2.6.2.3.    FY19 - 17% of leases expire;

17.2.6.2.4.    FY20 - 16% of leases expire;

            17.2.6.3.   sales from closed stores is calculated based on the average revenues generated by recently closed stores; and

            17.2.6.4.   40% of revenues from closed stores are assumed to be retained through reverse-cannibalisation.

    17.2.7.     Opening stores/other retail space reductions:

            17.2.7.1.   FY17 to FY19 new store openings are based on the company's property budget. FY20 new stores are based on estimates from the company using the company's property framework to forecast sales. It is assumed that all stores open in September.

    17.2.8.     Fast track initiatives:

            17.2.8.1.   COGS: savings of R95m (FY17), R156 (FY18), R108 (FY19), R100m (FY20) which includes anticipated benefits of direct sourcing;

            17.2.8.2.   GNFR: savings of R290m (FY17), R230 (FY18), R170m (FY19), R120m (FY20);

            17.2.8.3.   Lean HQ savings of R389m (FY17);

            17.2.8.4.   Edgars pilot stores: rollout assumes revenue improvements of 3% in both FY17 (cash sales for 11 months) and on cash and credit sales in FY18 plus a further 1% in FY19; and

            17.2.8.5.   Jet pilot stores: rollout assumes annual revenue improvement if 3% from FY17 (cash sales for 11 months).

**.GENERAL**

18.    **LOCK-UP AGREEMENT:  SUPPORT FROM CREDITORS**

The Company highlights that, as at the date of the Proposal Document, –

18.1.   in relation to the Senior Secured Class, Senior Secured Creditors who represent (in each case, based on values on or around 3 October 2016) –

    18.1.1.     23 in number of the Senior Secured Creditors; and

    18.1.2.     77% (seventy seven percent) in value of the Senior Secured Creditors

have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Senior Secured Company Resolution and Guarantor Resolutions;

18.2.   in relation to the Super Senior Class, Super Senior Third Ranking Creditors who represent (in each case, based on values on or around 3 October 2016) –

    18.2.1.     17 in number of the Super Senior Third Ranking Creditors; and

    18.2.2.     72% (seventy two percent) in value of the Super Senior Third Ranking Creditors

have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Super Senior Company Resolution and Guarantor Resolutions.

19.    **BOARD RECOMMENDATION**

The board of directors of the Company recommends that the Senior Secured Creditors vote in favour of the Senior Secured Company Compromise by approving the Senior Secured Company Resolution at the Senior Secured Company Meeting.

The board of directors of the Company recommends that the Super Senior Third Ranking Creditors vote in favour of the Super Senior Company Compromise by approving the Super Senior Company Resolution at the Super Senior Company Meeting.

20. **AMENDMENTS**

20.1. The terms and conditions of any Company Compromise may be varied or amended –

20.1.1. by the Company at any time before the date and time for the commencement of the Senior Secured Company Meeting or the Super Senior Company Meeting (as applicable) provided that such variations or amendments are not material to the relevant Compromise Creditors and would not change any right or obligation of any Compromise Creditor or impose any additional obligation on the Compromise Creditor if the Compromises are approved other than in the manner contemplated in the Proposal Document as at the date hereof and details of such variation and amendment have been Announced to the relevant Compromise Creditors ahead of the Senior Secured Company Meeting or the Super Senior Company Meeting (as applicable); or

20.1.2. in such manner as the Court may require, provided that such modification, addition, term or condition does not change any right or obligation of or impose an additional obligation (as at the date of sanctioning) on a Compromise Creditor.

20.2. If the terms and/or conditions of any Company Compromise are amended, any reference to such Company Compromise shall be deemed to be construed as a reference to such Company Compromise as amended.

21. **FOREIGN REPRESENTATIVE**

Mr. Charles Vikisi or any other person authorised by the board of directors of the Company is appointed and authorised to act as a foreign representative in respect of the Company Compromises ("**Foreign Representative**") in any Chapter 15 Proceedings.  The Foreign Representative is authorised on behalf of the Company to take any and all actions to execute, deliver, certify, file, and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Chapter 15 Proceedings.

22. **CERTIFICATE BY AN AUTHORISED DIRECTOR OF THE COMPANY**

In my capacity as authorised director on the board of directors of the Company, I hereby certify in terms of section 155(5) of the Companies Act, that –

22.1. the factual information provided in the Company Proposal appears to be accurate, complete and up to date; and

22.2. the projections provided in the Company Proposal are estimates made in good faith on the basis of the factual information and assumptions set out herein.

Signed at _____ on _____ 2016

_____

**RICHARD VAUGHAN**

**CHIEF FINANCIAL OFFICER AND DIRECTOR, EDCON LIMITED**

# Annexure A

# List of the Material Assets of the Company

# Annexure B

# List of the creditors of the Company

# Annexure C

# Summary of Probable Dividend Calculation

# Annexure D

# Projected Balance Sheet of the Company

# Annexure E

# Projected Statement of Income and Expenses of the Company

**EDGARS CONSOLIDATED STORES LIMITED**
Incorporated in South Africa
(Registration Number 1946/022751/06)

---

**ECSL PROPOSAL**
**INFORMATION REASONABLY REQUIRED TO FACILITATE COMPROMISE CREDITORS IN
DECIDING WHETHER OR NOT TO ACCEPT OR REJECT THE ECSL COMPROMISES AS
REQUIRED IN TERMS OF SECTION 155(3) OF THE COMPANIES ACT**

---

The definitions and interpretations commencing on page 7 of the Proposal Document apply
throughout, including this cover page (unless the context indicates a contrary intention).

**YOU ARE STRONGLY URGED TO READ THE EXPLANATORY STATEMENT IN ITS ENTIRETY
FOR MORE INFORMATION AS TO THE EFFECTS AND CONSEQUENCES SHOULD THE
COMPROMISES BECOME OPERATIVE.  THE EXPLANATORY STATEMENT SUMMARISES THE
EFFECT AND CONSEQUENCES OF NOT ONLY THE COMPROMISES, BUT ALSO THE RELEVANT
TRANSACTIONS IN THE RESTRUCTURING DOCUMENTS WHICH WILL IMPACT ON, AND
BIND, THE SENIOR SECURED CREDITORS AND SUPER SENIOR THIRD RANKING CREDITORS
RESPECTIVELY SHOULD THE COMPROMISES BECOME EFFECTIVE.  THE AFORESAID
TRANSACTIONS WILL BE IMPLEMENTED PURSUANT TO THE AUTHORITIES CONTAINED IN
THE RELEVANT COMPROMISE TO BIND THE RESPECTIVE COMPROMISE CREDITORS
THERETO.**

1.       **STRUCTURE OF THE COMPROMISES**
         For the purposes of section 155(3) of the Companies Act, the terms of the ECSL Compromises are divided into 3 (three) parts as follows –

1.1.     **PART A - BACKGROUND**
         In accordance with section 155(3)(a) of the Companies Act, this part sets out:

1.1.1.   a complete list of all the material assets of ECSL, as well as an indication as to which assets are held as security by creditors as at 26 November 2016;

1.1.2.   a complete list of the creditors of ECSL as at 26 November 2016, as well as an indication as to which creditors would qualify as secured, statutory preferent and concurrent in terms of the laws of insolvency, and an indication of which of the creditors have proved their claims;

1.1.3.   the probable dividend that would be received by creditors, in their specific classes, if ECSL were to be placed in liquidation;

1.1.4.   a complete list of the holders of ECSL issued securities, and the effect that the proposal in respect of the ECSL Compromises would have on them, if any; and

1.1.5.   whether the proposal in respect of the ECSL Compromises includes a proposal made informally by a creditor of ECSL.

         (See pages 917 to 928).

1.2.     **PART B - TERMS OF THE COMPROMISES**
         In accordance with section 155(3)(b) of the Companies Act, this part describes in detail the terms of each ECSL Compromise, including:

1.2.1.   noting that there is a debt moratorium proposed pursuant to the ECSL Compromises;

1.2.2.   the extent to which ECSL is to be released from the payment of its debts, and the extent to which any debt is proposed to be converted to equity in ECSL, or another Company;

1.2.3.   the treatment of contracts and ongoing role of ECSL;

1.2.4.   the property of ECSL that is proposed to be available to pay creditors' claims;

1.2.5.   the order of preference in which the proceeds of property of ECSL will be applied to pay creditors if the proposal is adopted; and

1.2.6.   the benefits of adopting the proposals in respect of the ECSL Compromises as opposed to the benefits that would be received by creditors if ECSL were to be placed in liquidation.

         This part also states that if (i) the Senior Secured ECSL Resolution is adopted by a majority of the relevant Senior Secured Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding as at the Record Date or DTC Record Date (as applicable) held by the Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured ECSL Meeting; and (ii) the Super Senior ECSL Resolution is adopted by a majority of the relevant Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding as at the Record Date held by the Super Senior Third Ranking Creditors who are present and voting in person or by proxy at the Super

Senior ECSL Meeting, then the ECSL Compromises will become effective once all the ECSL Conditions have been fulfilled upon the Compromise Effective Date

(See pages 928 to 931).

**1.3.    PART C – ASSUMPTIONS AND CONDITIONS**

In accordance with section 155(3)(c) of the Companies Act, this part sets out :

1.3.1.    a statement of the ECSL Conditions that must be satisfied, if any, for the ECSL Compromises to —

1.3.1.1.    come into operation; and

1.3.1.2.    be fully implemented;

1.3.2.    the effect, if any, that the ECSL Compromises contemplate having on the number of employees, and their terms and conditions of employment; and

1.3.3.    a projected —

1.3.3.1.    balance sheet for ECSL; and

1.3.3.2.    statement of income and expenses for the ensuing three years,

prepared on the assumption that the ECSL Compromises are accepted.

(See pages 931 to 932).

## PART A: BACKGROUND

**2.    LIST OF MATERIAL ASSETS OF ECSL AND SECURITY OVER SUCH ASSETS [SECTION 155(3)(a)(i)]**

2.1.    A complete list of the material assets of ECSL at book value and the security given in relation thereto as at 26 November 2016 is attached hereto marked Annexure A.

2.2.    The financial information of the Existing Group is calculated as at 26 November 2016 being the most recent financial information available as at the date of this Proposal Document.  There has been no change to the financial information between 26 November 2016 and the date of the Proposal Document which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

**3.    CREDITORS OF ECSL [SECTION 155(3)(a)(ii)]**

A complete list of the creditors of ECSL as at 26 November 2016 is attached as Annexure B, which furthermore identifies creditors as secured, statutory preferent and concurrent in terms of South African insolvency laws.  There has been no change to the list of creditors between 26 November 2016 and the date of the Proposal Document which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

No creditors have proved any claims against ECSL as ECSL is not in liquidation.

**4.    PROBABLE LIQUIDATION DIVIDEND [SECTION 155(3)(a)(iii)]**

4.1.    ECSL engaged the services of Matuson & Associates to calculate the probable dividend which would be received by the Compromise Creditors, if ECSL were to be put into liquidation, as at 26 November 2016.  A copy of the report prepared by Matuson & Associates reflecting the probable dividend calculation is attached hereto as Annexure C.

4.2.  Based on the dividend calculation, the probable dividend which creditors would receive as at such date is as follows:

4.2.1.  Secured Creditors : nil;

4.2.2.  Preferent Creditors : nil; and

4.2.3.  Concurrent Creditors : nil.

5.  **A SUMMARY OF THE FINANCIAL RESTRUCTURING**

5.1.  The Financial Restructuring provides for the re-organisation of the following intercompany loans in the Edcon Group:

5.1.1.  "**A Loan**" being the loan owing by ECSL to Bidco in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.2.  "**B Loan**" being the loan owing by the Company to Bidco in an amount of ZAR2 187 328 092 (two billion one hundred and eighty seven million three hundred and twenty eight thousand and ninety two Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.3.  "**C Loan**" being the loan owing by Bidco to the Company in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.4.  "**D Loan**" being the loan owing by ECSL to Holdco in an amount of ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.5.  "**E Loan**" being the loan owing by Holdco to Bidco in an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) as at the Pre-Completion Date, which is non-interest bearing;

5.1.6.  "**F Loan**" being the loan owing by the Company to Holdco in an amount of ZAR820 000 000.00 (eight hundred and twenty million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.7.  "**G Loan**" being the loan owing by the Company to Holdco in an amount of ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.8.  "**H Loan**" means the loan owing by ECSL to the Company in an amount of ZAR16 508 588.87 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and eighty seven cents) as at the Pre-Completion Date, the loan being non-interest bearing; and

5.1.9.  "**I Loan**" means the loan owing by the Company to ECSL in an amount of ZAR35 241 162.48 (thirty five million two hundred and forty one thousand one hundred and sixty two Rand and forty

eight cents) as at the Pre-Completion Date, the loan being non-interest bearing.

5.2.    With effect from the Pre-Completion Date, each of the A Loan, B Loan, C Loan, D Loan, E Loan, F Loan, G Loan, H Loan and I Loan are hereby deemed to be immediately due, owing and payable.

5.3.    The Company's obligation to discharge the B Loan will be set-off against Bidco's obligation to pay the C Loan, leaving an amount of ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand) shall remain immediately due, owing and payable under the B Loan to Bidco ("**Remaining B Loan**").

5.4.    The Company will delegate the Remaining B Loan in its entirety to ECSL, which delegation ECSL will accept.  As a result of the delegation, the Company shall become indebted to ECSL in an amount equal to the face value of the Remaining B Loan ("**B.1 Loan**"), which B.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.5.    ECSL will delegate the D Loan in its entirety to Bidco, which delegation Bidco will accept.  As a result of the delegation, ECSL shall become indebted to Bidco in an amount equal to the face value of the D Loan ("**D.1 Loan**"), which D.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.6.    The Company will delegate the F Loan in its entirety to Bidco, which delegation Bidco will accept.  As a result of the delegation, the Company shall become indebted to Bidco in an amount equal to the face value of the F Loan ("**F.1 Loan**"), which F.1 Loan shall be immediately due, owing and payable and which shall not bear interest.  The Company will thereafter delegate the F.1 Loan in its entirety to ECSL, which delegation ECSL will accept.  As a result of the thereof, the Company will become indebted to ECSL in an amount equal to the face value of the F.1 Loan ("**F.2 Loan**"), which F.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.7.    The Company will hereby delegate the G Loan in its entirety to Bidco, which delegation Bidco will accepts.  As a result of the delegation the Company shall become indebted to Bidco in an amount equal to the face value of the G Loan ("**G.1 Loan**"), which G.1 Loan shall be immediately due, owing and payable and which shall not bear interest.  The Company will thereafter delegate the G.1 Loan in its entirety to ECSL, which delegation ECSL will accept.  As a result thereof, the Company shall become indebted to ECSL in an amount equal to the face value of the G.1 Loan ("**G.2 Loan**"), which G.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.8.    Following the above mentioned delegations, Holdco owes the E Loan to Bidco, in an amount equal to ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents);

5.8.1.      Bidco owes –

5.8.1.1.    the D Loan to Holdco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

5.8.1.2.    the F Loan to Holdco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

5.8.1.3.    the G Loan to Holdco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents);

5.8.2.    ECSL owes -

5.8.2.1.    the A Loan to Bidco, in an amount equal to ZAR892 000 000.00 (eight hundred and ninety two million Rand);

5.8.2.2.    the Remaining B Loan to Bidco, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

5.8.2.3.    the D.1 Loan to Bidco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

5.8.2.4.    the F.1 Loan to Bidco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand);

5.8.2.5.    the G.1 Loan to Bidco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents); and

5.8.2.6.    the H Loan to the Company, in an amount equal to ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents); and

5.8.3.    The Company owes -

5.8.3.1.    the I Loan to ECSL, in an amount equal to ZAR35 248 162 (thirty five million two hundred and forty eight thousand one hundred and sixty two Rand);

5.8.3.2.    the B.1 Loan to ECSL, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

5.8.3.3.    the F.2 Loan to ECSL, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

5.8.3.4.    the G.2 Loan to ECSL, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents).

5.9.    Holdco's obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Bidco in terms of the E Loan shall be set-off against Bidco's obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Holdco under the G Loan, with the result that -

5.9.1.    the E Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.9.2.    an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed in terms of the G Loan shall be discharged through such set-off; and

5.9.3.    an amount of ZAR457 228 899.66 (four hundred and fifty seven million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents) shall remain owing under the G Loan to Holdco ("**Remaining G Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.10.    ECSL's obligation to repay the ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to the Company in terms of the H Loan shall be set-off against the Company's obligation to repay an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to ECSL under the G.2 Loan, with the result that -

5.10.1.    the H Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.10.2.    an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed in terms of the G.2 Loan shall be discharged through such set-off; and

5.10.3.    an amount of ZAR441 647 981.55 (four hundred and forty one million six hundred and forty seven thousand nine hundred and eighty one Rand and fifty five cents) shall remain owing under the G.2 Loan to ECSL ("**Remaining G.2 Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.11.    The effect of the above re-organisation of the intercompany loans will have the following effect:

5.11.1.    There will be "**Holdco-Bidco Loans**" being collectively, the D Loan, the F Loan, and the Remaining G Loan, all of which are owing by Bidco to Holdco and which in total amount to ZAR3 631 228 899.66 (three billion six hundred and thirty one million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents).

5.11.2.    There will be "**Bidco-ECSL Loans**" being Loan A in the amount of R6 047 million;

5.11.3.    There will be "**ECSL-Company Loans**" being the remaining loan H in the amount of R2 819 million.

5.12.   Holdco will subscribe for a Bidco Share for a subscription price equal to an amount of ZAR3 631 228 899.66 (three billion six hundred and thirty one million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents) ("**Bidco Share Subscription Consideration**"), with the Bidco Share Subscription Consideration left outstanding and being immediately due, owing and payable. On demand Holdco's obligation to pay the Bidco Share Subscription Consideration shall be set-off against Bidco's obligation to repay the Holdco-Bidco Loans, with the result that all payment obligations referred to in this clause shall be discharged and accordingly extinguished in their entirety, with such set-off constituting full discharge of the respective payment obligations.

5.13.   The effect hereof is that there will be no Holdco-Bidco Loans outstanding and the only intercompany debt will be the Bidco-ECSL Loans and the ECSL-Company Loans.

The Implementation Documents

5.14.   In terms of the Financial Restructuring, the following Implementation Steps will be implemented:

5.14.1.   The Senior Secured Creditors will have their indebtedness refinanced and capitalised in accordance with the documents to be executed in terms of Implementation Step S (see clause 8.32 and 8.33 of the Restructuring Agreement).

5.14.1.1.   50% of the Senior Secured Debt will be refinanced as New Holdco 2 PIK B Notes and 50% of the Senior Secured Debt will be capitalised at New Holdco 2 as follows:

5.14.1.1.1.   The Senior Secured Term Lenders can elect whether to be issued New Holdco 2 PIK B Notes in USD or ZAR. If they elect to be issued New Holdco 2 PIK B Notes in USD, the Senior Secured Term Loan Debt will be redenominated into USD ("USD Senior Secured Term Loan Debt").

5.14.1.1.2.   The Senior Secured Notes will be retranched into ZAR and USD denominated notes through a supplemental indenture, with such tranches being proportionate to the election made by Senior Secured Noteholders to ultimately take up New Holdco 2 PIK B Notes denominated in either USD or ZAR.

5.14.1.2.   The Company will delegate the USD Senior Secured Term Loan Debt and the obligation to pay the USD Senior Secured Notes Debt to New Holdco 2 and as a result of such delegation will incur amount,

denominated in USD, equal to the face value of the USD denominated Senior Secured Debt being delegated (the "USD Delegation Debt"), which will bear interest at 3% PIK per annum and which will be deeply subordinated.

5.14.1.3.  The Company will delegate the ZAR Senior Secured Term Loan and the obligation to pay the ZAR denominated Senior Secured Notes Debt to New Holdco 2 for an amount, denominated in ZAR, equal to the face value of the ZAR denominated Senior Secured Debt being delegated ("the ZAR Delegation Debt") denominated in ZAR, being non-interest bearing and being deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.4.  The USD Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in USD.  This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company. All of these intra-group debts are denominated in USD, bear interest at 3% PIK per annum and are deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.5.  The ZAR Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in ZAR.  This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company.  All of these intra-group debts are denominated in ZAR, do not bear interest and are deeply subordinated.

5.14.1.6.  New Holdco 2 will capitalise 50% of the Senior Secured Debt to New Holdco 2, by Senior Secured Creditors subscribing for New Holdco 2 Ordinary A Shares for an amount equal to 50% of the ZAR equivalent amount of the face value of their Senior Secured Debt ("the subscription debt"), with the subscription proceeds left outstanding on loan account. The subscription debt of the Senior Secured Term Loan Lenders is set-off against an equal amount of the face value of the Senior Secured Term Loan Debt, with a portion of the Senior Secured Term Loan Debt remaining outstanding.  The subscription debt of the Senior Secured Noteholders is set-off against an equal amount of the face value of

New Holdco 2's obligation to pay in terms of the Senior Secured Notes with a portion of the obligation to pay in terms of the Senior Secured Notes remaining outstanding.

5.14.1.7.    New Holdco 2 will refinance on a value-for-value basis the remaining 50% of the Senior Secured Debt as New Holdco 2 PIK B Notes, which are either USD denominated bearing interest at 3% PIK per annum or ZAR denominated bearing interest at 3% PIK plus the value on the Business Day prior to the Pre-Completion Date quoted by Bloomberg of a zero coupon fixed-rate USD / ZAR swap to 31 December 2022.  The New Holdco 2 PIK B Notes are issued in full settlement of the Senior Secured Debt.  The Senior Secured Debt will accordingly cease to exist.

5.14.1.8.    A USD denominated Delegation Debt corresponding in value to the New Holdco 2 PIK B Notes will be maintained between New Holdco 2 and New Holdco 1 as a deeply subordinated intragroup debt.  The remainder of the USD denominated Delegation Debt will be converted to ZAR.  The ZAR denominated Delegation Debt does not bear interest.  Similarly, USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes plus the value of the Commitment Fee Notes will be maintained between New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and ECSL and the Company.  The USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes (but not the portion corresponding to the Commitment Fee Notes) will be deeply subordinated to all creditors. The remainder of the USD denominated Delegation Debt intra-group will be converted to ZAR.  The ZAR denominated Delegation Debt will not bear interest and will be deeply subordinated to all creditors.

5.15.    The Super Senior Term Loan Debt and Super Senior 2019 Notes will be refinanced as New Holdco 2 PIK A Notes, which are EUR denominated bearing interest at 8% PIK per annum, in accordance with the documents to be executed in terms of Implementation Step O (see clause 8.27 of the Restructuring Agreement.)

5.15.1.    The Super Senior Term Loan Debt and the obligation to pay the Super Senior 2019 Notes will be delegated by the Company to New Holdco 2, with the Company becoming indebted to New Holdco 2 for an amount equal thereto.

5.15.2.    This debt owing by the Company to New Holdco 2 is then further delegated by the Company to New Holdco 1, by the Company to Parent, by the Company to Bidco and by the Company to ECSL.  All

of these intra-group debts are of equal value denominated in EUR and bear interest at 8% PIK per annum.

5.15.3.  New Holdco 2 will refinance the Super Senior Term Loan Debt as New Holdco 2 PIK A Notes.  New Holdco 2 will issue PIK A Notes to the Super Senior Noteholders in full settlement of the Super Senior Notes Debt.  The Super Senior Notes will be fully and finally settled.

5.16.  The Super Senior Hedging Debt will be refinanced as New Holdco 1 PIK A-2 Notes in accordance with the documents to be executed in terms of Implementation Step P (see clause 8.28 of the Restructuring Agreement.)

5.16.1.  The Super Senior Hedging Debt will be redenominated to USD ("USD Super Senior Hedging Debt").

5.16.2.  95% of the USD Super Senior Hedging Debt will be delegated by the Company to New Holdco 1, with the Company becoming indebted to New Holdco 1 for an amount equal to the USD Super Senior Hedging Debt.  This Delegation Debt will be denominated in USD, and will bear interest at 5% PIK per annum.

5.16.3.  The delegated USD Super Senior Hedging Debt will be further delegated by the Company to Parent, by the Company to Bidco and by the Company to ECSL.  All of these intra-group debts are of equal value denominated in USD and will bear interest at 5% PIK per annum.

5.16.4.  New Holdco 1 will refinance the delegated USD Super Senior Hedging Debt as New Holdco 1 PIK A-2 Notes, which are USD denominated and bear interest at 5% PIK per annum.

5.16.5.  The remaining 5% of the USD Super Senior Hedging Debt will remain enforceable at the Company and will only be released upon Completion,

5.17.  The terms of the Existing SSLF and Existing SSCF will be amended and a New RCF will be created in accordance with the documents to be executed in terms of Implementation Step N (see clause 8.26 of the Restructuring Agreement).

5.17.1.  A new RCF Facility of R575million will be made available at Completion Date to the Company.

5.18.  New Holdco 1 will issue New Holdco 1 PIK A Notes and the proceeds will be injected into the Company in accordance with the documents to be executed in terms of Implementation Step Q (see clause 8.29 and 8.30 of the Restructuring Agreement).

5.18.1.  New Holdco 1 will issue the USD equivalent of approximately ZAR2.25billion in New Holdco 1 PIK A Notes, which are USD denominated and bear interest at 25% PIK per annum, as follows:

5.18.1.1.  The ZAR Committed Amount of ZAR1.49billion; and

5.18.1.2.  The refinancing of the Facility A3 Lenders.

5.18.2.  In addition, New Holdco 1 will issue the Commitment Fee Notes (up to ZAR69,600,000) as a Commitment Fee to the Committed Creditors.

5.18.3.   The cash issue proceeds from the issue of the New Holdco 1 PIK A Notes will be loaned by New Holdco 1 to the Company as a USD denominated loan via loans to Parent, Bidco and ECSL, which intra-group loans will all be USD denominated and will bear interest at 25% PIK per annum.

5.18.4.   The Participating Creditors will also receive either New Holdco 2 Ordinary B Shares with a nominal amount equal to not more than 15% (when aggregated with the CVRs) of the equity at New Holdco 2 or the CVRs.

6.   **LIST OF HOLDERS OF ECSL'S ISSUED SECURITIES AND EFFECT OF THE ECSL COMPROMISES THEREON [SECTION 155(3)(a)(iv)]**

6.1.   ECSL's issued securities comprise, as at the date of this Proposal Document, of–

6.1.1.   543509670 Ordinary Shares held by Bidco.

6.2.   Save as otherwise expressly provided in the Restructuring Agreement, the Restructuring Agreement will be dated and binding on ECSL as an Initial Party as from the Initial Effective Date.

6.3.   On the Compromise Effective Date the Compromise Companies, including ECSL, and the Compromise Creditors, shall be bound by and shall comply with each of the Implementation Documents at such time as such Implementation Document becomes effective in accordance with its terms and the terms of the Restructuring Agreement.

6.4.   The Restructuring Agreement and the Execution Documents will affect ECSL in the following manner:

6.4.1.   The following intercompany loans will be in place as a result of the re-organisation of the intercompany loans in Implementation Step D:

6.4.1.1.   The ECSL-Company Loans will be in place, with the Company owing an amount of R6 047 million to ECSL;

6.4.1.2.   The ECSL-Bidco Loans will be in place, with Bidco owing an amount of R2 819 million to ECSL

6.4.2.   The following intra-group loans will be in place following the refinancing of the Senior Secured Debt:

6.4.2.1.   A USD denominated Delegation Debt, bearing interest at 3% PIK per annum; and

6.4.2.2.   A ZAR denominated Delegation Debt bearing no interest.

6.4.3.   The following intra-group loans will be in place following the refinancing of the Super Senior Third Ranking Debt:

6.4.3.1.   A EUR denominated Delegation Debt bearing interest at 8% PIK per annum.

6.4.4.   The following intra-group loans will be in place following the refinancing of the USD Super Senior Hedging Delegation Debt:

6.4.4.1.   A USD denominated USD Super Senior Hedging Delegation Debt bearing interest at 5% PIK per annum.

6.4.5.   In terms of Implementation Step G1 (*Matching Loan Delegation*) referred to in clause 8.15 of the Restructuring Agreements and

the documents to be entered into pursuant thereto Matching Loan owed by the Company to Holdco will be delegated to Bidco and ECSL respectively.

6.4.6.   In terms of Implementation Step G2 (*Share subscription and set-off agreement*) referred to in clause 8.15 of the Restructuring Agreement and the documents to be entered into pursuant thereto Holdco will subscribe for a share in Bidco and the payment of the subscription price will be paid through set-off. The intra-group loans between ECSL and Bidco and ECSL and the Company in the amount of ZAR6,859million created by the delegations in Implementation Step G1 will remain in place and will be deeply subordinated to all creditors.  These intra-group loans will be ZAR denominated and interest free.

6.4.7.   In the event that the Edcon Group obtains a favourable Binding Private Ruling from SARS, these intra-company loans will be capitalised in terms of the subscription of shares and set-off of the subscription price; failing which these loans will remain in place as described above.

6.4.8.   In terms of Implementation Step M (*Sale of Target Group to Parent for the Purchase Consideration*) the shares held by Holdco in Bidco will be sold to Parent.  As a result of this implementation step, Bidco will be transferred to the New Holdco Group.  As a subsidiary of Bidco, ECSL will also be transferred to the New Holdco Group.

6.4.9.   The ECSL Compromises, once operable, will secure the release of ECSL from the Guarantees provided by ECSL.

6.5.   Bidco as the shareholder of ECSL will be affected by the Financial Restructuring as follows:

6.5.1.   Bidco will be transferred to Parent in the New Holdco Group, along with its subsidiaries ECSL and the Company;

6.5.2.   The ECSL-Bidco Loans will be in place, with ECSL owing an amount of ZAR6,047 million to Bidco;

6.5.3.   The intra-group loans denominated in USD, EUR and ZAR as described in clauses 6.4.2, 6.4.3 and 6.4.4 above will be in place.

7.   **INFORMAL PROPOSAL [SECTION 155(3)(a)(v)]**

7.1.   The ECSL Compromises are based on the restructuring and revised steps plan as contemplated in the Lock-Up Agreement (and the annexures thereto), to which ECSL (by virtue of being a party thereto) and certain of the Existing Group's creditors are contractually obliged to propose and support the Compromises respectively and, as regards such creditors, to vote in favour of the relevant Company Compromise Resolutions and to execute and implement the Implementation Documents.

7.2.   The following percentage by value of the Existing Group's creditors signed the Lock-Up Agreement:

7.2.1.   100% of the RCF Creditors;

7.2.2.   100% of the Senior Secured Liquidity Facility Lenders;

7.2.3.   100% of the Super Senior Second Ranking Creditors;

7.2.4.     72% of the Super Senior Third Ranking Creditors; and

7.2.5.     77% of the Senior Secured Creditors.

**PART B: ECSL PROPOSALS**

8.      **TERMS OF THE COMPROMISES [SECTION 155(3)(b)]**

8.1.    Senior Secured ECSL Compromise:

This clause 8.1 applies to the Senior Secured Creditors only.

8.1.1.     The Senior Secured Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

8.1.2.     With effect on and as from the implementation of Implementation Step S in terms of the Restructuring Agreement on the Completion Date the Senior Secured Creditors irrevocably and unconditionally release ECSL from the terms of the Guarantees given by ECSL on the basis that no party shall have any liability whatsoever to the other thereunder.

8.2.    Super Senior ECSL Compromise:

This clause 8.2 applies to the Super Senior Third Ranking Creditors only.

8.2.1.     With effect on and as from the implementation of Implementation Step O in terms of the Restructuring Agreement on the Completion Date, the Super Senior Third Ranking Creditors hereby irrevocably and unconditionally release ECSL from the terms of the Guarantees given by ECSL on the basis that no party shall have any liability whatsoever to the other thereunder.

8.2.2.     The Super Senior Third Ranking Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

9.      **NATURE AND DURATION OF ANY DEBT MORATORIUM [SECTION 155(3)(b)(i)]**

A debt moratorium ("**Debt Moratorium**") is being proposed in terms of the ECSL Compromises as follows:

9.1.    the payment by the Company of –

9.1.1.     the March Coupon (being the payment of interest due 15 March 2016 in respect of the Senior Secured 2018 Notes) and the September Coupon (being the cash interest payment due 15 September 2016 on the Senior Secured 2018 Notes); and

9.1.2.     all cash interest payments that are due or will fall due under the Senior Secured Term Loans up to and including 14 December 2016,

is hereby deferred until 28 February 2017;

9.2.    the aforesaid deferral is subject to the occurrence of a Deferral Termination Event arising, as such term is defined in the LUA as amended by the Amendment Agreement ; and

10.     **save as aforesaid, no other debt moratorium is being proposed in terms of the ECSL Compromises.EXTENT TO WHICH ECSL WILL BE RELEASED FROM THE**

**PAYMENT OF DEBTS AND EXTENT TO WHICH ANY DEBT IS PROPOSED TO BE CONVERTED TO EQUITY [SECTION 155(3)(b)(ii)]**

10.1.   If the ECSL Compromises are approved, and the Financial Restructuring is implemented in accordance with the terms of the Implementation Documents, ECSL will be released from its obligations under the Guarantees as from the implementation of Step S under the Restructuring Agreement on the Completion Date.

10.2.   In terms of the Financial Restructuring:

10.2.1.   The following intercompany loans will be in place as a result of the re-organisation of the intercompany loans in Implementation Step D:

10.2.1.1.   The ECSL-Company Loans will be in place, with the Company owing an amount of ZA R2,819 million to ECSL.

10.2.1.2.   The ECSL-Bidco Loans will be in place, with ECSL owing an amount of ZAR6,047 million to Bidco.

10.2.2.   The following intra-group loans will be in place subject to the refinancing of the Senior Secured Debt:

10.2.2.1.   A USD denominated Delegation Debt, bearing interest at 3% PIK per annum; and

10.2.2.2.   A ZAR denominated Delegation Debt bearing no interest.

10.2.3.   The following intra-group loans will be in place following the refinancing of the Super Senior Third Ranking Debt:

10.2.3.1.   A EUR denominated Delegation Debt bearing interest at 8% PIK per annum.

10.2.4.   The following intra-group loans will be in place following the refinancing of the USD Super Senior Hedging Delegation Debt:

10.2.4.1.   A USD denominated USD Super Hedging Delegation Debt bearing interest at 5% PIK per annum.

11.   **TREATMENT OF CONTRACTS AND ONGOING ROLE OF ECSL [SECTION 155(3)(b)(iii)]**

11.1.   The Senior Secured 2018 Notes Indentures, the Senior Secured 2019 Notes Indentures and the Super Senior 2019 Notes Indentures will be cancelled pursuant to the refinancing of the Compromise Claims as set out above.

11.2.   The Senior Secured Term Loans and Super Senior Term Loans will be refinanced as set out above.

11.3.   As set out in clause 5 above, the Restructuring Agreement also affects the following contracts and agreements:

11.3.1.   The terms of the Existing SSLF and Existing SSCF will be amended and a New RCF Facility created);

11.3.2.   The Super Senior Second Ranking Debt will be refinanced as New Holdco 1 PIK A 2 Notes; and

11.3.3.   The debt of the Facility A3 Lenders will be refinanced as part of the New Money Notes Offer (see clause 8.30 of the Restructuring Agreement).

(see also Part A of the Explanatory Statement (*Company Information, Background and Reasons for the Financial Restructuring*))

11.4.   The ECSL Compromises are inextricably linked to and are an indivisible part of the Financial Restructuring of the Existing Group.

11.5.   The purpose of the Company Compromises is to enable the Company, insofar as is possible, to continue operating its business as a going concern in the ordinary course.

11.6.   The purpose of the Guarantor Compromises is to release the Guarantors from their obligations under the Guarantees, so as to ensure that the Company Compromises are given effect to in their fullest.

11.7.   If the Compromises fail to become operative on the Compromise Effective Date, then the board of directors of ECSL and each board of directors of each of the other Guarantors and the Company will need to consider all alternatives available to them at the time, which may include, but not be limited to, voluntary business rescue and/or a notice in terms of section 129(7) of the Companies Act and/or liquidation proceedings.

12.   **PROPERTY OF ECSL PROPOSED TO BE AVAILABLE TO PAY CREDITORS' CLAIMS [SECTION 155(3)(b)(iv)]**

12.1.   No property of ECSL is proposed to be made available to pay creditors claims by virtue of the fact that ECSL is not in liquidation proceedings.

13.   **ORDER OF PREFERENCE IN WHICH THE PROCEEDS OF THE PROPERTY OF ECSL WILL BE APPLIED TO PAY CREDITORS IF THE COMPROMISES ARE ADOPTED [SECTION 155(3)(b)(v)]**

13.1.   There is no order of preference that will apply to payments to the Compromise Creditors in relation to the ECSL Compromises because no proceeds of the property of ECSL will be applied under the Compromises.

14.   **BENEFITS OF ADOPTING THE COMPROMISES AS OPPOSED TO BENEFITS THAT WOULD BE RECEIVED BY CREDITORS IF ECSL WERE TO BE PLACED INTO LIQUIDATION [SECTION 155(3)(b)(vi)]**

14.1.   If ECSL were to be placed into liquidation, the creditors of ECSL would only receive the benefits as set out in clause 4 above in the Matuson & Associates report, namely –

14.1.1.   the creditors of ECSL would receive (as an estimate) –

14.1.1.1.   in respect of secured creditors, R0 (zero rand);

14.1.1.2.   in respect of preferent creditors, R0 (zero rand); and

14.1.1.3.   in respect of concurrent creditors, R0 (zero rand).

14.1.2.   the Super Senior Third Ranking Creditors would receive (as an estimate) R0 (zero rand); and

14.1.3.   the Senior Secured Creditors would receive (as an estimate) R0 (zero rand).

14.2.   The benefits to be received by the creditors if the Compromises become operative on the Compromise Effective Date is that the Company will be able to continue to trade in the ordinary course and the Financial Restructuring will be implemented in accordance with its terms which will have the result of deleveraging the Company, without ECSL retaining any residual liability under the Guarantees.   The Compromise Creditors will receive the Compromise Consideration in terms of the Company Compromises.

14.3.   As a result of the Financial Restructuring, the New Money Notes will be issued by New Holdco 1 which will result in funds flowing into the Company which will enable it to continue trading.

## PART C: ASSUMPTIONS AND CONDITIONS

15.   **STATEMENT OF CONDITIONS TO THE PROPOSAL [SECTION 155(3)(c)(i)]**

15.1.   Save for this clause 15 and clauses 18 to 22 (both inclusive) which will remain of full force and effect, the remainder of the ECSL Proposal is subject to the fulfilment of the following conditions precedent that, by not later than the 5 (five) Business Days prior to the Long-Stop Date –

15.1.1.   the Senior Secured Company Resolution has been lawfully passed by the Senior Secured Creditors at the Senior Secured Company Meeting;

15.1.2.   the Super Senior Company Resolution has been lawfully passed by the Super Senior Third Ranking Creditors at the Super Senior Company Meeting;

15.1.3.   the Guarantor Resolutions have been lawfully passed by the relevant Compromise Creditors at the relevant Compromise Meetings;

15.1.4.   the Compromises have been approved and sanctioned by the Court ("**Court Order/s**") in terms of section 155(7)(b) of the Companies Act, without any conditions attaching thereto or if subject to conditions, such conditions being acceptable to the Company and the applicable Compromise Creditors;  and

15.1.5.   a copy of the Court Order/s have been filed with the Commission in terms of section 155(8)(a) of the Companies Act within 5 (five) Business Days of being handed down by the relevant Court;

15.2.   The ECSL Conditions have been inserted for the benefit of ECSL and the Compromise Creditors and the fulfilment of such ECSL Conditions may only be waived (in whole or in part), to the extent capable of being legally waived, by ECSL and not less than a majority in number and 75% of the aggregate Compromise Claims held by Compromise Creditors in each class.

15.3.   Unless the ECSL Conditions have been fulfilled or waived by not later than the above dates, the provisions of the ECSL Proposal, save for this clause 15 and clauses 18 to 22 which will remain of full force and effect, will never become of any force or effect.

16.   **EMPLOYEES [SECTION 155(3)(c)(ii)]**

16.1.   ECSL does not have any employees.

17.   **PROJECTED FINANCIALS [SECTION 155(3)(c)(iii)]**

17.1.   On the assumption that the ECSL Compromises are accepted and become effective on the Compromise Effective Date, ECSL refers the Compromise Creditors to the documents attached as follows –

17.1.1.   projected balance sheet of ECSL immediately following the Completion Date attached as Annexure D; and

17.1.2.   a projected statement of income and expenses for the ensuing three years following the Completion Date attached as Annexure E.

17.2.   The assumptions used in preparing the projected statement of income and expenses are the following:

17.2.1.   bank charges are in line with current levels;

17.2.2.   no deposits or withdrawals from the account over the period;

17.2.3.   an interest rate of 2% per annum;

17.2.4.   USD/ZAR exchange rate of 13.5517 as of 04-Nov-16; and

17.2.5.   no capital gains tax.

**GENERAL:**

18.   **LOCK-UP AGREEMENT:  SUPPORT FROM CREDITORS**

ECSL highlights that, as at the date of the Proposal Document, –

18.1.   in relation to the Senior Secured Class, Senior Secured Creditors who represent –

18.1.1.   23 in number of the Senior Secured Creditors; and

18.1.2.   77% (seventy seven percent) in value of the Senior Secured Creditors

have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Senior Secured Company Resolution and Guarantor Resolutions;

18.2.   in relation to the Super Senior Class, Super Senior Third Ranking Creditors who represent –

18.2.1.   17 in number of the Super Senior Third Ranking Creditors; and

18.2.2.   72% (seventy two percent) in value of the Super Senior Third Ranking Creditors

have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Super Senior Company Resolution and Guarantor Resolutions.

19.   **BOARD RECOMMENDATION**

19.1.   The board of directors of ECSL recommends that the Senior Secured Creditors vote in favour of the Senior Secured ECSL Compromise by approving the Senior Secured ECSL Resolution at the Senior Secured ECSL Meeting.

19.2.   The board of directors of ECSL recommends that the Super Senior Third Ranking Creditors vote in favour of the Super Senior ECSL Compromise by approving the Super Senior ECSL Resolution at the Super Senior ECSL Meeting.

20.   **AMENDMENTS**

20.1.   The terms and conditions of any ECSL Compromise may be varied or amended –

20.1.1.   By ECSL at any time before the date and time for the commencement of the Senior Secured ECSL Meeting or Super Senior ECSL Meeting (as applicable) provided that such variations or amendments are not material to the relevant Compromise Creditors and would not change any right or obligation of any Compromise Creditor or impose any additional obligation on the Compromise Creditor if the Compromises are approved other than in the manner contemplated in the Proposal Document as at

the date hereof and details of such variation and amendment have been Announced to the relevant Compromise Creditors ahead of the Senior Secured Company Meeting or the Super Senior Company Meeting (as applicable); or

20.1.2.   in such manner as the Court may require, provided that such modification, addition, term or condition does not change any right or obligation of or impose an additional obligation (as at the date of sanctioning) on a Compromise Creditor.

20.2.   If the terms and/or conditions of any ECSL Compromise are amended, any reference to such ECSL Compromise shall be deemed to be construed as a reference to such ECSL Compromise as amended.

21.   **FOREIGN REPRESENTATIVE**

Mr. Charles Vikisi or any other person authorised by the board of directors of Holdco is appointed and authorised to act as a foreign representative in respect of the ECSL Compromises ("**Foreign Representative**") in any Chapter 15 Proceedings.   The Foreign Representative is authorised on behalf of ECSL to take any and all actions to execute, deliver, certify, file, and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Chapter 15 Proceedings.

22.   **CERTIFICATE BY AN AUTHORISED DIRECTOR OF ECSL**

In my capacity as authorised director on the board of directors of ECSL, I hereby certify in terms of section 155(5) of the Companies Act, that –

22.1.   the factual information provided in the ECSL Proposal appears to be accurate, complete and up to date; and

22.2.   the projections provided in the ECSL Proposal are estimates made in good faith on the basis of the factual information and assumptions set out herein.

Signed at _____ on _____ 2016

_____

**RICHARD VAUGHAN**

**CHIEF FINANCIAL OFFICER AND DIRECTOR, EDGARS CONSOLIDATED STORES LIMITED**

**Annexure A**      **List of the Material Assets of ECSL**

[*To be inserted*]

**Annexure B**      **List of the creditors of ECSL**

[*To be inserted*]

**Annexure C      Summary of Probable Dividend Calculation**

[*To be inserted*]

**Annexure D**     **Projected Balance Sheet of ECSL**

[*To be inserted*]

**Annexure E**       **Projected Statement of Income and Expenses of ECSL**

**EDCON ACQUISITION PROPRIETARY LIMITED**
Incorporated in South Africa
(Registration Number 2007/000518/07)

---

**BIDCO PROPOSAL**
**INFORMATION REASONABLY REQUIRED TO FACILITATE COMPROMISE CREDITORS IN DECIDING WHETHER OR NOT TO ACCEPT OR REJECT THE BIDCO COMPROMISES AS REQUIRED IN TERMS OF SECTION 155(3) OF THE COMPANIES ACT**

---

The definitions and interpretations commencing on page 7 of the Proposal Document apply throughout, including this cover page (unless the context indicates a contrary intention).

**YOU ARE STRONGLY URGED TO READ THE EXPLANATORY STATEMENT IN ITS ENTIRETY FOR MORE INFORMATION AS TO THE EFFECTS AND CONSEQUENCES SHOULD THE COMPROMISES BECOME OPERATIVE.  THE EXPLANATORY STATEMENT SUMMARISES THE EFFECT AND CONSEQUENCES OF NOT ONLY THE COMPROMISES, BUT ALSO THE RELEVANT TRANSACTIONS IN THE RESTRUCTURING DOCUMENTS WHICH WILL IMPACT ON, AND BIND, THE SENIOR SECURED CREDITORS AND SUPER SENIOR THIRD RANKING CREDITORS RESPECTIVELY SHOULD THE COMPROMISES BECOME OPERATIVE.  THE AFORESAID TRANSACTIONS WILL BE IMPLEMENTED PURSUANT TO THE AUTHORITIES CONTAINED IN THE RELEVANT COMPROMISE TO BIND THE RESPECTIVE COMPROMISE CREDITORS THERETO.**

1.    **STRUCTURE OF THE COMPROMISES**

For the purposes of section 155(3) of the Companies Act, the terms of the Bidco Compromises are divided into 3 (three) parts as follows –

1.1.    **PART A - BACKGROUND**

In accordance with section 155(3)(a) of the Companies Act, this part sets out:

1.1.1.    a complete list of the material assets of Bidco, as well as an indication as to which assets are held as security by creditors as at 26 November 2016;

1.1.2.    a complete list of the creditors of Bidco as at 26 November 2016, as well as an indication as to which creditors would qualify as secured, statutory preferent and concurrent in terms of the laws of insolvency, and an indication of which of the creditors have proved their claims;

1.1.3.    the probable dividend that would be received by creditors, in their specific classes, if Bidco were to be placed in liquidation;

1.1.4.    a complete list of the holders of Bidco issued securities, and the effect that the proposal in respect of the Bidco Compromises would have on them, if any; and

1.1.5.    whether the proposal in respect of the Bidco Compromises includes a proposal made informally by a creditor of Bidco.

(See pages 1020 to 1031).

1.2.    **PART B - TERMS OF THE COMPROMISES**

In accordance with section 155(3)(b) of the Companies Act, this part describes in detail the terms of each Bidco Compromise, including:

1.2.1.    noting that there is a debt moratorium proposed pursuant to the Bidco Compromises;

1.2.2.    the extent to which Bidco is to be released from the payment of its debts, and the extent to which any debt is proposed to be converted to equity in Bidco, or another Company;

1.2.3.    the treatment of contracts and ongoing role of Bidco;

1.2.4.    the property of Bidco that is proposed to be available to pay creditors' claims;

1.2.5.    the order of preference in which the proceeds of property of Bidco will be applied to pay creditors if the proposal is adopted; and

1.2.6.    the benefits of adopting the proposals in respect of the Bidco Compromises as opposed to the benefits that would be received by creditors if Bidco were to be placed in liquidation.

This part also states that if (i) the Senior Secured Bidco Resolution is adopted by a majority of the relevant Senior Secured Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding as at the Record Date or the DTC Record Date (as applicable) held by the Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Bidco Meeting; and (ii) the Super Senior Bidco Resolution is adopted by a majority of the relevant Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding at the Record Date held by the Super Senior Third Ranking

Creditors who are present and voting in person or by proxy at the Super Senior Bidco Meeting, then the Bidco Compromises will become effective once all the Bidco Conditions have been fulfilled upon the Compromise Effective Date.

(See pages 1031 to 1034).

**1.3.    PART C – ASSUMPTIONS AND CONDITIONS**

In accordance with section 155(3)(c) of the Companies Act, this part sets out :

1.3.1.    a statement of the Bidco Conditions that must be satisfied, if any, for the Bidco Compromises to—

1.3.1.1.    come into operation; and

1.3.1.2.    be fully implemented;

1.3.2.    the effect, if any, that the Bidco Compromises contemplate having on the number of employees, and their terms and conditions of employment; and

1.3.3.    a projected—

1.3.3.1.    balance sheet for Bidco; and

1.3.3.2.    statement of income and expenses for the ensuing three years,

prepared on the assumption that the Bidco Compromises are accepted.

(See pages 1034 to 1035).

**PART A: BACKGROUND**

2.    **LIST OF MATERIAL ASSETS OF BIDCO AND SECURITY OVER SUCH ASSETS [SECTION 155(3)(a)(i)]**

2.1.    A complete list of  material assets of Bidco at book value and the security given in relation thereto as at 26 November 2016 is attached hereto marked Annexure A.

2.2.    The financial information of the Existing Group is calculated as at 26 November 2016 being the most recent financial information available as at the date of this Proposal Document.  There has been no change to the financial information between 26 November 2016 and the date of the Proposal Document which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

3.    **CREDITORS OF BIDCO [SECTION 155(3)(a)(ii)]**

A list of the creditors of Bidco as at 26 November 2016 is attached as Annexure B, which furthermore identifies creditors as secured, statutory preferent and concurrent in terms of South African insolvency laws.  There has been no change to the list of creditors between 26 November 2016 and the date of the Proposal Document which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

No creditors have proved any claims against Bidco as Bidco is not in liquidation.

4.    **PROBABLE LIQUIDATION DIVIDEND [SECTION 155(3)(a)(iii)]**

4.1.    Bidco engaged the services of Matuson & Associates to calculate the probable dividend which would be received by the Compromise Creditors, if Bidco were to be put into liquidation, as at 26 November 2016.  A copy of the

report prepared by Matuson & Associates reflecting the probable dividend calculation is attached hereto as Annexure C.

4.2.   Based on the dividend calculation, the probable dividend which creditors would receive as at such date is as follows:

4.2.1.     Secured Creditors : nil

4.2.2.     Preferent Creditors: nil; and

4.2.3.     Concurrent Creditors : nil.

5.   **SUMMARY OF THE FINANCIAL RESTRUCTURING**

5.1.   The Financial Restructuring provides for the re-organisation of the following intercompany loans in the Edcon Group:

5.1.1.     "**A Loan**" being the loan owing by ECSL to Bidco in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.2.     "**B Loan**" being the loan owing by the Company to Bidco in an amount of ZAR2 187 328 092 (two billion one hundred and eighty seven million three hundred and twenty eight thousand and ninety two Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.3.     "**C Loan**" being the loan owing by Bidco to the Company in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.4.     "**D Loan**" being the loan owing by ECSL to Holdco in an amount of ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.5.     "**E Loan**" being the loan owing by Holdco to Bidco in an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) as at the Pre-Completion Date, which is non-interest bearing;

5.1.6.     "**F Loan**" being the loan owing by the Company to Holdco in an amount of ZAR820 000 000.00 (eight hundred and twenty million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.7.     "**G Loan**" being the loan owing by the Company to Holdco in an amount of ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.8.     "**H Loan**" means the loan owing by ECSL to the Company in an amount of ZAR16 508 588.87 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and eighty seven cents) as at the Pre-Completion Date, the loan being non-interest bearing; and

5.1.9.     "**I Loan**" means the loan owing by the Company to ECSL in an amount of ZAR35 241 162.48 (thirty five million two hundred and

forty one thousand one hundred and sixty two Rand and forty eight cents) as at the Pre-Completion Date, the loan being non-interest bearing.

5.2.   With effect from the Pre-Completion Date, each of the A Loan, B Loan, C Loan, D Loan, E Loan, F Loan, G Loan, H Loan and I Loan are hereby deemed to be immediately due, owing and payable.

5.3.   The Company's obligation to discharge the B Loan will be set-off against Bidco's obligation to pay the C Loan, leaving an amount of ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand) shall remain immediately due, owing and payable under the B Loan to Bidco ("**Remaining B Loan**").

5.4.   The Company will delegate the Remaining B Loan in its entirety to ECSL, which delegation ECSL will accept.   As a result of the delegation, the Company shall become indebted to ECSL in an amount equal to the face value of the Remaining B Loan ("**B.1 Loan**"), which B.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.5.   ECSL will delegate the D Loan in its entirety to Bidco, which delegation Bidco will accept.   As a result of the delegation, ECSL shall become indebted to Bidco in an amount equal to the face value of the D Loan ("**D.1 Loan**"), which D.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.6.   The Company will delegate the F Loan in its entirety to Bidco, which delegation Bidco will accept.   As a result of the delegation, the Company shall become indebted to Bidco in an amount equal to the F Loan ("**F.1 Loan**"), which F.1 Loan shall be immediately due, owing and payable and which shall not bear interest.   The Company will thereafter delegate the F.1 Loan in its entirety to ECSL, which delegation ECSL will accept.   As a result of thereof, the Company will become indebted to ECSL in an amount equal to the face value of the F.1 Loan ("**F.2 Loan**"), which F.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.7.   The Company will hereby delegate the G Loan in its entirety to Bidco, which delegation Bidco will accepts.   As a result of the delegation the Company shall become indebted to Bidco in an amount equal to the face value of the G Loan ("**G.1 Loan**"), which G.1 Loan shall be immediately due, owing and payable and which shall not bear interest.   The Company will thereafter delegate the G.1 Loan in its entirety to ECSL, which delegation ECSL will accept.   As a result of thereof, the Company shall become indebted to ECSL in an amount equal to the face value of the G.1 Loan ("**G.2 Loan**"), which G.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.8.   Following the above mentioned delegations, Holdco owes the E Loan to Bidco, in an amount equal to ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents);

5.8.1.   Bidco owes –

5.8.1.1.   the D Loan to Holdco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

5.8.1.2.   the F Loan to Holdco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

5.8.1.3.   the G Loan to Holdco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents);

5.8.2.   ECSL owes -

5.8.2.1.   the A Loan to Bidco, in an amount equal to ZAR892 000 000.00 (eight hundred and ninety two million Rand);

5.8.2.2.   the Remaining B Loan to Bidco, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

5.8.2.3.   the D.1 Loan to Bidco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

5.8.2.4.   the F.1 Loan to Bidco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand);

5.8.2.5.   the G.1 Loan to Bidco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents); and

5.8.2.6.   the H Loan to the Company, in an amount equal to ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents); and

5.8.3.   The Company owes -

5.8.3.1.   the I Loan to ECSL, in an amount equal to ZAR35 248 162 (thirty five million two hundred and forty eight thousand one hundred and sixty two Rand);

5.8.3.2.   the B.1 Loan to ECSL, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

5.8.3.3.   the F.2 Loan to ECSL, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

5.8.3.4.   the G.2 Loan to ECSL, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents).

5.9.   Holdco's obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Bidco in terms of the E Loan shall be set-off against Bidco's

obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Holdco under the G Loan, with the result that -

5.9.1.     the E Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.9.2.     an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed in terms of the G Loan shall be discharged through such set-off; and

5.9.3.     an amount of ZAR457 228 899.66 (four hundred and fifty seven million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents) shall remain owing under the G Loan to Holdco ("**Remaining G Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.10.   ECSL's obligation to repay the ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to the Company in terms of the H Loan shall be set-off against the Company's obligation to repay an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to ECSL under the G.2 Loan, with the result that -

5.10.1.    the H Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.10.2.    an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed in terms of the G.2 Loan shall be discharged through such set-off; and

5.10.3.    an amount of ZAR441 647 981.55 (four hundred and forty one million six hundred and forty seven thousand nine hundred and eighty one Rand and fifty five cents) shall remain owing under the G.2 Loan to ECSL ("**Remaining G.2 Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.11.   The effect of the above re-organisation of the intercompany loans will have the following effect:

5.11.1.    There will be "**Holdco-Bidco Loans**" being collectively, the D Loan, the F Loan, and the Remaining G Loan, all of which are owing by Bidco to Holdco and which in total amount to ZAR3 631 228 899.66 (three billion six hundred and thirty one million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents).

5.11.2.    There will be "**Bidco-ECSL Loans**" being Loan A in the amount of R6 047 million;

5.11.3.    There will be "**ECSL-Company Loans**" being the remaining loan H in the amount of R2 819 million.

5.12.   Holdco will subscribe for a Bidco Share for a subscription price equal to an amount of ZAR3 631 228 899.66 (three billion six hundred and thirty one million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents) ("**Bidco Share Subscription Consideration**"),

with the Bidco Share Subscription Consideration left outstanding and being immediately due, owing and payable. Holdco's obligation to pay the Bidco Share Subscription Consideration shall be set-off against Bidco's obligation to repay the Holdco-Bidco Loans, with the result that all payment obligations referred to in this clause shall be discharged and accordingly extinguished in their entirety, with such set-off constituting full discharge of the respective payment obligations.

5.13.   The effect hereof is that there will be no Holdco-Bidco Loans outstanding and the only intercompany debt will be the Bidco-ECSL Loans and the ECSL-Company Loans.

The Implementation Documents

5.14.   In terms of the Financial Restructuring, the following Implementation Steps will be implemented:

5.14.1.   The Senior Secured Creditors will have their indebtedness refinanced and capitalised in accordance with the documents to be executed in terms of Implementation Step S (see clause 8.32 and 8.33 of the Restructuring Agreement).

5.14.1.1.   50% of the Senior Secured Debt will be refinanced as New Holdco 2 PIK B Notes and 50% of the Senior Secured Debt will be capitalised at New Holdco 2 as follows:

5.14.1.2.   The Senior Secured Term Lenders can elect whether to be issued New Holdco 2 PIK B Notes in USD or ZAR. If they elect to be issued New Holdco 2 PIK B Notes in USD, the Senior Secured Term Loan Debt will be redenominated into USD ("USD Senior Secured Term Loan Debt").

5.14.1.3.   The Senior Secured Notes will be retranched into ZAR and USD denominated notes through a supplemental indenture, with such tranches being proportionate to the election made by Senior Secured Noteholders to ultimately take up New Holdco 2 PIK B Notes denominated in either USD or ZAR.

5.14.1.4.   The Company will delegate the USD Senior Secured Term Loan Debt and the obligation to pay the USD Senior Secured Notes Debt to New Holdco 2 and as a result of such delegation will incur amount, denominated in USD, equal to the face value of the USD denominated Senior Secured Debt being delegated (the "USD Delegation Debt") , which will bear interest at 3% PIK per annum and which will be deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.5.   The Company will delegate the ZAR Senior Secured Term Loan and the obligation to pay the ZAR denominated Senior Secured Notes Debt to New Holdco 2 for an amount, denominated in ZAR, equal to

the face value of the ZAR denominated Senior Secured Debt being delegated ("the ZAR Delegation Debt") denominated in ZAR, being non-interest bearing and being deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.6. The USD Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in USD. This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company. All of these intra-group debts are denominated in USD, bear interest at 3% PIK per annum and are deeply subordinated.

5.14.1.7. The ZAR Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in ZAR. This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company. All of these intra-group debts are denominated in ZAR, do not bear interest and are deeply subordinated.

5.14.1.8. New Holdco 2 will capitalise 50% of the Senior Secured Debt to New Holdco 2, by Senior Secured Creditors subscribing for New Holdco 2 Ordinary A Shares for an amount equal to 50% of the ZAR equivalent amount of the face value of their Senior Secured Debt ("the subscription debt"), with the subscription proceeds left outstanding on loan account. The subscription debt of the Senior Secured Term Loan Lenders is set-off against an equal amount of the face value of the Senior Secured Term Loan Debt, with a portion of the Senior Secured Term Loan Debt remaining outstanding. The subscription debt of the Senior Secured Noteholders is set-off against an equal amount of the face value of New Holdco 2's obligation to pay in terms of the Senior Secured Notes with a portion of the obligation to pay in terms of the Senior Secured Notes remaining outstanding.

5.14.1.9. New Holdco 2 will refinance on a value-for-value basis the remaining 50% of the Senior Secured Debt as New Holdco 2 PIK B Notes, which are either USD denominated bearing interest at 3% PIK per annum or ZAR denominated bearing interest at 3% PIK plus the value on the Business Day prior to the Pre-Completion Date quoted by Bloomberg of a zero coupon fixed-rate

USD / ZAR swap to 31 December 2022.  The New Holdco 2 PIK B Notes are issued in full settlement of the Senior Secured Debt.  The Senior Secured Debt will accordingly cease to exist.

5.14.1.10. A USD denominated Delegation Debt corresponding in value to the New Holdco 2 PIK B Notes will be maintained between New Holdco 2 and New Holdco 1 as a deeply subordinated intragroup debt.  The remainder of the USD denominated Delegation Debt will be converted to ZAR.  The ZAR denominated Delegation Debt does not bear interest.  Similarly, USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes plus the value of the Commitment Fee Notes will be maintained between New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and ECSL and the Company.  The USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes (but not the portion corresponding to the Commitment Fee Notes) will be deeply subordinated to all creditors. The remainder of the USD denominated Delegation Debt intra-group will be converted to ZAR.  The ZAR denominated Delegation Debt will not bear interest and will be deeply subordinated to all creditors.

5.15.   The Super Senior Term Loan Debt and Super Senior 2019 Notes will be refinanced as New Holdco 2 PIK A Notes, which are EUR denominated bearing interest at 8% PIK per annum, in accordance with the documents to be executed in terms of Implementation Step O (see clause 8.27 of the Restructuring Agreement.)

5.15.1.   The Super Senior Term Loan Debt and the obligation to pay the Super Senior 2019 Notes will be delegated by the Company to New Holdco 2, with the Company becoming indebted to New Holdco 2 for an amount equal thereto.

5.15.2.   This debt owing by the Company to New Holdco 2 is then further delegated by the Company to New Holdco 1, by the Company to Parent, by the Company to Bidco and by the Company to ECSL.  All of these intra-group debts are of equal value denominated in EUR and bearing interest at 8% PIK per annum.

5.15.3.   New Holdco 2 will refinance the Super Senior Term Loan Debt as New Holdco 2 PIK A Notes.  New Holdco 2 will issue PIK A Notes to the Super Senior Noteholders in full settlement of the Super Senior Notes Debt.  The Super Senior Notes will cease to exist.

5.16.   The Super Senior Hedging Debt will be refinanced as New Holdco 1 PIK A-2 Notes in accordance with the documents to be executed in terms of Implementation Step P (see clause 8.28 of the Restructuring Agreement.)

5.16.1.   The Super Senior Hedging Debt will be redenominated to USD ("USD Super Senior Hedging Debt").

5.16.2.   95% of the USD Super Senior Hedging Debt will be delegated by the Company to New Holdco 1, with the Company becoming indebted to New Holdco 1 for an amount equal to the USD Super Senior Hedging Debt.  This Delegation Debt will be denominated in USD, bearing interest at 5% PIK per annum.

5.16.3.   The delegated USD Super Senior Hedging Debt will be further delegated by the Company to Parent, by the Company to Bidco and by the Company to ECSL.  All of these intra-group debts are of equal value denominated in USD and bear interest at 5% PIK per annum.

5.16.4.   New Holdco 1 will refinance the delegated USD Super Senior Hedging Debt as New Holdco 1 PIK A-2 Notes, which are USD denominated and bearing interest at 5% PIK per annum.

5.16.5.   The remaining 5% of the USD Super Senior Hedging Debt will remain enforceable at the Company and will only be released upon Completion,

5.17.   The terms of the Existing SSLF and Existing SSCF will be amended and a New RCF will be created in accordance with the documents to be executed in terms of Implementation Step N (see clause 8.26 of the Restructuring Agreement).

5.17.1.   A new RCF Facility of R575million will be made available at Completion Date to the Company.

5.18.   New Holdco 1 will issue New Holdco 1 PIK A Notes and the proceeds will be injected into the Company in accordance with the documents to be executed in terms of Implementation Step Q (see clause 8.29 and 8.30 of the Restructuring Agreement).

5.18.1.   New Holdco 1 will issue the USD equivalent of approximately ZAR2.25billion in New Holdco 1 PIK A Notes, which are USD denominated and beari interest at 25% PIK per annum as follows:

5.18.1.1.   The ZAR Committed Amount of ZAR1.49billion; and

5.18.1.2.   The refinancing of the Facility A3 Lenders.

5.18.2.   In addition, New Holdco 1 will issue the Commitment Fee Notes (up to ZAR69,600,000) as a Commitment Fee to the Committed Creditors.

5.18.3.   The cash issue proceeds from the issue of the New Holdco 1 PIK A Notes will be loaned by New Holdco 1 to the Company as a USD denominated loan via loans to Parent, Bidco and ECSL, which intra-group loans will all be USD denominated bearing interest at 25% PIK per annum.

5.18.4.   The Participating Creditors will also receive either New Holdco 2 Ordinary B Shares with a nominal amount equal to not more than 15% (when aggregated with the CVRs) of the equity at New Holdco 2 or the CVRs.

6.   **LIST OF HOLDERS OF BIDCO'S ISSUED SECURITIES AND EFFECT OF THE BIDCO COMPROMISES THEREON [SECTION 155(3)(a)(iv)]**

6.1.   Bidco's issued securities comprise, as at the date of this Proposal Document, of–

6.1.1.    2 Ordinary Shares held by Holdco.

6.2.    Save as otherwise expressly provided in the Restructuring Agreement, the Restructuring Agreement will be dated and be binding on Bidco as an Initial Party as from the Initial Effective Date.

6.3.    The Restructuring Agreement and the Execution Documents will affect Bidco in the following manner:

6.3.1.    The following intercompany loans will be in place as a result of the re-organisation of the intercompany loans in Implementation Step D:

6.3.1.1.    The ECSL-Company Loans will be in place, with the Company owing an amount of ZAR2,819 million to ECSL;

6.3.1.2.    The ECSL-Bidco Loans will be in place, with ECSL owing an amount of ZAR6,047 million to Bidco.

6.3.2.    The following intra-group loans will be in place following the refinancing of the Senior Secured Debt:

6.3.2.1.    A USD denominated Delegation Debt, bearing interest at 3% PIK per annum; and

6.3.2.2.    A ZAR denominated Delegation Debt bearing no interest.

6.3.3.    The following intra-group loans will be in place following the refinancing of the Super Senior Third Ranking Debt:

6.3.3.1.    A EUR denominated Delegation Debt bearing interest at 8% PIK per annum.

6.3.4.    The following intra-group loans will be in place following the refinancing of the USD Super Senior Hedging Delegation Debt:

6.3.4.1.    A USD denominated USD Super Hedging Delegation Debt bearing interest at 5% PIK per annum.

6.3.5.    In terms of Implementation Step E (*transfer of Hollard Business Associates shares to below enforcement level by direct sale*) referred to in clause 8.13 of the Restructuring Agreement and the documents to be entered into pursuant thereto which provides for the following agreements will be concluded:

6.3.5.1.    the Hollard SPA;

6.3.5.2.    the Hollard Restatement Agreement;

6.3.5.3.    Addendum to Hollard JV Agreement;

6.3.5.4.    Addendum to the Business Relationship Agreement;

6.3.5.5.    Addendum to the Binder Agreement (Short-term Insurance Act);

6.3.5.6.    Addendum to the Binder Agreement (Long-term Insurance Act); and

6.3.5.7.    the Addendum to the Administration Agreement.

6.3.6.    In terms of Implementation Step G1 (*Matching Loan Delegation*) referred to in clause 8.15 of the Restructuring Agreements and the documents to be entered into pursuant thereto Matching Loan owed by the Company to Holdco will be delegated to Bidco and ECSL respectively.

6.3.7.    In terms of Implementation Step G2 (*Share subscription and set-off agreement*) referred to in clause 8.15 of the Restructuring Agreement and the documents to be entered into pursuant thereto Holdco will subscribe for a share in Bidco and the payment of the subscription price will be paid through set-off. The intra-group loans between ECSL and Bidco and ECSL and the Company in the amount of ZAR6,859million created by the delegations in Implementation Step G1 will remain in place and will be deeply subordinated to all creditors.  These intra-group loans will be ZAR denominated and interest free.

6.3.8.    In the event that the Edcon Group obtains a favourable Binding Private Ruling from SARS, these intra-company loans will be capitalised in terms of the subscription of shares and the set-off of the subscription price; failing which these loans will remain in place as described above

6.3.9.    In terms of Implementation Steps I, J and K (*Default, Acceleration and Enforcement*) referred to in clauses 8.19, 8.20 and 8.21 of the Restructuring Agreement the SPV Guarantor will demand payment from Holdco.

6.3.10.   In terms of Implementation Step M (*Sale of Target Group to Parent for the Purchase Consideration)* the shares held by Holdco in Bidco will be sold to Parent.  As a result of this implementation step, Bidco will be transferred to the New Holdco Group.

6.3.11.   The Bidco Compromises, once operable, will secure the release of Bidco from the Guarantees provided by Bidco.

6.3.12.   Accordingly, Holdco as the shareholder of Bidco will be affected by the Financial Restructuring as follows:

6.3.12.1.    Holdco will no longer hold the HBA Shares.

6.3.12.2.    Holdco will not be transferred with the Target Group to the New Holdco Group and its shares in Bidco will be transferred to Parent in the New Holdco Group.

6.3.12.3.    As set out above, the various intercompany loans between ECSL and Holdco, Holdco and Bidco and the Company and Holdco will be delegated and Holdco will subscribe for shares in Bidco, and the subscription price will be paid by way of set-of.

6.3.12.4.    Holdco will no longer have any claims against its Subsidiaries.

7.    **INFORMAL PROPOSAL [SECTION 155(3)(a)(v)]**

7.1.    The Bidco Compromises are based on the restructuring and revised steps plan as contemplated in the Lock-Up Agreement (and the annexures thereto), to which Bidco (by virtue of being a party thereto) and certain of the Existing Group's creditors are contractually obliged to propose and support the Compromises respectively and, as regards such creditors, to vote in favour of the relevant Company Compromise Resolutions and to execute and implement the Implementation Documents.

7.2.　　The following percentage by value of the Existing Group's creditors signed the Lock-Up Agreement:

　　7.2.1.　　100% of the RCF Creditors;

　　7.2.2.　　100% of the Senior Secured Liquidity Facility Lenders;

　　7.2.3.　　100% of the Super Senior Second Ranking Creditors;

　　7.2.4.　　72% of the Super Senior Third Ranking Creditors; and

　　7.2.5.　　77% of the Senior Secured Creditors.

**PART B: BIDCO PROPOSALS**

8.　　**TERMS OF THE COMPROMISES [SECTION 155(3)(b)]**

8.1.　　<u>Senior Secured Bidco Compromise:</u>

This clause 8.1 applies to the Senior Secured Creditors only.

　　8.1.1.　　With effect on and as from the implementation of Implementation Step S in terms of the Restructuring Agreement on the Completion Date the Senior Secured Creditors irrevocably and unconditionally release Bidco from the terms of the Guarantees given by Bidco on the basis no party shall have any liability whatsoever to the other thereunder.

　　8.1.2.　　The Senior Secured Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

8.2.　　<u>Super Senior Bidco Compromise:</u>

This clause 8.2 applies to the Super Senior Third Ranking Creditors only.

　　8.2.1.　　With effect on and as from the implementation of Implementation Step O in terms of the Restructuring Agreement on the Completion Date, the Super Senior Third Ranking Creditors hereby irrevocably and unconditionally release Bidco from the terms of the Guarantees given by Bidco on the basis that no party shall have any liability whatsoever to the other thereunder.

　　8.2.2.　　The Super Senior Third Ranking Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

9.　　**NATURE AND DURATION OF ANY DEBT MORATORIUM [SECTION 155(3)(b)(i)]**

A debt moratorium ("**Debt Moratorium**") is being proposed in terms of the Bidco Compromises as follows:

9.1.　　the payment by the Company of –

　　9.1.1.　　the March Coupon (being the payment of interest due 15 March 2016 in respect of the Senior Secured 2018 Notes) and the September Coupon (being the cash interest payment due 15 September 2016 on the Senior Secured 2018 Notes); and

　　9.1.2.　　all cash interest payments that are due or will fall due under the Senior Secured Term Loans up to and including 14 December 2016,

is hereby deferred until 28 February 2017;

9.2.　　the aforesaid deferral is subject to the occurrence of a Deferral Termination Event arising, as such term is defined in the LUA as amended by the Amendment Agreement ; and

10.     save as aforesaid, no other debt moratorium is being proposed in terms of the Bidco Compromises.**EXTENT TO WHICH BIDCO WILL BE RELEASED FROM THE PAYMENT OF DEBTS AND EXTENT TO WHICH ANY DEBT IS PROPOSED TO BE CONVERTED TO EQUITY [SECTION 155(3)(b)(ii)]**

10.1.     If the Bidco Compromises are approved, and the Financial Restructuring is implemented in accordance with the terms of the Implementation Documents, Bidco will be released from its obligations under the Guarantees as from the Completion Date.

10.2.     In terms of the Financial Restructuring:

    10.2.1.     The following intercompany loans will be in place as a result of the re-organisation of the intercompany loans in Implementation Step D:

        10.2.1.1.     The ECSL-Company Loans will be in place, with the Company owing an amount of ZAR2,819 million to ECSL;

        10.2.1.2.     The ECSL-Bidco Loans will be in place, with ECSL owing an amount of ZAR6,047 million to Bidco.

    10.2.2.     The following intra-group loans will be in place following the refinancing of the Senior Secured Debt:

        10.2.2.1.     A USD denominated Delegation Debt, bearing interest at 3% PIK per annum; and

        10.2.2.2.     A ZAR denominated Delegation Debt bearing no interest.

    10.2.3.     The following intra-group loans will be in place following the refinancing of the Super Senior Third Ranking Debt:

        10.2.3.1.     A EUR denominated Delegation Debt bearing interest at 8% PIK per annum.

    10.2.4.     The following intra-group loans will be in place following the refinancing of the USD Super Senior Hedging Delegation Debt:

        10.2.4.1.     A USD denominated USD Super Hedging Delegation Debt bearing interest at 5% PIK per annum.

11.     **TREATMENT OF CONTRACTS AND ONGOING ROLE OF BIDCO [SECTION 155(3)(b)(iii)]**

11.1.     The Senior Secured 2018 Notes Indentures, the Senior Secured 2019 Notes Indentures and the Super Senior 2019 Notes Indentures will be cancelled pursuant to the refinancing of the Compromise Claims as set out in above.

11.2.     The Senior Secured Term Loans and Super Senior Term Loans will be refinanced as set out in clauses above.

11.3.     As set out in clause 5 above, the Restructuring Agreement also affects the following contracts and agreements:

    11.3.1.     The terms of the Existing SSLF and Existing SSCF will be amended and a New RCF Facility created;

    11.3.2.     The Super Senior Second Ranking Debt will be refinanced as New Holdco 1 PIK A 2 Notes; and

    11.3.3.     The debt of the Facility A3 Lenders will be refinanced as part of the New Money Notes Offer (see clause 8.29 of the Restructuring Agreement).

(see also Part A of the Explanatory Statement (*Company Information, Background and Reasons for the Financial Restructuring*))

11.4.   The Bidco Compromises are inextricably linked to and are an indivisible part of the Financial Restructuring of the Existing Group.

11.5.   The purpose of the Company Compromises is to enable the Company, insofar as is possible, to continue operating its business as a going concern in the ordinary course.

11.6.   The purpose of the Guarantor Compromises is to release the Guarantors from their obligations under the Guarantees, so as to ensure that the Company Compromises are given effect to in their fullest.

11.7.   If the Compromises fail to become operative on the Compromise Effective Date, then the board of directors of Bidco and each board of directors of each of the other Guarantors and the Company will need to consider all alternatives available to them at the time, which may include, but not be limited to, voluntary business rescue and/or a notice in terms of section 129(7) of the Companies Act and/or liquidation proceedings.

12.   **PROPERTY OF BIDCO PROPOSED TO BE AVAILABLE TO PAY CREDITORS' CLAIMS [SECTION 155(3)(b)(iv)]**

12.1.   No property of Bidco is proposed to be made available to pay creditors claims by virtue of the fact that Bidco is not in liquidation proceedings.

13.   **ORDER OF PREFERENCE IN WHICH THE PROCEEDS OF THE PROPERTY OF BIDCO WILL BE APPLIED TO PAY CREDITORS IF THE COMPROMISES ARE ADOPTED [SECTION 155(3)(b)(v)]**

13.1.   There is no order of preference that will apply to payments to the Compromise Creditors in relation to the Bidco Compromises because no proceeds of the property of Bidco will be applied under the Compromises.

14.   **BENEFITS OF ADOPTING THE COMPROMISES AS OPPOSED TO BENEFITS THAT WOULD BE RECEIVED BY CREDITORS IF BIDCO WERE TO BE PLACED INTO LIQUIDATION [SECTION 155(3)(b)(vi)]**

14.1.   If Bidco were to be placed into liquidation, the creditors of Bidco would only receive the benefits as set out in clause 4 above in the Matuson & Associates report, namely –

14.1.1.   the creditors of Bidco would receive (as an estimate) –

14.1.1.1.   in respect of secured creditors, R0 (zero rand);

14.1.1.2.   in respect of preferent creditors, R0 (zero rand); and

14.1.1.3.   in respect of concurrent creditors, R0 (zero rand).

14.1.2.   the Super Senior Third Ranking Creditors would receive (as an estimate) R0 (zero rand); and

14.1.3.   the Senior Secured Creditors would receive (as an estimate) R0 (zero rand).

14.2.   The benefits to be received by the creditors if the Compromises become operative on the Compromise Effective Date is that the Company will be able to continue to trade in the ordinary course and the Financial Restructuring will be implemented in accordance with its terms which will have the result of deleveraging the Company, without Bidco retaining any residual liability under the Guarantees.   The Compromise Creditors will receive the Compromise Consideration in terms of the Company Compromises.

14.3.   As a result of the Financial Restructuring, the New Money Notes will be issued by New Holdco 1 which will result in funds flowing into the Company which will enable it to continue trading.

## PART C: ASSUMPTIONS AND CONDITIONS

15.   **STATEMENT OF CONDITIONS TO THE PROPOSAL [SECTION 155(3)(c)(i)]**

15.1.   Save for this clause 15 and clauses 18 to 22 (both inclusive) which will remain of full force and effect, the remainder of the Bidco Proposal is subject to the fulfilment of the following conditions precedent that, by not later than the 5 (five) Business Days prior to the Long-Stop Date –

15.1.1.   the Senior Secured Company Resolution has been lawfully passed by the Senior Secured Creditors at the Senior Secured Company Meeting;

15.1.2.   the Super Senior Company Resolution has been lawfully passed by the Super Senior Third Ranking Creditors at the Super Senior Company Meeting;

15.1.3.   the Guarantor Resolutions have been lawfully passed by the relevant Compromise Creditors at the relevant Compromise Meetings;

15.1.4.   the Compromises have been approved and sanctioned by the Court ("**Court Order/s**") in terms of section 155(7)(b) of the Companies Act, without any conditions attaching thereto or if subject to conditions, such conditions being acceptable to the Company and the applicable Compromise Creditors;  and

15.1.5.   a copy of the Court Order/s have been filed with the Commission in terms of section 155(8)(a) of the Companies Act within 5 (five) Business Days of being handed down by the relevant Court;

15.2.   The Bidco Conditions have been inserted for the benefit of Bidco and the Compromise Creditors and the fulfilment of such Bidco Conditions may only be waived (in whole or in part), to the extent capable of being legally waived, by Bidco and not less than a majority in number and 75% of the aggregate Compromise Claims held by Compromise Creditors in each class.

15.3.   Unless the Bidco Conditions have been fulfilled or waived by not later than the above dates, the provisions of the Bidco Proposal, save for this clause 15 and clauses 18 to 22 which will remain of full force and effect, will never become of any force or effect.

16.   **EMPLOYEES [SECTION 155(3)(c)(ii)]**

16.1.   Bidco does not have any employees.

17.   **PROJECTED FINANCIALS [SECTION 155(3)(c)(iii)]**

17.1.   On the assumption that the Bidco Compromises are accepted and become effective on the Compromise Effective Date, Bidco refers the Compromise Creditors to the documents attached as follows –

17.1.1.   projected balance sheet of Bidco immediately following the Completion Date attached as Annexure D; and

17.1.2.   a projected statement of income and expenses for the ensuing three years following the Completion Date attached as Annexure E.

17.2. The assumptions used in preparing the projected statement of income and expenses are as follows:

    17.2.1. the HBA Shares are transferred to Bidco, Bidco receives dividends from Q3 FY17 and that the dividends are not transferred to the Company;

    17.2.2. a tax rate of 28% for the interest income, and that bank charges are deductible;

    17.2.3. bank charges are in line with current levels as per ECSL;

    17.2.4. no deposits of withdrawals from the account over the period;

    17.2.5. an interest rate of 2% per annum;

    17.2.6. a 15% tax on dividend; and

    17.2.7. USD/ZAR exchange rate of 13.5517 as of 04-Nov-16.

**GENERAL:**

18. **LOCK-UP AGREEMENT: SUPPORT FROM CREDITORS**

Bidco highlights that, as at the date of the Proposal Document, –

18.1. in relation to the Senior Secured Class, Senior Secured Creditors who represent –

    18.1.1. 23 in number of the Senior Secured Creditors; and

    18.1.2. 77% (seventy seven percent) in value of the Senior Secured Creditors

    have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Senior Secured Company Resolution and Guarantor Resolutions;

18.2. in relation to the Super Senior Class, Super Senior Third Ranking Creditors who represent –

    18.2.1. 17 in number of the Super Senior Third Ranking Creditors; and

    18.2.2. 72% (seventy two percent) in value of the Super Senior Third Ranking Creditors

    have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Super Senior Company Resolution and Guarantor Resolutions.

19. **BOARD RECOMMENDATION**

19.1. The board of directors of Bidco recommends that the Senior Secured Creditors vote in favour of the Senior Secured Bidco Compromise by approving the Senior Secured Bidco Resolution at the Senior Secured Bidco Meeting.

19.2. The board of directors of Bidco recommends that the Super Senior Third Ranking Creditors vote in favour of the Super Senior Bidco Compromise by approving the Super Senior Bidco Resolution at the Super Senior Bidco Meeting.

20. **AMENDMENTS**

20.1. The terms and conditions of any Bidco Compromise may be varied or amended –

    20.1.1. by Bidco at any time before the date and time for the commencement of the relevant Compromise Meeting provided that such variations or amendments are not material to the relevant Compromise Creditors and would not change any right or

obligation of any Compromise Creditor or impose any additional obligation on the Compromise Creditor if the Compromises are approved other than in the manner contemplated in the Proposal Document as at the date hereof and details of such variation and amendment have been Announced to the relevant Compromise Creditors ahead of the Senior Secured Company Meeting or the Super Senior Company Meeting (as applicable); or

20.1.2.  in such manner as the Court may require, provided that such modification, addition, term or condition does not change any right or obligation of or impose an additional obligation (as at the date of sanctioning) on a Compromise Creditor.

20.2.  If the terms and/or conditions of any Bidco Compromise are amended, any reference to such Bidco Compromise shall be deemed to be construed as a reference to such Bidco Compromise as amended.

21.  **FOREIGN REPRESENTATIVE**

Mr. Charles Vikisi or any other person authorised by the board of directors of Holdco is appointed and authorised to act as a foreign representative in respect of the Bidco Compromises ("**Foreign Representative**") in any Chapter 15 Proceedings.  The Foreign Representative is authorised on behalf of Bidco to take any and all actions to execute, deliver, certify, file, and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Chapter 15 Proceedings.

22.  **CERTIFICATE BY AN AUTHORISED DIRECTOR OF BIDCO**

In my capacity as authorised director on the board of directors of Bidco, I hereby certify in terms of section 155(5) of the Companies Act, that –

22.1.  the factual information provided in the Bidco Proposal appears to be accurate, complete and up to date; and

22.2.  the projections provided in the Bidco Proposal are estimates made in good faith on the basis of the factual information and assumptions set out herein.

Signed at _____ on _____ 2016


_____


**RICHARD VAUGHAN**


**CHIEF FINANCIAL OFFICER AND DIRECTOR, EDCON ACQUISITION PROPRIETARY LIMITED**

**Annexure A List of the Material Assets of Bidco**

[*To be inserted*]

**Annexure B List of the creditors of Bidco**

[*To be inserted*]

**Annexure C Summary of Probable Dividend Calculation**

[*To be inserted*]

**Annexure D Projected Balance Sheet of Bidco**

[*To be inserted*]

### Annexure E Projected Statement of Income and Expenses of Bidco

[*To be inserted*]

**EDCON HOLDINGS LIMITED**
Incorporated in South Africa
(Registration Number 2006/036903/06)

---

**HOLDCO PROPOSAL**
**INFORMATION REASONABLY REQUIRED TO FACILITATE COMPROMISE CREDITORS IN DECIDING WHETHER OR NOT TO ACCEPT OR REJECT THE HOLDCO COMPROMISES AS REQUIRED IN TERMS OF SECTION 155(3) OF THE COMPANIES ACT**

---

The definitions and interpretations commencing on page 7 of the Proposal Document apply throughout, including this cover page (unless the context indicates a contrary intention).

**YOU ARE STRONGLY URGED TO READ THE EXPLANATORY STATEMENT IN ITS ENTIRETY FOR MORE INFORMATION AS TO THE EFFECTS AND CONSEQUENCES SHOULD THE COMPROMISES BECOME OPERATIVE.  THE EXPLANATORY STATEMENT SUMMARISES THE EFFECT AND CONSEQUENCES OF NOT ONLY THE COMPROMISES, BUT ALSO THE RELEVANT TRANSACTIONS IN THE RESTRUCTURING DOCUMENTS WHICH WILL IMPACT ON, AND BIND, THE SENIOR SECURED CREDITORS AND SUPER SENIOR THIRD RANKING CREDITORS RESPECTIVELY SHOULD THE COMPROMISES BECOME OPERATIVE.  THE AFORESAID TRANSACTIONS WILL BE IMPLEMENTED PURSUANT TO THE AUTHORITIES CONTAINED IN THE RELEVANT COMPROMISE TO BIND THE RESPECTIVE COMPROMISE CREDITORS THERETO.**

1.      **STRUCTURE OF THE COMPROMISES**

For the purposes of section 155(3) of the Companies Act, the terms of the Holdco Compromises are divided into 3 (three) parts as follows –

1.1.    **PART A - BACKGROUND**

In accordance with section 155(3)(a) of the Companies Act, this part sets out:

1.1.1.      a complete list of all the material assets of Holdco, as well as an indication as to which assets are held as security by creditors as at 26 November 2016;

1.1.2.      a complete list of the creditors of Holdco as at 26 November 2016, as well as an indication as to which creditors would qualify as secured, statutory preferent and concurrent in terms of the laws of insolvency, and an indication of which of the creditors have proved their claims;

1.1.3.      the probable dividend that would be received by creditors, in their specific classes, if Holdco were to be placed in liquidation;

1.1.4.      a complete list of the holders of Holdco issued securities, and the effect that the proposal in respect of the Holdco Compromises would have on them, if any; and

1.1.5.      whether the proposal in respect of the Holdco Compromises includes a proposal made informally by a creditor of Holdco.

(See pages 1124 to 1138).

1.2.    **PART B - TERMS OF THE COMPROMISES**

In accordance with section 155(3)(b) of the Companies Act, this part describes in detail the terms of each Holdco Compromise, including:

1.2.1.      noting that there is a debt moratorium proposed pursuant to the Holdco Compromises;

1.2.2.      the extent to which Holdco is to be released from the payment of its debts, and the extent to which any debt is proposed to be converted to equity in Holdco, or another Company;

1.2.3.      the treatment of contracts and ongoing role of Holdco;

1.2.4.      the property of Holdco that is proposed to be available to pay creditors' claims;

1.2.5.      the order of preference in which the proceeds of property of Holdco will be applied to pay creditors if the proposal is adopted; and

1.2.6.      the benefits of adopting the proposals in respect of the Holdco Compromises as opposed to the benefits that would be received by creditors if Holdco were to be placed in liquidation.

This part also states that if (i) the Senior Secured Holdco Resolution is adopted by a majority of the relevant Senior Secured Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding as at the Record Date or DTC Record Date (as applicable) held by the Senior Secured Creditors who are present and voting in person or by proxy at the Senior Secured Holdco Meeting; and (ii) the Super Senior Holdco Resolution is adopted by a majority of the relevant Super Senior Third Ranking Creditors representing at least 75% (seventy five percent) of the Compromise Claims outstanding as at the Record Date held by the Super Senior Third Ranking

Creditors who are present and voting in person or by proxy at the Super Senior Holdco Meeting, then the Holdco Compromises will become effective once all the Holdco Conditions have been fulfilled upon the Compromise Effective Date.

 (See pages 1138 to 1141).

**1.3.     PART C – ASSUMPTIONS AND CONDITIONS**

In accordance with section 155(3)(c) of the Companies Act, this part sets out :

1.3.1.     a statement of the Holdco Conditions that must be satisfied, if any, for the Holdco Compromises to —

1.3.1.1.     come into operation; and

1.3.1.2.     be fully implemented;

1.3.2.     the effect, if any, that the Holdco Compromises contemplate having on the number of employees, and their terms and conditions of employment; and

1.3.3.     a projected —

1.3.3.1.     balance sheet for Holdco; and

1.3.3.2.     statement of income and expenses for the ensuing year,

prepared on the assumption that the Holdco Compromises are accepted.  The statement of income and expenses is for only one year as the intention is to wind up Holdco in accordance with the terms of the Restructuring Term Sheet and not to continue operating Holdco beyond one year.

(See pages 1141 to 1144).

## PART A: BACKGROUND

2.     **LIST OF MATERIAL ASSETS OF HOLDCO AND SECURITY OVER SUCH ASSETS [SECTION 155(3)(a)(i)]**

2.1.     A complete list of the material assets of Holdco at book value and the security given in relation thereto as at 26 November 2016 is attached hereto marked Annexure A.

2.2.     The financial information of the Existing Group is calculated as at 26 November 2016 being the most recent financial information available as at the date of this Proposal Document.  There has been no change to the financial information between 26 November 2016 and the date of the Proposal Document which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

3.     **CREDITORS OF HOLDCO [SECTION 155(3)(a)(ii)]**

A complete list of the creditors of Holdco as at 26 November 2016 is attached as Annexure B, which furthermore identifies such creditors as secured, statutory preferent and concurrent in terms of South African insolvency laws.  There has been no change to the list of creditors between 26 November 2016 and the date of the Proposal Document. which will materially affect the decision of the Compromise Creditors whether to vote for or against the Compromise Proposals.

No creditors have proved any claims against Holdco as Holdco is not in liquidation.

4.    **PROBABLE LIQUIDATION DIVIDEND [SECTION 155(3)(a)(iii)]**

4.1.    Holdco engaged the services of Matuson & Associates to calculate the probable dividend which would be received by the Compromise Creditors, if Holdco were to be put into liquidation, as at 26 November 2016

4.2.    A copy of the report prepared by Matuson & Associates reflecting the probable dividend calculation is attached hereto as Annexure C.

4.3.    Based on the dividend calculation, the probable dividend which creditors would receive as at such date is as follows:

   4.3.1.    Secured Creditors:

      4.3.1.1.    Super Senior First Ranking Creditors: 2cents in the Rand, being an amount of R93million.

      4.3.1.2.    Super Senior Second Ranking Creditors :nil

      4.3.1.3.    Super Senior Third Ranking Creditors :nil

      4.3.1.4.    Senior Secured Creditors :nil.

   4.3.2.    Preferent Creditors: nil

   4.3.3.    Concurrent Creditors: nil

5.    **SUMMARY OF FINANCIAL RESTRUCTURING**

5.1.    The Financial Restructuring provides for the re-organisation of the following intercompany loans in the Edcon Group:

   5.1.1.    "**A Loan**" being the loan owing by ECSL to Bidco in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

   5.1.2.    "**B Loan**" being the loan owing by the Company to Bidco in an amount of ZAR2 187 328 092 (two billion one hundred and eighty seven million three hundred and twenty eight thousand and ninety two Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

   5.1.3.    "**C Loan**" being the loan owing by Bidco to the Company in an amount of ZAR892 000 000.00 (eight hundred and ninety two million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

   5.1.4.    "**D Loan**" being the loan owing by ECSL to Holdco in an amount of ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

   5.1.5.    "**E Loan**" being the loan owing by Holdco to Bidco in an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) as at the Pre-Completion Date, which is non-interest bearing;

   5.1.6.    "**F Loan**" being the loan owing by the Company to Holdco in an amount of ZAR820 000 000.00 (eight hundred and twenty million Rand) as at the Pre-Completion Date, the loan being non-interest bearing;

   5.1.7.    "**G Loan**" being the loan owing by the Company to Holdco in an amount of ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and

seventy Rand and twenty two cents) as at the Pre-Completion Date, the loan being non-interest bearing;

5.1.8.   "**H Loan**" means the loan owing by ECSL to the Company in an amount of ZAR16 508 588.87 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and eighty seven cents) as at the Pre-Completion Date, the loan being non-interest bearing; and

5.1.9.   "**I Loan**" means the loan owing by the Company to ECSL in an amount of ZAR35 241 162.48 (thirty five million two hundred and forty one thousand one hundred and sixty two Rand and forty eight cents) as at the Pre-Completion Date, the loan being non-interest bearing.

5.2.   With effect from the Pre-Completion Date, each of the A Loan, B Loan, C Loan, D Loan, E Loan, F Loan, G Loan, H Loan and I Loan are hereby deemed to be immediately due, owing and payable.

5.3.   The Company's obligation to discharge the B Loan will be set-off against Bidco's obligation to pay the C Loan, leaving an amount of ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand) shall remain immediately due, owing and payable under the B Loan to Bidco ("**Remaining B Loan**").

5.4.   The Company will delegate the Remaining B Loan in its entirety to ECSL, which delegation ECSL will accept.   As a result of the delegation, the Company shall become indebted to ECSL in an amount equal to the face value of the Remaining B Loan ("**B.1 Loan**"), which B.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.5.   ECSL will delegate the D Loan in its entirety to Bidco, which delegation Bidco will accept.   As a result of the delegation, ECSL shall become indebted to Bidco in an amount equal to the face value of the D Loan ("**D.1 Loan**"), which D.1 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.6.   The Company will delegate the F Loan in its entirety to Bidco, which delegation Bidco will accept.   As a result of the delegation, the Company shall become indebted to Bidco in an amount equal to the F Loan ("**F.1 Loan**"), which F.1 Loan shall be immediately due, owing and payable and which shall not bear interest.   The Company will thereafter delegate the F.1 Loan in its entirety to ECSL, which delegation ECSL will accept.   As a result of the thereof, the Company will become indebted to ECSL in an amount equal to the face value of the F.1 Loan ("**F.2 Loan**"), which F.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.7.   The Company will hereby delegate the G Loan in its entirety to Bidco, which delegation Bidco will accepts.   As a result of the delegation the Company shall become indebted to Bidco in an amount equal to the face value of the G Loan ("**G.1 Loan**"), which G.1 Loan shall be immediately due, owing and payable and which shall not bear interest.   The Company will thereafter delegate the G.1 Loan in its entirety to ECSL, which delegation ECSL will accept.  As a result of thereof, the Company shall become indebted to ECSL in an amount equal

to the face value of the G.1 Loan ("**G.2 Loan**"), which G.2 Loan shall be immediately due, owing and payable and which shall not bear interest.

5.8.  Following the above mentioned delegations, Holdco owes the E Loan to Bidco, in an amount equal to ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents);

    5.8.1.  Bidco owes –

        5.8.1.1.  the D Loan to Holdco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

        5.8.1.2.  the F Loan to Holdco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

        5.8.1.3.  the G Loan to Holdco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents);

    5.8.2.  ECSL owes -

        5.8.2.1.  the A Loan to Bidco, in an amount equal to ZAR892 000 000.00 (eight hundred and ninety two million Rand);

        5.8.2.2.  the Remaining B Loan to Bidco, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

        5.8.2.3.  the D.1 Loan to Bidco, in an amount equal to ZAR2 354 000 000.00 (two billion three hundred and fifty four million Rand);

        5.8.2.4.  the F.1 Loan to Bidco, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand);

        5.8.2.5.  the G.1 Loan to Bidco, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents); and

        5.8.2.6.  the H Loan to the Company, in an amount equal to ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents); and

    5.8.3.  The Company owes -

        5.8.3.1.  the I Loan to ECSL, in an amount equal to ZAR35 248 162 (thirty five million two hundred and forty eight thousand one hundred and sixty two Rand);

        5.8.3.2.  the B.1 Loan to ECSL, in an amount equal to ZAR1 295 328 092 (one billion two hundred and ninety five million three hundred and twenty eight thousand and ninety two Rand);

5.8.3.3.   the F.2 Loan to ECSL, in an amount equal to ZAR820 000 000.00 (eight hundred and twenty million Rand); and

5.8.3.4.   the G.2 Loan to ECSL, in an amount equal to ZAR458 156 570.22 (four hundred and fifty eight million one hundred and fifty six thousand five hundred and seventy Rand and twenty two cents).

5.9.   Holdco's obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Bidco in terms of the E Loan shall be set-off against Bidco's obligation to repay an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed to Holdco under the G Loan, with the result that -

5.9.1.   the E Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.9.2.   an amount of ZAR927 670.56 (nine hundred and twenty seven thousand six hundred and seventy Rand and fifty six cents) owed in terms of the G Loan shall be discharged through such set-off; and

5.9.3.   an amount of ZAR457 228 899.66 (four hundred and fifty seven million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents) shall remain owing under the G Loan to Holdco ("**Remaining G Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.10.   ECSL's obligation to repay the ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to the Company in terms of the H Loan shall be set-off against the Company's obligation to repay an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed to ECSL under the G.2 Loan, with the result that -

5.10.1.   the H Loan shall be discharged in full and extinguished in its entirety through such set-off;

5.10.2.   an amount of ZAR16 508 588.67 (sixteen million five hundred and eight thousand five hundred and eighty eight Rand and sixty seven cents) owed in terms of the G.2 Loan shall be discharged through such set-off; and

5.10.3.   an amount of ZAR441 647 981.55 (four hundred and forty one million six hundred and forty seven thousand nine hundred and eighty one Rand and fifty five cents) shall remain owing under the G.2 Loan to ECSL ("**Remaining G.2 Loan**"), the terms of which shall be set out in the Step D Intercompany Loan Agreement.

5.11.   The effect of the above re-organisation of the intercompany loans will have the following effect:

5.11.1.   There will be "**Holdco-Bidco Loans**" being collectively, the D Loan, the F Loan, and the Remaining G Loan, all of which are owing by Bidco to Holdco and which in total amount to ZAR3 631 228 899.66 (three billion six hundred and thirty one

million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty six cents).

5.11.2. There will be "**Bidco-ECSL Loans**" being Loan A in the amount of R6 047 million;

5.11.3. There will be "**ECSL-Company Loans**" being the remaining loan H in the amount of R2 819 million.

5.12. Holdco will subscribe for a Bidco Share for a subscription price equal to an amount of ZAR3 631 228 899.66 (three billion six hundred and thirty one million two hundred and twenty eight thousand eight hundred and ninety nine Rand and sixty nine cents) ("**Bidco Share Subscription Consideration**"), with the Bidco Share Subscription Consideration left outstanding and being immediately due, owing and payable. On demand Holdco's obligation to pay the Bidco Share Subscription Consideration shall be set-off against Bidco's obligation to repay the Holdco-Bidco Loans, with the result that all payment obligations referred to in this clause shall be discharged and accordingly extinguished in their entirety, with such set-off constituting full discharge of the respective payment obligations.

5.13. The effect hereof is that there will be no Holdco-Bidco Loans outstanding and the only intercompany debt will be the Bidco-ECSL Loans and the ECSL-Company Loans.

The Implementation Documents

5.14. In terms of the Financial Restructuring, the following Implementation Steps will be implemented:

5.14.1. The Senior Secured Creditors will have their indebtedness refinanced and capitalised in accordance with the documents to be executed in terms of Implementation Step S (see clause 8.32 and 8.33 of the Restructuring Agreement).

5.14.1.1. 50% of the Senior Secured Debt will be refinanced as New Holdco 2 PIK B Notes and 50% of the Senior Secured Debt will be capitalised at New Holdco 2 as follows:

5.14.1.2. The Senior Secured Term Lenders can elect whether to be issued New Holdco 2 PIK B Notes in USD or ZAR. If they elect to be issued New Holdco 2 PIK B Notes in USD, the Senior Secured Term Loan Debt will be redenominated into USD ("USD Senior Secured Term Loan Debt").

5.14.1.3. The Senior Secured Notes will be retranched into ZAR and USD denominated notes through a supplemental indenture, with such tranches being proportionate to the election made by Senior Secured Noteholders to ultimately take up New Holdco 2 PIK B Notes denominated in either USD or ZAR.

5.14.1.4. The Company will delegate the USD Senior Secured Term Loan Debt and the obligation to pay the USD Senior Secured Notes Debt to New Holdco 2 and as a result of such delegation will incur amount,

denominated in USD, equal to the face value of the USD denominated Senior Secured Debt being delegated. ("USD Delegation Debt") , which will bear interest at 3% PIK per annum and which will be deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.5.   The Company will delegate the ZAR Senior Secured Term Loan and the obligation to pay the ZAR denominated Senior Secured Notes Debt to New Holdco 2 for an amount, denominated in ZAR, equal to the face value of the ZAR denominated Senior Secured Debt being delegated ("the ZAR Delegation Debt") denominated in ZAR, being non-interest bearing and being deeply subordinated and with repayment made subject to meeting solvency requirements.

5.14.1.6.   The USD Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in USD.  This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company. All of these intra-group debts are denominated in USD, bear interest at 3% PIK per annum and are deeply subordinated.

5.14.1.7.   The ZAR Delegation Debt owing by the Company to New Holdco 2 is further delegated by the Company to New Holdco 1 with the Company thereby becoming indebted to New Holdco 1 for an equivalent amount in ZAR.  This obligation is then delegated by the Company to Parent, by Parent to Bidco, Bidco and ECSL and ECSL and the Company.  All of these intra-group debts are denominated in ZAR, do not bear interest and are deeply subordinated.

5.14.1.8.   New Holdco 2 will capitalise 50% of the Senior Secured Debt to New Holdco 2, by Senior Secured Creditors subscribing for New Holdco 2 Ordinary A Shares for an amount equal to 50% of the ZAR equivalent amount of the face value of their Senior Secured Debt ("the subscription debt"), with the subscription proceeds left outstanding on loan account. The subscription debt of the Senior Secured Term Loan Lenders is set-off against an equal amount of the face value of the Senior Secured Term Loan Debt, with a portion of the Senior Secured Term Loan Debt remaining outstanding.  The subscription debt of the Senior Secured Noteholders is set-off against an equal amount of the face value of New Holdco 2's obligation to pay in terms of the Senior

Secured Notes with a portion of the obligation to pay in terms of the Senior Secured Notes remaining outstanding.

5.14.1.9. New Holdco 2 will refinance on a value-for-value basis the remaining 50% of the Senior Secured Debt as New Holdco 2 PIK B Notes, which are either USD denominated bearing interest at 3% PIK per annum or ZAR denominated and bearing interest at 3% PIK plus the value on the Business Day prior to the Pre-Completion Date quoted by Bloomberg of a zero coupon fixed-rate USD / ZAR swap to 31 December 2022. The New Holdco 2 PIK B Notes are issued in full settlement of the Senior Secured Debt. The Senior Secured Debt will accordingly cease to exist.

5.14.1.10. A USD denominated Delegation Debt corresponding in value to the New Holdco 2 PIK B Notes will be maintained between New Holdco 2 and New Holdco 1. The remainder of the USD denominated Delegation Debt will be converted to ZAR. The ZAR denominated Delegation Debt does not bear interest. Similarly, USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes plus the value of the Commitment Fee Notes will be maintained between New Holdco 1 and Parent, Parent and Bidco, Bidco and ECSL and ECSL and the Company. The USD denominated Delegation Debts corresponding to the value of the New Holdco 2 PIK B Notes (but not the portion corresponding to the Commitment Fee Notes) will be deeply subordinated to all creditors. The remainder of the USD denominated Delegation Debt intra-group will be converted to ZAR. The ZAR denominated Delegation Debt will not bear interest and will be deeply subordinated to all creditors.

5.15. The Super Senior Term Loan Debt and Super Senior 2019 Notes will be refinanced as New Holdco 2 PIK A Notes, which are EUR denominated bearing interest at 8% PIK per annum, in accordance with the documents to be executed in terms of Implementation Step O (see clause 8.27 of the Restructuring Agreement.)

5.15.1. The Super Senior Term Loan Debt and the obligation to pay the Super Senior 2019 Notes will be delegated by the Company to New Holdco 2, with the Company becoming indebted to New Holdco 2 for an amount equal thereto.

5.15.2. This debt owing by the Company to New Holdco 2 is then further delegated by the Company to New Holdco 1, by the Company to Parent, by the Company to Bidco and by the Company to ECSL. All of these intra-group debts are of equal value denominated in EUR and bearing interest at 8% PIK per annum.

5.15.3. New Holdco 2 will refinance the Super Senior Term Loan Debt as New Holdco 2 PIK A Notes.  New Holdco 2 will issue PIK A Notes to the Super Senior Noteholders in full settlement of the Super Senior Notes Debt.  The Super Senior Notes will cease to exist.

5.16. The Super Senior Hedging Debt will be refinanced as New Holdco 1 PIK A-2 Notes in accordance with the documents to be executed in terms of Implementation Step P (see clause 8.28 of the Restructuring Agreement.)

5.16.1. The Super Senior Hedging Debt will be redenominated to USD ("USD Super Senior Hedging Debt").

5.16.2. 95% of the USD Super Senior Hedging Debt will be delegated by the Company to New Holdco 1, with the Company becoming indebted to New Holdco 1 for an amount equal to the USD Super Senior Hedging Debt.  This Delegation Debt will be denominated in USD, bearing interest at 5% PIK per annum.

5.16.3. The delegated USD Super Senior Hedging Debt will be further delegated by the Company to Parent, by the Company to Bidco and by the Company to ECSL.  All of these intra-group debts are of equal value denominated in USD and bearing interest at 5% PIK per annum.

5.16.4. New Holdco 1 will refinance the delegated USD Super Senior Hedging Debt as New Holdco 1 PIK A-2 Notes, which are USD denominated and bear interest at 5% PIK per annum.

5.16.5. The remaining 5% of the USD Super Senior Hedging Debt will remain enforceable at the Company and will only be released upon Completion,

5.17. The terms of the Existing SSLF and Existing SSCF will be amended and a New RCF will be created in accordance with the documents to be executed in terms of Implementation Step N (see clause 8.26 of the Restructuring Agreement).

5.17.1. A new RCF Facility of R575million will be made available at Completion Date to the Company.

5.18. New Holdco 1 will issue New Holdco 1 PIK A Notes and the proceeds will be injected into the Company in accordance with the documents to be executed in terms of Implementation Step Q (see clause 8.29 and 8.30 of the Restructuring Agreement).

5.18.1. New Holdco 1 will issue the USD equivalent of approximately ZAR2.25billion in New Holdco 1 PIK A Notes, which are USD denominated and bear interest at 25% PIK per annum as follows:

5.18.1.1. The ZAR Committed Amount of ZAR1.49billion; and

5.18.1.2. The refinancing of the Facility A3 Lenders.

5.18.2. The cash issue proceeds from the issue of the New Holdco 1 PIK A Notes will be loaned by New Holdco 1 to the Company as a USD denominated loan via loans to Parent, Bidco and ECSL, which intra-group loans will all be USD denominated bearing interest at 25% PIK per annum.

5.18.3. The Participating Creditors will also receive either New Holdco 2 Ordinary B Shares with a nominal amount equal to not more than

15% (when aggregated with the CVRs) of the equity at New Holdco 2 or the CVRs.

6. **LIST OF HOLDERS OF HOLDCO'S ISSUED SECURITIES AND EFFECT OF THE HOLDCO COMPROMISES THEREON [SECTION 155(3)(a)(iv)]**

6.1. Holdco's issued securities comprise, as at the date of this Proposal Document, of –

    6.1.1. 500 133 "A" ordinary shares:

        6.1.1.1. 96% of the "A" ordinary shares are held by Luxco;

        6.1.1.2. 3.7926% of the "A" ordinary shares are held by The Elephant Acquisition Primary Founder Investor Trust;

        6.1.1.3. 0.0002% of the "A" ordinary shares are held by The Elephant Acquisition Primary Independent Investor Trust and The Elephant Acquisition Primary Founder Investor Trust; and

        6.1.1.4. 0.05359% of the "A" ordinary shares are held by The Elephant Acquisition Primary Independent Investor Trust.

    6.1.2. 200 866 "A" preference shares:

        6.1.2.1. 98.6080% of the "A" preference shares are held by The Elephant Acquisition Primary Founder Investor Trust 2;

        6.1.2.2. 1.3915% of the "A" preference shares are held by The Elephant Acquisition Primary Founder Investor Trust; and

        6.1.2.3. 0.0005% of the "A" preference shares are held by The Elephant Acquisition Primary Founder Investor Trust and The Elephant Acquisition Primary Founder Investor Trust 2.

    6.1.3. 69 213 "B" ordinary shares held 100% by the BEE Trust:

    6.1.4. 55 841 "B" preference shares:

        6.1.4.1. 97.5224% of the "B" preference shares are held by Luxco;

        6.1.4.2. 2.4582% of the "B" preference shares are held by The Elephant Acquisition Primary Founder Investor Trust 2; and

        6.1.4.3. 0.0194% of the "B" preference shares are held by The Elephant Acquisition Primary Independent Investor Trust.

    6.1.5. 31 643 "C" ordinary shares:

        6.1.5.1. 92.84% of the "C" ordinary shares are held by The Elephant Acquisition Secondary Founder Investor Trust;

        6.1.5.2. 0.1215% of the "C" ordinary shares are held by The Elephant Acquisition Secondary Independent Investor Trust; and

        6.1.5.3. 7% of the "C" ordinary shares are held by The Elephant Acquisition Tertiary Investor Trust.

    6.1.6. 31 643 "D" ordinary shares:

6.1.6.1. 92.84% of the "D" ordinary shares are held by The Elephant Acquisition Secondary Founder Investor Trust 2;

6.1.6.2. 0.1215% of the "D" ordinary shares are held by The Elephant Acquisition Secondary Independent Investor Trust; and

6.1.6.3. 7% of the "D" ordinary shares are held by The Elephant Acquisition Tertiary Investor Trust 2.

6.1.7. 31 643 "E" ordinary shares:

6.1.7.1. 92.84% of the "E" ordinary shares are held by The Elephant Acquisition Secondary Founder Investor Trust 3;

6.1.7.2. 0.1215% of the "E" ordinary shares are held by The Elephant Acquisition Secondary Independent Investor Trust; and

6.1.7.3. 7% of the "E" ordinary shares are held by The Elephant Acquisition Tertiary Investor Trust 3.

6.1.8. F Ordinary Shares 95020 ("F Warrants") held by the Senior Secured 2019 Noteholders;

6.1.9. F1 Preference Shares 1 700 227 759 ("F1 Warrants") held by the Senior Secured 2019 Noteholders;

6.1.10. F2 Preference Shares 137 596 074 ("F2 Warrants") held by the Senior Secured 2019 Noteholders; and

6.1.11. Senior Holdco Notes.

6.2. Save as otherwise expressly provided in the Restructuring Agreement, the Restructuring Agreement will be dated and be binding on Holdco as an Initial Party on the Initial Effective Date.

6.3. On the Compromise Effective Date the Compromise Companies, including Holdco, and the Compromise Creditors, shall be bound by and shall comply with each of the obligations under each Implementation Document at such time as such Implementation Document becomes effective in accordance with its terms and the terms of the Restructuring Agreement.

6.4. The Compromise Creditors, the Super Senior Second Ranking Creditors, the Super Senior Second Ranking Participants and the Luxco Parties (including Luxco) have entered into an Accession Letter (as defined in the Lock-Up Agreement) (the **"Accession Letter"),** in terms of which, *inter alia:*

6.4.1. Luxco has acceded as a party to the Lock-Up Agreement;

6.4.2. the Luxco Parties will provide certain releases to the Company Parties, as well as any Compromise Creditor, Super Senior Second Ranking Creditor or Super Senior Second Ranking Participant that elects to become a party to the Accession Letter;

6.4.3. each Compromise Creditor, Super Senior Second Ranking Creditor and Super Senior Second Ranking Participant that elects to become a party to the Accession Letter will provide certain releases to the Luxco Parties;

6.4.4. the releases referred to in paragraphs 6.4.2 and 6.4.3 above (the **"Releases"),** will replace and supersede the releases provided in:

6.4.4.1.    clause 11.6(c) of the Lock-Up Agreement; and

6.4.4.2.    clause 12.7 of the Restructuring Agreement insofar as these releases are granted by the Locked-Up Super Senior Term Loan Lenders, the Locked-Up Senior Secured Term Loan Lenders, Locked-Up Super Senior Noteholders, Locked-Up Senior Secured Noteholders (both as defined in the Lock-Up Agreement), the Super Senior Second Ranking Creditors and/or the Super Senior Second Ranking Participants (as applicable) that have signed the Accession Letter to the Luxco Parties and by the Luxco Parties to the Locked-Up Super Senior Term Loan Lenders, the Locked-Up Senior Secured Term Loan Lenders, Locked-Up Super Senior Creditors Noteholders, Locked-Up Senior Secured Noteholders (both as defined in the Lock-Up Agreement), the Super Senior Second Ranking Creditors and/or the Super Senior Second Ranking Participants (as applicable) that have signed the Accession Letter.

6.5.    The accession described in 6.4.1 and the releases described in 6.4.2 and 6.4.3 will become effective on the Accession Effective Date being the latest of:

6.5.1.    the Completion Date; and

6.5.2.    the date on which the Accession Letter has been signed by Luxco, Holdco, the Company (in its capacity as the Company and on behalf of the other Company Parties), each Locked-Up Super Senior Term Loan Lender, the Locked-Up Senior Secured Term Loan Lender, the Locked-Up Super Senior Noteholders holding more than 50% in value of all Super Senior Notes Debt, the Locked-Up Senior Secured Noteholders holding more than 50% in value of all Senior Secured Notes Debt and each of the Super Senior Second Ranking Creditors and Super Senior Second Ranking Participants.

6.6.    As at the date of the Proposal Document, the Accession Letter has been signed by the requisite parties to satisfy the condition set out in paragraph 6.5.1 above and as such the Accession Effective Date will occur on the Completion Date.

6.7.    Each Compromise Creditor who has not already signed the Accession Letter has the option as to whether or not to become a party to the Accession Letter by contacting the Company's advisors (contact Jaslin Pritipaul on +27 11 269 7813 or +27 82 560 5834 or email jpritipaul@ensafrica.com in normal business hours to make arrangements to request an execution version of the Accession Letter), bearing in  mind that if a Compromise Creditor elects:

6.7.1.    to become a party to the Accession Letter, it will receive the releases  described in paragraph 6.4.2 above, and will be required to provide the releases described in 6.4.3 above it will also be receiving and providing the releases contained in the Restructuring Agreement insofar as they relate to the Company

Parties (as defined in the Restructuring Agreement) other than Holdco; and

6.7.2.      not to become a party to the Accession Letter, it will not receive the releases described in paragraph 6.4.2 above and will not be required to provide the releases described in paragraph 6.4.3 above; however it will be receiving and providing the releases contained in the Restructuring Agreement insofar as they relate to the Company Parties (as defined in the Restructuring Agreement).

6.8.    The Restructuring Agreement and the Execution Documents will affect Holdco in the following manner:

6.8.1.      Implementation Step D1 (*Re-organise various intra-group debt*) referred to in clause 8.12 of the Restructuring Agreement and the documents to be entered into pursuant thereto which provides for the delegation of the various intra-company loans between (i) Holdco and the Company and (ii) ECSL and Holdco and (iii) Holdco and Bidco;

6.8.2.      Implementation Step D2 (*Re-organise various intra-group debt*) referred to clause 8.12 of the Restructuring Agreement and the documents to be entered into pursuant thereto which provide for the subscription of shares by Holdco in Bidco and the payment of the subscription price through set-off.  The intra-group loans between ECSL and Bidco and ECSL and the Company will remain in place and will be subordinated.  These intra-group loans will be ZAR denominated and interest free;

6.8.3.      Implementation Step E (*transfer of Hollard Business Associates shares to below enforcement level by direct sale*) referred to in clause 8.13 of the Restructuring Agreement and the documents to be entered into pursuant thereto provides for the following agreements to be concluded:

6.8.3.1.      the Hollard SPA;

6.8.3.2.      the Hollard Restatement Agreement;

6.8.3.3.      Addendum to Hollard JV Agreement;

6.8.3.4.      Addendum to the Business Relationship Agreement;

6.8.3.5.      Addendum to the Binder Agreement (Short-term Insurance Act);

6.8.3.6.      Addendum to the Binder Agreement (Long-term Insurance Act); and

6.8.3.7.      the Addendum to the Administration Agreement.

6.8.4.      HBA Shares held by Holdco and the agreements which regulate the relationship between Holdco and the joint venture are to be transferred to Bidco.

6.8.5.      Implementation Step F (*waive Company/Restricted Newco, PIK A &B Loan and Proceeds Loan*) referred to in clause 8.14 of the Restructuring Agreement and the Waiver Agreement to be concluded in terms thereof which provides for the waiver of the intercompany loans between the Company and Restricted Newco,

the intercompany loan between Holdco and Unrestricted Newco and the Proceeds Loan.

6.8.6.   Implementation Step G1 (*Matching Loan Delegation*) referred to in clause 8.15 of the Restructuring Agreements and the documents to be entered into pursuant thereto which provides for the delegation of the Matching Loan owed by the Company to Holdco to Bidco and ECSL;

6.8.7.   Implementation Step G2 (*Share subscription and set-off agreement*) referred to in clause 8.15 of the Restructuring Agreement and the documents to be entered into pursuant thereto which provide for the subscription of shares by Holdco in Bidco and the, payment of the subscription price through set-off. Intra-company loans will remain in place between Bidco and ECSL and ECSL and the Company which loans will be deeply subordinated to all creditors and interest free. In the event that the Edcon Group obtains a favourable Binding Private Ruling from SARS, these intra-company loans will be capitalised in terms of the subscription of shares and the set-off of the subscription price; failing which these loans will remain in place as described above;

6.8.8.   Implementation Steps I, J and K (*Default, Acceleration and Enforcement*) referred to in clauses 8.19, 8.20 and 8.21 of the Restructuring Agreement in terms of which the SPV Guarantor will demand payment from Holdco;

6.8.9.   Implementation Step L (*Waiver of Proceeds Loan*) referred to in clause 8.23 of the Restructuring Agreement which provides for the waiver of the Proceeds Loan;

6.8.10.   Implementation Step M (*Sale of Target Group to Parent for the Purchase Consideration)* in terms of which the shares held by Holdco in Bidco will be sold to Parent.  As a result of this implementation step, Holdco will not be transferred to the New Holdco 2 structure and will remain behind in the Existing Group structure.

6.9.   The Senior Secured Creditors and the Super Senior Third Ranking Creditors will be refinanced in terms of Implementation Steps S and O respectively as set out above in clauses 8.32 and 8.33 and 8.27 respectively of the Restructuring Agreement and the Compromise Creditors will receive the Compromise Consideration on Completion Date .

6.10.   The Holdco Compromises once operable will secure the release of Holdco on the Completion Date from the Guarantees provided by Holdco.

6.11.   The Luxco loan to Holdco in the amount of R8,949billion will be capitalised. Luxco will subscribe for a share in Holdco and the subscription price will be paid by way of set-off.

6.12.   Accordingly, the shareholders of Holdco will be affected by the Financial Restructuring as follows:

6.12.1.   Holdco will no longer hold the HBA shares;

6.12.2.    Holdco will not be transferred with the Target Group to the New Holdco Group;

6.12.3.    Holdco will have no claims against any of its former subsidiaries after Completion Date;

6.12.4.    Holdco will have no claims against it by Luxco or its Subsidiaries in terms of intercompany loans;

6.12.5.    Holdco will redeem the Senior Holdco Notes in full on Completion;

6.12.6.    The BEE Trust will be issued with New Holdco 2 Ordinary C shares of approximately 10.6% of the issued shares in New Holdco 2;

6.12.7.    The Management Incentive Trust will not be issued with any shares in the New Holdco Group on the Completion Date; and

6.12.8.    Luxco will receive New Holdco 2 Ordinary E shares.

7.    **INFORMAL PROPOSAL [SECTION 155(3)(a)(v)]**

7.1.    The Holdco Compromises are based on the restructuring and revised steps plan as contemplated in the Lock-Up Agreement (and the annexures thereto), to which Holdco (by virtue of being a party thereto) and certain of the Existing Group's creditors are contractually obliged to propose and support the Compromises respectively and, as regards such creditors, to vote in favour of the relevant Compromise Resolutions and to execute and implement the Implementation Documents.

7.2.    The following percentage by value of the Existing Group's creditors signed the Lock-Up Agreement:

7.2.1.    100% of the RCF Creditors;

7.2.2.    100% of the Senior Secured Liquidity Facility Lenders;

7.2.3.    100% of the Super Senior Second Ranking Creditors;

7.2.4.    72% of the Super Senior Third Ranking Creditors; and

7.2.5.    77% of the Senior Secured Creditors.

**PART B: HOLDCO PROPOSALS**

8.    **TERMS OF THE COMPROMISES [SECTION 155(3)(b)]**

8.1.    Senior Secured Holdco Compromise:

This clause 8.1 applies to the Senior Secured Creditors only.

8.1.1.    With effect on and as from the implementation of Step S in the Restructuring Agreement  on the Completion Date the Senior Secured Creditors irrevocably and unconditionally release Holdco from the terms of the Guarantees given by Holdco in all respects and no party shall have any liability whatsoever to the other thereunder.

8.1.2.    The Senior Secured Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

8.2.    Super Senior Holdco Compromise:

This clause 8.2 applies to the Super Senior Third Ranking Creditors only.

8.2.1.    With effect on and as from the implementation of Step O in terms of the Restructuring Agreement on the Completion Date, the Super Senior Third Ranking Creditors hereby irrevocably and unconditionally release Holdco from the terms of the Guarantees

given by Holdco and no party shall have any liability whatsoever to the other thereunder.

8.2.2.   The Super Senior Third Ranking Creditors hereby approve the Debt Moratorium (as defined in clause 9 below), on the terms set out in clause 9 below.

9.   **NATURE AND DURATION OF ANY DEBT MORATORIUM [SECTION 155(3)(b)(i)]**

A debt moratorium ("**Debt Moratorium**") is being proposed in terms of the Holdco Compromises as follows:

9.1.   the payment by the Company of –

9.1.1.   the March Coupon (being the payment of interest due 15 March 2016 in respect of the Senior Secured 2018 Notes) and the September Coupon (being the cash interest payment due 15 September 2016 on the Senior Secured 2018 Notes); and

9.1.2.   all cash interest payments that are due or will fall due under the Senior Secured Term Loans up to and including 14 December 2016,

is hereby deferred until 28 February 2017;

9.2.   the aforesaid deferral is subject to the occurrence of a Deferral Termination Event arising, as such term is defined in the LUA as amended by the Amendment Agreement ; and

10.   **save as aforesaid, no other debt moratorium is being proposed in terms of the Holdco Compromises.EXTENT TO WHICH HOLDCO WILL BE RELEASED FROM THE PAYMENT OF DEBTS AND EXTENT TO WHICH ANY DEBT IS PROPOSED TO BE CONVERTED TO EQUITY [SECTION 155(3)(b)(ii)]**

10.1.   If the Holdco Compromises are approved, and the Financial Restructuring is implemented in accordance with the terms of the Implementation Documents, Holdco will be released from its obligations under the Guarantees on the Completion Date.

10.2.   As set out above, the intercompany loans that Holdco is owed by Bidco, ECSL and the Company will be delegated and Holdco will subscribe for shares in Bidco, and the subscription price will be paid by way of set-off.  Holdco will accordingly have no claims against any of its Subsidiaries.

10.3.   As set out in clause 6.11 above, Luxco will capitalise its loan to Holdco.

10.4.   Accordingly, post the Financial Restructuring, Holdco will have the no debt.

10.4.1.   A loan from Luxco which is subordinated to the solvency of Holdco;

10.4.2.   A loan from Newshelf 1304 Proprietary Limited, a company whose shares are held 30% by Luxco and 70% by Newshelf 1303 Proprietary Limited, which is due and payable in 2034;

10.4.3.   The Senior Holdco Notes debt which will be repaid in full on Completion;

10.4.4.   Holdco will eventually be wound up on the basis contemplated in the Restructuring Term Sheet.

11. **TREATMENT OF CONTRACTS AND ONGOING ROLE OF HOLDCO [SECTION 155(3)(b)(iii)]**

11.1.   The Senior Secured 2018 Notes Indentures, the Senior Secured 2019 Notes Indentures and the Super Senior 2019 Notes Indentures will be cancelled pursuant to the refinancing of the Compromise Claims as set out above.

11.2.   The Senior Secured Term Loans and Super Senior Term Loans will be refinanced as set out above.

11.3.   As set out in clause 5 above, the Restructuring Agreement also affects the following contracts and agreements:

11.3.1.   The terms of the Existing SSLF and Existing SSCF will be amended and a New RCF Facility created;

11.3.2.   The Super Senior Second Ranking Debt will be refinanced as New Holdco 1 PIK A 2 Notes; and

11.3.3.   The debt of the Facility A3 Lenders will be refinanced as part of the New Money Notes Offer (see clause 8.24 of the Restructuring Agreement),

(see also Part A of the Explanatory Statement (*Company Information, Background and Reasons for the Financial Restructuring*).

11.4.   The Holdco Compromises are inextricably linked to and are an indivisible part of the Financial Restructuring of the Existing Group.

11.5.   The purpose of the Company Compromises is to enable the Company, insofar as is possible, to continue operating its business as a going concern in the ordinary course.

11.6.   The purpose of the Guarantor Compromises is to release the Guarantors from their obligations under the Guarantees, so as to ensure that the Company Compromises are given effect to in their fullest.

11.7.   If the Compromises fail to become operative on the Compromise Effective Date, then the board of directors of Holdco and the board of directors of each of the other Guarantors and the Company will need to consider all alternatives available to them at the time, which may include, but not be limited to, voluntary business rescue and/or a notice in terms of section 129(7) of the Companies Act and/or liquidation proceedings.

12. **PROPERTY OF HOLDCO PROPOSED TO BE AVAILABLE TO PAY CREDITORS' CLAIMS [SECTION 155(3)(b)(iv)]**

12.1.   No property of Holdco is proposed to be made available to pay creditors claims by virtue of the fact that Holdco is not in liquidation proceedings.

13. **ORDER OF PREFERENCE IN WHICH THE PROCEEDS OF THE PROPERTY OF HOLDCO WILL BE APPLIED TO PAY CREDITORS IF THE COMPROMISES ARE ADOPTED [SECTION 155(3)(b)(v)]**

13.1.   There is no order of preference that will apply to payments to the Compromise Creditors in relation to the Holdco Compromises because no proceeds of the property of Holdco will be applied under the Compromises.

14. **BENEFITS OF ADOPTING THE COMPROMISES AS OPPOSED TO BENEFITS THAT WOULD BE RECEIVED BY CREDITORS IF HOLDCO WERE TO BE PLACED INTO LIQUIDATION [SECTION 155(3)(b)(vi)]**

14.1. If Holdco were to be placed into liquidation, the creditors of Holdco would only receive the benefits as set out in clause 4 above in the Matuson & Associates report, namely –

14.1.1. the creditors of Holdco would receive (as an estimate) –

14.1.1.1. in respect of secured creditors, R93 million in respect of the Super Senior First Ranking Creditors only;

14.1.1.2. in respect of preferent creditors, R0 (zero rand); and

14.1.1.3. in respect of concurrent creditors, R0 (zero rand)

14.1.2. the Super Senior Third Ranking Creditors would receive (as an estimate) R0 (zero rand); and

14.1.3. the Senior Secured Creditors would receive (as an estimate) R0 (zero rand).

14.2. The benefits to be received by the creditors if the Compromises become operative on the Compromise Effective Date is that the Company will be able to continue to trade in the ordinary course and the Financial Restructuring will be implemented in accordance with its terms which will have the result of deleveraging the Company, without Holdco retaining any residual liability under the Guarantees. The Compromise Creditors will receive the Compromise Consideration in terms of the Company Compromises.

14.3. As a result of the Financial Restructuring, the New Money Notes will be issued by New Holdco 1 which will result in funds flowing into the Company which will enable it to continue trading.

**PART C: ASSUMPTIONS AND CONDITIONS**

15. **STATEMENT OF CONDITIONS TO THE PROPOSAL [SECTION 155(3)(c)(i)]**

15.1. Save for this clause 15 and clauses 18 to 22 (both inclusive) which will remain of full force and effect, the remainder of the Holdco Proposal is subject to the fulfilment of the following conditions precedent that, by not later than the 5 (five) Business Days prior to the Long-Stop Date –

15.1.1. the Senior Secured Company Resolution has been lawfully passed by the Senior Secured Creditors at the Senior Secured Company Meeting;

15.1.2. the Super Senior Company Resolution has been lawfully passed by the Super Senior Third Ranking Creditors at the Super Senior Company Meeting;

15.1.3. the Guarantor Resolutions have been lawfully passed by the relevant Compromise Creditors at the relevant Compromise Meetings;

15.1.4. the Compromises have been approved and sanctioned by the Court ("**Court Order/s**") in terms of section 155(7)(b) of the Companies Act, without any conditions attaching thereto or if subject to conditions, such conditions being acceptable to the Company and the applicable Compromise Creditors; and

15.1.5.   a copy of the Court Order/s have been filed with the Commission in terms of section 155(8)(a) of the Companies Act within 5 (five) Business Days of being handed down by the relevant Court;

15.2.   The Holdco Conditions have been inserted for the benefit of Holdco and the Compromise Creditors and the fulfilment of such Holdco Conditions may only be waived (in whole or in part), to the extent capable of being legally waived, by Holdco and not less than a majority in number and 75% of the aggregate Compromise Claims held by Compromise Creditors in each class.

15.3.   Unless the Holdco Conditions have been fulfilled or waived by not later than the above dates, the provisions of the Holdco Proposal, save for this clause 15 and clauses 18 to 22 which will remain of full force and effect, will never become of any force or effect.

16.   **EMPLOYEES [SECTION 155(3)(c)(ii)]**

16.1.   Holdco does not have any employees.

17.   **PROJECTED FINANCIALS [SECTION 155(3)(c)(iii)]**

17.1.   On the assumption that the Holdco Compromises are accepted and become effective on the Compromise Effective Date, Holdco refers the Compromise Creditors to the documents attached as follows –

17.1.1.   projected balance sheet of Holdco immediately following the Completion Date  attached as Annexure D; and

17.1.2.   a projected statement of income and expenses for the ensuing year following the Completion Date attached as Annexure E.

17.2.   The assumptions used in the preparation of the projected statement of income and expenses are the following:

17.2.1.   No additional ratings costs for Holdco;

17.2.2.   R200 000 provision for additional administration costs; and

17.2.3.   Excludes tax and any potential tax liabilities.

**GENERAL:**

18.   **LOCK-UP AGREEMENT:  SUPPORT FROM CREDITORS**

Holdco highlights that, as at the date of the Proposal Document, –

18.1.   in relation to the Senior Secured Class, Senior Secured Creditors who represent –

18.1.1.   23 in number of the Senior Secured Creditors; and

18.1.2.   77% (seventy seven percent) in value of the Senior Secured Creditors

have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Senior Secured Company Resolution and Guarantor Resolutions;

18.2.   in relation to the Super Senior Class, Super Senior Third Ranking Creditors who represent –

18.2.1.   17 in number of the Super Senior Third Ranking Creditors; and

18.2.2.   72% (seventy two percent) in value of the Super Senior Third Ranking Creditors

have entered into the Lock-Up Agreement and, in so doing, agreed to vote in favour of the Super Senior Company Resolution and Guarantor Resolutions.

19.  **BOARD RECOMMENDATION**

19.1.  The board of directors of Holdco recommends that the Senior Secured Creditors vote in favour of the Senior Secured Holdco Compromise by approving the Senior Secured Holdco Resolution at the Senior Secured Holdco Meeting.

19.2.  The board of directors of Holdco recommends that the Super Senior Third Ranking Creditors vote in favour of the Super Senior Holdco Compromise by approving the Super Senior Holdco Resolution at the Super Senior Holdco Meeting.

20.  **AMENDMENTS**

20.1.  The terms and conditions of any Holdco Compromise may be varied or amended –

20.1.1.  By Holdco at any time before the date and time for the commencement of the Senior Secured Holdco Meeting or Super Senior Holdco Meeting (as applicable) provided that such variations or amendments are not material to the relevant Compromise Creditors and would not change any right or obligation of any Compromise Creditor or impose any additional obligation on the Compromise Creditor if the Compromises are approved other than in the manner contemplated in the Proposal Document as at the date hereof and details of such variation and amendment have been Announced to the relevant Compromise Creditors ahead of the Senior Secured Company Meeting or the Super Senior Company Meeting (as applicable); or

20.1.2.  in such manner as the Court may require, provided that such modification, addition, term or condition does not change any right or obligation of or impose an additional obligation (as at the date of sanctioning) on a Compromise Creditor.

20.2.  If the terms and/or conditions of any Holdco Compromise are amended, any reference to such Holdco Compromise shall be deemed to be construed as a reference to such Holdco Compromise as amended.

21.  **FOREIGN REPRESENTATIVE**

Mr. Charles Vikisi or any other person authorised by the board of directors of Holdco is appointed and authorised to act as a foreign representative in respect of the Holdco Compromises ("**Foreign Representative**") in any Chapter 15 Proceedings. The Foreign Representative is authorised on behalf of Holdco to take any and all actions to execute, deliver, certify, file, and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Chapter 15 Proceedings.

22.  **CERTIFICATE BY AN AUTHORISED DIRECTOR OF HOLDCO**

In my capacity as authorised director on the board of directors of Holdco, I hereby certify in terms of section 155(5) of the Companies Act, that –

22.1.  the factual information provided in the Holdco Proposal appears to be accurate, complete and up to date; and

22.2.  the projections provided in the Holdco Proposal are estimates made in good faith on the basis of the factual information and assumptions set out herein.


Signed at _____ on _____ 2016


_____

**RICHARD VAUGHAN**

**CHIEF FINANCIAL OFFICER AND DIRECTOR, EDCON HOLDINGS LIMITED**

**Annexure A List of the Material Assets of Holdco**

[*To be inserted*]

**Annexure B List of the creditors of Holdco**

[*To be inserted*]

**Annexure C Summary of Probable Dividend Calculation**

[*To be inserted*]

**Annexure D Projected Balance Sheet of Holdco**

[*To be inserted*]

**Annexure E Projected Statement of Income and Expenses of Holdco**

[*To be inserted*]

## <u>EXHIBIT 2</u>

**Board Resolutions**

Holdco

1

**EDCON HOLDINGS LIMITED**

(Registration No.2006/036903/06)

(the "Company")

---

## ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF THE COMPANY

---

We, the persons whose names appear below and who have signed this document (or other documents in the same form) are the directors ("**Directors**") of the Company and we hereby resolve that the following resolutions are passed as written resolutions in accordance with the memorandum of incorporation ("**MOI**") of the Company and section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

1. The Company, together with its subsidiaries ("**Subsidiaries**"), intends to undergo a corporate and financial restructuring ("**Financial Restructuring**"), which will include, *inter alia*, the launching of comprise proceedings instituted or to be instituted in terms of section 155 of the Companies Act (the "**Compromise Proceedings**") and the filing of a recognition proceeding (the "**Chapter 15 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York for the Company to obtain recognition of the Compromise Proceedings as foreign main proceedings under chapter 15 of title 11 of the United States Code (the "**Recognition Order**") and in accordance with the compromise proposal (as read with the supporting explanatory statement and other supporting documents, the "**Compromise Proposal**").

2. The Financial Restructuring is intended to be implemented in accordance with the terms and conditions contained in the restructuring agreement made between, among others, (i) Edcon Limited ("**Opco**"), (ii) the Company, (iii) Edcon Acquisitions Proprietary Limited ("**Bidco**"), (iv) Edgars Consolidated Stores Limited ("**ECSL**"), (v) the RCF Lenders (as defined therein), (vi) the Super Senior Secured Liquidity Facility Lenders (as defined therein), (vii) the Super Senior Second Ranking Creditors (as defined therein), (viii) the Senior Secured Creditors (as defined therein), (ix) the Super Senior Third Ranking Creditors (as defined therein), (x) Lucid Issuer Services Limited as information agent, (xi) K2016470295 (South Africa) Proprietary Limited, (xii) K2016470260 (South Africa) Limited ("**New Holdco 1**"), (xiii) K2016470219 (South Africa) Limited ("**New Holdco 2**") and (xiv) certain other entities as set out and defined therein (such agreement, including all of its schedules, the "**Restructuring Agreement**").

2

3. The Financial Restructuring is further described in, amongst other things, the steps plan ("**Steps Plan**") (which is schedule 1 to the Restructuring Agreement). The Steps Plan sets out the various steps ("**Steps**") which need to be taken by the various parties to the Restructuring Agreement.

4. A copy of the Restructuring Agreement, the Compromise Proposal, the Steps Plan, the Amendment Deed to the Lock-Up Agreement (3 October 2016) and, for the avoidance of doubt, the Implementation Documents (as defined in the Restructuring Agreement) (hereinafter referred to as the "**Relevant Documents**") have been circulated to each of the Directors. By executing this document, each Director acknowledges that he/she has familiarised himself/herself with the Steps of the Financial Restructuring, such Steps which are not repeated here.

5. The Company may, by entering into and giving effect to the Financial Restructuring as a whole:

    5.1. provide financial assistance ("**Financial Assistance**") within the meaning of sections 44 and/or 45 of the Companies Act; and

    5.2. make distributions ("**Distributions**") within the meaning of section 46 of the Companies Act.

6. The Directors have considered all reasonably foreseeable financial circumstances of the Company so as to satisfy themselves of the solvency and liquidity of the Company immediately after providing the Financial Assistance or the Distributions, as the case may be, in accordance with sections 4, 44, 45 and 46 of the Companies Act, for purposes of which the Directors have considered the following information, namely:

    6.1. the most recent financial statements of the Company, which financial statements satisfy the requirements of section 29 of the Companies Act;

    6.2. the most recent accounting records of the Company, which accounting records satisfy the requirements of section 28 of the Companies Act; and

    6.3. the fair value of the Company's assets and liabilities, including any reasonably foreseeable contingent assets and liabilities.

7. The sole shareholder of the Company has or will adopt a special resolution ("**Financial Assistance Special Resolution**") providing the Company with the authority to provide the Financial Assistance, subject to compliance with the requirements of the Company's MOI and the Companies Act.

NOW THEREFORE IT IS RECORDED THAT:

8. For purposes of section 75 of the Companies Act, save as disclosed in paragraphs 9 to12 below, each Director has confirmed that neither he/she nor, to his/her knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the Companies Act) has a personal financial interest in the matters decided in the written resolutions below which he/she is required by

section 75 of the Companies Act or the MOI of the Company to disclose, other than those matters which have already been disclosed in writing in accordance with section 75(4) of the Companies Act.

9.    Bernard Joseph Brookes, a Director of the Company, has disclosed that certain related parties, being Opco, ECSL New Holdco 1, New Holdco 2 and Bidco, each have a personal financial interest in some of the matters to be considered in the resolutions below. Therefore, while he will receive written notice of the resolutions below, he is required to take such steps as are necessary to comply with section 75 of the Companies Act and his signature hereof is merely to acknowledge receipt of service.

10.    Urin Ferndale, a Director of the Company, has disclosed that a related party, being Opco, has a personal financial interest in some of the matters to be considered in the resolutions below. Therefore, while he will receive written notice of the resolutions below, he is required to take such steps as are necessary to comply with section 75 of the Companies Act and his signature hereof is merely to acknowledge receipt of service.

11.    Richard Vaughan, a Director of the Company, has disclosed that certain related parties, being Opco, Bidco, ECSL, New Holdco 1 New Holdco 2, Newshelf 1303 Proprietary Limited and Newshelf 1304 Proprietary Limited each have a personal financial interest in some of the matters to be considered in the resolutions below. Therefore, while he will receive written notice of the resolutions below, he is required to take such steps as are necessary to comply with section 75 of the Companies Act and his signature hereof is merely to acknowledge receipt of service.

12.    Antonio Maximillian Alvarez, a Director of the Company, has disclosed that he has a personal financial interest in some of the matters to be considered in the resolutions below. Therefore, while he will receive written notice of the resolutions below, he is required to take such steps as are necessary to comply with section 75 of the Companies Act and his signature hereof is merely to acknowledge receipt of service.

13.    Accordingly, subject to the necessary shareholder approvals being obtained, the Directors wish to authorise the Company to:

13.1.    enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring, including the execution of the Relevant Documents;

13.2.    provide the Financial Assistance, in compliance with the requirements of sections 4, 44, and 45 of the Companies Act;

13.3.    make the Distributions, in compliance with the requirements of sections 4 and 46 of the Companies Act;

13.4.    authorise and empower any Director to do all such things necessary to sign, enter into and implement the Approved Documents;

13.5.    authorise the commencement of the Chapter 15 Proceeding; and

13.6.    ratify all actions already taken in relation to the Approved Documents.

IT IS HEREBY RESOLVED THAT:

**RESOLUTION NUMBER 1:** *Entry into and Performance of Documents*

14.    The Company be and is hereby authorised to:

14.1.    enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring and the Compromise Proposal (the documents required, necessary and/or desirable to consummate the Financial Restructuring being, amongst other things, the Relevant Documents); and

14.2.    enter into and perform its obligations under any other ancillary documents required, necessary and/or desirable in connection with the consummation of the transactions contemplated by the Relevant Documents, to be concluded by the Company from time to time, on the terms and conditions contained the Relevant Documents,

(collectively, the "**Approved Documents**") in substantially the same form as the drafts thereof circulated to the Directors simultaneously with these resolutions; and

14.3.    perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

**RESOLUTION NUMBER 2:** *Financial Assistance and Distributions*

Financial Assistance

15.    The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 44(2) of the Companies Act, the Company to provide Financial Assistance to any person arising under, to the extent applicable, any of the Approved Documents, as may be required to give effect to the Financial Restructuring.

16.    In terms of and pursuant to the provisions of section 44(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company and the information referred to in paragraph 6 above, immediately after providing the Financial Assistance as contemplated in paragraph 15 above:

5

16.1. the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

16.2. it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

16.3. the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

16.4. all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

17. The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 45(2) of the Companies Act, the Company to provide Financial Assistance to any "related or inter-related company" (as that term is contemplated in the Companies Act) of the Company, arising under, to the extent applicable, any of the Approved Documents.

18. In terms of and pursuant to the provisions of section 45(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after providing the Financial Assistance:

18.1. the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

18.2. it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

18.3. the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

18.4. all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

19. Written notice of the Financial Assistance shall be provided to the shareholder(s) of the Company and the relevant trade unions (if required), within the required statutory period.

Distributions

20. The Directors hereby authorise the Company to make Distributions under, to the extent applicable, any of the Approved Documents.

21.  In terms of and pursuant to the provisions of section 46(1)(c) of the Companies Act, the Directors hereby confirm that they have applied the solvency and liquidity test as set out in section 4 of the Companies Act and they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after completing the Distribution contemplated in paragraph 20 above:

21.1.  the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company); and

21.2.  it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of the Distribution.

**RESOLUTION NUMBER 3:** *Authorisation*

22.  Any 1 (one) Director (or her/his duly authorised alternate), from time to time, in her/his capacity as a Director, be and is hereby authorised and empowered to:

22.1.  negotiate, amend, vary and settle all the terms and conditions of, and sign and enter into:

22.1.1.  the Approved Documents;

22.1.2.  any other documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

22.1.3.  any other documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents,

provided that no amendments made to the Approved Documents (as contemplated above) will result in a material variation of the terms and conditions of the Approved Documents which have been circulated to the Directors simultaneously with these resolutions; and

22.2.  generally do everything reasonably required or necessary for the implementation of the Approved Documents;

23.  The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Financial Restructuring.

24.  Any agreement or document signed by the person(s) referred to in this Resolution Number 3 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**RESOLUTION NUMBER 4:** *Chapter 15 Proceeding*

28    The appropriate notices, applications, and filings in connection with the Chapter 15 Proceeding for the Company are hereby authorized and approved.

**RESOLUTION NUMBER 5:** *Ratification*

29.   To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred to in Resolution Number 3 above may already have taken in relation to the Approved Documents and any other agreements and documents referred to above,

30.   To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the Company has taken, including, but not limited to the entry by the Company into any and all agreements and/or documents necessary, ancillary, and/or desirable in connection with the Financial Restructuring.

<u>Counterparts</u>

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be signed in counterparts.

**Name:  Antonio Maximillian Alvarez**

(who signs only to acknowledge receipt)

**Capacity: Director**

Date:  December 8th  2016

**Name: Edward Barry Berk**

**Capacity: Director**

Date:

**Name:  Roanne Blythe Daniels**

**Capacity: Director**

Date:

**Name: Keith Douglas Mandley**

**Capacity: Director**

Date:

**Name: Urin Ferndale**

(who signs only to acknowledge receipt)

**Name: Zohra Begum Ebrahim**

**EDCON ACQUISITION PROPRIETARY LIMITED**

(Registration No. 2007/000518/07 )

(the "**Company**")

---

### ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF THE COMPANY

---

We, the persons whose names appear below and who have signed this document (or other documents in the same form) are the directors ("**Directors**") of the Company and we hereby resolve that the following resolutions are passed as written resolutions in accordance with the memorandum of incorporation ("**MOI**") of the Company and section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

1.  Edcon Holdings Limited (Registration Number 2006/036903/06) ("**Holdco**"), together with its subsidiaries ("**Subsidiaries**"), intends to undergo a corporate and financial restructuring ("**Financial Restructuring**"), which will include, *inter alia*, the launching of comprise proceedings instituted or to be instituted in terms of section 155 of the Companies Act (the "**Compromise Proceedings**") and the filing of a recognition proceeding (the "**Chapter 15 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York for the Company to obtain recognition of the Compromise Proceedings as foreign main proceedings under chapter 15 of title 11 of the United States Code and in accordance with the compromise proposal (as read with the supporting explanatory statement and other supporting documents, the "**Compromise Proposal**").

2.  The Financial Restructuring is intended to be implemented in accordance with the terms and conditions contained in the restructuring agreement made between, among others, (i) Holdco, (ii) the Company, (iii) Edcon Limited ("**Opco**"), (iv) Edgars Consolidated Stores Limited ("**ECSL**"), (v) the RCF Lenders (as defined therein), (vi) the Super Senior Secured Liquidity Facility Lenders (as defined therein), (vii) the Super Senior Second Ranking Creditors (as defined therein), (viii) the Senior Secured Creditors (as defined therein), (ix) the Super Senior Third Ranking Creditors (as defined therein), (x) Lucid Issuer Services Limited as information agent, (xi) K2016470295 (South Africa) Proprietary Limited, (xii) K2016470260 (South Africa) Limited ("**New Holdco 1**"), (xiii) K2016470219 (South Africa) Limited ("**New Holdco 2**") and (xiv) certain other entities as set out and defined therein (such agreement, including all of its schedules, the "**Restructuring Agreement**").

2

3.    The Financial Restructuring is further described in, amongst other things, the steps plan ("**Steps Plan**") (which is schedule 1 to the Restructuring Agreement). The Steps Plan sets out the various steps ("**Steps**") which need to be taken by the various parties to the Restructuring Agreement.

4.    A copy of the Restructuring Agreement, the Compromise Proposal, the Steps Plan and, for the avoidance of doubt, the Amendment Deed to the Lock-Up Agreement (3 October 2016), the Implementation Documents (as defined in the Restructuring Agreement) (hereinafter referred to as the "**Relevant Documents**") have been circulated to each of the Directors. By executing this document, each Director acknowledges that he/she has familiarised himself/herself with the Steps of the Financial Restructuring, such Steps which are not repeated here.

5.    The Company may, by entering into and giving effect to the Financial Restructuring as a whole:

    5.1.    provide financial assistance ("**Financial Assistance**") within the meaning of sections 44 and/or 45 of the Companies Act; and

    5.2.    make distributions ("**Distributions**") within the meaning of section 46 of the Companies Act.

6.    The Directors have considered all reasonably foreseeable financial circumstances of the Company so as to satisfy themselves of the solvency and liquidity of the Company immediately after providing the Financial Assistance or the Distributions, as the case may be, in accordance with sections 4, 44, 45 and 46 of the Companies Act, for purposes of which the Directors have considered the following information, namely:

    6.1.    the most recent financial statements of the Company, which financial statements satisfy the requirements of section 29 of the Companies Act;

    6.2.    the most recent accounting records of the Company, which accounting records satisfy the requirements of section 28 of the Companies Act; and

    6.3.    the fair value of the Company's assets and liabilities, including any reasonably foreseeable contingent assets and liabilities.

7.    The sole shareholder of the Company has or will adopt a special resolution ("**Financial Assistance Special Resolution**") providing the Company with the authority to provide the Financial Assistance, subject to compliance with the requirements of the Company's MOI and the Companies Act.

8.    The issue by the Company of shares ("**Issue Shares**") to its sole shareholder, Holdco (hereinafter also referred to as the "**Subscriber**") as contemplated in the applicable Relevant Documents may amount to an issue of shares to a related person as contemplated in section 41(1)(b) of the Companies Act. The implementation of the applicable Relevant Documents is consequently conditional on the sole shareholder of the Company, being Holdco, approving the issue of the Issue

Shares to the Subscriber by way of a special resolution (the "**Section 41(1) Shareholders Resolution**").

9.  The issue by the Company of the Issue Shares to the Subscriber as contemplated in the applicable Relevant Documents may amount to an issue of shares equal to or in excess of the 30% threshold described in section 41(3) of the Companies Act. The implementation of the applicable Relevant Documents is consequently conditional on the sole shareholder of the Company, namely Holdco, approving the issue of the Issue Shares to the Subscriber by way of a special resolution (the "**Section 41(3) Shareholders Resolution**").

**NOW THEREFORE IT IS RECORDED THAT:**

10. For purposes of section 75 of the Companies Act, save as disclosed at paragraphs 11 and 12 below, each Director has confirmed that neither he/she nor, to his/her knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the Companies Act) has a personal financial interest in the matters decided in the written resolutions below which he/she is required by section 75 of the Companies Act or the MOI of the Company to disclose, other than those matters which have already been disclosed in writing in accordance with section 75(4) of the Companies Act.

11. Bernard Joseph Brookes, a Director of the Company, has disclosed that certain related parties, being Opco, ECSL, New Holdco 1, New Holdco 2 and Holdco, each have a personal financial interest in some of the matters to be considered in the resolutions below.

12. Richard Vaughan, a Director of the Company, has disclosed that certain related parties, being Holdco, Opco, ECSL, New Holdco 1, New Holdco 2, Newshelf 1303 Proprietary Limited and Newshelf 1304 Proprietary Limited, each have a personal financial interest in some of the matters to be considered in the resolutions below.

13. Since both of the directors of the Company have disclosed a personal financial interest in some of the matters to be considered, they wish to resolve to approve the decisions contained herein and detailed below, in accordance with section 75 of the Companies Act, and will disclose the aforementioned interest to its sole shareholder, being Holdco, to approve same by way of ordinary resolution, as is required by section 75 of the Companies Act.

14. Accordingly, subject to the necessary shareholder approvals being obtained, the Directors wish to authorise the Company to:

    14.1. enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring, including the execution of the Relevant Documents;

4

14.2.    provide the Financial Assistance, in compliance with the requirements of sections 4, 44, and 45 of the Companies Act;

14.3.    make the Distributions, in compliance with the requirements of sections 4 and 46 of the Companies Act;

14.4.    issue the Issue Shares at adequate consideration to the Subscriber, as contemplated in the applicable Relevant Documents, in compliance with the requirements of sections 38(1), 41(1)(b) and 41(3) of the Companies Act, respectively;

14.5.    submit certain shareholder resolutions to Holdco, being the sole shareholder, for approval;

14.6.    authorise and empower any Director to do all such things necessary to sign, enter into and implement the Approved Documents;

14.7.    authorise the commencement of the Chapter 15 Proceeding; and

14.8.    ratify all actions already taken in relation to the Approved Documents.

## IT IS HEREBY RESOLVED THAT:

### RESOLUTION NUMBER 1: *Entry into and Performance of Documents*

15.    The Company be and is hereby authorised to:

15.1.    enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring and the Compromise Proposal (the documents required, necessary and/or desirable to consummate the Financial Restructuring being, amongst other things, the Relevant Documents); and

15.2.    enter into and perform its obligations under any other ancillary documents required, necessary and/or desirable in connection with the consummation of the transactions contemplated by the Relevant Documents, to be concluded by the Company from time to time, on the terms and conditions contained the Relevant Documents,

(collectively, the "**Approved Documents**") in substantially the same form as the drafts thereof circulated to the Directors simultaneously with these resolutions; and

15.3.    perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

### RESOLUTION NUMBER 2: *Financial Assistance and Distributions*

Financial Assistance

16.    The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 44(2) of the Companies Act, the Company to provide Financial Assistance to any person arising under, to the extent applicable, any of the Approved Documents, as may be required to give effect to the Financial Restructuring.

17.    In terms of and pursuant to the provisions of section 44(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company and the information referred to in paragraph 6 above, immediately after providing the Financial Assistance as contemplated in paragraph 16 above:

   17.1.    the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

   17.2.    it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

   17.3.    the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

   17.4.    all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

18.    The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 45(2) of the Companies Act, the Company to provide Financial Assistance to any "related or inter-related company" (as that term is contemplated in the Companies Act) of the Company, arising under, to the extent applicable, any of the Approved Documents.

19.    In terms of and pursuant to the provisions of section 45(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after providing the Financial Assistance:

   19.1.    the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

   19.2.    it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

   19.3.    the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

6

19.4.   all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

20.   Written notice of the Financial Assistance shall be provided to the shareholder(s) of the Company and the relevant trade unions (if required), within the required statutory period.

Distributions

21.   The Directors hereby authorise the Company to make Distributions under, to the extent applicable, any of the Approved Documents.

22.   In terms of and pursuant to the provisions of section 46(1)(c) of the Companies Act, the Directors hereby confirm that they have applied the solvency and liquidity test as set out in section 4 of the Companies Act and they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after completing the Distribution contemplated in paragraph 21 above:

22.1.   the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company); and

22.2.   it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of the Distribution.

**RESOLUTION NUMBER 3:** *Issue of Issue Shares to Subscriber*

23.   Subject to the relevant time as set out in the Restructuring Agreement occurring and the passing of the Section 41(1) Shareholders Resolution and Section 41(3) Shareholders Resolution, the Company be and is hereby authorised, in terms of section 38(1) of the Companies Act, to allot and issue the Issue Shares  to the Subscriber in accordance with the terms and conditions contained in the applicable Relevant Documents.

**RESOLUTION NUMBER 4:** *Adequate Consideration in respect of the Issue Shares*

24.   The consideration to be paid by the Subscriber to the Company in respect of the subscription for the shares so subscribed for by the Subscriber is adequate consideration, as contemplated in section 40(1)(a) of the Companies Act, having regard to the Company's assets and liabilities and the terms of the applicable Relevant Document.

**RESOLUTION NUMBER 5:** *Section 41(1) Shareholders Resolution*

25.   The Company submits, which it hereby does, the Section 41(1) Shareholders Resolution to Holdco, being its sole shareholder, for its consideration and the Directors, acting in what they believe to be

the best interests of the Company, hereby propose that Holdco votes in favour of and adopts the Section 41(1) Shareholders Resolution.

**RESOLUTION NUMBER 6:** *Section 41(3) Shareholders Resolution*

26. The Company submits, which it hereby does, the Section 41(3) Shareholders Resolution to Holdco, being its sole shareholder, for its consideration and the Directors, acting in what they believe to be the best interests of the Company, hereby propose that Holdco votes in favour of and adopts the Section 41(3) Shareholders Resolution.

**RESOLUTION NUMBER 7:** *Authorisation*

27. Any 1 (one) Director (or her/his duly authorised alternate), from time to time, in her/his capacity as a Director, be and is hereby authorised and empowered to:

    27.1.    negotiate, amend, vary and settle all the terms and conditions of, and sign and enter into:

        27.1.1.    the Approved Documents;

        27.1.2.    any other documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

        27.1.3.    any other documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents,

    provided that no amendments made to the Approved Documents (as contemplated above) will result in a material variation of the terms and conditions of the Approved Documents which have been circulated to the Directors simultaneously with these resolutions; and

    27.2.    generally do everything reasonably required or necessary for the implementation of the Approved Documents;

28. The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Financial Restructuring.

29. Any agreement or document signed by the person(s) referred to in this Resolution Number 7 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**RESOLUTION NUMBER 8:** *Chapter 15 Proceeding*

28    The appropriate notices, applications, and filings in connection with the Chapter 15 Proceeding for
the Company are hereby authorized and approved.

**RESOLUTION NUMBER 9:** *Ratification*

29.   To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred
to in Resolution Number 7 above may already have taken in relation to the Approved Documents
and any other agreements and documents referred to above.

30.   To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the
Company has taken, including, but not limited to the entry by the Company into any and all
agreements and/or documents necessary, ancillary, and/or desirable in connection with the Financial
Restructuring.

**Counterparts**

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be
signed in counterparts.

**Name:  Richard Vaughan**

**Capacity: Director**

**Date:**

**Name: Bernard Joseph Brookes**

**Capacity: Director**

**Date:**

**EDGARS CONSOLIDATED STORES LIMITED**

(Registration No. 1946/022751/06)

(the "**Company**")

---

## ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF THE COMPANY

---

We, the persons whose names appear below and who have signed this document (or other documents in the same form) are the directors ("**Directors**") of the Company and we hereby resolve that the following resolutions are passed as written resolutions in accordance with the memorandum of incorporation ("**MOI**") of the Company and section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

1.  Edcon Holdings Limited (Registration Number 2006/036903/06) ("**Holdco**"), together with its subsidiaries ("**Subsidiaries**"), intends to undergo a corporate and financial restructuring ("**Financial Restructuring**"), which will include, *inter alia*, the launching of comprise proceedings instituted or to be instituted in terms of section 155 of the Companies Act (the "**Compromise Proceedings**") and the filing of a recognition proceeding (the "**Chapter 15 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") for the Company to obtain recognition of the Compromise Proceedings as foreign main proceedings under chapter 15 of title 11 of the United States Code (the "**Recognition Order**") and in accordance with the compromise proposal (as read with the supporting explanatory statement and other supporting documents, the "**Compromise Proposal**").

2.  The Financial Restructuring is intended to be implemented in accordance with the terms and conditions contained in the restructuring agreement made between, among others, (i) Holdco, (ii) the Company, (iii) Edcon Acquisitions Proprietary Limited ("**Bidco**"), (iv) Edcon Limited ("**Opco**"), (v) the RCF Lenders (as defined therein), (vi) the Super Senior Secured Liquidity Facility Lenders (as defined therein), (vii) the Super Senior Second Ranking Creditors (as defined therein), (viii) the Senior Secured Creditors (as defined therein), (ix) the Super Senior Third Ranking Creditors (as defined therein), (x) Lucid Issuer Services Limited as information agent, (xi) K2016470295 (South Africa) Proprietary Limited, (xii) K2016470260 (South Africa) Limited ("**New Holdco 1**"), (xiii) K2016470219 (South Africa) Limited ("**New Holdco 2**") and (xiv) certain other entities as set out and defined therein (such agreement, including all of its schedules, the "**Restructuring Agreement**").

2

3.   The Financial Restructuring is further described in, amongst other things, the steps plan ("**Steps Plan**") (which is schedule 1 to the Restructuring Agreement). The Steps Plan sets out the various steps ("**Steps**") which need to be taken by the various parties to the Restructuring Agreement.

4.   A copy of the Restructuring Agreement, the Compromise Proposal, the Steps Plan, the Amendment Deed to the Lock-Up Agreement (3 October 2016) and, for the avoidance of doubt, the Implementation Documents (as defined in the Restructuring Agreement) (hereinafter referred to as the "**Relevant Documents**") have been circulated to each of the Directors. By executing this document, each Director acknowledges that he/she has familiarised himself/herself with the Steps of the Financial Restructuring, such Steps which are not repeated here.

5.   The Company may, by entering into and giving effect to the Financial Restructuring as a whole:

5.1.   provide financial assistance ("**Financial Assistance**") within the meaning of sections 44 and/or 45 of the Companies Act; and

5.2.   make distributions ("**Distributions**") within the meaning of section 46 of the Companies Act.

6.   The Directors have considered all reasonably foreseeable financial circumstances of the Company so as to satisfy themselves of the solvency and liquidity of the Company immediately after providing the Financial Assistance or the Distributions, as the case may be, in accordance with sections 4, 44, 45 and 46 of the Companies Act, for purposes of which the Directors have considered the following information, namely:

6.1.   the most recent financial statements of the Company, which financial statements satisfy the requirements of section 29 of the Companies Act;

6.2.   the most recent accounting records of the Company, which accounting records satisfy the requirements of section 28 of the Companies Act; and

6.3.   the fair value of the Company's assets and liabilities, including any reasonably foreseeable contingent assets and liabilities.

7.   The sole shareholder of the Company has or will adopt a special resolution ("**Financial Assistance Special Resolution**") providing the Company with the authority to provide the Financial Assistance, subject to compliance with the requirements of the Company's MOI and the Companies Act.

8.   The issue by the Company of shares ("**Issue Shares**") to its sole shareholder, Bidco (hereinafter also referred to as the "**Subscriber**") as contemplated in the applicable Relevant Documents may amount to an issue of shares to a related person as contemplated in section 41(1)(b) of the Companies Act. The implementation of the applicable Relevant Documents is consequently conditional on the sole shareholder of the Company, being Bidco, approving the issue of the Issue

Shares to the Subscriber by way of a special resolution (the "**Section 41(1) Shareholders Resolution**").

9.  The issue by the Company of the Issue Shares to the Subscriber as contemplated in the applicable Relevant Documents may amount to an issue of shares equal to or in excess of the 30% threshold described in section 41(3) of the Companies Act. The implementation of the applicable Relevant Documents is consequently conditional on the sole shareholder of the Company, namely Bidco approving the issue of the Issue Shares to the Subscriber by way of a special resolution (the "**Section 41(3) Shareholders Resolution**").

**NOW THEREFORE IT IS RECORDED THAT:**

10. For purposes of section 75 of the Companies Act, save as disclosed in paragraph 11 and 12 below, each Director has confirmed that neither he nor, to his knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the Companies Act) has a personal financial interest in the matters decided in the written resolutions below which he is required by section 75 of the Companies Act or the MOI of the Company to disclose, and which prohibits him from taking part in the consideration of such matters, other than those matters which have already been disclosed in writing in accordance with section 75(4) of the Companies Act.

11. Bernard Joseph Brookes, a Director of the Company, has disclosed that certain related parties, being Holdco, Bidco, Opco, New Holdco 1 and New Holdco 2, each have a personal financial interest some of in the matters to be considered in the resolutions below.

12. Richard Vaughan, a Director of the Company, has disclosed that certain related parties, being Holdco, Bidco, Opco, New Holdco 1, New Holdco 2, Newshelf 1303 Proprietary Limited and Newshelf 1304 Proprietary Limited, each have a personal financial interest some of in the matters to be considered in the resolutions below.

13. The Directors of the Company have each disclosed a personal financial interest in some of the matters to be considered and wish to resolve to approve the decisions contained herein and detailed below, in accordance with section 75 of the Companies Act, and will disclose the aforementioned interest to its sole shareholder, Bidco, to approve same by way of ordinary resolution, as is required by section 75 of the Companies Act.

14. Accordingly, subject to the necessary shareholder approval being obtained, the Directors wish to authorise the Company to:

14.1.  enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring, including the execution of the Relevant Documents;

14.2.   provide the Financial Assistance, in compliance with the requirements of sections 4, 44, and 45 of the Companies Act;

14.3.   make the Distributions, in compliance with the requirements of sections 4 and 46 of the Companies Act;

14.4.   issue the Issue Shares at adequate consideration to the Subscriber, as contemplated in the applicable Relevant Documents, in compliance with the requirements of sections 38(1), 41(1)(b) and 41(3) of the Companies Act, respectively;

14.5.   submit certain shareholder resolutions to Bidco, being the sole shareholder, for approval;

14.6.   authorise and empower any Director to do all such things necessary to sign, enter in and implement the Approved Documents;

14.7.   authorise the commencement of the Chapter 15 Proceeding; and

14.8.   ratify all actions already taken in relation to the Approved Documents.

## IT IS HEREBY RESOLVED THAT:

**RESOLUTION NUMBER 1: *Entry into and Performance of Documents***

15.   The Company be and is hereby authorised to:

15.1.   enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring and the Compromise Proposal (the documents required, necessary and/or desirable to consummate the Financial Restructuring being, amongst other things, the Relevant Documents); and

15.2.   enter into and perform its obligations under any other ancillary documents required, necessary and/or desirable in connection with the consummation of the transactions contemplated by the Relevant Documents, to be concluded by the Company from time to time, on the terms and conditions contained the Relevant Documents,

(collectively, the "**Approved Documents**"), in substantially the same form as the drafts thereof circulated to the Directors simultaneously with these resolutions; and

15.3.   perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

**RESOLUTION NUMBER 2: *Financial Assistance and Distributions***

Financial Assistance

16.   The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 44(2) of the Companies Act, the Company to provide Financial Assistance to any person arising under, to the extent applicable, any of the Approved Documents, as may be required to give effect to the Financial Restructuring.

17.   In terms of and pursuant to the provisions of section 44(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company and the information referred to in paragraph 6 above, immediately after providing the Financial Assistance as contemplated in paragraph 16 above:

   17.1.   the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

   17.2.   it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

   17.3.   the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

   17.4.   all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

18.   The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 45(2) of the Companies Act, the Company to provide Financial Assistance to any "related or inter-related company" (as that term is contemplated in the Companies Act) of the Company, arising under, to the extent applicable, any of the Approved Documents.

19.   In terms of and pursuant to the provisions of section 45(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after providing the Financial Assistance:

   19.1.   the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

   19.2.   it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

   19.3.   the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

19.4.   all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

20.   Written notice of the Financial Assistance shall be provided to the shareholder(s) of the Company and the relevant trade unions (if required), within the required statutory period.

Distributions

21.   The Directors hereby authorise the Company to make Distributions under, to the extent applicable, any of the Approved Documents.

22.   In terms of and pursuant to the provisions of section 46(1)(c) of the Companies Act, the Directors hereby confirm that they have applied the solvency and liquidity test as set out in section 4 of the Companies Act and they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after completing the Distribution contemplated in paragraph 21 above:

22.1.   the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company); and

22.2.   it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of the Distribution.

**RESOLUTION NUMBER 3:** *Issue of Issue Shares to Subscriber*

23.   Subject to the relevant time as set out in the Restructuring Agreement (occurring and the passing of the Section 41(1) Shareholders Resolution and Section 41(3) Shareholders Resolution, the Company be and is hereby authorised, in terms of section 38(1) of the Companies Act, to allot and issue the Issue Shares to the Subscriber in accordance with the terms and conditions contained in the applicable Relevant Documents.

**RESOLUTION NUMBER 4:** *Adequate Consideration in respect of the Issue Shares*

24.   The consideration to be paid by the Subscriber to the Company in respect of the subscription for the shares so subscribed for by the Subscriber is adequate consideration, as contemplated in section 40(1)(a) of the Companies Act, having regard to the Company's assets and liabilities and the terms of the applicable Relevant Document.

**RESOLUTION NUMBER 5:** *Section 41(1) Shareholders Resolution*

25.   The Company submits, which it hereby does, the Section 41(1) Shareholders Resolution to Bidco, being its sole shareholder, for its consideration and the Directors, acting in what they believe to be

the best interests of the Company, hereby propose that Bidco votes in favour of and adopts the Section 41(1) Shareholders Resolution.

**RESOLUTION NUMBER 6: *Section 41(3) Shareholders Resolution***

26.    The Company submits, which it hereby does, the Section 41(3) Shareholders Resolution to Bidco, being its sole shareholder, for its consideration and the Directors, acting in what they believe to be the best interests of the Company, hereby propose that Bidco votes in favour of and adopts the Section 41(3) Shareholders Resolution.

**RESOLUTION NUMBER 7: *Authorisation***

27.    Any 1 (one) Director (or her/his duly authorised alternate), from time to time, in her/his capacity as a Director, be and is hereby authorised and empowered to:

27.1.    negotiate, amend, vary and settle all the terms and conditions of, and sign and enter into:

27.1.1.    the Approved Documents;

27.1.2.    any other documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

27.1.3.    any other documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents,

provided that no amendments made to the Approved Documents (as contemplated above) will result in a material variation of the terms and conditions of the Approved Documents which have been circulated to the Directors simultaneously with these resolutions; and

27.2.    generally do everything reasonably required or necessary for the implementation of the Approved Documents;

28.    The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Financial Restructuring.

29.    Any agreement or document signed by the person(s) referred to in this Resolution Number 7 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**RESOLUTION NUMBER 8:** *Chapter 15 Proceeding*

28    The appropriate notices, applications, and filings in connection with the Chapter 15 Proceeding for
the Company are hereby authorized and approved.

**RESOLUTION NUMBER 9:** *Ratification*

29.   To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred
to in Resolution Number 7 above may already have taken in relation to the Approved Documents
and any other agreements and documents referred to above.

30.   To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the
Company has taken, including, but not limited to the entry by the Company into any and all
agreements and/or documents necessary, ancillary, and/or desirable in connection with the Financial
Restructuring.

Counterparts

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be
signed in counterparts.

**Name:  Bernard Joseph Brookes**

**Capacity: Director**

**Date:**

**Name: Richard Vaughan**

**Capacity: Director**

**Date:**

**EDCON LIMITED**

(Registration No. 2007/003525/06)

(the "**Company**")

---

### ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF THE COMPANY

---

We, the persons whose names appear below and who have signed this document (or other documents in the same form) are the directors ("**Directors**") of the Company and we hereby resolve that the following resolutions are passed as written resolutions in accordance with the memorandum of incorporation ("**MOI**") of the Company and section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

1.   Edcon Holdings Limited (Registration Number 2006/036903/06) ("**Holdco**"), together with its subsidiaries ("**Subsidiaries**"), intends to undergo a corporate and financial restructuring ("**Financial Restructuring**"), which will include, *inter alia*, the launching of comprise proceedings instituted or to be instituted in terms of section 155 of the Companies Act (the "**Compromise Proceedings**") and the filing of a recognition proceeding (the "**Chapter 15 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York for the Company to obtain recognition of the Compromise Proceedings as foreign main proceedings under chapter 15 of title 11 of the United States Code and in accordance with the compromise proposal (as read with the supporting explanatory statement and other supporting documents, the "**Compromise Proposal**").

2.   The Financial Restructuring is intended to be implemented in accordance with the terms and conditions contained in the restructuring agreement made between, among others, (i) Holdco, (ii) the Company, (iii) Edcon Acquisitions Proprietary Limited ("**Bidco**"), (iv) Edgars Consolidated Stores Limited ("**ECSL**"), (v) the RCF Lenders (as defined therein), (vi) the Super Senior Secured Liquidity Facility Lenders (as defined therein), (vii) the Super Senior Second Ranking Creditors (as defined therein), (viii) the Senior Secured Creditors (as defined therein), (ix) the Super Senior Third Ranking Creditors (as defined therein), (x) Lucid Issuer Services Limited as information agent, (xi) K2016470295 (South Africa) Proprietary Limited, (xii) K2016470260 (South Africa) Limited ("**New Holdco 1**"), (xiii) K2016470219 (South Africa) Limited ("**New Holdco 2**") and (xiv) certain other entities as set out and defined therein (such agreement, including all of its schedules, the "**Restructuring Agreement**").

3.  The Financial Restructuring is further described in, amongst other things, the steps plan ("**Steps Plan**") (which is schedule 1 to the Restructuring Agreement).  The Steps Plan sets out the various steps ("**Steps**") which need to be taken by the various parties to the Restructuring Agreement.

4.  A copy of the Restructuring Agreement, the Compromise Proposal, the Steps Plan, the Amendment Deed to the Lock-Up Agreement (3 October 2016) and, for the avoidance of doubt, the Implementation Documents (as defined in the Restructuring Agreement) (hereinafter referred to as the "**Relevant Documents**") have been circulated to each of the Directors. By executing this document, each Director acknowledges that he/she has familiarised himself/herself with the Steps of the Financial Restructuring, such Steps which are not repeated here.

5.  The Company may, by entering into and giving effect to the Financial Restructuring as a whole:

    5.1.  provide financial assistance ("**Financial Assistance**") within the meaning of sections 44 and/or 45 of the Companies Act; and

    5.2.  make distributions ("**Distributions**") within the meaning of section 46 of the Companies Act.

6.  The Directors have considered all reasonably foreseeable financial circumstances of the Company so as to satisfy themselves of the solvency and liquidity of the Company immediately after providing the Financial Assistance or the Distributions, as the case may be, in accordance with sections 4, 44, 45 and 46 of the Companies Act, for purposes of which the Directors have considered the following information, namely:

    6.1.  the most recent financial statements of the Company, which financial statements satisfy the requirements of section 29 of the Companies Act;

    6.2.  the most recent accounting records of the Company, which accounting records satisfy the requirements of section 28 of the Companies Act; and

    6.3.  the fair value of the Company's assets and liabilities, including any reasonably foreseeable contingent assets and liabilities.

7.  The sole shareholder of the Company has or will adopt a special resolution ("**Financial Assistance Special Resolution**") providing the Company with the authority to provide the Financial Assistance, subject to compliance with the requirements of the Company's MOI and the Companies Act.

8.  The issue by the Company of shares ("**Issue Shares**") to its sole shareholder, ECSL (hereinafter also referred to as the "**Subscriber**") as contemplated in the applicable Relevant Documents may amount to an issue of shares to a related person as contemplated in section 41(1)(b) of the Companies Act.  The implementation of the applicable Relevant Documents is consequently conditional on the sole shareholder of the Company, being ECSL, approving the issue of the Issue

Shares to the Subscriber by way of a special resolution (the "**Section 41(1) Shareholders Resolution**").

9.    The issue by the Company of the Issue Shares to the Subscriber as contemplated in the applicable Relevant Documents may amount to an issue of shares equal to or in excess of the 30% threshold described in section 41(3) of the Companies Act. The implementation of the applicable Relevant Documents is consequently conditional on the sole shareholder of the Company, namely ECSL, approving the issue of the Issue Shares to the Subscriber by way of a special resolution (the "**Section 41(3) Shareholders Resolution**").

**NOW THEREFORE IT IS RECORDED THAT:**

10.   For purposes of section 75 of the Companies Act, save as disclosed in paragraphs 15 to 13 below, each Director has confirmed that neither he/she nor, to his/her knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the Companies Act) has a personal financial interest in the matters decided in the written resolutions below which he/she is required by section 75 of the Companies Act or the MOI of the Company to disclose, and which prohibits him/her from taking part in the consideration of such matters, other than those matters which have already been disclosed in writing in accordance with section 75(4) of the Companies Act.

11.   Bernard Joseph Brookes, a Director of the Company, has disclosed that certain related parties, being Holdco, ECSL, New Holdco 1, New Holdco 2 and Bidco, each have a personal financial interest in some of the matters to be considered in the resolutions below.

12.   Urin Ferndale, a Director of the Company, has disclosed that a related party, being Holdco, has a personal financial interest some of in the matters to be considered in the resolutions below.

13.   Richard Vaughan, a Director of the Company, has disclosed that certain related parties, being Holdco, Bidco, ECSL, Newshelf 1303 Proprietary Limited, Newshelf 1304 Proprietary Limited, New Holdco 1 and New Holdco 2, each have a personal financial interest in some of the matters to be considered in the resolutions below.

14.   Each of the Directors of the Company have disclosed a personal financial interest in some of the matters to be considered, they wish to resolve to approve the decisions contained herein and detailed below, in accordance with section 75 of the Companies Act, and will disclose the aforementioned interest to its sole shareholder, being ECSL, to approve same by way of ordinary resolution, as is required by section 75 of the Companies Act.

15.   Accordingly, subject to the necessary shareholder approvals being obtained, the Directors wish to authorise the Company to:

4

15.1.   enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring, including the execution of the Relevant Documents;

15.2.   provide the Financial Assistance, in compliance with the requirements of sections 4, 44, and 45 of the Companies Act;

15.3.   make the Distributions, in compliance with the requirements of sections 4 and 46 of the Companies Act;

15.4.   issue the Issue Shares to the Subscriber at adequate consideration, as contemplated in the applicable Relevant Documents, in compliance with the requirements of sections 38(1), 41(1)(b) and 41(3) of the Companies Act, respectively;

15.5.   submit certain shareholder resolutions to ECSL, being the sole shareholder, for approval;

15.6.   authorise and empower any Director to do all such things necessary to sign, enter in and implement the Approved Documents (as defined below);

15.7.   authorise the voluntary winding up of Newshelf 1303 Proprietary Limited (Registration No. 2015/166641/07) ("**Restricted Newco**");

15.8.   authorise the commencement of the Chapter 15 Proceeding; and

15.9.   ratify all actions already taken in relation to the Approved Documents (as defined below).

**IT IS HEREBY RESOLVED THAT:**

**RESOLUTION NUMBER 1:** *Entry into and Performance of Documents*

16.   The Company be and is hereby authorised to:

16.1.   enter into and perform its obligations under any and all agreements and/or documents required, necessary and/or desirable to consummate the Financial Restructuring and the Compromise Proposal (the documents required, necessary and/or desirable to consummate the Financial Restructuring being, amongst other things, the Relevant Documents); and

16.2.   enter into and perform its obligations under any other ancillary documents required, necessary and/or desirable in connection with the consummation of the transactions contemplated by the Relevant Documents, to be concluded by the Company from time to time, on the terms and conditions contained the Relevant Documents,

(collectively, the "**Approved Documents**"), in substantially the same form as the drafts thereof circulated to the Directors simultaneously with these resolutions; and

16.3.   perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

**RESOLUTION NUMBER 2:** *Financial Assistance and Distributions*

<u>Financial Assistance</u>

17.   The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 44(2) of the Companies Act, the Company to provide Financial Assistance to any person arising under, to the extent applicable, any of the Approved Documents, as may be required to give effect to the Financial Restructuring.

18.   In terms of and pursuant to the provisions of section 44(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company and the information referred to in paragraph 6 above, immediately after providing the Financial Assistance as contemplated in paragraph 17 above:

18.1.   the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

18.2.   it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

18.3.   the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

18.4.   all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

19.   The Directors hereby authorise, pursuant to the Financial Assistance Special Resolution and in terms of section 45(2) of the Companies Act, the Company to provide Financial Assistance to any "related or inter-related company" (as that term is contemplated in the Companies Act) of the Company, arising under, to the extent applicable, any of the Approved Documents.

20.   In terms of and pursuant to the provisions of section 45(3)(b) of the Companies Act, the Directors hereby confirm that they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after providing the Financial Assistance:

20.1.   the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company);

6

20.2.   it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of this resolution;

20.3.   the terms under which the Financial Assistance is provided, are fair and reasonable to the Company; and

20.4.   all relevant conditions and restrictions (if any) relating to the granting of Financial Assistance by the Company contained in the MOI of the Company have been satisfied.

21.   Written notice of the Financial Assistance shall be provided to the shareholder(s) of the Company and the relevant trade unions (if required), within the required statutory period.

Distributions

22.   The Directors hereby authorise the Company to make Distributions under, to the extent applicable, any of the Approved Documents.

23.   In terms of and pursuant to the provisions of section 46(1)(c) of the Companies Act, the Directors hereby confirm that they have applied the solvency and liquidity test as set out in section 4 of the Companies Act and they are satisfied that after considering all reasonably foreseeable financial circumstances of the Company, immediately after completing the Distribution contemplated in paragraph 22 above:

23.1.   the assets of the Company (fairly valued) will equal or exceed the liabilities of the Company (fairly valued) (taking into consideration reasonably foreseeable contingent assets and liabilities of the Company); and

23.2.   it appears that the Company will be able to pay its debts as they become due in the ordinary course of business for a period of 12 (twelve) months after the date of the Distribution.

**RESOLUTION NUMBER 3: *Issue of Issue Shares to Subscriber***

24.   Subject to the relevant time as set out in the Restructuring Agreement occurring and the passing of the Section 41(1) Shareholders Resolution and Section 41(3) Shareholders Resolution, the Company be and is hereby authorised, in terms of section 38(1) of the Companies Act, to allot and issue the Issue Shares to the Subscriber in accordance with the terms and conditions contained in the applicable Relevant Documents.

**RESOLUTION NUMBER 4: *Adequate Consideration in respect of the Issue Shares***

25.   The consideration to be paid by the Subscriber to the Company in respect of the subscription for the shares so subscribed for by the Subscriber is adequate consideration, as contemplated in

section 40(1)(a) of the Companies Act, having regard to the Company's assets and liabilities and the terms of the applicable Relevant Document.

**RESOLUTION NUMBER 5:** *Restricted Newco Winding Up*

26.    In order to authorise the voluntary winding up of Restricted Newco as contemplated in section 80(1) of the Companies Act and in the applicable Relevant Document, the Company, in its capacity as the sole shareholder of Restricted Newco, hereby authorises any Director to execute the shareholders resolution to be submitted to it by the board of directors of Restricted Newco for this purpose.

**RESOLUTION NUMBER 6:** *Section 41(1) Shareholders Resolution*

27.    The Company submits, which it hereby does, the Section 41(1) Shareholders Resolution to ECSL, being its sole shareholder, for its consideration and the Directors, acting in what they believe to be the best interests of the Company, hereby propose that ECSL votes in favour of and adopts the Section 41(1) Shareholders Resolution.

**RESOLUTION NUMBER 7:** *Section 41(3) Shareholders Resolution*

28.    The Company submits, which it hereby does, the Section 41(3) Shareholders Resolution to ECSL, being its sole shareholder, for its consideration and the Directors, acting in what they believe to be the best interests of the Company, hereby propose that ECSL votes in favour of and adopts the Section 41(3) Shareholders Resolution.

**RESOLUTION NUMBER 8:** *Authorisation*

29.    Any 1 (one) Director (or her/his duly authorised alternate), from time to time, in her/his capacity as a Director, be and is hereby authorised and empowered to:

    29.1.    negotiate, amend, vary and settle all the terms and conditions of, and sign and enter into:

        29.1.1.    the Approved Documents;

        29.1.2.    any other documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

        29.1.3.    any other documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents,

    provided that no amendments made to the Approved Documents (as contemplated above) will result in a material variation of the terms and conditions of the Approved Documents which have been circulated to the Directors simultaneously with these resolutions and

29.2.   generally do everything reasonably required or necessary for the implementation of the Approved Documents;

30.   The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Financial Restructuring.

31.   Any agreement or document signed by the person(s) referred to in this Resolution Number 8 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**RESOLUTION NUMBER 9: *Chapter 15 Proceeding***

28   The appropriate notices, applications, and filings in connection with the Chapter 15 Proceeding for the Company are hereby authorized and approved.

**RESOLUTION NUMBER 10: *Ratification***

29.   To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred to in Resolution Number 8 above may already have taken in relation to the Approved Documents and any other agreements and documents referred to above.

30.   To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the Company has taken, including, but not limited to the entry by the Company into any and all agreements and/or documents necessary, ancillary, and/or desirable in connection with the Financial Restructuring.

**Counterparts**

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be signed in counterparts.

Name:  Urin Ferndale

Capacity: Director

Date:

Name: Richard Vaughan

Capacity: Director

Date:

**ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF EDCON HOLDINGS LIMITED**

**(FORMERLY EDCON HOLDINGS PROPRIETARY LIMITED) (Registration No. 2006/036903/06)**

**("the Company")**

We, the persons whose names appear below and who have signed this document (or other documents in the same form) are directors of the Company and we hereby resolve that the following resolutions are passed as written resolutions in accordance with the memorandum of incorporation of the Company and section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

The Company wishes to conclude the transactions broadly described in the term sheets attached hereto as **Annexure A** (*Project Ellis: Restructuring Commercial Heads of Terms*) and/or the steps plan attached hereto as **Annexure B** (*Project Ellis: Financial Restructuring Lock-up Agreement steps plan*) and/or the agreement attached hereto as **Annexure C** (*Lock-up Agreement*) (together, the "**Restructuring**").

**NOW THEREFORE IT IS RECORDED THAT:**

For purposes of section 75 of the Companies Act, 2008 (the "**Companies Act**"), each director has confirmed that neither he/she nor, to his/her knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the Companies Act) has a personal financial interest in the matters decided in the written resolutions below which he/she is required by section 75 of the Companies Act or the Memorandum of Incorporation of the Company to disclose, other than those matters which have already been disclosed.

**IT IS HEREBY RESOLVED THAT:**

1.      **RESOLUTION NO. 1: Entry Into and Performance of Documents**

        The board of directors of the Company hereby approves the terms of, and the transactions contemplated by, any and all agreements and/or documents required, necessary and/or desirable to consummate the Restructuring (the "**Relevant Documents**") and the Company be and is hereby authorised to:

        1.1.      enter into, execute, deliver and perform its obligations under the Relevant Documents; and

        1.2.      enter into, execute, deliver and perform its obligations under any other ancillary documents required, necessary and/or desirable in connection with the consummation of the transactions contemplated by the Relevant Documents, to be concluded by the Company from time to time, on the terms and conditions contained the Relevant Documents,

        (collectively, the "**Approved Documents**"); and

1.3.   perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

**IT IS FURTHER RESOLVED THAT:**

2.   **RESOLUTION NO. 2: Authority of Edcon Limited**

The board of directors of the Company hereby authorises and appoints Edcon Limited to act as the agent for and on behalf of the Company in relation to all actions which, if taken by Edcon Limited pursuant to or in connection with the Approved Documents (including the giving of any consent, the making of any determination and the signature of any document), may impact and/or have an effect on the Company ("**Designated Actions**") on the basis that –

2.1.   prior to taking any such Designated Actions, Edcon Limited shall be obliged to consult with and obtain the approval of the board of the Company in relation to such Designated Actions; and

2.2.   once such Designated Actions are approved and taken as aforesaid, would have the effect as if such Designated Actions had been expressly taken by the Company or concurred with it.

**IT IS FURTHER RESOLVED THAT:**

3.   **RESOLUTION NO.3: Authority of the Transaction Committee**

The board of directors of the Company hereby authorises and appoints the committee of the board of directors of the Company known as the "**Transaction Committee**" from time to time to act as the agent for and on behalf of the Company in relation to all Designated Actions which, if taken by the Transaction Committee pursuant to or in connection with the Approved Documents, may impact and/or have an effect on the Company on the basis that –

3.1.   prior to taking any such Designated Actions, the Transaction Committee shall be obliged to consult with and obtain the approval of the board of the Company in relation to such Designated Actions; and

3.2.   once such Designated Actions are approved and taken as aforesaid, would have the effect as if such Designated Actions had been expressly taken by the Company or concurred with it.

**IT IS FURTHER RESOLVED THAT:**

4.    **RESOLUTION NO. 4: Chapter 15**

Charles Vikisi (or any person nominated by him from time to time) be and is hereby authorised and appointed as the foreign representative on behalf of the Company for purposes of Chapter 15 of the United States Bankruptcy Code in relation to the Approved Documents to –

4.1.    sign any and all documents in relation to Chapter 15 of the United States Bankruptcy Code and sign and/or despatch all documents and notices to be signed and/or despatched under or in connection with such documents and any other documents and/or agreements contemplated therein;

4.2.    sign any and all documents and/or agreements amplifying, amending and/or reinstating any of the aforesaid including without limitation negotiating and/or settling the terms of any such documents or agreements amending, replacing and/or reinstating such documents; and

4.3.    generally do everything that may be necessary for and incidental to the implementation of this resolution.'

**IT IS FURTHER RESOLVED THAT:**

5.    **RESOLUTION NO. 5: Authorisation and Delegation**

5.1.    Any 1 (one) director of the Company (or her/his duly authorised alternate or nominee), from time to time, in her/his capacity as director of the Company, be and is hereby authorised and empowered to:

5.1.1.    negotiate, amend, vary and settle all the terms and conditions of, and sign, despatch and/or enter into:

5.1.1.1.    the Approved Documents;

5.1.1.2.    any and all documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

5.1.1.3.    any and all documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents; and

5.1.2.    generally do everything reasonably required or necessary for the implementation of the Approved Documents in each case in such manner or form as that director may in his or her absolute discretion this fit.

5.2.    The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Restructuring.

5.3.    Any agreement or document signed by the person(s) referred to in this paragraph 5 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**IT IS FURTHER RESOLVED THAT:**

6.    **RESOLUTION NO. 6: Ratification**

6.1.    To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred to in paragraph 5 above may already have taken in relation to the Approved Documents and any other agreements and documents referred to above.

6.2.    To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the Company has taken, including, but not limited to the entry by the Company into any and all agreements and/or documents necessary, ancillary, and/or desirable in connection with the Restructuring.

7.    **Counterparts**

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be signed in counterparts and shall become effective once a counterpart has been signed by a majority of the directors of the Company.

*[The remainder of this page intentionally left blank; Signature page follows.]*

**ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF EDCON ACQUISITION**

**PROPRIETARY LIMITED (REGISTRATION NO. 2007/000518/07) (the "Company")**

We, the persons whose names appear below and who have signed this document (or other documents in the same form) are the directors of the Company and we hereby resolve that the following resolutions are passed as written resolutions in accordance with the memorandum of incorporation of the Company and section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

The Company wishes to conclude the transactions broadly described in the term sheets attached hereto as **Annexure A** (*Project Ellis: Restructuring Commercial Heads of Terms*) and/or the steps plan attached hereto as **Annexure B** (*Project Ellis: Financial Restructuring Lock-up Agreement steps plan*) and/or the agreement attached hereto as **Annexure C** (*Lock-up Agreement*) (together, the "**Restructuring**").

**NOW THEREFORE IT IS RECORDED THAT:**

For purposes of section 75 of the Companies Act, each director has confirmed that neither he/she nor, to his/her knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the Companies Act) has a personal financial interest in the matters decided in the written resolutions below which he/she is required by section 75 of the Companies Act or the Memorandum of Incorporation of the Company to disclose, other than those matters which have already been disclosed.

**IT IS HEREBY RESOLVED THAT:**

1.      **RESOLUTION NO. 1: Entry Into and Performance of Documents**

The board of directors of the   Company hereby approves the terms of, and the transactions contemplated by, any and all agreements and/or documents required, necessary and/or desirable to consummate the Restructuring (the "**Relevant Documents**") and the Company  be and is hereby authorised to:

1.1.      enter into, execute, deliver and perform its obligations under the Relevant Documents; and

1.2.      enter into, execute, deliver and perform its obligations under any other ancillary documents required, necessary and/or desirable in connection with the consummation of the transactions contemplated by the Relevant Documents, to be concluded by the Company from time to time, on the terms and conditions contained the Relevant Documents,

(collectively, the "**Approved Documents**"); and

1.3.    perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

**IT IS FURTHER RESOLVED THAT:**

2.    **RESOLUTION NO. 2: Authority of Edcon Limited**

The board of directors of the Company hereby authorises and appoints Edcon Limited to act as the agent for and on behalf of the Company in relation to all actions which, if taken by Edcon Limited pursuant to or in connection with the Approved Documents (including the giving of any consent, the making of any determination and the signature of any document), may impact and/or have an effect on the Company ("**Designated Actions**") on the basis that –

2.1.    prior to taking any such Designated Actions, Edcon Limited shall be obliged to consult with and obtain the approval of the board of the Company and the board of Edcon Holdings Limited, in relation to such Designated Actions; and

2.2.    once such Designated Actions are approved and taken as aforesaid, would have the effect as if such Designated Actions had been expressly taken by the Company or concurred with it.

Nothing in this resolution shall detract from or prevent the board of directors of the Company or the Company from taking any Designated Actions itself.

**IT IS FURTHER RESOLVED THAT:**

3.    **RESOLUTION NO. 3: Transaction Committee**

The board of directors of the Company hereby appoints and constitutes a committee of the board of directors of the Company to be known as the "**Transaction Committee**" consisting of the members of the current Transaction Committee of Edcon Holdings Limited from time to time on the terms, and in accordance with(insofar as is practical), the transaction committee charter attached to this document as **Annexure D** (*Transaction Committee Charter*) (on the basis that all references to Edcon Holdings Limited shall be deemed to be references to the Company) and hereby delegates to the Transaction Committee, the authority of the board of directors of the Company as is set out therein.

**IT IS FURTHER RESOLVED THAT:**

4.    **RESOLUTION NO. 4: Authority of the Transaction Committee**

The board of directors of the Company hereby authorises and appoints the Transaction Committee to act as the agent for and on behalf of the Company in relation to all Designated Actions which, if

taken by the Transaction Committee pursuant to or in connection with the Approved Documents, may impact and/or have an effect on the Company on the basis that –

4.1.    prior to taking any such Designated Actions, the Transaction Committee shall be obliged to consult with and obtain the approval of the board of the Company and the board of Edcon Holdings Limited, in relation to such Designated Actions; and

4.2.    once such Designated Actions are approved and taken as aforesaid, would have the effect as if such Designated Actions had been expressly taken by the Company or concurred with it.

Nothing in this resolution shall detract from or prevent the board of directors of the Company or the Company from taking any Designated Actions itself.

**IT IS FURTHER RESOLVED THAT:**

5.    **RESOLUTION NO. 5: Chapter 15**

Charles Vikisi (or any person nominated by him from time to time) be and is hereby authorised and appointed as the foreign representative on behalf of the Company for purposes of Chapter 15 of the United States Bankruptcy Code in relation to the Approved Documents to –

5.1.    sign any and all documents in relation to Chapter 15 of the United States Bankruptcy Code and sign and/or despatch all documents and notices to be signed and/or despatched under or in connection with such documents and any other documents and/or agreements contemplated therein;

5.2.    sign any and all documents and/or agreements amplifying, amending and/or reinstating any of the aforesaid including without limitation negotiating and/or settling the terms of any such documents or agreements amending, replacing and/or reinstating such documents; and

5.3.    generally do everything that may be necessary for and incidental to the implementation of this resolution.

**IT IS FURTHER RESOLVED THAT:**

6.    **RESOLUTION NO. 6: Authorisation and Delegation**

6.1.    Any 1 (one) director of the Company (or her/his duly authorised alternate or nominee), from time to time, in her/his capacity as director of the Company, be and is hereby authorised and empowered to:

6.1.1.    negotiate, amend, vary and settle all the terms and conditions of, and sign, despatch and/or enter into:

6.1.1.1.    the Approved Documents;

6.1.1.2.    any and all documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

6.1.1.3.    any and all documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents; and

6.1.2.    generally do everything reasonably required or necessary for the implementation of the Approved Documents in each case in such manner or form as that director may in his or her absolute discretion think fit.

6.2.    The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Restructuring.

6.3.    Any agreement or document signed by the person(s) referred to in this paragraph 6 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**IT IS FURTHER RESOLVED THAT:**

7.    **RESOLUTION NO. 7: Ratification**

7.1.    To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred to in paragraph 6 above may already have taken in relation to the Approved Documents and any other agreements and documents referred to above.

7.2.    To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the Company has taken, including, but not limited to the entry by the Company into any and all agreements and/or documents necessary, ancillary, and/or desirable in connection with the Restructuring.

8.    **Counterparts**

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be signed in counterparts and shall become effective once a counterpart has been signed by a majority of the directors of the Company.

*[The remainder of this page intentionally left blank; Signature page follows.]*

**ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF EDGARS CONSOLIDATED
STORES LIMITED (REGISTRATION NO. 1946/022751/06) (the "Company")**

We, the persons whose names appear below and who have signed this document (or other documents in
the same form) are the directors of the Company and we hereby resolve that the following resolutions are
passed as written resolutions in accordance with the memorandum of incorporation of the Company and
section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid
and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

The Company wishes to conclude the transactions broadly described in the term sheets attached hereto as
**Annexure A** (*Project Ellis: Restructuring Commercial Heads of Terms*) and/or the steps plan attached hereto
as **Annexure B** (*Project Ellis: Financial Restructuring Lock-up Agreement steps plan*) and/or the agreement
attached hereto as **Annexure C** (*Lock-up Agreement*) (together, the "**Restructuring**").

**NOW THEREFORE IT IS RECORDED THAT:**

For purposes of section 75 of the Companies Act, each director has confirmed that neither he/she nor, to
his/her knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the
Companies Act) has a personal financial interest in the matters decided in the written resolutions below
which he/she is required by section 75 of the Companies Act or the Memorandum of Incorporation of the
Company to disclose, other than those matters which have already been disclosed.

**IT IS HEREBY RESOLVED THAT:**

1.      **RESOLUTION NO. 1: Entry Into and Performance of Documents**

        The board of directors of the Company hereby approves the terms of, and the transactions
        contemplated by, any and all agreements and/or documents required, necessary and/or desirable to
        consummate the Restructuring (the "**Relevant Documents**") and the Company be and is hereby
        authorised to:

        1.1.    enter into, execute, deliver and perform its obligations under the Relevant Documents; and

        1.2.    enter into, execute, deliver and perform its obligations under any other ancillary documents
                required, necessary and/or desirable in connection with the consummation of the
                transactions contemplated by the Relevant Documents, to be concluded by the Company
                from time to time, on the terms and conditions contained the Relevant Documents,

        (collectively, the "**Approved Documents**"); and

1.3.   perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

**IT IS FURTHER RESOLVED THAT:**

2.   **RESOLUTION NO. 2: Authority of Edcon Limited**

The board of directors of the Company hereby authorises and appoints Edcon Limited to act as the agent for and on behalf of the Company in relation to all actions which, if taken by Edcon Limited pursuant to or in connection with the Approved Documents (including the giving of any consent, the making of any determination and the signature of any document), may impact and/or have an effect on the Company ("**Designated Actions**") on the basis that –

2.1.   prior to taking any such Designated Actions, Edcon Limited shall be obliged to consult with and obtain the approval of the board of the Company and the board of Edcon Holdings Limited, in relation to such Designated Actions; and

2.2.   once such Designated Actions are approved and taken as aforesaid, would have the effect as if such Designated Actions had been expressly taken by the Company or concurred with it.

Nothing in this resolution shall detract from or prevent the board of directors of the Company or the Company from taking any Designated Actions itself.

**IT IS FURTHER RESOLVED THAT:**

3.   **RESOLUTION NO. 3: Transaction Committee**

The board of directors of the Company  hereby appoints and constitutes a committee of the board of directors of the Company to be known as the "**Transaction Committee**" consisting of the members of the current Transaction Committee of Edcon Holdings Limited from time to time on the terms, and in accordance with(insofar as is practical), the transaction committee charter attached to this document as **Annexure D** (*Transaction Committee Charter*) (on the basis that all references to Edcon Holdings Limited shall be deemed to be references to the Company) and hereby delegates to the Transaction Committee , the authority of the board of directors of the Company as is set out therein.

**IT IS FURTHER RESOLVED THAT:**

4.   **RESOLUTION NO. 4: Authority of the Transaction Committee**

The board of directors of the Company hereby authorises and appoints the Transaction Committee to act as the agent for and on behalf of the Company in relation to all Designated Actions which, if

taken by the Transaction Committee pursuant to or in connection with the Approved Documents, may impact and/or have an effect on the Company on the basis that –

4.1.    prior to taking any such Designated Actions, the Transaction Committee shall be obliged to consult with and obtain the approval of the board of the Company and the board of Edcon Holdings Limited, in relation to such Designated Actions; and

4.2.    once such Designated Actions are approved and taken as aforesaid, would have the effect as if such Designated Actions had been expressly taken by the Company or concurred with it.

Nothing in this resolution shall detract from or prevent the board of directors of the Company or the Company from taking any Designated Actions itself.

**IT IS FURTHER RESOLVED THAT:**

5.    **RESOLUTION NO. 5– Chapter 15**

Charles Vikisi (or any person nominated by him from time to time) be and is hereby authorised and appointed as the foreign representative on behalf of the Company for purposes of Chapter 15 of the United States Bankruptcy Code in relation to the Approved Documents to –

5.1.    sign any and all documents in relation to Chapter 15 of the United States Bankruptcy Code and sign and/or despatch all documents and notices to be signed and/or despatched under or in connection with such documents and any other documents and/or agreements contemplated therein;

5.2.    sign any and all documents and/or agreements amplifying, amending and/or reinstating any of the aforesaid including without limitation negotiating and/or settling the terms of any such documents or agreements amending, replacing and/or reinstating such documents; and

5.3.    generally do everything that may be necessary for and incidental to the implementation of this resolution.

**IT IS FURTHER RESOLVED THAT:**

6.    **RESOLUTION NO. 6: Authorisation and Delegation**

6.1.    Any 1 (one) director of the Company (or her/his duly authorised alternate or nominee), from time to time, in her/his capacity as director of the Company, be and is hereby authorised and empowered to:

6.1.1.    negotiate, amend, vary and settle all the terms and conditions of, and sign, despatch and/or enter into:

6.1.1.1.    the Approved Documents;

6.1.1.2.    any and all documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

6.1.1.3.    any and all documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents; and

6.1.2.    generally do everything reasonably required or necessary for the implementation of the Approved Documents in each case in such manner or form as that director may in his or her absolute discretion think fit.

6.2.    The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Restructuring.

6.3.    Any agreement or document signed by the person(s) referred to in this paragraph 6 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**IT IS FURTHER RESOLVED THAT:**

7.    **RESOLUTION NO. 7: Ratification**

7.1.    To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred to in paragraph 6 above may already have taken in relation to the Approved Documents and any other agreements and documents referred to above.

7.2.    To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the Company has taken, including, but not limited to the entry by the Company into any and all agreements and/or documents necessary, ancillary, and/or desirable in connection with the Restructuring.

8.    <u>**Counterparts**</u>

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be signed in counterparts and shall become effective once a counterpart has been signed by a majority of the directors of the Company.

*[The remainder of this page intentionally left blank; Signature page follows.]*

**ROUND ROBIN RESOLUTIONS OF THE BOARD OF DIRECTORS OF EDCON LIMITED**
**(REGISTRATION NO. 2007/003525/06) (the "Company")**

We, the persons whose names appear below and who have signed this document (or other documents in the same form) are the directors of the Company and we hereby resolve that the following resolutions are passed as written resolutions in accordance with the memorandum of incorporation of the Company and section 74 of the Companies Act, 2008 (the "**Companies Act**"), and further agree that they shall be as valid and as effective as if they had been passed at a meeting of directors duly convened, constituted and held.

**WHEREAS:**

The Company wishes to conclude the transactions broadly described in the term sheets attached hereto as **Annexure A** (*Project Ellis: Restructuring Commercial Heads of Terms*) and/or the steps plan attached hereto as **Annexure B** (*Project Ellis: Financial Restructuring Lock-up Agreement steps plan*) and/or the agreement attached hereto as **Annexure C** (*Lock-up Agreement*) (together, the "**Restructuring**").

**NOW THEREFORE IT IS RECORDED THAT:**

For purposes of section 75 of the Companies Act, each director has confirmed that neither he/she nor, to his/her knowledge, any related person (as defined by section 1 read together with section 75(1)(b) of the Companies Act) has a personal financial interest in the matters decided in the written resolutions below which he/she is required by section 75 of the Companies Act or the Memorandum of Incorporation of the Company to disclose, other than those matters which have already been disclosed.

**IT IS HEREBY RESOLVED THAT:**

1.    **RESOLUTION NO. 1: Entry Into and Performance of Documents**

The Company hereby approves the terms of, and the transactions contemplated by, any and all agreements and/or documents required, necessary and/or desirable to consummate the Restructuring (the "**Relevant Documents**") and the Company be and is hereby authorised to:

1.1.    enter into, execute, deliver and perform its obligations under the Relevant Documents; and

1.2.    enter into, execute, deliver and perform its obligations under any other ancillary documents required, necessary and/or desirable in connection with the consummation of the transactions contemplated by the Relevant Documents, to be concluded by the Company from time to time, on the terms and conditions contained the Relevant Documents,

(collectively, the "**Approved Documents**"); and

1.3.    perform any other required, appropriate or desirable actions and formalities in connection with the Approved Documents.

**IT IS FURTHER RESOLVED THAT:**

2.    **RESOLUTION NO. 2: Acceptance as Agent**

The board of directors of the Company be appointed, and hereby accepts appointment, to act as the agent of Edcon Holdings Limited, Edcon Acquisitions Proprietary Limited and Edgars Consolidated Stores Limited on the terms more fully set out in each of such entities' board resolutions passed contemporaneously with this board resolution.

**IT IS FURTHER RESOLVED THAT:**

3.    **RESOLUTION NO. 3: Transaction Committee**

The board of directors of the Company hereby appoints and constitutes a committee of the board of directors of the Company to be known as the "**Transaction Committee**" consisting of the members of the current Transaction Committee of Edcon Holdings Limited from time to time on the terms, and in accordance with (insofar as is practical), the transaction committee charter attached to this document as **Annexure D** (*Transaction Committee Charter*) (on the basis that all references to Edcon Holdings Limited shall be deemed to be references to the Company) and hereby delegates to such committee, the authority of the board of directors of the Company as is set out therein.

**IT IS FURTHER RESOLVED THAT:**

4.    **RESOLUTION NO. 4: Authority of the Transaction Committee**

The board of directors of the Company hereby authorises and appoints the Transaction Committee to act as the agent for and on behalf of the Company in relation to all actions which, if taken by the Transaction Committee pursuant to or in connection with the Approved Documents, may impact and/or have an effect on the Company ("**Designated Actions**") on the basis that –

4.1.    prior to taking any such Designated Actions, the Transaction Committee shall be obliged to consult with and obtain the approval of the board of the Company and the board of Edcon Holdings Limited, in relation to such Designated Actions; and

4.2.    once such Designated Actions are approved and taken as aforesaid, would have the effect as if such Designated Actions had been expressly taken by the Company or concurred with it.

Nothing in this resolution shall detract from or prevent the board of directors of the Company or the Company from taking any Designated Actions itself.

**IT IS FURTHER RESOLVED THAT:**

5.    **RESOLUTION NO. 5:  Chapter 15**

Charles Vikisi (or any person nominated by him from time to time) be and is hereby authorised and appointed as the foreign representative on behalf of the Company for purposes of Chapter 15 of the United States Bankruptcy Code in relation to the Approved Documents to –

5.1.    sign any and all documents in relation to Chapter 15 of the United States Bankruptcy Code and sign and/or despatch all documents and notices to be signed and/or despatched under or in connection with such documents and any other documents and/or agreements contemplated therein;

5.2.    sign any and all documents and/or agreements amplifying, amending and/or reinstating any of the aforesaid including without limitation negotiating and/or settling the terms of any such documents or agreements amending, replacing and/or reinstating such documents; and

5.3.    generally do everything that may be necessary for and incidental to the implementation of this resolution.

**IT IS FURTHER RESOLVED THAT:**

6.    **RESOLUTION NO. 6: Authorisation and Delegation**

6.1.    Any 1 (one) director of the Company (or her/his duly authorised alternate or nominee), from time to time, in her/his capacity as director of the Company, be and is hereby authorised and empowered to:

6.1.1.    negotiate, amend, vary and settle all the terms and conditions of, and sign, despatch and/or enter into:

6.1.1.1.    the Approved Documents;

6.1.1.2.    any and all documents or powers of attorney which may be necessary for the implementation of the Approved Documents;

6.1.1.3.    any and all documents and notices to be signed and/or despatched by/or on behalf of the Company under or in connection with the Approved Documents; and

6.1.2.    generally do everything reasonably required or necessary for the implementation of the Approved Documents in each case in such manner or form as that director may in his or her absolute discretion think fit.

6.2.    The Company is authorised to appoint any person(s) to act as its agent in connection with any of the Approved Documents, to the extent necessary, required and/or desirable in order to consummate the Restructuring.

6.3.    Any agreement or document signed by the person(s) referred to in this paragraph 6 and purporting to act under authority of these resolutions shall conclusively be deemed against the Company to be the agreement or document authorised in terms hereof and to have been entered into and signed pursuant hereto.

**IT IS FURTHER RESOLVED THAT:**

7.    **RESOLUTION NO. 7: Ratification**

7.1.    To the extent necessary, the Company hereby ratifies all or any actions which the person(s) referred to in paragraph 6 above may already have taken in relation to the Approved Documents and any other agreements and documents referred to above.

7.2.    To the extent necessary, the board of directors of the Company hereby ratifies, all actions which the Company has taken, including, but not limited to the entry by the Company into any and all agreements and/or documents necessary, ancillary, and/or desirable in connection with the Restructuring.

8.    **Counterparts**

Notwithstanding that no meeting of the Company may have been held, these round robin resolutions may be signed in counterparts and shall become effective once a counterpart has been signed by a majority of the directors of the Company.

*[The remainder of this page intentionally left blank; Signature page follows.]*